ACCEPTED
15-25-00109-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
6/23/2025 5:08 PM
CHRISTOPHER A. PRINE
CLERK

No. \_\_\_-\_\_\_-_____-**CV**

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
6/23/2025 5:08:40 PM
CHRISTOPHER A. PRINE
Clerk

## IN THE FIFTEENTH COURT OF APPEALS
## AUSTIN, TEXAS

IN RE STORABLE, INC.; REDNOVA LABS, INC. (D/B/A STOREDGE);
SITELINK SOFTWARE, LLC; EASY STORAGE SOLUTIONS, LLC; BADER
CO.; AND PROPERTY FIRST GROUP, LP

*Relators.*

Relating to Trial Court Cause No. 25-BC03A-0001
In the Third Division of the Texas Business Court

## SWORN MANDAMUS RECORD

Dale Wainwright
State Bar No. 00000049
dale.wainwright@gtlaw.com
Justin Bernstein
State Bar No. 24105462
justin.bernstein@gtlaw.com
GREENBERG TRAURIG, LLP
300 West 6th Street
Suite 2050
Austin, Texas 78701
T: (512) 320-7200
F: (512) 320-7210

COUNSEL FOR RELATORS

# INDEX TO SWORN MANDAMUS RECORD

| Exhibit | Description | Date | Pages |
|---|---|---|---|
| 1 | Docket Sheet | N/A | 008-046 |
| 2 | Plaintiff's Verified Second Amended Petition and Application for A Temporary Restraining Order, Temporary Injunction, and Permanent Injunction | 01/28/2025 | 047-083 |
| 3 | Reporter's Record Volume 4 of 7 Volumes from Appeal No. 15-25-00020-CV (excerpt) | 02/13/2025 | 084-092 |
| 4 | Reporter's Record Volume 5 of 7 Volumes from Appeal No. 15-25-00020-CV (excerpt) | 02/14/2025 | 093-102 |
| 5 | Notice of Appeal | 02/25/2025 | 103-107 |
| 6 | Agreed Protective Order and Temporary Sealing Order | 02/27/2025 | 108-119 |
| 7 | Storable's Motion to Modify Protective Order/ Require Disclosure and Request for Expedited Consideration | 04/04/2025 | 120-135 |
| 8 | Exhibits A-J of Storable's Motion to Modify Protective Order/ Require Disclosure and Request for Expedited Consideration | 04/04/2025 | 136-181 |
| 9 | Plaintiff's Response to Motion to Modify Protective Order and Require Disclosure | 04/11/2025 | 182-224 |
| 10 | Order Denying Motion to Modify Protective Order | 04/15/2025 | 225-227 |
| 11 | Defendants' Objections and Responses to Plaintiff SafeLease Insurance Services, LLC's First Merits Request for Production | 04/21/2025 | 228-245 |

| 12 | Defendants' Amended Answer, Affirmative Defenses, Response in Opposition to Plaintiff's Application for Temporary Injunction, and Counterclaims | 05/05/2025 | 246-276 |
|---|---|---|---|
| 13 | Lockelaw PLLC's Letter to the Court | 05/16/2025 | 277-280 |
| 14 | Supplement to Plaintiff's Verified Second Amended Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction | 05/22/2025 | 281-284 |
| 15 | Arnold & Porter's Response Letter to Lockelaw PLLC's Letter to the Court | 05/23/2025 | 285-289 |
| 16 | Discovery Order [referred to as the Production Order in the petition for writ of mandamus] | 05/28/2025 | 290-295 |
| 17 | Defendants' Motion for Partial Summary Judgment on SafeLease's Attempted Monopolization Claim | 06/02/2025 | 296-326 |
| 18 | Declaration of Katherine Ginzburg Treistman in Support of Defendants' Motion for Partial Summary Judgment on SafeLease's Attempted Monopolization Claim | 06/02/2025 | 327-694 |
| 19 | Storable's Emergency Motion for a Partial Stay of the June 13, 2025 Court-Ordered Production Deadline | 06/06/2025 | 695-704 |
| 20 | Storable's Motion for Reconsideration of the Court's April 15, 2025 Order Denying Modification of the Protective Order | 06/06/2025 | 705-793 |
| 21 | Storable's Motion for Partial Reconsideration of the May 28, 2025 Discovery Order (including declaration and exhibit to declaration) | 06/09/2025 | 794-862 |

| 22 | Notices of Written Submission and Briefing Schedules | 06/10/2025 | 863-864 |
|---|---|---|---|
| 23 | Plaintiff's Opposition to Defendants' Motion for Partial Stay of Production Deadline | 06/12/2025 | 865-960 |
| 24 | Storable's Reply in Support of Emergency Motion for a Partial Stay of the June 13, 2025 Court-Ordered Production Deadline | 06/12/2025 | 961-966 |
| 25 | Order Partially Granting Emergency Stay and Additional Relief | 06/12/2025 | 967-968 |
| 26 | Plaintiff's Response to Motion for Reconsideration of Order Denying Modification of Protective Order | 06/16/2025 | 969-985 |
| 27 | Storable's Motion for Extension of Stay and Reply Deadline | 06/17/2025 | 986-996 |
| 28 | Plaintiff's Response to Motion for Partial Reconsideration of May 28, 2025 Discovery Order | 06/19/2025 | 997-1042 |
| 29 | Notice of Submission | 06/20/2025 | 1043-1045 |
| 30 | Storable's Reply in Support of its Motion for Partial Reconsideration of the May 28, 2025 Discovery Order | 06/23/2025 | 1046-1070 |
| 31 | Plaintiff's Response to Motion for Extension of Stay | 06/23/2025 | 1071-1075 |
| 32 | Orders on Motions for Reconsideration; Other Relief | 06/23/2025 | 1076-1079 |

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a copy of the foregoing document was served on counsel of record by using the Court's CM/ECF system on the 23rd day of June 2025, addressed as follows:

STONE HILTON PLLC

Judd E. Stone II
State Bar No. 2407670
judd@stonehilton.com
Christopher D. Hilton
State Bar No. 24087727
600 Congress Ave.,
Austin, Texas 78701
T: (737) 465-7248

YETTER COLEMAN LLP

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Susanna R. Allen
State Bar No. 24126616
sallen@yettercoleman.com
Luke A. Schamel
State Bar No. 24106403
lschamel@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
811 Main Street, Suite 4100
Houston, Texas 77002
T: (713) 632-8000

*COUNSEL FOR REAL PARTY*

I also certify that a copy of the foregoing document was served by email on Respondent on the 23rd day of June 2025, addressed as follows:

Honorable Melissa Andrews
Third Division of the Texas Business Court
Herman Marion Sweatt Courthouse
Courtroom 421
1000 Guadalupe St.
Austin, Texas 78701
BCDivision3A@txcourts.gov

*/s/ Dale Wainwright*
Dale Wainwright

# VERIFICATION

Before me, the undersigned authority, on this day personally appeared Dale Wainwright, who acknowledged that he is counsel for Relators and that the documents contained in the Sworn Mandamus Record are true and correct copies.

Signed this the 23rd day of June, 2025.

_Dale Wainwright_
Dale Wainwright

Sworn and subscribed to before me on the 23rd day of June, 2025.



Sylvia Dominguez
My Commission Expires
11/18/2028
Notary ID131673410

_Sylvia Dominguez_
Notary Public

https://research.txcourts.gov/CourtRecordsSearch/ViewCasePrint/7c3dd6b992cc448397adba060cc864e6    **008**

## Case Information

SafeLease Insurance Services LLC vs. Storable, Inc.,RedNova Labs, Inc.,SiteLink Software, LLC,Easy Storage Solutions, LLC,Bader Co.,Property First Group, LP

25-BC03A-0001

Location
Business Court 3a

Case Category
Civil - Other Civil

Case Type
Tortious Interference

Case Filed Date
1/29/2025

Judge
Andrews, Melissa Davis

Case Status
Open (Active)

## Parties 7

| Type | Name | Nickname/Alias | Attorneys |
|---|---|---|---|
| Plaintiff | SafeLease Insurance Services LLC | | Adam Locke, Alexander Dvorscak, Christopher Hilton, Julia Risley, Luke Schamel, Mr Judd Stone, II, Mr R. Paul Yetter, Shannon Smith, Susanna Allen |
| Appellant | Storable, Inc. | | Andrew Bergman, John Holler, Justice Dale Wainwright, Lakshmi Kumar, Mikaila Skaroff, Mr Neil Kenton Alexander, JR, Ms Elizabeth Eoff, Ms Jonna Summers, Ms Katherine G. Treistman, Ray Torgerson |
| Appellant | RedNova Labs, Inc. | | Andrew Bergman, John Holler, Justice Dale Wainwright, Lakshmi Kumar, Mikaila Skaroff, Mr Neil Kenton Alexander, JR, Ms Elizabeth Eoff, Ms Jonna Summers, Ms Katherine G. Treistman, Ray Torgerson |
| Appellant | SiteLink Software, LLC | | Andrew Bergman, John Holler, Justice Dale Wainwright, Lakshmi Kumar, Mikaila Skaroff, Mr Neil Kenton Alexander, JR, Ms Elizabeth Eoff, Ms Jonna Summers, Ms Katherine G. Treistman, Ray Torgerson |
| Appellant | Easy Storage Solutions, LLC | | Andrew Bergman, John Holler, Justice Dale Wainwright, Lakshmi Kumar, Mikaila Skaroff, Mr Neil Kenton Alexander, JR, Ms Elizabeth Eoff, Ms Jonna Summers, Ms Katherine G. Treistman, Ray Torgerson |
| Appellant | Bader Co. | | Andrew Bergman, John Holler, Justice Dale Wainwright, Justin Bernstein, Lakshmi Kumar, Mikaila Skaroff, Mr Neil Kenton Alexander, JR, Ms Elizabeth Eoff, Ms Jonna Summers, Ms Katherine G. Treistman, Ray Torgerson |
| Appellant | Property First Group, LP | | Andrew Bergman, John Holler, Justice Dale Wainwright, Justin Bernstein, Lakshmi Kumar, Mikaila Skaroff, Mr Neil Kenton Alexander, JR, Ms Elizabeth Eoff, Ms Jonna Summers, Ms Katherine G. Treistman, Ray Torgerson |

## Hearings 11

| Date/Time | Hearing Type | Judge | Location | Result |
|---|---|---|---|---|
| 2/11/2025 09:00 AM | Temporary Injunction Hearing | Andrews, Melissa Davis | Heman Marion Sweatt Courthouse - Hearing Room 421 | Held |

**009**

| Date/Time | Hearing Type | Judge | Location | Result |
|---|---|---|---|---|
| 2/13/2025 09:00 AM | Temporary Injunction Hearing | Andrews, Melissa Davis | Heman Marion Sweatt Courthouse - Hearing Room 421 | Held |
| 2/14/2025 09:00 AM | Temporary Injunction Hearing | Andrews, Melissa Davis | Heman Marion Sweatt Courthouse - Hearing Room 421 | Held |
| 2/18/2025 02:00 PM | Temporary Injunction Hearing | Andrews, Melissa Davis | Virtual/Video Hearing | Held |
| 3/13/2025 09:00 AM | Scheduling Conference | Andrews, Melissa Davis | Virtual/Video Hearing | Held |
| 4/10/2025 10:00 AM | Other Hearing | Andrews, Melissa Davis | Virtual/Video Hearing | |
| 6/2/2025 10:00 AM | Other Hearing | Andrews, Melissa Davis | Virtual/Video Hearing | Held |
| 7/1/2025 09:00 AM | Motion for Summary Judgment | Andrews, Melissa Davis | Heman Marion Sweatt Courthouse - Hearing Room 421 | |
| 6/12/2026 09:00 AM | Pre-Trial Conference | Andrews, Melissa Davis | | |
| 6/23/2026 09:00 AM | Pre-Trial Hearing | Andrews, Melissa Davis | | |
| 6/30/2026 09:00 AM | Bench Trial | Andrews, Melissa Davis | Heman Marion Sweatt Courthouse - Hearing Room 421 | |

## Events 207

| Date | Event | Type | Comments | Documents |
|---|---|---|---|---|
| 1/29/2025 | Filing | Case Information Sheet | | Business Court Case Information Sheet.pdf |
| 1/29/2025 | Filing | Transfer (County Use Only) | Exhibit A - Appendix & Travis County Records | Exhibit A - Appendix & Travis County Records.pdf |
| 1/29/2025 | Filing | Notice of Removal to Business Court | Notice of Removal To Business Court | Notice of Removal To Business Court.pdf |
| 1/29/2025 | Filing | New Cases Filed (OCA) | | *No Documents* (i) |
| 1/30/2025 | Filing | Application | Plaintiff's Emergency Application For Temporary Restraining Order, Temporary Injunction, and In The Alternative, Motion For Recondsideration | Plaintiff's Emergency Application For Temporary Restraining Order, Temporary Injunction, and In The.pdf |
| 1/30/2025 | Filing | Protective Order | Proposed Temporary Restraining Order and Order Setting Hearing For Temporary Injunction | Proposed Temporary Restraining Order and Order Setting Hearing For Temporary Injunction.pdf |
| 1/30/2025 | Filing | Appearance of Counsel | | Notice of Appearance.pdf |
| 1/30/2025 | Filing | Notice of Hearing | Notice of Hearing - TRO | Notice of Hearing - TRO.pdf |
| 1/30/2025 | Filing | Objection | Defendants' Objection to Removal and Request for Hearing | Defs' Obj to Removal and Request for Hearing.pdf, Ex. A - Email Ruling.pdf |
| 1/30/2025 | Filing | Protective Order | Proposed Temporary Restraining Order and Order Setting Hearing for Temporary Injunction | Proposed Temporary Restraining Order and Order Setting Hearing for Temporary Injunction.pdf |
| 1/31/2025 | Filing | Protective Order | Proposed Order Denying Plaintiff's Emergency Application for Temporary Restraining Order | Proposed Order Denying Application for Emg TRO.pdf, Transmittal Letter to Business Court and Proposed Order Attached.pdf |
| 1/31/2025 | Filing | Objection | Defendants' Objections to Plaintiff's January 30 Proposed Order | Defendants' Objections to January 30 Proposed Order.pdf |
| 1/31/2025 | Filing | Notice of Hearing | | Notice of Hearing.pdf |
| 1/31/2025 | Filing | Order | Order Denying Application for Temporary Restraining Order | Order Denying Application for Temporary Restraining Order.pdf |

**010**

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 1/31/2025 | Filing | Motions - All Other | Defendants' Motion to Remand | Motion to Remand.pdf, Proposed Order Granting Motion To Remand.pdf |
| 1/31/2025 | Filing | Notice of Hearing | Notice of Hearing on Motion to Remand | Notice of Hearing on Motion to Remand.pdf |
| 2/3/2025 | Filing | Letter from Attorney | Court Welcome Letter | Welcome Letter.pdf |
| 2/3/2025 | Filing | Certificate of Court Reporter | Appointment of Deputy Official Court Reporter and Statement | Appointment of Deputy Court Reporter and Statement.pdf |
| 2/4/2025 | Filing | Motions - All Other | Plaintiff's Emergency Motion for Expedited Discovery and Entry of Discovery Control Plan | Plaintiff's Emergency Motion For Expedited Discovery & Entry of Discovery Control Plan.pdf |
| 2/4/2025 | Filing | Order | Order Setting Briefing Schedule and Hearing | Order Setting Briefing Schedule and Hearing on Motion to Remand.pdf |
| 2/4/2025 | Filing | Notice of Court Proceeding | | Notice of Court Order.pdf |
| 2/4/2025 | Filing | Order | Expedited Discovery Order | Expedited Discovery Order.pdf |
| 2/7/2025 | Filing | Protective Order | Proposed Order Denying Motion to Remand | Proposed Order Denying Motion to Remand.pdf |
| 2/7/2025 | Filing | Answer/Response | Plaintiff's Opposition to Defendants' Motion to Remand | Plaintiff's Opposition to Defendants' Motion to Remand.pdf |
| 2/10/2025 | Filing | Witness List | Plaintiff's Witness List | Plaintiff's Witness List for TI Hearing (Incl Expert Discl) - REDACTED.pdf |
| 2/10/2025 | Filing | Brief | Plaintiff's Hearing Brief On Texas Antitrust Law | Plaintiff's Hearing Brief on Texas Antitrust Law.pdf |
| 2/10/2025 | Filing | Answer/Response | Defendants' Reply Supporting Motion to Remand | Defendants' Reply Supporting Motion to Remand.pdf |
| 2/10/2025 | Filing | Brief | Plaintiff's Hearing Brief on Reconsideration | Plaintiff's Hearing Brief on Reconsideration.pdf |
| 2/10/2025 | Filing | Answer/Response | Plaintiff's Original Answer and Special Exceptions to Defendants' Counterclaims | Plaintiff's Answer and Special Exceptions to Defendants' Counterclaims.pdf |
| 2/10/2025 | Filing | Letter from Attorney | Plaintiff's Discovery Letter | Plaintiff's Discovery Letter.pdf |
| 2/10/2025 | Filing | Opinion | Order & Opinion Denying Motion to Remand | Order & Opinion Denying Defendants' Motion to Remand.pdf |
| 2/10/2025 | Filing | Notice of Court Proceeding | | Notice of Court Order.pdf |
| 2/10/2025 | Filing | Letter from Attorney | Response to Discovery Letter to Court | Ex. A - 2025-02-07 Plaintiff's Response to Def..pdf, Ex. B - 2025-01-12 Plaintiff's Objections to D.pdf, Response to Discovery Letter.pdf |
| 2/11/2025 | Hearing | Temporary Injunction Hearing | - | - |
| 2/11/2025 | Filing | Letter from Attorney | Plaintiff's Discovery Response Letter | Plaintiff's Discovery Response Letter.pdf |
| 2/13/2025 | Hearing | Temporary Injunction Hearing | - | - |
| 2/13/2025 | Filing | Certificate of Court Reporter | Appointment of Deputy Official Court Reporter and Statement | Appointment of Court Reporter Form.pdf |
| 2/14/2025 | Hearing | Temporary Injunction Hearing | - | - |
| 2/14/2025 | Filing | Notice of Hearing | Notice of Hearing | Notice of Hearing - TI Closing Arguments.pdf |

**011**

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 2/18/2025 | Filing | Brief | Defendants' Bench Brief on the Court's Authority to Compel Parties to Enter into Contract, Set Price Terms, and Permit Free-Riding | Defendants' Bench Brief on the Court's Authority.pdf |
| 2/18/2025 | Filing | Brief | Requested Bench Brief | Requested Bench Brief.pdf |
| 2/18/2025 | Filing | Brief | Plaintiff's Post-Hearing Brief on Legal Issues | Plaintiff's Post-Hearig Breif.pdf |
| 2/18/2025 | Filing | Motions - All Other | Motion to Exclude or Disregard Opinions of Dr. Williams on the Ground that they are Unreliable and Constitute No Evidence | Motion to Exclude or Disregard Opinions of Dr. Williams On The Ground That They Are Unreliable & Con.pdf |
| 2/18/2025 | Filing | Protective Order | API Access Proposed TI Order | Proposed TI Order.pdf |
| 2/18/2025 | Filing | Protective Order | AU Access Proposed TI Order | Proposed TI Order.pdf |
| 2/18/2025 | Filing | Protective Order | Order Denying Plaintiff's Application for Temporary Injunction | Proposed Order Denying Plaintiff's Application.pdf |
| 2/18/2025 | Hearing | Temporary Injunction Hearing | - | - |
| 2/19/2025 | Filing | Protective Order | Proposed Order Granting Temporary Injunction | Propopsed Order Granting Temporary Injunction.pdf |
| 2/19/2025 | Filing | ISCOI | Order Granting Temporary Injunction | Order Granting Plaintiff's Application for Temporary Injunction.pdf |
| 2/20/2025 | Filing | Bond | Cash Bond | Cash Bond Form.pdf |
| 2/20/2025 | Filing | Protective Order | Proposed Agreed Protective Order | 2025-02-20 Agreed Protective Order_Business Court.pdf |
| 2/21/2025 | Service | Writ | - | - |
| 2/21/2025 | Filing | Writ of Injunction | Storable, Inc. | Writ of Temporary Injunction.pdf |
| 2/21/2025 | Filing | Letter from Attorney | Letter to Court Regarding Bond | Letter to Ct re Bond.pdf |
| 2/21/2025 | Filing | Motions - All Other | Objections to temporary injunction order and motion to reconsider | 2025-02-21 Objections to temporary injunction order and motion to reconsider.pdf |
| 2/21/2025 | Filing | Protective Order | Proposed Order Granting Defendants' Motion To Exclude and Reconsider | Proposed Order Granting Motion To Reconsider.pdf |
| 2/24/2025 | Filing | Answer/Response | Plaintiff's Response to Motion to Reconsider TI Order with Proposed Order attached | Plaintiff's Resp. to Mot. to Reconsider TI Order.pdf, Proposed Order Denying Mot. to Reconsider TI Order.pdf |
| 2/25/2025 | Filing | Notice | Defs Notice of Submission | 2025-02-25 Notice of Submission.pdf |
| 2/25/2025 | Filing | Notice of Appeal | Defendants' Notice of Appeal | 2025-02-25 Notice of Appeal.pdf |
| 2/25/2025 | Filing | Request | Request for Reporter's Record - D. Goree | 2025-02-25 Request for Reporter's Record D. Goree.pdf |
| 2/25/2025 | Filing | Request | Request for Reporter's Record - K.Kidd | 2025-02-25 Request for Reporter's Record K. Kidd.pdf |
| 2/25/2025 | Filing | Request | Defs' Request for Clerk's Records | 2025-02-25 Request for Clerk's Record.pdf |
| 2/26/2025 | Filing | Request | Request for Reporter's Record L. Schnoor | 2025-02-26 Request for Reporter's Record L. Schnoor.pdf |
| 2/27/2025 | Filing | Correspondence - Received | From 15th Court of Appeals | Correspondence From 15th Court of Appeals.pdf |

**012**

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 2/27/2025 | Filing | Notice of Hearing | Notice of Hearing - Sealing Motion | Notice of Hearing - Sealing.pdf |
| 2/27/2025 | Filing | Notice of Hearing | Notice of Scheduling Conference | Notice of Scheduling Conference.pdf |
| 2/27/2025 | Filing | Order | Agreed Protective Order & Temporary Sealing Order | Agreed Protective Order and Temporary Sealing Order.pdf |
| 2/27/2025 | Filing | Request | Request for Reporter's Record J. Simon | Request for Reporter's Record J. Simon.pdf |
| 2/27/2025 | Filing | Notice of Court Proceeding | e Service Reciept | Notice of Court Proceeding.pdf |
| 2/28/2025 | Filing | Correspondence - Sent | Invoice - Cost of Preparation of Clerk's Record | Invoice.pdf |
| 2/28/2025 | Filing | Letter from Attorney | Payment for Clerk's Record $1003.00 | Clerk's Record Invoice.pdf |
| 3/3/2025 | Filing | Request | Designation of Reporter's Records | Designation of Reporter's Records.pdf |
| 3/4/2025 | Filing | Correspondence - Received | From 15th Court of Appeals re: Court Reporter's Extension | Correspondence - Received.pdf |
| 3/5/2025 | Filing | Ody - Motion - Dismiss | Plaintiff's Corporate Disclosure Statement | Plaintiff's Corporate Disclosure Statement.pdf |
| 3/5/2025 | Filing | Protective Order | Proposed Scheduling Order | 2025.03.05 - Proposed Sch. Order (Final).pdf |
| 3/5/2025 | Filing | Ody - Motion - Dismiss | Defendants' Corporate Disclosure Statement | Defendants' Corporate Disclosure Statement.pdf |
| 3/6/2025 | Filing | Notice of Hearing | Amended Notice of Hearing - Sealing Motion | Amended Notice of Hearing Sealing.pdf |
| 3/6/2025 | Filing | Notice of Court Proceeding | EService Receipt | Notice of Court Proceeding.pdf |
| 3/7/2025 | Filing | Appearance of Counsel | Notice of Attorney Appearance by Katherine G. Treistman and Andrew D. Bergman for Defendants Storable, Inc., RedNova Labs, Inc. d/b/a StorEDGE, Sitelink Software, LLC, Easy Storage Solutions, LLC, Bader Co., and Property First Group, LP | Notice of Appearance by Katherine G. Treistman and Andrew D. Bergman.pdf |
| 3/7/2025 | Filing | Order | Amended Temporary Sealing Order | Amended Temporary Sealing Order.pdf |
| 3/7/2025 | Filing | Answer/Response | Supplement to Plaintiff's Response to Objections to Injunction and Motion to Reconsider | 2025-03-07 25-BC03A-0001 Plaintiff's Supp. Resp. to Mtn to Reconsider TI Order.pdf, Exhibit A - 2025.02.27 - Storable Defends Platform Integrity.pdf |
| 3/10/2025 | Filing | Correspondence - Received | From 15th Court of Appeals re: Clerk's Record Filed | Letter From 15th Court of Appeals re: Clerk's Record Filed.pdf |
| 3/10/2025 | Filing | Notice of Court Proceeding | Receipt Eserve Temp Sealing Order | Eserve Temp Sealing Order.pdf |
| 3/10/2025 | Filing | Answer/Response | Storables Reply Supporting Objections to Temporary Injunction Order, Motion to Rule On Exclusion of Opinions of Dr. Williams, and Motion to Reconsider Based on Objections and Exclusion | Reply supporting objections to temporary injunction order and motion to reconsider.pdf |
| 3/11/2025 | Filing | Order | Order on Post-TI Motions | Order on Post-TI Motions.pdf |

**013**

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 3/11/2025 | Filing | ISCOI | Amended Order Granting Temporary Injunction | Amended Order Granting Temporary Injunction.pdf |
| 3/11/2025 | Filing | Notice of Court Proceeding | Eserve Receipt of Order on Post TI Motions | Notice of Court Proceeding.pdf |
| 3/11/2025 | Filing | Notice of Court Proceeding | Eserve Receipt for Amended TI Order | Notice of Court Proceeding.pdf |
| 3/11/2025 | Filing | Motion | Defendant's Motion for Clarification | Defendant's Motion for Clarification.pdf |
| 3/12/2025 | Filing | Protective Order | Defendant's Motion for Clarification | Proposed Order Granting Defendants' Motion for Clarification.pdf |
| 3/12/2025 | Filing | Notice | Notice of Hearing By Submission on Motion for Clarification | Notice of Hearing By Submission on Motion for Clarification.pdf |
| 3/12/2025 | Filing | Notice | Notice of Submission - Motion for Clarification | Notice of Submission - Motion for Clarification.pdf |
| 3/13/2025 | Hearing | Scheduling Conference | - | - |
| 3/13/2025 | Filing | Notice of Court Proceeding | Eserve Receipt of Notice of Written Submissions | Notice of Court Proceeding- Eserve Notice of Submission.pdf |
| 3/13/2025 | Filing | Notice | Amended Notice of Submission | Amended Notice of Submission.pdf |
| 3/13/2025 | Filing | Notice of Court Proceeding | Eserve Amended Notice of Submission | Notice of Court Proceeding-Eserve Amended Notice of Submission.pdf |
| 3/14/2025 | Filing | Special/Other | Scheduling Order | Scheduling Order.pdf |
| 3/14/2025 | Filing | Protective Order | Proposed ESI Protocol Order | 2025-03-14 Proposed ESI Protocol Order.pdf |
| 3/19/2025 | Filing | Answer/Response | Plaintiff's Response to Motion for Clarification | Plaintiff's Response to Motion to Clarify TI Order.pdf |
| 3/19/2025 | Filing | Motion | Plaintiff's Motion to Release Cash Bond and Substitute with Surety Bond | Plaintiff's Motion to Release and Substitute Bond.pdf, Proposed Order Releasing and Substituting Bond.pdf |
| 3/19/2025 | Filing | Bond | SafeLease Surety Bond | Surety Bond - SafeLease.pdf |
| 3/20/2025 | Filing | Notice | Notice of Written Submission - Motion to Release | Notice of Submission - Motion to Release.pdf |
| 3/24/2025 | Filing | Answer/Response | Storable's Reply in Support of Motion for Claification | Storable's Reply in Support of Motion for Clarification.pdf |
| 3/24/2025 | Filing | Order | Order on Motion for Clarification | Order on Motion for Clarification.pdf |
| 3/24/2025 | Filing | Appearance of Counsel | Notice of Appearance of Adam T. Locke for Plaintiff SafeLease Insurance Services LLC | Notice of Appearance of Adam T. Locke for Plaintiff SafeLease Insurance Services LLC.pdf |
| 3/25/2025 | Filing | Answer/Response | Storable's Response in Opposition to Plaintiff's Motion to Release Cash Bond and Substitute with Surety Bond | Storable's Response in Opposition to Plaintiff's Motion to Release Cash Bond.pdf |
| 3/25/2025 | Filing | Letter from Attorney | Letter re Protective Order & Sealed Records + Ex. A | Letter re Protective Order & Sealed Records + Ex. A.pdf |
| 3/25/2025 | Filing | Exhibit List | Receipt of Exhibits | Receipt of Exhibits.pdf |
| 3/25/2025 | Filing | Motions - All Other | Plaintiff's Unopposed Motion for Permanent Sealing Order | 2025-03-25 Motion for Perm Seal (final).pdf, 2025-03-25 Proposed Order Perm. Seal.pdf |
| 3/26/2025 | Filing | Protective Order | Proposed Permanent Sealing Order | Proposed Permanent Sealing Order.pdf |

**014**

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 3/26/2025 | Filing | Notice of Hearing | Public Notice of Hearing on Plaintiff's Unopposed Motion for Permanent Sealing Order | 2025-03-26 Public Notice Hearing on Perm Seal.pdf |
| 3/26/2025 | Filing | Protective Order | Denying Plaintiff's Motion to Release Cash Bond and Substitute with Surety Bond | Proposed Order Denying Plaintiff's Motion to Release Cash Bond and Substitute with Surety Bond.pdf |
| 3/26/2025 | Filing | Motion | Defendants' Rule 76A Motion to Seal Court Records | Defendants' Rule 76A Motion to Seal Court Reco.pdf, Proposed Order.pdf |
| 3/26/2025 | Filing | Notice of Appeal | Amended Notice of Appeal by Storable | Amended Notice of Appeal by Storable.pdf |
| 3/26/2025 | Filing | Notice | Notice of Rule 76A Motion to Seal Court Records | Notice of Rule 76A Motion to Seal Court Record.pdf |
| 3/27/2025 | Filing | Request | Defendant's Request for Preparation of First Supplemental Clerk's Record | Defendant's Request for Preparation of First Supplemental Clerk's Record.pdf |
| 3/27/2025 | Filing | Return of Service | Verified Public Notice of Hearing | Verified Public Notice Hearing on Perm Seal.pdf |
| 3/27/2025 | Filing | Service Return | Officer's Return of Service of Notice of Rule 76A Motion to Seal Court Records | Officer's Return of Service of Notice of Rule.pdf |
| 3/27/2025 | Filing | Notice | 2025-03-27 Verified Public Notice of Hearing (Mtn to Seal) | 2025-03-27 Verified Public Notice Hearing on Perm Seal.pdf |
| 3/27/2025 | Filing | Answer/Response | Plaintiff's Reply in Support of its Motion to Release Cash Bond and Sub with Surety Bond | Plaintiff's Reply in Support of its Motion to Release Cash Bond and Sub with Surety Bond.pdf |
| 3/28/2025 | Filing | Motion | Storable's Unopposed Motion for Leave to File a Sur-Reply | Proposed Order Granting Storable's Motion for Leave to File Sur-Reply.pdf, Storable's Sur-Reply in Opposition to Plaintiff's Motion to Release Cash Bond.pdf, Storable's Unopposed Motion for Leave to File a Sur-Reply.pdf |
| 3/28/2025 | Filing | Correspondence - Received | Payment for Supplemental Clerk's Record $181.00 | Invoice - Supplemental Clerks Record.pdf |
| 3/28/2025 | Filing | Protective Order | Proposed Order Granting Unopposed Motion for Leave to File a Sur-Reply | Proposed Order Granting Storable's Motion for Leave to File Sur-Reply.pdf |
| 3/31/2025 | Filing | Correspondence - Received | From 15th Court of Appeals - Supplemental Clerk's Record Filed | Notice From 15th Court of Appeals - Supplemental Clerk's Record Filed.pdf |
| 3/31/2025 | Filing | Order | Denying Motion to Substitute Bond | Order Denying Motion to Substitute Bond.pdf |
| 4/3/2025 | Filing | Motion | Mikaila Skaroff's Unopposed Motion for Pro Hac Vice Admission and Proposed Order | Mikaila Skaroff's Unopposed Motion for Pro Hac Vice Admission.pdf, Proposed Order Granting Unopposed Motion of Mikaila Skaroff to Appear Pro Hac Vice.pdf |
| 4/3/2025 | Filing | Motion | Motion of Katherine G. Treistman Requesting Admission of Mikaila Skaroff to Appear Pro Hac Vice | Motion of Katherine G. Treistman Requesting Admission of Mikaila Skaroff to Appear Pro Hac Vice.pdf |
| 4/3/2025 | Filing | Order | Order Granting Motion to Appear Pro Hac Vice-Signed | Order Granting Skaroff PHV Motion.pdf |

**O15**

| Date | Event | Type | Comments | Documents |
|---|---|---|---|---|
| 4/3/2025 | Filing | Answer/Response | Response in Opposition to Defendants' Motion to Seal | 2025.04.03 Response in Opposition to Defendants' Motion to Seal_Redacted.pdf, 2025-04-03 Proposed Order Partially Denying Sealing.pdf |
| 4/4/2025 | Filing | Protective Order | Proposed Order Partially Denying Sealing | Proposed Order Partially Denying Sealing.pdf |
| 4/4/2025 | Filing | MODIFY | Storable's Motion to Modify Protective Order - Require Disclosure and Request for Expedited Consideration | 2025-04-04 Proposed Order Granting Storable's Motion to Modify Protective Order.pdf, EX A - Excerpt of Feb. 11, 2025 TI Transcript.pdf, EX B - Excerpt of Jan. 16, 2025 TI Hearing.pdf, EX C - SafeLease Press Release re Adam Locke (Jul. 20, 2022).pdf, EX D - Agreed Protective Order and Temporary Sealing Order (Feb. 27, 2025).pdf, EX E - 2025-04-04 A. Bergman Declaration (Signed).pdf, EX F - 2025-03-25 - K. Treistman Letter to P. Yetter.pdf, EX G - A. Locke Letter to K. Treistman (Mar. 26, 2025).pdf, EX H - A. Locke Email to K. Treistman (Mar. 28, 2025)_Redacted.pdf, EX I - 2025-03-31 - K. Treistman Letter to A. Locke.pdf, EX J - A. Locke Letter to K. Treistman (Apr. 2, 2025).pdf, Storable's Motion to Modify Protective Order.pdf |
| 4/7/2025 | Filing | PO | Granting Storable's Motion to Modify Protective Order Require Disclosure and Request for Expedited Consideration | Granting Storable's Motion to Modify Protective Order Require Disclosure and Request for Expedited C.pdf |
| 4/7/2025 | Filing | NOT | Notice of Written Submission on Storable's Motion to Modify Protective Order - Require Disclosure and Request for Expedited Consideration | 2025-04-07 Notice of Written Submission on Storable's Motion to Modify Protective Order.pdf |
| 4/7/2025 | Filing | NOT | Court's Notice of Submission - Motion to Modify | Court's Notice of Submission - Motion to Modify with Briefing Deadlines.pdf |
| 4/7/2025 | Filing | M | Plaintiff's Unopposed Revised Motion to Release Cash Bond and Substitute with Surety Bond | Plaintiff's Unopposed Revised Motion to Release Cash Bond and Substitute with Surety Bond.pdf, Proposed Order Releasing and Substituting Bond.pdf |
| 4/7/2025 | Filing | ORD | Order Granting Motion to Release Cash Bond and Substitute with Surety Bond | Order Granting Motion to Release Cash Bond.pdf |
| 4/7/2025 | Filing | BOND | Temporary Injunction Bond | 2025.04.03 - Bond.pdf |
| 4/9/2025 | Filing | ACR | Storable's First Supplement to Its Rule 76A Motion to Seal Court Records | Ex. B Revised.pdf, Ex. C Slipsheet.pdf, Ex. D Slipsheet.pdf, Ex. E Slipsheet.pdf, Ex. F Slipsheet.pdf, Ex. G Declaration of Neil Verma.pdf, Proposed Permanent Sealing Order.pdf, Storable's First Supplement to Its Rule 76A Motion to Seal Court Records.pdf |
| 4/10/2025 | Hearing | Other Hearing | - | - |
| 4/11/2025 | Filing | ACR | Plaintiff's Response to Motion to Modify Protective Order and Require Disclosure | 2025-04-11 Proposed Order Denying Motion to Modify PO.pdf, Plaintiff's Response to Motion to Modify Protective Order and Require Disclosure.pdf |
| 4/11/2025 | Filing | PO | Proposed Order Denying Defendants' Motion to Modify the Protective Order and to Require Disclosure | Proposed Order Denying Defendants' Motion to Modify the Protective Order and to Require Disclosure.pdf |
| 4/14/2025 | Filing | ORD | Permanent Sealing Order-Signed | Permanent Sealing Order-Signed.pdf |

**016**

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 4/14/2025 | Filing | ACR | Storable's Reply in Support of Its Motion to Modify Protective Order and to Require Disclosure | Exhibit K.pdf, Exhibit L - Excerpt of P's Second Merits RFPs.pdf, Second Proposed Order Granting Storable's Motion to Modify PO (Apr. 14, 2025).pdf, Storable's Reply in Support of Its Motion to Modify Protective Order and to Require Disclosure.pdf |
| 4/15/2025 | Filing | ORD | Order Denying Motion to Modify Protective Order | Order Denying Motion to Modify Protective Order.pdf |
| 4/21/2025 | Filing | REQ | Plaintiff's Request to Supplement Clerk's Record | Plaintiff's Request to Supplement Clerk's Record.pdf |
| 4/23/2025 | Filing | REQ | Corrected Request to Supplement Reporter's Record | Corrected Request to Supplement Reporter's Record.pdf |
| 5/5/2025 | Filing | AMEND | Defendants' Amended Answer, Affirmative Defenses, Response in Opposition to Plaintiff's Application for Temporary Injunction, and Counterclaims | Defendants' Amended Answer, Affirmative Defenses, Response in Opposition.pdf |
| 5/9/2025 | Filing | MOTAO | Defendants' Unopposed Rule 76a Motion to Seal Portions of Apr. 10 Transcript | Defendants' Unopposed Rule 76a Motion to Seal Portions of Apr. 10 Transcript.pdf, Ex. A - List of Transcript Excerpts.pdf, Ex. B (Temp. Seal COVER SHEET ONLY).pdf, Ex. C - NV Declaration.pdf, Ex. D - Copy of StorEDGE TOS.pdf, Proposed Permanent Sealing Order.pdf |
| 5/12/2025 | Filing | VL | Vacation Letter for Ms. Treistman | Vacation Letter for Ms. Treistman.pdf |
| 5/12/2025 | Filing | M | Plaintiff's Motion for Access to Sealed Reporter's Record and Proposed Order | Plaintiff's Motion for Access to Sealed Reporter's Record.pdf, Proposed order granting access to record.pdf |
| 5/14/2025 | Filing | ORD | Order Granting Motion for Access | Order Granting Motion for Access.pdf |
| 5/16/2025 | Filing | LTR | Letter Summarizing Discovery Dispute Under Local Rule 4(d) | Letter Summarizing Discovery Dispute Under Local Rule 4(d).pdf |
| 5/20/2025 | Filing | RETS | Public Notice of Hearing on Defendants' Unopposed Rule 76a Motion to Seal | Return of Service Public Notice of Hearing on Defendants' Unopposed Rule 76a Motion to Seal.pdf |
| 5/22/2025 | Filing | AMEND | Supplement to Plaintiff's Verified Second Amended Petition and Application for TRO, TI and PI | Supplement to Plaintiff's Verified Second Amended Petition and Application for TRO, TI and PI.pdf |
| 5/23/2025 | Filing | ACR | Storable's Response to SafeLease's Discovery Dispute Letter | Storable's Response to SafeLease's Discovery Dispute Letter (May 23, 2025).pdf |
| 5/28/2025 | Filing | CORR-R | Correspondence Letter from 15th Court of Appeals | Correspondence From 15th Court of Appeals.pdf |
| 5/28/2025 | Filing | ORD | Discovery Order | Discovery Order.pdf |
| 5/29/2025 | Filing | NOT | Plaintiff's Notice to Defendants of Subpoena to EQT | Plaintiff's Notice to Defendants of Subpoena to EQT.pdf |
| 5/29/2025 | Filing | NOT | Plaintiff's Notice to Defendants of Subpoena to Cove Hill | Plaintiff's Notice to Defendants of Subpoena to Cove Hill.pdf |
| 5/29/2025 | Filing | MOTAO | Motion of Katherine G. Treistman Requesting Admission of John Holler to Appear Pro Hac Vice | Motion of Katherine G. Treistman Requesting Admission of John Holler to Appear Pro Hac Vice.pdf |

**017**

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 5/29/2025 | Filing | MOTAO | John Holler's Unopposed Motion for Pro Hac Vice Admission | John Holler's Unopposed Motion for Pro Hac Vice Admission.pdf, Proposed Order Granting Unopposed Motion of John Holler to Appear Pro Hac Vice.pdf |
| 5/29/2025 | Filing | RETS | Re: Notice of Intent To Seek Production of Documents From Non-Party Subpoena on EQT IX GP LLC | Return of Service of Notice of Intent To Seek Production of Documents From Non-Party Subpoena on EQT.pdf |
| 5/30/2025 | Filing | RETS | Re: Notice of Intent To Seek Production of Documents From Non-Party Subpoena to Cove Hill Partners L.P. | Re: Notice of Intent To Seek Production of Documents From Non-Party Subpoena to Cove Hill Partners L.pdf |
| 5/30/2025 | Filing | AOC | Notice of Appearance Julia Risley | Notice of Appearance Julia Risley.pdf |
| 6/2/2025 | Hearing | Other Hearing | - | - |
| 6/2/2025 | Filing | ORD | Sealing Order | Permanent Sealing Order.pdf |
| 6/2/2025 | Filing | ORD | Order Granting John Holler's Unopposed Motion to Appear Pro Hac Vice | Order Granting John Holler's Unopposed Motion to Appear Pro Hac Vice.pdf |
| 6/2/2025 | Filing | ATCH | Part 2 of 2 of Declaration of Katherine Ginzburg Treistman in Support of Defendants' Motion for Partial Summary Judgment | Part 2 of 2 of Declaration of Katherine Ginzburg Treistman in Support of Defendants' Motion for Part.pdf |
| 6/2/2025 | Filing | PO | Proposed Order Granting Defendants Motion for Partial Summary Judgment on SafeLeases Attempted Monopolization Claim | Proposed Order Granting Defendants Motion for Partial Summary Judgment on SafeLeases Attempted Monop.pdf |
| 6/2/2025 | Filing | M | Defendants' Motion for Partial Summary Judgment on SafeLease's Attempted Monopolization Claim | Defendants' Motion for Partial Summary Judgment on SafeLease's Attempted Monopolization Claim.pdf, Part 1 of 2 of Declaration of Katherine Ginzburg Treistman in Support.pdf |
| 6/5/2025 | Filing | NOH | Notice of Hearing - Motion for Partial Summary Judgment | Notice of Hearing - Motion for Partial Summary Judgment.pdf |
| 6/6/2025 | Filing | M | Storable's Unopposed Motion for a Temporary Sealing Order | Storable's Unopposed Motion for a Temporary Sealing Order.pdf |
| 6/6/2025 | Filing | PO | Proposed Order Granting Storable's Unopposed Motion for a Temporary Sealing Order | Proposed Order Granting Storable's Unopposed Motion for a Temporary Sealing Order.pdf |
| 6/6/2025 | Filing | M | Storable's Emergency Motion for a Partial Stay of the June 13, 2025 Court-Ordered Production Deadline | Storable's Emergency Motion for a Partial Stay of the June 13, 2025 Court-Ordered Production Deadlin.pdf |
| 6/6/2025 | Filing | PO | Proposed Order Granting Storable's Emergency Motion for a Partial Stay | Proposed Order Granting Defendants' Emergency Motion for a Partial Stay.pdf |
| 6/6/2025 | Filing | M | Storable's Motion for Reconsideration of the Court's April 15, 2025 Order Denying Modification of the Protective Order | Storable's Motion for Reconsideration of the Court's April 15, 2025 Order Denying Modification of th.pdf |

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 6/6/2025 | Filing | PO | Proposed Order Granting Storable's Motion for Reconsideration of the Court's April 15, 2025 Order Denying Modification of the Protective Order | Proposed Order Granting Storable's Motion for Reconsideration of the Court's April 15, 2025 Order.pdf |
| 6/9/2025 | Filing | ORD | Order Granting Temporary Sealing Motion | Order Granting Temporary Sealing Motion.pdf |
| 6/9/2025 | Filing | M | Storable's Motion for Partial Reconsideration of the May 28, 2025 Discovery Order | Storable's Motion for Partial Reconsideration of the May 28, 2025 Discovery Order.pdf |
| 6/9/2025 | Filing | PO | Proposed Order Granting Storable's Motion for Partial Reconsideration of the May 28, 2025 Discovery Order | Proposed Order Granting Storable's Motion for Partial Reconsideration.pdf |
| 6/10/2025 | Filing | OTH | RETURN OF SERVICE | P336508_001.pdf |
| 6/10/2025 | Filing | NOT | Notice of Written Submission and Briefing Deadlines | Notice of Written Submission and Briefing Deadlines.pdf |
| 6/10/2025 | Filing | CLRKREC | Second Supplemental Clerk's Record | 2nd Supplemental Clerk's Record.pdf |
| 6/11/2025 | Filing | CORR-R | From 15th Court of Appeals | Correspondence - Received.pdf |
| 6/11/2025 | Filing | RETS | Return of Service for Subpoena, exhibit a, B, witness fee for Cove Hill Partners L.P | Return of Service for Subpoena, exhibit a, B, witness fee for Cove Hill Partners L.P.pdf |
| 6/11/2025 | Filing | CORR-R | From 15th Court of Appeals | Correspondence - Received From 15th Court of Appeals.pdf |
| 6/12/2025 | Filing | PO | Proposed Order Denying Motion to Stay | 2025-06-12 Proposed Order Denying Motion to Stay.pdf |
| 6/12/2025 | Filing | ACR | SafeLease Opposition to Defendants' Motion for partial stay of Production deadline | 2025.06.12 - SafeLease Response to Motion to Stay Discovery Order -.pdf |
| 6/12/2025 | Filing | ORD | Order Partially granting Emergency Saty and additional Relief | Order Partially granting Emergency Saty and additional Relief.pdf |
| 6/12/2025 | Filing | ACR | Storables Reply in Support of Emergency Motion for a Partial Stay of the June 13, 2025 Court-Ordered Production Deadline | Defs' Reply re Stay Motion DRAFT(254344243.1).pdf |
| 6/16/2025 | Filing | ACR | SafeLease Response to Motion to Reconsider April 15 Order | SafeLease Response to Motion to Reconsider April 15 Order.pdf |
| 6/16/2025 | Filing | PO | Proposed Order Denying Motion to Reconsider Order Denying Modification of PO | 2025-06-16 Proposed Order Denying Motion to Reconsider Order Denying Modification of PO.pdf |
| 6/17/2025 | Filing | PO | Proposed Order Granting Defendants' Motion for Extension of Stay and MSJ Reply Deadline | Proposed Order Granting Storable's Motion for Extension.pdf |
| 6/17/2025 | Filing | M | Defendants' Motion for Extension of Stay and MSJ Reply Deadline | Defendants' Motion for Extension of Stay and MSJ Reply Deadline.pdf |

**019**

| Date | Event | Type | Comments | Documents |
|------|-------|------|----------|-----------|
| 6/18/2025 | Filing | ORD | Order Granting in Part Motion for Extension | Order Granting in Part Motion for Extension.pdf |
| 6/19/2025 | Filing | ACR | Storable's Reply in Support of its Motion for Reconsideration of the Court's April 15, 2025 Order Denying Modification of the Protective Order | Storable's Reply in Support of its Motion for Reconsideration of the Court's April 15, 2025 Order.pdf |
| 6/19/2025 | Filing | PO | Proposed Order Denying Motion to Reconsider Discovery Order | 2025-06-19 Proposed Order Denying Motion to Reconsider Discovery Order.pdf |
| 6/19/2025 | Filing | ACR | SafeLease Response to Motion for Partial Reconsideration of May 28 Order | SafeLease Response to Motion for Partial Reconsideration of May 28 Order.pdf |
| 6/20/2025 | Filing | NOT | Notice of Submission - Motion for Extension of Stay | Notice of Submission - Motion for Extension of Stay.pdf |
| 6/23/2025 | Filing | ACR | Storable's Reply in Support of its Motion for Partial Reconsideration of the May 28, 2025 Discovery Order | 2025-06-23 Defs' Reply re MFR of Discovery Order.pdf |
| 6/23/2025 | Filing | PO | Proposed Order Denying Motion for Extension of Stay | 2025-06-23 Proposed Order Denying Motion for Extension of Stay.pdf |
| 6/23/2025 | Filing | ACR | Plaintiff's Response to Motion for Extension of Stay | Plaintiff's Response to Motion for Extension of Stay.pdf |
| 6/23/2025 | Filing | OTH | Order on Motions to Reconsider | Order on Motions to Reconsider.pdf |
| 7/1/2025 | Hearing | Motion for Summary Judgment | - | - |
| 6/12/2026 | Hearing | Pre-Trial Conference | - | - |
| 6/23/2026 | Hearing | Pre-Trial Hearing | - | - |
| 6/30/2026 | Hearing | Bench Trial | - | - |

© 2025 Tyler Technologies, Inc. | All Rights Reserved

Version: 2025.2.92.1249



**This page intentionally left blank.**

This page intentionally left blank.

This page intentionally left blank.

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

**This page intentionally left blank.**

This page intentionally left blank.

**This page intentionally left blank.**

**This page intentionally left blank.**

This page intentionally left blank.

**This page intentionally left blank.**

This page intentionally left blank.

This page intentionally left blank.

This page intentionally left blank.

**This page intentionally left blank.**

**This page intentionally left blank.**

This page intentionally left blank.

This page intentionally left blank.

**This page intentionally left blank.**

This page intentionally left blank.

This page intentionally left blank.

This page intentionally left blank.

1/28/2025 10:59 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-24-010233
Victoria Benavides

No. D-1-GN-24-010233

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § | |
| v. | § § | TRAVIS COUNTY, TEXAS |
| STORABLE, INC., et al., | § § | |
| Defendants. | § § | 345TH JUDICIAL DISTRICT |

**PLAINTIFF'S VERIFIED SECOND AMENDED PETITION AND APPLICATION FOR A TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION**

Plaintiff SafeLease Insurance Services LLC ("SafeLease") files this Second Amended Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction against defendants Storable, Inc.; RedNova Labs, Inc.; SiteLink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP.

**NATURE OF THE CASE**

1.      This action is necessary to prevent a monopoly software provider from using its market power to cripple a low-price competitor in this State in a related market for insurance.

2.      Founded and based in this County since 2021, plaintiff SafeLease is a startup that offers low-cost insurance plans through self-storage facilities to protect people who store goods at those facilities. SafeLease's plans cover tenants at facilities in Texas and elsewhere throughout the United States. Most self-storage companies rely on third-party vendors like SafeLease for these products. With better prices and service, SafeLease has seen steady growth and an enthusiastic response from customers.

3.      To administer its policies, SafeLease is required to access the facility management software systems of self-storage facility operator partners. Operators rely on facility management software to run virtually all aspects of their day-to-day operations. Operators give their advance

permission to SafeLease to secure access to their software systems and agree to provide, through these software systems, the information SafeLease needs to administer policies.

4. Defendants are affiliated companies that also offer products and services to the self-storage industry, including facility management software. In fact, with products marketed as storEDGE, SiteLink, and Easy Storage Solutions, defendants have a dominant role in the market for facility management software. Their market share in the relevant market likely exceeds 75%. Given the central role of these systems to operations of self-storage facilities, defendants' power over mission-critical software provides them with considerable control and influence across the self-storage industry.

5. Relatedly, defendants offer insurance plans that compete directly with products and services of SafeLease. Defendants aggressively have grown their share of the tenant insurance market through acquisitions of industry leaders. Despite defendants' efforts to consolidate the tenant insurance market, SafeLease has made considerable inroads, winning customers from defendants with its competitive products. Witnessing SafeLease's potential and rapid rise, Storable has made overtures to buy SafeLease for years and as recently as late 2024.

6. On December 17, 2024, defendants abruptly went on the attack. They blocked SafeLease's "authorized user" access to defendants' storEDGE system, a widely used facility management software, for which customers specifically designate SafeLease as an authorized user. In so doing, defendants cut off SafeLease's ability to access critical data to properly service its tenant insurance plans and administer policies for customers covering thousands of storage units. This action was both sudden and unprompted, as SafeLease has been an authorized user to access customer accounts for years with defendants' full knowledge.

7.     Notably, these impacted customers are *joint* customers, as they use defendants' storEDGE system as well as SafeLease's insurance products. In January 2025, over 44,000 self-storage units were scheduled to commence or renew coverage under SafeLease insurance plans. Countless more units would incur claims on existing plans that need to be serviced. SafeLease would be unable to properly service the several thousands of these new or renewed customers and claims on storEDGE systems without access to its customers' storEDGE systems.

8.     Making matters worse, defendants began taking steps to cut off SafeLease's access to other facility management software products, SiteLink and Easy Storage Solutions. This would impact hundreds of thousands of additional tenants. These actions are unwarranted, threaten the viability of SafeLease's business, interfere with current and future contracts with customers, and put innocent self-storage operators and tenants at imminent risk of substantial and needless harm.

9.     In short, defendants were using dominance in one market (facility management software) to get power over another market (tenant insurance). Their actions were calculated to cripple SafeLease and force customers to switch to defendants' higher-cost, competing insurance products. This was blatant monopoly leveraging, not legitimate competition.

10.     To protect its customers and business, SafeLease filed suit on December 30, 2024, requesting a temporary restraining order, as well as temporary and permanent injunctions, to prevent irreparable harm from defendants' conduct. The Court granted SafeLease's request for a temporary restraining order on December 31. Defendants restored SafeLease's access to their facility management software less than an hour after the TRO became effective. The Court then denied defendants' request to dissolve the TRO and extended the TRO through January 21, 2025.

11. For the three weeks the TRO was effective, SafeLease again was able to service the parties' mutual customers without interruption. However, on January 21, 2025, the day the TRO expired, the Court denied SafeLease's request for a temporary injunction.

12. Defendants wasted no time in resuming and amplifying their attack. In just hours, they cut off SafeLease's access not only to storEDGE but also SiteLink and Easy Storage Solutions. The scope of the blocking is massive and exceeds even what SafeLease feared prior to entry of the TRO. Defendants have singled out and targeted SafeLease. Its access has been completely severed, and its customers have no way to grant SafeLease access to the customers' own critical data in the software. As a result, SafeLease is unable to fully and timely service its customers that use defendants' facility management software products. This affects over 275,000 tenants at facilities with SafeLease insurance coverage.

13. These new attacks are proof positive of defendants' anticompetitive scheme to cut off a competitor and to avoid competition on the merits for tenant insurance, ensure higher insurance prices, and eliminate or buy out the only discount insurance competitor in the industry. Unless restrained, defendants will cause substantial, irreparable harm to self-storage operators and tenants in this State and to SafeLease, which has no choice but to seek injunctive relief from the Court.

### DISCOVERY CONTROL PLAN

14. SafeLease intends that this case be conducted under a Level 3 Discovery Control Plain in accordance with TEX. R. CIV. P. 190.4.

### PARTIES

15. Plaintiff SafeLease Insurance Services LLC is a Texas limited liability company with its principal place of business in this County at 800 Brazos Street, Suite 320, Austin, Texas

-4-

78701. It provides insurance plans to protect tenants and operators of independent self-storage facilities.

16. Defendant Storable, Inc. is a Delaware corporation with its principal place of business in this County at 11000 N. Mopac Expressway, #300, Austin, Texas 78759. It has appeared and answered. It is a supplier of products and services to the self-storage industry and the corporate parent, directly or indirectly, of the other defendants.

17. Defendant RedNova Labs, Inc. is a Texas foreign for-profit corporation with its principal place of business in this County at 10900 Research Blvd., Suite 160C, Austin, Texas 78759. It has appeared and answered. It is a subsidiary of Storable, Inc.

18. Defendant SiteLink Software, LLC is a North Carolina limited liability company with its principal place of business in this County at 10900 Research Blvd., Suite 160C, Austin, Texas 78759. It has appeared and answered. It is a subsidiary of Storable, Inc.

19. Defendant Easy Storage Solutions, LLC is a Utah limited liability company with its principal place of business in this County at 10900 Research Blvd., Suite 160C, Austin, Texas 78759. It has appeared and answered. It is a subsidiary of Storable, Inc.

20. Defendant Bader Co. is an Indiana corporation with a principal place of business in Indiana. It has appeared and answered. It is a subsidiary of Storable, Inc.

21. Defendant Property First Group, LP is a Pennsylvania limited partnership with its principal place of business in Pennsylvania. It has appeared and answered. It is a subsidiary of Storable, Inc.

22. Defendants RedNova, SiteLink, Easy Storage Solutions, Bader, and Property First are commonly and centrally owned and controlled by Storable, Inc., their parent company. Their

activities are coordinated together by or with Storable, Inc. As such, defendants are a single business enterprise controlled by Storable, Inc., from Austin, Texas.

<div align="center">JURISDICTION AND VENUE</div>

23.     Jurisdiction and venue are proper in this Court pursuant to the Texas Constitution, Art. 5, Sec. 8 and TEX. BUS. & COM. CODE § 15.21 and § 15.26. Defendants do substantial business in this County and State.

24.     This case could not be filed in and is not removable to federal court. There is no diversity of citizenship between the parties, and no federal claim is raised in this petition. *See Am. Airlines, Inc. vs. Sabre Inc.*, 694 F.3d 539, 543 (5th Cir. 2013).

<div align="center">RELEVANT BACKGROUND</div>

**A.     Self-Storage Industry**

25.     There are an estimated 52,301 self-storage facilities in the U.S. *See* SpareFoot, *U.S. Self-Storage Indus. Stats.* (Oct. 10, 2024), https://www.sparefoot.com/blog/self-storage-industry-statistics/. The industry is largely made up of operators that own/run facilities that lease storage space to businesses and individuals on a temporary basis, usually month-to-month. The industry is valued at $44.3 billion, and it is anticipated to reach nearly $50 billion by 2029. *Id*. According to the Self Storage Association, 11.1% of U.S. households currently rent a self-storage unit—some 14.6 million households. *See The Self-Storage Almanac 2024*, Sec. 1, https://digital.modernstorage media.com/almanac/self-storage-almanac-2024db/.

26.     Self-storage is big business in Texas. This State has the most self-storage facilities of any state in the country. In 2023, there were 5,564 total storage facilities in Texas, representing more than 10% of all facilities in the nation. *Id.* (Table 1.4). The amount of rentable self-storage

space in Texas is 256 million square feet. This is one of the highest square feet of rentable space per capita, at 8.70, compared to a national average of 6.32. *Id.* (Table 1.3).

27.     Some self-storage space in the U.S. is owned by large public companies. Four of these companies are real estate investment trusts: Extra Space, Public Storage, CubeSmart, and National Storage Affiliates Trust. The fifth is U-Haul, also a public company. Together, these companies operate 22.5% of self-storage facilities, representing 37.6% of self-storage space by rentable square footage. *Id.* at Sec. 2. Most or all of these companies have their own insurance programs and proprietary management software.

28.     Most self-storage facilities and square footage are owned and operated by small- and medium-sized businesses or individuals. These independent owners represent 77.5% of self-storage facilities and 62.4% of all rentable square feet. *Id*. Many of these businesses are mom-and-pop shops. *Id.* (Chart 2.1). Independent facility owners rely on third-party vendors for their facility management software and tenant insurance plans.

### i.  Facility Management Software

29.     Independent self-storage facilities rely on third-party software to run the day-to-day operations of their businesses. Facility owners subscribe to facility management software, sometimes referred to as FMS, which allows them to track and manage their storage units. This software facilitates core services, such as tracking tenant data, allowing for billings, managing communications, generating financial reports, and servicing tenant insurance policies.

30.     Facility management software is an essential tool for owners and their vendors. It is common in the industry for owners to permit vendors to access their facility management software to provide the vendor's services. These services range from onsite management to remote financial services. For example, owners routinely authorize facility management software access

for an on-site manager (who may run front-of-house) and for access control systems (which operate gate codes). It is also essential for vendors that offer remote or administrative services. For example, an owner may authorize a third-party call center to access its facility management software to follow sales leads or address customer inquiries. Similarly, owners may authorize a bill collection agency to access their facility management software to collect payment data and follow up on delinquent payments. This software is designed to facilitate many services in one place for owner management.

31.     Defendants are the largest supplier of facility management software systems to independent self-storage facilities. They offer three such systems: storEDGE, SiteLink, and Easy Storage Solutions. Defendants rolled up the companies that offered these systems under common ownership from 2018-20. *See* SpareFoot, *Tech Firms Combine Under Storable Brand Name To Serve Self-Storage Indus.* (Apr. 29, 2024), https://www.sparefoot.com/blog/tech-firms-combine-storable-brand-name-serve-self-storage-industry/; Inside Self Storage, *Storable Acquires Self-Storage Software Provider Easy Storage Solutions* (June 5, 2020), https://www.insideselfstorage.com/software/storable-acquires-self-storage-software-provider-easy-storage-solutions.

32.     According to industry statistics, defendants control some 75% of the U.S. market for facility management software systems for independent self-storage facilities.

33.     According to defendants, "more than half of every single storage facility in the United States" uses their facility management software. *2023 State of the Self-Storage Indus.*, https://www.storable.com/resources/learn/unpacked-webinar-2023-state-of-the-self-storage-industry/. The numbers are even starker considering that the only storage facilities that use third-party facility management software are independent facilities. Some 40,500 facilities in the U.S. are independent self-storage facilities. *See The Self-Storage Almanac 2024*, Sec. 2 (independent

owners represent 77.5% of self-storage facilities). And nearly 32,000 self-storage facilities used defendants' facility management software systems as of 2023. *See 2023 State of the Self-Storage Indus., supra*. Today, defendants advertise that 36,000 self-storage facilities "are currently managed with Storable software." Storable, *About Us*, https://www.storable.com/about-us/.

34.     SafeLease does not offer facility management software. Rather, its independent self-storage customers rely on their facility management software to facilitate the administration of SafeLease's tenant insurance plans. Each of these customers expressly authorizes SafeLease to be one of its third-party vendors, to access its facility management software with administrative user credentials, and to use its systems to offer tenant insurance plans. Customers also agree to provide the information SafeLease needs to administer policies through access to their facility management software.

### B.     Tenant Insurance Plans

35.     SafeLease basically offers two types of related insurance products for its independent self-storage customers: tenant insurance and tenant protection.

36.     Tenant insurance is produced directly to the tenant by the facility. In most states, the facility operates under a limited lines license, where SafeLease is the designated responsible licensed producer—that is, the overseer for the program. The tenant is directly insured for stored goods, rather than having recourse to the owner-operator of the storage facility.

37.     Tenant protection involves the placement of a contractual liability insurance policy with the storage facility owner-operator. The policy covers risk to tenant stored goods on the rental agreement. Under SafeLease's program, rental agreements are amended so that the standard exculpatory clause (where owners/operators disclaim liability for tenant stored goods) is pared back, and the facility owner-operator instead has limited liability for certain types of loss.

38.     These products are marketed largely as substitutes. Some facility owner-operators prefer conventional tenant insurance, while others choose tenant protection. The coverage levels and cost for the product borne by the tenant and the revenue that can be earned by the facility owner-operator for distribution are comparable.

39.     Defendants directly compete with SafeLease on both insurance product lines.

40.     In addition to rolling up facility management software system vendors, defendants also acquired various insurance producers and books of business. These include Property First Group LP (StorSmart) and Bader Co. *See* Inside Self-Storage, *Storable Adds Self-Storage Ins. Providers Bader, Storsmart to Stable of Cos.* (Sept. 3, 2019), https://www.insideselfstorage.com/in-surance/storable-adds-self-storage-insurance-providers-bader-storsmart-to-stable-of-companies. Defendants also acquired a large book of insurance business from Sage Insurance in 2021.

41.     In short, defendants provide tenant insurance at independent facilities. In addition, they offer an unlicensed, insurance-like "protection plan" program to independent facilities through Easy Storage Solutions facility management software. In total, defendants together control the single largest share of the market for tenant insurance and tenant protection ("tenant insurance") at independent self-storage facilities.

42.     The parties compete in the market for tenant insurance at independent self-storage facilities.

**C.     SafeLease Access to Customer Accounts**

43.     SafeLease opened for business in mid-2021 and has grown steadily. It now covers 2576 facilities, representing about 322,000 units with active SafeLease-acquired coverage.

44.     SafeLease currently administers insurance policies/plans through customer facility management software systems. Access to this software is critical to enable SafeLease to effectively administer its customers' insurance protection and to protect facility owners/operators and tenants.

45.     To administer these policies, SafeLease must access facility management software that its self-storage customers use. Given defendants' dominance in the facility management software market, the vast majority of customer plans that SafeLease administers must be managed through defendants' software systems. Over 275,000 tenants at nearly 2000 facilities must be administered through defendants' facility management software:

    a.   storEdge: 83,992 plans (683 facilities)

    b.   SiteLink: 147,233 plans (734 facilities)

    c.   Easy Storage Solutions: 44,681 plans (514 facilities)

46.     The remaining policies are administered through third-party facility management software offered by companies other than the defendants, such as Self Storage Manager, Cubby, and WebSelfStorage.

47.     Since 2021, for defendants' storEDGE and SiteLink systems, SafeLease has accessed its customers' accounts as a designated "Authorized User" on the systems after its customers granted SafeLease such access in accordance with its contracts with those customers. StorEDGE and SiteLink permit a customer to designate "as many" Authorized Users to access its accounts "as you wish," according to the terms of service for their facility management software.

    a.   *Sitelink Terms of Use*, https://www.storable.com/privacy/sitelink-terms-of-use/ ("4.2. Authorized Users. You may designate and authorize as many Users as you wish under the Agreement."); and

    b.   *storEDGE Terms of Service*, https://www.storable.com/privacy/storedge-terms-of-service/ ("4.2. Authorized Users. You may designate and authorize as many Users as you wish under the Agreement.").

48. Likewise, SafeLease's access to defendants' Easy Storage Solutions (which is a more basic software than storEDGE or SiteLink) only occurs when access is given by defendants at the request of a customer. Access is "locked" otherwise. Easy Storage Solutions customers then must create an Authorized User account for SafeLease. Defendants knew SafeLease was accessing the facility management software on behalf of customers and provided access for it to do so.

49. In SafeLease's customer contracts, storage facilities are obligated to give SafeLease access to their facility management software for it to administer the relevant insurance policies. The data within the facility management software—for example, information about a particular facility, its tenants, and its operations—belongs to SafeLease's customers (not to defendants). SafeLease's customers grant SafeLease permission to access this information kept on their facility management software by logging in with a username and password, exactly as the facility owners would log in to access the same information. This is how SafeLease has accessed its customers' facility management software.

50. The information SafeLease can access is controlled by its facility customers. SafeLease only accesses the information that is necessary to carry out its insurance functions. It does not access sensitive information that is irrelevant to SafeLease providing its contractual insurance services. SafeLease never has access to tenant credit card information. SafeLease uses secure, independently audited, SOC-2 certified processes when accessing and storing customer data.

51. Storable has known for years that SafeLease is an Authorized User to administer its customer insurance policies. In general, SafeLease can access facility management software to administer coverage policies by a direct connection to the software through an application programming interface (API) or as an Authorized User through the graphical user interface (GUI).

In 2021, just months after SafeLease opened, it reached out to defendants regarding API access for SiteLink. Defendants declined, saying they are "not planning to add additional providers." As a result, SafeLease moved forward as an Authorized User and successfully has operated that way ever since.

52. As an Authorized User, SafeLease efficiently can collect targeted data every day or few days from a customer's facility management software that it needs to administer policies. SafeLease accesses the least data necessary and only the data that its customers allow, even gathering information more efficiently than if a user were manually operating the software. SafeLease's access to facility management software has not intensified in nature or scope across time. In fact, since 2021, SafeLease has further tailored its operations to make its access of facility management software even more narrow and efficient. Until this case was filed, defendants never claimed that SafeLease's practices harmed defendants' facility management software and never demanded that SafeLease stop or change its Authorized User access.

53. SafeLease's ability to access the facility management software as an Authorized User has been beneficial to defendants. For example, SafeLease products are low-cost options that defendants admit are popular with and beneficial to facility operators and their tenants. Operators want to use SafeLease products, so having a facility management software that is compatible with SafeLease products enhances defendants' software, making it more valuable to facility management software customers and increasing its marketability. Conversely, cutting off SafeLease's access to facility management software hurts defendants' own customers, who are left at risk of disruption and uninsured loss.

D. **Defendants' Actions Towards SafeLease**

54. Since SafeLease's founding, defendants have expressed interest in acquiring its insurance business. Storable's CEO sees SafeLease's business as "interesting" and "compelling."

-13-

He believes SafeLease can "help our customers" increase tenant enrollment in insurance coverage, which "benefits" self-storage operators, their tenants, and insurance providers, which can "grow the business." SafeLease repeatedly has declined defendants' overtures.

55. In March 2022, less than a year after SafeLease's founding, defendants inquired about buying SafeLease. The next year, following discussions in May 2023, the parties entered into a term sheet regarding a potential long-term partnership. The parties ultimately could not agree on terms and agreed to pause negotiations in March 2024. In September 2024, defendants again expressed general interest in acquiring SafeLease.

56. Defendants' tactics then changed after acquisition talks broke down in October. On October 15, 2024, SafeLease got a cryptic email from defendants noting upcoming "security measures" on the facility management software, including "stricter policies around user roles, access authorization, and ensuring only authorized personnel can access Storable systems." This raised possible concerns that defendants might limit SafeLease access to the facility management software—access that its shared customers long had authorized and that SafeLease successfully had used without issue for many years.

57. In this message and the surrounding communications, defendants made no specific complaint about any specific SafeLease practice—referring only to nebulous "security" issues but never telling SafeLease that defendants believed it was causing or responsible for any such issues. They could not and did not explain any harm from SafeLease's continued operation as an Authorized User in the same manner as it had done for years.

58. In response, SafeLease asked about an interim agreement with defendants to "avoid disruptions to the services and agreements with [their] shared customers." SafeLease sought a call as soon as possible, including technical resources, so that it could understand the planned "security

changes" and take appropriate measures. In addition, SafeLease proposed as a potential solution an agreement to access defendants' API—access that they had denied years earlier.

59.     Defendants responded with egregious terms to access the system via an API. They proposed a penalty price of $1.00 per unit per month, far greater than the market price for such access. Moreover, they would charge SafeLease an even higher price for units that had been served by defendants if the customer chose to switch to SafeLease for its insurance products. In that case, SafeLease would have to pay $1.50 for API access—50% more—whenever it out-competed defendants for business. The terms were confiscatory, exclusionary, anticompetitive, and another example of defendants flexing their monopoly power.

60.     Indeed, defendants' demanded price was so high that it would drive SafeLease out of business. Defendants knew this since they offer similar insurance plans and are well aware of the economics. For example, the most common protection plans typically cost a tenant $12/month for $2000 of coverage. The facility will keep most of that $12, as it has the relationship with the tenant, and a coverage provider like SafeLease will get $2-3/plan per month, which also must cover the cost of the insurance itself, which is not less than $2/plan per month. So, charging $1 to $1.50 per unit for API access would consume 50% or more of SafeLease's gross profit, which would not leave enough to cover insurance premiums.

61.     In short, API access was no option at all on defendants' monopolistic terms, which were designed as merely another way to drive a low-cost competitor out of the market to the detriment of consumers and the industry.

62.     Defendants then took their next step. On November 4, 2024, SafeLease noticed issues logging into storEDGE. Its engineers found that SafeLease IP addresses had been blocked

from logging into storEDGE. On November 6, 2024, SiteLink similarly blocked SafeLease IP addresses, although SafeLease was able to re-establish its authorized access.

63.     On December 4, 2024, there was another wave. Defendants blocked the IP address for the SafeLease office from accessing storEDGE and SiteLink facility management software. This cut off SafeLease's access to customer accounts and was a direct interference with servicing its policies. Again, SafeLease was able to engineer a solution to restore access.

64.     At the same time, defendants' buyout overtures continued. On December 9, 2024, they again expressed interest in acquiring SafeLease, warning that additional "security" measures soon would be implemented.

65.     On December 17, 2024, defendants took a dramatic step. They blacklisted SafeLease from storEDGE. In addition to blocking the SafeLease office IP address, defendants deactivated storEDGE users with @safelease.com emails even though they were customer-designated as Authorized Users. There was no technical workaround. As a result, SafeLease could not access storEDGE on behalf of customers. It lost the ability to service 84,062 insurance plans for storage facilities that use storEDGE facility management software. This caused, and if left unchecked was set to cause more, serious harms, including gaps in coverage and delays in adjudication of claims for SafeLease and defendants' shared customers.

66.     SafeLease filed this petition and request for temporary and permanent injunctive relief on December 30, 2025, to prevent irreparable harm that would commence January 1, 2025. SafeLease was due to issue thousands of contracted-for new and renewed policies to its customers, a process that it could not do without accessing its customers' facility management software.

67.     The Court acted swiftly and granted SafeLease's requested temporary restraining order on December 31. Defendants' actions in the hours that followed showed that the status quo

imposed no burden at all on them. Indeed, less than an hour after the TRO became effective, defendants restored SafeLease's access as a customer-designated Authorized User on storEDGE.

68.    Defendants moved to dissolve the TRO on January 2, 2025. In turn, SafeLease moved for expedited discovery and to extend the TRO to allow for this discovery. On January 9, the Court denied the motion to dissolve, extended the TRO to January 21, and granted targeted discovery in advance of a temporary injunction hearing, which was set for January 16.

69.    While the TRO was in effect prior to the temporary injunction hearing, SafeLease got to work. It was able again to service the parties' mutual customers by:

a. sending notices to self-storage facilities with tenants transferring into SafeLease insurance coverage;

b. confirming coverage for 33,000+ units switching to SafeLease coverage for facilities using defendants' facility management software;

c. helping facilities meet insurance requirements by confirming tenants have valid homeowner policies linked to their accounts or are enrolled in SafeLease;

d. collecting reports to bill facilities for premiums that must be paid to insurance carriers to maintain necessary coverage; and

e. securing facility data to advance adjustor files to pay pending claims.

70.    On January 16, 2025, the parties participated in an evidentiary hearing on the request for a temporary injunction to maintain the status quo through trial.

71.    The Court denied the request for a temporary injunction on January 21, the day the TRO dissolved by its extended terms.

72.    Defendants wasted no time in resuming their anticompetitive attacks. The next day, January 22, defendants reinstated their block on SafeLease access to storEDGE. Then they went further to cut off SafeLease from the other two facility management software products, SiteLink and Easy Storage Solutions.

73. The impact of defendants' attacks has increased dramatically. SafeLease cannot access its customers' data in the facility management software, despite express user authorization from those same mutual customers. The number of units, tenants, and facilities that defendants are preventing SafeLease from servicing properly and timely under their existing contracts has tripled. There are over 275,000 tenants at nearly 2000 facilities who SafeLease no longer can provide the insurance services that they and the facilities have contracted for.

74. Defendants have not merely disabled SafeLease's Authorized User accounts. They also have fully disabled SafeLease from having access by any means to any of defendants' facility management software systems. Their excuse for cutting off access is alleged "security" concerns posed by SafeLease's using automated log-in to its customers' software to access its customer data (as customers have authorized and contracted for). Defendants have said that manually logging in would resolve those concerns. But they now will not allow even that means of access, that is, access that is identical to how any facility owner would access its own facility management software.

75. This newly restricted means of access for SafeLease is no different from how other contractors, consultants, or third parties with which facility owners do business access customers' facility management software. For example, a certified public accountant who a facility owner has designated as an Authorized User to provide accounting or tax services also accesses the customer software via username and password manually. That access is allowed for third parties who don't compete with defendants, but defendants have denied the same access to its competitor SafeLease.

76. Defendants took further steps to target SafeLease and eliminate competition. They disabled all SiteLink accounts where SafeLease had been using the system's legacy custom third-party insurance module to provide insurance to facility customers. Disabling SafeLease's accounts

that used this custom insurance module has no legitimate purpose. It simply singles out SafeLease to block access for a competitor and to interfere with its contracts with customers.

77.     This custom insurance module is a means of access long approved by defendants and used by other insurance vendors. The module was created by defendants specifically to enable facility owners to use an insurance provider that does not have API access to SiteLink. Facility owners pay defendants $10 per facility/month to use this custom insurance module, and SafeLease reimburses the customers. So, when and whether a facility owner is using a third-party insurance provider via this module is known to and long allowed by defendants.

78.     Using this custom module poses none of the alleged security issues that defendants claim justify cutting SafeLease's access. Indeed, this custom module is defendants' own creation.

79.     To SafeLease's knowledge, defendants did not block access to this custom module for any other insurance provider. Cutting off SafeLease from even this method of accessing data and servicing customers further shows that defendants are targeting SafeLease, and their in-court excuses for removing SafeLease's access are pretextual.

80.     Since defendants cut off access again only days ago, the parties' mutual customers have expressed confusion and concern about how it will impact them and their tenants. Reactions from customers have ranged from anxiety to frustration to anger, including the following:

a.  "Help me understand where our account stands as of today; 1. Are our tenants covered and how long will they be covered? 2. How do we continue coverage? 3. Will the payments by our tenants no longer be accessed by SafeLease? . . . I am just scratching the surface with questions, by my greatest concern is to make sure that our tenant protection doesn't lapse during this struggle."

b.  "We utilize SiteLink at our facility and currently pay $10 per month for the ability to use SafeLease. We are concerned about the potential disruption of service and insurance coverage for our tenants."

c.  "I see that SafeLease has been deleted as a user in my corporate account. . . . Should I add you back as an authorized user? They deleted without

mentioning anything to me. . . . Also, if a tenant moves in now, will they even have access to coverage?"

d. "I want safe lease to immediately have access to manage my tenant protection. . . . I have been with easy storage solutions way before storable purchased them. I have been a loyal customer since 2012 and demand the right to choose my tenant protection for the best options for my tenants." (email sent to *defendants*)

e. "Sounds like you already don't have access to our system. What issues is this going to cause us until you regain access?"

f. "Safelease was removed from each of my locations. They are my tenant protection company. . . . I'm going to be adding them back in today so that I can go over my numbers as I do monthly with them. Please, can you make sure Storable does not remove someone I have given permission to." (email sent to *defendants*)

g. "Could you please clarify if Storable's actions have also impacted the data transfer and service for SiteLink users who pay for SafeLease access? Are you still receiving our information, or has this been interrupted as well?"

h. "Team Storable, Please immediately restore access to all authorized users. SafeLease must have full access." (email sent to *defendants*)

i. "Have you guys looked into any legal recourse? My opinion is that Storable is doing some potentially illegal stuff throughout (not a lawyer)."

j. "This seems like it is breaking some sort of law and at a minimum a terrible way to do business."

k. "We have also experienced the anticompetitive activities of Storable. When we attempted to access our own data, they demanded an outrageous toll fee for the access."

l. "Not surprised that Storable would pull such a dirty trick. Can't expect much better from them."

Common to the customer reactions to defendants' actions are concerns about disruption of service, increased risks, and loss of protection for them and their tenants.

81.     By contrast, as SafeLease was cut off from accessing these facility management software systems, defendants' insurance products offered through Bader and StorSmart remained integrated in the software.

82.     Defendants' actions have been greatly damaging to SafeLease, its customers, and the industry. As a result, SafeLease cannot operate its business as it has done for years with defendants' knowledge, consistent with its terms, and with customer authorization and agreement.

**E.     Relevant Markets**

83.     The relevant primary product market is for tenant insurance at independent self-storage facilities. SafeLease and defendants, as well as firms such as Xercor, Deans & Homer, Insurance Office of America, and MiniCo Insurance Agency, compete in this market.

84.     Because of the fragmented nature of self-storage facility ownership and the fact that large public companies offer their own insurance plans, this tenant insurance is offered only at independent self-storage facilities. Consumers at these facilities can turn to either tenant protection or tenant insurance products. These products are substitutable in that a consumer reasonably could turn from one product to the other in response to a price increase to satisfy their insurance needs.

85.     Market share in this market can be measured based on the number of facilities using a tenant insurance product. Defendants are collectively the largest provider in this market.

86.     The relevant secondary product market is for facility management software. Defendants dominate this market. Other competitors are Self Storage Management, Cubby, and WebSelfStorage.

87.     Because of the fragmented nature of self-storage facility ownership and the fact that large public companies use their own proprietary management software, these facility management software products are offered only to independent self-storage facilities.

88.     Market share can be measured based on the number of facilities that use facility management software. Defendants control over 75% of this market within the United States.

89.     Defendants have a monopoly in this secondary market. They are leveraging their market power to harm and control competition in the primary market, for tenant insurance at independent self-storage facilities, and to acquire monopoly power.

### a.  Geographic Market

90.     The relevant geographic market for both product markets is the United States.

91.     For tenant insurance, the parties and others operate throughout the nation. Consumers in Texas looking to purchase tenant insurance reasonably can turn to any such product offered by a provider if it is licensed to provide insurance in this State.

92.     For facility management software systems, defendants and its competitors operate throughout the nation. Consumers looking to purchase such software for their independent self-storage facilities may turn to any competitor in the country to provide this product.

### F.     Defendants' Anticompetitive Conduct and Effects

93.     Defendants have engaged in an anticompetitive scheme to monopolize the market for tenant insurance and drive a low-cost competitor out of business. They are leveraging their monopoly power in the facility management software market to try to monopolize the connected market for tenant insurance. Facility management software is vital to the market they are attempting to monopolize, and defendants have a monopoly of that software market. Their actions are an attempt to exploit that connection to the detriment of consumers and competition.

94.     So, armed with this unique power in an adjacent market, defendants are engaging in prohibited predatory conduct by refusing to deal with SafeLease by cutting off SafeLease's access to their facility management software systems. This shuts out SafeLease from the tenant

insurance market, excluding or foreclosing competition and harming consumers including with higher prices. SafeLease is precluded from accessing more than 75% of the market, so defendants will be able to scoop up the customers that SafeLease no longer can compete for.

95. Defendants cut off SafeLease after years of allowing what it now prohibits. This long-known and consented-to access was voluntary and to defendants' benefit, as it made their facility management software product more enticing to consumers, some of whom would not have chosen it if SafeLease were not allowed access, severely limiting their tenant insurance options. And defendants cut off SafeLease's access without warning or valid business justification. As is clear from defendants' conduct, their motive is to achieve anticompetitive ends.

96. Defendants are familiar with SafeLease and how it does business, including that it has Authorized User access to defendants' facility management software granted by their shared customers. Defendants have expressed interest in partnering with or buying SafeLease. As recently as just weeks ago, they proposed acquiring SafeLease. It was only after talks broke down that they sought to drive SafeLease out of the market and remove a low-cost competitor. They retaliated by cutting off SafeLease and making a confiscatory "offer" for API access that was no offer at all and was, instead, another way to try to destroy a competitor to reduce competition, to the detriment of consumers. The timing shows that defendants' "justifications" for their conduct are pretextual.

97. Defendants' anticompetitive conduct escalated after suit was filed. In December, SafeLease successfully competed for a new customer that uses defendants' SiteLink as its facility management software. That customer had used defendant Bader as its tenant insurance provider, until SafeLease out-competed Bader for this customer's business. On December 31, 2024, the same day the Court granted the TRO, defendant Bader tried to scare the customer into switching back to Bader's insurance coverage by informing the customer that defendants were going to block

-23-

SafeLease from accessing SiteLink, just as they had done with storEDGE. Confused and concerned, the customer alerted SafeLease, who assured the customer that a TRO was in place.

98.     Although the TRO was in place, defendants' threat to remove access proved too much for this customer. He determined that the risk of SiteLink severing ties with SafeLease posed a significant operational challenge and financial risk to the customer, which he could not bear, so he chose to cancel his planned contract with SafeLease.

99.     This recent conduct is further proof of defendants' plans to monopolize the tenant insurance market not by competing on the merits but by removing competition through leveraging their monopoly in the facility management software market and interfering with SafeLease's prospective business with these customers.

100.     With defendants' monopoly power, their scheme to drive out competitors in the related tenant insurance market has a dangerous probability of success. Defendants know how vital facility management software is to independent self-storage facilities. Having captured more than 75% of the market for this software, while allowing SafeLease and others to access the software for years, defendants are able to leverage that monopoly and customer reliance on the software to drive out as many competitors in the tenant insurance market as it can by refusing to deal with them, or by allowing them to use defendants' software products only on the condition that the competitors promise not to compete for defendants' customers and pay a penalty if they do. This will, in turn, drive customers to their only practical option at that point: buying higher-cost tenant insurance from defendants.

101.     This anticompetitive scheme is an attempt to monopolize the market for tenant insurance. It will harm competition and consumers, remove low-cost competitors like SafeLease, and drive-up costs and reduce options.

## G.    Damages and Continuing Injury

102.    Defendants' anticompetitive conduct is causing irreparable harm to SafeLease, its customers, and the industry.

103.    On December 17, 2024, defendants cut off SafeLease accounts from accessing the storEDGE facility management software, revoking the Authorized User status granted to SafeLease by storage facility customers. The only thing that stopped this anticompetitive scheme and prevented further harm to SafeLease, consumers, and competition was the TRO. But when the TRO expired, defendants escalated their attacks by cutting off SafeLease from accessing *all* their facility management software systems. Without access, SafeLease cannot service insurance policies for tenants with units in facilities that use those systems. Practically, this means that SafeLease's customers will experience delays in adjudication of their insurance claims and risky gaps in coverage while SafeLease is unable to renew or issue new policies it has or would have contracted with customers to issue.

104.    This risk and these gaps cannot be filled by these mutual customers. They cannot legally intake or adjust tenant insurance claims, which is something that only a licensed insurance agent like SafeLease can do. This disruption and interference with customer-authorized access to customer data on its customers' software has wholly impaired SafeLease's ability to service more than 275,000 tenants and thousands of customer facilities. This harms not only SafeLease but also innocent customers and their tenants.

105.    Defendants' actions have jeopardized SafeLease's entire business, which is worth over $100 million. It has and will continue to harm and cause loss to SafeLease's goodwill, clientele, and operations. Defendants' actions also put at risk the insurance coverage that customers secured through SafeLease, which exceeds $600 million.

106. Defendants' unjustified and anticompetitive actions are calculated to and do destroy competition by excluding a low-cost competitor from competing in the market to the detriment of competition and consumers. This harm will be outsized in Texas which has more storage units than any other state and in which the parties are based and conduct their business.

### H. Status Quo Poses No Harm to Defendants

107. SafeLease accessed defendants' facility management software as an Authorized User with defendants' consent for over three years until they abruptly cut off access in December. Defendants' actions after the TRO was entered show that returning to the status quo imposes no burden at all on them. Indeed, in less than an hour after the TRO became effective, defendants restored SafeLease's access as a customer-designated Authorized User of storEDGE.

### FIRST CAUSE OF ACTION
### Violation of the Texas Antitrust Act, Section B

108. SafeLease incorporates the material fact allegations from the preceding paragraphs.

109. Through anticompetitive conduct, defendants intend to secure dominant market power and a monopoly in the market for tenant insurance at independent self-storage facilities. They leveraged their monopoly of the facility management software market to lessen or destroy competition in the tenant insurance market by cutting off SafeLease from accessing storEDGE, SiteLink, and Easy Storage Solutions facility management software on behalf of and for the benefit of customers. This refusal to deal is contrary to defendants' prior voluntary practice of allowing such access for years, which benefited defendants, and it will harm defendants' own customers.

110. This refusal to deal is intended to remove a discount competitor from the market to help defendants gain market share and solidify a second monopoly in the market for tenant insurance. Their monopoly of the facility management software market gives them a unique ability

to exclude or foreclose competition in the market for tenant insurance by excluding competitors in that market, like SafeLease, from facility management software.

111. Defendants are exercising this unique anticompetitive ability here by excluding SafeLease from their facility management software systems after years of knowing use. Given this unique power to exclude or foreclose competition in the vast majority of the market, made possible by leveraging a monopoly of facility management software, defendants' scheme has a dangerously high probability of success.

112. This conduct is an attempted monopolization in violation of TEX. BUS. & COMM. CODE § 15.05(b). This unlawful conduct has been willful and flagrant.

113. As a direct and proximate result of this unlawful conduct, SafeLease has been injured in its business and property, including by being foreclosed from competing in the market for tenant insurance.

114. These injuries to SafeLease and the public are injuries to the competitive process and are the type of injuries that the antitrust laws are intended to prohibit. They constitute antitrust injuries in Texas.

115. SafeLease did and will suffer irreparable injury and loss of business and property, for which there is no adequate remedy at law, unless the Court enjoins defendants' continuing and imminent violations.

116. SafeLease has been forced to retain attorneys to protect its rights and to prosecute this claim. Under TEX. BUS. & COMM. CODE § 15.21, it is entitled to recover its reasonable attorney fees and costs spent in this matter.

### SECOND CAUSE OF ACTION
### Tortious Interference with Existing Contracts

117. SafeLease incorporates the material fact allegations from the preceding paragraphs.

118. SafeLease has a contract with each of its customers that use defendants' facility management software. These contracts are commonly titled "Storage Partner Agreements." They require the customers to provide SafeLease with access to their facility management software and their data that they keep on these software systems for the sole purpose of providing the parties' contractually agreed insurance services.

119. SafeLease's contracts with its customers are valid contracts. Defendants are not parties to these contracts.

120. Defendants are willfully and intentionally interfering with SafeLease's contracts with its customers. Defendants know that SafeLease provides insurance services to their mutual customers. Defendants know that such services are under contracts between SafeLease and the customers. Defendants know that these services require SafeLease to access and use customer data that is stored on the facility management software systems. Defendants know that SafeLease's customers grant it access to their facility management software as an Authorized User.

121. Defendants intentionally cut off SafeLease's access to their facility management software. Defendants are preventing the parties' mutual customers from providing SafeLease the access that the customers want and are obligated to provide. Defendants know or reasonably should know that blocking access interferes with the customers' ability to perform under their contracts, including by preventing customers from being able to give SafeLease the agreed, desired, and necessary access to their facility management software systems and data.

122. Defendants cut off SafeLease's access in order to interfere with performance of these obligations, and it was substantially certain that the consequences of cutting off access would be to interfere with performance of these obligations.

123. Defendants' interference with SafeLease's customer contracts proximately caused SafeLease harm and loss to its business, business operations, goodwill, and clientele. It threatens to destroy SafeLease's entire business. This harm and loss are continuing, increase with every day, and given their nature are not easily or readily quantifiably.

## THIRD CAUSE OF ACTION
### Tortious Interference with Prospective Business Relations

124. SafeLease incorporates the material fact allegations from the preceding paragraphs.

125. Defendants have willfully and intentionally interfered with SafeLease's ability to compete in the market for tenant insurance. They have removed SafeLease's ability to service customers that use defendants' facility management software systems, which comprise over 75% of the market.

126. Defendants' leveraging of their monopoly in the facility management software market to cut off SafeLease from thousands of customers in the tenant insurance market makes it nearly impossible for SafeLease to compete for new business, as customers now are effectively unreachable to SafeLease. Defendants are telling SafeLease's prospective customers that they plan to and now have cut off SafeLease's access, for the purpose of interfering with SafeLease's attempts to enter contracts to provide services to the potential customers.

127. Defendants' software is so vital to customers that their threat of stopping SafeLease access already has lost SafeLease customers, including a customer who cancelled his contract with SafeLease when he learned that SiteLink was planning to remove SafeLease's access.

128. Defendants' threats to remove SafeLease's access and then actual removal of that access have caused customers to cancel or back out of agreements with SafeLease, thus injuring it. These injuries are the direct result and intent of defendants' anticompetitive acts to leverage their monopoly power to interfere with SafeLease's prospective business relations.

129. Defendants' interference with SafeLease's prospective business with customers has proximately caused SafeLease harm and loss to its business, business operations, goodwill, and clientele. It threatens to destroy SafeLease's entire business. This harm and loss are continuing, increase with every day and with every prospective customer with which defendants interfere, and given their nature are not easily or readily quantifiably.

<div align="center">SERVICE ON ATTORNEY GENERAL</div>

130. SafeLease has mailed a copy of this amended petition to the Attorney General of Texas, in compliance with TEX. BUS. & COMM. CODE §15.21(c).

<div align="center">**VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION**</div>

131. SafeLease has requested that the Court issue a TRO and temporary injunction against defendants to prevent probable imminent and irreparable harm to SafeLease, its customers, and the industry. The Court issued the requested TRO on December 31, 2024 and extended it to January 21, 2025. In the interim, it held a temporary injunction hearing on January 16. The Court denied the requested temporary injunction via email notice from its clerk on January 21.

<div align="center">GROUNDS FOR INJUNCTIVE RELIEF</div>

132. Temporary injunctive relief is necessary to preserve the status quo prior to a trial on the merits. The last actual, peaceable, non-contested status preceding the pending controversy is SafeLease's accessing defendants' facility management software systems so that it may service the parties' shared customers, which SafeLease did for years with defendants' knowledge until they cut off access. *See In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy") (cite omitted).

133. Defendants' cutting off access to this critical software did and will cause irreparable harm to SafeLease, its customers, and the industry. Without access SafeLease will be unable to

run its business and administer insurance services for its customers. Temporarily enjoining defendants imposes no or minimal burden on them and also will allow SafeLease to service these mutual customers as it had done with defendants' knowledge and consent for years.

134.     SafeLease pleads valid causes of action and has shown a probable right to relief. It has furnished evidence that defendants' actions and threatened imminent actions are an illegal monopolization attempt of the market for tenant insurance, using an anticompetitive scheme and predatory or exclusory means. Given defendants' monopoly power and ability to leverage it to exclude or foreclose competition, they have a dangerous probability of succeeding. Defendants' actions also improperly interfere with SafeLease's current and prospective customer contracts.

135.     Federal antitrust case law, which the Texas Antitrust Act follows, supports the state law claim raised here. *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 483 (1992) ("If Kodak [a monopolist] adopted its . . . policies [refusing to deal] as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated §2."); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) (monopolist liable for refusing to deal with competitor where parties had prior voluntary course of dealing that was ended without justification); *United States v. Griffith*, 334 U.S. 100 (1948) (finding monopolization where defendants used monopoly power in one market to acquire monopoly control of other markets); *Covad Commc'ns Co. v. BellSouth Corp.*, 299 F.3d 1272, 1284 (11th Cir. 2002) ("Monopoly leveraging occurs when a firm uses its market power in one market to gain market share in another market other than by competitive means."), *vacated on other grounds*, 540 U.S. 1147 (2004).

136.     SafeLease also has shown probable imminent and irreparable injuries prior to a trial on the merits. Accessing defendants' software is its only means of servicing customers that use the

software. Without access, it cannot address claims made by tenants, correctly bill its customers, or commence new or renew insurance policies that it has contracted with tenants to provide.

137. The impact of this disruption is wholly or largely immeasurable to SafeLease and the tenants that it helps insure. It did and will cause immediate and irreparable harm to SafeLease's business and customers by preventing SafeLease from, among other things, renewing or issuing new policies, notifying tenants of changes in coverage, adjusting or adjudicating insurance claims, or billing facilities accurately. This harm from loss of access critically impairs SafeLease's business and its ability to service thousands of customers, is ongoing, and is irreparable because it places its entire business at risk, making much or all of the current harm to SafeLease's business impossible to measure in damages.

138. As such, the Court issued a TRO enjoining defendants before the application for temporary injunction was heard:

      a. Defendants should be ordered to restore SafeLease's status as an Authorized User on the storEDGE or any other facility management software for customer accounts that grant SafeLease such authorization.

      b. Defendants should be ordered to take no action to remove or otherwise restrict SafeLease's access to its storEDGE, SiteLink, or Easy Storage Solutions facility management software systems as an Authorized User for customer accounts that grant SafeLease such authorization.

139. SafeLease posted a bond to make the TRO effective. A minimal bond was required and warranted because the TRO simply restored the way that the parties have operated for years. As a result, the risk of irreparable harm to defendants was nil.

140. SafeLease further requested that the Court temporarily enjoin Storable from these same acts until the trial of this case and that, after trial, the Court permanently enjoin Storable upon entry of final judgment.

141. On January 21, 2025, the Court denied the temporary injunction request.

## PRAYER

SafeLease respectfully seeks a TRO, temporary injunction, and permanent injunction that enjoins defendants and their officers, agents, servants, and employees from performing the anticompetitive and tortious acts described above, and a judgment for SafeLease and against defendants for reasonable and necessary attorney fees, costs of court, pre- and post-judgment interest, and all other relief to which SafeLease may be entitled.

Dated:  January 28, 2025          Respectfully submitted,

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Susanna R. Allen
State Bar No. 24126616
sallen@yettercoleman.com
Luke A. Schamel
State Bar No. 24106403
lschamel@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

      I certify that a copy of the foregoing document was served on all counsel of record via the Court e-filing service and/or by email, on January 28, 2025.

                                     /s/ *Shannon N. Smith*
                                       Shannon N. Smith

**VERIFICATION**

My name is Steven Stein. My date of birth is November 18, 1994. I am the Chief Executive Officer of plaintiff SafeLease and have been since its inception. My business address is 800 Brazos Street, Suite 320, Austin, Texas 78701. I declare under penalty of perjury that the material facts alleged in this Verified Second Amended Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction, except for paragraphs 80 and 97–98 (as to which another SafeLease employee is verifying), are true and correct based on my personal knowledge or, as indicated, on reliable referenced information sources.

Executed in Travis County, Texas on this 28th day of January, 2025.

_____
Steven Stein

## VERIFICATION

My name is Nathaniel Kinet. My date of birth is December 12, 1986. I am Chief Revenue Officer of plaintiff SafeLease and have been an employee of SafeLease since May 2021. My business address is 800 Brazos Street, Suite 320, Austin, Texas 78701. I declare under penalty of perjury that the material facts alleged in paragraphs 80 and 97–98 of this Verified Second Amended Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction are true and correct based on my personal knowledge.

Executed in Travis County, Texas on this 28th day of January, 2025.

Nathaniel Kinet

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alyssa Smith on behalf of R. Yetter
Bar No. 22154200
asmith@yettercoleman.com
Envelope ID: 96716932
Filing Code Description: Amended Filing
Filing Description: PLAINTIFF'S VERIFIED SECOND AMENDED PETITION AND APPLICATION FOR A TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION
Status as of 1/29/2025 11:08 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Neil KentonAlexander | | kalexander@porterhedges.com | 1/28/2025 10:59:33 PM | SENT |
| Ray TTorgerson | | rtorgerson@porterhedges.com | 1/28/2025 10:59:33 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 1/28/2025 10:59:33 PM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 1/28/2025 10:59:33 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 1/28/2025 10:59:33 PM | SENT |
| Jacqueline Chin | | jchin@porterhedges.com | 1/28/2025 10:59:33 PM | SENT |
| Ruth Tucker | | rtucker@porterhedges.com | 1/28/2025 10:59:33 PM | SENT |
| Stephanie Jennings | | sjennings@porterhedges.com | 1/28/2025 10:59:33 PM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 1/28/2025 10:59:33 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 1/28/2025 10:59:33 PM | SENT |
| Austin Brumbaugh | 24121929 | abrumbaugh@yettercoleman.com | 1/28/2025 10:59:33 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 1/28/2025 10:59:33 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 1/28/2025 10:59:33 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 1/28/2025 10:59:33 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 1/28/2025 10:59:33 PM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 1/28/2025 10:59:33 PM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 1/28/2025 10:59:33 PM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 1/28/2025 10:59:33 PM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 1/28/2025 10:59:33 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 1/28/2025 10:59:33 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 1/28/2025 10:59:33 PM | SENT |

# REPORTER'S RECORD

## VOLUME 4 OF 7 VOLUMES

### TRIAL COURT CAUSE NO. 25-BC03A-0001

### APPELLATE CASE NO. 15-25-00020-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
3/17/2025 3:37:13 PM
CHRISTOPHER A. PRINE
Clerk

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES, LLC | : | TEXAS BUSINESS COURT |
| Plaintiff, | : | |
| v. | : | |
| | : | DIVISION 3A |
| STORABLE, INC., REDNOVA LABS, INC., (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP | : | |
| | : | TRAVIS COUNTY, TEXAS |
| Defendants. | : | |

**HEARING ON PLAINTIFF'S EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION AND ALTERNATIVE MOTION FOR RECONSIDERATION**

On the 13th day of February, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Melissa Andrews, Judge Presiding, held in person in Austin, Travis County, Texas.

Proceedings reported by stenographic machine shorthand.

# A P P E A R A N C E S

APPEARING FOR THE PLAINTIFFS:

YETTER COLEMAN, LLP
811 Main Street, Suite 4100
Houston, Texas   77002-6125
(713) 632-8000

**HON. R. PAUL YETTER**
State Bar No. 22154200
pyetter@yettercoleman.com
**HON. SUSANNA R. ALLEN**
State Bar No. 24126616

STONE HILTON, LLP
811 Main Street, Suite 4100
Houston, Texas   77002-6125
(713) 632-8000

**HON. CHRISTOPHER HILTON**
State Bar No. 24087727
chris@stonehilton.com

APPEARING FOR THE DEFENDANTS:

PORTER HEDGES, LLP
1000 Main Street, Floor 36
Houston, Texas   77002-6341
(713) 226-6650

**HON. RAY T. TORGERSON**
State Bar No. 24003067
rtorgerson@porterhedges.com

**HON. NEIL KENTON ALEXANDER**
State Bar No. 00996600
kalexander@porterhedges.com

**HON. LIZA EOFF**
State Bar No. 24095062
leoff@porterhedges.com

**A P P E A R A N C E S**

GREENBERG TRAURIG, LLP
300 West 6th Street, Suite 2050
Austin, Texas  78701

**HON. DALE WAINWRIGHT**
State Bar No. 00000049
(512) 320-7226
wainwrightd@gtlaw.com
dale.wainwright@gtlaw.com

**HON. JUSTIN LEWIS BERNSTEIN**
State Bar No. 24105462
(617) 512-5191
bernsteinju@gtlaw.com

ALSO PRESENT:

    Chuck Gordon
    Rick Verma
    Lakshmi Kumar

**VOLUME 4 OF 7**

**CHRONOLOGICAL INDEX**

**(February 13, 2025)**

| TEMPORARY INJUNCTION HEARING | PAGE | VOL |
|---|---|---|
| Case called/appearances | 6 | 4 |
| Housekeeping matters | 6 | 4 |
| Motion to compel by Ms. Allen | 6 | 4 |
| Response by Ms. Eoff | 7 | 4 |
| Adjournment | 262 | 4 |
| Certificate of Court Reporter | 263 | 4 |

**CHRONOLOGICAL WITNESS INDEX**

| WITNESSES: | D | X | RD | RX | VOL |
|---|---|---|---|---|---|
| NATE KINET | 10 | 23 | 86 | 99 | 4 |
| JULIETTE CAMINADE | 103 | 163 | 208 | 215 | 4 |
| JULIETTE CAMINADE | | | | 217 | 4 |
| JOHN MANES | 221 | 242 | 262 | | 4 |

**ALPHABETICAL WITNESS INDEX**

| WITNESSES: | D | X | RD | RX | VOL |
|---|---|---|---|---|---|
| CAMINADE, JULIETTE | 103 | 163 | 208 | 215 | 4 |
| CAMINADE, JULIETTE | | | | 217 | 4 |
| KINET, NATE | 10 | 23 | 86 | 99 | 4 |
| MANES, JOHN | 221 | 242 | 262 | | 4 |

INDEX OF EXHIBITS

**PLAINTIFF'S EXHIBITS:**

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|---|---|---|---|---|
| 185 | Storable website page - About Us | 198 | | 4 |
| 197 | List of customer cancelations | 12 | 12 | 4 |

**DEFENDANT'S EXHIBITS:**

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|---|---|---|---|---|
| 352 | Storable software integration page | 140 | 140 | 4 |
| 357 | Monopoly share analysis | 136 | | 4 |
| 359 | Email from Stephen Skinner | 52 | 52 | 4 |

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

A.    You could add up the amounts that those customers have been invoiced for as long as they have worked with us, yes.

Q.    So, of those 10 or 12 customers, we could know, moving forward, how much to expect revenue SafeLease would not be recognizing because of this cancellation; true?

A.    If you are looking exclusively of the 12 that have so far canceled.

Q.    Right.  You would agree with that proposition though.  This is a knowable calculation, true?

A.    For the knowable 12 customers, yes.

Q.    Okay.  I just want to be clear.  To date, you have actually not had a problem with an insurance policy lapsing after January 21st; true?

A.    I don't know.

Q.    Certainly no data of that has been produced in this case; right?

A.    I don't know.

Q.    Okay.  And as you sit here today, to your knowledge, since January 21st, has a single claim been denied or unpaid as a result of being blocked from the Storable platforms?

A.    Again, I don't know.  I don't oversee claims.

Q.    And do you know if any of that information has been produced in this case?

A.    Again, I don't know.

THE COURT: This is a good time --

MR. TORGERSON: I'm almost done.

THE COURT: Okay.

Q. (BY MR. TORGERSON) You understand that those customers that terminated you, those 12 customers, there are other options for them in the market; right?

A. Sure.

Q. All right. And you know that there are other FMS providers out there, right?

A. I do, yes.

Q. And you agree with me that in some instances SafeLease has been recommending that their customers consider Cubby as a replacement FMS provider, true?

A. That is true.

Q. All right.

A. In the same way that Storable recommends their customers go to one of their insurance companies. I don't see it being any different.

Q. Okay. Let's look at DX-348. SafeLease has a head-of-talent job posting, right?

A. We do, yes.

Q. Does this report to you?

A. Does not.

Q. You are familiar with this posting?

A. I'm familiar with the role. I wouldn't say that I'm

very familiar with this posting.  I didn't write it.  It's not, again, something that rolls up to me.  So --

Q.   Let's look at the last sentence of the first paragraph, Mr. Kinet.  It says:  We're three years old, profitable, and intent on building the best insurance provider in storage.

Do you see that?

A.   Yes.

Q.   "Profitable," you know what that means.

A.   I think there is a lot of different ways to define "profitable."

Q.   Profitable means you make more money than you lose, doesn't it?

A.   I think in the simplest terms, yes.

Q.   And in the simplest terms, you would agree with me that right now SafeLease is not profitable?

A.   I would agree with that.

Q.   You understand that for no year of its existence has SafeLease realized a net profit.

A.   Yes.

Q.   So, this statement that SafeLease is profitable, in simplest terms, that is quite false; isn't it?

A.   Again, I didn't write this.  I can't speak to why it was written or what the meaning behind it was.

Q.   Just to be clear --

THE STATE OF TEXAS:

COUNTY OF AUSTIN:

### CERTIFICATE OF COURT REPORTER

I, DONNA A. GOREE, Official Court Reporter in and for the Texas Business Court, Division 3A of Austin County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-entitled and numbered cause, all of which occurred in open court and were stenographically reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND on this the 11th day of March, 2025.

/s/ *Donna Goree*

DONNA A. GOREE, CSR, RPR, CRR
Official Court Reporter
Texas Business Courts
Austin County, Texas
3721 Carmen Avenue
Rancho Viejo, Texas  78575
(979) 533-0422
Certificate No. 3909
Expiration Date: 07/31/2025

REPORTER'S RECORD

VOLUME 5 OF 7 VOLUMES

TRIAL COURT CAUSE NO. 25-BC03A-0001

APPELLATE CASE NO. 15-25-00020-CV

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
3/17/2025 3:37:13 PM
CHRISTOPHER A. PRINE
Clerk

| | |
|---|---|
| SAFELEASE INSURANCE SERVICES, LLC | TEXAS BUSINESS COURT |
| Plaintiff, | |
| v. | |
| STORABLE, INC., REDNOVA LABS, INC., (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP | DIVISION 3A |
| Defendants. | TRAVIS COUNTY, TEXAS |

**HEARING ON PLAINTIFF'S EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION AND ALTERNATIVE MOTION FOR RECONSIDERATION**

On the 14th day of February, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Melissa Andrews, Judge Presiding, held in person in Austin, Travis County, Texas.

Proceedings reported by stenographic machine shorthand.

**A P P E A R A N C E S**

APPEARING FOR THE PLAINTIFF:

**YETTER COLEMAN, LLP**
811 Main Street, Suite 4100
Houston, Texas   77002-6125
(713) 632-8000

**HON. R. PAUL YETTER**
State Bar No. 22154200
pyetter@yettercoleman.com

**HON. SUSANNA R. ALLEN**
State Bar No. 24126616
sallen@yettercoleman.com

**STONE HILTON, LLP**
811 Main Street, Suite 4100
Houston, Texas   77002-6125
(713) 632-8000

**HON. CHRISTOPHER HILTON**
State Bar No. 24087727
chris@stonehilton.com


APPEARING FOR THE DEFENDANTS:

**PORTER HEDGES, LLP**
1000 Main Street, Floor 36
Houston, Texas   77002-6341
(713) 226-6650

**HON. RAY T. TORGERSON**
State Bar No. 24003067
rtorgerson@porterhedges.com

**HON. NEIL KENTON ALEXANDER**
State Bar No. 00996600
kalexander@porterhedges.com

**HON. LIZA EOFF**
State Bar No. 24095062
leoff@porterhedges.com

# A P P E A R A N C E S

**GREENBERG TRAURIG, LLP**
300 West 6th Street, Suite 2050
Austin, Texas 78701
(512) 320-7226

**HON. DALE WAINWRIGHT**
State Bar No. 00000049
wainwrightd@gtlaw.com
dale.wainwright@gtlaw.com

**HON. JUSTIN LEWIS BERNSTEIN**
State Bar No. 24105462
(617) 512-5191
bernsteinju@gtlaw.com

**VOLUME 5 OF 7**

*** I N D E X ***

(February 14, 2025)

|                             | PAGE | VOL |
|-----------------------------|------|-----|
| Case called/ appearances    | 7    | 5   |
| Adjournment                 | 286  | 5   |
| Certificate of Court Reporter | 287 | 5   |

**CHRONOLOGICAL WITNESSES INDEX**

| WITNESSES:        | D   | X      | RD  | RX  | VOL |
|-------------------|-----|--------|-----|-----|-----|
| STEVEN STEIN      | 12  | 58/131 | 135 |     | 5   |
| CHARLES GORDON    | 138 | 169    | 222 | 222 | 5   |
| DAN FRITCHER      | 233 | 248    |     |     | 5   |
| DANIEL STEINBROOK | 265 | 284    | 286 |     | 5   |

**ALPHABETICAL WITNESS INDEX**

| WITNESSES:          | D   | X   | RD  | RX  | VOL |
|---------------------|-----|-----|-----|-----|-----|
| FRITCHER, DAN       | 233 | 248 |     |     | 5   |
| GORDON, CHARLES     | 138 | 169 | 222 | 222 | 5   |
| STEIN, STEVEN       | 12  | 131 | 135 |     | 5   |
| STEIN, STEVEN       |     | 58  |     |     | 5   |
| STEINBROOK, DANIEL  | 265 | 284 | 286 |     | 5   |

**VOLUME 5 OF 7**

**EXHIBIT INDEX**

**PLAINTIFF'S EXHIBITS**

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|-----|-------------|---------|----------|-----|
| 178 | ESS incident log | 253 | 253 | 5 |
| 185 | Wayback Machine | 10 | 10 | 5 |
| 198 | (Demonstrative) SafeLease dashboard | 21 | | 5 |
| 206 | (Demonstrative) | 13 | | 5 |
| 207 | Storable letter to customer | 11 | 11 | 5 |
| 208 | Courtney to Storable email 1-28-25 | 11 | 11 | 5 |

**VOLUME 5 OF 7**

**EXHIBIT INDEX**

**DEFENDANT'S EXHIBITS**

| NO. | DESCRIPTION | OFFERED | RECEIVED | VOL |
|---|---|---|---|---|
| 361 | Email 2-6-25 Sudlow to SafeLease | 137 | 137 | 5 |
| 362 | Excel spreadsheet | 137 | 234 | 5 |
| 362 | ESS database entry | 234 | | 5 |
| 363 | Email 1-28-25 O'Risky to SafeLease | 137 | 137 | 5 |
| 364 | Email 2-10-25 McAdams to SafeLease | 11 | 11 | 5 |
| 364 | Email 2-10-25 McAdams to SafeLease | 137 | | 5 |
| 365 | Self Storage Association doc | 137 | | 5 |
| 366 | Storable timeline | 141 | 141 | 5 |

**A.**    That's correct.

**Q.**    Where is SafeLease's home state as it relates to insurance?

**A.**    Texas.

**Q.**    And who is bigger in the tenant coverage market, SafeLease or Storable?

**A.**    Storable.

**Q.**    Storable's counsel at the prior hearing asked you about some marketing materials where SafeLease says:  It's the largest tenant protection and tenant insurance provider in the self-storage industry.

Can you explain to me how that's the case if Storable is a larger player in this market?

**A.**    SafeLease is one of the few producers that offers both of those products under one flag.  Storable is a collection of different companies.  Some of those companies only offer protection.  Some only offer insurance.

**Q.**    So, is it -- when it comes to Storable overall, is it fair to say that they are significantly larger than SafeLease in the tenant insurance market?

**A.**    They are.

**Q.**    They just may not have one entity that offers both products?

**A.**    That's correct.

**Q.**    Do you consider SafeLease a discount provider?  Is

that the term that you have heard?

A. It's not regularly used. I don't think it would be a mischaracterization. Occasionally, one deals on price. But I would like to think it's a combination of reasons why someone would work with us. Of course, price is always important in the insurance world.

Q. Do you agree that SafeLease offers highly competitive prices?

A. We do, yes.

Q. And the term "discount provider," is that, in fact, a term that Storable has called SafeLease in its papers in this litigation?

A. That's correct.

Q. About how many of your customers use the Storable product as their FMS?

A. I think it's now 1,800 facilities.

Q. Do you know about what percentage of your customers use a Storable FMS?

A. It's approximately 70 percent.

Q. 70 percent?

A. That's correct.

Q. Do you, SafeLease, ever access the customer's Facility Management Software without their permission?

A. Never. We wouldn't be able to. The customer has to create the credentials.

MS. ALLEN:  I would like to just very quickly pull up Plaintiff's Exhibit 70, which is "outside, counsel eyes only."

Please don't.  Okay.  Apologies.  Thank you. You can republish the document.

Q.  (BY MS. ALLEN) Is this an example of a contract between SafeLease and a facility customer that includes that authorization?

A.  Yeah, this is the first page.

Q.  Let's go to Page 2 in the program.  Is this an example a customer can send for you to access their Facility Management Software as an authorized user?

A.  It is, yes.

Q.  And it also authorizes you to access the customer's data?

A.  It does, yes.

Q.  For every customer, do you have a consent like this?

A.  We do.

Q.  Whose data is stored on the FMS?

A.  It's only the customer's data, and they are authorizing just for the purposes of facilitating the insurance program.

Q.  It's the facility's data?

A.  That's correct.

Q.  And does even Storable acknowledge that?

THE STATE OF TEXAS:

TEXAS BUSINESS COURTS:


### CERTIFICATE OF COURT REPORTER

I, DONNA A. GOREE, Official Court Reporter in and for the Texas Business Courts, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-entitled and numbered cause, all of which occurred in open court and were stenographically reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND on this the 12th day of March, 2025.

/s/ *Donna Goree*

DONNA A. GOREE, CSR, RPR, CRR
Official Court Reporter
Texas Business Courts
3721 Carmen Avenue
Rancho Viejo, Texas 78575
(979) 533-0422
donna.goree.csr3909@gmail.com
Texas Certification No. 3909
Expiration Date: 07/31/2025

E-filed in the Office of the Clerk
for the Business Court of Texas
2/25/2025 1:00 PM 103
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

## CAUSE NO. 25-BC03A-0001

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES, LLC | § § § | THE BUSINESS COURT OF TEXAS |
| Plaintiff, | § § | |
| v. | § § | THIRD DIVISION |
| | § | |
| STORABLE, INC., REDNOVA LABS, INC., (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP. | § § § § § § § | |
| Defendants. | § § | TRAVIS COUNTY, TEXAS |

### NOTICE OF APPEAL

Pursuant to Rules 25.1 and 28.1 of the Texas Rules of Appellate Procedure, Defendants Storable, Inc.; RedNova Labs, Inc. (d/b/a storEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP (collectively "Storable" or "Defendants") hereby file this Notice of Appeal.

Defendants desire to appeal to the Fifteenth Court of Appeals, which has exclusive jurisdiction over this appeal pursuant to Texas Government Code Sections 22.220(d)(3) and 25A.007 because this is an appeal from an order of a business court. Defendants appeal the Order Granting Temporary Injunction signed February 19, 2025 in the above-styled case, and all adverse rulings and failures to rule related to the Order Granting Temporary Injunction, including, but not limited to, rulings made during hearings and the February 10, 2025 Opinion and Order denying Defendants' motion to remand.

This is an accelerated appeal because it is an appeal of an interlocutory order. TEX. R. APP. P. 28.1(a). In compliance with Texas Rule of Appellate Procedure 25.1(d)(6), Defendants confirm that this appeal is not a parental termination or child protection case, or an appeal from an order certifying a child to stand trial as an adult.

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: */s/ Dale Wainwright*_____
Dale Wainwright
State Bar No. 00000049
dale.wainwright@gtlaw.com
Justin Bernstein
State Bar No. 24105462
bernsteinju@gtlaw.com
300 West 6th Street, Suite 2050
Austin, Texas 78701
T: (512) 320-7200
F: (512) 320-7210

COUNSEL FOR APPELLANTS/DEFENDANTS

-3-

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served to all attorneys of record, in compliance with Rule 21a of the Texas Rules of Civil Procedure and Rule 25.1(e) of the Texas Rules of Appellate Procedure, on February 25, 2025.

*/s/ Dale Wainwright*
Dale Wainwright

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sylvia Dominguez on behalf of Dale Wainwright
Bar No. 49
sylvia.dominguez@gtlaw.com
Envelope ID: 97769294
Filing Code Description: Notice of Appeal
Filing Description: Defendants' Notice of Appeal
Status as of 2/25/2025 1:51 PM CST

Associated Case Party: SafeLease Insurance Services LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Courtney Smith | | csmith@yettercoleman.com | 2/25/2025 1:00:29 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 2/25/2025 1:00:29 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 2/25/2025 1:00:29 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 2/25/2025 1:00:29 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 2/25/2025 1:00:29 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 2/25/2025 1:00:29 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 2/25/2025 1:00:29 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 2/25/2025 1:00:29 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 2/25/2025 1:00:29 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 2/25/2025 1:00:29 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Justin Bernstein | | bernsteinju@gtlaw.com | 2/25/2025 1:00:29 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 2/25/2025 1:00:29 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 2/25/2025 1:00:29 PM | SENT |

Associated Case Party: Storable, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Neil KentonAlexander | | kalexander@porterhedges.com | 2/25/2025 1:00:29 PM | SENT |
| Ray TTorgerson | | rtorgerson@porterhedges.com | 2/25/2025 1:00:29 PM | SENT |

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sylvia Dominguez on behalf of Dale Wainwright
Bar No. 49
sylvia.dominguez@gtlaw.com
Envelope ID: 97769294
Filing Code Description: Notice of Appeal
Filing Description: Defendants' Notice of Appeal
Status as of 2/25/2025 1:51 PM CST

Associated Case Party: Storable, Inc.

| | | | | |
|---|---|---|---|---|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 2/25/2025 1:00:29 PM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 2/25/2025 1:00:29 PM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 2/25/2025 1:00:29 PM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 2/25/2025 1:00:29 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 2/25/2025 1:00:29 PM | SENT |
| Liza Eoff | | leoff@porterhedges.com | 2/25/2025 1:00:29 PM | SENT |

**The Business Court of Texas,
Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE | § | |
| SERVICES LLC, | § | |
| *Plaintiff*, | § | |
| v. | § | Cause No. 25-BC03A-0001 |
| | § | |
| STORABLE, INC., et al., | § | |
| *Defendants*. | § | |

### AGREED PROTECTIVE ORDER & TEMPORARY SEALING ORDER

The Court enters the following Agreed Protective Order and Temporary Sealing Order (the Agreed Protective Order or Protective Order) as agreed to by the parties, except that the Court has deleted paragraph 24 and modified paragraph 20 to comply with Rule 76a and grant a temporary sealing order.

In order to expedite the flow of discovery material, facilitate the prompt resolution of disputes over confidentiality, adequately protect material entitled to be kept confidential, and ensure that protection is afforded only to material so entitled, entry of this Agreed Protective Order pursuant to Texas Rule of Civil Procedure 192.6 is merited. This Protective Order applies to materials produced in advance of the Temporary Injunction hearing and functions as the operative Protective Order for this matter until such time as this Order is amended or replaced.

It is hereby ORDERED that:

1.      All Confidential Information and Outside Counsel's Eyes Only Information produced or exchanged by the parties in the course of this litigation, including information produced by third parties/non-parties, shall be used solely for the purpose of preparation, trial, and appeal of this litigation and for no other purpose whatsoever, and shall not be disclosed to any person except in accordance with the terms hereof.

1

2.      "Confidential Information" as used herein means any information of any type, kind, or character which is designated as "Confidential" by any of the supplying or receiving parties, including third parties/non-parties supplying said information, whether it be a document, information contained in a document, discovery materials, information or testimony revealed during a deposition, or otherwise.

3.      "Outside Counsel's Eyes Only Information" as used herein means any information that is "Confidential" as described herein and additionally may not be disclosed to anyone except the Qualified Persons described in Paragraph 6, *infra.* "Outside Counsel's Eyes Only Information" includes trade secrets or other non-public, proprietary, or sensitive business or financial information.  More specifically, an "Outside Counsel's Eyes Only" designation means that the materials so denoted may not be disclosed to any party or employee, representative, or affiliate of a party, except by agreement or a subsequent Order by this Court.

4.      In designating information as "Confidential" or "Outside Counsel's Eyes Only," a party or third party/non-party supplying information will make such designation only as to that information that it in good faith believes contains "Confidential" or "Outside Counsel's Eyes Only" information.  Information or material which is available to the public, including industry materials, advertising materials, and the like shall not be classified as "Confidential" or "Outside Counsel's Eyes Only."

5.      "Qualified Persons" as used herein for "Confidential Information" means:

(a) Attorneys of record for the parties in this litigation and employees and/or agents of such attorneys to whom it is necessary that the information be shown for purposes of this litigation;

(b) Actual or potential independent experts or consultants (and their administrative or

2

clerical staff) engaged in connection with this litigation (which shall not include the current employees, officers, members, or agents of the parties or affiliates of the parties) who have signed a document in the form of Exhibit A attached hereto (such signed document to be maintained by the attorney retaining such person);

(c) The parties and their respective in-house counsel, paralegals, legal staff or experts;

(d) The Court and its staff, including court reporters;

(e) Vendors engaged by the parties or the parties' respective counsel, including independent copy services, printers, or illustrators, and court reporters for the purpose of this litigation who have signed a document in the form of Exhibit A attached hereto (such signed document to be maintained by the attorney retaining such person);

(f) The authors and original recipients of the documents or information unless any such person no longer has a right to access or possess any such documents or information by virtue of a change in employment, position, or other circumstance;

(g) The designated corporate representative for the party that produced the documents or information as "Confidential" or "Outside Counsel's Eyes Only"; or

(h) By agreement of the parties, or if this Court so elects, any other person designated as a Qualified Person by order of this Court, after notice to all the parties and hearing.

6. For "Outside Counsel's Eyes Only Information," "Qualified Persons" includes (a), (b), and (d) - (h), above.

7.     Documents produced in this action may be designated by any party or parties or by any third party and/or non-party producing said documents as "Confidential" or "Outside Counsel's Eyes Only" information by marking each page of the document(s) with the word(s) "Confidential" or "Outside Counsel's Eyes Only." However, for documents produced in electronic native form, such as Excel spreadsheets, the designation may be affixed to the drive, disk, or other medium on which the documents or materials are produced or in the file names without marking each page of the documents or materials "Confidential" or "Outside Counsel's Eyes Only."

8.     In lieu of marking the original of a document, if the original is not produced, the designating party may mark the copies that are produced or exchanged.

9.     Information disclosed at (a) the deposition of a party or one of its present or former officers, directors, employees, agents or independent experts retained by counsel for the purpose of this litigation, or (b) the deposition of a third party (which information pertains to a party) may be designated by any party, including a third party/non-party disclosing said information or being deposed, as "Confidential" or "Outside Counsel's Eyes Only" information by indicating on the record at the deposition that the testimony is "Confidential" or "Outside Counsel's Eyes Only" and is subject to the provisions of this Order.

10.    Any party or third party/non-party disclosing said information or being deposed may also designate said information disclosed at such deposition as "Confidential" or "Outside Counsel's Eyes Only" by notifying all of the parties, in writing within 30 days of receipt of the transcript, of the specific pages and lines of the transcript which should be treated as "Confidential" or "Outside Counsel's Eyes Only" thereafter. Each party shall attach a copy of such written notice or notices to the face of the transcript and each copy thereof in

his possession, custody or control. All deposition transcripts shall be treated as "Confidential" for a period of 30 days after the receipt of the transcript, apart from any portions designated on the record as "Outside Counsel's Eyes Only," which portions shall be treated as Attorneys' Eyes Only.

11. To the extent possible, the court reporter shall segregate into separate transcripts information designated as "Confidential" or "Outside Counsel's Eyes Only" with blank, consecutively numbered pages being provided in a non-designated main transcript. The separate transcript containing "Confidential" or "Outside Counsel's Eyes Only" information shall have page numbers that correspond to the blank pages in the main transcript.

12. "Confidential" or "Outside Counsel's Eyes Only" information shall not be disclosed or made available by the receiving party to persons other than Qualified Persons as delineated above. Notwithstanding the foregoing, nothing in this Protective Order restricts the ability of a party and/or third party/non-party to review, disclose, or disseminate its own documents or information as it sees fit.

13. Documents produced prior to entry of this Protective Order may be retroactively designated "Confidential" or "Outside Counsel's Eyes Only" by notice in writing of the designated class of each document by Bates number within 30 days of the entry of this Protective Order. Documents unintentionally produced without designation as "Confidential" or "Outside Counsel's Eyes Only" may be retroactively designated in the same manner and shall be treated appropriately from the date written notice of the designation is provided to the receiving party. The burden shall be on the party claiming confidentiality to prove the confidential nature of the documents.

14. Documents to be inspected shall be treated as "Confidential" during inspection. At the time of copying for the receiving parties, such inspected documents shall be marked or stamped prominently "Confidential" or "Outside Counsel's Eyes Only" by the producing party.

15. If a receiving party learns of any unauthorized disclosure of "Confidential" or "Outside Counsel's Eyes Only," the party shall immediately upon learning of such disclosure inform the producing party of all pertinent facts relating to such disclosure and shall make all reasonable efforts to prevent disclosure by each unauthorized person who received such information.

16. Nothing herein shall prevent disclosure beyond the terms of this Protective Order if each party or third party/non-party designating the information as "Confidential" or "Outside Counsel's Eyes Only" consents in writing to such disclosure or if the Court orders such disclosure. Nor shall anything herein prevent any counsel of record from utilizing "Confidential" or "Outside Counsel's Eyes Only" information in the examination or cross-examination of any person who is indicated on the document as being an author, source or recipient of the "Confidential" or "Outside Counsel's Eyes Only" information, or if counsel has a reasonable belief that such person was an author, source or recipient of "Confidential" or "Outside Counsel's Eyes Only" information irrespective of which party or third party/non-party produced such information.

17. A party shall not be obligated to challenge the propriety of a designation as "Confidential" or "Outside Counsel's Eyes Only" at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. In the event that any party to this litigation disagrees at any stage of these proceedings with the designation by the designating party of any information as "Confidential" or "Outside Counsel's Eyes Only" or the designation of any person as a

Qualified Person, the parties shall first try to resolve such dispute in good faith on an informal basis, such as production of redacted copies. If the dispute cannot be resolved, the objecting party may invoke this Protective Order by objecting in writing to the party or third party/non-party who has designated the document or information as "Confidential" or "Outside Counsel's Eyes Only" or designated any person as a Qualified Person. The designating party shall be required to move the Court for an order preserving the designated status of such information or person within 30 business days of receipt of the written objection. The disputed information shall remain "Confidential" or "Outside Counsel's Eyes Only" unless and until the Court orders otherwise. Failure to move for an order shall constitute a termination of the restricted status of such item unless the parties otherwise agree. The party or third party/non-party objecting to disclosure bears the burden of proof to establish the confidentiality of the document.

18. The parties may, by stipulation, provide for exceptions to this Protective Order, and any party may seek an order of this Court modifying this Protective Order.

19. Nothing shall be regarded as "Confidential" or "Outside Counsel's Eyes Only" information if it is information that either:

(a) is in the public domain at the time of disclosure supported by appropriate evidence; or

(b) becomes part of the public domain through no fault of the other party, as supported by appropriate evidence.

20. The following provisions govern the treatment of "Confidential" or "Outside Counsel's Eyes Only" Information used in connection with Court filings or proceedings:

(a) Temporary Sealing Order. There have been hearings in this case in connection with plaintiff's request for a temporary restraining order (TRO) and temporary injunction

7

(TI). The Court has determined that the criteria of Rule 76a(5) is satisfied and hereby GRANTS a temporary sealing order covering (1) the exhibits that are designated as "Confidential" or "Outside Counsel's Eyes Only" and (2) the transcripts of those proceedings. This temporary sealing order will remain in effect until **March 24, 2025**.

(b) <u>Sealing Motion, Notice, and Hearing</u>. At **1 p.m. on March 20, 2025**, the Court will hold a hearing on whether to permanently seal the materials covered by the temporary sealing order in subsection (a), above. At least 14 days before the hearing, the parties, either jointly or individually, must (1) file a motion to seal any portions of the material covered by the temporary sealing order that should not be made public upon expiration of the temporary sealing order; and (2) comply with the notice requirements of Rule 76a(3). **The motion(s) must identify the specific portions of the hearing transcript(s) to be sealed by page and line.** The Court will not seal the entire transcript(s). The exhibits to be sealed must be identified by exhibit numbers. Any documents or transcripts previously provided to the Court need not be provided again, but any transcripts or exhibits that a party seeks to seal that were not previously provided to the Court should be provided to the Court in the same manner as the hearing exhibits for the TI hearing and served on the other parties subject to this Agreed Protective Order.

(c) <u>Future hearings</u>. For future hearings at which the parties expect to disclose "Confidential" or "Outside Counsel's Eyes Only" Information or documents containing such information, the parties may move for a temporary sealing order under Rule 76a(5) before the hearing. Any material at issue in the motion that has

not previously been provided to the Court should be provided to the Court for *in camera* inspection but not filed in the case. If granted, the temporary sealing order will remain in place for 30 days after the hearing and may be extended for good cause. The parties may move for permanent sealing by obtaining a hearing date from the Court and complying with Rule 76a and the procedures in subsection (b), above, relating to the motion and notice. For any part of the hearing record that contains "Confidential" or "Outside Counsel's Eyes Only" Information that has been sealed under a prior sealing order, the motion to seal need only identify the portion of the record (by page and line or exhibit number) to be sealed and the applicable sealing order.

(d) <u>Filings</u>. To the extent documents containing or revealing "Confidential" or "Outside Counsel's Eyes Only" Information are filed in this Court after the date of this order, the parties shall undertake the following procedures:

1. The filing party must redact any material that would disclose "Confidential" or "Outside Counsel's Eyes Only" Information from the Court filing and simultaneously serve an unredacted version on the other parties subject to this Protective Order.

2. The redacted filing must identify the redacted material by Bates Number, page and line, or as specifically as possible.

3. The parties have five days after such filing to move to temporarily or permanently seal the designated information. If no motion to seal is timely filed, the filing party will file the unredacted version of the document with the Court. If a motion to seal is timely filed, the filing party will wait until

the Court rules on the motion to seal, then file the unredacted version of the document under seal or not under seal, as dictated by the Court's ruling.

4. The foregoing notwithstanding, if the parties agree that any or all of the redacted material is not needed for the resolution of the matter, that material may remain redacted, will not become part of the Court's record, and will not be considered by, relied on, or before the Court.

(e) <u>Trial</u>. The use of "Confidential" or "Outside Counsel's Eyes Only" Information at trial will be addressed in the pretrial order and/or at the pretrial conference.

(f) The parties understand that material provided to the Court for *in camera* inspection but not filed in the case will not be part of the record unless further action is taken.

(g) The parties understand that material filed in the case under a temporary sealing order may become part of the public record if a permanent sealing order is denied.

21. Unless otherwise agreed to in writing by the parties or ordered by the Court, all proceedings involving or relating to "Confidential" or "Outside Counsel's Eyes Only" documents or information shall be subject to the provisions of this Protective Order.

22. After the conclusion of this litigation and any appeal thereof, any "Confidential" or "Outside Counsel's Eyes Only" documents and all copies or reproductions of such documents produced by a party or third party/non-party in the possession of any of the "Qualified Persons" shall be returned to the producing party or third party/non-party within 60 days of receipt of a timely written request by said producing party or third party/non-party, except as this Court may otherwise order or to the extent such information was used as evidence at the trial. As far as the provisions of any protective orders entered in this action restrict the communication and use of the documents produced thereunder, such orders shall

continue to be binding after the conclusion of this litigation, except (a) that there shall be no restriction on documents that are used as exhibits in open court, and (b) that a party may seek the written permission of the producing party or order of the Court with respect to dissolution or modification of such protective orders. Alternatively, at the conclusion of this litigation, in lieu of the actual physical return of "Confidential" or "Outside Counsel's Eyes Only" documents, counsel for each party may provide a certification certifying that (1) all experts and any other person(s) receiving "Confidential" or "Outside Counsel's Eyes Only" documents have been instructed to delete or destroy all documents; and (2) all "Confidential" or "Outside Counsel's Eyes Only" documents in the possession of counsel have been deleted or destroyed.

23.   Any party designating any person as a "Qualified Person" shall have the duty to reasonably ensure that such person observes the terms of this Protective Order.

Signed this 27th day of February, 2025.

_____
Hon. Melissa Andrews
Judge Presiding

CAUSE NO. D-1-GN-24-010233

| | | |
|---|---|---|
| **SAFELEASE INSURANCE SERVICES, LLC,** | § § § | **IN THE DISTRICT COURT** |
| *Plaintiff,* | § § § | |
| **v.** | § § | |
| **STORABLE, INC., REDNOVA LABS, INC. (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP,** | § § § § § § § | **345ᵀᴴ JUDICIAL DISTRICT** |
| *Defendants.* | § § § | **TRAVIS COUNTY, TEXAS** |

## EXHIBIT A

### AGREEMENT TO BE BOUND BY TERMS OF PROTECTIVE ORDER

My name is, _____, my date of birth is _____, and my address is, _____. I have read and am familiar with the terms of the Protective Order concerning the records and testimony produced by the respective parties in this case, and I agree to abide by all terms of said Protective Order and not to reveal or otherwise communicate any of the information disclosed to me pursuant thereto to anyone except in accordance with the terms of said Protective Order. I agree not to make any use of that information or materials other than for the purpose of this litigation.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Executed in _____ County, State of _____

Date:

E-filed in the Office of the Clerk
for the Business Court of Texas
4/4/2025 8:29 PM **120**
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

**The Business Court of Texas,**
**Third Division**

SAFELEASE INSURANCE §
SERVICES LLC, §
§
§
*Plaintiff,* §
§
§ Cause No. 25-BC03A-0001
*v.* §
§
STORABLE, INC., et al., §
§
§
*Defendants.* §

---

**Storable's Motion to Modify Protective Order/Require Disclosure and**
**Request for Expedited Consideration**

---

Pursuant to the February 27, 2025 Protective Order, and the Court's inherent authority under the Texas Rules of Civil Procedure, Defendants Storable, Inc., RedNova Labs, Inc., SiteLink Software, LLC, Easy Storage Solutions, LLC, Bader Co., and Property First Group, LP ("Storable" or "Defendants") respectfully move the Court on an expedited basis for an order requiring Plaintiff SafeLease Insurance Services LLC ("SafeLease") to disclose information necessary to investigate potential unauthorized access to Storable's "Outside Counsel's Eyes Only" ("OCEO") Documents—information which SafeLease is refusing to provide. Storable further moves the Court for an order modifying the Protective Order ("PO") to exclude attorney Adam Locke ("Locke") from accessing Storable's OCEO documents going forward. Given the nature of the relief requested, Storable respectfully requests the Court's expedited consideration and would show as follows:

**Summary of the Argument**

During the Court's hearing on the temporary injunction, one of Plaintiffs' counsel, Mr. Yetter, represented in open court that SafeLease's **"outside general counsel is Adam Locke"** and

that "**when we get into outside/counsel only, we will ask him to be excused**." TI Hr'g Tr. (Feb. 11, 2025) at 95:12–16, **Exhibit A** (emphasis added). SafeLease is now attempting to insert Locke—its general counsel, who is also its **former chief operating officer, and a witness in this case**—as an outside counsel of record with full access to Storable's OCEO documents. When the parties entered into an Agreed Protective Order, which the Court issued on February 27, 2025, both Storable and the Court understood that SafeLease was excluding Locke from OCEO materials. Just a few weeks later, however, on March 24, 2025, Locke entered an appearance in this case and has admitted to reviewing Storable's OCEO documents as early as the very next day, March 25, 2025, and is continuing to access and review such documents.

Now, despite Storable's multiple requests, SafeLease refuses to provide basic information—*e.g.*, what OCEO documents Locke reviewed and when—for Storable to determine whether there was unauthorized access to its OCEO documents. SafeLease is required to provide this information under the PO, and the Court should order it to do so.

Storable further requests that the Court modify the PO to expressly exclude Locke from reviewing Storable's OCEO documents going forward consistent with SafeLease's conduct, and Storable's understanding at the time of the PO, prior to Locke's attempted hat change. **Had Storable known that Locke planned to appear in the case and access OCEO materials, Storable would not have agreed to the PO in its current form.** Whether strategic or unintentional, Locke's March 24 appearance, weeks after the PO was entered, deprived Storable of the opportunity to advocate for provisions in the PO necessary to protect its OCEO documents.

Because of the issues raised in this motion, Storable respectfully requests that the Court consider the motion on an expedited basis. Storable requested that SafeLease temporarily pause Locke's access to OCEO documents to avoid a need for expedited relief, yet SafeLease refused.

**Relevant Background**

## I. Adam Locke

Locke is SafeLease's current outside General Counsel. At the February 11, 2025 hearing on Plaintiffs' Temporary Injunction Motion, Plaintiffs' counsel, Mr. Yetter, represented to the Court that SafeLease's "outside general counsel is Adam Locke" and that "when we get into outside/counsel only, we will ask him to be excused." TI Hr'g Tr. (Feb. 11, 2025) at 95:12–16, Exh. A. Plaintiff's counsel similarly represented at the January 16, 2025 hearing on Plaintiff's TI motion before the District Court that Locke was one of SafeLease's "client representatives" and that "he is the outside General Counsel." TI Hr'g Tr. (Jan. 16, 2025) at 35:21–25, **Exhibit B**. Locke was repeatedly excused during the course of the TI hearing in this Court when OCEO materials were being introduced or discussed.

Locke is also SafeLease's former Chief Operating Officer, a position he held during the relevant time period for purposes of this case and therefore is likely a potential witness in this case. *See Press Release: SafeLease Hires Adam Locke as Chief Operating Officer* (Jul. 20, 2022), https://www.safelease.com/resources/safelease-hires-adam-locke-as-chief-operating-officer, **Exhibit C**.

## II. The Agreed Protective Order

As of the Court's February 11 hearing, the Parties had been operating under a Rule 11 Agreement permitting one another to designate produced documents as "Confidential" or "Outside Counsel's Eyes Only." However, on February 20, 2025, the Parties submitted a Proposed Agreed Protective Order to formalize those protections. *See* [Proposed] Agreed PO (Feb. 20, 2025). On February 27, 2025, this Court entered the PO in the form submitted by the Parties with slight modifications. *See* PO, **Exhibit D**. At the time the Parties agreed to the Proposed Agreed PO and when the Court entered the PO, both Defendants and the Court understood, pursuant to Plaintiff's

counsel's representations, that Locke was SafeLease's general counsel and not permitted to view documents marked by Defendants as OCEO.

The PO provides that "Documents produced in this action may be designated by any party . . . as 'Confidential' or 'Outside Counsel's Eyes Only' information by marking each page of the document(s) with the words 'Confidential' or 'Outside Counsel's Eyes Only.'" *Id.* § 7. The PO "applies to materials produced in advance of the Temporary Injunction hearing" and granted a temporary sealing order for all exhibits to those hearings marked "Confidential" or "Outside Counsel's Eyes Only," which the Court determined to meet the standards for temporary sealing under Rule 76a(5). *Id.* § 20(a). Both Plaintiff and Defendants have marked several documents produced as OCEO, including several exhibits to the TI hearings.

Under the PO, documents designated OCEO "may not be disclosed to any party or employee, representative, or affiliate of a party, except by agreement or a subsequent Order by this Court." *Id.* § 3. The PO specifies the limited individuals who may view OCEO documents, including only: counsel of record for the Parties and their staff; experts or consultants for the Parties in this litigation and their staff; the Court and its staff; vendors engaged by the Parties' counsel; authors and recipients of any particular document (subject to restrictions); a party's corporate representative (but only as to documents designated as OCEO by such party); and other materials as may be agreed by the Parties or ordered by the Court. *Id.* §§ 5(a)–(b) & (d)–(h), 6.

### III. Locke Appears as Counsel of Record and Admits to Having Reviewed An OCEO Document the Next Day

On March 24, 2025 Locke filed a notice of appearance in this matter. *See* Notice of Appearance of Counsel (Mar. 24, 2025). The following day, counsel for the Parties participated in a meet-and-confer regarding the Parties' motions to seal, which was conducted by teleconference. Locke attended this meeting and other counsel for SafeLease represented that

Locke is a "member of SafeLease's outside counsel team." Declaration of Defendants' Counsel, A. Bergman, **Exhibit E**. During the meeting, Locke stated that he reviewed one of the TI hearing exhibits that Defendants marked OCEO as an example of a document he did not believe should be sealed, and he explained his reasoning based on the contents of the document. *Id.* At the end of the meeting, counsel for Defendants stated, for the record, that Defendants do not accept Plaintiff's characterization of Locke as "outside counsel" for SafeLease, to which Locke responded "we'll raise it with the Court." *Id.*

**IV.     Locke Refuses to Stop Accessing Storable's OCEO Documents and to Provide a List of Which Storable OCEO Documents He Reviewed and When.**

Later on March 25, 2025, and shortly after Locke's admission that he reviewed an OCEO document, counsel for Defendants sent a letter to lead counsel for Plaintiff, P. Yetter, formally demanding that Locke cease and desist from viewing documents marked by Defendants as OCEO. *See* K. Treistman Letter to P. Yetter (Mar. 25, 2025), **Exhibit F**. The letter requested (1) counsel's confirmation that Locke would immediately and permanently cease and desist from reviewing OCEO documents unless and until any such OCEO designation is properly challenged and removed by the Court; and (2) a list of all documents marked OCEO by Defendants that Locke has reviewed. *Id.* The letter also requested a Rule 11 agreement to memorialize Plaintiff's agreement that Locke will cease and desist from the improper conduct. *See id.*

On March 26, 2025, Locke sent a response letter in which he insists that he is "outside counsel" and entitled to access Storable's OCEO documents. *See* A. Locke Letter to K. Treistman (Mar. 26, 2025), **Exhibit G**. Locke's response did not state whether he would provide the requested list of documents, nor whether he would agree to stop looking at Storable's OCEO documents going forward.

On March 28, counsel for Storable conferred with Locke by telephone and email and asked once again that he stop viewing Storable's OCEO documents, and that, in the alternative he stop doing so temporarily while the parties resolve this issue in order to avoid the need to go to the Court on an expedited basis. Locke again insisted that he is SafeLease's outside counsel and should have full access to Storable's OCEO documents. *See* A. Locke Email to K. Treistman (Mar. 28, 2025), **Exhibit H**. His response did not address the proposed temporary pause. *See id.*

On March 31, undersigned counsel sent Locke another letter asking him to confirm his refusal to stop accessing Storable's OCEO documents and to provide the list of which OCEO documents he has reviewed and when. *See* K. Treistman Letter to A. Locke (Mar. 31, 2025), **Exhibit I**. The March 31 letter also proposed an alternative solution—namely that if Locke would agree to stop accessing Storable's OCEO documents across the board, Storable would consider de-designations of certain OCEO documents if one of SafeLease's outside law firms, Yetter Coleman or Stone Hilton, determines that Locke's review of such documents is necessary for SafeLease to pursue its case. *Id.* at 2.

In a response letter on April 2, 2025, Locke confirmed his refusal to stop accessing Storable's OCEO's documents, but again refused to provide a response to the requested list of Storable's OCEO documents that he reviewed and when he reviewed them. *See* A. Locke Letter to K. Treistman (Apr. 2, 2025), **Exhibit J**. Locke did, however, reject Storable's proposal to discuss de-designations of particular OCEO documents that SafeLease's outside law firms may need Locke to review. *Id.* at 3.

In yet another attempt to reach a resolution without the Court's intervention, on April 3, Storable's counsel conferred in writing asking SafeLease to confirm its refusal to provide the list

of documents (which it failed to provide despite two requests). As of this filing, SafeLease has not responded to this final request.

## Legal Standard

The PO's paragraph 15 provides that "[i]f a receiving party learns of any unauthorized disclosure of [OCEO], the party shall immediately upon learning of such disclosure inform the producing party of all pertinent facts relating to such disclosure . . . ." PO § 15, Exh. D. As with any order, Court has "all powers necessary" to enforce the PO. TEX. GOV. CODE § 21.001(a). Those powers include aiding "the exercise of [the Court's] jurisdiction," facilitating "the administration of justice," and preserving "the independence and independence and integrity of the judicial system." *Brewer v. Lennox Hearth Products, LLC*, 601 S.W.3d 704, 718 (Tex. 2020).

The Texas Rules of Civil Procedure also allow courts to issue any protective orders regarding discovery "in the interest of justice." TEX. R. CIV. P. § 192.6(b).

## Argument and Authorities

The Court should require SafeLease to disclose which of Storable's OCEO documents Locke reviewed and when he reviewed them. The Court should also modify the PO to exclude Locke from viewing Storable's OCEO documents going forward.

**I.     SafeLease Must Provide Facts Relevant to Determine Whether There Was Any Unauthorized Disclosure of Storable's OCEO Documents.**

The Court should order SafeLease to disclose which of Storable' OCEO documents Locke reviewed and when he reviewed them. Under the PO, SafeLease is required to promptly disclose "all pertinent facts" relating to any unauthorized disclosure of OCEO documents. PO § 15, Exh. D. The record shows that there has been at least some—if not a significant amount—of unauthorized disclosure of Storable's OCEO documents. *See* Exhs. E, H, J.

A. **If Locke Was Not Permitted to View OCEO Documents, then Storable is Entitled to Know Which Documents He Reviewed**

First, and as an initial matter, it is not clear at all that an "outside general counsel" such as Locke is truly an "outside counsel" within the letter or spirit of the PO's OCEO provisions. If he is not, then it is essential for SafeLease to disclose all Storable OCEO documents that Locke has viewed so that Storable and the Court can determine the extent of protected OCEO information that was compromised.

Under the PO, counsel permitted to view OCEO documents include "[a]ttorneys of record for the parties in this litigation . . . to whom it is **necessary** that the information be shown for purposes of this litigation." PO §§ 5(a), 6 (emphasis added), Exh. D. OCEO materials, however, "may not be disclosed to any party or employee, **representative**, or affiliate of a party . . . ." *Id.* § 3 (emphasis added). SafeLease has already affirmed in open court that Locke is a "client representative[,]" TI Hr'g Tr. (Jan. 16, 2025) at 35:21–25, Exh. B, and expressly took the position that he needed to be excused from discussion and review of OCEO materials that were before the Court. TI Hr'g Tr. (Feb. 11, 2025) at 95:12–16, Exh. A.

Locke cannot erase, or attempt to somehow explain, these judicial admissions as to his role simply by filing a notice of appearance. If a party's general counsel could do this, then it would render the PO's OCEO restrictions a nullity. In any event, SafeLease has litigated this case for months before Locke's March 24 notice of appearance—including prosecuting a TI motion before two different courts involving multiple days of hearings—so it is unclear why SafeLease's general counsel now suddenly qualifies as attorney "to whom it is **necessary** that [OCEO] information be shown **for purposes of this litigation**." PO §§ 5(a), 6 (emphasis added), Exh. D.

To the extent Locke does not qualify to review Storable's OCEO documents under the PO, SafeLease is required under section 15 to provide Storable with, at minimum, a list of the OCEO documents Locke reviewed, and all other "pertinent facts relating to such disclosure[.]" *Id.* § 15.[1]

**B.** **Even if Locke Might Qualify to Review OCEO Materials—Storable is Still Entitled to Know Which Documents he Reviewed and <u>When</u>.**

Even if Locke's March 24, 2025 notice of appearance could transform him from a client "representative" (required to be excluded from OCEO materials), into an "outside counsel" with full access to those materials under the PO (which is not clear at all), Storable is plainly entitled to know which of its OCEO materials Locke reviewed and, most importantly, when (or, at minimum, whether the review occurred before or after his appearance). *See id.* § 15. At bare minimum, counsel must file an appearance in the case to be an "attorney of record" who may view OCEO materials under the PO. *Id.* §§ 5(a), 6 (emphasis added).

There can be no realistic dispute that Locke's review, if any, of Storable's OCEO documents <u>before</u> his March 24 notice of appearance would have been improper. Given that Locke filed his notice of appearance at 6:26 PM on March 24, 2025—yet was discussing a Storable OCEO document that he reviewed at the parties' 2:00 PM meet-and-confer <u>the very next day</u> (*see* Exh. E), it is possible, if not likely, that Locke was accessing and viewing Storable's OCEO documents before his March 24, 6:26 PM notice of appearance. At minimum, there is enough indicia of unauthorized disclosure to trigger SafeLease's requirement to provide Storable with the pertinent facts—including which OCEO documents Locke reviewed and when—pursuant to section 15 of the PO.

---

[1] Storable respectfully reserves it right to move for an order to show cause or other relief for any violations of the PO. It does not do so at this time simply because it was necessary to seek the more limited relief in this motion on an expedited basis—namely to (1) get the information needed to investigate any unauthorized disclosure of its OCEO information in the first instance and (2) to seek modification of the PO going forward. If the Court determines on its own that an order to show cause is warranted, Storable respectfully requests that it be permitted to provide its position in the ordinary course and consistent with the Court's procedures.

## II. The Court Should Modify PO Section 3 to Expressly Exclude Locke from Viewing Storable's OCEO Information.

When the PO was entered on February 27, 2025, everyone—the Court, Storable, and SafeLease's lead counsel, Mr. Yetter—understood that Locke was a "client representative" of SafeLease who had to be excluded from viewing OCEO materials. *See* Exh. A, Exh. B. Regardless of whether the PO as written permits Locke to change hats simply by filing a notice of appearance, going forward, the Court should modify section 3 of the PO as follows to reflect the Parties' and the Court's understanding at the time it was entered:

> 3. . . . More specifically, an "Outside Counsel's Eyes Only" designation means that the materials so denoted may not be disclosed to any party or employee, representative, or affiliate of a party, except by agreement or a subsequent Order by this Court. <u>For the avoidance of doubt, materials containing an "Outside Counsel's Eyes Only" designation produced by Defendants may not be disclosed to attorney Adam Locke, who is Plaintiff's outside general counsel, except by agreement or a subsequent Order of this Court.</u>

Modifying the PO in this manner is "in the interests of justice" for several reasons.

<u>First</u>, the PO was an agreed protective order which the parties negotiated and which the Court entered (with slight modifications not relevant here). At the time of the Parties' agreement, Storable did not know that Locke planned to appear in the case as counsel of record and obtain access to OCEO documents. Neither Locke nor SafeLease ever disclosed this intention before the PO was entered, and indeed, Locke did not actually file his appearance until almost a month <u>after</u> the PO was entered. Instead, SafeLease made exactly the opposite representation regarding Locke's role at the hearings before this Court and the District Court. *See* Exh. A, Exh. B. Neither a party's good faith agreement to a protective order, nor a Court's approval of such an order, should ever be procured on a bait-and-switch basis as SafeLease has done here—and least of all where the agreement at issue concerns a party's confidential and competitively sensitive materials produced with the expectation that the opposing party's client representatives, like Locke, would

not see them. The Court should ensure that the PO's provisions fairly reflect the Parties' and the Court's mutual understanding as to who could review OCEO documents at the time the order was entered.

Second, even putting aside settled expectations at the time the PO was entered, Locke is objectively a client representative of SafeLease who should not in fairness be permitted to view Storable's OCEO documents going forward. Locke's correspondences regarding this matter admit that he is SafeLease's "outside general counsel"—a role in which he provides SafeLease with "general legal advice" that SafeLease relies on. Exh. G at 2–3. This role is different from an outside counsel retained for this litigation. SafeLease is a direct competitor of Storable, and Storable's OCEO materials include competitively sensitive information. *See* PO § 3, Exh. D (OCEO documents include "trade secrets or other non-public, proprietary, or sensitive business or financial information"). Storable's right to the confidentiality and propriety of such information under the PO is violated if individuals like Locke, who are involved in SafeLease's general business operations or discussions, are privy to OCEO documents.

Finally, SafeLease will not be prejudiced if Locke were to be excluded from viewing Storable's OCEO materials. This is not a situation in which a business litigant with limited means cannot afford more than one lawyer to serve as its general counsel and its outside litigation counsel. Rather, independent of Locke, SafeLease has hired two entirely capable outside law firms, Yetter Coleman and Stone Hilton, that were ably handling this case for months before Locke filed his March 24 notice of appearance. If Locke is excluded from OCEO materials, SafeLease will still have several qualified and experienced outside counsel with access to these documents. Further, Storable remains willing to consider de-designating certain OCEO documents if SafeLease's outside law firms determine that Locke needs to review them (*see* Exh. I at 2), and even if the

parties cannot agree on de-designations, the PO has a procedure for challenging OCEO designations.  *See* PO § 17, Exh. D.

**III.    The Grounds for the Relief Sought in this Motion Call for Expedited Consideration**

In this case between competitors, the PO's OCEO provisions apply to the Parties' highly sensitive trade secret, financial, and other proprietary information.  *See id.* § 3.  Accordingly, under the PO, Storable has a right to be "immediately" informed of "all pertinent facts" relating to any unauthorized disclosure of its OCEO information.  *Id.* § 15.  Similarly, wrongful disclosure of trade secret information, even under a protective order, constitutes <u>irreparable harm</u>.  *See In re Leviton Mfg. Co., Inc.*, 1 S.W.3d 898, 900 (Tex. App.—Waco 1999, orig. proceeding) (emphasis added).  SafeLease has refused to provide the requested information, and Locke has refused to stop viewing Storable's OCEO documents—either in general or even temporarily to avoid the need Court intervention.

**Conclusion**

Accordingly, Storable respectfully requests that the Court expedite its consideration of this Motion and require SafeLease to disclose which of Storable's OCEO documents Locke viewed and when; modify the February 27, 2025 PO to exclude Locke from viewing OCEO materials going forward; and grant any other relief to which Storable may justly be entitled.

Respectfully submitted April 4, 2025.

*/s/ Katherine G. Treistman*
Katherine G. Treistman
State Bar No. 00796632
Andrew D. Bergman
State Bar No. 24101507
**ARNOLD & PORTER KAYE SCHOLER LLP**
700 Louisiana Street, Suite 4000
Houston, Texas 77002–2755
Tel.: (713) 576–2400
Fax: (713) 576–2499
Katherine.Treistman@arnoldporter.com
Andrew.Bergman@arnoldporter.com

Mikaila Skaroff (*admitted pro hac vice*)
Colorado Bar No. 60688
**ARNOLD & PORTER KAYE SCHOLER LLP**
1144 Fifteenth St, Suite 3100
Denver, Colorado 80202
Tel.: (303) 863–1000
Fax: (303) 863–2301
Mikaila.Skaroff@arnoldporter.com

Ray T. Torgerson
State Bar No. 24003067
Neil Kenton Alexander
State Bar No. 00996600
Jonna N. Summers
State Bar No. 24060649
Elizabeth "Liza" Eoff
State Bar No. 24095062
Lakshmi N. Kumar
State Bar No. 24144581
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Tel.: (713) 226–6000
Fax: (713) 226–6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
ljumar@porterhedges.com

Dale Wainwright
State Bar No. 00000049
Justin Bernstein
State Bar No. 24105462
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel.: (512) 320–7240
Fax: (512) 320–7240
Dale.wainwright@gtlaw.com
bernsteinju@gtlaw.com

*Counsel for Defendants*

## Certificate of Conference

The Parties conferred multiple times via email, telephone calls, and letters exchanged from March 25, 2025 through April 3, 2025 regarding the relief requested in this Motion. Counsel for Plaintiff indicated that it would not discontinue Mr. Locke's access to OCEO materials. Counsel for Plaintiff failed to response to repeated requests for the disclosure of information requested in this Motion. On April 3, 2025, counsel for Defendants attempted one final time to confer with Plaintiff's counsel regarding Plaintiff's position on the relief requested in this Motion. As of this filing on April 4, 2025, Plaintiff's counsel has not responded. Due to the exigent nature of the underlying dispute, Defendants have proceeded to file this Motion, despite the lack of response. Based on Plaintiff's counsel's statements in the parties' meet-and-confer discussions, it is my understanding that Plaintiff is opposed to the relief requested in this Motion.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

## Certificate of Compliance

I hereby certify that this document complies with Local Rule 5(a) and contains 3,783 words, excluding the case caption, any index, table of contents or table of authorities, signature blocks, attached evidence, or any required certificates.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

## Certificate of Service

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon counsel of record in accordance with the Texas Rules of Civil Procedure on April 4, 2025.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cathy Hodges on behalf of Katherine Ginzburg Treistman
Bar No. 796632
catherine.hodges@aporter.com
Envelope ID: 99322069
Filing Code Description: Motions - All Other
Filing Description: Storable's Motion to Modify Protective Order - Require Disclosure and Request for Expedited Consideration
Status as of 4/7/2025 9:37 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 4/4/2025 8:29:07 PM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 4/4/2025 8:29:07 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 4/4/2025 8:29:07 PM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 4/4/2025 8:29:07 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 4/4/2025 8:29:07 PM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 4/4/2025 8:29:07 PM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 4/4/2025 8:29:07 PM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 4/4/2025 8:29:07 PM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 4/4/2025 8:29:07 PM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 4/4/2025 8:29:07 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 4/4/2025 8:29:07 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 4/4/2025 8:29:07 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 4/4/2025 8:29:07 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 4/4/2025 8:29:07 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 4/4/2025 8:29:07 PM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 4/4/2025 8:29:07 PM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 4/4/2025 8:29:07 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 4/4/2025 8:29:07 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 4/4/2025 8:29:07 PM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 4/4/2025 8:29:07 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 4/4/2025 8:29:07 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 4/4/2025 8:29:07 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cathy Hodges on behalf of Katherine Ginzburg Treistman
Bar No. 796632
catherine.hodges@aporter.com
Envelope ID: 99322069
Filing Code Description: Motions - All Other
Filing Description: Storable's Motion to Modify Protective Order - Require Disclosure and Request for Expedited Consideration
Status as of 4/7/2025 9:37 AM CST

Case Contacts

| Dolores Brunelle | | dbrunelle@porterhedges.com | 4/4/2025 8:29:07 PM | SENT |
|---|---|---|---|---|
| Cathy Hodges | | catherine.hodges@aporter.com | 4/4/2025 8:29:07 PM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 4/4/2025 8:29:07 PM | SENT |
| Adam Locke | | adam@lockelaw.com | 4/4/2025 8:29:07 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 4/4/2025 8:29:07 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 4/4/2025 8:29:07 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 4/4/2025 8:29:07 PM | SENT |

# EXHIBIT A

REPORTER'S RECORD

VOLUME 3 OF 13 VOLUMES


CAUSE NO. 15-25-00020-CV
TRIAL COURT CAUSE NO. 25-BC03A-0001
IN THE FIFTEENTH COURT OF APPEALS
Sitting at Austin, Texas


STORABLE, INC.; REDNOVA LABS, INC.
(D/B/A STOREDGE); SITELINK SOFTWARE, LLC;
EASY STORAGE SOLUTIONS, LLC; BADER CO.;
AND PROPERTY FIRST GROUP, LP

V.

SAFELEASE INSURANCE SERVICES, LLC

------------------------------------------------------------

REPORTER'S RECORD

FEBRUARY 11, 2025

------------------------------------------------------------

On the 11th day of February, 2025, the hearing on Discovery Motions and a Temporary Injunction came on to be heard in the above-entitled and -numbered cause; and the following proceedings were had before the Honorable Melissa Andrews, Judge Presiding, held in Austin, Travis County, Texas:

Proceedings reported by computerized stenotype machine; Reporter's Record produced by computer-assisted transcription.

THE COURT:  Thank you very much.

If the plaintiff would like to go forward with their first witness.

MR. YETTER:  Yes.  Our first witness is Dr. Williams, as I said earlier; and our colleague, Mr. Schamel, will present his examination.

MR. TORGERSON:  We would like to invoke the rule as to fact witnesses, and I would like time to rearrange with my co-counsel.

THE COURT:  Okay.

MR. YETTER:  I neglected to introduce our CEO, who is our corporate representative.  That is Mr. Stein, Steven Stein; and the outside general counsel is Adam Locke, L-O-C-K-E.  He is not a witness; but when we get into outside/counsel only, we will ask both of them to be excused.  But they're not subject to the rule because one is a lawyer and one is our corporate representative.  Thank you.

MR. SCHAMEL:  Good morning, Your Honor. SafeLease calls Dr. Williams.

(Whereupon, the witness was sworn)

MR. SCHAMEL:  May it please the court.

THE COURT:  Please proceed.

MR. SCHAMEL:  Before I get started, we prepared a PowerPoint slide.  May I approach and give

THE STATE OF TEXAS

COUNTY OF HARRIS

I, Kimberly Kidd, Deputy Court Reporter in and for the Business Court of Texas, Third Division, Travis County, Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

I further certify that the total cost for te preparation of this Reporter's Record is $2,837.65 and was paid by Defendant.

WITNESS my hand this the 12th day of March, 2025.

/s/Kimberly Kidd
Kimberly Kidd, Texas CSR No. 2437
Expiration Date:  8/31/26
Deputy Court Reporter
1104 Londonderry Avenue
Friendswood, Texas  77546
kkidd295th@live.com

# EXHIBIT B

**REPORTER'S RECORD**
**CAUSE NO. D-1-GN-24-010233**

SAFELEASE INSURANCE SERVICES, )IN THE DISTRICT COURT OF
LLC,                           )
        Plaintiff,             )
                               )
v.                             )
                               )TRAVIS COUNTY, TEXAS
STORABLE, INC., REDNOVA LABS   )
(D/B/A storEDGE), SITELINK     )
SOFTWARE, LLC, EASY STORAGE    )
SOLUTIONS, LLC, BADER CO., AND)
PROPERTY FIRST GROUP, LP,      )
        Defendants.            )345TH JUDICIAL DISTRICT

_____

**TEMPORARY INJUNCTION HEARING**

_____

    On the 16th day of January, 2025, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Jessica Mangrum, Judge Presiding, held in Austin, Travis County, Texas.

    Proceedings reported in computerized machine shorthand by a Texas Certified Shorthand Reporter, Certification Number 7076.

P R O C E E D I N G S

**THURSDAY, JANUARY 16, 2025**

**(9:07 a.m.)**

THE COURT: All right. Good morning, everyone. Welcome to the 200th District Court. We are here this morning in Cause No. GN-24-010233, SafeLease Insurance Services, LLC versus Storable, Inc., et al.

If we could start off with introductions, just let me know you're here and who you're representing.

**APPEARANCES**

MR. YETTER: Yes, good morning, Your Honor. Paul Yetter for the Plaintiff, and with me are my colleagues: Susanna Allen, who is with me --

MS. ALLEN: Good morning.

THE COURT: Good morning.

MR. YETTER: -- at Counsel table. Luke Schamel will be here. Shannon Smith is behind me and my colleague Alyssa Smith and Bronson Parker is our courtroom graphics person.

And, Your Honor, our client representatives in the back: Steven Stein; he is -- will be a witness, and he is also the chief executive of the Plaintiff, and the outside General Counsel is Adam Locke, who is next to him.

**REPORTER'S CERTIFICATE**

STATE OF TEXAS                    )

COUNTY OF TRAVIS                  )


     I, Janis Simon, Official Court Reporter in and for the 200th District Court of Travis, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court and were reported by me.

     I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

     WITNESS MY OFFICIAL HAND this 30th day of January, 2025.

                         /s/ Janis Simon

                         Janis Simon, CSR
                         Texas CSR 7076
                            Expires:  07/31/2026
                         Official Court Reporter
                         200th District Court
                         Travis County, Texas
                         P.O. Box 1748
                         Austin, Texas 78767
                         Telephone:  (512) 854-9325

# EXHIBIT C

**Products**  **Company**  **Resources**  **Contact** ⌄  👤 **Facility Login**  **File Claim**

July 20, 2022

PRESS RELEASE

# SafeLease Hires Adam Locke as Chief Operating Officer

   

*Experienced leader will focus on operational efficiencies, risk management, and ongoing compliance to accelerate company growth*

- *Locke has a strong track record of driving efficiencies and managing complex processes at law firms and early-stage companies*

- *His experience as an outside general counsel and corporate attorney brings a new perspective to the SafeLease leadership team and positions the company to effectively manage risk*

AUSTIN, July 20,2022 – SafeLease, the leader in self-storage tenant protection, is pleased to announce the appointment of Adam Locke as the company's Chief Operating Officer. Locke will focus on ensuring the company's strategic business objectives are met by increasing operational capabilities and driving efficiencies across all functional departments.

Locke worked with SafeLease as an outside advisor prior to joining the company as its COO. During that time, he gained expert knowledge of SafeLease's products, market positioning, and the value the company delivers to its customers.

"SafeLease is excited to bring Adam on board to spearhead new operational initiatives," says Steven Stein, Founder and CEO at SafeLease. "His deep regulatory acumen and

cross-functional strengths complement our fast-growing product, sales, and marketing functions."

"SafeLease is well-positioned to redefine risk management solutions for the commercial real estate industry," says Locke. "The space SafeLease is innovating in is ripe for disruption. With such a talented team and tremendous market opportunity, I was thrilled to join. I look forward to working with my new colleagues to ensure the company reaches its full potential."

Prior to joining SafeLease, Locke owned and ran a boutique law firm where he was outside general counsel to tech startups, commercial real estate firms, and investment managers. Locke also owned and operated an advisory firm focused on legal assets. He has advised on transactions totaling over $200 million.

Locke began his career as a litigator and advisor at corporate law firms and clerked for a federal appellate judge. He earned a law degree from Yale.

Click here to read the press release on Cision PR Newswire.

# Read Next

**SELF-STORAGE**



JULY 12, 2024

**As seen on ISS: Tenant Insurance or a Tenant-Protection Plan? Guidance to Help You Choose the Right Product for Your Self-Storage Business**



JULY 9, 2024

**SafeLease and DaVinci Lock Announce Strategic Partnership**

**PRESS RELEASE**



JUNE 27, 2024

**SafeLease Launches Reputation Management Tool for Self-Storage**

Email                                              **Submit**

**SafeLease**

800 Brazos Street
Suite 320
Austin, TX 78701

855.657.2338

**Products**
Tenant Protection &
Insurance

Reputation
Management

**Company**
About Us

Careers

**Resources**
Blog

Events

**Contact**
Licenses

Storage Unit Brochure

Outdoor Unit Brochure

Facility Login

**File Claim**

© 2024 SafeLease Insurance Services LLC. All rights reserved.                    Privacy Policy

# EXHIBIT D

**The Business Court of Texas,**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE | § | |
| SERVICES LLC, | § | |
| *Plaintiff*, | § | |
| v. | § | Cause No. 25-BC03A-0001 |
| | § | |
| STORABLE, INC., et al., | § | |
| *Defendants*. | § | |

## AGREED PROTECTIVE ORDER & TEMPORARY SEALING ORDER

The Court enters the following Agreed Protective Order and Temporary Sealing Order (the Agreed Protective Order or Protective Order) as agreed to by the parties, except that the Court has deleted paragraph 24 and modified paragraph 20 to comply with Rule 76a and grant a temporary sealing order.

In order to expedite the flow of discovery material, facilitate the prompt resolution of disputes over confidentiality, adequately protect material entitled to be kept confidential, and ensure that protection is afforded only to material so entitled, entry of this Agreed Protective Order pursuant to Texas Rule of Civil Procedure 192.6 is merited. This Protective Order applies to materials produced in advance of the Temporary Injunction hearing and functions as the operative Protective Order for this matter until such time as this Order is amended or replaced.

It is hereby ORDERED that:

1.      All Confidential Information and Outside Counsel's Eyes Only Information produced or exchanged by the parties in the course of this litigation, including information produced by third parties/non-parties, shall be used solely for the purpose of preparation, trial, and appeal of this litigation and for no other purpose whatsoever, and shall not be disclosed to any person except in accordance with the terms hereof.

1

2.     "Confidential Information" as used herein means any information of any type, kind, or character which is designated as "Confidential" by any of the supplying or receiving parties, including third parties/non-parties supplying said information, whether it be a document, information contained in a document, discovery materials, information or testimony revealed during a deposition, or otherwise.

3.     "Outside Counsel's Eyes Only Information" as used herein means any information that is "Confidential" as described herein and additionally may not be disclosed to anyone except the Qualified Persons described in Paragraph 6, *infra.* "Outside Counsel's Eyes Only Information" includes trade secrets or other non-public, proprietary, or sensitive business or financial information.  More specifically, an "Outside Counsel's Eyes Only" designation means that the materials so denoted may not be disclosed to any party or employee, representative, or affiliate of a party, except by agreement or a subsequent Order by this Court.

4.     In designating information as "Confidential" or "Outside Counsel's Eyes Only," a party or third party/non-party supplying information will make such designation only as to that information that it in good faith believes contains "Confidential" or "Outside Counsel's Eyes Only" information.  Information or material which is available to the public, including industry materials, advertising materials, and the like shall not be classified as "Confidential" or "Outside Counsel's Eyes Only."

5.     "Qualified Persons" as used herein for "Confidential Information" means:

(a) Attorneys of record for the parties in this litigation and employees and/or agents of such attorneys to whom it is necessary that the information be shown for purposes of this litigation;

(b) Actual or potential independent experts or consultants (and their administrative or

clerical staff) engaged in connection with this litigation (which shall not include the current employees, officers, members, or agents of the parties or affiliates of the parties) who have signed a document in the form of Exhibit A attached hereto (such signed document to be maintained by the attorney retaining such person);

(c) The parties and their respective in-house counsel, paralegals, legal staff or experts;

(d) The Court and its staff, including court reporters;

(e) Vendors engaged by the parties or the parties' respective counsel, including independent copy services, printers, or illustrators, and court reporters for the purpose of this litigation who have signed a document in the form of Exhibit A attached hereto (such signed document to be maintained by the attorney retaining such person);

(f) The authors and original recipients of the documents or information unless any such person no longer has a right to access or possess any such documents or information by virtue of a change in employment, position, or other circumstance;

(g) The designated corporate representative for the party that produced the documents or information as "Confidential" or "Outside Counsel's Eyes Only"; or

(h) By agreement of the parties, or if this Court so elects, any other person designated as a Qualified Person by order of this Court, after notice to all the parties and hearing.

6. For "Outside Counsel's Eyes Only Information," "Qualified Persons" includes (a), (b), and (d) - (h), above.

7.      Documents produced in this action may be designated by any party or parties or by any third party and/or non-party producing said documents as "Confidential" or "Outside Counsel's Eyes Only" information by marking each page of the document(s) with the word(s) "Confidential" or "Outside Counsel's Eyes Only." However, for documents produced in electronic native form, such as Excel spreadsheets, the designation may be affixed to the drive, disk, or other medium on which the documents or materials are produced or in the file names without marking each page of the documents or materials "Confidential" or "Outside Counsel's Eyes Only."

8.      In lieu of marking the original of a document, if the original is not produced, the designating party may mark the copies that are produced or exchanged.

9.      Information disclosed at (a) the deposition of a party or one of its present or former officers, directors, employees, agents or independent experts retained by counsel for the purpose of this litigation, or (b) the deposition of a third party (which information pertains to a party) may be designated by any party, including a third party/non-party disclosing said information or being deposed, as "Confidential" or "Outside Counsel's Eyes Only" information by indicating on the record at the deposition that the testimony is "Confidential" or "Outside Counsel's Eyes Only" and is subject to the provisions of this Order.

10.    Any party or third party/non-party disclosing said information or being deposed may also designate said information disclosed at such deposition as "Confidential" or "Outside Counsel's Eyes Only" by notifying all of the parties, in writing within 30 days of receipt of the transcript, of the specific pages and lines of the transcript which should be treated as "Confidential" or "Outside Counsel's Eyes Only" thereafter. Each party shall attach a copy of such written notice or notices to the face of the transcript and each copy thereof in

his possession, custody or control. All deposition transcripts shall be treated as "Confidential" for a period of 30 days after the receipt of the transcript, apart from any portions designated on the record as "Outside Counsel's Eyes Only," which portions shall be treated as Attorneys' Eyes Only.

11.   To the extent possible, the court reporter shall segregate into separate transcripts information designated as "Confidential" or "Outside Counsel's Eyes Only" with blank, consecutively numbered pages being provided in a non-designated main transcript. The separate transcript containing "Confidential" or "Outside Counsel's Eyes Only" information shall have page numbers that correspond to the blank pages in the main transcript.

12. "Confidential" or "Outside Counsel's Eyes Only" information shall not be disclosed or made available by the receiving party to persons other than Qualified Persons as delineated above. Notwithstanding the foregoing, nothing in this Protective Order restricts the ability of a party and/or third party/non-party to review, disclose, or disseminate its own documents or information as it sees fit.

13.   Documents produced prior to entry of this Protective Order may be retroactively designated "Confidential" or "Outside Counsel's Eyes Only" by notice in writing of the designated class of each document by Bates number within 30 days of the entry of this Protective Order. Documents unintentionally produced without designation as "Confidential" or "Outside Counsel's Eyes Only" may be retroactively designated in the same manner and shall be treated appropriately from the date written notice of the designation is provided to the receiving party. The burden shall be on the party claiming confidentiality to prove the confidential nature of the documents.

14. Documents to be inspected shall be treated as "Confidential" during inspection. At the time of copying for the receiving parties, such inspected documents shall be marked or stamped prominently "Confidential" or "Outside Counsel's Eyes Only" by the producing party.

15. If a receiving party learns of any unauthorized disclosure of "Confidential" or "Outside Counsel's Eyes Only," the party shall immediately upon learning of such disclosure inform the producing party of all pertinent facts relating to such disclosure and shall make all reasonable efforts to prevent disclosure by each unauthorized person who received such information.

16. Nothing herein shall prevent disclosure beyond the terms of this Protective Order if each party or third party/non-party designating the information as "Confidential" or "Outside Counsel's Eyes Only" consents in writing to such disclosure or if the Court orders such disclosure. Nor shall anything herein prevent any counsel of record from utilizing "Confidential" or "Outside Counsel's Eyes Only" information in the examination or cross-examination of any person who is indicated on the document as being an author, source or recipient of the "Confidential" or "Outside Counsel's Eyes Only" information, or if counsel has a reasonable belief that such person was an author, source or recipient of "Confidential" or "Outside Counsel's Eyes Only" information irrespective of which party or third party/non-party produced such information.

17. A party shall not be obligated to challenge the propriety of a designation as "Confidential" or "Outside Counsel's Eyes Only" at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. In the event that any party to this litigation disagrees at any stage of these proceedings with the designation by the designating party of any information as "Confidential" or "Outside Counsel's Eyes Only" or the designation of any person as a

Qualified Person, the parties shall first try to resolve such dispute in good faith on an informal basis, such as production of redacted copies. If the dispute cannot be resolved, the objecting party may invoke this Protective Order by objecting in writing to the party or third party/non-party who has designated the document or information as "Confidential" or "Outside Counsel's Eyes Only" or designated any person as a Qualified Person. The designating party shall be required to move the Court for an order preserving the designated status of such information or person within 30 business days of receipt of the written objection. The disputed information shall remain "Confidential" or "Outside Counsel's Eyes Only" unless and until the Court orders otherwise. Failure to move for an order shall constitute a termination of the restricted status of such item unless the parties otherwise agree. The party or third party/non-party objecting to disclosure bears the burden of proof to establish the confidentiality of the document.

18.   The parties may, by stipulation, provide for exceptions to this Protective Order, and any party may seek an order of this Court modifying this Protective Order.

19.   Nothing shall be regarded as "Confidential" or "Outside Counsel's Eyes Only" information if it is information that either:

(a) is in the public domain at the time of disclosure supported by appropriate evidence; or

(b) becomes part of the public domain through no fault of the other party, as supported by appropriate evidence.

20.   The following provisions govern the treatment of "Confidential" or "Outside Counsel's Eyes Only" Information used in connection with Court filings or proceedings:

(a) Temporary Sealing Order. There have been hearings in this case in connection with plaintiff's request for a temporary restraining order (TRO) and temporary injunction

7

(TI). The Court has determined that the criteria of Rule 76a(5) is satisfied and hereby GRANTS a temporary sealing order covering (1) the exhibits that are designated as "Confidential" or "Outside Counsel's Eyes Only" and (2) the transcripts of those proceedings. This temporary sealing order will remain in effect until **March 24, 2025**.

(b) <u>Sealing Motion, Notice, and Hearing</u>. At **1 p.m. on March 20, 2025**, the Court will hold a hearing on whether to permanently seal the materials covered by the temporary sealing order in subsection (a), above. At least 14 days before the hearing, the parties, either jointly or individually, must (1) file a motion to seal any portions of the material covered by the temporary sealing order that should not be made public upon expiration of the temporary sealing order; and (2) comply with the notice requirements of Rule 76a(3). **The motion(s) must identify the specific portions of the hearing transcript(s) to be sealed by page and line.** The Court will not seal the entire transcript(s). The exhibits to be sealed must be identified by exhibit numbers. Any documents or transcripts previously provided to the Court need not be provided again, but any transcripts or exhibits that a party seeks to seal that were not previously provided to the Court should be provided to the Court in the same manner as the hearing exhibits for the TI hearing and served on the other parties subject to this Agreed Protective Order.

(c) <u>Future hearings</u>. For future hearings at which the parties expect to disclose "Confidential" or "Outside Counsel's Eyes Only" Information or documents containing such information, the parties may move for a temporary sealing order under Rule 76a(5) before the hearing. Any material at issue in the motion that has

not previously been provided to the Court should be provided to the Court for *in camera* inspection but not filed in the case. If granted, the temporary sealing order will remain in place for 30 days after the hearing and may be extended for good cause. The parties may move for permanent sealing by obtaining a hearing date from the Court and complying with Rule 76a and the procedures in subsection (b), above, relating to the motion and notice. For any part of the hearing record that contains "Confidential" or "Outside Counsel's Eyes Only" Information that has been sealed under a prior sealing order, the motion to seal need only identify the portion of the record (by page and line or exhibit number) to be sealed and the applicable sealing order.

(d) <u>Filings</u>. To the extent documents containing or revealing "Confidential" or "Outside Counsel's Eyes Only" Information are filed in this Court after the date of this order, the parties shall undertake the following procedures:

1. The filing party must redact any material that would disclose "Confidential" or "Outside Counsel's Eyes Only" Information from the Court filing and simultaneously serve an unredacted version on the other parties subject to this Protective Order.

2. The redacted filing must identify the redacted material by Bates Number, page and line, or as specifically as possible.

3. The parties have five days after such filing to move to temporarily or permanently seal the designated information. If no motion to seal is timely filed, the filing party will file the unredacted version of the document with the Court. If a motion to seal is timely filed, the filing party will wait until

the Court rules on the motion to seal, then file the unredacted version of the document under seal or not under seal, as dictated by the Court's ruling.

4. The foregoing notwithstanding, if the parties agree that any or all of the redacted material is not needed for the resolution of the matter, that material may remain redacted, will not become part of the Court's record, and will not be considered by, relied on, or before the Court.

(e) <u>Trial</u>. The use of "Confidential" or "Outside Counsel's Eyes Only" Information at trial will be addressed in the pretrial order and/or at the pretrial conference.

(f) The parties understand that material provided to the Court for *in camera* inspection but not filed in the case will not be part of the record unless further action is taken.

(g) The parties understand that material filed in the case under a temporary sealing order may become part of the public record if a permanent sealing order is denied.

21. Unless otherwise agreed to in writing by the parties or ordered by the Court, all proceedings involving or relating to "Confidential" or "Outside Counsel's Eyes Only" documents or information shall be subject to the provisions of this Protective Order.

22. After the conclusion of this litigation and any appeal thereof, any "Confidential" or "Outside Counsel's Eyes Only" documents and all copies or reproductions of such documents produced by a party or third party/non-party in the possession of any of the "Qualified Persons" shall be returned to the producing party or third party/non-party within 60 days of receipt of a timely written request by said producing party or third party/non-party, except as this Court may otherwise order or to the extent such information was used as evidence at the trial. As far as the provisions of any protective orders entered in this action restrict the communication and use of the documents produced thereunder, such orders shall

continue to be binding after the conclusion of this litigation, except (a) that there shall be no restriction on documents that are used as exhibits in open court, and (b) that a party may seek the written permission of the producing party or order of the Court with respect to dissolution or modification of such protective orders. Alternatively, at the conclusion of this litigation, in lieu of the actual physical return of "Confidential" or "Outside Counsel's Eyes Only" documents, counsel for each party may provide a certification certifying that (1) all experts and any other person(s) receiving "Confidential" or "Outside Counsel's Eyes Only" documents have been instructed to delete or destroy all documents; and (2) all "Confidential" or "Outside Counsel's Eyes Only" documents in the possession of counsel have been deleted or destroyed.

23.   Any party designating any person as a "Qualified Person" shall have the duty to reasonably ensure that such person observes the terms of this Protective Order.

Signed this 27th day of February, 2025.

Hon. Melissa Andrews
Judge Presiding

CAUSE NO. D-1-GN-24-010233

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES, LLC, | §<br>§<br>§ | IN THE DISTRICT COURT |
| *Plaintiff,* | §<br>§ | |
| v. | §<br>§<br>§ | |
| STORABLE, INC., REDNOVA LABS, INC. (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP, | §<br>§<br>§<br>§<br>§<br>§<br>§ | 345TH JUDICIAL DISTRICT |
| *Defendants.* | §<br>§ | TRAVIS COUNTY, TEXAS |

## EXHIBIT A

### AGREEMENT TO BE BOUND BY TERMS OF PROTECTIVE ORDER

My name is, _____, my date of birth is _____, and my address is, _____. I have read and am familiar with the terms of the Protective Order concerning the records and testimony produced by the respective parties in this case, and I agree to abide by all terms of said Protective Order and not to reveal or otherwise communicate any of the information disclosed to me pursuant thereto to anyone except in accordance with the terms of said Protective Order. I agree not to make any use of that information or materials other than for the purpose of this litigation.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Executed in _____ County, State of _____

Date:

# EXHIBIT E

**The Business Court of Texas,
Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § § | |
| *Plaintiff,* | § § | Cause No. 25-BC03A-0001 |
| *v.* | § § | |
| STORABLE, INC., et al., | § § | |
| *Defendants.* | § | |

---

### Declaration of Andrew D. Bergman

---

I, Andrew David Bergman, hereby declare as follows:

1.      I am over the age of 18, of sound mind, and competent to make this declaration.

2.      I am an attorney licensed in Texas.  My State Bar number is 24101507.  I am employed by the law firm Arnold & Porter Kaye Scholer LLP, and my office address is 700 Louisiana Street, Suite 4000, Houston, Texas 77002.

3.      I am one of the attorneys representing Defendants Storable, Inc., RedNova Labs, Inc., SiteLink Software, LLC, Easy Storage Solutions, LLC, Bader Co., and Property First Group, LP (collectively "Defendants") in the above-styled case.

4.      I attended a meet-and-confer meeting with counsel for both Defendants and Plaintiff SafeLease Insurance Service, LLC ("Plaintiff") on March 25, 2025 at approximately 2:00 pm CT.  Counsel for Plaintiff requested the meeting to confer regarding the parties' then-forthcoming motions to seal exhibits and transcripts from the temporary injunction hearings pursuant to Texas Rule of Civil Procedure 76a.

5. The March 25 meet-and-confer was conducted via teleconference (e.g., Teams). The attendees present for Defendants included Ms. Elizabeth Eoff and myself. The attendees present for Plaintiff included Ms. Susanna Allen, Ms. Shannon Smith, and Mr. Adam Locke.

6. At the beginning of the meeting, one of the attorneys present for Plaintiff other than Mr. Locke introduced Mr. Locke as a "member of SafeLease's outside counsel team."

7. During the meeting, Mr. Locke gave an example of an exhibit to the TI hearing that Defendants had marked as "Outside Counsel's Eyes Only," and which Defendants had designated for potential sealing, but that he (Mr. Locke) believed should not be sealed. Mr. Locke explained his reasons why the document should not be sealed. I do not recall whether Mr. Locke specified the exact document, and his discussion of the document was not specific enough that it could be readily identified, however, he clearly stated that the document was marked by Defendants as "Outside Counsel's Eyes Only."

8. Near the end of the meeting, I stated that Defendants "do not accept [Plaintiff's] characterization of Mr. Locke as 'outside counsel.'" In response, Mr. Locke stated that "we'll raise it with the Court."

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4TH day of April, 2025.

_____
Andrew D. Bergman

# EXHIBIT F

# Arnold & Porter

**Katherine Ginzburg Treistman**
+1 713.576.2433 Direct
Katherine.Treistman@arnoldporter.com

March 25, 2025

**VIA E-MAIL**

R. Paul Yetter
YETTER COLEMAN LLP
811 Main St., Suite 4100
Houston, Texas 77002
pyetter@yettercoleman.com

> Re:  *SafeLease Ins. Servs., LLC v. Storable, Inc., et al.*, Cause No. 35-BC03A-0001 (Tex. Bus. Ct. 3d Div.)

Paul:

I understand that Mr. Locke joined the meet-and-confer with counsel for the Parties today. On that call, other counsel for SafeLease attempted to hold out Mr. Locke as "a member of SafeLease's outside counsel team." During the call, Mr. Locke affirmatively stated that he had reviewed a document marked by Defendants as "Outside Counsel's Eyes Only" ("OCEO").

Mr. Locke is not outside counsel for SafeLease, and he is not permitted to view any documents that Defendants have marked OCEO pursuant to the Court's February 27, 2025 Agreed Protective Order. You know this because you represented to the Court at the TI hearing on February 11, 2025 that SafeLease's "outside general counsel is Adam Locke" and that "when we get into outside/counsel only, we will ask [him] to be excused." Feb. 11, 2025 Tr. at 95:13–16. Moreover, it is my understanding that he is the former Chief Operating Officer, as well as potentially a witness in the case given his involvement during that time frame in that role. Given the above roles, merely the filing a notice of appearance on March 24, 2025 does not transform him into outside counsel.

**This letter is a formal demand that Mr. Locke immediately cease and desist from reviewing any and all documents that Defendants have marked OCEO.** Within 24 hours of your receipt of this letter, please do the following:

(1) Confirm Mr. Locke will immediately desist from viewing any documents that Defendants have marked OCEO;

**Arnold&Porter**

(2) Provide a list of any and all documents marked OCEO by Defendants that Mr. Locke has reviewed; and

(3) Confirm by your countersignature below SafeLease's agreement, pursuant to Texas Rule of Civil Procedure 11, that Mr. Locke will permanently cease and desist from reviewing any document marked by Defendants as OCEO, unless and until such designation is removed in accordance with the Court's February 27, 2025 Agreed Protective Order or other order of the Court.

Absent your agreement to the above, we'll move for protection with the Court. Thanks in advance.

Respectfully yours,

Katherine Ginzburg Treistman
*Attorney for Defendants*

AGREED AND ACCEPTED BY:

_____

R. Paul Yetter
*Attorney for Plaintiff*

# EXHIBIT G



2617 Bissonnet, Ste. 503, Houston, Texas 77005
Tel: 713-832-0242 · Fax: 713-565-4709

Attorney Adam Locke
Direct: 713-832-0243 · adam@lockelaw.com

March 26, 2025

Katherine Ginzburg Treistman
Arnold & Porter Kaye Scholer LLP
700 Louisiana Street, Suite 4000
Houston, TX 77002-2755

Via email: katherine.treistman@arnoldporter.com

> Re:  *SafeLease Ins. Servs., LLC v. Storable, Inc., et al.*, Cause No. 35-BC03A-0001 (Tex. Bus. Ct. 3d Div.)

Dear Katherine:

I received a copy of the cease and desist letter you sent yesterday to my co-counsel, Paul Yetter, which demanded action of me and my law firm within 24 hours. The letter, which suggests that I may violate a Court order, reflects a serious misunderstanding of my outside counsel relationship with SafeLease, of my law firm serving dozens of clients, of my ongoing role in the litigation prior to your appearance, and of my own professional ethics, which I believe you know well. I will respond to your letter in some detail in the hope of avoiding another needless dispute in this important litigation.

### 1. **I Have Honored and Will Continue to Honor the Agreed Protective Order.**

First and foremost, I'm writing to assure your clients that my appearing as an attorney of record for SafeLease in this matter will not compromise the protections in the Agreed Protective Order. Please be assured that I will faithfully abide by all obligations the Court has imposed on counsel of record relating to materials defendants have designated as Outside Counsel Eyes Only ("OCO"). I have read the Agreed Protective Order, and I acknowledge that my access to OCO materials comes with strict limitations — *all* of which I will honor. In particular, your clients can rest assured that I will honor the following obligations:

- I will use OCO materials *only* to prepare for, try, and appeal this matter.

- I will *not* use OCO materials to advise SafeLease on business or legal matters.

- I will *not* disclose OCO materials to SafeLease employees, agents, or affiliates.

- I will disclose OCO materials, and offer advice based on it, *only* as permitted by the Protective Order.

I understand that the above obligations are just some of the limitations on my conduct pursuant to the Protective Order. For example, I recognize that accessing OCO materials in this litigation may limit my participation in business dealings or negotiations between the parties if they implicate OCO information. Accordingly, I will ensure that I am walled off from dealings or negotiations between the parties where, for example, my participation or advice may give or appear to give SafeLease an unfair advantage because of knowledge of OCO materials.

In short, I fully understand and take seriously the limitations in the Protective Order. I will protect your clients' non-public, proprietary, or sensitive business or financial information that is designated as OCO. And I will adhere strictly to the limits imposed on me as an attorney of record for SafeLease. These are commitments that I share with all other counsel of record in this case.

2. **I Am Outside Counsel for SafeLease and Have Been Since July 2023.**

As you know, from our 20-minute phone call on March 7, 2025, which you initiated and I welcomed, I am outside counsel for SafeLease. On that call, you asked if I was "in house" at SafeLease. I replied that I was not. I explained that I had been outside counsel for SafeLease since July 2023, that like many litigators at private firms, I provided general legal advice to my longtime client (which I have represented since 2021), and that through my law firm Lockelaw PLLC, I represent dozens of clients — of which SafeLease was just one.

Following my explanation, you responded that you "got it" and understood I was — like many lawyers in private practice — representing a longtime client in an array of matters, as its de facto "outside general counsel." To my surprise, your letter suggests you now don't understand my role. If so, please allow me to further explain my role and history with SafeLease.

I launched my firm in 2020, during the height of the pandemic, with a handful of clients who helped me keep the lights on. SafeLease was not one of them. I did not begin representing SafeLease until 2021. After a year of working with SafeLease, I was invited to join the company as Chief Operating Officer and General Counsel. I accepted this invitation, but even while employed by SafeLease, with SafeLease's permission, I maintained my firm and a limited roster of loyal clients. By 2023, demand for my services had grown, and I felt a strong pull back to private practice. By June, SafeLease's CEO, Steven Stein, and I had come to a mutual decision where I would continue to represent SafeLease as outside counsel but would no longer have any in-house role or relationship with SafeLease. My decision had real consequences: as part of my departure and transition, I forfeited a significant amount of company stock and benefits. I did so in order to build an independent firm and serve a broader range of clients as outside counsel.

Thankfully, my law firm, Lockelaw PLLC, has done reasonably well. I have represented dozens of clients since mid-2023. They range from individuals and startups to investment funds and public companies. I offer my clients a variety of legal services. While I handle disputes, I also advise them on a variety of legal issues: e.g., employment and labor issues, regulatory issues, investigations, and commercial agreements. Some of my clients either don't have the resources to hire in-house counsel or simply appreciate my flexibility, so they rely on me for general legal advice. SafeLease falls into this category.

SafeLease's reliance on me for general legal advice does not transform me into an in-house lawyer for SafeLease. As a simple Google search will show, countless lawyers at large law firms — *including your fine firm* — serve as "outside general counsel" for their clients, including clients where they previously served in an in-house role. My arrangement is hardly unique, and your letter's suggestion that my prior operating role with SafeLease somehow disqualifies me from representing SafeLease as its counsel in this action is baseless.

My role for SafeLease is not news to Storable. Storable knew that I operated a law firm independently of SafeLease before this dispute arose in December 2024. Indeed, Storable's in-house general counsel, Neil Verma, joined me for coffee on the morning of December 6, 2024, before Storable cut off SafeLease's authorized user accounts. During our coffee meeting, he noted that he and Storable's CEO Chuck Gordon knew I was working independently of SafeLease, and it would be great for Storable to hire me if it wouldn't pose a conflict (I politely noted it would).

In short, for Storable to now suggest that I am not independent of SafeLease — and that my past role excludes me from being its outside counsel — is misguided and ignores my recent discussions with both you and Storable.

3. **Mr. Yetter's Comment Does Not Transform Me into an In-House Lawyer.**

Finally, your letter notes that Mr. Yetter said at the February 11 TI hearing that SafeLease's "outside general counsel is Adam Locke." This is true. My legal services can be more or less categorized as falling under "outside general counsel" services, as I explained above. Your letter then notes that Mr. Yetter said, "when we get into outside/counsel only, we will ask [him] to be excused." It seems to suggest, incorrectly, that Mr. Yetter's statement implies that I am not "outside counsel" to SafeLease or cannot become counsel of record in this action.

Simply put, Mr. Yetter's reference to "outside/counsel only" was a reference to the Protective Order's distinction between discovery materials designated for counsel of record in this action (i.e., OCO) and materials that all other lawyers, advisors, etc. are able to see (including

materials marked as merely "confidential"). At the time of the hearing, I was not counsel of record in this action, as I had not filed an appearance for SafeLease.

While my client felt that a good-faith settlement was possible, I was not counsel of record for SafeLease and did not have access to OCO materials. As such, I was in a position to maintain equal footing with Mr. Verma so that he and I could engage in good faith efforts to resolve this dispute. Regrettably, those efforts failed. And just weeks ago, you told me on our phone call that I was not to direct any further settlement communications to Mr. Verma, but rather to talk only to you — outside counsel to outside counsel — about settlement.

Respectfully, your letter tries to contort Mr. Yetter's reference to the Protective Order into an admission that I am not outside counsel to SafeLease, despite admitted evidence to the contrary.

Lastly, let me add my hope that your own experience with me and my professional ethics is consistent with the contents and assurances of this letter. A dozen years ago, after clerking for the Fifth Circuit, I started my legal career at a (then-small) commercial litigation boutique where you were a respected partner. As I've told you, I always thought highly of you. Recently, on our call, you offered very kind words to me, which I greatly appreciated. Those kind words, and your personal experience with me on which they were based, are at odds with the tone and suggestions of your letter. Based on what you know about me, and on what I have shared with you in this response, I sincerely hope that this much is clear: the demands in your letter are unfounded.

I trust that this resolves any legitimate concerns that Storable may have.

Sincerely,

Adam Locke

# EXHIBIT H



**From:** Adam Locke <adam@lockelaw.com>
**Sent:** Friday, March 28, 2025 1:11:46 PM
**To:** Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>
**Subject:** SafeLease/Storable — Protective Order and OCO

External E-mail

Katherine -

Thank you for making time today to discuss your clients' concerns about my representation of SafeLease as counsel of record.

I appreciate and share your desire not to burden the Court with matters that the parties should be able to resolve by agreement.

As we have discussed, and as stated in my response to your clients' cease and desist letter, I am outside counsel to SafeLease and have been since July 2023. I have a broad client base. I run my own firm and have since 2020.

Most importantly, I will fully abide by the Agreed Protective Order. You and your clients have my word. As an attorney and officer of the Court, nothing could be more important to me than honoring my ethical and legal obligations.

To that end, I ask: is there any assurance I can provide regarding my compliance with the Agreed Protective Order, other than those I have already given, that would allow us not to burden the Court with this disagreement over my role in the case? If so, please let me know.

Kind regards,
Adam



On Fri, Mar 28, 2025 at 10:30 AM Adam Locke <adam@lockelaw.com> wrote:

> Katherine - I'm in a meeting at the moment. I can call you back at 10:45 if that works. Thanks.



# EXHIBIT I

# Arnold & Porter

**Katherine G. Treistman**
+1 713.576.2433 Direct
Katherine.Treistman@arnoldporter.com

March 31, 2025

<u>**VIA E-MAIL**</u>

Adam Locke
LOCKELAW PLLC
2617 Bissonet, Ste. 503
Houston, Texas 77005
adam@lockelaw.com

> Re:  *SafeLease Ins. Servs., LLC v. Storable, Inc. et al.*, Cause No. 35-BC03A-0001 (Tex. Bus. Ct. 3d Div.)

Dear Adam:

Thank you for your March 26, 2025 letter, our phone call on March 28, 2025, and your email on March 28, 2025.

Based on our communications, we understand your (and Plaintiff's) position to be the following:

1. You will not agree to stop reviewing Defendants' OCEO documents;

2. You will not agree to stop reviewing Defendants' OCEO documents temporarily while we are working to investigate and resolve this issue;

3. You believe that you have been both Plaintiff's "outside counsel" and Plaintiff's "outside general counsel" from July 2023 to the present, including during the TI hearings in this dispute.

If I am mistaken as to any of the above points, please advise. Assuming I am not mistaken, we may need to seek Court intervention on this matter. To be clear, as I expressed during our call, our concern is less about whether you are personally maintaining the confidentiality of the documents, but rather that this is a case between competitors—and you are extensively involved in Plaintiff's business, including now as an "outside general counsel" to whom you admit to providing "general legal advice," as a former C-level executive during relevant time periods for this case, and as a potential witness in this

# Arnold & Porter

Adam Locke
March 31, 2025
Page 2

dispute.  As you are aware, when the parties agreed to the Protective Order, you had not entered an appearance, and both Storable and the Court understood based on Mr. Yetter's representations that you were being excluded from OCEO materials.

"Walling off" does not resolve Storable's concerns.  While ethical walls can be effective for protecting first-tier "Confidential" documents, they do not work for OCEO documents, which are so sensitive that individuals involved in a party's general business activities are not allowed to <u>see</u> them.  For example, if SafeLease asks for your "general" advice relating to language in operator contracts, language that you will have seen in Storable's contracts and other OCEO documents will improperly influence your advice and SafeLease's resulting business decisions.  An ethical wall does not allow you to unsee such documents or unlearn their contents.

Finally, in an attempt to resolve this issue and remove the need for Court intervention, we note there is a procedure under the Protective Order for removing OCEO designations.  If you will agree to stop reviewing Defendants' OCEO documents as a general matter, and there are OCEO documents that SafeLease's outside law firms (Yetter Coleman or Stone Hilton) believe that you, as "outside general counsel," need to review in order for SafeLease to properly litigate this case, in a continued effort to reach a compromise, Storable is open to conferring regarding limited de-designations of specified documents.

Please consider, and I look forward to your response.

Respectfully yours,

Katherine G. Treistman
*Attorney for Defendants*

# EXHIBIT J



2617 Bissonnet, Ste. 503, Houston, Texas 77005
Tel: 713-832-0242 · Fax: 713-565-4709

Attorney Adam Locke
Direct: 713-832-0243 · adam@lockelaw.com

April 2, 2025

Katherine Ginzburg Treistman
Arnold & Porter Kaye Scholer LLP
700 Louisiana Street, Suite 4000
Houston, TX 77002-2755

Via email: katherine.treistman@arnoldporter.com

Re:     *SafeLease Ins. Servs., LLC v. Storable, Inc., et al.*, Cause No. 35-BC03A-0001 (Tex. Bus. Ct. 3d Div.)

Dear Katherine:

This letter responds to your March 31, 2025, letter, which demands that I effectively withdraw as counsel of record in this litigation. Given how important this case is to my client and my unqualified commitment to follow the protective order, I respectfully decline to do so.

Your letter begins with three points you believe to be my position. Here is my position:

1.  I cannot agree, as counsel of record for SafeLease, not to review materials defendants have designated as Outside Counsel Eyes Only ("OCO"). My client has the right to choose its counsel, and it chose me for this critically important matter. As counsel of record, I have the ethical duty to zealously represent my client, and such zealous representation requires that I have full access to discovery materials that may be reviewed by other counsel of record.

2.  That said, I unequivocally agree to faithfully abide by all obligations the Court has imposed on counsel of record relating to materials defendants have designated as OCO. As noted in my last letter to you, I have read the Agreed Protective Order, and I acknowledge that my access to OCO materials comes with strict limitations — *all* of which I will honor.

Your letter goes on to make certain allegations and characterizations that I will briefly address to ensure that the record of our respective positions is clear.

First, your letter mistakenly describes my serving as SafeLease's outside counsel from July 2023 to the present as a "belief." But this is a *fact*, as I explained in my March 26, 2025, letter. Since July 2023, my relationship to SafeLease has only been one of outside counsel to client.

Second, your letter suggests that my role as outside counsel is at odds with the nature of my legal services to SafeLease, which I describe as "outside general counsel" services due to the variety of legal issues I advise on. I trust that your letter does not juxtapose these concepts to imply that I cannot *both* be outside counsel *and* offer general legal advice: as explained in my last letter to you, and as you acknowledged on our last phone call, there are many examples of lawyers at *outside* law firms—*including yours*—that describe their services to their clients in this exact way.

Third, your letter goes on to state that your client apparently is not concerned about whether I am "personally maintaining the confidentiality of the [OCO] documents." Respectfully, if there is no concern that I would violate the Protective Order and subject myself to serious sanctions, there should be no objection to my representing SafeLease as counsel of record and doing so on the same footing as other counsel of record. Yet your letter proceeds to offer several unfounded reasons why your client should have a veto over my client's right to choose its counsel:

- Your letter makes false assertions, such as that I am "extensively involved in Plaintiff's *business*." I am not involved in SafeLease's business decisions. As I have explained, I provide legal advice to SafeLease. I neither make nor participate in non-legal, commercial decisions for any of my firm's clients, including SafeLease.

- Your letter raises my former employment with SafeLease and suggests that I could be a "potential" witness. I am surprised that your clients consider a job I held 17 months *before* they unlawfully interfered with my client's business to be relevant to this dispute. My past employment with SafeLease, which lasted from April 2022 to June 2023, is irrelevant to whether I may serve as counsel of record in this case.

- Your letter says that "the Court understood based on Mr. Yetter's representations that [I was] being excluded from OCEO materials." What is clear is that the Agreed Protective Order allows outside counsel to review OCO materials, and I am outside counsel to SafeLease. And Mr. Yetter never so much as suggested to the Court that I would not file an appearance in this case. Rather, as my last letter to you explained, Mr. Yetter told the Court that I would be excused for "outside/counsel only" testimony, which owed to the fact that I had not filed an appearance (and thus was not counsel of record) as of the hearing.

Finally, your letter seems to suggest that my merely seeing OCO documents in this case would permanently prevent me from representing SafeLease as counsel in any matter other than

this litigation. Surely this is not your position. If so, it is inconsistent with how seasoned litigators (like you) routinely and ethically practice law following exposure to OCO documents. Consider:

1. A litigator is not barred from going in house with a client merely because the litigator, as outside counsel, saw OCO documents of a competitor.

2. A litigator is not barred from advising a client on employment disputes or regulatory matters merely because the litigator saw OCO documents pertaining to a competitor's anticompetitive API fees or nonsolicitation/noncompete terms.

3. A litigator is not barred from suing a company merely because it was exposed to OCO materials produced by that company in prior litigation.

These are just a few examples that undercut your letter's suggestion that my representation of SafeLease is forbidden once I lay eyes on OCO materials. However, to address the example in your letter, let me say: there is *nothing* in your clients' operator contracts that could affect the advice I give to SafeLease. As explained, I don't make or participate in decisions about commercial terms; SafeLease's executives do. Knowing that Storable may impose anticompetitive terms on operators, as it does SafeLease, would not affect my legal advice. If your letter was actually referring to *vendor* contracts, then the example is even more strained. Nothing about the supracompetitive API fees Storable charges, or the restrictive covenants it imposes, is relevant to SafeLease's dealings with other FMS providers.

Your letter's final request—that my access to OCO materials be requested by my co-counsel on a need-to-know basis and subject to your client's approval—is unnecessary and impractical. I have repeatedly assured your clients that I will follow the Protective Order. I emailed to see if there was anything, short of walling me off from OCO materials, that would allow your client to avoid burdening the Court with this dispute. The final request ignores my efforts to find a resolution, implies that my law firm, Lockelaw PLLC, is not one of SafeLease's "outside law firms" (it has been since July 2023), and suggests that I seek to see OCO materials as "outside general counsel." Again, I am outside counsel. My need to see OCO materials produced by your clients owes solely to my role as counsel of record in this case and my ethical obligation to zealously advocate for SafeLease—something I cannot do if forced to litigate with a hand tied behind my back.

Sincerely,

Adam Locke

E-filed in the Office of the Clerk
for the Business Court of Texas
4/11/2025 11:51 AM 182
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

**The Business Court of Texas**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff*, | § | |
| v. | § | Cause No. 25-BC03A-0001 |
| | § | |
| STORABLE, INC., et al., | § § | |
| *Defendants*. | § § | |

**PLAINTIFF'S RESPONSE TO MOTION TO MODIFY**
**PROTECTIVE ORDER AND REQUIRE DISCLOSURE**

- 1 -

TABLE OF CONTENTS

PAGE

Introduction ........................................................................................................... - 1 -
Factual and Procedural Background ....................................................................... - 1 -
Applicable Legal Standards ................................................................................... - 8 -
Argument and Authorities ...................................................................................... - 9 -
    1.   The Protective Order Permits Counsel of Record to View OCO Materials. ................... - 9 -
    2.   Mr. Locke Is Counsel of Record in this Action. ............................................. - 9 -
    3.   As Counsel of Record, Mr. Locke Is Permitted to Review OCO Materials. ................. - 12 -
    4.   The Protective Order Should Not Be Modified to Exclude Mr. Locke. ........................ - 13 -
    5.   Defendants Are Not Entitled to Know What OCO Materials He Has Reviewed. ......... - 14 -
Conclusion ........................................................................................................... - 15 -
Certificate of Service ........................................................................................... - 16 -
Certificate of Compliance .................................................................................... - 16 -

**INTRODUCTION**

This litigation seeks to put an end to the significant and irreparable harm Storable has inflicted, and is intent on continuing to inflict, upon our State's only low-cost innovator in the tenant insurance industry. Given how important this litigation is to SafeLease—to its ability to service its customers, protect their tenants, and *survive*—its outside general counsel, seasoned litigator Adam Locke of Lockelaw PLLC, filed a notice of appearance on March 24, 2025, becoming an attorney of record in this case.

Since appearing, Mr. Locke has given repeated, unconditional assurances to Storable that he has abided and will always abide by the Agreed Protective Order, to no avail. Defendants ask the Court to grant extraordinary and unwarranted relief in modifying the order to exclude Mr. Locke from seeing key documents. In making their request, defendants mischaracterize his relationship with SafeLease and recklessly accuse him (without basis) of violating a court order by "likely" reviewing OCO documents *before* he became an attorney of record. Not so. There simply is no basis effectively to neuter one of SafeLease's chosen counsel nor to strip Mr. Locke of his right to zealously litigate as an attorney of record.

For these and other reasons discussed below, Storable's motion should be denied.

**FACTUAL AND PROCEDURAL BACKGROUND**

Given the significance of defendants' effort to change the Protective Order, and limit who may represent SafeLease and how, we will provide a fulsome recitation of relevant background.

**Mr. Locke's experience**. Mr. Locke is a seasoned litigator and counselor who practices law at his own firm, Lockelaw PLLC. He founded his firm in December 2019, after more than six years in private practice, including at Susman Godfrey. A. Locke Decl. (Ex. 1) ¶ 5. SafeLease was a regular client. *Id.* ¶ 12. In April 2022, he joined SafeLease as its in-house General Counsel and

Chief Operating Officer. *Id.* ¶ 13. While employed by SafeLease, and with its permission, he kept his firm and a limited roster of clients. *Id.* ¶ 14.

In June 2023, Mr. Locke resigned from SafeLease. *Id.* ¶ 16. Since then, he has had no in-house or business role with SafeLease. *Id.* He has represented SafeLease as outside counsel through his firm. *Id.* ¶ 17. It is one of dozens of clients that he and his firm have represented. *Id.* ¶ 11. Clients, like SafeLease, who regularly retain him for advice on discrete legal issues often have him serve as a first point of contact for general advice and triage before deciding whether to hire a specialist. *See id.* ¶ 9. These clients get what he describes on his website as "outside general counsel" services. *See* Services, LockeLaw PLLC, https://www.lockelaw.com/services. Clients who use such services may refer to Mr. Locke as their "outside general counsel," as SafeLease has chosen to do since July 2023. *See* A. Locke Decl. (Ex. 1) ¶ 18. Such services are routinely provided by litigators at national law firms, including the fine defense counsel in this case.[1]

As an outside lawyer, Mr. Locke does not provide commercial advice to SafeLease, make business decisions for it, or participate in non-legal, commercial decisions. A. Locke Decl. (Ex. 1) ¶ 19. He is *not* involved in its general business operations or discussions, which are reserved for SafeLease business leaders. *Id.* ¶ 20.

---

[1] *See, e.g.*, Ex. 2 at 1-2, *Porter Hedges Welcomes Back Derek Forinash*, Porter Hedges (Mar. 16, 2020), https://www.porterhedges.com/newsroom-news-porter-hedges-welcomes-back-derek-forinash (his "practice focuses on serving as outside general counsel to private companies"); *id.* at 4, Ray Torgerson, Porter Hedges, https://www.porterhedges.com/professionals-RayTTorgerson (practice includes "consult[ing] with businesses on technology matters, including licensing, cybersecurity, and data privacy"); *id.* at 6, Michael T. Larkin, Porter Hedges, https://www.porterhedges.com/professionals-MichaelTLarkin (his experience includes providing corporate advice "as outside general counsel"); *id.* at 7, Michael Burshteyn, Greenberg Traurig, https://www.gtlaw.com/en/professionals/b/burshteyn-michael ("He draws on this business background to serve as outside general counsel . . . ."); *id.* at 8, Galit Kierkut, Greenberg Traurig, https://www.gtlaw.com/en/professionals/k/kierkut-galit ("She also takes on the role of outside general counsel for many of her start-up and growth-stage clients . . . ."); *id.* at 9, Ben Fackler, Arnold & Porter, https://www.arnoldporter.com/en/people/f/fackler-ben (he "often serves as outside general counsel to his clients").

Mr. Locke's role as a law firm owner and outside counsel to SafeLease was known to Storable prior to this case. *Id.* ¶ 26. For example, on December 6, 2024, before Storable cut off authorized user accounts, its in-house general counsel, Neil Verma, joined Mr. Locke for coffee in Houston. *Id.* ¶ 27. In the meeting, Mr. Verma noted that he and Storable's CEO Chuck Gordon knew that Mr. Locke was working independently of SafeLease. *Id.* Mr. Verma even said Storable would like to hire Mr. Locke in the future if it would not pose a conflict. *Id.* ¶ 28. Mr. Locke believed such an engagement likely would create a conflict and politely suggested as much. *Id.*

**Litigation role**. From the outset of this case through the temporary injunction hearing, Mr. Locke was not counsel of record for SafeLease with access to OCO materials. *See id.* ¶¶ 41-42. As SafeLease told the Court, he was *outside* general counsel. At that time, SafeLease believed that a good-faith settlement was possible. Since Mr. Locke had not filed a notice of appearance, he had parity in settlement discussions with Mr. Verma and could try to work in good faith toward a resolution. *See id.* ¶ 29.

Regrettably, those efforts failed. On February 3, 2025, before the Protective Order was entered, Mr. Locke and Mr. Verma had a 21-minute call to discuss a potential settlement. *Id.* ¶ 30. Given the tone of the discussion and his concern that talks were breaking down, Mr. Locke said that he would file a notice of appearance in this case if settlement talks failed. *Id.* ¶ 31. Mr. Verma told him to "go ahead" and do what he needed to do. *Id.* So, while Mr. Locke chose to wait until March 24 to appear as counsel of record, defendants had been on notice for several weeks.

Last month, Defendants were reminded that Mr. Locke is outside counsel for SafeLease. On March 7, Storable's then-new lead counsel, Ms. Treistman, called Mr. Locke. *Id.* ¶ 32. On their call, she asked about his relationship to SafeLease, including if he was "in house." *Id.* ¶ 35. Mr. Locke told her that he was *not* in-house but provided general legal advice through his firm, and he

represents many other clients. *Id.* She said she "got it." *Id.* ¶ 36. She also said that all settlement communications from Mr. Locke should be with her—outside counsel to outside counsel—not Mr. Verma. *Id.* ¶ 37.

**Access to OCO materials**. Given how important this case is to SafeLease, it decided to add Mr. Locke as counsel of record. Before gaining access to *any* OCO materials, he reviewed the Protective Order. *Id.* ¶ 40. He filed and served a notice of appearance and became counsel of record in this action on March 24 at 6:25 p.m. *Id.* ¶ 41. He got access to OCO materials later that night. *Id.* ¶ 42. The timing of his appearance was not arbitrary. Earlier that day, Storable had said it would seek permanent sealing of dozens of exhibits and hundreds of pages of testimony in this case. *Id.* ¶ 39. Mr. Locke's review of OCO documents was to assist with that issue and related briefing. *Id.* ¶ 40.

The next day, Mr. Locke participated in a meet and confer regarding the parties' motions to seal, which included discussion of OCO documents. *Id.* ¶ 44. He was introduced as "outside counsel," consistent with his role. *Id.* ¶ 45. At the end of the call, Storable's counsel said "[his] clients do not accept [plaintiff's] characterization of Mr. Locke as outside counsel." *Id.* ¶ 47. Mr. Locke was surprised, given his call with Ms. Treistman, but noted that defendants were entitled to "raise it with the Court." *See id.* ¶ 49.

**Assurances**. Mr. Locke provided detailed explanation of his role with SafeLease and clear assurances of compliance with the Protective Order prior to this issue coming before the Court. The following chronology reflects his unqualified commitments as an officer of the Court.

On March 25, defendants sent a letter demanding that Mr. Locke stop viewing Storable OCO documents, provide a list of OCO documents he had reviewed, and agree never to view any such documents. Mot., Ex. F at 1-2. In a reversal from Ms. Treistman's call a few weeks earlier,

the letter alleged that "Mr. Locke is not outside counsel for SafeLease." *Id.* at 1. It said his former employment by SafeLease barred him from being its outside counsel. *See id.* It suggested he was a potential witness based on his "involvement" with SafeLease in 2022–23. *See id.* It also cast Mr. Yetter's representations to the Court as inconsistent, despite accurately describing Mr. Locke's status as *outside* general counsel. *See id.*

On March 26, Mr. Locke responded with an unequivocal commitment: his "appearing as an attorney of record for SafeLease in this matter will not compromise the protections in the Agreed Protective Order." Mot., Ex. G at 1. He acknowledged the "strict limitations" of access to OCO materials, confirming that defendants "can rest assured that I will honor the following obligations":

- I will use OCO materials *only* to prepare for, try, and appeal this matter.

- I will *not* use OCO materials to advise SafeLease on business or legal matters.

- I will *not* disclose OCO materials to SafeLease employees, agents, or affiliates.

- I will disclose OCO materials, and offer advice based on it, *only* as permitted by the Protective Order.

*Id.* at 1-2. Mr. Locke also confirmed that the above obligations were "just some of the limitations on [his] conduct pursuant to the Protective Order," and that accessing OCO materials may limit his "participation in business dealings or negotiations between the parties if they implicate OCO information." *Id.* at 2. "In short," he said, "I fully understand and take seriously the limitations in the Protective Order. I will protect your clients' non-public, proprietary, or sensitive business or financial information that is designated as OCO. And I will adhere strictly to the limits imposed on me as an attorney of record for SafeLease." *Id.*

Mr. Locke's response offers extensive information about his history with SafeLease, his law firm, and his representation of SafeLease as outside counsel. *See id.* at 2-4. His response also confirms that Mr. Yetter correctly represented that because Mr. Locke was not counsel of record during the temporary injunction hearings, he could not be present for testimony about OCO materials in accordance with the Protective Order. *Id.* at 3-4.

On March 28, Ms. Treistman called Mr. Locke to discuss his response. She reiterated her clients' demands and asked him not to review OCO materials going forward. A. Locke Decl. (Ex. 1) ¶ 51. She suggested that, even with no access to OCO materials, he could "do everything that Mr. Yetter could do in the litigation—take depositions, represent [SafeLease] at hearings," etc. *Id.* ¶ 55. He responded that any counsel of record needs full access to discovery materials to zealously represent their clients. *Id.* ¶ 56.

Mr. Locke followed up with an email emphasizing his desire to resolve this issue without burdening the Court. He stressed his unqualified commitment to follow the Protective Order, and honor his ethical and legal obligations, as an experienced litigator. He asked: "*is there any assurance I can provide regarding my compliance with the Agreed Protective Order, other than those I have already given, that would allow us not to burden the Court with this disagreement over my role in the case? If so, please let me know*." Mot., Ex. H at 1.

On March 31, Ms. Treistman sent a follow up letter. It confirmed that defendants' "concern is less about whether [Mr. Locke is] personally *maintaining the confidentiality* of the documents, but rather that this is a case between competitors." Mot., Ex. I at 1. The letter repeats the mistaken view that Mr. Locke is "extensively involved in Plaintiff's business," despite repeated assurances that he does not make business decisions or provide business advice to SafeLease. *Id.* The letter

offers to have *other* SafeLease counsel decide what OCO materials Mr. Locke needs to see to litigate this case and then ask for defendants' permission for limited de-designations. *Id.* at 2.

Contrary to assertions in Storable's motion, the letter does not ask Mr. Locke to state when he gained access to OCO materials. *See* Mot. at 6. Its incorrect claim that he refused to disclose "when he reviewed" OCO documents is especially troubling given its assertion that he "likely" violated the Protective Order by accessing OCO documents *before* becoming counsel of record. *Id.* at 9.

On April 2, Mr. Locke responded. He confirmed that he is SafeLease's counsel of record, and that SafeLease has the right to choose him as its litigator in this case. Mot., Ex. J at 1. He emphasized that he has an ethical duty to zealously represent SafeLease in this case, and this requires that he has full access to discovery materials available to other counsel of record. *Id.* He also unequivocally agreed faithfully to abide by all obligations imposed on counsel of record under the Protective Order. *Id.* Mr. Locke's response addressed defendants' claim that exposure to their OCO contracts would affect the advice he gives SafeLease, noting that nothing in the contracts could affect his legal advice outside of this case, and he does not make or advise on commercial decisions anyway. *Id.* at 3.

On April 3 (at 9:42 p.m.), defense counsel emailed to ask SafeLease to confirm whether it refuses to disclose which OCO documents Mr. Locke reviewed and when. The email incorrectly states that Ms. Treistman's earlier letter requested this information. Ex. 3 at 1. It concludes by asking whether SafeLease is opposed to this motion. *Id.* The next day, Storable filed its motion without getting a response from SafeLease.

The most aggressive accusation in the motion could have been omitted had Storable waited for a response. Storable *never* requested to know *when* Mr. Locke first gained access to OCO

materials until its late-night email. Yet, its motion alleges that "it is possible, *if not likely*, that Locke was accessing and viewing Storable's OCEO documents before his March 24, 6:26 PM [sic] notice of appearance." Mot. at 9. This assertion is baseless, as Mr. Locke gained access to OCO materials only after he filed an appearance as an attorney of record.

## APPLICABLE LEGAL STANDARDS

Absent agreement of the parties, a court may modify discovery procedures, including agreed protective orders, for "good cause." Tex. R. Civ. P. 191.1; *see In re Navistar, Inc.*, 501 S.W.3d 136, 142 (Tex. App.—Corpus Christi 2016, no pet.). A court also may enter a protective order to "protect the movant from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights." Tex. R. Civ. P. 192.6.

But a court's power to modify discovery agreements is not "unbounded." Tex. R. Civ. P. 191.1 cmt. 1. Whenever possible, a court should give effect to the parties' otherwise enforceable agreements. "When the parties conclude an agreement, the court should not lightly ignore their bargain." *In re BP Prods. N. Am., Inc.*, 244 S.W.3d 840, 846 (Tex. 2008). There must be a "valid basis" for setting aside a discovery agreement, which is supported by the record. *Id.* at 846, 848 (finding the trial court abused its discretion in setting aside a valid discovery agreement without good cause; the movant's grounds of misrepresentation, estoppel, and changed circumstances were not supported by the record; and one party had acted in reliance on the agreed procedure).

The movant bears the burden of proving that a motion to modify a discovery agreement is based on good cause and has a valid basis. *See* Tex. R. Civ. P. 191.1; *BP Prods.*, 244 S.W.3d at 846; *see also EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 698 (5th Cir. 2017) (a movant "bears the burden of showing that a protective order is necessary, which contemplates a particular and

specific demonstration of fact as distinguished from stereotyped and conclusory statements" (internal quote and citation omitted)).

<div align="center">

**ARGUMENT AND AUTHORITIES**

</div>

1. **The Protective Order Permits Counsel of Record to View OCO Materials.**

Under the Protective Order, *all* counsel of record may view *all* discovery materials. It says that "'Confidential' or 'Outside Counsel's Eyes Only' information shall not be disclosed or made available by the receiving party to persons other than Qualified Persons as delineated above." Protective Order ¶ 12. For both Confidential and OCO information, Qualified Persons include "Attorneys of record for the parties in this litigation." *Id*. ¶ 5(a), ¶ 6. Attorneys of record have *no* limitation on their ability to access OCO information. *Id.*

By contrast, the Protective Order excludes "parties and their respective *in-house* counsel, paralegals, legal staff or experts" from the definition of Qualified Persons permitted to access OCO information. *Id*. ¶ 5(c), ¶ 6 (emphasis added).

2. **Mr. Locke Is Counsel of Record in this Action.**

It is undisputed that under the Protective Order, Mr. Locke is counsel of record, i.e., an "attorney of record," for SafeLease. To become counsel of record, he filed a public notice of appearance. Storable argues that he should not be a counsel of record, so "was not permitted to view OCEO documents," for a litany of reasons. All of Storable's arguments fail.

**"He gives general legal advice."** There is *no* prohibition on lawyers who advise clients on day-to-day legal issues from being counsel of record here. Storable does not cite a legal basis for this argument. Some or all defense counsel surely do the same. Mr. Locke has provided repeated assurances about his commitment to abide by the Protective Order, including his understanding of the "strict limitations" associated with accessing OCO materials. He has assured Storable that "I will use OCO materials *only* to prepare for, try, and appeal this matter," and "I will *not* use OCO

materials to advise SafeLease on business or legal matters." Mot., Ex. G at 1. There is no credible basis to dispute his commitment to abide by the order. Indeed, Storable earlier confirmed, "our concern is less about whether [he is] personally maintaining the confidentiality of the documents." Mot., Ex. I at 1. This is no basis to deprive Mr. Locke from access to critical case documents.

**"He once was employed by SafeLease."** That Mr. Locke worked for SafeLease two years ago is irrelevant. Litigators often go in-house and then back to outside firms where they represent former clients. Nothing about his history undermines his commitment to abide by court orders.

**"He was not counsel of record at the hearings or until after the Protective Order was entered."** Neither point is relevant to Mr. Locke's current status in the case. After the temporary injunction order, the Court set this case for trial in June 2026, beginning a long road of discovery, briefing, and trial preparation. This was a natural juncture for the parties to assess their lawyer teams. Indeed, Arnold & Porter was not counsel of record during these hearings either, which does not affect its ability to be counsel now. In addition, when SafeLease hoped a good-faith settlement was possible, Mr. Locke refrained from filing a notice of appearance so that he and Mr. Verma were on equal footing in the talks. A. Locke Decl. (Ex. 1) ¶ 29. The efforts failed, and Storable wants settlement discussions now to be directed exclusively to outside counsel. *Id.* ¶ 37.

**"He is estopped because of Yetter's representations and was a client representative at the January hearing."** Mr. Yetter's representations were true and in no way suggested that Mr. Locke was *in-house* counsel or otherwise ineligible to be counsel of record. Mr. Yetter accurately referred to him as "outside" SafeLease general counsel. *See* Mot., Ex. A. He was a "client representative" at that hearing, just as all attorneys are representatives of their clients. But unlike Mr. Stein, Mr. Locke was there as outside counsel and could not bind SafeLease to any decision without his client's consent. Storable also claims Mr. Yetter's stating that Mr. Locke would be

excused from a hearing when OCO materials were introduced shows that Mr. Locke is not *outside* counsel. The statement was accurate and proper under the Protective Order. As of February 11, Mr. Locke was not counsel of record, he could not view OCO materials, and he was excused for those parts of the hearing. Nothing in these comments estops SafeLease from choosing him as its attorney of record.

**"He is involved in 'general business operations' of SafeLease."** The premise of this point is far from true. Mr. Locke gives *legal* advice to SafeLease. He is not involved in its business decisions or giving it business advice. A. Locke Decl. (Ex. 1) ¶ 21. He last participated in business decisions at SafeLease two years ago, in June 2023. *Id.* ¶ 16. He runs a law firm, not a business consulting firm, and bills SafeLease by the hour for discrete legal work. As his malpractice policy doesn't cover claims relating to non-legal advice, he is careful not to provide such advice. *Id.* ¶ 23.

**"He did not tell Storable he would file an appearance before the Order was entered."** In fact, on a February 3 phone call, Mr. Locke told Mr. Verma that he would file an appearance if settlement talks failed. Rather than object, Mr. Verma said Mr. Locke should "go ahead" and do "what he needed to do." *Id.* ¶ 31. This was weeks before the Protective Order was entered on February 27. Even had this conversation not taken place, SafeLease had no duty to give advance notice of who would serve as its counsel of record (nor did Storable).

Mr. Locke is a Texas-licensed attorney who is committed to uphold the Protective Order. He has served as SafeLease's outside counsel for nearly two years. He filed an appearance as its attorney of record on March 24, allowing him to represent his client in this bet-the-company case. As such, he was entitled under the Protective Order to view all discovery materials.

### 3. As Counsel of Record, Mr. Locke Is Permitted to Review OCO Materials.

The Protective Order provides that the Qualified Persons who may see OCO information include "Attorneys of record for the parties in this litigation." *Id*. ¶ 5(a), ¶ 6. Mr. Locke is an attorney of record for SafeLease and thus may see any materials defendants have marked OCO.

Storable argues that it is not "necessary" for Mr. Locke, as counsel of record, to see OCO materials, so the Protective Order bars him from accessing the information. Mot. at 8. Its argument rests on omitting a key clause from paragraph 5(a) of the Protective Order, emphasized below, so as to change the order's plain meaning:

> Under the PO, counsel permitted to view OCEO documents include "[a]ttorneys of record for the parties in this litigation ***and employees and/or agents of such attorneys to whom it is necessary*** that the information be shown for purposes of this litigation.

The "necessary" condition applies to employees/agents of the attorneys, not attorneys themselves. Storable's reading of paragraph 5(a) makes no sense and invites mischief. It would allow opposing counsel to challenge whether access to discovery by an attorney of record is "necessary" and seek to deny attorneys of record access to *Confidential* documents, which even the parties themselves may access without restriction.

The "necessity" requirement does not limit counsel of record's access for several reasons. First, attorneys of record need access to all discovery materials to represent their clients diligently and zealously. And, of course, all counsel of record should have equal access to discovery materials to ensure the litigation is procedurally fair. Plus, extending the "necessity" requirement to counsel of record would subject them to a higher threshold for accessing Confidential materials than that imposed on the parties themselves and their in-house counsel (for whom there is no necessity requirement). Protective Order ¶ 5(a), ¶ 5(c).

Mr. Locke is an attorney of record for SafeLease. Under the Protective Order, he may see OCO materials marked by defendants. Storable's misreading of the order should be rejected.

**4. The Protective Order Should Not Be Modified to Exclude Mr. Locke.**

Mr. Locke has complied with the Protective Order in every respect, and he has assured this Court and defendants that he will continue to comply with it. "When the parties conclude an agreement, the court should not lightly ignore their bargain." *BP Prods*., 244 S.W.3d at 846. What Storable requests is to create unequal classes of attorneys of record. This would be a serious and unjustified departure from norms and standard litigation practice in Texas courts.

Storable first argues that the order was not fairly negotiated but provides no valid basis to say that. *See* Mot. at 10-11. Contrary to the motion's claim, Mr. Locke *did* raise his intent to file an appearance before the order was entered, in the February 3 settlement call with Mr. Verma (discussed above), with not a word of objection by Mr. Verma on behalf of defendants. *See* A. Locke Decl. (Ex. 1) ¶ 31. Moreover, Storable's claim that Mr. Yetter represented that Mr. Locke was not outside counsel ignores his words, which correctly state that Mr. Locke is outside general counsel (but not yet an attorney of record) and would be excused during OCO testimony. There was no "bait-and-switch." Mot. at 10.

Storable's second claim is that Mr. Locke is "objectively a client representative." *See id.* at 11. This is both incomplete and beside the point. Like all lawyers, he was a "representative" of his client, but that does not alter the fact that during this case, he has always been its *outside* counsel and, as of March 24, one of its attorneys *of record* in the case. It also is based on the false assumption he is "involved in SafeLease's general business operations or discussions." In fact, he has not advised SafeLease on business operations or participated in its commercial decisions since he resigned in June 2023. *See* A. Locke Decl. (Ex. 1) ¶ 16. Beyond that, he became SafeLease's

attorney of record under the Protective Order when he filed an appearance. This entitles him to access all of defendants' discovery materials, both confidential and OCO.

Finally, SafeLease *will* be prejudiced if Mr. Locke is excluded from OCO materials. SafeLease does *not* have unlimited means to prosecute this case. It is not the industry's "10,000-pound gorilla," as Mr. Manes described Storable. It is a small, innovative startup fighting for survival against a monopolist. It wishes to be represented by Mr. Locke, who has been a litigator longer than all but two members of SafeLease's trial team (and whose rate is the lowest). To ensure vigorous advocacy and control costs in this critical case, he is an indispensable member of SafeLease's trial team.

Accordingly, the motion to modify the Protective Order is unmerited and should be denied.

## 5. Defendants Are Not Entitled to Know What OCO Materials He Has Reviewed.

Although not required under the Protective Order, SafeLease will disclose when Mr. Locke first accessed defendants' OCO materials: March 24 at 6:54 p.m. *Id.* ¶ 42. It was *after* he filed an appearance and became an attorney of record. SafeLease makes this disclosure to lay to rest the specious claim that he "likely" accessed OCO materials earlier and so violated the Protective Order. *See* Mot. at 9.

SafeLease has no obligation to disclose what Storable OCO materials he has reviewed. To force counsel of record to divulge such information would invade the protections given to attorney work product under established legal principles. The documents he chose to review after becoming an attorney of record would reveal his mental processes, which warrant protection and are not subject to compelled disclosure. "The attorney work product privilege protects . . . the mechanical compilation of information to the extent such compilation reveals the attorney's thought processes." *Occidental Chem. Corp. v. Banales*, 907 S.W.2d 488, 490 (Tex. 1995); *see also* Tex. R. Civ. P. 192.5(b) (attorney work-product privilege).

- 14 -

Moreover, there is no question Mr. Locke accessed OCO materials only *after* becoming an attorney of record for SafeLease. Storable cites paragraph 15 of the Protective Order in support of its request for disclosure: "If a receiving party learns of any unauthorized disclosure of [OCO], the party shall immediately upon learning of such disclosure inform the producing party of all pertinent facts relating to such disclosure." But disclosure of OCO materials to Mr. Locke *was* authorized once he became an attorney of record. SafeLease has no duty to divulge facts relating to his review. Accordingly, Storable's request to compel disclosure should be denied.

<div align="center">CONCLUSION</div>

The Court should deny defendants' motion to modify the Protective Order and to compel disclosure of attorney work product. SafeLease does not request an oral hearing on this motion but is happy to provide oral argument if it would assist the Court.

Date: April 11, 2025

Respectfully submitted,

*/s/ R. Paul Yetter*

Judd E. Stone II
State Bar No. 24076720
judd@stonehilton.com
Christopher D. Hilton
State Bar No. 24087727
chris@stonehilton.com
Alexander M. Dvorscak
State Bar No. 24120461
alex@stonehilton.com
STONE HILTON PLLC
600 Congress Ave.
Austin, Texas 78748
(737) 465-3897

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Susanna R. Allen
State Bar No. 24126616
sallen@yettercoleman.com
Luke A. Schamel
State Bar No. 24106403
lschamel@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

Adam T. Locke
State Bar No. 24083184
adam@lockelaw.com
LOCKELAW PLLC
2617 Bissonnet Street, Suite 503
Houston, Texas 77005
(713) 832-0243

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on all counsel of record via the Court e-filing service and/or by email, on April 11, 2025.

*/s/ Luke Schamel*
Luke Schamel

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with Local Rule 5(a) and contains 4692 words, not including the case caption, any index, table of contents or table of authorities, signature blocks, attached evidence, or any required certificates.

*/s/ Luke Schamel*
Luke Schamel

# Exhibit 1

**The Business Court of Texas**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § | |
| *Defendants.* | § § | |

**DECLARATION OF ADAM LOCKE**

1.      My name is Adam Locke, and I am over 18 years of age and competent to make this declaration.

2.      The facts set forth in this declaration are based on my personal knowledge, and are true and correct.

My Background and Current Practice

3.      I have been licensed to practice law in Texas since 2012.

4.      I have operated my law firm, Lockelaw PLLC, since founding it in December 2019.

5.      Prior to founding Lockelaw, I was a counsel at Akin Gump Strauss Hauer & Feld LLP in New York City from 2016 to 2019. Prior to working at Akin Gump, I was an associate in the Kansas City offices of Shook, Hardy & Bacon LLP and Rouse Hendricks German May PC from 2015 to 2016. Before working at Shook, I was an associate in the Houston office of Susman Godfrey LLP from 2013 to 2015.

6.      I served as a law clerk to the Honorable Carolyn Dineen King of the United States Court of Appeals for the Fifth Circuit from 2012 to 2013.

7.      I graduated from Yale Law School and received my Juris Doctor in 2012.

8. At Lockelaw, my law practice consists of commercial litigation, employment litigation, arbitration, investigations, regulatory advice, and legal due diligence for credit investors.

9. On a limited basis, Lockelaw also offers outside general counsel services. "Outside general counsel services" refers to serving as a first point of contact for my business and investor clients, providing general legal advice on the issues they encounter on a regular basis when possible, and referring specialized work to other outside counsel as needed.

10. I do not offer business advice to my clients or advise on commercial issues, such as the suitability of price terms in agreements.

11. My law firm has represented dozens of clients, including investment managers, startups, public companies, family-owned businesses, and individuals.

My Relationship with SafeLease

12. SafeLease became a client of Lockelaw PLLC in 2021.

13. In April 2022, I joined SafeLease as its General Counsel and Chief Operating Officer.

14. While employed by SafeLease, with SafeLease's permission, I maintained my law firm and certain clients I had served since founding my law firm.

15. Over the year I was employed with SafeLease, demand for my legal services from outside clients grew, and I could not service these clients while employed with SafeLease.

16. In June 2023, I resigned from SafeLease and no longer had any in-house or business role with SafeLease.

17. Following my resignation from SafeLease, I began to represent SafeLease as outside counsel through Lockelaw PLLC.

18. I remain outside counsel to SafeLease, a role I have had since July 2023.

19.     I do not provide commercial advice to SafeLease, make business decisions for SafeLease, or participate in non-legal, commercial decision-making with SafeLease.

20.     I am not involved in SafeLease's general business operations or discussions, which are operations handled by and discussions maintained by SafeLease's internal business leaders.

21.     I do not participate in SafeLease's business operations or discussions because my role as outside counsel is to provide legal advice.

22.     Lockelaw PLLC is not a business consultancy, and I do not run a business consultancy.

23.     In addition, I do not participate in SafeLease's business operations or discussions because, as SafeLease's outside counsel, were I to give SafeLease business advice, any claims arising out of such advice would not be covered by my professional malpractice insurance, which exclusively covers claims relating to legal advice.

24.     As a small firm owner, I do not and cannot expose myself to risks associated with giving business advice to my law firm clients, which would be outside of my circle of competence.

My Relevant Communications with Storable's Counsel Before I Filed an Appearance

25.     I have personal knowledge of the facts stated in SafeLease's response to Storable's motion to modify the agreed protective order and to compel disclosure of a list of certain documents that I have reviewed as counsel of record in this action, which response this declaration supports.

26.     Storable has known that I am outside counsel to SafeLease since before this case was filed.

27.     On December 6, 2024, I had coffee with Neil Verma, Storable's General Counsel. During this meeting, Mr. Verma told me that he and Storable's CEO, Chuck Gordon, understood

that I was independent of SafeLease and was operating an outside law firm. I confirmed to Mr. Verma that I was and had been representing SafeLease as outside counsel through my law firm, Lockelaw PLLC, since the summer of 2023. I explained to Mr. Verma at this meeting high-level details about why I had left SafeLease, the nature of my client base and services, and confirmed that I was outside counsel to SafeLease among many other clients of my firm.

28. Mr. Verma noted that he would like to retain me on behalf of Storable in the future once his department had the resources to do so. Mr. Verma suggested that such an arrangement might not be possible at that time due to potential conflicts, but that the situation could change. I indicated to Mr. Verma that I appreciated the kind words and consideration, but there likely was a conflict.

29. Once this lawsuit was filed, Mr. Verma and I engaged in multiple rounds of settlement discussions. I believe these good faith settlement talks were enabled by my being on equal footing with Mr. Verma, in that I had refrained from filing a notice of appearance and gaining access to discovery materials that he could not view as in-house counsel under a Rule 11 agreement.

30. A 21-minute-long settlement call I had with Mr. Verma on February 3, 2025, was memorable because it was far more negative in tone from our other settlement calls, which were generally polite and constructive.

31. Based on the negative tone of the February 3 call, I informed Mr. Verma that I would file a notice of appearance in the action if settlement talks continued to break down or failed. Mr. Verma responded for me to "go ahead" and do what I needed to do.

32. On March 7, 2025, Storable's new lead counsel, Katherine Treistman, called me.

33.     Ms. Treistman knows me from when I began my career in private practice in 2013 at Susman Godfrey LLP, the litigation boutique where Ms. Treistman was then a partner.

34.     On the March 7 call, I spoke with Ms. Treistman for twenty minutes. On the call, Ms. Treistman told me she wanted to reconnect with me and discuss her approach towards this litigation. Ms. Treistman told me that she hoped the parties could take a more constructive approach to this litigation, a statement with which I agreed.

35.     Ms. Treistman also inquired into my relationship to SafeLease, specifically asking me if I was "in house" counsel. I informed Ms. Treistman that I was not "in house" but had been outside counsel to SafeLease since July 2023. I explained to Ms. Treistman that, like many litigators at private firms, I provided legal advice on various issues to SafeLease, my longtime client, through my firm, Lockelaw PLLC, where I have represented dozens of other clients.

36.     Following my explanation, Ms. Treistman said she "got it," indicating she understood the outside counsel arrangement between me and SafeLease.

37.     Also following my explanation, Ms. Treistman told me that all settlement communications from me going forward needed to be directed to her, not Mr. Verma.

38.     Now that I could no longer engage in settlement discussions with Mr. Verma, I felt that I no longer had any reason not to file a notice of appearance.

<u>I File an Appearance and Afterward Receive Access to OCO Materials</u>

39.     On March 24, Storable indicated that it would seek permanent sealing of dozens of exhibits and hundreds of pages of testimony in this case.

40.     To assist with the sealing issue and related briefing, I decided to file an appearance. Before gaining access to any OCO materials, I reviewed the Protective Order.

41.     On March 24, 2025, at 6:25 PM CDT, I filed and served my notice of appearance in this action, becoming counsel of record to SafeLease.

42. On March 24, 2025, at 6:54 PM CDT, I first received access to OCO materials.

43. Following receipt of the OCO materials, I reviewed some of them.

My Relevant Communications with Storable's Counsel After I Filed an Appearance

44. On March 25, 2025, I participated in a meet and confer about the parties' motions to seal.

45. On that call, my co-counsel introduced me as outside counsel to SafeLease.

46. Later on the call, I noted that defendants' OCO designations appeared overbroad, citing an email defendants produced and marked OCO where Storable executives discussed an email they had received from the parties' mutual customer. I noted that there was nothing in the email that appeared confidential, certainly nothing that would warrant an OCO designation.

47. At the end of the March 25 call, without prompting or explanation, Storable's counsel, Andrew Bergman, said the following to me and my co-counsel: "my clients do not accept your characterization of Mr. Locke as outside counsel."

48. I was surprised by this, given that weeks earlier, I told Ms. Treistman I was outside counsel, and even explained my relationship to SafeLease, and she said that she understood my role and invited me to participate in settlement talks directly with her, outside counsel to outside counsel.

49. I ended the call by saying that Mr. Bergman was entitled to "raise it with the Court."

50. On March 25, 2025, lead counsel for Storable, Ms. Treistman, sent the first of two letters demanding that I immediately and permanently stop viewing Storable's OCO materials and disclose what OCO materials I had reviewed.

51. Ms. Treistman reiterated her clients' demands to me on a March 28 phone call and in a March 31 letter.

52. Both of Ms. Treistman's letters mischaracterize my relationship to SafeLease as "not outside counsel" and as someone "extensively involved in Plaintiff's business" or involved in SafeLease's "general business activities."

53. I informed Ms. Treistman in response to her letters that I am outside counsel to SafeLease, have been since July 2023, and am not involved in SafeLease's business activities.

54. I assured Ms. Treistman in several written responses to her letters and on the March 28 call that I had abided by the Agreed Protective Order in this case and always would do so.

55. On the March 28 phone call, Ms. Treistman said to me that even with no access to OCO materials, I could "do everything that Mr. Yetter could do in the litigation—take depositions, represent [SafeLease] at hearings," etc.

56. I disagreed with Ms. Treistman and responded that any counsel of record needs full access to discovery materials to zealously represent their clients.

57. Storable's counsel at Arnold and Porter emailed me on April 3 (at 9:42 pm) and said that, in her March 31 letter, Ms. Treistman had requested to know when I first viewed OCO materials in this case.

58. In this April 3 email, Storable's counsel alleged that I had failed to respond to Ms. Treistman's request for the date and time I first accessed OCO materials; however, prior to the April 3 email, Storable's counsel had never asked me to disclose when I first gained access to OCO materials in this litigation.

My Appearance Benefits SafeLease in this Litigation

59. In this action, the hourly rate I charge SafeLease is the lowest charged by any member of SafeLease's trial team.

60. Of the members of SafeLease's trial team, just two have litigated longer than me.

My name is Adam Locke, my date of birth is October 11, 1986, and my business address is 2607 Bissonnet Street, Suite 503, Houston, Texas 77005. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Houston, Texas, on the 11 day of April, 2025.

Adam T. Locke

# Exhibit 2

# PORTER | HEDGES

## Porter Hedges Welcomes Back Derek Forinash

**Firm News | 03.16.2020**

Porter Hedges announced today that Derek Forinash has returned to the firm as a Partner. His practice focuses on serving as outside general counsel to private companies as well as continuing to provide comprehensive intellectual property legal services to various clients.

His experience includes more than eighteen years in both private practice and as in-house counsel, including serving as Senior Corporate Counsel for an oilfield services company and as Vice President and General Counsel of a Houston-based reservoir engineering company.

"Derek brings a unique perspective to clients having served both as lead in-house counsel as well as in private practice. We are excited to have him back as an asset for our clients representing them in both general business management issues as well as intellectual property matters," said Managing Partner Rob Reedy.

As outside general counsel, he provides practical legal advice to private companies on the day-to-day issues that impact their businesses including employment matters, commercial contracts, intellectual property, governance, financial transactions, and risk management.

His intellectual property practice focuses developing, protecting, and monetizing clients' intellectual property portfolios as well as drafting and negotiating various technology-related transactions, including SaaS agreements, technology licenses, and joint development agreements.

Prior to law school, Derek worked as an engineer designing oilfield equipment.

Derek received his J.D. from the University of Houston Law Center and his B.S. from Louisiana State University in Mechanical Engineering.

## Attorneys



Derek V. Forinash
Partner

## Practice Areas

Intellectual Property

Patent and Trademark Prosecution

# Trade Secret Litigation

# Trademark and Copyright Litigation

# PORTER | HEDGES



## Ray T. Torgerson
### Partner

1000 Main St., 36th Floor
Houston, TX 77002

713.226.6650
rtorgerson@porterhedges.com

Ray Torgerson has extensive first- and second-chair jury trial experience in both state and federal courts, as well as arbitration before various ADR bodies, on behalf of both plaintiffs and defendants. He has represented public and private corporations, partnerships, small companies, and foreign and domestic individuals across various industries.

Ray handles the full range of intellectual property disputes; disputes involving investors, operators, and services contractors in the upstream and midstream energy sectors; and commercial claims involving breach of contract, personal injury, and business torts such as fraud and breach of fiduciary duty. He has substantial experience in disputes involving partnerships and closely held corporations and has handled a wide array of cases involving real estate, environmental, securities, white collar, and construction matters. He also consults with businesses on technology matters, including licensing, cybersecurity, and data privacy.

In addition, Ray helps resolve American Indian law issues, having worked for tribes, businesses, organizations, and individual tribal members across the United States on a variety of topics, including sovereignty, jurisdiction, civil rights, natural resources, and economic development. He also taught an American Indian law course at the University of Houston Law Center.

### Honors & Recognitions

*Best Lawyers in America*, Commercial Litigation

## Education

J.D., University of Texas School of Law, 1997

B.A., Texas A&M University, *magna cum laude*, 1994

## Admissions

Texas

## Practices

Litigation

Commercial Litigation

Energy Litigation

Intellectual Property

Trademark and Copyright Litigation

Alternative Dispute Resolution

Native American Law

Private Company Disputes / Business Divorce

Patent Litigation

Real Estate Litigation and Disputes

Trade Secret Litigation

# PORTER | HEDGES



## Michael T. Larkin
### Partner

1000 Main St., 36th Floor
Houston, TX 77002

713.226.6629
mlarkin@porterhedges.com

Mike Larkin practices primarily in the areas of mergers and acquisitions, public and private offerings of securities, joint ventures and strategic alliances, and corporate and securities law. Mike represents companies primarily in the oil and gas, health care, telecommunications, technology, pharmaceuticals, manufacturing, and professional services industries.

## Affiliations

American Bar Association, Member

State Bar of Texas, Member

Houston Bar Association, Member

Association for Corporate Growth, Member

## Experience

Mike's representations have included the following:

**Mergers and Acquisitions**

- An online continuing education provider for emergency medical services and firefighting professionals in its sale to a portfolio company of a private equity firm.
- A privately held consumer products company in a leveraged recapitalization and sale transaction with private equity buyer.

## Education

J.D., St. Mary's University School of Law, 1991

M.B.A., Texas Christian University, 1987

B.A., University of Texas at Austin, 1985

## Admissions

Texas

## Practices

Corporate

Mergers & Acquisitions

Energy Transactions

Capital Markets

Corporate Governance, Compliance & Investigations

Real Estate Joint Ventures and Partnerships

Renewable & Alternative

- Numerous public and privately held issuers in private placements of debt and equity securities.

- A NYSE.MKT issuer in underwritten offerings of preferred stock, including subsequent ATM offerings.

**Corporate Advisory**

- A natural gas pipeline company regarding securities and general corporate matters, including listing and securities law compliance, disclosure matters, and numerous merger and acquisition transactions.

- Numerous publicly traded and privately held companies in the oil and gas exploration and production, pipeline, and oil field service industries as outside general counsel.

- Publicly traded companies in a cross section of industries (including telecommunications, technology, oil and gas exploration and production, oil and gas pipelines, and oil field services) in all aspects of SEC reporting, corporate governance matters, and general securities law.

**Litigation Finance and Additional Expertise**

- Numerous lenders, investors and borrowers in litigation finance transactions, including loans and prepaid forward structures.

- Attorneys and law firms in purchase and sale and joint venture transactions.

- Numerous corporate borrowers in connection with syndicated credit agreements, L/C facilities, and loan agreements.

## Recent News

Porter Hedges Represents Cathedral Energy Services in its $41 Million Acquisition of Rime Downhole Technologies
07.13.2023

The Houston Business Journal Once Again Names Porter Hedges Among the Largest Corporate Firms in Houston
06.02.2023

Porter Hedges Represents Founder of Fitzgerald Wealth Management in Sale to Wealth Enhancement Group
08.04.2021



## GreenbergTraurig

# Michael Burshteyn

SHAREHOLDER
Michael.Burshteyn@gtlaw.com

SAN FRANCISCO
T +1 415.655.1300

Mike Burshteyn litigates complex commercial disputes and class actions involving privacy, crypto, data security, AI, defamation, and other novel Internet law and technology issues. He is lead counsel in multiple cases involving more than $100m in controversy. Mike also represents clients in cybercrime, crypto, and consumer protection investigations and regulatory inquiries. He has litigated matters in federal and state courts in California, New York, Texas, Florida, Arizona, Georgia, Ohio, Delaware, Puerto Rico, and internationally.

Mike previously founded and was the CEO of CryptoMove, a security startup that developed novel moving target defense technology. He draws on this business background to serve as outside general counsel to crypto, SaaS, AI, e-commerce, and other technology startups, as well as individual and institutional investors. Mike helps these innovators define and manage their legal roadmaps based on practical business needs across corporate, financing, M&A, licensing, IP, regulatory, and other issues.

Mike graduated from Emory Law School and, as a visiting student, attended the University of California, Berkeley, School of Law, where he worked in the Samuelson Law and Technology Clinic. Mike analyzed early legal implications of bitcoin and blockchain technologies as an associate editor of the *Berkeley Technology Law Journal*.

Mike honed his passion for client advocacy during his time as a college debater at University of California, Berkeley, where he led the Cal debate team to the number one national ranking. Mike maintains an active pro bono practice defending internet rights, security researcher rights, and housing rights.

## Capabilities

Intellectual Property Litigation  |  Intellectual Property & Technology  |  Blockchain & Digital Assets  |  Data Privacy & Cybersecurity  |  Innovation & Artificial Intelligence

## Experience

### Representative Matters

- **Class actions.** Defended tech, media, and financial services companies in dozens of privacy and consumer protection class action and mass-tort claims.

© 2025 Greenberg Traurig, LLP

GT GreenbergTraurig



# Galit Kierkut

SHAREHOLDER
kierkutg@gtlaw.com

NEW JERSEY
D +1 973.443.3292
T +1 973.360.7900

Galit Kierkut is a seasoned litigator and advisor to national and international clients in the pharmaceutical, medical device, financial services, hospitality, and health care industries, among others. She also takes on the role of outside general counsel for many of her start-up and growth-stage clients, assembling and leading teams of professionals to seamlessly address her clients' legal needs.

Galit is also a key member of Greenberg Traurig's Israel Practice, providing employment counsel to Israeli start up and growth stage clients in their U.S. operations.

Galit practices in the areas of trade secret and non-compete counseling and litigation, employment law, and complex commercial litigation. She is a skilled litigator who is never afraid to champion her client's rights but also works to reach non-litigation solutions when possible. She trains and counsels employers in all employment compliance areas, including reasonable accommodations, anti-harassment and implicit bias and is a frequent writer and speaker on these topics.

Galit has been honored by numerous organizations for her leadership and advocacy for women in the law and has received an award from the New Jersey Commission on Professionalism in the Law in conjunction with the New Jersey Women Lawyers Association. Galit is a past President of the New Jersey Women Lawyers Association and serves as the chair of the Trial Practices Committee of the Executive Committee of the Employment Section of the New Jersey State Bar Association.

## Concentrations

- Serving as outside general counsel

- Trade secret litigation

- Employee leave and accommodation counseling and litigation

- Israel practice

- Restrictive covenant drafting, counseling and litigation

- Employment discrimination counseling and litigation

- Employment compliance training

- Complex commercial litigation

- Start-ups

The attorney is providing legal services through and affiliated with Greenberg Traurig, LLP, a New York Limited Liability Partnership. Prior results do not guarantee a similar outcome.

© 2025 Greenberg Traurig, LLP

# Arnold&Porter



## Ben Fackler

Partner

San Francisco

*Tel* +1 415.471.3125

ben.fackler@arnoldporter.com

## Credentials

### Education

J.D., Harvard Law School, *magna cum laude*

B.S., Pomona College, *magna cum laude*

### Admissions

California

New York

Ben Fackler is an experienced, pragmatic corporate advisor who draws from his work in law, investment banking, principal investment, and business to help his clients successfully navigate complex situations and complete critical transactions. He focuses his practice on mergers and acquisitions, capital raising transactions, and matters affecting corporate strategy and governance. Ben has represented numerous public and private companies, including boards of directors, special committees, management, and founders, as well as investment firms, financial sponsors, venture investors, and family offices, in domestic and cross-border M&A, buyouts, corporate reorganizations, venture and later stage investments, and other transactions, totaling over US$250 billion in deal value. He also advises on matters involving shareholder activism, proxy contests, and contested situations. He regularly assists entrepreneurs and investors in growing new businesses and new technologies, and often serves as outside general counsel to his clients.

## Experience

**Representative Experience**

Various companies on mergers & acquisitions, buyouts and restructurings, including

*Rewrite Therapeutics Inc.*, a private biotechnology company focused on advancing novel DNA writing technologies, on its sale to Intellia Therapeutics Inc. (Nasdaq: NTLA)

*Pfizer Inc.* (NYSE: PFE) on its acquisition of the assets of Lucira Health Inc. through a Bankruptcy Code Section 363 transaction

*Xoriant Technologies Inc.*, a digital product, software development and technology services firm, on its sale to affiliates of ChrysCapital, a leading private equity firm based out of India

*HomeSnap Inc.*, a digital residential real estate solutions provider, on its sale to CoStar Group Inc. (Nasdaq: CSGP)

*Mayne Pharma Group Limited* (ASX: MYN), a specialty pharmaceutical company focused on commercializing novel and generic pharmaceuticals, on its exclusive license and acquisition of pharmaceutical assets from TherapeuticsMD Inc. (Nasdaq: TXMD)

*Robertson Stephens Wealth Management LLC*, on various acquisitions of investment advisory businesses

*Founders of Alter Eco Americas PBC*, a leading sustainability-focused chocolate-centric food company, on the sale of the company to NextWorld Evergreen, a private equity firm focused in the consumer and retail industry

# Exhibit 3

| | |
|---|---|
| **Subject:** | RE: SafeLease/Storable - Mar. 31 letter |
| **Date:** | Thursday, April 3, 2025 at 9:42:51 PM Central Daylight Time |
| **From:** | Bergman, Andrew D. |
| **To:** | Adam Locke, Treistman, Katherine Ginzburg |
| **CC:** | Yetter, Paul |
| **Attachments:** | ~WRD2222.jpg, image001.png |

Paul and Adam,

Can you please confirm whether SafeLease is refusing to disclose which of Defendants' OCEO documents Adam has reviewed and when they were reviewed?   Katherine's March 31 letter requested this, and Adam's letter received yesterday does not address this request.

If SafeLease is refusing to provide this information, please indicate whether you are opposed to a motion for the Court to require SafeLease to do so.  Please also indicate whether SafeLease opposes a motion to modify the Protective Order to exclude Adam from viewing Defendants' OCEO documents going forward.

Thank you,
Andrew

───────────────
Andrew D. Bergman
Senior Associate | Bio

## Arnold & Porter

700 Louisiana Street | Suite 4000
Houston, TX 77002-2755
T: +1 713.576.2430
Andrew.Bergman@arnoldporter.com
www.arnoldporter.com | LinkedIn

---

**From:** Adam Locke <adam@lockelaw.com>
**Sent:** Wednesday, April 2, 2025 9:30 PM
**To:** Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>
**Cc:** Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; Yetter, Paul <pyetter@yettercoleman.com>
**Subject:** Re: SafeLease/Storable - Mar. 31 letter

External E-mail

Hi Katherine,

Please see the attached response.

Kind regards,
Adam



**From:** Adam Locke <adam@lockelaw.com>
**Date:** Wednesday, April 2, 2025 at 7:43 PM
**To:** Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>
**Cc:** Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>
**Subject:** Re: SafeLease/Storable - Mar. 31 letter

I'm going to respond. Thanks.

**From:** Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>
**Date:** Wednesday, April 2, 2025 at 6:24 PM
**To:** Adam Locke <adam@lockelaw.com>
**Cc:** Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>
**Subject:** SafeLease/Storable - Mar. 31 letter

Adam,

Katherine has been out this afternoon but asked me to check with you on the status of your response to our March 31 letter.

Thanks,
Andrew

Andrew D. Bergman
Senior Associate | Bio

**Arnold & Porter**
700 Louisiana Street | Suite 4000
Houston, TX 77002-2755
T: +1 713.576.2430
Andrew.Bergman@arnoldporter.com
www.arnoldporter.com | LinkedIn

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alyssa Smith on behalf of R. Yetter
Bar No. 22154200
asmith@yettercoleman.com
Envelope ID: 99565332
Filing Code Description: Answer/Response
Filing Description: SafeLease's Response to Motion to Modify PO
Status as of 4/11/2025 12:11 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 4/11/2025 11:51:06 AM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 4/11/2025 11:51:06 AM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 4/11/2025 11:51:06 AM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 4/11/2025 11:51:06 AM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 4/11/2025 11:51:06 AM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 4/11/2025 11:51:06 AM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 4/11/2025 11:51:06 AM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 4/11/2025 11:51:06 AM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 4/11/2025 11:51:06 AM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 4/11/2025 11:51:06 AM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 4/11/2025 11:51:06 AM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 4/11/2025 11:51:06 AM | SENT |
| Judd Stone | | Judd@stonehilton.com | 4/11/2025 11:51:06 AM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 4/11/2025 11:51:06 AM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 4/11/2025 11:51:06 AM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 4/11/2025 11:51:06 AM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 4/11/2025 11:51:06 AM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 4/11/2025 11:51:06 AM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 4/11/2025 11:51:06 AM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 4/11/2025 11:51:06 AM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 4/11/2025 11:51:06 AM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 4/11/2025 11:51:06 AM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alyssa Smith on behalf of R. Yetter
Bar No. 22154200
asmith@yettercoleman.com
Envelope ID: 99565332
Filing Code Description: Answer/Response
Filing Description: SafeLease's Response to Motion to Modify PO
Status as of 4/11/2025 12:11 PM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Dolores Brunelle | | dbrunelle@porterhedges.com | 4/11/2025 11:51:06 AM | SENT |
| Cathy Hodges | | catherine.hodges@aporter.com | 4/11/2025 11:51:06 AM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 4/11/2025 11:51:06 AM | SENT |
| Adam Locke | | adam@lockelaw.com | 4/11/2025 11:51:06 AM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 4/11/2025 11:51:06 AM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 4/11/2025 11:51:06 AM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 4/11/2025 11:51:06 AM | SENT |

FILED IN
BUSINESS COURT OF TEXAS
225
BEVERLY CRUMLEY, CLERK
ENTERED
4/15/2025



**The Business Court of Texas,
Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § | |
| *Plaintiff,* | § | |
| v. | § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § | |
| *Defendants.* | § § § | |

_____

**Order Denying Motion to Modify Protective Order**

_____

Having considered Storable's Motion to Modify Protective Order/Require

Disclosure and Request for Expedited Consideration, Plaintiff's response, the reply,

the evidence, and the applicable law, the Court DENIES the motion.


SIGNED ON: April 15, 2025.



_____

Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 99686066
Filing Code Description: No Fee Documents
Filing Description: Order Denying Motion to Modify
Status as of 4/15/2025 12:17 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 4/15/2025 12:12:31 PM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 4/15/2025 12:12:31 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 4/15/2025 12:12:31 PM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 4/15/2025 12:12:31 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 4/15/2025 12:12:31 PM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 4/15/2025 12:12:31 PM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 4/15/2025 12:12:31 PM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 4/15/2025 12:12:31 PM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 4/15/2025 12:12:31 PM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 4/15/2025 12:12:31 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 4/15/2025 12:12:31 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 4/15/2025 12:12:31 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 4/15/2025 12:12:31 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 4/15/2025 12:12:31 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 4/15/2025 12:12:31 PM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 4/15/2025 12:12:31 PM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 4/15/2025 12:12:31 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 4/15/2025 12:12:31 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 4/15/2025 12:12:31 PM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 4/15/2025 12:12:31 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 4/15/2025 12:12:31 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 4/15/2025 12:12:31 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 99686066
Filing Code Description: No Fee Documents
Filing Description: Order Denying Motion to Modify
Status as of 4/15/2025 12:17 PM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Dolores Brunelle | | dbrunelle@porterhedges.com | 4/15/2025 12:12:31 PM | SENT |
| Cathy Hodges | | catherine.hodges@aporter.com | 4/15/2025 12:12:31 PM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 4/15/2025 12:12:31 PM | SENT |
| Adam Locke | | adam@lockelaw.com | 4/15/2025 12:12:31 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 4/15/2025 12:12:31 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 4/15/2025 12:12:31 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 4/15/2025 12:12:31 PM | SENT |

**The Business Court of Texas,**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff,* | § § | |
| *v.* | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § § | |
| *Defendants.* | § | |

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF SAFELEASE INSURANCE SERVICES, LLC'S FIRST MERITS REQUEST FOR PRODUCTION**

Defendants Storable, Inc.; RedNova Labs, Inc.; SiteLink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP ("Storable" or "Defendants") hereby submit the following objections and responses to the First Set of Merits Requests for Production served by Plaintiff SafeLease Insurance Services, LLC ("SafeLease" or "Plaintiff"). These responses will be amended and/or supplemented in accordance with the Texas Rules of Civil Procedure.

**OBJECTIONS TO DEFINITIONS**

1. Storable objects to each of SafeLease's Definitions as overbroad, unduly burdensome, and unreasonable to the extent that SafeLease seeks information outside the scope of discovery or otherwise purports to impose discovery obligations beyond those set forth in the Texas Rules of Civil Procedure. Storable will therefore construe these requests as seeking non-privileged information within the bounds of the Texas Rules of Civil Procedure.

2. Storable objects to the Definition of "API" as vague and ambiguous.

3. Storable objects to the Definition of "Authorized User" as inaccurate and argumentative.

4. Storable objects to the Definitions of "Defendants," "you," and "your" as overbroad, unduly burdensome, and unreasonable to the extent SafeLease seeks information in the possession, custody, or control of any third-party or all/any employees. Storable further objects to these definitions to the extent they include Storable's attorneys, agents,

consultants, representatives, and advisors, whether past or present, who have facilitated or provided legal advice to Storable. Storable will therefore construe the requests as seeking non-privileged, responsive documents in the possession, custody, or control of Storable.

5. Storable objects to the Definitions of "Document," and/or "Documents," to the extent such Definitions cause any request to seek irrelevant information, render any request overbroad, unduly burdensome, or disproportionate to the needs of this case, are duplicative, or purport to require the disclosure of information protected by the attorney-client privilege, the work-product doctrine, or other applicable immunities. Storable will construe requests employing these definitions as seeking non-privileged information, reasonably giving words their ordinary meaning consistent with the Texas Rules of Civil Procedure.

6. Storable objects to the Definition of "Facility management software" in that it improperly characterizes facility management software as covering only products offered by Defendants.

7. Storable objects to the Definition of "Facility management software market" as calling for a legal conclusion.

8. Storable objects to the Definition of "Tenant insurance" as vague and ambiguous.

9. Storable objects to the Definition of "Tenant insurance market" as vague and ambiguous and calling for a legal conclusion.

<div align="center">

**OBJECTIONS TO INSTRUCTIONS**

</div>

1. Storable objects to each of SafeLease's Instructions as overbroad, unduly burdensome, and unreasonable to the extent that SafeLease seeks information outside the scope of discovery or otherwise purports to impose discovery obligations beyond those set forth in the Texas Rules of Civil Procedure, including with respect to the production of native documents. Storable will therefore construe these requests as seeking non-privileged information within the bounds of the Texas Rules of Civil Procedure.

2. Storable objects to SafeLease's Instructions to the extent that it seeks information that is not in Storable's possession, custody, or control.

<div align="center">

**RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION**

</div>

**Request for Production No. 1:**

All documents that reflect communications with any customer, tenant, or other third-party (including consultants and the like) regarding SafeLease. This includes complaints or feedback regarding SafeLease's access to your facility management software, discussions about purported performance or security issues caused by SafeLease's access to your facility management software, discussions about any technical restrictions put in place to limit SafeLease's access to

<div align="center">

2

</div>

your facility management software, and discussions about switching from your tenant insurance products or offerings to SafeLease's tenant insurance products or offerings.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. This Request seeks expansive information not related to the dispute at issue in this case. Storable further objects to the phrase "communications . . . regarding SafeLease" as vague and ambiguous. Storable further objects that this Request seeks confidential information of non-parties to this lawsuit. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 2:**

All documents reflecting your internal communications regarding SafeLease. This includes communications regarding SafeLease's access to your facility management software, competition with SafeLease over tenant insurance customers, any competitive analysis of SafeLease, any antitrust implications of restricting SafeLease's access to your facility management software, discussions incident to any business negotiations between you and SafeLease (including API access negotiations and discussion of any potential acquisition), and any performance or security issues caused by SafeLease's access to your facility management software.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. This Request seeks expansive information not related to the dispute at issue in this case. Storable further objects to the phrase "communications regarding SafeLease" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any

information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 3:**

All documents reflecting your communications with SafeLease regarding access to your facility management software, including any performance, stability, privacy, or security issues allegedly caused by the same.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects that this Request seeks information that is already in the possession of SafeLease.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 4:**

All documents reflecting your communications with board members, investors, or senior management regarding SafeLease. This includes reports submitted to a director, investor, or senior management regarding SafeLease, any approvals or directives issued by a board member regarding your dealings with SafeLease, and any communications your employees or agents had with a director, investor, or senior management regarding SafeLease.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. This Request seeks expansive information not related to the dispute at issue in this case. Storable further objects to the phrase "communications . . . regarding SafeLease" as vague and ambiguous. Storable further objects that this Request is duplicative and cumulative of

Request No. 2. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 5:**

All documents reflecting communications with board members, investors, or senior management regarding your market share in the facility management software market or tenant insurance market.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the phrase "communications . . . regarding your market share" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 6:**

All documents reflecting analysis or documentation of your market share in the tenant insurance market or facility management software market.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 7:**

All documents relating to your business plans, strategies, initiatives, or analyses concerning your market share in the tenant insurance market, including about acquiring Third-Party Insurance Vendors, restricting Third-Party Insurance Vendors from accessing your facility management software, and establishing fees for API access to your facility management software for Third-Party Insurance Vendors.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to everything after "including" as cumulative. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 8:**

All documents relating to your business plans, strategies, initiatives, or analyses concerning how to gain or maintain your market share in the facility management software market, including cross-

selling of facility management software with any other product and restricting or controlling access to any other product or service offered by you.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 9:**

All documents concerning your strategy, decision making, business plans, or analyses concerning API access pricing for Third-Party Insurance Vendors or SafeLease.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the term "API access pricing" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 10:**

Documents sufficient to show all self-storage facilities that use your facility management software, including addresses for those facilities.

**RESPONSE:**

Storable objects to this Request as seeking irrelevant information, overbroad, unduly burdensome, and not proportional to the needs of the case, as well as on the basis that it seeks confidential, proprietary, and commercially sensitive information of the highest degree. This Request seeks expansive information not related to the dispute at issue in this case. Storable further objects that this Request seeks confidential information of non-parties to this lawsuit. Storable further objects to the extent this Request seeks documents outside of Storable's possession, custody, or control.

Subject to and without waiving the foregoing objections, Storable will not produce documents in response to this Request.

**Request for Production No. 11:**

Documents sufficient to show all self-storage facilities that you contend constitute the relevant market for purposes of this dispute.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the term "relevant market" as vague and ambiguous. Storable further objects to this Request as calling for a legal conclusion. Storable further objects to the extent this Request seeks documents outside of Storable's possession, custody, or control.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 12:**

Documents sufficient to show all Authorized Users on your storEDGE and SiteLink facility management software during the relevant time period.

8

**RESPONSE:**

Storable objects to this Request as seeking irrelevant information, overbroad, unduly burdensome, and not proportional to the needs of the case, as well as on the basis that it seeks confidential, proprietary, and commercially sensitive information of the highest degree. This Request seeks expansive information not related to the dispute at issue in this case. Storable further objects that this Request seeks confidential information of non-parties to this lawsuit. Storable further objects to the extent this Request seeks documents outside of Storable's possession, custody, or control.

Subject to and without waiving the foregoing objections, Storable will not produce documents in response to this Request.

**Request for Production No. 13:**

All documents reflecting any efforts by you to acquire customers from SafeLease, including any business plans or strategies regarding the same.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. This Request seeks expansive information not related to the dispute at issue in this case. Storable further objects to the phrase "efforts by you to acquire customers" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 14:**

All documents reflecting your policies and procedures for granting, maintaining, tracking, or terminating Authorized User access to your facility management software applicable at any point during the relevant time period.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the terms "tracking" and "access" as vague and ambiguous.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 15:**

All documents relating to the planned, actual, or potential removal or restriction of SafeLease or any Third-Party Insurance Vendor from accessing your facility management software as an Authorized User or otherwise, including plans, strategies, and reasoning for any such removal or restriction.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the term "accessing" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 16:**

All documents regarding your decision to remove the third-party producer option or custom insurance module from the SiteLink marketplace.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the undefined terms "third-party producer option" and "custom insurance model" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 17:**

Documents sufficient to show each Third-Party Insurance Vendor with access to the SiteLink custom third-party insurance module at any time during the relevant time period, along with the dates such access was available.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the undefined term "SiteLink custom third-party insurance module" as vague and ambiguous. Storable further objects to the term "access" as vague and ambiguous. Storable further objects that this Request seeks confidential information of non-parties to this lawsuit.

Subject to and without waiving the foregoing objections, Storable responds that it will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 18:**

Documents sufficient to show each Third-Party Insurance Vendor with access to your Easy Storage Solutions facility management software at any time during the relevant time period, along with the dates such access was available.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the term "access" as vague and ambiguous. Storable further objects that this Request seeks confidential information of non-parties to this lawsuit.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 19:**

All documents relating to identification, diagnosis, analysis, or consideration of any purported security, privacy, performance, stability, or related issue caused by SafeLease's access to your facility management software.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable objects to the term "related issue" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 20:**

All documents evidencing any technical security measures implemented by you to manage, disable, limit, restrict, or block SafeLease's access to your facility management software.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case, as well as on the basis that it seeks confidential, proprietary, and commercially sensitive information of the highest degree. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will not produce documents in response to this Request.

**Request for Production No. 21:**

Documents sufficient to show the occurrence of and reason for any system outage, interruption, slowdown, or other material performance issue on your facility management software from 2021 to present.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to this Request as overbroad in time to the extent it seeks documents prior to August 1, 2021. Storable further objects to this Request as overbroad in scope to the extent it seeks documents on "any system outage, interruption, [or] slowdown," regardless of materiality.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 22:**

Documents sufficient to show the capabilities of the storEDGE and SiteLink APIs, including the customer data available to Third-Party Insurance Vendors who access storEDGE and SiteLink via API and the reports Third-Party Insurance Vendors are able to generate through access to storEDGE and SiteLink via API.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case.  Storable further objects to the term "capabilities" as vague and ambiguous.  Storable further objects that this Request seeks confidential information of non-parties to this lawsuit.  Storable further objects to this Request to the extent it seeks to require Storable to create documents not in existence.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 23:**

All documents related to your negotiations with SafeLease for API access to your facility management software, including pricing proposals, fee schedules, and communications with any person reflecting the pricing structure offered to SafeLease.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case.  Storable further objects that this Request seeks information that is already in the possession of SafeLease.  Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product

14

doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 24:**

All documents regarding the restoration or restriction of SafeLease's access to your facility management software in response to the issuance or expiration of any court order.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the term "access" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 25:**

All documents related to any communications with any journalist, reporter, media outlet, or website regarding SafeLease or this dispute.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to this Request as duplicative of Request No. 1. Storable further objects to the extent this Request calls for the disclosure of any information

protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

Respectfully submitted April 21, 2025.

<div style="text-align:right">

*/s/ Mikaila Skaroff*
Katherine G. Treistman
State Bar No. 00796632
Andrew D. Bergman
State Bar No. 24101507
**ARNOLD & PORTER KAYE SCHOLER LLP**
700 Louisiana Street, Suite 4000
Houston, Texas 77002–2755
Tel.: (713) 576–2400
Fax: (713) 576–2499
Katherine.Treistman@arnoldporter.com
Andrew.Bergman@arnoldporter.com

Mikaila Skaroff (*admitted pro hac vice*)
Colorado Bar No. 60688
**ARNOLD & PORTER KAYE SCHOLER LLP**
1144 Fifteenth St, Suite 3100
Denver, Colorado 80202
Tel.: (303) 863–1000
Fax: (303) 863–2301
Mikaila.Skaroff@arnoldporter.com

Ray T. Torgerson
State Bar No. 24003067
Neil Kenton Alexander
State Bar No. 00996600
Jonna N. Summers
State Bar No. 24060649
Elizabeth "Liza" Eoff
State Bar No. 24095062
Lakshmi N. Kumar
State Bar No. 24144581
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002

</div>

Tel.: (713) 226–6000
Fax: (713) 226–6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
ljumar@porterhedges.com

Dale Wainwright
State Bar No. 00000049
Justin Bernstein
State Bar No. 24105462
**GREENBERG TRAURIG LLP**
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel.: (512) 320–7240
Fax: (512) 320–7240
Dale.wainwright@gtlaw.com
bernsteinju@gtlaw.com

*Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

       I hereby certify that a copy of the foregoing was served on all counsel of record on April 21, 2025.

<div align="right">

*/s/ Mikaila Skaroff*
Mikaila Skaroff

</div>

E-filed in the Office of the Clerk
for the Business Court of Texas
**246**
5/5/2025 6:09 PM
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

**The Business Court of Texas,**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § | |
| *Plaintiff,* | § § | |
| *v.* | § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § § | |
| *Defendants.* | § § | |

### DEFENDANTS' AMENDED ANSWER, AFFIRMATIVE DEFENSES, RESPONSE IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TEMPORARY INJUNCTION, AND COUNTERCLAIMS

Defendants Storable, Inc.; RedNova Labs (d/b/a storEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP (collectively "Storable") file this Amended Answer, Affirmative Defenses, Response in Opposition to Plaintiff's Application for Temporary Injunction, and Counterclaims, and would respectfully show the Court as follows:

### GENERAL DENIAL

1.      Pursuant to Texas Rule of Civil Procedure Rule 92, Defendants generally deny each and every material allegation contained in Plaintiff SafeLease Insurance Services, LLC's ("SafeLease") Verified Second Amended Original Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction and demand strict proof thereof by a preponderance of the evidence.  By virtue of this General Denial, Defendants respectfully reserve the right to amend and supplement their pleadings by adding defenses, affirmative defenses, special exceptions, and any counterclaims as the allegations and facts of the case are more fully developed, in conformity with the Texas Rules of Civil Procedure.

## DEFENSES AND AFFIRMATIVE DEFENSES

2.      Plaintiff's claims fail, in whole or in part, because Plaintiff's removal of this case to Business Court was untimely.

3.      Plaintiff's claims fail, in whole or in part, because Plaintiff fails to state a claim upon which relief may be granted.

4.      Plaintiff's claims fail, in whole or in part, because Plaintiff has by its own acts and/or omissions, waived any right to seek the relief it claims.

5.      Plaintiff's claims fail, in whole or in part, because of Plaintiff's own fraud and/or misconduct.

6.      Plaintiff's claims fail, in whole or in part, by Plaintiff's own inequitable conduct and/or unclean hands.

7.      Plaintiff's claims fail, in whole or in part, because Plaintiff has not suffered the alleged damages or alternatively has failed to plead its damages with sufficient specificity to provide fair notice.

8.      Plaintiff's claims fail, in whole or in part, because Plaintiff's own acts and/or omissions were the cause of Plaintiff's alleged damages and/or injury, if any.

9.      Plaintiff's claims fail, in whole or in part, because at least some of Plaintiff's claims are frivolous and groundless under Texas Rule of Civil Procedure 13 and Texas Civil Practice & Remedies Code §§ 9.001 *et seq.*

10.      Plaintiff's claims fail, in whole or in part, because the injunctive relief requested by Plaintiff under the Texas Antitrust Act would cover business or customers wholly outside of Texas, and the Texas Antitrust Act only applies to "trade and commerce occurring wholly or partly within the State of Texas." TEX. BUS & COMM. CODE ANN. § 15.04.

11.    Plaintiff's claims fail, in whole or in part, because Defendants' actions were justified.

12.    Plaintiff's claims fail, in whole or in part, because Plaintiff lacks authority, capacity, and/or standing.

13.    Plaintiff's claims fail, in whole or in part, because Plaintiff cannot establish that Defendants have monopoly power in any relevant market, that Defendants harmed competition in any relevant market, that there is a dangerous probability that Defendants will achieve monopoly power in any relevant market, or that Defendants have specific intent to monopolize any relevant market.

14.    Plaintiff's claims fail, in whole or in part, because Defendants have legitimate business purposes for their conduct.

15.    Plaintiff's claims fail, in whole or in part, because Plaintiff has not properly defined the relevant market(s).

16.    Plaintiff's claims fail, in whole or in part, because Defendants' conduct did not constitute predatory or anticompetitive conduct.

17.    Plaintiff's claims fail, in whole or in part, because Defendants' conduct had procompetitive effects, such as benefiting consumers.

18.    Plaintiff's claims fail, in whole or in part, because Defendants' conduct was required or affirmatively approved by statute or regulatory agency.

19.    Plaintiff's claims fail, in whole or in part, because certain or all of Plaintiff's conduct is improper or illegal.

20.    Plaintiff's attorneys' fees are not recoverable or otherwise not reasonable and necessary.

21.     Defendants assert their right to any and all applicable statutory caps and other damages caps available.

22.     Defendants do not assume the burden of proof on any matters that would otherwise rest upon Plaintiff.

23.     Defendants reserve and assert all affirmative defenses available under any applicable law.  Defendants reserve the right to supplement this Amended Answer in accordance with the Texas Rules of Civil Procedure and the Court's Scheduling Order and assert additional affirmative defenses or other defenses at such time and to such extent as warranted by discovery and the factual development of this case.

<div align="center">**SPECIAL EXCEPTION**</div>

24.     Defendants specially except to Plaintiff's discovery control plan because Plaintiff failed to provide the required Rule 47 statement indicating what relief it deems itself entitled.  *See* Plaintiff's Sec. Am. Pet. ¶ 14; TEX. R. CIV. P. 47(c).  Consequently, Defendants object to conducting any discovery until Plaintiff complies.  TEX. R. CIV. P.47(c) ("A party that fails to comply with (c) may not conduct discovery until the party's pleading is amended to comply.").

**RESPONSE IN OPPOSITION TO APPLICATION FOR TEMPORARY INJUNCTION**

25.     A temporary injunction is an extraordinary remedy and does not issue as a matter of right.  *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).  To obtain a temporary injunction, an applicant must plead and prove: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.  *Id.*  The applicant bears the burden of offering evidence of each of these elements.  *Guillory*, 445 S.W.3d at 845 (citing *In re Tex. Natural Res. Conservation Comm'n*, 85 S.W.3d 201, 204 (Tex. 2002) (orig. proceeding)).  Here, Plaintiff is unable to meet its burden.

26.     Further, Plaintiff's request for injunctive relief exclusively relies on Defendants' contracts with mutual customers. *See* Sec. Am. Pet. ¶ 118. Courts ordinarily will not enforce contractual rights by injunction, in part because a party can seldom show irreparable harm when damages are available for breach of contract. *Home Asset, Inc. v. MPT of Victory Lakes Fcer, LLC*, No. 01-22- 00441-CV, 2023 WL 3183322, at *3 (Tex. App.—Houston [1st Dist.] May 2, 2023, no pet.) (citing *Reach Grp. v. Angelina Grp.*, 173 S.W.3d 834, 838 (Tex. App.—Houston [14th Dist.] 2005, no pet.)).

27.     In order for Plaintiff to show a temporary injunction should issue, Plaintiff must meet a higher evidentiary standard than what is required for a temporary restraining order and must provide admissible evidence. *See In re Tex. Natural Res. Conservation Comm'n*, 85 S.W.3d at 204 (noting temporary injunctions require more stringent proof requirements than temporary restraining orders that can issue on sworn pleadings). There must be testimony or some type of evidence. *See Markel v. World Flight, Inc.*, 938 S.W.2d 74, 79 (Tex. App.—San Antonio 1996, no writ) (holding that pleadings alone will not support entry of a temporary injunction where record contains absolutely no testimony or any type of evidence to prove imminent or irreparable harm); *see also Millwrights Local Union No. 2484 v. Rust Eng'g Co.*, 433 S.W.2d 683, 685–87 (Tex. 1968) (holding that temporary restraining order may issue on sworn petition while temporary injunction requires evidence).

**No Probable Right to Recovery**

28.     Plaintiff must establish a probable right to recovery on one of its pleaded claims: Violation of the Texas Antitrust Act, Section B; Tortious Interference with Existing Contracts; or Tortious Interference with Prospective Business Relations.

29.     The current Texas Antitrust Act declares that "[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce."

TEX. BUS. & COM. § 15.05(b). This provision is "modeled on" Section 2 of the Sherman Antitrust Act, which provides in relevant part: "'Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce among the several States. . . shall be deemed guilty of a felony . . . .'" *Caller-Times Pub. Co. v. Triad Comm'ns., Inc.*, 826 S.W.2d 576, 580 (Tex. 1992) (quoting 15 U.S.C. § 2) (alteration in orig.)). "Consistent with its foundation in federal law, the Texas Antitrust Act provides that it is to be interpreted in harmony with federal judicial interpretations of comparable federal laws." *Id.* (citing TEX. BUS. & COM. CODE § 15.04). Accordingly, because "section 15.05(b) of the Texas Antitrust Act is comparable to section 2 of the Sherman Antitrust Act," the Court looks to "federal law interpreting section 2 of the Sherman Act for guidance in interpreting section 15.05(b) of the Texas Antitrust Act." *Id.*

30.     Plaintiff cannot establish a probable right to recovery because it is unable to prove each element of its claim of attempted monopolization. Section 15.05(b) of the Texas Antitrust Act and Section 2 of the Sherman Act "cover monopoly and attempted monopoly." *Id.* at 580. The purpose of the Texas Antitrust Act "is to protect competition and not individual competitors." *Id.* at 581. To establish attempted monopolization, a plaintiff must prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 690 (Tex. 2006) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)); *see also Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 591 (Tex. App.—Austin 2007, pet. denied). "Because the purpose of the statute is to protect the public's interest in a competitive market, the test is directed 'not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition

itself.'" *Tex. Disposal Sys. Landfill, Inc.*, 219 S.W.3d at 592 (quoting *Spectrum Sports, Inc.*, 506 U.S. at 456). The test for proving an attempted monopolization claim is not whether a defendant's conduct has damaged the plaintiff's business. Rather, the test is, even assuming a defendant has monopoly power (clearly absent in this case), whether the defendant's conduct is: (1) not consistent with providing better service or quality to its customers; and (2) has injured competition in a properly defined relevant market.

31.     Plaintiff is also unable to establish a probable right to recovery on its tortious interference claims. To prevail on its claim for tortious interference with prospective business relations, SafeLease must establish that Storable's conduct was independently tortious or unlawful. *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). SafeLease claims that Storable's alleged attempted monopolization is the independent, wrongful act, but SafeLease will be unable to prove each element of its attempted monopolization claim.

32.     Even if there was any merit to Plaintiff's claims (there is not), Plaintiff could not prevail because Defendants' conduct is justified. Justification is an affirmative defense to an antitrust claim and tortious interference claims. TEX. BUS. & COM. CODE ANN. § 15.05(g) (Vernon 2002); *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996). Justification can be based on the exercise of either (1) the party's own legal rights or (2) the party's good faith claim to a colorable right, even though the claim ultimately proves to be mistaken. *Tex. Beef Cattle Co.*, 921 S.W.2d at 211. When the party conclusively establishes it had a legal right to engage in the complained-of conduct, the party's motive for engaging in that conduct is irrelevant. *Id.*

33.     Defendants have several legitimate business reasons for ending SafeLease's unfettered access to Defendants' FMS platforms. First, Defendants are simply enforcing their respective Terms of Service, which they have the right to do. Second, Defendants have a right

7

(and obligation) to protect their customers' personally identifiable information ("PII") and other sensitive data. Defendants can do this by requiring that third parties access their FMS platforms by way of an application programming interface ("API"), the industry standard for information exchanges and communications between different software systems. Third, Defendants are not required to give their software products freely to their competitors. *Morris Comm'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004). Here, it is undisputed Defendants are willing to give its competitors, including Plaintiff, access to its FMS platforms for a fee, which would permit Plaintiff to avoid the injury claimed in its Second Amended Petition. Preventing free-riding, which is an inherently economic motivation, is a valid business justification for Defendants' conduct. *Id.* at 1298.

## Adequate Remedy at Law

34. Plaintiff also cannot establish a probable, imminent, and irreparable injury if the court does not issue a temporary injunction prior to a trial on the merits. *Cameron Int'l Corp. v. Guillory*, 445 S.W.3d 840, 845 (Tex. App.—Houston [1st Dist.] 2014, no pet.). To obtain injunctive relief before trial, Plaintiff must establish that a probable, imminent, and irreparable injury will occur in the absence of the injunction. *Butnaru*, 84 S.W.3d at 204. To meet the "probable injury" requirement, an applicant must show that the harm is imminent, the injury would be irreparable, and the applicant has no other legal remedy. *Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 716 (Tex. App.—Corpus Christi 2001, no pet.) (emphasis added). "In a temporary-injunction hearing, the burden is on the applicant to prove that the damages cannot be calculated, not for the opposing party to *dis*prove the notion." *N. Cypress Med. Ctr. Operating Co., Ltd. v. St. Laurent*, 296 S.W.3d 171, 177 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (emphasis in original).

35.     Plaintiff must prove that it faces certain injury without an injunction. Plaintiff is not entitled to an injunction if the injury it claims is merely speculative. *Washington DC Party Shuttle, LLC v. IGuide Tours*, 406 S.W.3d 723, 742 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("An injunction is not proper when the claimed injury is merely speculative; fear of injury is not sufficient to support a temporary injunction.").

36.     Plaintiff's claim rests on Defendants' contracts with the parties' mutual customers—Plaintiff simply does not want to pay for the contractual right to access Defendants' software systems. Importantly, "contractual rights are not enforced by writs of injunction absent exceptional circumstances, since an inadequate remedy at law and irreparable injury are rarely shown when a suit for damages for breach of contract is available." *Chevron v. Stoker*, 666 S.W.2d 379, 382 (Tex. App.—Eastland 1984, writ dismissed).

37.     Plaintiff alleges that its agreements with the parties' mutual customers give it the right to access Defendants' software to manage its customers' business. Defendants claim Plaintiff needs to enter into its own contract directly with Defendants to access Defendants' software. The Texas Supreme Court has recognized that "generally, a court will not enforce contractual rights by injunction, because a party can rarely establish an irreparable injury and an inadequate legal remedy when damages for breach of contract are available." *Butnaru*, 84 S.W.3d at 211; *see Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993) ("Damages are usually an adequate remedy at law, and the requirement of demonstrating an interim injury is not to be taken lightly."). Thus, because Plaintiff has an adequate legal remedy, it cannot show irreparable harm.

38.     Plaintiff also cannot establish the alleged harm is imminent. The dispute over Plaintiff's ability to access Defendants' FMS platforms or whether Plaintiff needs an API agreement has been ongoing for months, if not years. Requiring an API agreement to access to

Storable's proprietary software has been Storable's historic business practice for years. Plaintiff knows it needs an API agreement to access Defendants' platforms, but it refuses to pay the market rate. That is not an imminent harm.

**Plaintiff Has Unclean Hands**

39.    A temporary injunction is an equitable remedy subject to the maxims of equity, including the clean hands doctrine, which requires that one who seeks equity, does equity. *In re Francis*, 186 S.W.3d 534, 551 (Tex. 2006). Equitable relief is not warranted when the plaintiff has engaged in unlawful or inequitable conduct regarding the issue in dispute. *Id.* (citing *Right to Life Advocates, Inc. v. Aaron Women's Clinic*, 737 S.W.2d 564, 571–72 (Tex. App.—Houston [14th Dist.] 1987, writ denied); *Sharma v. Vinmar Int'l, Ltd.*, 231 S.W.3d 405, 421 (Tex. App.— Houston [14th Dist.] 2007, no pet.) ("A party seeking an equitable remedy such as an injunction, must do equity and come into court with clean hands.").

40.    Plaintiff has unclean hands because it has misused its access to Defendants' software platforms by improperly using bot technology to scrape information, overloading Defendants' software systems, and exploiting that information for its own business. Additionally, Plaintiff concedes it circumvented Defendants' security system by "engineer[ing] a solution to restore access" to Defendants' software system without Defendants' permission. Sec. Am. Pet. ¶ 63. Further, Plaintiff improperly filed this lawsuit in an effort to gain leverage in business negotiations with Defendants over the pricing under an API agreement. Plaintiff should not be rewarded with an injunction in view of such misconduct.

**Requested Injunction is Improper**

41.    Even if the Court finds an injunction should issue (it should not for reasons explained herein), the scope and substance of the requested injunction is also improper for at least four reasons: (1) the requested injunction does more than preserve the status quo; (2) the requested

10

injunction makes Defendants' enforcement of its own Terms of Service virtually impossible; (3) the requested injunction exceeds the relief permitted under the Texas Antitrust Act; and (4) the requested injunction could result in a taking of Defendants' property without just compensation.

42.     Specifically, the requested injunctive relief does more than preserve the uncontested, peaceable status quo.  On a request for a temporary injunction, the "sole issue before the trial court" is preserving the status quo pending a trial on the merits.  *Correa v. Houston Surgical Assistant Services, Inc.*, No. 14-12-01050-CV, 2013 WL 3958499, at *4 (Tex. App.— Houston [14th Dist.] 2013); *see also Butnaru*, 84 S.W.3d at 204 (The purpose of a temporary injunction is to "preserve the status quo of the litigation's subject matter pending a trial on the merits.").  The status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy."  *Patel v. St. Luke's Sugar Land Partnership*, 445 S.W.3d 413, 419 (Tex. App.—Houston [1st Dist.] 2013) (citing *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004).  Here, the last non-contested status was the need for an API agreement in order for Plaintiff to access and use Defendants' FMS.  Plaintiff cannot use Defendants' FMS without paying for it like other competitors; otherwise, such use could result in a taking.  Plaintiff's requested temporary injunction would effectively adjudicate the parties' pricing dispute without a trial, fundamentally altering the status quo pending trial.  Plaintiff's request for this extraordinary relief should be denied.

43.     Further, the Texas Antitrust Act in particular, the Supreme Court of Texas holds that the Act does not "afford a cause of action for injury outside the state" and thus, there can be no award of damages and no injunctive relief for injury that occurred in other states." *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 674 (Tex. 2006). Accordingly, an injunctive relief should not be awarded for injury that allegedly occurred in other states.

## COUNTERCLAIMS

### I.   Discovery

1.     Discovery in this matter shall proceed under Level 3 pursuant to the Texas Rules of Civil Procedure.

### II.   Claim for Relief

2.     At this time, Defendants/Counter-Plaintiffs seek monetary relief of at least $1,000,000, including damages of any kind, penalties, court costs, expenses, prejudgment interest, post-judgment interest, and attorneys' fees.  TEX. R. CIV. P. 47(c)(4).

### III.   Parties

3.     Defendant/Counter-Plaintiff Storable, Inc. ("Storable, Inc.") is a Delaware corporation with its principal place of business in Austin, Texas, and has made its appearance through undersigned counsel.

4.     Defendant/Counter-Plaintiff RedNova Labs, Inc. (d/b/a "storEDGE") is a Texas foreign for-profit corporation with its principal place of business in Austin, Texas, and has made its appearance through undersigned counsel.

5.     Defendant/Counter-Plaintiff Sitelink Software, LLC ("Sitelink") is a North Carolina limited liability company with its principal place of business in Austin, Texas, and has made its appearance through undersigned counsel.

6.     Defendant/Counter-Plaintiff Easy Storage Solutions, LLC ("Easy Storage Solutions") is a Utah limited liability company with its principal place of business in Austin, Texas, and has made its appearance through undersigned counsel.

7.     Defendant/Counter-Plaintiff Bader Co. ("Bader") is an Indiana corporation with its principal place of business in Indiana, and has made its appearance through undersigned counsel.

8. Plaintiff/Counter-Defendant SafeLease Insurance Services, LLC is a Texas limited liability company that has generally appeared and may be served through counsel.

## IV. Jurisdiction and Venue

9. All parties are not properly subject to the jurisdiction of this Court. Plaintiff untimely removed this case to Business Court.

10. Venue in this Court is not appropriate.

## V. Factual Background

11. Storable is an established provider of several facility management software ("FMS") products (storEDGE, Sitelink, and Easy Storage Solution) used by storage unit operators. These software products help storage unit operators manage access, security, payment, and other aspects of renting storage units to tenants. Storable also sells insurance to operators and their tenants.

12. Storable's FMS products may be used locally (as on a computer desktop) or online by way of a cloud interface, depending on the product. Storage unit operators access Storable's FMS products using their own computers.

13. Importantly, Storable does not require that operators using its FMS also purchase its insurance. Operators and their tenants are free to purchase storage insurance from any of the growing number of tenant insurance providers, including Alchemy, AON, Deans & Homer, MiniCo, SafeLease, SafeStor, Savvy, SnapNsure, Storage Protectors, Storage Shield, Tripemco, World Insurance, and Xercor.

14. Many tenant insurance companies and other third parties servicing operators enter into API agreements with FMS providers, such as Storable, so they can access these providers' FMS in order to serve their customers. This is the industry norm. Storable has API agreements with many tenant insurance companies and other third-party service providers.

15. Since approximately 2021, SafeLease provides insurance on a discount basis and relies heavily on FMS from third parties including Storable and certain of Storable's competitors, such as Cubby (cubbystorage.com) and CCStorage (ccstorage.com). Unlike certain other FMS providers, SafeLease is not in privity with Storable. Instead, SafeLease obtains unauthorized access to Storable's FMS platforms by using its customers' "Authorized User" accounts. As explained below, SafeLease's methods of accessing Storable's FMS platforms violate Storable's Terms of Service.

16. In approximately April 2024, Storable noticed slowdowns and performance issues on its FMS platforms, which led to an investigation to determine possible causes and sources. Storable discovered that SafeLease was the culprit, having designed a sophisticated and automated computer system to backdoor their way into Storable's customers' software accounts. For unexplained reasons, SafeLease was running millions of reports on Storable's FMS on various levels (e.g., tenant, unit, facility) using automated bots, spiking traffic and significantly slowing down the system. Further, SafeLease was using multiple accounts in what seemed like an effort to avoid detection and appeared to be "data scraping" Storable's customer information. There is no apparent reason why SafeLease was using this approach other than to illegally harvest data from Storable's FMS. This massive surge in traffic caused severe system-wide performance problems that disrupted Storable's business operations and potentially exposed personally identifiable information ("PII") without Storable's clients' knowledge.

17. Storable's Terms of Service plainly state in relevant part:

4.1. Right to Access and Use the Services. Subject to the terms and conditions of the Agreement, and upon timely payment of all applicable Fees set forth in an Order Form, we hereby grant to you a non-exclusive, non-transferable, limited right to access and use (and permit your Users to use) the Services to which you have subscribed solely for your internal business purposes.

4.2. Authorized Users. You may designate and authorize as many Users as you wish under the Agreement. You (i) are responsible for your Users' compliance with the Agreement, and (ii) shall use commercially reasonable efforts to prevent unauthorized access to or use of the Services and shall notify us immediately of any such unauthorized access or use. It is your responsibility to remove access to the Services if authorized status of a User or designated employee changes.

4.3. Your Responsibilities and Restrictions. You are responsible for all activities that occur under your use of the Services and the use by your Users. … You may not, and you shall ensure your Users do not … (ii) license, sublicense, sell, rent, assign, distribute, time share transfer, lease, loan, resell, distribute or otherwise commercially exploit, grant rights in or make the Services available to any third party; (iii) use the Services except as expressly authorized hereunder or in violation of any applicable laws; … or or (viii) interfere with or disrupt the integrity or performance of the Services or third-party data contained therein.

18.     SafeLease itself admits to using Storable's FMS for its own external business use. *See, e.g.*, Sec. Am. Pet. ¶ 69.   Storable's Terms of Service underscore the fact that neither its customers nor third parties may use its FMS platforms for external business or commercial uses. Both storEDGE and Sitelink's Terms of Service include a clause plainly stating that "[a]ny use by a third party, affiliate, agent of customer, or any use to develop a commercial product, requires a separate third-party DEI agreement, which will expressly memorialize the rights and uses thereunder." *See Sitelink Terms of Use*, https://www.storable.com/privacy/sitelink-terms-of-use/ ("4.5. Data Exchange Interface ("DEI") Rights."); *storEDGE Terms of Service*, https://www.storable.com/privacy/storedge- terms-of-service/ ("4.5. Data Exchange Interface ("DEI") Rights.).   Further, Easy Storage Solution's Terms of Service include a clause explaining that its users "may use Confidential Information solely for [their] internal business use in

connection with [their] use of Services, and [they] may not provide such Confidential Information to any third party, except with our prior written consent." *See Easy Storage Solutions Terms of Service*, https://www.storageunitsoftware.com/terms-of-service/ ("Rights to Content").

19. In response to its investigation, Storable approached SafeLease in October 2024 about its security concerns and offered to enter into an API agreement. Simply stated, an API agreement would govern SafeLease's access and use of Storable's FMS platforms by way of a secure method designed specifically for securely passing specific data to SafeLease. Storable offered SafeLease the same current pricing terms as other storage insurance companies, but SafeLease wanted a deep discount from market prices.

20. By early November 2024, negotiations had largely reached an impasse. Without an API agreement in place, SafeLease continued to piggyback on its customers' access to Storable's FMS, improperly using customers' full administrative authority and effectively free-riding on Storable's software.

21. SafeLease's conduct violates Storable's Terms of Service in several ways. First, operators only can use the software for internal business purposes—not resell access to third parties like SafeLease. Second, the FMS cannot be commercially exploited, which SafeLease is plainly doing. Third, SafeLease's activities interfered with or disrupted the integrity or performance of Storable's FMS platform. Fourth, SafeLease's unfettered administrative access exposes tenants' PII and other sensitive data, including credit card details, addresses, and email information. SafeLease's reckless behavior creates a significant risk of legal liability for Storable, as it could face lawsuits from both operators and tenants over compromised data. To Storable's knowledge, SafeLease is the only insurance provider that accesses Storable's FMS in this way.

All other integrated providers obtain access to Storable's FMS directly from Storable by way of an API agreement.

22.  Critically, SafeLease does not require full administrative access in order to service its mutual customers. SafeLease simply can contact its customers to seek the basic information residing in Storable's FMS. Or SafeLease can access such information by way of an API like its competitors do.

23.  By December 2024, as part of continued efforts to secure and stabilize its FMS platforms, Storable decided on December 17, 2024 to block SafeLease's illegal and tortious administrative access to the storEDGE platform.

24.  Unable to secure an API agreement on below-market economic terms, and in order to gain leverage in API negotiations, SafeLease filed its Verified Original Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction ("TRO Application") in the 345th Judicial District of Travis County, Texas at 10 PM on December 30, 2024. The next day, SafeLease obtained an ex parte temporary restraining order. SafeLease filed its First Amended Petition on January 6, 2025. Plaintiff asserted a single cause of action: attempted monopolization under Section 15.05(b) of the Texas Antitrust Act.

25.  The district court held an evidentiary hearing on Plaintiff's request for a temporary injunction, denying its request on January 16, 2025.

26.  Having lost in the district court, SafeLease filed an untimely Notice of Removal to the Third Division of the Business Court of Texas on January 29, 2025. The day after filing its Notice of Removal, SafeLease filed a request for a temporary injunction.

27.  On February 19, 2025, this Court granted SafeLease a temporary injunction on its tortious interference with existing contracts claim under the condition that SafeLease post a $6.6

million bond to protect Storable against third-party access to its systems, with no ability to control the risks and damage caused by that access. SafeLease posted a $6.6 million cash bond on February 20, 2025.

## VI.    Causes of Action

### A.    Count 1 – Declaratory Judgment

28.    Defendants/Counter-Plaintiffs incorporate the preceding allegations as if set out in full herein.

29.    An actual and substantial controversy exists regarding the parties' rights and responsibilities under the Terms of Service under which Storable's FMS customers (and their vendors, such as SafeLease) operate. Among other disputes, the parties disagree as to the nature of the Terms of Service, as well as the parties' respective rights, duties, obligations, and remedies available under them, and as such, there is a justiciable controversy. Defendants/Counter-Plaintiffs therefore seek relief pursuant to the Uniform Declaratory Judgments Act. TEX. CIV. PRAC. & REM. CODE §§ 37.001, *et seq.* Specifically, Defendants/Counter-Plaintiffs seek an Order from this Court declaring that:

a.    Plaintiff's conduct violates Storable's Terms of Service, and Plaintiff's requested injunctive relief seeks to permit such conduct.

b.    Storable has the unilateral right to protect and limit access to its FMS platforms.

c.    Storable has not engaged in any anticompetitive or predatory conduct actionable under the Texas Antitrust Act.

d.    The conduct alleged by Plaintiff to constitute attempted monopolization is not attempted monopolization as a matter of law.

e. There was no attempted monopolization by Defendants as a matter of law, in part because Defendants do not possess monopoly power in any market.

f. Defendants were merely exercising their rights by terminating SafeLease's access to Storable's FMS platforms.

g. Defendants' conduct was justified by legitimate business reasons.

h. SafeLease's attempted monopolization claim was brought in bad faith and/or for purposes of harassment.

**B.      Count 2 – Tortious Interference with an Existing Contract**

30. Defendants/Counter-Plaintiffs incorporate the preceding allegations as if set out in full herein.

31. Defendants/Counter-Plaintiffs have valid contracts with its customers and operators, that include valid and enforceable Terms of Service relating to access and use of Defendants/Counter-Plaintiffs' FMS.

32. SafeLease knew or had reason to know of these Terms of Service and Defendants/Counter-Plaintiffs' interest in them. SafeLease willfully, intentionally, and with actual malice interfered with Defendants/Counter-Plaintiffs' Terms of Service by: (i) piggybacking on its customers' access to Storable's FMS, rather than entering an API agreement and paying for access to the software itself; or otherwise (ii) engaging in conduct that violates those Terms of Service and proximately causing damages.

33. SafeLease's interference proximately caused injury to Defendants/Counter-Plaintiffs. SafeLease commercially exploited its mutual customers' administrative access to infiltrate Defendants/Counter-Plaintiffs' FMS and steal sensitive data. This unauthorized data scraping severely interfered with and degraded the FMS platform's performance, causing system-

wide slowdowns that were traced directly to SafeLease in fall 2024. The resulting service disruptions forced Storable to incur costs investigating and remedying the damage.

34.    Defendants/Counter-Plaintiffs seek damages, including exemplary damages under TEX. TEX. CIV. PRAC. & REM. CODE § 41.003(a)(1-2), within the jurisdictional limits of this Court.

**C.    Count 3 – Violations of the Consumer Protection Against Consumer Spyware Act**

35.    Defendants/Counter-Plaintiffs incorporate the preceding allegations as if set out in full herein.

36.    On information and belief, SafeLease wrongfully exploited its mutual customers' administrative access to Defendants/Counter-Plaintiffs' FMS software by illegally scraping data. SafeLease, as a third-party vendor, had limited access to the FMS platforms through its customers, but exceeded this authority to obtain financial gain and/or avoid expense and potentially harvest sensitive information.

37.    On information and belief, SafeLease illegally harvested data from Storable's FMS. Upon investigation, in approximately September 2024, Defendants/Counter-Plaintiffs discovered that SafeLease was running millions of reports on Storable's FMS on various levels (e.g., tenant, unit, facility) using automated bots, spiking traffic and significantly slowing down the system. Further, SafeLease was using multiple accounts in what seemed like an effort to avoid detection and appeared to be "data scraping" Storable's customer information. This conduct was not a benefit to mutual customers; rather, it was a benefit to SafeLease as one of multiple insurance providers that compete with Storable.

38.    The resulting massive surge in cyber traffic on Storable's FMS caused system-wide performance problems that disrupted Defendants/Counter-Plaintiffs' business operations and potentially exposed PII without Storable's customers' knowledge.

39.     Accordingly, and on information and belief, SafeLease knowingly violated the Consumer Protection Against Consumer Spyware Act. TEX. BUS. & COMM. CODE ANN. § 324.001.

40.     Specifically, and on information and belief, SafeLease's conduct violates § 324.051, the "unauthorized collection or culling of personally identifiable information." SafeLease's illegal data scraping constitutes the culling, "through intentionally deceptive means . . . of personally identifiable information," since SafeLease misused and exploited its access in an apparent attempt to obtain the personal and sensitive data of Defendants/Counter-Plaintiffs' clients. *Id.* at § 324.051.

41.     On information and belief, SafeLease's conduct also violates § 324.055, the "unauthorized creation of, access to, or use of zombies or botnets." SafeLease knowingly used botnets to collect and send data to itself from Defendants/Counter-Plaintiffs' FMS without authorization, collect personally identifiable information of customers and operators, and/or perform other unauthorized acts. *Id.* at § 324.055(c)(3), (5), and (6).

42.     As a result of SafeLease's illegal conduct, Defendants/Counter-Plaintiffs incurred loss or disruption of the services they provide to their customers by way of their FMS platforms for which they are entitled to pursue a private action for damages under § 324.101.

**D.      Count 4 – Unjust Enrichment**

43.     Defendants/Counter-Plaintiffs incorporate the preceding allegations as if set out in full herein.

44.     SafeLease must acknowledge it has no independent right to administrative access to Defendants/Counter-Plaintiffs' FMS. To date, SafeLease has wrongfully retained administrative access to Storable's FMS while refusing to pay the fees that similarly situated insurance companies pay for FMS access by way of standard API agreements.

45.    By obtaining this valuable service without payment, SafeLease has been unjustly enriched at Defendants/Counter-Plaintiffs' expense.  Accordingly, Defendants/Counter-Plaintiffs seek damages within the jurisdictional limits of this Court.

**E.    Count 5 – Conversion**

46.    Defendants/Counter-Plaintiffs incorporate the preceding allegations as if set out in full herein.

47.    Defendants/Counter-Plaintiffs own as their personal property the FMS at issue in this case and had and have the right to immediate possession of this property.

48.    SafeLease, as a third-party vendor, wrongfully exploited the administrative access its customers gave it to Defendants/Counter-Plaintiffs' FMS by illegally scraping data from Defendants/Counter-Plaintiffs' FMS.  As a third party, SafeLease had limited access through its customers, but exceeded this authority to obtain financial gain and/or avoid expense and potentially harvest sensitive information.    This unauthorized conduct damaged Defendants/Counter-Plaintiffs' business in at least three ways: (i) it significantly slowed down their software, causing service delays for both customers and system operators; (ii) increased capital costs to address the performance issues; and (iii) compromised confidential data, exposing Storable to risk if not liability.

49.    SafeLease's wrongful conduct proximately caused injury to Defendants/Counter-Plaintiffs.

50.    Defendants/Counter-Plaintiffs seek damages within the jurisdictional limits of this Court. Defendants/Counter-Plaintiffs' injuries result from SafeLease's fraud and/or malice, which entitle Defendants/Counter-Plaintiffs to exemplary damages under TEX. CIV. PRAC. & REM. CODE § 41.003(a)(1-2).

**F.      Count 6 – Quantum Meruit**

51.      Defendants/Counter-Plaintiffs incorporate the preceding allegations as if set out in full herein.

52.      Defendants/Counter-Plaintiffs provide valuable services by way of their proprietary FMS platforms.

53.      SafeLease had reasonable notice that Defendants/Counter-Plaintiffs would restrict FMS access to vendors without API agreements in place so as to ensure system stability, security, and would expect reasonable compensation for access to Defendants/Counter-Plaintiffs' software. SafeLease was offered a chance to enter into such an API agreement, which would allow for FMS access upon payment at market rates.

54.      As a proximate result, Defendants/Counter-Plaintiffs have suffered damages and seek recovery from SafeLease's uncompensated access to Defendants/Counter-Plaintiffs' valuable software.

**G.      Count 7 – Violations of the Texas Theft Liability Act**

55.      Defendants/Counter-Plaintiffs incorporate the preceding allegations as if set out in full herein.

56.      SafeLease knowingly and wrongfully obtained administrative access to Storable's FMS, without Storable's authorization or consent, while refusing to pay the fees that similarly situated insurance companies pay for FMS access by way of standard API agreements.

57.      On information and belief, SafeLease illegally harvested data from Storable's FMS. Upon investigation, in approximately September 2024, Defendants/Counter-Plaintiffs discovered that SafeLease was collecting information from Storable's FMS, including by running millions of reports on various levels (e.g., tenant, unit, facility) using automated bots, spiking traffic and significantly slowing down the system.  Further, SafeLease was using multiple accounts in what

seemed like an effort to avoid detection and appeared to be "data scraping" Storable's customer information. This unlawful practice was not a benefit to mutual customers; rather, it was a benefit to SafeLease as one of multiple insurance providers that compete with Storable and other insurance providers.

58. On information and belief, SafeLease deceived SafeLease and Storable's mutual customers by failing to disclose its intended use of its administrative access to Storable's FMS. SafeLease commercially exploited its mutual customers' administrative access, without Storable's consent, to infiltrate Defendants/Counter-Plaintiffs' FMS and steal commercially sensitive data to its own benefit.

59. Accordingly, and on information and belief, SafeLease knowingly violated the Texas Theft Liability Act. TEX. CIV. PRAC. & REM. CODE § 134.001, *et seq.*

60. Specifically, and on information and belief, SafeLease's conduct constitutes "theft of service" under TEX. PEN. CODE § 31.04. SafeLease accessed Storable's FMS, without Storable's consent or authorization, to knowingly divert data and services from Storable's FMS for SafeLease's own benefit and without payment to Storable. *Id.* §§ 31.04(a)(2), (b).

61. As a result of SafeLease's illegal conduct, Defendants/Counter-Plaintiffs incurred damages in the amount to be proved at trial for which they are entitled to pursue under TEX. CIV. PRAC. & REM. CODE § 134.005.

**H.    Count 8 – Harmful Access by Computer**

62. Defendants/Counter-Plaintiffs incorporate the preceding allegations as if set out in full herein.

63. SafeLease knowingly and wrongfully obtained administrative access to Storable's FMS, without Storable's authorization or consent, while refusing to pay the fees that similarly situated insurance companies pay for FMS access by way of standard API agreements.

64.     On information and belief, SafeLease illegally harvested data from Storable's FMS. Upon investigation, in approximately September 2024, Defendants/Counter-Plaintiffs discovered that SafeLease was running millions of reports on Storable's FMS on various levels (e.g., tenant, unit, facility) using automated bots, spiking traffic and significantly slowing down the system. Further, SafeLease was using multiple accounts in what seemed like an effort to avoid detection and appeared to be "data scraping" Storable's customer information. This unlawful practice was not a benefit to mutual customers; rather, it was a benefit to SafeLease as one of multiple insurance providers that compete with Storable.

65.     Storable's FMS is a "computer network" or "computer system" under TEX. PEN. CODE § 33.01.

66.     Accordingly, and on information and belief, SafeLease committed a breach of computer security under TEX. PEN. CODE § 33.02. SafeLease knowingly accessed Storable's FMS without Storable's consent or authorization.

67.     As a result of SafeLease's illegal conduct, Defendants/Counter-Plaintiffs incurred damages in the amount to be proved at trial for which they are entitled to pursue under TEX. CIV. PRAC. & REM. CODE § 143.001.

## VII.    Attorneys' Fees and Costs

68.     Defendants/Counter-Plaintiffs are entitled to reasonable and necessary attorneys' fees and costs under Section 134A.005(1) of the Texas Civil Practice & Remedies Code because Plaintiff's attempted monopolization claim was groundless and brought in bad faith or for the purpose of harassment.

69.     Defendants/Counter-Plaintiffs are further entitled to attorneys' fees and costs as are equitable and just based on their claim for declaratory judgment. *See supra* Count 1 – Declaratory Judgment; TEX. CIV. PRAC. & REM. CODE § 37.001, *et seq.*

70.     Defendants/Counter-Plaintiffs are further entitled to reasonable and necessary attorneys' fees and costs based on Plaintiff's violations of the Texas Theft Liability Act. TEX. CIV. PRAC. & REM. CODE § 134.001, *et seq.*

71.     Defendants/Counter-Plaintiffs are further entitled to reasonable attorneys' fees and costs under TEX. CIV. PRAC. & REM. CODE § 143.001 or any other applicable authority.

## VIII.    Prayer

72.     Defendants/Counter-Plaintiffs Storable, Inc.; RedNova Labs (d/b/a storEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP respectfully request this Court to enter judgment as follows:

a.     Plaintiff SafeLease Insurance Services, LLC take nothing and dismiss Plaintiff's suit with prejudice;

b.     the Court award Defendants/Counter-Plaintiffs their actual, consequential, and incidental damages and pre-judgment and post-judgment interest at the maximum rates permitted by law;

c.     the Court award Defendants/Counter-Plaintiffs exemplary damages as permitted by law;

d.     the Court make the declarations requested above;

e.     the Court award Defendants/Counter-Plaintiffs their reasonable and necessary attorneys' fees as are equitable and just in prosecuting their claims through trial and, if necessary, through appeal on the grounds noted above;

f.     the Court award Defendants/Counter-Plaintiffs all costs of suit; and

g.     such other and further relief, at law or in equity, to which Defendants/Counter-Plaintiffs may show themselves justly entitled.

Respectfully submitted May 5, 2025.

*/s/ Katherine G. Treistman*
Katherine G. Treistman
State Bar No. 00796632
Andrew D. Bergman
State Bar No. 24101507
**ARNOLD & PORTER KAYE SCHOLER LLP**
700 Louisiana Street, Suite 4000
Houston, Texas 77002–2755
Tel.: (713) 576–2400
Fax: (713) 576–2499
Katherine.Treistman@arnoldporter.com
Andrew.Bergman@arnoldporter.com

Mikaila Skaroff (*admitted pro hac vice*)
Colorado Bar No. 60688
**ARNOLD & PORTER KAYE SCHOLER LLP**
1144 Fifteenth St, Suite 3100
Denver, Colorado 80202
Tel.: (303) 863–1000
Fax: (303) 863–2301
Mikaila.Skaroff@arnoldporter.com

Ray T. Torgerson
State Bar No. 24003067
Neil Kenton Alexander
State Bar No. 00996600
Jonna N. Summers
State Bar No. 24060649
Elizabeth "Liza" Eoff
State Bar No. 24095062
Lakshmi N. Kumar
State Bar No. 24144581
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Tel.: (713) 226–6000
Fax: (713) 226–6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
ljumar@porterhedges.com

Dale Wainwright
State Bar No. 00000049
Justin Bernstein
State Bar No. 24105462
**GREENBERG TRAURIG LLP**
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel.: (512) 320–7240
Fax: (512) 320–7240
Dale.wainwright@gtlaw.com

27

bernsteinju@gtlaw.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served on all counsel of record on May 5, 2025.

<div align="right">

<u>/s/ Katherine G. Treistman</u>
Katherine G. Treistman

</div>

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cathy Hodges on behalf of Katherine Ginzburg Treistman
Bar No. 796632
catherine.hodges@aporter.com
Envelope ID: 100465146
Filing Code Description: Amended Filing
Filing Description: Defendants' Amended Answer, Affirmative Defenses, Response in Opposition to Plaintiff's Application for Temporary Injunction, and Counterclaims
Status as of 5/6/2025 8:09 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 5/5/2025 6:09:50 PM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 5/5/2025 6:09:50 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 5/5/2025 6:09:50 PM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 5/5/2025 6:09:50 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 5/5/2025 6:09:50 PM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 5/5/2025 6:09:50 PM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 5/5/2025 6:09:50 PM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 5/5/2025 6:09:50 PM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 5/5/2025 6:09:50 PM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 5/5/2025 6:09:50 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 5/5/2025 6:09:50 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 5/5/2025 6:09:50 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 5/5/2025 6:09:50 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 5/5/2025 6:09:50 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 5/5/2025 6:09:50 PM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 5/5/2025 6:09:50 PM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 5/5/2025 6:09:50 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 5/5/2025 6:09:50 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 5/5/2025 6:09:50 PM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 5/5/2025 6:09:50 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 5/5/2025 6:09:50 PM | SENT |

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cathy Hodges on behalf of Katherine Ginzburg Treistman
Bar No. 796632
catherine.hodges@aporter.com
Envelope ID: 100465146
Filing Code Description: Amended Filing
Filing Description: Defendants' Amended Answer, Affirmative Defenses, Response in Opposition to Plaintiff's Application for Temporary Injunction, and Counterclaims
Status as of 5/6/2025 8:09 AM CST

Case Contacts

| Business Court Division 3A | | bcdivision3a@txcourts.gov | 5/5/2025 6:09:50 PM | SENT |
|---|---|---|---|---|
| Dolores Brunelle | | dbrunelle@porterhedges.com | 5/5/2025 6:09:50 PM | SENT |
| Cathy Hodges | | catherine.hodges@aporter.com | 5/5/2025 6:09:50 PM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 5/5/2025 6:09:50 PM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 5/5/2025 6:09:50 PM | SENT |
| Adam Locke | | adam@lockelaw.com | 5/5/2025 6:09:50 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 5/5/2025 6:09:50 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 5/5/2025 6:09:50 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 5/5/2025 6:09:50 PM | SENT |

**LOCKELAW**

2617 Bissonnet, Ste. 503, Houston, Texas 77005
Tel: 713-832-0242 · Fax: 713-565-4709

Attorney Adam Locke
Direct: 713-832-0243 · adam@lockelaw.com

**Via electronic filing**

May 16, 2025

The Honorable Melissa Andrews
The Business Court of Texas, Third Division
1000 Guadalupe St, Austin, TX 78701

> Re: *SafeLease Ins. Servs. LLC v. Storable, Inc., et al.*, No. 25-BC03A-0001 — Letter Summarizing Discovery Dispute Regarding Plaintiff's RFPs

Dear Judge Andrews:

Plaintiff SafeLease Insurance Services, LLC respectfully submits this letter summarizing an unresolved discovery dispute. Defendants ("Storable") refuse to produce documents in response to SafeLease requests for production ("RFPs") Nos. 10, 12, and 20.

This letter follows SafeLease's good-faith attempts to resolve this dispute through emails and calls, including a 90-minute meet and confer on May 7, 2024, as detailed in the Certificate of Conference. During the May 7 call, SafeLease explained the relevance and proportionality of these requests to issues of market definition, market power, and anticompetitive conduct. SafeLease also noted that the Protective Order addresses any confidentiality concerns. Despite these efforts, the dispute remains unresolved. Storable maintains its refusal to produce responsive documents.

The RFPs at issue seek information central to the parties' claims and defenses.

**RFP 10:** "Documents sufficient to show all self-storage facilities that use your facility management software, including addresses for those facilities."

- Storable refused to produce any documents, based on irrelevance, overbreadth, burden, proportionality, and confidentiality grounds. It offered only to provide the number of facilities using its FMS and a breakdown by state. This would not permit SafeLease to verify this information. Storable suggested that its counsel or a third party could verify.

- SafeLease narrowed its request to "Documents sufficient to show all self-storage facilities that use your facility management software, including the City, State, ZIP, and FMS for those facilities, as of December 30, 2024." Storable refuses to produce documents responsive to this narrowed request, maintaining its previous offer.

- This information is relevant and proportional to the needs of this case. It is critical for defining the relevant antitrust market and assessing Storable's market power and competitive impact of its conduct—all core issues. SafeLease must be able to assess

and verify this data and not be required to accept representations by Storable or a third party hired by Storable.

**RFP 12:** "Documents sufficient to show all Authorized Users on your storEDGE and SiteLink facility management software during the relevant time period."

- Storable refused any production based on similar grounds as RFP 10, including burden, irrelevance, proportionality, and confidentiality. It only offered to provide the total number of Authorized Users on storEDGE and SiteLink and said it could identify third-party insurance producers who are Authorized Users on the systems. This information is insufficient to analyze Storable's exclusionary conduct and targeting of SafeLease.

- SafeLease narrowed its request to "Documents sufficient to show all third-party Authorized Users on your facility management software as of December 30, 2024." On May 14, Storable refused to produce documents responsive to this narrowed request, stating that it has no way to know the full universe of third-party users and objecting that it does not maintain lists of such users, so it does not possess documents showing who such users are. It admitted that creating such a list is possible.

- Understanding the scope of Authorized Users, including how many other vendors have Authorized User access, is relevant and proportional to the needs of this case. This information is critical to assess Storable's exclusionary conduct and its market impact.

**RFP 20:** "All documents evidencing any technical security measures implemented by you to manage, disable, limit, restrict, or block SafeLease's access to your facility management software."

- Storable refused any production, citing overbreadth, proportionality, confidentiality concerns, and burden, particularly as to computer code. It does not dispute relevance.

- SafeLease narrowed this request to documents responsive to the original request *other than* computer code. On May 14, Storable refused to produce documents responsive to this narrowed request, offering instead to produce documents showing only "when it took specific security measures that affected SafeLease."

- This information is necessary to evaluate Storable's justifications defense and are key issues for SafeLease's antitrust and tortious interference claims. Documents showing only *when* such actions were taken are not enough.

As the parties remain at an impasse regarding RFPs 10, 12, and 20, SafeLease seeks relief from the Court.

Respectfully submitted,

/s/ *Adam Locke*
Adam Locke
LOCKELAW PLLC
*Counsel for SafeLease Insurance Services LLC*

## <u>CERTIFICATE OF CONFERENCE</u>

I certify that the parties diligently tried to resolve the discovery dispute before filing the accompanying Letter Summarizing Discovery Dispute Regarding Plaintiff's RFPs.

1. **Dates:** A conference was held via Zoom on May 7, 2025. This followed six emails from SafeLease seeking to schedule this conference, beginning in mid-April.

2. **Participants:** Counsel participated in the May 7 call. For SafeLease, they included Julia Risley and Luke Schamel of Yetter Coleman, and me. For Storable, they included Andrew Bergman, Mikaila Skaroff, and John Holler of Arnold & Porter.

3. **Results:** On the May 7 call, Storable proposed a limited production of documents in response to RFPs 10, 12, and 20. On May 8, via email, SafeLease proposed narrowed RFPs 10, 12, and 20. On May 14, Storable maintained its position that it would not produce any documents responsive to these requests at this time.

4. **Topics:** On May 7, SafeLease explained its view on the relevance and proportionality of the requests to the claims and defenses in this matter. It also discussed alternative methods to address Storable's stated confidentiality concerns, such as applying designations under the existing Protective Order. Storable maintained its objections to relevance, proportionality, and confidentiality for these specific RFPs but proposed making a limited production in response to these RFPs. SafeLease determined such a limited production would not be appropriate in this case and would exclude relevant information. On May 8, SafeLease proposed narrowed RFPs. Storable refused to produce all documents responsive to these narrowed requests. The parties were unable to resolve or narrow the dispute.

Dated: May 16, 2025.

/s/ *Adam Locke*
Adam Locke
LOCKELAW PLLC
*Counsel for SafeLease Insurance Services LLC*

<u>**CERTIFICATE OF SERVICE**</u>

       This is to certify that on May 16, 2025, a true and correct copy of the above and foregoing

instrument was served upon all parties via eFile in accordance with Rules 21 and 21a of the Texas

Rules of Civil Procedure.

                                            */s/ Adam Locke*
                                            Adam Locke

E-filed in the Office of the Clerk
for the Business Court of Texas
5/22/2025 3:25 PM
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

**The Business Court of Texas**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § | |
| *Defendants*. | § § | |

**SUPPLEMENT TO**
**PLAINTIFF'S VERIFIED SECOND AMENDED PETITION AND**
**APPLICATION FOR A TEMPORARY RESTRAINING ORDER,**
**TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION**

Plaintiff SafeLease Insurance Services LLC ("SafeLease") respectfully supplements its Second Amended Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction as to the following paragraph and in no other respect:

**DISCOVERY CONTROL PLAN**

14. SafeLease intends that this case be conducted under a Level 3 Discovery Control Plain in accordance with TEX. R. CIV. P. 190.4. As stated in its prior pleadings and representations to the Court, and other than attorney fees and costs to which it may be entitled, SafeLease only seeks non-monetary injunctive relief at this time.

Date: May 22, 2025

Respectfully submitted,

Judd E. Stone II
State Bar No. 24076720
judd@stonehilton.com
Christopher D. Hilton
State Bar No. 24087727
chris@stonehilton.com
Alexander M. Dvorscak
State Bar No. 24120461
alex@stonehilton.com
STONE HILTON PLLC
600 Congress Ave., Suite 2350
Austin, Texas 78701
(737) 465-3897

Adam T. Locke
State Bar No. 24083184
adam@lockelaw.com
LOCKELAW PLLC
2617 Bissonnet Street, Suite 503
Houston, Texas 77005
(713) 832-0243

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Susanna R. Allen
State Bar No. 24126616
sallen@yettercoleman.com
Luke A. Schamel
State Bar No. 24106403
lschamel@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

ATTORNEYS FOR PLAINTIFF

### CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served on all counsel of record via the Court e-filing service and/or by email, on May 22, 2025.

/s/ *Luke A. Schamel*
Luke A. Schamel

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Steven Vacek on behalf of R. Yetter
Bar No. 22154200
svacek@yettercoleman.com
Envelope ID: 101174075
Filing Code Description: No Fee Documents
Filing Description: Supplement to Plaintiff's Verified Second Amended Petition and Application for TRO, TI and PI
Status as of 5/22/2025 3:45 PM CST

Associated Case Party: SafeLease Insurance Services LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Delonda Dean | | ddean@yettercoleman.com | 5/22/2025 3:25:11 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 5/22/2025 3:25:11 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 5/22/2025 3:25:11 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 5/22/2025 3:25:11 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 5/22/2025 3:25:11 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 5/22/2025 3:25:11 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 5/22/2025 3:25:11 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 5/22/2025 3:25:11 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 5/22/2025 3:25:11 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 5/22/2025 3:25:11 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 5/22/2025 3:25:11 PM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 5/22/2025 3:25:11 PM | SENT |
| Adam Locke | | adam@lockelaw.com | 5/22/2025 3:25:11 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 5/22/2025 3:25:11 PM | SENT |
| Julia C.Risley | | jrisley@yettercoleman.com | 5/22/2025 3:25:11 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 5/22/2025 3:25:11 PM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 5/22/2025 3:25:11 PM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 5/22/2025 3:25:11 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Steven Vacek on behalf of R. Yetter
Bar No. 22154200
svacek@yettercoleman.com
Envelope ID: 101174075
Filing Code Description: No Fee Documents
Filing Description: Supplement to Plaintiff's Verified Second Amended Petition and Application for TRO, TI and PI
Status as of 5/22/2025 3:45 PM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 5/22/2025 3:25:11 PM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 5/22/2025 3:25:11 PM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 5/22/2025 3:25:11 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 5/22/2025 3:25:11 PM | SENT |
| Cathy Hodges | | catherine.hodges@aporter.com | 5/22/2025 3:25:11 PM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 5/22/2025 3:25:11 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 5/22/2025 3:25:11 PM | SENT |

Associated Case Party: Storable, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Carolyn Reed | | creed@porterhedges.com | 5/22/2025 3:25:11 PM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 5/22/2025 3:25:11 PM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 5/22/2025 3:25:11 PM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 5/22/2025 3:25:11 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 5/22/2025 3:25:11 PM | SENT |
| Ray TTorgerson | | rtorgerson@porterhedges.com | 5/22/2025 3:25:11 PM | SENT |

E-filed in the Office of the Clerk
for the Business Court of Texas
5/23/2025 4:05 PM
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

# Arnold & Porter

**Katherine G. Treistman**
+1 713.576.2433 Direct
Katherine.Treistman@arnoldporter.com

May 23, 2025

**VIA E-FILING**

The Honorable Melissa Andrews
Business Court of Texas, Third Division
1000 Guadalupe St., Austin, TX 78701

     Re:    *SafeLease Ins. Servs. LLC v. Storable, Inc., et al.*, No. 25-BC03A-0001

Dear Judge Andrews:

I write on behalf of Storable in response to SafeLease's May 16, 2025 letter.

The accusations that Storable "refused" to produce responsive documents are inaccurate. For each request, Storable offered, as a compromise, to produce documents that would provide SafeLease with discovery relevant and proportional to its stated needs. SafeLease rejected these reasonable compromises to seek the Court's intervention.

**RFP 10 (All facilities using Storable's FMS and their addresses)**

SafeLease stated that the relevance of this request is to help calculate Storable's FMS market share. Rather than producing its entire customer list with addresses—a highly confidential document—to a hostile competitor with whom Storable is in litigation, Storable proposed to produce information sufficient to show the total number of Storable's FMS customers, including a breakdown of the totals in each state. This compromise would provide the numerator needed to calculate Storable's market share.

SafeLease refused this proposal, insisting that it needs the list with city-level address information to verify that the facilities listed are accurate. In addition to the verification mechanisms noted by SafeLease in its letter, Storable proposed as a further compromise that SafeLease's expert review the list in person or remotely, while the list remained in Storable's possession. SafeLease rejected this proposal.

Before the TI hearings in this matter, Storable produced its calculation of the number of facilities using its FMS as of December 2024 (*see* DX-198), yet SafeLease's economist, Michael Williams, did not use this information. Instead, at both the January 16 and February 11 hearings, his market share testimony was based solely on the approximate customer count listed on Storable's website without further verification. 1/16 Tr. 221:1–7; 2/11 Tr. 120:3–16. If SafeLease or its expert relied on and presented this estimate as reliable at the TI hearings without further "verification," it is unclear why further verification is even needed.

Thus, based on the stated relevance, it is unclear why Storable's alternative proposals were inadequate.

---

**Arnold&Porter**

**RFP 12 (All authorized users for storEDGE and SiteLink)**

SafeLease's stated relevance of this request is determining whether Storable "singled out" SafeLease for allegedly unfavorable treatment.

Storable informed SafeLease that no such documents exist.  Storable does not maintain lists of authorized users.  The Texas Rules of Civil Procedure do not require a party to create documents that do not otherwise exist.  Further, SafeLease has not requested this information in a proper manner, which would be to propound interrogatories.  Storable has already informed SafeLease that it intends to amend its response to the document request to reflect that no responsive documents exist.

Still, given the stated relevance of the request, Storable offered as a compromise to produce the total number of authorized users and information showing whether other tenant insurance providers have authorized users.  SafeLease rejected this compromise.

**RFP 20 (All documents evidencing security measures impacting SafeLease's access to Storable's FMS)**

As the Court is aware from testimony in this case, the security measures implemented at issue were uniform, not targeted at SafeLease.  Thus, the request as written asks for "all documents" regarding Storable's general security measures.  This request is overbroad and burdensome as it would require Storable to produce potentially every document it has relating to its general security measures.  As a compromise, Storable offered to produce documents sufficient to show the specific security measures that affected SafeLease and when it took those measures.  Again, inexplicably, SafeLease refused this reasonable compromise designed to get it the discovery it allegedly needs.

In conclusion, Storable's offered compromises are reasonable and would provide to SafeLease the discovery it allegedly needs without the Court's intervention.  For the reasons presented, Storable respectfully requests that the Court dismiss SafeLease's discovery dispute.

Respectfully submitted,

*s/ Katherine G. Treistman*
Katherine G. Treistman

cc:     Counsel of Record (by e-filing)

**Arnold&Porter**

The Honorable Melissa Andrews
May 23, 2025
Page 3

**Response to Certificate of Conference**

Storable generally does not dispute Plaintiff's certificate of conference and would simply direct the Court's attention to the conflict between SafeLease's statement in the certificate that "Storable proposed making a limited production in response to these RFPs" with its statements in the uncertified letter that Storable "refused to produce any documents" or "refused any production."

*s/ Katherine G. Treistman*
Attorney for Defendants

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Grace Ojionuka on behalf of Katherine Ginzburg Treistman
Bar No. 796632
Grace.Ojionuka@arnoldporter.com
Envelope ID: 101228824
Filing Code Description: No Fee Documents
Filing Description: Storable's Response to SafeLease's Discovery Dispute Letter
Status as of 5/23/2025 4:09 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 5/23/2025 4:05:20 PM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 5/23/2025 4:05:20 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 5/23/2025 4:05:20 PM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 5/23/2025 4:05:20 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 5/23/2025 4:05:20 PM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 5/23/2025 4:05:20 PM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 5/23/2025 4:05:20 PM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 5/23/2025 4:05:20 PM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 5/23/2025 4:05:20 PM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 5/23/2025 4:05:20 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 5/23/2025 4:05:20 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 5/23/2025 4:05:20 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 5/23/2025 4:05:20 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 5/23/2025 4:05:20 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 5/23/2025 4:05:20 PM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 5/23/2025 4:05:20 PM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 5/23/2025 4:05:20 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 5/23/2025 4:05:20 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 5/23/2025 4:05:20 PM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 5/23/2025 4:05:20 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 5/23/2025 4:05:20 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 5/23/2025 4:05:20 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Grace Ojionuka on behalf of Katherine Ginzburg Treistman
Bar No. 796632
Grace.Ojionuka@arnoldporter.com
Envelope ID: 101228824
Filing Code Description: No Fee Documents
Filing Description: Storable's Response to SafeLease's Discovery Dispute Letter
Status as of 5/23/2025 4:09 PM CST

Case Contacts

| Dolores Brunelle | | dbrunelle@porterhedges.com | 5/23/2025 4:05:20 PM | SENT |
|---|---|---|---|---|
| Cathy Hodges | | catherine.hodges@aporter.com | 5/23/2025 4:05:20 PM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 5/23/2025 4:05:20 PM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 5/23/2025 4:05:20 PM | SENT |
| Adam Locke | | adam@lockelaw.com | 5/23/2025 4:05:20 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 5/23/2025 4:05:20 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 5/23/2025 4:05:20 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 5/23/2025 4:05:20 PM | SENT |
| Julia C.Risley | | jrisley@yettercoleman.com | 5/23/2025 4:05:20 PM | SENT |



**The Business Court of Texas,
Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § | |
| *Plaintiff,* | § § | |
| v. | § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § | |
| *Defendants.* | § § | |

## Discovery Order

Before the Court is plaintiff SafeLease's discovery-dispute letter, filed under Business Court Local Rule 4(d), and the response letter filed by defendants (collectively, Storable). SafeLease seeks, and Storable resists, production of documents responsive to SafeLease's requests for production (RFPs) numbers 10, 12, and 20. The Court ORDERS as follows:

**RFP 10:** Storable is **ORDERED** to produce documents sufficient to show the name, city, state, and zip code of all self-storage facilities using Storable's FMS platforms as of December 30, 2024.

Storable asserts that its customer list with addresses is "a highly confidential document"[1] and that SafeLease is "a hostile competitor with whom Storable is in litigation."[2] The agreed protective order in this case contains "confidential" and "outside counsel's eyes only" (OCEO) designations, both available to Storable to protect its confidential information as appropriate. Because the parties previously disputed whether certain counsel should have access to OCEO material, the Court directs them to *Westlake Longview Corp. v. Eastman Chemical Co.*, 2025 Tex. Bus. 19, for guidance on the evidentiary standards applicable to such disputes.[3]

**RFP 12:** Storable is **ORDERED** to either (a) produce documents sufficient to show all authorized users on storEDGE and SiteLink as of December 30, 2024 or (b) amend its RFP 12 response to state that no responsive documents exist and give the number of authorized users on storEDGE and SiteLink on December 30, 2024.

Storable states that "no [] documents exist" that are responsive to RFP 12, it "does not maintain lists of authorized users," and it will amend its discovery responses "to reflect that no responsive documents exist." If that is the case, amending the discovery responses is sufficient. Storable is correct that it is not

---

[1] Storable did not assert that the information at issue constitutes a trade secret.

[2] While SafeLease may be a competitor of Storable's insurance affiliates, the customer list at issue is for Storable's FMS customers. SafeLease does not compete in the FMS market.

[3] The *Westlake* decision addresses access for in-house counsel but notes that federal courts have applied the same test for both outside and in-house lawyers. *Westlake*, 2025 Tex. Bus. 19 at n.16.

obligated to create a document that does not exist in response to this RFP.

The Court notes, however, that RFP 12 is not limited to a list of authorized users and "documents" is broadly defined to include not just physical files but also, for example, electronic data.[4] If Storable has data that shows the authorized users on storEDGE and SiteLink as of December 30, 2024, Storable need not process such data to create a list for SafeLease but must produce the data (subject to privilege).[5] The Court raises this because Storable offered "to produce the total number of authorized users and information showing whether other tenant insurance providers have authorized users," and it is plausible that the data from which Storable would derive that information would be responsive to RFP 12.

**RFP 20:** Storable is **ORDERED** to produce documents evidencing the specific security measures it took that affected SafeLease's access to Storable's FMS, other than computer code, and when it took such measures.

This reflects SafeLease's offer to limit its request to exclude computer code and Storable's offer to produce "documents sufficient to show the specific security measures that affected SafeLease and when it took those measures."

Storable is **ORDERED** to comply with this order by June 13, 2025.

---

[4] Under the parties' agreed ESI protocols, electronic data should be produced in TIF format.

[5] Storable need not produce data that is duplicative—only data that is "sufficient to show" the authorized users on the given date.

Date signed: May 28, 2025

_____
Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 101329629
Filing Code Description: No Fee Documents
Filing Description: Discovery Order
Status as of 5/28/2025 12:43 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 5/28/2025 12:37:00 PM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 5/28/2025 12:37:00 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 5/28/2025 12:37:00 PM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 5/28/2025 12:37:00 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 5/28/2025 12:37:00 PM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 5/28/2025 12:37:00 PM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 5/28/2025 12:37:00 PM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 5/28/2025 12:37:00 PM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 5/28/2025 12:37:00 PM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 5/28/2025 12:37:00 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 5/28/2025 12:37:00 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 5/28/2025 12:37:00 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 5/28/2025 12:37:00 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 5/28/2025 12:37:00 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 5/28/2025 12:37:00 PM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 5/28/2025 12:37:00 PM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 5/28/2025 12:37:00 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 5/28/2025 12:37:00 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 5/28/2025 12:37:00 PM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 5/28/2025 12:37:00 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 5/28/2025 12:37:00 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 5/28/2025 12:37:00 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 101329629
Filing Code Description: No Fee Documents
Filing Description: Discovery Order
Status as of 5/28/2025 12:43 PM CST

Case Contacts

| Dolores Brunelle | | dbrunelle@porterhedges.com | 5/28/2025 12:37:00 PM | SENT |
|---|---|---|---|---|
| Cathy Hodges | | catherine.hodges@aporter.com | 5/28/2025 12:37:00 PM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 5/28/2025 12:37:00 PM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 5/28/2025 12:37:00 PM | SENT |
| Adam Locke | | adam@lockelaw.com | 5/28/2025 12:37:00 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 5/28/2025 12:37:00 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 5/28/2025 12:37:00 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 5/28/2025 12:37:00 PM | SENT |
| Julia C.Risley | | jrisley@yettercoleman.com | 5/28/2025 12:37:00 PM | SENT |

E-filed in the Office of the Clerk
for the Business Court of Texas
**296**
6/3/2025 9:22 AM
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

**The Business Court of Texas,**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § | |
| *Plaintiff,* | § § § | Cause No. 25-BC03A-0001 |
| *v.* | § § | |
| STORABLE, INC., et al., | § § § | |
| Defendants. | § | |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON**
**SAFELEASE'S ATTEMPTED MONOPOLIZATION CLAIM**

# TABLE OF CONTENTS

I. SUMMARY OF THE ARGUMENT ................................................................ 1

II. STATEMENT OF UNDISPUTED FACTS ................................................... 2

    A. Background on Storable.................................................................... 2

    B. Competition for Tenant Insurance................................................... 3

    C. Storable's Right to Determine Who Accesses its FMS Platforms and on What Terms 4

    D. Storable's API Pricing.................................................................... 5

    E. SafeLease's Dispute with Storable.................................................. 7

III. PROCEDURAL HISTORY ........................................................................ 8

IV. LEGAL STANDARD ............................................................................... 10

V. ARGUMENT AND AUTHORITIES ........................................................ 11

    A. STORABLE DOES NOT HAVE A DANGEROUS PROBABILITY OF MONOPOLIZING THE TENANT INSURANCE MARKET................................. 11

    B. STORABLE'S CONDUCT DID NOT HARM COMPETITION FOR TENANT INSURANCE.......................................................................... 14

    C. STORABLE'S CONDUCT IS NEITHER ANTICOMPETITIVE NOR PREDATORY ............................................................................ 16

        1. Storable Has Not Excluded or Refused to Deal with SafeLease ......... 17

        2. Storable's Conduct Has Legitimate Business Justifications ............... 21

    D. STORABLE DOES NOT HAVE A SPECIFIC INTENT TO MONOPOLIZE THE TENANT INSURANCE MARKET.......................................................... 23

VI. CONCLUSION....................................................................................... 24

Defendants Storable, Inc.; RedNova Labs (d/b/a storEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP (collectively, "Storable") respectfully move the Court for summary judgment on the First Cause of Action (Violation of the Texas Antitrust Act, Section B) in Plaintiff SafeLease Insurance Services LLC's Second Amended Petition, and would show as follows:

## I.    SUMMARY OF THE ARGUMENT

SafeLease's attempted monopolization claim is fatally flawed and fails as a matter of law for myriad reasons. Storable is nowhere close to monopolizing the alleged tenant insurance market. Storable's challenged conduct is not anticompetitive and it has not harmed competition for tenant insurance. And Storable has no intent to monopolize the tenant insurance space. Storable's conduct also has legitimate business justifications, which provide a complete defense to SafeLease's claim.

SafeLease tries to repackage as an antitrust claim its failed negotiations with Storable over an API agreement to access Storable's FMS platforms. But the undisputed facts do not support that claim and no potentially discoverable facts could save it. The Court should resolve this Motion now to avoid expansive, unnecessary discovery on this claim and the disclosure of highly confidential, competitively sensitive information to one of Storable's competitors. SafeLease's suit rises and falls on its tort claims and only those claims should proceed at this stage.

Without any further discovery, the undisputed facts in SafeLease's petition and the record doom SafeLease's attempted monopolization claim. Storable and SafeLease are just two of more than a dozen tenant insurance competitors in the U.S. No tenant insurance competitor is dominant or anywhere close to being a monopolist; even construing all facts in SafeLease's favor, Storable has less than 25% share. No facts in the record or potentially obtainable through discovery could

1

show that Storable's conduct harmed tenant insurance competition or that Storable has attempted to exclude any tenant insurance competitor apart from SafeLease. The undisputed evidence shows the opposite: instead of excluding competitors, Storable has promoted competition by entering into API agreements with more than a dozen tenant insurance competitors—every other tenant insurance provider that has sought to access its FMS platforms. Out of all these competitors, only SafeLease has complained about Storable's conduct. Yet Storable is treating SafeLease just like any other competitor: it offered SafeLease the same API terms that it has offered every tenant insurance competitor newly seeking to connect to its platforms in the last three years, terms to which at least four other competitors have agreed. While SafeLease may not like the terms of accessing Storable's platform, SafeLease's gripes do not transform its ordinary business grievance into attempted monopolization of the tenant insurance space.

Because there are no genuine disputes of material fact relevant to multiple elements of this claim, the Court should grant Defendants' Motion, which will help streamline discovery, promoting judicial efficiency and preserving the parties' resources.

## II.   STATEMENT OF UNDISPUTED FACTS

This Motion relies on the following undisputed facts based on evidence in the record. True and correct copies of the materials cited herein are attached as exhibits to the authenticating Declaration of Katherine Treistman in support of this Motion.

### A.  Background on Storable

Storable offers a suite of products and services for self-storage facilities, including three facility management software ("FMS") platforms and multiple tenant insurance and protection products. *See* Ex. L at 140:11-141:1 (Gordon). Storable's FMS platforms rely on proprietary software owned and controlled solely by Storable. *See generally* Exs. M-O. By offering a full suite of offerings, Storable adds significant value to its self-storage customers. *See* Ex. L at 139:12-

2

140:10 (Gordon) (Storable's "comprehensive platform" helps "simplify the daily lives of our customers, mak[ing] them more efficient and more profitable").

### B. Competition for Tenant Insurance

There is broad competition for self-storage tenant insurance in the United States. Storable and SafeLease are just two of more than a dozen tenant insurance competitors in the U.S., including Deans & Homer, MiniCo, SafeStor, Savvy, SBOA, Storage Shield, and Xercor. Ex. L at 146:11-22 (Gordon); Ex. P at 2; Ex. K at 139:6-21 (Caminade), 236:16-19 (Manes); *see also* Ex. J at 231:18-232:4 (Rudkin). SafeLease admits that it competes with a "variety of insurance providers" for "the same business." Ex. K at 79:9-15 (Kinet).

There is no evidence that any competitor has more than 25% share of the alleged tenant insurance market. *See* Ex. J at 177:21-178:1, 179:8-18 (Williams); Ex. H at 175:9-24 (Stein); Ex. K at 141:23-25 (Caminade). Even using SafeLease's improperly small market size and assuming its tenant insurance market is properly defined, Storable has at most ~23% share (██████/43,764 facilities). *See* ██████ Ex. R at 5. SafeLease estimates that it has a "low single digit" share in tenant insurance. Ex. H at 175:9-12 (Stein). SafeLease serves ~2,575 to ████ facilities, *see* Ex. L at 28:14-21 (Stein)████,[1] so again using SafeLease's improperly small market size, *see* Ex. R at 5, SafeLease would have ~6% share.

There has been recent entry in the tenant insurance space, suggesting that barriers to entry are low. SafeLease itself was started less than five years ago, in late 2021. Ex. H at 149:13-14 (Stein); *see also* Ex. K at 251:5-22 (Manes) (Storage Shield started in 2020 or 2021).

---

[1] Based on Mr. Stein's testimony, ~70% of SafeLease's customers, or 1,800 facilities, use a Storable FMS, so SafeLease has ~2,571 total customers. ████████████████████

Self-storage facilities can readily switch between tenant insurance providers. *See* Ex. K at 89:13-20 (Kinet). Self-storage facilities are not required to use a tenant insurance product offered by their FMS provider. Storable, for example, does not require that its FMS customers use its tenant insurance products; today, less than a third of Storable's FMS customers use its insurance products. Ex. L at 148:18-20, 155:3-8 (Gordon). Similarly, SafeLease has pushed customers to switch from Storable's to Cubby's FMS, while staying with SafeLease for insurance. Ex. K at 82:4-18 (Kinet); *see also* Ex. T; Ex. J at 309:10-310:8 (Kinet).

**C. Storable's Right to Determine Who Accesses its FMS Platforms and on What Terms**

As the owner of its proprietary FMS software, Storable is entitled to define the terms under which companies can access it. Storable has standard terms that outline and limit its self-storage customers' use of its FMS platforms. Exs. M-O. Under those terms, Storable can control who has "authorized user" access to its platforms. Ex. M at 2; Ex. N at 6; Ex. O at 6. Under Storable's interpretation of its terms, third-party service providers like SafeLease are not allowed to access Storable's platforms as authorized users. *See* Ex. H at 260:16-24, 266:12-14 (Gordon).

While Storable could restrict third-party access to its FMS platforms, Storable instead has promoted provider choice and competition among service providers on its platforms. Storable wants to provide its customers with broad choice for services that integrate with Storable's FMS platform, including tenant insurance. *Id.* at 132:25-133:12 (Gordon). Indeed, the value of Storable's platforms is predicated in part on offering a broad choice of providers to its FMS customers. Ex. L at 147:25-148:17 (Gordon).

To connect to its FMS platforms, Storable requires that third-party service providers enter an application programming interface ("API") agreement and access its platforms using an API. Using APIs to facilitate information exchanges between FMS platforms and third-party service

4

providers is an industry-standard process. Ex. H at 179:13-23 (Stein); *see* Ex. L at 145:4-18 (Gordon) (other FMS providers use APIs as well). Storable's API agreements enable third-party service providers to securely send and receive information from Storable's FMS systems so the providers can serve their customers. *See* Ex. H at 103:23-104:5 (Gordon); Ex. L at 191:12-17 (Gordon). Integrated API access to Storable's FMS platforms provides value for self-storage operators and tenant insurance companies by helping them pull data cheaply and increasing demand for their services. *See* Ex. K at 143:5-144:20, 148:22-149:12 (Caminade); Ex. L at 157:3-24 (Gordon).

To date, Storable has entered into API agreements with more than 100 third-party service providers, including over a dozen tenant insurance providers. *See, e.g.*, ████████████████ Ex. L at 146:14-147:24 (Gordon); Ex. U; Ex. V at 2. SafeLease does not have an API agreement with Storable. Ex. CCC at 2. Apart from SafeLease, every other tenant insurance company seeking to connect to Storable's FMS platforms has entered into an API agreement with Storable. Ex. H at 87:6-17 (Gordon); Ex. L at 151:1-4 (Gordon).

Storable's requirement that third parties access its platform using an API have legitimate business justifications. If third parties can unrestrictedly access Storable's systems without an API, those systems face security and stability risks, including surges and outages. To protect its proprietary software and its customers' sensitive information, Storable needs to be able to control who can access to its platforms and how information flows to and from them. Ex. H at ████ ████ 256:10-21 (Fritcher); ████████████ *see also* Ex. K at 233:25-234:15 (Manes).

### D. Storable's API Pricing

Over the years, Storable has adjusted the terms under which third-party service providers can access its FMS platforms. In 2021, Storable reevaluated how to price API access for third-

party service providers, including tenant insurance companies.  Ex. H at 87:18-88:17 (Gordon); Ex. Y.  Based on that evaluation, Storable adopted a two-pronged pricing strategy.

First, for providers that had integrated with Storable's FMS platforms before 2021, Storable ████████████████████████████████████████████████████████████ ████████████████████  At least eight tenant insurance providers with API agreements with Storable have terms along these lines.  ████████

Second, for providers that had not integrated with Storable's FMS platform before 2021, Storable set its standard fees at ████████████████████████████████████ ████████████████████████████████████.  *See* Ex. L at 45:20-25 (Stein)████ ████████.  At least four tenant insurance providers have API agreements with Storable using this ████████ rate structure.  ████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████

Storable adopted this updated pricing strategy to align with the value that Storable's platforms provide to third-party service providers.  ████████████████████████ Operators and service providers receive value from being able to access Storable's rich marketplace.  *See* ████████████████████████████████████████████ ████████ 142:14-24 (Caminade).  Building and maintaining APIs has costs for Storable and provides value for which service providers are willing to pay.  Ex. L at 155:9-21 (Gordon); Ex. K at ████████████████████████████████████████████████ 232:25-233:5 (Manes).  Storable is constantly investing in and improving its APIs by adding new features and making them more secure.  Ex. L at 155:9-21 (Gordon).  Storable set a higher price for serving facilities that previously used a Storable insurance product because there is greater value in

connecting with those facilities. *Id.* at 153:8-155:2 (Gordon); ▮▮▮▮▮▮ *see also* Ex. K at 181:14-183:4 (Caminade). Storable has invested in building the insurance revenue opportunity with these facilities, so they are more valuable prospective customers for Storable's tenant insurance competitors. Ex. L at 153:13-154:10 (Gordon).

If an FMS platform provides more value to third-party service providers, those providers may have to pay a higher fee to access that platform. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Compared to other FMS providers' APIs, Storable's API offers access to a platform with a broader suite of services, exposure to more facilities, and strong service, which provides significantly more value. Ex. L at 145:4-24, 157:14-24 (Gordon); *see also* Ex. K at 148:3-149:12 (Caminade) ▮▮▮▮▮▮▮▮▮▮▮.

**E. SafeLease's Dispute with Storable**

SafeLease, unlike any other tenant insurance provider, has systematically accessed Storable's FMS platforms using automated bots and other unauthorized means. *See* Ex. H at 255:25-256:21 (Fritcher); Ex. L at 150:17-25 (Gordon), 234:24-236:5 ▮▮▮▮▮▮▮ (Fritcher) ▮▮▮▮. In or around April 2024, Storable realized the extent of SafeLease's unauthorized access to its FMS platforms. *See* ▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. L at 234:24-236:5 (Fritcher) ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. SafeLease's unauthorized use of Storable's FMS platforms, in particular its use of automated bots to run millions of reports, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ After uncovering the extent of SafeLease's unauthorized access, Storable informed SafeLease that it needed to enter into an API agreement to access Storable's FMS platforms. *See id.* at 116:6-10, 117:9-16 (Gordon). In mid-October 2024, Storable informed SafeLease that it was implementing

security measures that would block unauthorized access to its systems and may affect SafeLease. Ex. RR; Ex. H at 112:22-113:6 (Gordon).

In late 2024 into early 2025, Storable and SafeLease exchanged multiple offers for pricing under an API agreement. On October 22, 2024, Storable offered ███████████████ ██████████████████████████ Several days later, Storable offered an updated proposal with the same framework but ██████████████████████████████████████ ██████████. █ SafeLease countered with ██████████. █ Between then and February 2025, the parties exchanged multiple other offers. During these negotiations, Storable offered SafeLease ██████████████████████████████████████████████ ████████████████

## III. PROCEDURAL HISTORY

On December 30, 2024, unsatisfied with these API negotiations, SafeLease sued Storable in district court in Travis County, alleging an attempted monopolization claim and seeking a temporary injunction ("TI"). SafeLease alleged that Storable had leveraged its purported monopoly power in FMS services to attempt to monopolize the alleged tenant insurance market. Ex. SS ¶¶ 83-84. Specifically, SafeLease alleged that Storable's decision to cut off SafeLease's "authorized user" access to its FMS platforms was a "refusal to deal [] intended to remove a low-cost competitor from the market to help defendants gain market share and solidify a second monopoly in the market for tenant insurance." *Id.*

On January 21, 2025, the district court denied SafeLease's request for a TI on the attempted monopolization claim. Ex. TT. In so ruling, the court inherently rejected SafeLease's arguments that the evidence showed a probable right to relief on this claim.

On January 28, 2025, SafeLease filed its Second Amended Petition, tacking on two tort claims and again requesting a TI. Ex. A. In this amended petition, SafeLease does not allege that

8

Storable targeted any tenant insurance competitor apart from SafeLease. Rather, it states that Storable "singled out and targeted SafeLease" (¶ 12) through a scheme to "cut off a competitor" (¶ 13) (emphasis added). It further states that Storable "did not block access to [the SiteLink] customer module for any other insurance provider." *Id.* ¶ 79.

After losing in district court, SafeLease forum shopped by improperly removing this case to this Court to get a second bite at the apple. *See* Ex. DDD. This Court held a four-day evidentiary hearing between February 11 and 18, 2025. On February 18, 2025, Storable moved to exclude the testimony of Dr. Williams, SafeLease's economic expert, arguing, *inter alia*, that Dr. Williams's opinion was unsupported *ipse dixit*. Ex. E at 1. Among other things, Storable argued that Dr. Williams's opinion that Storable posed a dangerous probability of achieving monopoly power was conclusory, unreliable, and failed to analyze myriad relevant factors. *Id.* at 3-7.

On February 19, 2025, this Court granted a TI on SafeLease's tortious interference with existing contracts claim, not its antitrust claim. Ex. C. On February 21, 2025, Storable filed objections to the TI order and moved the Court for reconsideration of the TI order and to rule on its motion to exclude Dr. Williams's testimony. Ex. F.

On March 11, 2025, the Court denied the motion for reconsideration but confirmed that "the TI order does not rely on SafeLease's antitrust claim; it relies exclusively on SafeLease's claim for tortious interference with existing contracts." Ex. B at 4. Similarly, the Court declined to exclude Dr. Williams's testimony but noted that it "did not consider Dr. Williams's opinion regarding whether Storable had a dangerous probability of achieving monopoly power" in reaching its decision. *Id.* at 7. The Court also stated that it considers the district court's prior decisions "as carrying the same weight as its own prior decisions in this case." *Id.* at 3 n.1. In so ruling, the Court effectively confirmed that SafeLease's antitrust claim is unlikely to be successful on the

merits and that changed circumstances between December 2024 and January 2025 did not justify a TI on that claim.

On March 11, 2025, the Court entered an amended TI order, adjusting the language to clarify that the order was based solely on one of the tort claims and that SafeLease had not proven any cause of action, including its attempted monopolization claim. Ex. D. On March 26, 2025, Storable appealed this amended TI order. That appeal is pending.

## IV. LEGAL STANDARD

Under Texas law, summary judgment is appropriate on a claim for which there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

SafeLease claims that Storable leveraged its alleged monopoly in FMS services to attempt to monopolize the tenant insurance space. To support this claim, as a threshold matter, SafeLease must show that Storable's challenged conduct harmed competition in the alleged tenant insurance market. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993); *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001).[2] Additionally, to establish standing to bring this claim, SafeLease must show a threat of "antitrust injury"—i.e., "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109, 111 (1986); *Roberts v. Whitfill*, 191 S.W.3d 348, 355 (Tex. App. 2006) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). If SafeLease's alleged injury is based on conduct that harmed SafeLease but not

---

[2] This Motion relies largely on federal antitrust caselaw because the Texas Antitrust Act ("TFEAA") is construed in line with federal antitrust laws, TEX. BUS. & COM. CODE § 15.04, and Texas courts "rely heavily" on federal antitrust jurisprudence given the limited state caselaw interpreting the TFEAA. *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 689 (Tex. 2006).

competition, it is not antitrust injury. *See Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 346 (5th Cir. 2002); *Midwest Commc'ns v. Minnesota Twins, Inc.*, 779 F.2d 444, 453 (8th Cir. 1985).

Separate but related to these threshold requirements, SafeLease must prove that Storable "(1) ... engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" in the alleged tenant insurance market. *Coca-Cola*, 218 S.W.3d at 690 (quoting *Spectrum Sports*, 506 U.S. at 456). Valid business justifications for Storable's conduct are a defense to SafeLease's allegations that that conduct was anticompetitive. *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295-1296 (11th Cir. 2004).

If Storable negates <u>any</u> element of SafeLease's antitrust claim or conclusively proves an affirmative defense, the Court must grant summary judgment for Storable on this claim because SafeLease cannot present evidence creating a fact issue. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

## V.     <u>ARGUMENT AND AUTHORITIES</u>

Based on the undisputed facts, SafeLease's attempted monopolization claim fails as a matter of law for myriad reasons. Any of these reasons is an independent basis to grant summary judgment for Defendants on this claim.

### A.  STORABLE DOES NOT HAVE A DANGEROUS PROBABILITY OF MONOPOLIZING THE TENANT INSURANCE MARKET

The undisputed facts show that Storable does not have a dangerous probability of monopolizing the alleged tenant insurance market. To establish this element of its claim, SafeLease would need to show, *inter alia*, that Storable has a high market share (usually 50% or greater) in the alleged tenant insurance market. *M & M Med. Supplies & Serv., Inc. v. Pleasant*

*Valley Hosp., Inc.*, 981 F.2d 160, 168 (4th Cir. 1992); *see generally Puentes v. Spohn Health Network*, No. 13-08-00100-CV, 2009 WL 1974592, at \*6 (Tex. App. June 11, 2009) (market share finding required for a TFEAA claim). Storable's market share is calculated <u>at the time</u> it started engaging in the challenged conduct (i.e., late 2024), not <u>after</u>. *See Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000); *Texas Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 592 (Tex. App. 2007). SafeLease cannot establish that Storable had more than a 25% share in this space, so its antitrust claim fails as a matter of law.

It is impossible for SafeLease to establish—and SafeLease does not even claim—that Storable has anywhere close to 50% share in the alleged tenant insurance market. The record supports just the opposite. As described in Section II.B, there are more than a dozen tenant insurance providers in the U.S. and there has been entry in the last 4-5 years. *See Lens Exp., Inc. v. Ewald*, 907 S.W.2d 64, 70 (Tex. App. 1995) ("The word *monopoly* loses much of its meaning when applied to a market in which there are ten or more competitors."). Even adopting SafeLease's improperly small market size, Storable has at most ~23% share. *See* Sec. II.B *supra*. This share is far too low to infer a "dangerous probability" of monopolization. *See M & M*, 981 F.2d at 168 (less than 30% share presumptively rejected).

Establishing that Storable could ever obtain 50% market share through its allegedly exclusionary practices would require multiple illogical leaps that run against the law and the facts. Take a counterfactual where, *contra* the law, market share is calculated <u>after</u> the alleged exclusion, not <u>before</u>. Even in this scenario, the Court would need to make multiple unsupported assumptions contradicted by the facts to show that Storable could ever approach 50% share. First, the Court would need to assume that Storable pushes SafeLease out of business and captures all its tenant insurance customers—both baseless assumptions. Again using SafeLease's claimed market size,

SafeLease has ~6% market share. *See* Sec. II.B *supra*. Even if Storable (improbably) took all of SafeLease's business, it would still have at most ~29% share. Second, the Court would need to assume that Storable is likely to foreclose multiple other tenant insurance providers and fully recoup their lost insurance business. But no evidence or further discovery could show that Storable has even attempted to exclude <u>any</u> other tenant insurance companies. The facts show the opposite: that Storable has encouraged competition by allowing more than a dozen tenant insurance competitors to access its FMS platforms. SafeLease's inability to show that Storable could reach 50% share under even this counterfactual illustrates the ludicrousness of SafeLease's claim that Storable is poised to monopolize the tenant insurance space.

Dr. Williams's vague claim that Storable will likely obtain "substantial market share" in the tenant insurance space is baseless, conclusory, and does not create a dispute of material fact. *See* Ex. H at 225:20-226:20 (Williams). Dr. Williams conducted no analysis of the tenant insurance space: he did not analyze the number of competitors, the strength of those competitors, or any competitor's market share in that space. Ex. J at 177:21-178:1, 179:8-18 (Williams). Similarly, Dr. Williams's claim that there is a "dangerous probability" that if Storable continues its conduct, it would "be successful in leveraging its monopoly power from the FMS market to the tenant insurance market" is wholly speculative—a throwaway line at the end of his presentation. *Id.* at 151:21-152:4 (Williams).[3] There is no evidence that Storable's conduct affected any tenant insurance competitor other than SafeLease or that Storable is anywhere close to having market power in the tenant insurance space. No further discovery would provide such evidence.

---

[3] Summary judgment is appropriate when an expert suggests the court adopt an irrational inference based on implausible assumptions inconsistent with record evidence. *See Matsushita v. Zenith Radio Corp.,* 475 U.S. 574, 594 n. 19 (1986).

Thus, SafeLease cannot show as a matter of law that Storable had a dangerous probability of monopolizing the alleged tenant insurance market.

## B. STORABLE'S CONDUCT DID NOT HARM COMPETITION FOR TENANT INSURANCE

SafeLease's antitrust claim fails as a matter of law because SafeLease cannot show that Storable's conduct harmed competition for tenant insurance. SafeLease has not adduced any evidence showing that Storable's allegedly exclusionary conduct harmed tenant insurance competition market-wide or affected any competitor apart from SafeLease. Additional discovery cannot save SafeLease's claim.

In an antitrust case between competitors, the plaintiff competitor always complains that they have been harmed. But antitrust laws focus on harm to "competition, not competitors." *Brunswick*, 429 U.S. at 488; *Marlin v. Robertson*, 307 S.W.3d 418, 425 (Tex. App. 2009) (citing Tex. Bus. & Com. Code § 15.04) (same); *see also Spectrum Sports*, 506 U.S. at 458 (monopolization law prohibits "conduct which unfairly tends to destroy competition itself").

To establish harm to competition, showing "harm to one or more *competitors* will not suffice." *Microsoft*, 253 F.3d at 58. "Even the *elimination* of a single competitor, standing alone, does not prove anticompetitive effect." *Austin v. McNamara*, 979 F.2d 728, 739 (9th Cir. 1992) (cleaned up). Rather, SafeLease must show "proof of market-wide harm." *Coca-Cola*, 218 S.W.3d at 688-690; *see also Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1281 (10th Cir. 2012) (challenged conduct must impact "[m]arket wide prices, quantity or quality"); *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1014 (6th Cir. 2005) (plaintiff must show "adverse effect on the market as a whole").

Storable's conduct has not harmed competition for tenant insurance. As explained above, broad competition for tenant insurance exists, with more than a dozen tenant insurance providers

14

in the U.S.  *See* Sec. II.B *supra*.  There is no evidence that the many other tenant insurance providers are not competitive or that Storable's conduct had any market-wide effect—and no further discovery could show this.  Indeed, despite having the opportunity to do so, SafeLease's economist did not evaluate competition or even the number of competitors in the tenant insurance space.  Ex. J at 177:21-178:1 (Williams); Ex. K at 139:3-8 (Caminade).

Rather than harming competition, Storable has promoted competition in the tenant insurance space.  *See* Ex. K at 142:1-13 (Caminade).  Instead of excluding its competitors, Storable has entered into API agreements and invested in building, supporting, and improving APIs with more than a dozen tenant insurance competitors that allow them to access Storable's FMS platforms in order to serve their customers and compete for tenant insurance business.  *Id.* at 139:6-140:11 (Caminade); Ex. L at 146:14-147:3, 155:9-21 (Gordon); Ex. U; Ex. V at 2.

SafeLease has repeatedly admitted that no competitor has been excluded or targeted by Storable except SafeLease.  The Second Amended Petition focuses only on alleged harm to SafeLease, not harm to competition or any other competitors.  Ex. A ¶¶ 12-13, 79.  At the hearing on January 30, 2025, SafeLease's counsel emphasized that there is "no other insurer who's been locked out of access to a Storable platform in the way that SafeLease has."  Ex. I at 13:15-17.  SafeLease's fact-free suggestions that other competitors will be "driven out" of the market, Ex. A ¶ 100, are baseless and contradicted by Storable's history of entering API agreements with its tenant insurance competitors.  This history and the lack of evidence that any tenant competitor apart from SafeLease has been or will be harmed by Storable dooms SafeLease's antitrust claim.

Dr. Williams's claim that Storable's conduct "substantially reduced competition in the tenant insurance market" is completely unsupported by any facts.  Ex. J at 145:2-8 (Williams).  No evidence that Dr. Williams referred to showed any effect on competition; at most, it showed an

15

effect on SafeLease. *See id.* at 144:9-145:8, 148:14-25 (Williams). Dr. Williams's discussion of how Storable allegedly "leveraged" its FMS market power, *id.* at 126:5-143:11, does not show that that purported leveraging had <u>any</u> effect on tenant insurance competition.

Finally, SafeLease has not established antitrust injury because the injury it allegedly suffered or is threatened by is not the type of injury that the antitrust laws were designed to prevent and does not flow from harm to competition. *Cargill*, 479 U.S. at 109-110. Rather, any alleged injury to SafeLease flows from Storable's legitimate business policy that third-party service providers access its FMS platforms under an API agreement on commercially reasonable terms and SafeLease's refusal to accept those terms. SafeLease complains about Storable's API policy, but through that policy, Storable has promoted competition by enabling more than a dozen tenant insurance competitors to access and compete for business on its platforms. Even if Storable's conduct were tortious (it is not), it has not harmed competition, thus the purported injury flowing from it is not antitrust injury. *See Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 616 (6th Cir. 2001). As such, SafeLease cannot establish antitrust injury, so it lacks antitrust standing.

## C. STORABLE'S CONDUCT IS NEITHER ANTICOMPETITIVE NOR PREDATORY

While SafeLease may complain about Storable's conduct, monopolization laws do not prohibit all allegedly "unfair" conduct, *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 892 (5th Cir. 2016), or afford a remedy for every tort allegedly committed by one competitor against another. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993); *see also Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 500 S.W.3d 26, 49 (Tex. App. 2016). "[A]ntitrust law is rife with [] examples of what competitors

16

find to be disreputable business practices that do not qualify as predatory behavior." *Retractable Techs.*, 842 F.3d at 892 (quoting *Taylor*, 216 F.3d at 476).

SafeLease alleges that Storable engaged in two types of anticompetitive conduct: "monopoly leveraging" and a refusal to deal. *See, e.g.*, Ex. G. Standing alone, "'monopoly leveraging' does not violate antitrust laws unless it takes a particular form, such as a … refusal to deal." *Schor v. Abbott Lab'ys*, 457 F.3d 608, 610, 615 (7th Cir. 2006). Put differently, "leveraging" is not inherently anticompetitive but rather "presupposes anticompetitive conduct." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004). In this case, SafeLease's leveraging and refusal-to-deal theories of harm challenge the same conduct— Storable's requirement that SafeLease access its FMS platforms under an API agreement on its standard terms and its decision to cutoff SafeLease's unauthorized access to those platforms—so the analysis of those theories is the same. *See Morris*, 364 F.3d at 1294 n.11.

As explained in Section V.B, to be "condemned as exclusionary," Storable's conduct must "harm the competitive *process*," not just SafeLease. *Microsoft*, 253 F.3d at 58. "Even a company with monopoly power has no general duty to cooperate with its business rivals and may refuse to deal with them if valid business reasons exist for such refusal." *Morris*, 364 F.3d at 1295. Thus, to determine whether conduct is exclusionary, the court must consider the "proffered business justification" for the conduct. *Retractable Techs.*, 842 F.3d at 892 (quoting *Taylor*, 216 F.3d at 475). Conduct is deemed anticompetitive only if it has "no rational business purpose other than its adverse effects on competitors." *Id.*; *see also Morris*, 364 F.3d at 1295.

### 1. Storable Has Not Excluded or Refused to Deal with SafeLease

Despite SafeLease's gripes, Storable has not engaged in any anticompetitive or predatory conduct. Contrary to SafeLease's claims, Storable has not actually or *de facto* excluded SafeLease from the market or refused to deal with SafeLease, much less harmed competition through its

challenged conduct.  To the contrary, Storable asked SafeLease to access its FMS platforms using an industry-standard API on commercially reasonable terms that others have accepted.  Moreover, SafeLease continues to compete for tenant insurance business today even with restricted access to Storable's FMS platforms.

SafeLease does not <u>need</u> access to Storable's FMS platforms to offer a competitive tenant insurance product.  SafeLease has not claimed that Storable's FMS platforms are a so-called "essential facility."  *See, e.g.*, Ex. G (no reference to "essential facilities"); *see generally MCI Comm'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1132-33 (7th Cir. 1983) (outlining elements of the essential facilities doctrine).  Nor could it.  Even if Storable's FMS platforms were somehow essential (they are not), *see Morris Comm'ns Corp. v PGA Tour*, 235 F. Supp. 2d 1269, 1285 (M.D. Fla. 2002) (access to information on a proprietary platform is not considered "essential"), Storable has not refused to provide SafeLease with access to its platforms: it has made them accessible on the same terms offered to all third-party insurance providers not connected to Storable's FMS platforms before 2021.  *See* ██████████████████ *MCI*, 708 F.2d at 1132-33 (firms controlling an essential facility only have to make it available "on non-discriminatory terms").  Further, SafeLease and its customers have found ways to work around Storable's restrictions on SafeLease's access to its platforms.  *See* Ex. J at 221:25-222:19 ("just more work for us"), 261:5-20 (Rudkin), 319:14-320:5 (Kinet); Ex. L at 128:20-129:6 (Stein), 149:10-24, 161:23-162:6 (Gordon); *Alaska Airlines v. United Airlines*, 948 F.2d 536, 544 (9th Cir. 1991) ("plaintiff must show more than inconvenience, or even some economic loss; he must show that an alternative to the facility is not feasible").

While Storable has not refused to deal with SafeLease, it has a right to do so: Storable has no duty to deal with SafeLease.  A company has no duty to deal with its competitors except under

the limited carveout described in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  To fall within that carveout, SafeLease would need to show that Storable terminated a voluntary, profitable, multiyear course of dealing between Storable and SafeLease.  *Trinko*, 540 U.S. at 408-09; *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013).  SafeLease would further need to show that Storable was unwilling to enter into any agreement with SafeLease whatsoever, even one with a high fee.  *Trinko*, 540 U.S. at 408-09.

SafeLease's claim plainly falls outside the *Aspen Skiing* carveout.  Here, there was no voluntary, longstanding, profitable course of dealing between the parties.  Storable has never had an API agreement or other type of access agreement with SafeLease.  Nothing about SafeLease's unauthorized use of Storable's platforms was profitable for Storable███████████████████████████████████████████████████████████████████████████████████████  Storable's purported knowledge that SafeLease was using "authorized user" accounts to access its platforms does not make that access authorized or transform it into an actionable course of dealing <u>between</u> the parties.  The only conduct terminated was SafeLease's unilateral, unauthorized access to Storable's platforms.  Further, unlike in *Aspen Skiing,* Storable has not refused to deal with SafeLease all together; it has requested that SafeLease enter an API agreement on its current, standard terms.

Despite SafeLease's bluster, the undisputed facts show that Storable has not attempted to exclude SafeLease from the tenant insurance space.  Storable has repeatedly offered to enter an API agreement with SafeLease, including one that ███████████████.  *See* Sec. II.E *supra*. Storable has never told its customers that they can't use SafeLease or tried to get them to leave SafeLease.  Ex. L at 164:3-21 (Gordon); Ex. V at 3 ("If you wish to continue using SafeLease, you

are more than welcome to do so"). Storable even created articles to explain how customers can automate sending reports to SafeLease. Ex. L at 165:19-166:20 (Gordon); Exs. UU-WW.

Storable's requirement that SafeLease access its FMS through an API and pay its standard fee is not *de facto* exclusion and SafeLease's claim that it would put it out of business does not hold water. First, this fee structure has been accepted by multiple other tenant insurance providers, none of whom it put out of business. Second, SafeLease has never explained how Storable's offers to ███████████████████████████████████████ are anticompetitive or would not fully address its concerns. The fact that SafeLease has an unsustainable business model predicating on free riding on Storable's platform *ad aeternum* does not transform Storable's standard, market-accepted fee into an antitrust violation.

Further, other FMS platforms' actions show that Storable's move to block SafeLease's "authorized user" access for violating its terms of service was a valid business decision, not exclusionary. At least one other FMS provider (WSS) has blocked SafeLease from using "authorizer user" accounts to access its platform because it breached its terms of service too. Ex. XX; Ex. K at 75:9-78:10 (Kinet).

Moreover, even without an API agreement with Storable, SafeLease is not excluded from serving customers that use a Storable FMS. Indeed, Storable today serves insurance customers that use other FMS providers even though it does not have an API agreement with those providers. Ex. L at 145:25-146:10 (Gordon). SafeLease could do the same. SafeLease also can serve customers by having them pull reports manually, just as it would do for a tenant insurance customer that does not use an FMS platform at all. *Id.* at 149:10-24, 164:3-21 (Gordon). While serving its customers this way might be more difficult or expensive for SafeLease, requiring access through a mode that makes interconnection more difficult or expensive is not predatory or anticompetitive.

20

*See ILC Peripherals Leasing Corp. v. Int'l Bus. Machines Corp.*, 458 F. Supp. 423, 440-41, 443-44 (N.D. Cal. 1978), *aff'd sub nom. Memorex Corp. v. Int'l Bus. Machines*, 636 F.2d 1188 (9th Cir. 1980) (switching to a different interconnection strategy "at least as justifiable as the alternative" does not violate monopolization law even if it forces a competitor to "change some of its product designs"); *Logic Process Corp. v. Bell & Howell Publications Sys. Co.*, 162 F. Supp. 2d 533, 540 (N.D. Tex. 2001) (defendant has right to adjust manner of delivering services even if it does not "improve[] the quality or efficiency of [plaintiff's] products or services to mutual customers"). The fact that SafeLease may bear additional costs to access its customers' data in a particular way is not antitrust harm.

Finally, even assuming *arguendo* that Storable has excluded SafeLease from serving Storable FMS customers, SafeLease has not been excluded from a broad portion of the market: it still has access to and serves many customers that do not use Storable's FMS. SafeLease has API agreements with at least three other FMS providers. ███████████████████████████ Ex. L at 48:17-22 (Stein). Indeed, SafeLease has been actively encouraging customers to switch to Cubby's FMS. Ex. K at 82:4-18 (Kinet); Ex. L at 116:10-12 (Stein). SafeLease's ability to compete for customers using these FMS providers' platforms undermines any argument that its alleged exclusion from Storable's FMS platforms harmed competition market-wide.

### 2. Storable's Conduct Has Legitimate Business Justifications

Storable has legitimate business justifications for its requirement that SafeLease access its FMS platforms under an API agreement using its standard terms and its decision to cut off SafeLease's unauthorized access to its platforms.

As a matter of law, Storable's conduct cannot be considered anticompetitive if it has a legitimate business justification. *Morris*, 364 F.3d at 1295; *see also Aspen Skiing,* 472 U.S. at 605 (refusal to deal with a competitor does not violate monopolization law "if valid business reasons

exists for that refusal"). Once Storable offers a valid business justification, the burden shifts to SafeLease to show that the proffered justification is pretextual. *Morris*, 364 F.3d at 1295. To rebut Storable's proferred justification, SafeLease must show that Storable's conduct "makes sense only because it eliminates competition." *Id.* (citing cases); *Novell*, 731 F.3d at 1075 (plaintiff must show that defendant's conduct was "irrational but for its anticompetitive effect"). If Storable's alleged refusal to deal with SafeLease is "designed to protect or further [Storable's] legitimate business purposes," it "does not violate the antitrust laws, even if that refusal injures competition." *Morris*, 364 F.3d at 1295.

It is undisputed that Storable has (and has had) a legitimate business interest in protecting the security and control over its FMS platforms. Storable has a legitimate interest in controlling who can access its platforms and on what terms in order to safeguard its proprietary software and its customers' sensitive information. Storable requires that third parties access its FMS platforms using an API to mitigate security and stability risks, including surges and outages. *See* Sec. II.C *supra*.

Storable also has a legitimate business interest in preventing free riding on its FMS platforms. *See Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 55 (1977); *Morris*, 364 F.3d at 1295-1296 (describing prevention of free riding by competitors as a legitimate business purpose and a defense to an antitrust claim). Storable invests millions of dollars annually to develop, improve, and maintain its FMS platforms to better serve its customers. *See* ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Ex. L at 142:9-19 (Gordon). Storable has also invested heavily to set up, enroll, and manage its customers' accounts and help them make more money from tenant insurance. *See* Ex. H at 93:5-94:4 (Gordon); Ex. L at 153:13-154:10. Storable is allowed to require that competitors access its FMS platforms on terms that help recoup and prevent free riding on those investments.

22

*See Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1559 (11th Cir. 1983) (upholding restrictive covenants because defendant had a "legitimate interest in protecting [its investment] from opportunistic appropriation").

Because Storable's challenged conduct has legitimate, non-pretextual business justifications, it cannot be considered anticompetitive as a matter of law. No further discovery can show otherwise. Storable's legitimate business justifications provide a complete defense to SafeLease's antitrust claim.

## D. STORABLE DOES NOT HAVE A SPECIFIC INTENT TO MONOPOLIZE THE TENANT INSURANCE MARKET

Finally, SafeLease cannot establish as a matter of law that Storable had "a specific intent to destroy competition or build monopoly" in the alleged tenant insurance market. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 626 (1953); *see also Coca-Cola*, 218 S.W.3d at 690. Even if Storable had the "mere intention" to exclude SafeLease (which it did not), that would not establish specific intent. *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986). Merely finding that Storable engaged in "unfair" or "predatory" tactics is also insufficient to show specific intent. *Spectrum Sports*, 506 U.S. at 457-59. To infer intent from allegedly predatory conduct, that conduct must have "no legitimate business justification other than to destroy or damage competition." *Great Escape*, 791 at 541.

The only allegation SafeLease musters related to this prong is its conclusory claim that Storable is trying to "drive out as many competitors in the tenant insurance market as it can." Ex. A ¶ 100. But no evidence supports this claim. Indeed, SafeLease's only other allegations related to "driving out" competition relate solely to SafeLease. *See id.* ¶¶ 61, 63, 96. Based on the undisputed facts, the only intent SafeLease can show is that Storable had the intent to get SafeLease to sign an API agreement on its standard terms. *See* Ex. H at 117:9-16 (Gordon).

23

There is no evidence and no further discovery could show that Storable had an intent to destroy competition in the tenant insurance space, much less monopolize it. Even assuming *arguendo* that Storable attempted to exclude SafeLease, there is zero evidence that Storable "drove out" or even attempted to "drive out" any other tenant insurance competitors. To the contrary, Storable has API agreements with more than a dozen tenant insurance providers that enable them to compete for tenant insurance business on its marketplace. *See* Sec. II.C *supra*. And Storable was willing to enter an API agreement with SafeLease too. If Storable had an intent to monopolize the tenant insurance space, it would not have entered API agreements <u>with every other tenant insurance company that requested one</u>.

Finally, as explained in Section V.C.2, Storable's conduct has legitimate business justifications other than to destroy or damage competition. *Great Escape*, 791 F.2d at 541. Storable has the right to determine the terms under which third parties access its proprietary FMS platforms and take security measures to prevent them for accessing its platforms by unauthorized means. Requiring that third-party providers use an API to access its FMS platforms helps Storable ensure the security and stability of its platforms. And the API fee reflects the value of connecting to SafeLease's platforms. *See* Sec. II.C-D *supra*. The legitimate business justifications for Storable's API requirements and security measures undermine the specific intent prong of SafeLease's claim and preclude this claim as a matter of law.

## VI. CONCLUSION

For the foregoing reasons, Storable respectfully requests that the Court grant this Motion and any other relief to which Storable may be entitled.


Respectfully submitted June 2, 2025.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

24

State Bar No. 00796632
Andrew D. Bergman
State Bar No. 24101507
**ARNOLD & PORTER KAYE SCHOLER LLP**
700 Louisiana Street, Suite 4000
Houston, Texas 77002–2755
Tel.: (713) 576–2400
Fax: (713) 576–2499
katherine.treistman@arnoldporter.com
andrew.bergman@arnoldporter.com

John Holler (*admitted pro hac vice*)
New York Bar No. 5922463
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, New York 10019
Tel.: (212) 836–8000
Fax: (212) 836–8689
john.holler@arnoldporter.com

Mikaila Skaroff (*admitted pro hac vice*)
Colorado Bar No. 60688
**ARNOLD & PORTER KAYE SCHOLER LLP**
1144 Fifteenth St, Suite 3100
Denver, Colorado 80202
Tel.: (303) 863–1000
Fax: (303) 863–2301
mikaila.skaroff@arnoldporter.com

Ray T. Torgerson
State Bar No. 24003067
Neil Kenton Alexander
State Bar No. 00996600
Jonna N. Summers
State Bar No. 24060649
Elizabeth "Liza" Eoff
State Bar No. 24095062
Lakshmi N. Kumar
State Bar No. 24144581
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Tel.: (713) 226–6000
Fax: (713) 226–6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
ljumar@porterhedges.com

Dale Wainwright
State Bar No. 00000049
Justin Bernstein
State Bar No. 24105462

**GREENBERG TRAURIG LLP**
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel.: (512) 320–7240
Fax: (512) 320–7240
dale.wainwright@gtlaw.com
bernsteinju@gtlaw.com

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing motion complies with the word limitation set forth under Local Rule 5(a), because it contains 7,499 words not including the items excluded from the word limitation under the local rule.

*/s/ Katherine G. Treistman*

Katherine G. Treistman

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record on June 2, 2025.

*/s/ Katherine G. Treistman*

Katherine G. Treistman

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cathy Hodges on behalf of Katherine Ginzburg Treistman
Bar No. 796632
catherine.hodges@aporter.com
Envelope ID: 101537432
Filing Code Description: Motions - All Other
Filing Description: Defendants' Motion for Partial Summary Judgment on SafeLease???s Attempted Monopolization Claim
Status as of 6/3/2025 9:32 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 6/3/2025 9:22:17 AM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 6/3/2025 9:22:17 AM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 6/3/2025 9:22:17 AM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 6/3/2025 9:22:17 AM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 6/3/2025 9:22:17 AM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 6/3/2025 9:22:17 AM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 6/3/2025 9:22:17 AM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 6/3/2025 9:22:17 AM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 6/3/2025 9:22:17 AM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 6/3/2025 9:22:17 AM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 6/3/2025 9:22:17 AM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 6/3/2025 9:22:17 AM | SENT |
| Judd Stone | | Judd@stonehilton.com | 6/3/2025 9:22:17 AM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 6/3/2025 9:22:17 AM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 6/3/2025 9:22:17 AM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 6/3/2025 9:22:17 AM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 6/3/2025 9:22:17 AM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 6/3/2025 9:22:17 AM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 6/3/2025 9:22:17 AM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 6/3/2025 9:22:17 AM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 6/3/2025 9:22:17 AM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/3/2025 9:22:17 AM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cathy Hodges on behalf of Katherine Ginzburg Treistman
Bar No. 796632
catherine.hodges@aporter.com
Envelope ID: 101537432
Filing Code Description: Motions - All Other
Filing Description: Defendants' Motion for Partial Summary Judgment on SafeLease???s Attempted Monopolization Claim
Status as of 6/3/2025 9:32 AM CST

Case Contacts

| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/3/2025 9:22:17 AM | SENT |
|---|---|---|---|---|
| Cathy Hodges | | catherine.hodges@aporter.com | 6/3/2025 9:22:17 AM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 6/3/2025 9:22:17 AM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 6/3/2025 9:22:17 AM | SENT |
| Adam Locke | | adam@lockelaw.com | 6/3/2025 9:22:17 AM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 6/3/2025 9:22:17 AM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 6/3/2025 9:22:17 AM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 6/3/2025 9:22:17 AM | SENT |
| Julia C.Risley | | jrisley@yettercoleman.com | 6/3/2025 9:22:17 AM | SENT |

E-filed in the Office of the Clerk
for the Business Court of Texas
6/3/2025 9:22 AM
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

**The Business Court of Texas,**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § | |
| *Plaintiff,* | § § | |
| *v.* | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § § | |
| *Defendants.* | § | |

**DECLARATION OF KATHERINE GINZBURG TREISTMAN IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON SAFELEASE'S ATTEMPTED MONOPOLIZATION CLAIM**

I, Katherine Ginzburg Treistman, declare as follows:

1. I am counsel of record for Defendants Storable, Inc.; Rednova Labs, Inc. (d/b/a StorEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP ("Storable" or "Defendants") in the above-captioned action.

2. I am a partner at the law firm Arnold & Porter Kaye Scholer LLP. My business address is 700 Louisiana Street, Suite 4000, Houston, Texas 77002. I am an active member of the State Bar of Texas. My State Bar number is 00796632.

3. I submit this declaration in support of Defendants' Motion for Partial Summary Judgment on SafeLease's Attempted Monopolization Claim.

4. Attached as **Exhibit A** is a true and correct copy of Plaintiff SafeLease Insurance Services LLC's ("Plaintiff") Verified Second Amended Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction, filed in the District Court of Travis County on January 28, 2025.

5. Attached as **Exhibit B** is a true and correct copy of the Court's March 11, 2025 Memorandum Opinion and Order on Defendants' Motion to Reconsider.

6. Attached as **Exhibit C** is a true and correct copy of this Court's Order Granting Temporary Injunction, signed on February 19, 2025.

7. Attached as **Exhibit D** is a true and correct copy of this Court's Amended Order Granting Temporary Injunction, signed on March 11, 2025.

1

8. Attached as **Exhibit E** is a true and correct copy of Defendants' Motion to Exclude or Disregard Opinions of Dr. Williams on the Ground that They Are Unreliable and Constitute No Evidence, filed in this Court on February 18, 2025.

9. Attached as **Exhibit F** is a true and correct copy of Defendants' Objections to Temporary Injunction Order, Motion to Rule On Exclusion of Opinions of Dr. Williams, and Motion to Reconsider Based on Objections and Exclusion, filed in this Court on February 21, 2025.

10. Attached as **Exhibit G** is a true and correct copy of Plaintiff's Hearing Brief on Texas Antitrust Law, filed in this Court on February 10, 2025.

11. Attached as **Exhibit H** is a true and correct excerpted copy of the transcript of the January 16, 2025 proceedings before the District Court of Travis County.*[1]

12. Attached as **Exhibit I** is a true and correct excerpted copy of the transcript of the January 30, 2025 proceedings before the District Court of Travis County in the above-captioned action.

13. Attached as **Exhibit J** is a true and correct excerpted copy of the transcript of the February 11, 2025 proceedings before this Court in the above-captioned action.*

14. Attached as **Exhibit K** is a true and correct excerpted copy of the transcript of the February 13, 2025 proceedings before this Court in the above-captioned action.* Defendants have added page numbers to the transcript excerpt for the Court's convenience.

15. Attached as **Exhibit L** is a true and correct excerpted copy of the transcript of the February 14, 2025 proceedings before this Court in the above-captioned action.*

16. Attached as **Exhibit M** is a true and correct copy of Defendants' Exhibit 1 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000001.

17. Attached as **Exhibit N** is a true and correct copy of Defendants' Exhibit 2 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000010.

18. Attached as **Exhibit O** is a true and correct copy of Defendants' Exhibit 3 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000028.

19. Attached as **Exhibit P** is a true and correct copy of Defendants' Exhibit 366 from the Temporary Injunction Hearing before this Court, which was introduced as an exhibit by Defendants in the above-captioned action without a Bates stamp.

---

[1] An asterisk (*) indicates that an exhibit or transcript excerpt was previously permanently sealed by the Court, either in full or in part.

20. Attached as **Exhibit Q** is a true and correct copy of Defendants' Exhibit 199 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE001027.*

21. Attached as **Exhibit R** is a true and correct copy of Defendants' Exhibit 357 from the Temporary Injunction Hearing before this Court, which is a demonstrative used by Defendants in the above-captioned action without a Bates stamp.

22. Attached as **Exhibit S** is a true and correct copy of Defendants' Exhibit 175 from the Temporary Injunction Hearing before this Court, which was produced by Plaintiff in the above-captioned action as SAFELEASE0000906.*

23. Attached as **Exhibit T** is a true and correct copy of Plaintiff's Exhibit 123 from the Temporary Injunction Hearing before this Court, which was produced by Plaintiff in the above-captioned action as SAFELEASE0030406.

24. Attached as **Exhibit U** is a true and correct copy of Defendants' Exhibit 352 from the Temporary Injunction Hearing before this Court, which is a public webpage without a Bates stamp.

25. Attached as **Exhibit V** is a true and correct copy of Defendants' Exhibit 207 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE001061.

26. Attached as **Exhibit W** is a true and correct copy of Defendants' Exhibit 35 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000526.*

27. Attached as **Exhibit X** is a true and correct copy of Defendants' Exhibit 36 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000423.*

28. Attached as **Exhibit Y** is a true and correct copy of Plaintiff's Exhibit 13 from the Temporary Injunction Hearing before this Court, which was produced by Plaintiff in the above-captioned action as SAFELEASE0000053.

29. Attached as **Exhibit Z** is a true and correct copy of Defendants' Exhibit 4 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000079.*

30. Attached as **Exhibit AA** is a true and correct copy of Defendants' Exhibit 6 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000109.*

31. Attached as **Exhibit BB** is a true and correct copy of Defendants' Exhibit 8 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000138.*

32. Attached as **Exhibit CC** is a true and correct copy of Defendants' Exhibit 9 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000167.*

33. Attached as **Exhibit DD** is a true and correct copy of Defendants' Exhibit 12 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000252.*

34. Attached as **Exhibit EE** is a true and correct copy of Defendants' Exhibit 13 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000279.*

35. Attached as **Exhibit FF** is a true and correct copy of Defendants' Exhibit 14 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000307.*

36. Attached as **Exhibit GG** is a true and correct copy of Defendants' Exhibit 15 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000335.*

37. Attached as **Exhibit HH** is a true and correct copy of Defendants' Exhibit 5 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000094.*

38. Attached as **Exhibit II** is a true and correct copy of Defendants' Exhibit 7 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000111.*

39. Attached as **Exhibit JJ** is a true and correct copy of Defendants' Exhibit 19 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000378.*

40. Attached as **Exhibit KK** is a true and correct copy of Defendants' Exhibit 176 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000055.*

41. Attached as **Exhibit LL** is a true and correct copy of Defendants' Exhibit 122 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as SAFELEASE0000137.*

42. Attached as **Exhibit MM** is a true and correct copy of Defendants' Exhibit 55 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000599.*

43. Attached as **Exhibit NN** is a true and correct copy of Defendants' Exhibit 100 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000655.*

4

44. Attached as **Exhibit OO** is a true and correct copy of Defendants' Exhibit 103 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000661.*

45. Attached as **Exhibit PP** is a true and correct copy of Defendants' Exhibit 104 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000662.*

46. Attached as **Exhibit QQ** is a true and correct copy of Defendants' Exhibit 107 from the Temporary Injunction Hearings before this Court, which was produced by Defendants in the above-captioned action as STORABLE000665.*

47. Attached as **Exhibit RR** is a true and correct copy of Plaintiff's Exhibit 40 from the Temporary Injunction Hearing before this Court, which was produced by Plaintiff in the above-captioned action as SAFELEASE0000140.

48. Attached as **Exhibit SS** is a true and correct copy of Plaintiff's Verified Original Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction, filed in the District Court of Travis County on December 30, 2024.

49. Attached as **Exhibit TT** is a true and correct copy of an email sent by the District Court of Travis County on January 21, 2025 denying Plaintiff's request for a temporary injunction.

50. Attached as **Exhibit UU** is a true and correct copy of Defendants' Exhibit 228 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE001115.

51. Attached as **Exhibit VV** is a true and correct copy of Defendants' Exhibit 229 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE001120.

52. Attached as **Exhibit WW** is a true and correct copy of Defendants' Exhibit 230 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE001128.

53. Attached as **Exhibit XX** is a true and correct copy of Defendants' Exhibit 349 from the Temporary Injunction Hearing before this Court, which was produced by Plaintiff in the above-captioned action as SAFELEASE0030332.

54. Attached as **Exhibit YY** is a true and correct copy of Defendants' Exhibit 23 from the Temporary Injunction Hearing before this Court, which was produced by Plaintiff in the above-captioned action as SAFELEASE0000639.*

55. Attached as **Exhibit ZZ** is a true and correct copy of Defendants' Exhibit 24 from the Temporary Injunction Hearing before this Court, which was produced by Plaintiff in the above-captioned action as SAFELEASE0000655.*

56. Attached as **Exhibit AAA** is a true and correct copy of Plaintiff's Exhibit 24 from the Temporary Injunction Hearing before this Court, which was produced by Plaintiff in the above-captioned action as SAFELEASE000678.*

57. Attached as **Exhibit BBB** is a true and correct copy of Defendants' Exhibit 39 from the Temporary Injunction Hearing before this Court, which was produced by Defendants in the above-captioned action as STORABLE000433.*

58. Attached as **Exhibit CCC** is a true and correct copy of Plaintiff's Response to Defendants' First Requests for Admission, which was served by Plaintiff in the above-captioned action on May 19, 2025.

59. Attached as **Exhibit DDD** is a true and correct copy of Defendants' Motion to Remand, filed in this Court on January 31, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, State of Texas, on the 2nd day of June, 2025.

Katherine Ginzburg Treistman

# Exhibit A

No. D-1-GN-24-010233

| SAFELEASE INSURANCE SERVICES LLC, | § | IN THE DISTRICT COURT OF |
|---|---|---|
| | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| STORABLE, INC., et al., | § | |
| | § | |
| Defendants. | § | 345TH JUDICIAL DISTRICT |

**PLAINTIFF'S VERIFIED SECOND AMENDED PETITION AND APPLICATION FOR A TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION**

Plaintiff SafeLease Insurance Services LLC ("SafeLease") files this Second Amended Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction against defendants Storable, Inc.; RedNova Labs, Inc.; SiteLink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP.

**NATURE OF THE CASE**

1.      This action is necessary to prevent a monopoly software provider from using its market power to cripple a low-price competitor in this State in a related market for insurance.

2.      Founded and based in this County since 2021, plaintiff SafeLease is a startup that offers low-cost insurance plans through self-storage facilities to protect people who store goods at those facilities. SafeLease's plans cover tenants at facilities in Texas and elsewhere throughout the United States. Most self-storage companies rely on third-party vendors like SafeLease for these products. With better prices and service, SafeLease has seen steady growth and an enthusiastic response from customers.

3.      To administer its policies, SafeLease is required to access the facility management software systems of self-storage facility operator partners. Operators rely on facility management software to run virtually all aspects of their day-to-day operations. Operators give their advance

permission to SafeLease to secure access to their software systems and agree to provide, through these software systems, the information SafeLease needs to administer policies.

4.  Defendants are affiliated companies that also offer products and services to the self-storage industry, including facility management software. In fact, with products marketed as storEDGE, SiteLink, and Easy Storage Solutions, defendants have a dominant role in the market for facility management software. Their market share in the relevant market likely exceeds 75%. Given the central role of these systems to operations of self-storage facilities, defendants' power over mission-critical software provides them with considerable control and influence across the self-storage industry.

5.  Relatedly, defendants offer insurance plans that compete directly with products and services of SafeLease. Defendants aggressively have grown their share of the tenant insurance market through acquisitions of industry leaders. Despite defendants' efforts to consolidate the tenant insurance market, SafeLease has made considerable inroads, winning customers from defendants with its competitive products. Witnessing SafeLease's potential and rapid rise, Storable has made overtures to buy SafeLease for years and as recently as late 2024.

6.  On December 17, 2024, defendants abruptly went on the attack. They blocked SafeLease's "authorized user" access to defendants' storEDGE system, a widely used facility management software, for which customers specifically designate SafeLease as an authorized user. In so doing, defendants cut off SafeLease's ability to access critical data to properly service its tenant insurance plans and administer policies for customers covering thousands of storage units. This action was both sudden and unprompted, as SafeLease has been an authorized user to access customer accounts for years with defendants' full knowledge.

7.      Notably, these impacted customers are *joint* customers, as they use defendants' storEDGE system as well as SafeLease's insurance products. In January 2025, over 44,000 self-storage units were scheduled to commence or renew coverage under SafeLease insurance plans. Countless more units would incur claims on existing plans that need to be serviced. SafeLease would be unable to properly service the several thousands of these new or renewed customers and claims on storEDGE systems without access to its customers' storEDGE systems.

8.      Making matters worse, defendants began taking steps to cut off SafeLease's access to other facility management software products, SiteLink and Easy Storage Solutions. This would impact hundreds of thousands of additional tenants. These actions are unwarranted, threaten the viability of SafeLease's business, interfere with current and future contracts with customers, and put innocent self-storage operators and tenants at imminent risk of substantial and needless harm.

9.      In short, defendants were using dominance in one market (facility management software) to get power over another market (tenant insurance). Their actions were calculated to cripple SafeLease and force customers to switch to defendants' higher-cost, competing insurance products. This was blatant monopoly leveraging, not legitimate competition.

10.      To protect its customers and business, SafeLease filed suit on December 30, 2024, requesting a temporary restraining order, as well as temporary and permanent injunctions, to prevent irreparable harm from defendants' conduct. The Court granted SafeLease's request for a temporary restraining order on December 31. Defendants restored SafeLease's access to their facility management software less than an hour after the TRO became effective. The Court then denied defendants' request to dissolve the TRO and extended the TRO through January 21, 2025.

11.     For the three weeks the TRO was effective, SafeLease again was able to service the parties' mutual customers without interruption. However, on January 21, 2025, the day the TRO expired, the Court denied SafeLease's request for a temporary injunction.

12.     Defendants wasted no time in resuming and amplifying their attack. In just hours, they cut off SafeLease's access not only to storEDGE but also SiteLink and Easy Storage Solutions. The scope of the blocking is massive and exceeds even what SafeLease feared prior to entry of the TRO. Defendants have singled out and targeted SafeLease. Its access has been completely severed, and its customers have no way to grant SafeLease access to the customers' own critical data in the software. As a result, SafeLease is unable to fully and timely service its customers that use defendants' facility management software products. This affects over 275,000 tenants at facilities with SafeLease insurance coverage.

13.      These new attacks are proof positive of defendants' anticompetitive scheme to cut off a competitor and to avoid competition on the merits for tenant insurance, ensure higher insurance prices, and eliminate or buy out the only discount insurance competitor in the industry. Unless restrained, defendants will cause substantial, irreparable harm to self-storage operators and tenants in this State and to SafeLease, which has no choice but to seek injunctive relief from the Court.

<div align="center">**DISCOVERY CONTROL PLAN**</div>

14.     SafeLease intends that this case be conducted under a Level 3 Discovery Control Plain in accordance with TEX. R. CIV. P. 190.4.

<div align="center">**PARTIES**</div>

15.     Plaintiff SafeLease Insurance Services LLC is a Texas limited liability company with its principal place of business in this County at 800 Brazos Street, Suite 320, Austin, Texas

78701. It provides insurance plans to protect tenants and operators of independent self-storage facilities.

16.     Defendant Storable, Inc. is a Delaware corporation with its principal place of business in this County at 11000 N. Mopac Expressway, #300, Austin, Texas 78759. It has appeared and answered. It is a supplier of products and services to the self-storage industry and the corporate parent, directly or indirectly, of the other defendants.

17.     Defendant RedNova Labs, Inc. is a Texas foreign for-profit corporation with its principal place of business in this County at 10900 Research Blvd., Suite 160C, Austin, Texas 78759. It has appeared and answered. It is a subsidiary of Storable, Inc.

18.     Defendant SiteLink Software, LLC is a North Carolina limited liability company with its principal place of business in this County at 10900 Research Blvd., Suite 160C, Austin, Texas 78759. It has appeared and answered. It is a subsidiary of Storable, Inc.

19.     Defendant Easy Storage Solutions, LLC is a Utah limited liability company with its principal place of business in this County at 10900 Research Blvd., Suite 160C, Austin, Texas 78759. It has appeared and answered. It is a subsidiary of Storable, Inc.

20.     Defendant Bader Co. is an Indiana corporation with a principal place of business in Indiana. It has appeared and answered. It is a subsidiary of Storable, Inc.

21.     Defendant Property First Group, LP is a Pennsylvania limited partnership with its principal place of business in Pennsylvania. It has appeared and answered. It is a subsidiary of Storable, Inc.

22.     Defendants RedNova, SiteLink, Easy Storage Solutions, Bader, and Property First are commonly and centrally owned and controlled by Storable, Inc., their parent company. Their

activities are coordinated together by or with Storable, Inc. As such, defendants are a single business enterprise controlled by Storable, Inc., from Austin, Texas.

<div align="center">JURISDICTION AND VENUE</div>

23.     Jurisdiction and venue are proper in this Court pursuant to the Texas Constitution, Art. 5, Sec. 8 and TEX. BUS. & COM. CODE § 15.21 and § 15.26. Defendants do substantial business in this County and State.

24.     This case could not be filed in and is not removable to federal court. There is no diversity of citizenship between the parties, and no federal claim is raised in this petition. *See Am. Airlines, Inc. vs. Sabre Inc.*, 694 F.3d 539, 543 (5th Cir. 2013).

<div align="center">RELEVANT BACKGROUND</div>

**A.     Self-Storage Industry**

25.     There are an estimated 52,301 self-storage facilities in the U.S. *See* SpareFoot, *U.S. Self-Storage Indus. Stats.* (Oct. 10, 2024), https://www.sparefoot.com/blog/self-storage-industry-statistics/. The industry is largely made up of operators that own/run facilities that lease storage space to businesses and individuals on a temporary basis, usually month-to-month. The industry is valued at $44.3 billion, and it is anticipated to reach nearly $50 billion by 2029. *Id*. According to the Self Storage Association, 11.1% of U.S. households currently rent a self-storage unit—some 14.6 million households. *See The Self-Storage Almanac 2024*, Sec. 1, https://digital.modernstorage media.com/almanac/self-storage-almanac-2024db/.

26.     Self-storage is big business in Texas. This State has the most self-storage facilities of any state in the country. In 2023, there were 5,564 total storage facilities in Texas, representing more than 10% of all facilities in the nation. *Id.* (Table 1.4). The amount of rentable self-storage

space in Texas is 256 million square feet. This is one of the highest square feet of rentable space per capita, at 8.70, compared to a national average of 6.32. *Id.* (Table 1.3).

27.     Some self-storage space in the U.S. is owned by large public companies. Four of these companies are real estate investment trusts: Extra Space, Public Storage, CubeSmart, and National Storage Affiliates Trust. The fifth is U-Haul, also a public company. Together, these companies operate 22.5% of self-storage facilities, representing 37.6% of self-storage space by rentable square footage. *Id.* at Sec. 2. Most or all of these companies have their own insurance programs and proprietary management software.

28.     Most self-storage facilities and square footage are owned and operated by small- and medium-sized businesses or individuals. These independent owners represent 77.5% of self-storage facilities and 62.4% of all rentable square feet. *Id*. Many of these businesses are mom-and-pop shops. *Id.* (Chart 2.1). Independent facility owners rely on third-party vendors for their facility management software and tenant insurance plans.

### i. Facility Management Software

29.     Independent self-storage facilities rely on third-party software to run the day-to-day operations of their businesses. Facility owners subscribe to facility management software, sometimes referred to as FMS, which allows them to track and manage their storage units. This software facilitates core services, such as tracking tenant data, allowing for billings, managing communications, generating financial reports, and servicing tenant insurance policies.

30.     Facility management software is an essential tool for owners and their vendors. It is common in the industry for owners to permit vendors to access their facility management software to provide the vendor's services. These services range from onsite management to remote financial services. For example, owners routinely authorize facility management software access

for an on-site manager (who may run front-of-house) and for access control systems (which operate gate codes). It is also essential for vendors that offer remote or administrative services. For example, an owner may authorize a third-party call center to access its facility management software to follow sales leads or address customer inquiries. Similarly, owners may authorize a bill collection agency to access their facility management software to collect payment data and follow up on delinquent payments. This software is designed to facilitate many services in one place for owner management.

31. Defendants are the largest supplier of facility management software systems to independent self-storage facilities. They offer three such systems: storEDGE, SiteLink, and Easy Storage Solutions. Defendants rolled up the companies that offered these systems under common ownership from 2018-20. *See* SpareFoot, *Tech Firms Combine Under Storable Brand Name To Serve Self-Storage Indus.* (Apr. 29, 2024), https://www.sparefoot.com/blog/tech-firms-combine-storable-brand-name-serve-self-storage-industry/; Inside Self Storage, *Storable Acquires Self-Storage Software Provider Easy Storage Solutions* (June 5, 2020), https://www.insideselfstorage.com/software/storable-acquires-self-storage-software-provider-easy-storage-solutions.

32. According to industry statistics, defendants control some 75% of the U.S. market for facility management software systems for independent self-storage facilities.

33. According to defendants, "more than half of every single storage facility in the United States" uses their facility management software. *2023 State of the Self-Storage Indus.*, https://www.storable.com/resources/learn/unpacked-webinar-2023-state-of-the-self-storage-industry/. The numbers are even starker considering that the only storage facilities that use third-party facility management software are independent facilities. Some 40,500 facilities in the U.S. are independent self-storage facilities. *See The Self-Storage Almanac 2024*, Sec. 2 (independent

owners represent 77.5% of self-storage facilities). And nearly 32,000 self-storage facilities used defendants' facility management software systems as of 2023. *See 2023 State of the Self-Storage Indus., supra*. Today, defendants advertise that 36,000 self-storage facilities "are currently managed with Storable software." Storable, *About Us*, https://www.storable.com/about-us/.

34.     SafeLease does not offer facility management software. Rather, its independent self-storage customers rely on their facility management software to facilitate the administration of SafeLease's tenant insurance plans. Each of these customers expressly authorizes SafeLease to be one of its third-party vendors, to access its facility management software with administrative user credentials, and to use its systems to offer tenant insurance plans. Customers also agree to provide the information SafeLease needs to administer policies through access to their facility management software.

### B.     Tenant Insurance Plans

35.     SafeLease basically offers two types of related insurance products for its independent self-storage customers: tenant insurance and tenant protection.

36.     Tenant insurance is produced directly to the tenant by the facility. In most states, the facility operates under a limited lines license, where SafeLease is the designated responsible licensed producer—that is, the overseer for the program. The tenant is directly insured for stored goods, rather than having recourse to the owner-operator of the storage facility.

37.     Tenant protection involves the placement of a contractual liability insurance policy with the storage facility owner-operator. The policy covers risk to tenant stored goods on the rental agreement. Under SafeLease's program, rental agreements are amended so that the standard exculpatory clause (where owners/operators disclaim liability for tenant stored goods) is pared back, and the facility owner-operator instead has limited liability for certain types of loss.

38. These products are marketed largely as substitutes. Some facility owner-operators prefer conventional tenant insurance, while others choose tenant protection. The coverage levels and cost for the product borne by the tenant and the revenue that can be earned by the facility owner-operator for distribution are comparable.

39. Defendants directly compete with SafeLease on both insurance product lines.

40. In addition to rolling up facility management software system vendors, defendants also acquired various insurance producers and books of business. These include Property First Group LP (StorSmart) and Bader Co. *See* Inside Self-Storage, *Storable Adds Self-Storage Ins. Providers Bader, Storsmart to Stable of Cos.* (Sept. 3, 2019), https://www.insideselfstorage.com/in-surance/storable-adds-self-storage-insurance-providers-bader-storsmart-to-stable-of-companies. Defendants also acquired a large book of insurance business from Sage Insurance in 2021.

41. In short, defendants provide tenant insurance at independent facilities. In addition, they offer an unlicensed, insurance-like "protection plan" program to independent facilities through Easy Storage Solutions facility management software. In total, defendants together control the single largest share of the market for tenant insurance and tenant protection ("tenant insurance") at independent self-storage facilities.

42. The parties compete in the market for tenant insurance at independent self-storage facilities.

C. **SafeLease Access to Customer Accounts**

43. SafeLease opened for business in mid-2021 and has grown steadily. It now covers 2576 facilities, representing about 322,000 units with active SafeLease-acquired coverage.

44. SafeLease currently administers insurance policies/plans through customer facility management software systems. Access to this software is critical to enable SafeLease to effectively administer its customers' insurance protection and to protect facility owners/operators and tenants.

45. To administer these policies, SafeLease must access facility management software that its self-storage customers use. Given defendants' dominance in the facility management software market, the vast majority of customer plans that SafeLease administers must be managed through defendants' software systems. Over 275,000 tenants at nearly 2000 facilities must be administered through defendants' facility management software:

   a. storEdge: 83,992 plans (683 facilities)

   b. SiteLink: 147,233 plans (734 facilities)

   c. Easy Storage Solutions: 44,681 plans (514 facilities)

46. The remaining policies are administered through third-party facility management software offered by companies other than the defendants, such as Self Storage Manager, Cubby, and WebSelfStorage.

47. Since 2021, for defendants' storEDGE and SiteLink systems, SafeLease has accessed its customers' accounts as a designated "Authorized User" on the systems after its customers granted SafeLease such access in accordance with its contracts with those customers. StorEDGE and SiteLink permit a customer to designate "as many" Authorized Users to access its accounts "as you wish," according to the terms of service for their facility management software.

   a. *Sitelink Terms of Use*, https://www.storable.com/privacy/sitelink-terms-of-use/ ("4.2. Authorized Users. You may designate and authorize as many Users as you wish under the Agreement."); and

   b. *storEDGE Terms of Service*, https://www.storable.com/privacy/storedge-terms-of-service/ ("4.2. Authorized Users. You may designate and authorize as many Users as you wish under the Agreement.").

48.     Likewise, SafeLease's access to defendants' Easy Storage Solutions (which is a more basic software than storEDGE or SiteLink) only occurs when access is given by defendants at the request of a customer. Access is "locked" otherwise. Easy Storage Solutions customers then must create an Authorized User account for SafeLease. Defendants knew SafeLease was accessing the facility management software on behalf of customers and provided access for it to do so.

49.     In SafeLease's customer contracts, storage facilities are obligated to give SafeLease access to their facility management software for it to administer the relevant insurance policies. The data within the facility management software—for example, information about a particular facility, its tenants, and its operations—belongs to SafeLease's customers (not to defendants). SafeLease's customers grant SafeLease permission to access this information kept on their facility management software by logging in with a username and password, exactly as the facility owners would log in to access the same information. This is how SafeLease has accessed its customers' facility management software.

50.     The information SafeLease can access is controlled by its facility customers. SafeLease only accesses the information that is necessary to carry out its insurance functions. It does not access sensitive information that is irrelevant to SafeLease providing its contractual insurance services. SafeLease never has access to tenant credit card information. SafeLease uses secure, independently audited, SOC-2 certified processes when accessing and storing customer data.

51.     Storable has known for years that SafeLease is an Authorized User to administer its customer insurance policies. In general, SafeLease can access facility management software to administer coverage policies by a direct connection to the software through an application programming interface (API) or as an Authorized User through the graphical user interface (GUI).

In 2021, just months after SafeLease opened, it reached out to defendants regarding API access for SiteLink. Defendants declined, saying they are "not planning to add additional providers." As a result, SafeLease moved forward as an Authorized User and successfully has operated that way ever since.

52. As an Authorized User, SafeLease efficiently can collect targeted data every day or few days from a customer's facility management software that it needs to administer policies. SafeLease accesses the least data necessary and only the data that its customers allow, even gathering information more efficiently than if a user were manually operating the software. SafeLease's access to facility management software has not intensified in nature or scope across time. In fact, since 2021, SafeLease has further tailored its operations to make its access of facility management software even more narrow and efficient. Until this case was filed, defendants never claimed that SafeLease's practices harmed defendants' facility management software and never demanded that SafeLease stop or change its Authorized User access.

53. SafeLease's ability to access the facility management software as an Authorized User has been beneficial to defendants. For example, SafeLease products are low-cost options that defendants admit are popular with and beneficial to facility operators and their tenants. Operators want to use SafeLease products, so having a facility management software that is compatible with SafeLease products enhances defendants' software, making it more valuable to facility management software customers and increasing its marketability. Conversely, cutting off SafeLease's access to facility management software hurts defendants' own customers, who are left at risk of disruption and uninsured loss.

**D.     Defendants' Actions Towards SafeLease**

54. Since SafeLease's founding, defendants have expressed interest in acquiring its insurance business. Storable's CEO sees SafeLease's business as "interesting" and "compelling."

He believes SafeLease can "help our customers" increase tenant enrollment in insurance coverage, which "benefits" self-storage operators, their tenants, and insurance providers, which can "grow the business." SafeLease repeatedly has declined defendants' overtures.

55. In March 2022, less than a year after SafeLease's founding, defendants inquired about buying SafeLease. The next year, following discussions in May 2023, the parties entered into a term sheet regarding a potential long-term partnership. The parties ultimately could not agree on terms and agreed to pause negotiations in March 2024. In September 2024, defendants again expressed general interest in acquiring SafeLease.

56. Defendants' tactics then changed after acquisition talks broke down in October. On October 15, 2024, SafeLease got a cryptic email from defendants noting upcoming "security measures" on the facility management software, including "stricter policies around user roles, access authorization, and ensuring only authorized personnel can access Storable systems." This raised possible concerns that defendants might limit SafeLease access to the facility management software—access that its shared customers long had authorized and that SafeLease successfully had used without issue for many years.

57. In this message and the surrounding communications, defendants made no specific complaint about any specific SafeLease practice—referring only to nebulous "security" issues but never telling SafeLease that defendants believed it was causing or responsible for any such issues. They could not and did not explain any harm from SafeLease's continued operation as an Authorized User in the same manner as it had done for years.

58. In response, SafeLease asked about an interim agreement with defendants to "avoid disruptions to the services and agreements with [their] shared customers." SafeLease sought a call as soon as possible, including technical resources, so that it could understand the planned "security

changes" and take appropriate measures. In addition, SafeLease proposed as a potential solution an agreement to access defendants' API—access that they had denied years earlier.

59.     Defendants responded with egregious terms to access the system via an API. They proposed a penalty price of $1.00 per unit per month, far greater than the market price for such access. Moreover, they would charge SafeLease an even higher price for units that had been served by defendants if the customer chose to switch to SafeLease for its insurance products. In that case, SafeLease would have to pay $1.50 for API access—50% more—whenever it out-competed defendants for business. The terms were confiscatory, exclusionary, anticompetitive, and another example of defendants flexing their monopoly power.

60.     Indeed, defendants' demanded price was so high that it would drive SafeLease out of business. Defendants knew this since they offer similar insurance plans and are well aware of the economics. For example, the most common protection plans typically cost a tenant $12/month for $2000 of coverage. The facility will keep most of that $12, as it has the relationship with the tenant, and a coverage provider like SafeLease will get $2-3/plan per month, which also must cover the cost of the insurance itself, which is not less than $2/plan per month. So, charging $1 to $1.50 per unit for API access would consume 50% or more of SafeLease's gross profit, which would not leave enough to cover insurance premiums.

61.     In short, API access was no option at all on defendants' monopolistic terms, which were designed as merely another way to drive a low-cost competitor out of the market to the detriment of consumers and the industry.

62.     Defendants then took their next step. On November 4, 2024, SafeLease noticed issues logging into storEDGE. Its engineers found that SafeLease IP addresses had been blocked

from logging into storEDGE. On November 6, 2024, SiteLink similarly blocked SafeLease IP addresses, although SafeLease was able to re-establish its authorized access.

63. On December 4, 2024, there was another wave. Defendants blocked the IP address for the SafeLease office from accessing storEDGE and SiteLink facility management software. This cut off SafeLease's access to customer accounts and was a direct interference with servicing its policies. Again, SafeLease was able to engineer a solution to restore access.

64. At the same time, defendants' buyout overtures continued. On December 9, 2024, they again expressed interest in acquiring SafeLease, warning that additional "security" measures soon would be implemented.

65. On December 17, 2024, defendants took a dramatic step. They blacklisted SafeLease from storEDGE. In addition to blocking the SafeLease office IP address, defendants deactivated storEDGE users with @safelease.com emails even though they were customer-designated as Authorized Users. There was no technical workaround. As a result, SafeLease could not access storEDGE on behalf of customers. It lost the ability to service 84,062 insurance plans for storage facilities that use storEDGE facility management software. This caused, and if left unchecked was set to cause more, serious harms, including gaps in coverage and delays in adjudication of claims for SafeLease and defendants' shared customers.

66. SafeLease filed this petition and request for temporary and permanent injunctive relief on December 30, 2025, to prevent irreparable harm that would commence January 1, 2025. SafeLease was due to issue thousands of contracted-for new and renewed policies to its customers, a process that it could not do without accessing its customers' facility management software.

67. The Court acted swiftly and granted SafeLease's requested temporary restraining order on December 31. Defendants' actions in the hours that followed showed that the status quo

imposed no burden at all on them. Indeed, less than an hour after the TRO became effective, defendants restored SafeLease's access as a customer-designated Authorized User on storEDGE.

68.     Defendants moved to dissolve the TRO on January 2, 2025. In turn, SafeLease moved for expedited discovery and to extend the TRO to allow for this discovery. On January 9, the Court denied the motion to dissolve, extended the TRO to January 21, and granted targeted discovery in advance of a temporary injunction hearing, which was set for January 16.

69.     While the TRO was in effect prior to the temporary injunction hearing, SafeLease got to work. It was able again to service the parties' mutual customers by:

   a.   sending notices to self-storage facilities with tenants transferring into SafeLease insurance coverage;

   b.   confirming coverage for 33,000+ units switching to SafeLease coverage for facilities using defendants' facility management software;

   c.   helping facilities meet insurance requirements by confirming tenants have valid homeowner policies linked to their accounts or are enrolled in SafeLease;

   d.   collecting reports to bill facilities for premiums that must be paid to insurance carriers to maintain necessary coverage; and

   e.   securing facility data to advance adjustor files to pay pending claims.

70.     On January 16, 2025, the parties participated in an evidentiary hearing on the request for a temporary injunction to maintain the status quo through trial.

71.     The Court denied the request for a temporary injunction on January 21, the day the TRO dissolved by its extended terms.

72.     Defendants wasted no time in resuming their anticompetitive attacks. The next day, January 22, defendants reinstated their block on SafeLease access to storEDGE. Then they went further to cut off SafeLease from the other two facility management software products, SiteLink and Easy Storage Solutions.

73.     The impact of defendants' attacks has increased dramatically. SafeLease cannot access its customers' data in the facility management software, despite express user authorization from those same mutual customers. The number of units, tenants, and facilities that defendants are preventing SafeLease from servicing properly and timely under their existing contracts has tripled. There are over 275,000 tenants at nearly 2000 facilities who SafeLease no longer can provide the insurance services that they and the facilities have contracted for.

74.     Defendants have not merely disabled SafeLease's Authorized User accounts. They also have fully disabled SafeLease from having access by any means to any of defendants' facility management software systems. Their excuse for cutting off access is alleged "security" concerns posed by SafeLease's using automated log-in to its customers' software to access its customer data (as customers have authorized and contracted for). Defendants have said that manually logging in would resolve those concerns. But they now will not allow even that means of access, that is, access that is identical to how any facility owner would access its own facility management software.

75.     This newly restricted means of access for SafeLease is no different from how other contractors, consultants, or third parties with which facility owners do business access customers' facility management software. For example, a certified public accountant who a facility owner has designated as an Authorized User to provide accounting or tax services also accesses the customer software via username and password manually. That access is allowed for third parties who don't compete with defendants, but defendants have denied the same access to its competitor SafeLease.

76.     Defendants took further steps to target SafeLease and eliminate competition. They disabled all SiteLink accounts where SafeLease had been using the system's legacy custom third-party insurance module to provide insurance to facility customers. Disabling SafeLease's accounts

that used this custom insurance module has no legitimate purpose. It simply singles out SafeLease to block access for a competitor and to interfere with its contracts with customers.

77.     This custom insurance module is a means of access long approved by defendants and used by other insurance vendors. The module was created by defendants specifically to enable facility owners to use an insurance provider that does not have API access to SiteLink. Facility owners pay defendants $10 per facility/month to use this custom insurance module, and SafeLease reimburses the customers. So, when and whether a facility owner is using a third-party insurance provider via this module is known to and long allowed by defendants.

78.     Using this custom module poses none of the alleged security issues that defendants claim justify cutting SafeLease's access. Indeed, this custom module is defendants' own creation.

79.     To SafeLease's knowledge, defendants did not block access to this custom module for any other insurance provider. Cutting off SafeLease from even this method of accessing data and servicing customers further shows that defendants are targeting SafeLease, and their in-court excuses for removing SafeLease's access are pretextual.

80.     Since defendants cut off access again only days ago, the parties' mutual customers have expressed confusion and concern about how it will impact them and their tenants. Reactions from customers have ranged from anxiety to frustration to anger, including the following:

   a.   "Help me understand where our account stands as of today; 1. Are our tenants covered and how long will they be covered? 2. How do we continue coverage? 3. Will the payments by our tenants no longer be accessed by SafeLease? . . . I am just scratching the surface with questions, by my greatest concern is to make sure that our tenant protection doesn't lapse during this struggle."

   b.   "We utilize SiteLink at our facility and currently pay $10 per month for the ability to use SafeLease. We are concerned about the potential disruption of service and insurance coverage for our tenants."

   c.   "I see that SafeLease has been deleted as a user in my corporate account. . . . Should I add you back as an authorized user? They deleted without

  mentioning anything to me. . . . Also, if a tenant moves in now, will they even have access to coverage?"

d. "I want safe lease to immediately have access to manage my tenant protection. . . . I have been with easy storage solutions way before storable purchased them. I have been a loyal customer since 2012 and demand the right to choose my tenant protection for the best options for my tenants." (email sent to *defendants*)

e. "Sounds like you already don't have access to our system. What issues is this going to cause us until you regain access?"

f. "Safelease was removed from each of my locations. They are my tenant protection company. . . . I'm going to be adding them back in today so that I can go over my numbers as I do monthly with them. Please, can you make sure Storable does not remove someone I have given permission to." (email sent to *defendants*)

g. "Could you please clarify if Storable's actions have also impacted the data transfer and service for SiteLink users who pay for SafeLease access? Are you still receiving our information, or has this been interrupted as well?"

h. "Team Storable, Please immediately restore access to all authorized users. SafeLease must have full access." (email sent to *defendants*)

i. "Have you guys looked into any legal recourse? My opinion is that Storable is doing some potentially illegal stuff throughout (not a lawyer)."

j. "This seems like it is breaking some sort of law and at a minimum a terrible way to do business."

k. "We have also experienced the anticompetitive activities of Storable. When we attempted to access our own data, they demanded an outrageous toll fee for the access."

l. "Not surprised that Storable would pull such a dirty trick. Can't expect much better from them."

Common to the customer reactions to defendants' actions are concerns about disruption of service, increased risks, and loss of protection for them and their tenants.

81. By contrast, as SafeLease was cut off from accessing these facility management software systems, defendants' insurance products offered through Bader and StorSmart remained integrated in the software.

82. Defendants' actions have been greatly damaging to SafeLease, its customers, and the industry. As a result, SafeLease cannot operate its business as it has done for years with defendants' knowledge, consistent with its terms, and with customer authorization and agreement.

E. **Relevant Markets**

83. The relevant primary product market is for tenant insurance at independent self-storage facilities. SafeLease and defendants, as well as firms such as Xercor, Deans & Homer, Insurance Office of America, and MiniCo Insurance Agency, compete in this market.

84. Because of the fragmented nature of self-storage facility ownership and the fact that large public companies offer their own insurance plans, this tenant insurance is offered only at independent self-storage facilities. Consumers at these facilities can turn to either tenant protection or tenant insurance products. These products are substitutable in that a consumer reasonably could turn from one product to the other in response to a price increase to satisfy their insurance needs.

85. Market share in this market can be measured based on the number of facilities using a tenant insurance product. Defendants are collectively the largest provider in this market.

86. The relevant secondary product market is for facility management software. Defendants dominate this market. Other competitors are Self Storage Management, Cubby, and WebSelfStorage.

87. Because of the fragmented nature of self-storage facility ownership and the fact that large public companies use their own proprietary management software, these facility management software products are offered only to independent self-storage facilities.

88.     Market share can be measured based on the number of facilities that use facility management software. Defendants control over 75% of this market within the United States.

89.     Defendants have a monopoly in this secondary market. They are leveraging their market power to harm and control competition in the primary market, for tenant insurance at independent self-storage facilities, and to acquire monopoly power.

### a.  Geographic Market

90.     The relevant geographic market for both product markets is the United States.

91.     For tenant insurance, the parties and others operate throughout the nation. Consumers in Texas looking to purchase tenant insurance reasonably can turn to any such product offered by a provider if it is licensed to provide insurance in this State.

92.     For facility management software systems, defendants and its competitors operate throughout the nation. Consumers looking to purchase such software for their independent self-storage facilities may turn to any competitor in the country to provide this product.

### F.     Defendants' Anticompetitive Conduct and Effects

93.     Defendants have engaged in an anticompetitive scheme to monopolize the market for tenant insurance and drive a low-cost competitor out of business. They are leveraging their monopoly power in the facility management software market to try to monopolize the connected market for tenant insurance. Facility management software is vital to the market they are attempting to monopolize, and defendants have a monopoly of that software market. Their actions are an attempt to exploit that connection to the detriment of consumers and competition.

94.     So, armed with this unique power in an adjacent market, defendants are engaging in prohibited predatory conduct by refusing to deal with SafeLease by cutting off SafeLease's access to their facility management software systems. This shuts out SafeLease from the tenant

insurance market, excluding or foreclosing competition and harming consumers including with higher prices. SafeLease is precluded from accessing more than 75% of the market, so defendants will be able to scoop up the customers that SafeLease no longer can compete for.

95.     Defendants cut off SafeLease after years of allowing what it now prohibits. This long-known and consented-to access was voluntary and to defendants' benefit, as it made their facility management software product more enticing to consumers, some of whom would not have chosen it if SafeLease were not allowed access, severely limiting their tenant insurance options. And defendants cut off SafeLease's access without warning or valid business justification. As is clear from defendants' conduct, their motive is to achieve anticompetitive ends.

96.     Defendants are familiar with SafeLease and how it does business, including that it has Authorized User access to defendants' facility management software granted by their shared customers. Defendants have expressed interest in partnering with or buying SafeLease. As recently as just weeks ago, they proposed acquiring SafeLease. It was only after talks broke down that they sought to drive SafeLease out of the market and remove a low-cost competitor. They retaliated by cutting off SafeLease and making a confiscatory "offer" for API access that was no offer at all and was, instead, another way to try to destroy a competitor to reduce competition, to the detriment of consumers. The timing shows that defendants' "justifications" for their conduct are pretextual.

97.     Defendants' anticompetitive conduct escalated after suit was filed. In December, SafeLease successfully competed for a new customer that uses defendants' SiteLink as its facility management software. That customer had used defendant Bader as its tenant insurance provider, until SafeLease out-competed Bader for this customer's business. On December 31, 2024, the same day the Court granted the TRO, defendant Bader tried to scare the customer into switching back to Bader's insurance coverage by informing the customer that defendants were going to block

SafeLease from accessing SiteLink, just as they had done with storEDGE. Confused and concerned, the customer alerted SafeLease, who assured the customer that a TRO was in place.

98. Although the TRO was in place, defendants' threat to remove access proved too much for this customer. He determined that the risk of SiteLink severing ties with SafeLease posed a significant operational challenge and financial risk to the customer, which he could not bear, so he chose to cancel his planned contract with SafeLease.

99. This recent conduct is further proof of defendants' plans to monopolize the tenant insurance market not by competing on the merits but by removing competition through leveraging their monopoly in the facility management software market and interfering with SafeLease's prospective business with these customers.

100. With defendants' monopoly power, their scheme to drive out competitors in the related tenant insurance market has a dangerous probability of success. Defendants know how vital facility management software is to independent self-storage facilities. Having captured more than 75% of the market for this software, while allowing SafeLease and others to access the software for years, defendants are able to leverage that monopoly and customer reliance on the software to drive out as many competitors in the tenant insurance market as it can by refusing to deal with them, or by allowing them to use defendants' software products only on the condition that the competitors promise not to compete for defendants' customers and pay a penalty if they do. This will, in turn, drive customers to their only practical option at that point: buying higher-cost tenant insurance from defendants.

101. This anticompetitive scheme is an attempt to monopolize the market for tenant insurance. It will harm competition and consumers, remove low-cost competitors like SafeLease, and drive-up costs and reduce options.

G.      **Damages and Continuing Injury**

102.    Defendants' anticompetitive conduct is causing irreparable harm to SafeLease, its customers, and the industry.

103.    On December 17, 2024, defendants cut off SafeLease accounts from accessing the storEDGE facility management software, revoking the Authorized User status granted to SafeLease by storage facility customers. The only thing that stopped this anticompetitive scheme and prevented further harm to SafeLease, consumers, and competition was the TRO. But when the TRO expired, defendants escalated their attacks by cutting off SafeLease from accessing *all* their facility management software systems. Without access, SafeLease cannot service insurance policies for tenants with units in facilities that use those systems. Practically, this means that SafeLease's customers will experience delays in adjudication of their insurance claims and risky gaps in coverage while SafeLease is unable to renew or issue new policies it has or would have contracted with customers to issue.

104.    This risk and these gaps cannot be filled by these mutual customers. They cannot legally intake or adjust tenant insurance claims, which is something that only a licensed insurance agent like SafeLease can do. This disruption and interference with customer-authorized access to customer data on its customers' software has wholly impaired SafeLease's ability to service more than 275,000 tenants and thousands of customer facilities. This harms not only SafeLease but also innocent customers and their tenants.

105.    Defendants' actions have jeopardized SafeLease's entire business, which is worth over $100 million. It has and will continue to harm and cause loss to SafeLease's goodwill, clientele, and operations. Defendants' actions also put at risk the insurance coverage that customers secured through SafeLease, which exceeds $600 million.

106.     Defendants' unjustified and anticompetitive actions are calculated to and do destroy competition by excluding a low-cost competitor from competing in the market to the detriment of competition and consumers. This harm will be outsized in Texas which has more storage units than any other state and in which the parties are based and conduct their business.

**H.     Status Quo Poses No Harm to Defendants**

107.     SafeLease accessed defendants' facility management software as an Authorized User with defendants' consent for over three years until they abruptly cut off access in December. Defendants' actions after the TRO was entered show that returning to the status quo imposes no burden at all on them. Indeed, in less than an hour after the TRO became effective, defendants restored SafeLease's access as a customer-designated Authorized User of storEDGE.

<div align="center">

**FIRST CAUSE OF ACTION**
**Violation of the Texas Antitrust Act, Section B**

</div>

108.     SafeLease incorporates the material fact allegations from the preceding paragraphs.

109.     Through anticompetitive conduct, defendants intend to secure dominant market power and a monopoly in the market for tenant insurance at independent self-storage facilities. They leveraged their monopoly of the facility management software market to lessen or destroy competition in the tenant insurance market by cutting off SafeLease from accessing storEDGE, SiteLink, and Easy Storage Solutions facility management software on behalf of and for the benefit of customers. This refusal to deal is contrary to defendants' prior voluntary practice of allowing such access for years, which benefited defendants, and it will harm defendants' own customers.

110.     This refusal to deal is intended to remove a discount competitor from the market to help defendants gain market share and solidify a second monopoly in the market for tenant insurance. Their monopoly of the facility management software market gives them a unique ability

<div align="center">-26-</div>

to exclude or foreclose competition in the market for tenant insurance by excluding competitors in that market, like SafeLease, from facility management software.

111.     Defendants are exercising this unique anticompetitive ability here by excluding SafeLease from their facility management software systems after years of knowing use. Given this unique power to exclude or foreclose competition in the vast majority of the market, made possible by leveraging a monopoly of facility management software, defendants' scheme has a dangerously high probability of success.

112.     This conduct is an attempted monopolization in violation of TEX. BUS. & COMM. CODE § 15.05(b). This unlawful conduct has been willful and flagrant.

113.     As a direct and proximate result of this unlawful conduct, SafeLease has been injured in its business and property, including by being foreclosed from competing in the market for tenant insurance.

114.     These injuries to SafeLease and the public are injuries to the competitive process and are the type of injuries that the antitrust laws are intended to prohibit. They constitute antitrust injuries in Texas.

115.     SafeLease did and will suffer irreparable injury and loss of business and property, for which there is no adequate remedy at law, unless the Court enjoins defendants' continuing and imminent violations.

116.     SafeLease has been forced to retain attorneys to protect its rights and to prosecute this claim. Under TEX. BUS. & COMM. CODE § 15.21, it is entitled to recover its reasonable attorney fees and costs spent in this matter.

**SECOND CAUSE OF ACTION**
**Tortious Interference with Existing Contracts**

117.     SafeLease incorporates the material fact allegations from the preceding paragraphs.

118.    SafeLease has a contract with each of its customers that use defendants' facility management software. These contracts are commonly titled "Storage Partner Agreements." They require the customers to provide SafeLease with access to their facility management software and their data that they keep on these software systems for the sole purpose of providing the parties' contractually agreed insurance services.

119.    SafeLease's contracts with its customers are valid contracts. Defendants are not parties to these contracts.

120.    Defendants are willfully and intentionally interfering with SafeLease's contracts with its customers. Defendants know that SafeLease provides insurance services to their mutual customers. Defendants know that such services are under contracts between SafeLease and the customers. Defendants know that these services require SafeLease to access and use customer data that is stored on the facility management software systems. Defendants know that SafeLease's customers grant it access to their facility management software as an Authorized User.

121.    Defendants intentionally cut off SafeLease's access to their facility management software. Defendants are preventing the parties' mutual customers from providing SafeLease the access that the customers want and are obligated to provide. Defendants know or reasonably should know that blocking access interferes with the customers' ability to perform under their contracts, including by preventing customers from being able to give SafeLease the agreed, desired, and necessary access to their facility management software systems and data.

122.    Defendants cut off SafeLease's access in order to interfere with performance of these obligations, and it was substantially certain that the consequences of cutting off access would be to interfere with performance of these obligations.

123. Defendants' interference with SafeLease's customer contracts proximately caused SafeLease harm and loss to its business, business operations, goodwill, and clientele. It threatens to destroy SafeLease's entire business. This harm and loss are continuing, increase with every day, and given their nature are not easily or readily quantifiably.

### THIRD CAUSE OF ACTION
### Tortious Interference with Prospective Business Relations

124. SafeLease incorporates the material fact allegations from the preceding paragraphs.

125. Defendants have willfully and intentionally interfered with SafeLease's ability to compete in the market for tenant insurance. They have removed SafeLease's ability to service customers that use defendants' facility management software systems, which comprise over 75% of the market.

126. Defendants' leveraging of their monopoly in the facility management software market to cut off SafeLease from thousands of customers in the tenant insurance market makes it nearly impossible for SafeLease to compete for new business, as customers now are effectively unreachable to SafeLease. Defendants are telling SafeLease's prospective customers that they plan to and now have cut off SafeLease's access, for the purpose of interfering with SafeLease's attempts to enter contracts to provide services to the potential customers.

127. Defendants' software is so vital to customers that their threat of stopping SafeLease access already has lost SafeLease customers, including a customer who cancelled his contract with SafeLease when he learned that SiteLink was planning to remove SafeLease's access.

128. Defendants' threats to remove SafeLease's access and then actual removal of that access have caused customers to cancel or back out of agreements with SafeLease, thus injuring it. These injuries are the direct result and intent of defendants' anticompetitive acts to leverage their monopoly power to interfere with SafeLease's prospective business relations.

129. Defendants' interference with SafeLease's prospective business with customers has proximately caused SafeLease harm and loss to its business, business operations, goodwill, and clientele. It threatens to destroy SafeLease's entire business. This harm and loss are continuing, increase with every day and with every prospective customer with which defendants interfere, and given their nature are not easily or readily quantifiably.

### SERVICE ON ATTORNEY GENERAL

130. SafeLease has mailed a copy of this amended petition to the Attorney General of Texas, in compliance with TEX. BUS. & COMM. CODE §15.21(c).

### VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION

131. SafeLease has requested that the Court issue a TRO and temporary injunction against defendants to prevent probable imminent and irreparable harm to SafeLease, its customers, and the industry. The Court issued the requested TRO on December 31, 2024 and extended it to January 21, 2025. In the interim, it held a temporary injunction hearing on January 16. The Court denied the requested temporary injunction via email notice from its clerk on January 21.

### GROUNDS FOR INJUNCTIVE RELIEF

132. Temporary injunctive relief is necessary to preserve the status quo prior to a trial on the merits. The last actual, peaceable, non-contested status preceding the pending controversy is SafeLease's accessing defendants' facility management software systems so that it may service the parties' shared customers, which SafeLease did for years with defendants' knowledge until they cut off access. *See In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (status quo is "the last, actual, peaceable, non-contested status which preceded the pending controversy") (cite omitted).

133. Defendants' cutting off access to this critical software did and will cause irreparable harm to SafeLease, its customers, and the industry. Without access SafeLease will be unable to

run its business and administer insurance services for its customers. Temporarily enjoining defendants imposes no or minimal burden on them and also will allow SafeLease to service these mutual customers as it had done with defendants' knowledge and consent for years.

134.    SafeLease pleads valid causes of action and has shown a probable right to relief. It has furnished evidence that defendants' actions and threatened imminent actions are an illegal monopolization attempt of the market for tenant insurance, using an anticompetitive scheme and predatory or exclusory means. Given defendants' monopoly power and ability to leverage it to exclude or foreclose competition, they have a dangerous probability of succeeding. Defendants' actions also improperly interfere with SafeLease's current and prospective customer contracts.

135.    Federal antitrust case law, which the Texas Antitrust Act follows, supports the state law claim raised here. *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 483 (1992) ("If Kodak [a monopolist] adopted its . . . policies [refusing to deal] as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated §2."); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) (monopolist liable for refusing to deal with competitor where parties had prior voluntary course of dealing that was ended without justification); *United States v. Griffith*, 334 U.S. 100 (1948) (finding monopolization where defendants used monopoly power in one market to acquire monopoly control of other markets); *Covad Commc'ns Co. v. BellSouth Corp.*, 299 F.3d 1272, 1284 (11th Cir. 2002) ("Monopoly leveraging occurs when a firm uses its market power in one market to gain market share in another market other than by competitive means."), *vacated on other grounds*, 540 U.S. 1147 (2004).

136.    SafeLease also has shown probable imminent and irreparable injuries prior to a trial on the merits. Accessing defendants' software is its only means of servicing customers that use the

software. Without access, it cannot address claims made by tenants, correctly bill its customers, or commence new or renew insurance policies that it has contracted with tenants to provide.

137.    The impact of this disruption is wholly or largely immeasurable to SafeLease and the tenants that it helps insure. It did and will cause immediate and irreparable harm to SafeLease's business and customers by preventing SafeLease from, among other things, renewing or issuing new policies, notifying tenants of changes in coverage, adjusting or adjudicating insurance claims, or billing facilities accurately. This harm from loss of access critically impairs SafeLease's business and its ability to service thousands of customers, is ongoing, and is irreparable because it places its entire business at risk, making much or all of the current harm to SafeLease's business impossible to measure in damages.

138.    As such, the Court issued a TRO enjoining defendants before the application for temporary injunction was heard:

a.    Defendants should be ordered to restore SafeLease's status as an Authorized User on the storEDGE or any other facility management software for customer accounts that grant SafeLease such authorization.

b.    Defendants should be ordered to take no action to remove or otherwise restrict SafeLease's access to its storEDGE, SiteLink, or Easy Storage Solutions facility management software systems as an Authorized User for customer accounts that grant SafeLease such authorization.

139.    SafeLease posted a bond to make the TRO effective. A minimal bond was required and warranted because the TRO simply restored the way that the parties have operated for years. As a result, the risk of irreparable harm to defendants was nil.

140.    SafeLease further requested that the Court temporarily enjoin Storable from these same acts until the trial of this case and that, after trial, the Court permanently enjoin Storable upon entry of final judgment.

141.    On January 21, 2025, the Court denied the temporary injunction request.

## PRAYER

SafeLease respectfully seeks a TRO, temporary injunction, and permanent injunction that enjoins defendants and their officers, agents, servants, and employees from performing the anticompetitive and tortious acts described above, and a judgment for SafeLease and against defendants for reasonable and necessary attorney fees, costs of court, pre- and post-judgment interest, and all other relief to which SafeLease may be entitled.

Dated:  January 28, 2025                    Respectfully submitted,

/s/ R. Paul Yetter
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Susanna R. Allen
State Bar No. 24126616
sallen@yettercoleman.com
Luke A. Schamel
State Bar No. 24106403
lschamel@yettercoleman.com
Shannon N. Smith
State Bar No. 24110378
ssmith@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing document was served on all counsel of record via the Court e-filing service and/or by email, on January 28, 2025.

 /s/ *Shannon N. Smith*_____
Shannon N. Smith

**VERIFICATION**

My name is Steven Stein. My date of birth is November 18, 1994. I am the Chief Executive Officer of plaintiff SafeLease and have been since its inception. My business address is 800 Brazos Street, Suite 320, Austin, Texas 78701. I declare under penalty of perjury that the material facts alleged in this Verified Second Amended Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction, except for paragraphs 80 and 97–98 (as to which another SafeLease employee is verifying), are true and correct based on my personal knowledge or, as indicated, on reliable referenced information sources.

Executed in Travis County, Texas on this 28th day of January, 2025.

Steven Stein

## VERIFICATION

My name is Nathaniel Kinet. My date of birth is December 12, 1986. I am Chief Revenue Officer of plaintiff SafeLease and have been an employee of SafeLease since May 2021. My business address is 800 Brazos Street, Suite 320, Austin, Texas 78701. I declare under penalty of perjury that the material facts alleged in paragraphs 80 and 97–98 of this Verified Second Amended Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction are true and correct based on my personal knowledge.

Executed in Travis County, Texas on this 28th day of January, 2025.

Nathaniel Kinet

-36-

# Exhibit B

FILED IN
BUSINESS COURT OF TEXAS
BEVERLY CRUMLEY, CLERK
ENTERED
3/11/2025

2025 Tex. Bus. 10



# The Business Court of Texas, Third Division

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff,* | § § | Cause No. 25-BC03A-0001 |
| v. | § § | |
| STORABLE, INC., et al., | § § | |
| *Defendants.* | § § | |

## MEMORANDUM OPINION AND ORDER

¶1    Before the Court is a document titled "Objections To Temporary Injunction Order, Motion to Rule On Exclusion Of Opinions Of Dr. Williams, And Motion to Reconsider Based On Objections And Exclusion" (hereafter, the Motion to Reconsider) filed by defendants Storable Inc., RedNova Labs Inc., Bader Co., SiteLink Software LLC, Easy Storage Solutions LLC, and Property First Group LP (collectively, Storable). The Court GRANTS in part and DENIES in part the Motion to Reconsider, as detailed below.

**Background**

¶2     This suit arises out of a dispute between SafeLease Insurance Services LLC (SafeLease), which provides insurance for self-storage facilities, and Storable, which licenses facility-management software (FMS) to such facilities. Storable's FMS platforms include storEDGE, SiteLink, and Easy Storage Solutions (ESS). The dispute centers on SafeLease's access to information maintained on these platforms by self-storage facilities that license FMS software from Storable and that are also customers of SafeLease. Until recently, SafeLease accessed these FMS platforms as an authorized user on its customers' accounts. In late 2024, Storable began blocking SafeLease's access to storEDGE. The parties dispute the impetus of these actions: SafeLease alleges that Storable seeks to drive it out of the self-storage insurance market to benefit Storable's own self-storage insurance products; Storable asserts that it is enforcing its software's terms of use and mitigating security threats posed by SafeLease's misuse of the platform.

¶3     SafeLease sued Storable in the 345th District Court in Travis County on December 30, 2024. The District Court granted a temporary restraining order (TRO) compelling Storable to restore SafeLease's authorized-user access to storEDGE and prohibiting Storable from removing or restricting SafeLease's access to storEDGE, SiteLink, or ESS. After extending the TRO, the District Court denied the request for a temporary injunction (TI). A week later, SafeLease amended its

petition to include new tortious interference claims and allegations about Storable's actions after the TI was denied. SafeLease then removed the action to this Court.

¶4  In this Court, SafeLease filed a new application for a TRO and TI to protect its access to the information on Storable's FMS platforms while the lawsuit is pending.[1] On January 30, 2025, the Court denied the TRO and set a TI hearing. The TI hearing was conducted on February 11, 13, and 14, with closing arguments on Tuesday, February 18. The Court issued a TI Order the following day, February 19, granting SafeLease limited injunctive relief. Storable filed this Motion two days later, on Friday, February 21, and set it for written submission today, March 11.

## Analysis

### A.    Storable's Request for Ruling and Reconsideration

¶5  The Motion to Reconsider asks the Court to rule on another motion filed by Storable—its "Motion To Exclude Or Disregard Opinions Of Dr. Williams On The Ground That They Are Unreliable And Constitute No Evidence" (the Motion to Exclude)—and to reconsider the TI Order on that basis. The Court determines that reconsideration is unnecessary for several reasons.

---

[1] The Court treats this as a new application, based on the newly asserted claims and the changed circumstances that occurred after the District Court denied the prior TI application. In any event, the Court views the District Court's prior decisions in this case with the same deference and as carrying the same weight as its own prior decisions in the case.

¶6 First, exclusion of the challenged testimony would not alter the Court's decision to grant the TI Order. The Motion to Exclude challenges the testimony of SafeLease's antitrust economist, Dr. Michael Williams. Dr. Williams testified in support of SafeLease's antitrust claim, but the TI Order does not rely on SafeLease's antitrust claim; it relies exclusively on SafeLease's claim for tortious interference with existing contracts. The Motion to Reconsider points to a reference in paragraph 4 of the TI Order to Storable "leveraging" its "market power in the FMS market." Although "leveraging" and "market power" may be terms of art in antitrust law, the Court refers to Storable's use of its position in the FMS market and as the FMS provider for a large segment of SafeLease's tenant-insurance customers, and not to SafeLease's antitrust claims. To avoid any potential confusion, the Court will amend the TI Order to replace "leveraging their market power in the FMS market" with "using their position in the FMS market."

¶7 Second, while the Motion to Reconsider was set for written submission, the underlying Motion to Exclude was never set for either written submission or oral hearing. A motion must be presented to the court to trigger the court's duty to rule.[2]

---

[2] *See, e.g.*, *Ballard v. King*, 652 S.W.2d 767, 769 (Tex. 1983); *Lawrence v. Jones*, No. 14-23-00270-CV, 2024 WL 1269874, at *4 (Tex. App.—Houston [14th Dist.] Mar. 26, 2024, no pet.); *In re Ogaz*, No. 08-23-00344-CR, 2023 WL 8519276, at *1 (Tex. App.—El Paso Dec. 7, 2023, no pet.); *In re Liverman*, 658 S.W.3d 881, 882 (Tex. App.—El Paso 2022, no pet.); *In re Blakeney*, 254 S.W.3d 659, 662 (Tex. App.—Texarkana 2008, orig. proceeding); *Guyot v. Guyot*, 3 S.W.3d 243, 246 (Tex. App.—Fort Worth 1999, no pet.); *Evans v. First Nat'l Bank of Bellville*, 946 S.W.2d 367, 378 (Tex. App.—Houston [14th Dist.] 1997, writ denied); *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W.2d 724, 736 (Tex. App.—Dallas 1992, writ denied).

Merely filing the motion does not satisfy this requirement; presentation requires that the motion be set for an oral hearing or written submission.[3] This process is important because, among other reasons, it puts opposing parties on notice of when responsive filings are due. Because the Motion to Exclude was never set, SafeLease never responded and was not required to do so. Given the pace of the TI proceedings, the Court likely would have expedited setting the Motion to Exclude, while still giving SafeLease an opportunity to respond, if requested.[4] But the Court received no request to do so or to otherwise set the Motion to Exclude.

¶8    Third, the February 18 Motion to Exclude challenges Dr. Williams's testimony given at the TI hearing on February 11. A motion to exclude filed a week after the conclusion of the challenged testimony generally comes too late.[5]

¶9    Storable's Motion to Exclude asserts challenges to the foundation and methodology underlying Dr. Williams's opinions.[6] To be timely, those objections

---

[3] *E.g.*, *Lawrence*, 2024 WL 1269874, at *4; *Moore v. Carder*, No. 01-22-00156-CV, 2023 WL 3102582, at *2 (Tex. App.—Houston [1st Dist.] Apr. 27, 2023, no pet.); *Smith v. El Paso Veterans Transitional Living Ctr.*, 556 S.W.3d 361, 362 (Tex. App.—El Paso 2018, no pet.); *see also* TEX. BUS. CT. LOC. R. 5; 3RD DIV. CT. PRO. at V(A)–(B).

[4] The parties have known since February 14 that the Court would issue its TI Order on February 19. When it filed the Motion to Exclude on February 18, Storable was aware that it was filing the day before the TI Order would issue.

[5] *See, e.g.*, *Knoderer v. State Farm Lloyds*, 515 S.W.3d 21, 44 (Tex. App.—Texarkana 2017, pets. denied); *Farm Servs., Inc. v. Gonzales*, 756 S.W.2d 747, 750 (Tex. App.—Corpus Christi–Edinburg 1988, writ denied); *Traders & Gen. Ins. Co. v. Randolph*, 467 S.W.2d 689, 690 (Tex. App.—Amarillo 1971, writ dism'd).

[6] For example, Storable argues that Williams: failed to "provide reliable data to support his market-share opinion" or "study the factors that determine the likelihood of monopoly power"; should have used revenue or output, rather than the number of facilities, in measuring market share; "used

had to be raised and ruled on before or when the testimony is offered.[7] The purpose of this requirement is two-fold: (1) it gives the trial court the necessary opportunity to look beyond the face of the testimony to inquire into its underlying basis before ruling,[8] and (2) it "gives the proponent a fair opportunity to cure any deficiencies and prevents trial and appeal by ambush."[9] Once opinion testimony is admitted without objection, "it may be considered probative evidence even if the basis for the opinion is unreliable."[10]

¶10    The Motion to Exclude also argues that Dr. Williams's opinion that Storable had "a dangerous probability of achieving monopoly power" in the tenant-insurance market is conclusory.[11] Unlike objections to foundation or methodology, a party need not timely object to expert testimony that is conclusory on its face; such

---

incorrect numbers, without necessary adjustments, for the number of Storable's facilities and the total number of self-storage facilities in the United States"; and should not have excluded certain large operators in defining the relevant market. Motion to Exclude at 1, 7.

[7] *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 786 (Tex. 2020); *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816–17 (Tex. 2009).

[8] *Pike*, 610 S.W.3d at 786 (quoting *Coastal Transp. Co. v. Crown Cent. Petrol. Corp.*, 136 S.W.3d 227, 233 (Tex. 2004)); *Pollock*, 284 S.W.3d at 816–17 (same).

[9] *Pike*, 610 S.W.3d at 786; *Pollock*, 284 S.W.3d at 817; *see also, e.g.*, *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 716 (Tex. 2016); *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 409 (Tex. 1998).

[10] *W & T Offshore, Inc. v. Fredieu*, 610 S.W.3d 884, 899 (Tex. 2020) (quoting *Pollock*, 284 S.W.3d at 818); *see also Pike*, 610 S.W.3d at 786 (same).

[11] Motion to Exclude at 3–7.

testimony inherently lacks probative value.[12] But the Court need not reach this issue because it did not consider Dr. Williams's opinion regarding whether Storable had a dangerous probability of achieving monopoly power in the tenant-insurance market. As Storable points out in its Motion to Exclude,[13] that opinion related to SafeLease's antitrust claims, which the Court did not rely on in granting injunctive relief under the TI Order.

¶11    The Court notes that Storable objected to Dr. Williams's testimony on several grounds at the TI hearing and took Dr. Williams on voir dire. To the extent any objections were timely raised and ruled on at the hearing, no further objection or ruling is needed. The Court further notes that there was limited opportunity for discovery and to vet the expert opinions before the TI hearing, which occurred less than two months after the case was filed. While it was necessary to expedite the TI proceedings, the substance of any testimony offered in the TI proceedings remains subject to challenges and objections at future stages of the case, including summary judgment and trial.

## B.    Storable's Objections to the TI Order

¶12    Storable objects that the TI Order decides the "ultimate merits" of the case rather than only whether SafeLease demonstrated a "probable" right to

---

[12] *Pike*, 610 S.W.2d at 786 (quoting *Coastal Transp.*, 136 S.W.3d at 233); *Pollock*, 284 S.W.3d at 816 (same).

[13] Motion to Exclude at 3.

recover.[14] The Court disagrees and notes that Storable issued a press release shortly after the TI issued demonstrating that it correctly understood that the TI Order "does not represent a final determination on the merits of the case."[15] The TI Order states that SafeLease demonstrated a "probable right to relief" and expressly notes that such a showing does not mean that SafeLease will ultimately prevail on the merits based on a fully developed record.[16] Rule 683 compels the Court to include in the TI Order the findings that form the reasons it granted the injunction,[17] and the TI Order makes it clear that the findings are based on the evidence presented at the TI hearing and that a final trial on the merits has not yet occurred. Nevertheless, to avoid any potential confusion, the Court will amend the TI Order to further clarify that the holdings in the order are based on the evidence the parties presented at the

---

[14] Motion to Reconsider at 2–3.

[15] Exhibit A to "Supplement to Plaintiff's Response to Objections to Injunction and Motion to Reconsider."

[16] TI Order at ¶ 3 & n.1 (quoting *Bienati v. Cloister Holdings, LLC*, 691 S.W.3d 493, 498 (Tex. 2024); *Transp. Co. of Tex. v. Robertson Transps., Inc.*, 152 Tex. 551, 556, 261 S.W.2d 549, 552 (1953)).

[17] TEX. R. CIV. P. 683 (requiring order to specify the reasons the court granted the relief). Storable objects to the statement in the TI Order that "SafeLease has *pleaded and proved* valid causes of action against Defendants; a probable right to the relief sought; and a probable, imminent, and irreparable injury in the interim." Motion to Reconsider at 3 (emphasis added). But this is a common way of stating the elements required for a TI. *See, e.g.*, *State v. Loe*, 692 S.W.3d 215, 226 (Tex. 2024); *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Hughs v. Dikeman*, 631 S.W.3d 362, 382 (Tex. App.—Houston [14th Dist.] 2020, no pet.); *Adobe Oilfield Servs., Ltd. v. Trilogy Operating, Inc.*, 305 S.W.3d 402, 405 (Tex. App.—Eastland 2010, no pet.); *8100 N. Freeway Ltd. v. City of Houston*, 329 S.W.3d 858, 861 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The statement is in no way a ruling that SafeLease has or ultimately will prevail on the merits.

TI hearing and do not prevent either party from proving or disproving any of the disputed facts at the trial on the merits.

¶13　The Court will also amend the TI Order to remove a statement that the parties agreed to the form but not the substance of the order. Although the Court instructed the parties to confer and reach an agreement as to the form (but not the substance) of each side's proposed orders, the Motion informs the Court that Storable refused to do so.[18] The Court notes that if Storable had meaningfully engaged in this process, some of its concerns might have been ameliorated before the TI Order issued.

SIGNED ON: March 11, 2025.

Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

---

[18] Motion to Reconsider at 3.

# Exhibit C

**The Business Court of Texas,**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, *Plaintiff,* v. STORABLE, INC., et al., *Defendants.* | § § § § § § § § | Cause No. 25-BC03A-0001 |

**ORDER GRANTING TEMPORARY INJUNCTION**

On this day, the Court considered the Application for Temporary Injunction and, in the Alternative, Motion for Reconsideration (the Application) filed by plaintiff SafeLease Insurance Services LLC (SafeLease) against defendants Storable, Inc. (Storable), RedNova Labs, Inc., SiteLink Software, LLC, Easy Storage Solutions, LLC, Bader Co., and Property First Group, LP (collectively, Defendants). After due notice, the parties appeared in person and by counsel for an evidentiary hearing commencing on February 11, 2025. After considering the Application, evidence presented, arguments of counsel, and papers on file, the Court finds that a Temporary Injunction is necessary to preserve the status quo and prevent irreparable injury, loss, or damage. The Court grants the Application.

The Court further finds or concludes that:

1.      SafeLease has pleaded and proved valid causes of action against Defendants; a probable right to the relief sought; and a probable, imminent, and irreparable injury in the interim.

2.      SafeLease has properly pleaded valid causes of action against Defendants in the Second Amended Petition ("Petition") for violations of the Texas Antitrust Act, tortious interference with existing contracts, and tortious interference with prospective business relations. The Petition gives fair and adequate notice of the facts upon which SafeLease bases its claims.

3. The evidence shows that SafeLease has a probable right to relief on its claims for tortious interference with valid, existing SafeLease contracts.[1] Defendants reasonably do or should know that these contracts involve providing tenant-insurance services that require SafeLease to access and use certain customer-owned data within the processes of the FMS systems that customers license from Defendants and expressly authorize and enable SafeLease to access and use, as required by their agreements with SafeLease. FMS systems licensed from Defendants are critical to customers to maintain and access their data, which is not readily or effectively accessible otherwise. Under the terms of their contracts with Defendants, customers are entitled to designate third-party contractors as authorized users to access and use this customer data within the processes of the FMS systems to assist customer operations. Defendants' actions are calculated to impede, prevent, and interfere with performance of these contract rights by preventing SafeLease's access to customer-owned data on customers' FMS systems. Defendants reasonably do or should know that their actions impede, prevent, and interfere with performance of these customer contracts, proximately causing harm and loss to SafeLease and its business, operations, reputation, and goodwill.

4. Defendants intentionally interfere with existing SafeLease customer contracts through exclusionary, anticompetitive, or otherwise wrongful means, including by blocking SafeLease from accessing customer-owned data within the processes of their licensed FMS systems—a marked change from Defendants' past practices; by leveraging market power in the

---

[1] *See, e.g.*, *Bienati v. Cloister Holdings, LLC*, 691 S.W.3d 493, 498 (Tex. 2024) (observing that party's showing of probable right to relief at temporary-injunction stage "does not mean that the party obtaining temporary relief will prevail on the merits based on a fully developed record" and conversely, failure to demonstrate probable right to temporary relief does not mean party will not prevail at trial); *Transp. Co. of Tex. v. Robertson Transps., Inc.*, 152 Tex. 551, 556, 261 S.W.2d 549, 552 (1953) ("To warrant the issuance of the writ [of temporary injunction], the applicant need only show a probable right and a probable injury; he is not required to establish that he will finally prevail in the litigation.").

FMS market to prevent and impede SafeLease from providing services to customers in the tenant insurance market; and by making false or misleading representations about SafeLease to mutual customers regarding misuse of sensitive customer data, use of malicious code and processes, and the risks to cybersecurity.

5.     The evidence failed to show that SafeLease misused or improperly disclosed customer data; that SafeLease used spybots, engaged in hacking, or introduced or attempted to introduce malicious code or viruses; that SafeLease overloaded Defendants' FMS system, causing a crash, outage, or otherwise interfered with or interrupted the performance or integrity of the FMS systems; that SafeLease accessed customer data in a manner not authorized by the customer; or that SafeLease's access and use of its customers' data on FMS systems licensed by Defendants materially increased the risk of a security breach beyond what it otherwise was. The evidence presented by Defendants to support these claims was not credible, and SafeLease's controverting evidence was credible. While there was evidence that SafeLease used automated processes, or "bots," to conduct its business, evidence from both sides showed that "bots" can be good bots or bad bots, and the evidence did not show that SafeLease's automated processes were harmful. The evidence also did not establish that SafeLease caused Defendants' SiteLink or storEDGE FMS systems to crash or have an interruption of services. While there was some evidence indicating that Defendant's Easy Storage Solutions (ESS) FMS Platform may have crashed in April 2024, for which Defendants blamed SafeLease, there was conflicting evidence as to whether a crash or outage actually occurred and insufficient evidence that SafeLease was a sole or principal cause.

6.     The evidence fails to show that Defendants' actions are justified or privileged.[2]

---

[2] Justification or privilege is an affirmative defense on which Defendants bear the burden of proof. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77–78 (Tex. 2000); *ACS Invs., Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex. 1997).

7.      Storable's Terms of Service authorize customers to "designate and authorize as many Users as you wish under the Agreement." These Terms of Service specify that a User "may include . . . consultants, contractors and agents, and third parties with which you transact business." Storable asserts that customers' designation of SafeLease, and possibly any insurance provider, as an authorized user violates the Terms of Service. Storable also asserts that it could amend their Terms of Service at any time, such as to preclude customers from designating insurance providers as authorized users. But Defendants admit that they have not changed their Terms of Service or informed their customers that they are allegedly in breach of the Terms of Service or otherwise attempted to enforce their alleged contractual rights against the customers themselves. After SafeLease made a public statement to mutual customers, Storable communicated to customers that "this is not your problem" and that its actions were motivated by data privacy and the threat that SafeLease allegedly posed to the stability of Defendants' platforms. As discussed above, the evidence presented at the temporary-injunction hearing does not support these claims.

8.      Storable asserts that the Terms of Service for SiteLink and storEDGE require that "any use to develop a commercial product requires a separate third-party DEI [Data Exchange Interface] agreement." The evidence presented at the temporary-injunction hearing does not show that SafeLease was using SiteLink or storEDGE to develop a commercial product.

9.      While the evidence does establish that SafeLease needs access to the customer data on the FMS platforms to perform insurance services for the parties' mutual customers, the evidence establishes that the same is generally true for other third-party vendors that customers designate as authorized users on the FMS platforms, and Defendants agree that designation of other vendors, such as accountants, does not violate their terms of services. Defendants attempt to distinguish

accountants, as authorized users, from insurance providers (like SafeLease), as authorized users, based on the extent of use, but the Terms of Service do not draw such a distinction.

10. The evidence shows that Defendants' actions are not motivated by any alleged breach of their Terms of Service.

11. Defendants assert justification or privilege based on an alleged right to prevent "free riders" on their services. The evidence at the hearing shows that Defendants are paid for their services by their customers, that their customers are authorized to designated third-party vendors as authorized users, and that the customers in question have designated SafeLease as an authorized user. Additionally, Defendants have not identified, and the Court has not found, any authority holding under what circumstances, if ever, an alleged right to prevent free riders constitutes a justification or privilege defeating a tortious-interference claim under Texas law.

12. The evidence shows that SafeLease will incur a probable, imminent, and irreparable injury absent injunctive relief before trial of this case. Beginning in 2021, it routinely accessed customer-owned data within the processes of their FMS systems licensed from Defendants with express customer permission for such access and use. This access was through the graphical user interface as an authorized user, consistent with the customers' own access and their rights to appoint authorized users. On December 17, 2024, Defendants cut off SafeLease from access to Defendants' storEdge system, which was restored through a temporary restraining order. After January 21, 2025, Defendants cut off SafeLease from access to all three of their FMS systems and revoked access granted to SafeLease by the parties' mutual customers. Without access to customer-owned data within the processes of these customer FMS systems, SafeLease's ability to service customers is wholly or significantly impaired. Among other services, SafeLease is prevented from or impeded in issuing contracted-for new or renewed policies to customers,

providing timely and effective lease compliance services, amending lease documentation for tenant protection plans, processing opt-out tenants with separate coverage, providing timely and accurate insurance data visualization services, issuing required tenant notices or billing, and promptly and fully adjusting tenant claims for loss.

13.     The evidence shows that Defendants intend to continue to refuse to allow SafeLease to access customer-owned data within the processes of FMS systems licensed by customers who grant SafeLease such access.

14.     The evidence at the temporary-injunction hearing supported SafeLease's assertion that it cannot practicably perform its contractual obligations to the parties' mutual clients while blocked from the FMS systems by Defendants, and that obtaining reports from customers is not, alone, a long-term viable solution.

15.     The evidence shows that the harm to SafeLease is and would be irreparable. Its loss of ability to service customers that license Defendants' FMS will be difficult or impossible to measure fully with damages. It is likely to permanently damage SafeLease's customer relationships and reputation and good will in the industry, as well as put customers at risk of disruption and loss. Without access to customer-owned data in its customers' FMS systems, SafeLease will be substantially impaired or prevented from offering its services to its customers, and SafeLease likely will be unable to continue operating or competing in the tenant-insurance market. These harms could not be adequately remedied with money damages or otherwise at law, and some portion of the likely pecuniary injury will be extremely difficult, if not impossible, to accurately identify, trace, quantify, and prove with reasonable certainty.

16.     The evidence shows that temporary injunctive relief is necessary to preserve the status quo before trial. The status quo is the last, actual, peaceable, non-contested status that

preceded this controversy. Here, it is customer-authorized access by SafeLease to customer-owned data within the processes of FMS systems licensed from Defendants. The status quo is preserved by ensuring resumed access to such customer-owned data in their FMS systems so that SafeLease may provide agreed services to the parties' mutual customers.

17. The evidence shows that the balance of equities favors issuance of injunctive relief. Beginning in 2021, and with customer permission and Defendants' knowledge, SafeLease accessed customer-owned data in their licensed FMS systems in order to provide tenant insurance services to the parties' mutual customers. On December 17, 2024, with no advance customer permission or notice, Defendants cut off SafeLease's access to the storEDGE platform. On December 31, 2024, it took Defendants less than an hour to restore access after TRO relief was granted. After the TRO expired on January 21, 2025, and the district court denied SafeLease's original temporary-injunction application, Defendants immediately disabled access by SafeLease to customer-owned data in all three of Defendants' FMS platforms. Access by SafeLease to customer-owned data in their FMS systems, as it had for three years before this dispute arose, will create no imminent or likely risk of SafeLease data breach or misuse, nor of disruption to Defendants' server performance or stability. SafeLease employs SOC-2 certified data protection processes and uses customer data only consistent with its customer agreements. If temporary injunctive relief is granted, Defendants will suffer no irreparable harm and, at most, immaterial monetary harm that will be protected by the bond ordered below.

18. The evidence also shows significantly changed circumstances that further altered the status quo from the time the district court denied SafeLease's first request for temporary injunction.

19.     The Court finds it equitable and appropriate to restore the status quo and protect SafeLease from irreparable injury by entering this Temporary Injunction against Defendants.

Therefore, it is Ordered, Adjudged, and Decreed that Defendants are enjoined as follows:

As to SafeLease customers as of January 21, 2025, Defendants shall take no action to prevent, impede, or otherwise interfere with SafeLease's authorized-user access to mutual customers' data stored in FMS systems licensed from Defendants (i.e., storEDGE, SiteLink, and Easy Storage Solutions), as well as SafeLease's use of such data within the processes of the FMS systems, as authorized by and available to such customers and for the purpose of providing insurance services for such customers.

This injunctive relief is subject to SafeLease maintaining SOC-2 certification of its data protection processes and only using customer data stored in FMS licensed from Defendants consistent with its customer agreements and historic practices.

The Clerk of the Court shall issue a writ of injunction to Defendants in accordance with the terms of this Order. Service of the writ by private process server is authorized.

This Order is binding upon Defendants and all their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

It is further Ordered that this Order shall expire 30 days after a trial on the merits in this case is completed, unless extended or earlier terminated by further order of this Court. Trial on the merits shall be scheduled to begin on the 30th day of June, 2026.

It is further Ordered that SafeLease shall post with the Clerk of this Court a bond in the amount of $6,600,000. This bond reflects Defendants' estimate of their potential losses resulting from the temporary injunction; but it does not include potential additional losses Defendants could suffer in the result of a data breach during the pendancy of the temporary

injunction, as no credible evidence has been presented to indicate that such a data breach is likely to occur as a result of this injunctive relief.

The bond must be filed and approved by the Clerk of the Court before any writ of injunction may issue pursuant to this temporary injunction. SafeLease may post a cash deposit in lieu of a bond under Texas Rule of Civil Procedure 14c.

The parties have agreed as to the form of this order but not its substantive content, which is in dispute.

SIGNED ON: February 19, 2025.

 

 

_____

Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

# Exhibit D

FILED IN
BUSINESS COURT OF TEXAS
**391**
BEVERLY CRUMLEY, CLERK
ENTERED
3/11/2025

**The Business Court of Texas,**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff,* | § | |
| v. | § | Cause No. 25-BC03A-0001 |
| | § | |
| STORABLE, INC., et al., | § | |
| *Defendants.* | § | |

**AMENDED ORDER GRANTING TEMPORARY INJUNCTION**

On this day, the Court considered the Application for Temporary Injunction and, in the Alternative, Motion for Reconsideration (the Application) filed by plaintiff SafeLease Insurance Services LLC (SafeLease) against defendants Storable, Inc. (Storable), RedNova Labs, Inc., SiteLink Software, LLC, Easy Storage Solutions, LLC, Bader Co., and Property First Group, LP (collectively, Defendants). After due notice, the parties appeared in person and by counsel for an evidentiary hearing commencing on February 11, 2025 (the TI Hearing). After considering the Application, evidence presented, arguments of counsel, and papers on file, the Court finds that a Temporary Injunction is necessary to preserve the status quo and prevent irreparable injury, loss, or damage. The Court grants the Application.

The Court makes the findings and conclusions below based on the evidence presented at the TI Hearing and the parties' filings properly before the Court. The Court recognizes that the case is in its early stages, discovery is still ongoing, and the evidence presented at future stages of the case (including summary judgment and trial) may differ from the evidence presented at the TI hearing and could support different findings and conclusions.

1. SafeLease has pleaded and proved the elements required for temporary injunctive relief: a valid cause of action against Defendants; a probable right to the relief sought; and a probable, imminent, and irreparable injury in the interim.

2.      SafeLease has properly pleaded valid causes of action against Defendants in the Second Amended Petition ("Petition") for violations of the Texas Antitrust Act, tortious interference with existing contracts, and tortious interference with prospective business relations. The Petition gives fair and adequate notice of the facts upon which SafeLease bases its claims.

3.      The evidence shows that SafeLease has a probable right to relief on its claims for tortious interference with valid, existing SafeLease contracts.[1] Defendants reasonably do or should know that these contracts involve providing tenant-insurance services that require SafeLease to access and use certain customer-owned data within the processes of the FMS systems that customers license from Defendants and expressly authorize and enable SafeLease to access and use, as required by their agreements with SafeLease. FMS systems licensed from Defendants are critical to customers to maintain and access their data, which is not readily or effectively accessible otherwise. Under the terms of their contracts with Defendants, customers are entitled to designate third-party contractors as authorized users to access and use this customer data within the processes of the FMS systems to assist customer operations. Defendants' actions are calculated to impede, prevent, and interfere with performance of these contract rights by preventing SafeLease's access to customer-owned data on customers' FMS systems. Defendants reasonably do or should know that their actions impede, prevent, and interfere with performance of these customer contracts, proximately causing harm and loss to SafeLease and its business, operations, reputation, and goodwill.

---

[1] *See, e.g.*, *Bienati v. Cloister Holdings, LLC*, 691 S.W.3d 493, 498 (Tex. 2024) (observing that party's showing of probable right to relief at temporary-injunction stage "does not mean that the party obtaining temporary relief will prevail on the merits based on a fully developed record" and conversely, failure to demonstrate probable right to temporary relief does not mean party will not prevail at trial); *Transp. Co. of Tex. v. Robertson Transps., Inc.*, 152 Tex. 551, 556, 261 S.W.2d 549, 552 (1953) ("To warrant the issuance of the writ [of temporary injunction], the applicant need only show a probable right and a probable injury; he is not required to establish that he will finally prevail in the litigation.").

4.  Defendants intentionally interfere with existing SafeLease customer contracts through exclusionary, anticompetitive, or otherwise wrongful means, including by blocking SafeLease from accessing customer-owned data within the processes of their licensed FMS systems—a marked change from Defendants' past practices; by using their position in the FMS market to prevent and impede SafeLease from providing services to customers in the tenant insurance market; and by making false or misleading representations about SafeLease to mutual customers regarding misuse of sensitive customer data, use of malicious code and processes, and the risks to cybersecurity.

5.  The evidence failed to show that SafeLease misused or improperly disclosed customer data; that SafeLease used spybots, engaged in hacking, or introduced or attempted to introduce malicious code or viruses; that SafeLease overloaded Defendants' FMS system, causing a crash, outage, or otherwise interfered with or interrupted the performance or integrity of the FMS systems; that SafeLease accessed customer data in a manner not authorized by the customer; or that SafeLease's access and use of its customers' data on FMS systems licensed by Defendants materially increased the risk of a security breach beyond what it otherwise was. The evidence presented by Defendants to support these claims was not credible, and SafeLease's controverting evidence was credible. While there was evidence that SafeLease used automated processes, or "bots," to conduct its business, evidence from both sides showed that "bots" can be good bots or bad bots, and the evidence did not show that SafeLease's automated processes were harmful. The evidence also did not establish that SafeLease caused Defendants' SiteLink or storEDGE FMS systems to crash or have an interruption of services. While there was some evidence indicating that Defendant's Easy Storage Solutions (ESS) FMS Platform may have crashed in April 2024,

for which Defendants blamed SafeLease, there was conflicting evidence as to whether a crash or outage actually occurred and insufficient evidence that SafeLease was a sole or principal cause.

6. The evidence fails to show that Defendants' actions are justified or privileged.[2]

7. Storable's Terms of Service authorize customers to "designate and authorize as many Users as you wish under the Agreement." These Terms of Service specify that a User "may include . . . consultants, contractors and agents, and third parties with which you transact business." Storable asserts that customers' designation of SafeLease, and possibly any insurance provider, as an authorized user violates the Terms of Service. Storable also asserts that it could amend their Terms of Service at any time, such as to preclude customers from designating insurance providers as authorized users. But Defendants admit that they have not changed their Terms of Service or informed their customers that they are allegedly in breach of the Terms of Service or otherwise attempted to enforce their alleged contractual rights against the customers themselves. After SafeLease made a public statement to mutual customers, Storable communicated to customers that "this is not your problem" and that its actions were motivated by data privacy and the threat that SafeLease allegedly posed to the stability of Defendants' platforms. As discussed above, the evidence presented at the temporary-injunction hearing does not support these claims.

8. Storable asserts that the Terms of Service for SiteLink and storEDGE require that "any use to develop a commercial product requires a separate third-party DEI [Data Exchange Interface] agreement." The evidence presented at the temporary-injunction hearing does not show that SafeLease was using SiteLink or storEDGE to develop a commercial product.

---

[2] Justification or privilege is an affirmative defense on which Defendants bear the burden of proof. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77–78 (Tex. 2000); *ACS Invs., Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex. 1997).

9.      While the evidence does establish that SafeLease needs access to the customer data on the FMS platforms to perform insurance services for the parties' mutual customers, the evidence establishes that the same is generally true for other third-party vendors that customers designate as authorized users on the FMS platforms, and Defendants agree that designation of other vendors, such as accountants, does not violate their terms of services. Defendants attempt to distinguish accountants, as authorized users, from insurance providers (like SafeLease), as authorized users, based on the extent of use, but the Terms of Service do not draw such a distinction.

10.     The evidence shows that Defendants' actions are not motivated by any alleged breach of their Terms of Service.

11.     Defendants assert justification or privilege based on an alleged right to prevent "free riders" on their services. The evidence at the hearing shows that Defendants are paid for their services by their customers, that their customers are authorized to designated third-party vendors as authorized users, and that the customers in question have designated SafeLease as an authorized user. Additionally, Defendants have not identified, and the Court has not found, any authority holding under what circumstances, if ever, an alleged right to prevent free riders constitutes a justification or privilege defeating a tortious-interference claim under Texas law.

12.     The evidence shows that SafeLease will incur a probable, imminent, and irreparable injury absent injunctive relief before trial of this case. Beginning in 2021, it routinely accessed customer-owned data within the processes of their FMS systems licensed from Defendants with express customer permission for such access and use. This access was through the graphical user interface as an authorized user, consistent with the customers' own access and their rights to appoint authorized users. On December 17, 2024, Defendants cut off SafeLease from access to Defendants' storEDGE system, which was restored through a temporary restraining order. After

January 21, 2025, Defendants cut off SafeLease from access to all three of their FMS systems and revoked access granted to SafeLease by the parties' mutual customers. Without access to customer-owned data within the processes of these customer FMS systems, SafeLease's ability to service customers is wholly or significantly impaired. Among other services, SafeLease is prevented from or impeded in issuing contracted-for new or renewed policies to customers, providing timely and effective lease compliance services, amending lease documentation for tenant protection plans, processing opt-out tenants with separate coverage, providing timely and accurate insurance data visualization services, issuing required tenant notices or billing, and promptly and fully adjusting tenant claims for loss.

13.     The evidence shows that Defendants intend to continue to refuse to allow SafeLease to access customer-owned data within the processes of FMS systems licensed by customers who grant SafeLease such access.

14.     The evidence at the temporary-injunction hearing supported SafeLease's assertion that it cannot practicably perform its contractual obligations to the parties' mutual clients while blocked from the FMS systems by Defendants, and that obtaining reports from customers is not, alone, a long-term viable solution. If injunctive relief is not granted, the interim injury to SafeLease may prevent the case from reaching a final resolution on the merits.

15.     The evidence shows that the harm to SafeLease is and would be irreparable. Its loss of ability to service customers that license Defendants' FMS will be difficult or impossible to measure fully with damages. It is likely to permanently damage SafeLease's customer relationships and reputation and good will in the industry, as well as put customers at risk of disruption and loss. Without access to customer-owned data in its customers' FMS systems, SafeLease will be substantially impaired or prevented from offering its services to its customers,

and SafeLease likely will be unable to continue operating or competing in the tenant-insurance market. These harms could not be adequately remedied with money damages or otherwise at law, and some portion of the likely pecuniary injury will be extremely difficult, if not impossible, to accurately identify, trace, quantify, and prove with reasonable certainty.

16.     The evidence shows that temporary injunctive relief is necessary to preserve the status quo before trial. The status quo is the last, actual, peaceable, non-contested status that preceded this controversy. Here, it is customer-authorized access by SafeLease to customer-owned data within the processes of FMS systems licensed from Defendants. The status quo is preserved by ensuring resumed access to such customer-owned data in their FMS systems so that SafeLease may provide agreed services to the parties' mutual customers.

17.     The evidence shows that the balance of equities favors issuance of injunctive relief. Beginning in 2021, and with customer permission and Defendants' knowledge, SafeLease accessed customer-owned data in their licensed FMS systems in order to provide tenant insurance services to the parties' mutual customers. On December 17, 2024, with no advance customer permission or notice, Defendants cut off SafeLease's access to the storEDGE platform. On December 31, 2024, it took Defendants less than an hour to restore access after TRO relief was granted. After the TRO expired on January 21, 2025, and the district court denied SafeLease's original temporary-injunction application, Defendants immediately disabled access by SafeLease to customer-owned data in all three of Defendants' FMS platforms. Access by SafeLease to customer-owned data in their FMS systems, as it had for three years before this dispute arose, will create no imminent or likely risk of SafeLease data breach or misuse, nor of disruption to Defendants' server performance or stability. SafeLease employs SOC-2 certified data protection processes and uses customer data only consistent with its customer agreements. If temporary

injunctive relief is granted, Defendants will suffer no irreparable harm and, at most, immaterial monetary harm that will be protected by the bond ordered below.

18. The evidence also shows significantly changed circumstances that further altered the status quo from the time the district court denied SafeLease's first request for temporary injunction.

19. The Court finds it equitable and appropriate to restore the status quo and protect SafeLease from irreparable injury by entering this Temporary Injunction against Defendants.

Therefore, it is Ordered, Adjudged, and Decreed that Defendants are enjoined as follows:

As to SafeLease customers as of January 21, 2025, Defendants shall take no action to prevent, impede, or otherwise interfere with SafeLease's authorized-user access to mutual customers' data stored in FMS systems licensed from Defendants (i.e., storEDGE, SiteLink, and Easy Storage Solutions), as well as SafeLease's use of such data within the processes of the FMS systems, as authorized by and available to such customers and for the purpose of providing insurance services for such customers.

This injunctive relief is subject to SafeLease maintaining SOC-2 certification of its data protection processes and only using customer data stored in FMS licensed from Defendants consistent with its customer agreements and historic practices.

The Clerk of the Court shall issue a writ of injunction to Defendants in accordance with the terms of this Order. Service of the writ by private process server is authorized.

This Order is binding upon Defendants and all their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

It is further Ordered that this Order shall expire 30 days after a trial on the merits in this case is completed, unless extended or earlier terminated by further order of this Court. Trial on the merits shall be scheduled to begin on the 30th day of June, 2026.

It is further Ordered that SafeLease shall post with the Clerk of this Court a bond in the amount of $6,600,000.[3] This bond reflects the amount of anticipated losses resulting from the temporary injunction as estimated by Defendants; but it does not include potential additional losses Defendants could suffer in the result of a data breach during the pendency of the temporary injunction, as no credible evidence has been presented to indicate that such a data breach is likely to occur as a result of this injunctive relief.

The bond must be filed and approved by the Clerk of the Court before any writ of injunction may issue pursuant to this temporary injunction. SafeLease may post a cash deposit in lieu of a bond under Texas Rule of Civil Procedure 14c.

SIGNED ON: March 11, 2025.

_____
Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

---

[3] The Court notes that SafeLease has done so, and a writ of injunction has issued, as of the date of this Amended Order.

# Exhibit E

E-filed in the Office of the Clerk
for the Business Court of Texas
2/18/2025 11:54 AM **401**
Accepted by: Beverly Crumley
Case Number: 25-BC03A-0001

NO. 25-BC03A-0001

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES, LLC, | § § § | THE BUSINESS COURT OF TEXAS |
| *Plaintiff*, | § § | |
| v. | § § | THIRD DIVISION |
| | § | |
| STORABLE, INC., REDNOVA LABS, INC., (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP, | § § § § § § | |
| | § § | TRAVIS COUNTY, TEXAS |
| *Defendants*. | § | |

**Motion To Exclude Or Disregard Opinions Of Dr. Williams
On The Ground That They Are Unreliable And Constitute No Evidence**

Defendants Storable, Inc.; RedNova Labs (d/b/a storEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP (collectively "Storable" or "Defendants") file this Motion to Exclude or Disregard Opinions of Dr. Williams.

I. **Introduction.**

Dr. Michael Williams provided a bare expert opinion unsupported by analysis of the factors critical to forming that conclusion. Dr. Williams opined that Storable had a dangerous probability of achieving monopoly power, a required element for SafeLease's claims.[1] But Dr. Williams did not provide reliable data to support his market-share opinion, or study the factors that determine the likelihood of monopoly power, including supracompetitive pricing, barriers to entry, the number or capabilities of competitors, Storable's ability to exclude insurers in the manner SafeLease alleges without counterproductively losing market share, or how pricing works in the relevant markets.

Dr. Williams's opinion is merely his *ipse dixit*—his unsupported opinion that constitutes no evidence. Therefore, SafeLease lacks evidence of a dispositive element of its claims.

---

[1]     Defendants have identified a number of other defects in Dr. Williams' opinions that will be brought to the Court's attention. However, due to the expedited timetable and the Court's indication it desired succinct briefing to assist in making its decision within the next two days, Defendants focus on the issues briefed herein at this time.

IMANAGE\17091056v1                                                     1

## II.     Expert Opinion Must Be Excluded When It Is Unreliable.

An "expert must not only be qualified, but his proposed testimony must be relevant and reliable." *Volkswagen of Am., Inc. v. Ramirez,* 159 S.W.3d 897, 904–05 (Tex. 2004). Expert testimony is unreliable if it is not grounded "in the methods and procedures of science" and is no more than "subjective belief or unsupported speculation." *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556, 557 (Tex. 1995). Moreover, expert testimony is unreliable when based on data that has not been established as reliable. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997).

Expert testimony is also unreliable if there is too great an analytical gap between the data on which the expert relies and the opinion offered. *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 727 (Tex. 1998). Therefore, expert testimony is unreliable even if the underlying data is sound if the expert draws conclusions from that data based on flawed methodology. *Merrell*, 953 S.W.2d at 714. Analytical gaps may include circumstances in which the expert unreliably applies otherwise sound principles and methodologies, *see Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 629 (Tex. 2002), the expert's opinion is based on assumed facts that vary materially from the facts in the record, *Independent Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995), or the expert's opinion is based on tests or data that do not support the conclusions reached, *City of San Antonio v. Pollock,* 284 S.W.3d 809, 818–19 (Tex. 2009).

To help judges determine reliability, Justice Harvey Brown recommended using three reliability "gates" based on Texas precedents. Harvey Brown, *Eight Gates For Expert Witnesses*, 36 Hous. L. Rev. 743 (1999); Harvey Brown and Melissa Davis, *Eight Gates For Expert Witnesses: Fifteen Years Later*, 52 Hous. L. Rev. 1 (2014). Those gates are:

- Methodological Reliability Gate: The expert's methodology must be reliable.

- Connective Reliability Gate: There must be sound reasoning connecting the expert's basis to their conclusion.

- Foundational Reliability Gate: The data underpinning the expert's opinion must be reliable.

*Id.* As shown below, and in the testimony of Defendants' expert witness showing miscalculations of market share, all three gates should bar Dr. Williams's opinion.

"Opinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact more probable or less probable." *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004). Therefore, an "expert's bare opinion [*ipse dixit*] will not suffice." *Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex. 1999).

**III.     Dr. Williams Lacked Any Basis For His Conclusory Opinion That Storable Posed A Dangerous Probability Of Achieving Monopoly Power.**

Both SafeLease and Storable acknowledge that whether conduct is predatory or anticompetitive and has a dangerous probability of achieving monopoly power are topics requiring expert testimony. In the evidentiary injunction hearing, SafeLease proffered expert Michael Williams, Ph.D. and Defendants countered with Juliette Caminade, Ph.D. to address these issues.

**A.  Standard for proving dangerous probability.**

To establish attempted monopolization, Plaintiff must prove "1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize **and** (3) **a dangerous probability of achieving monopoly power**." *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 690 (Tex. 2006) (emphasis added). To determine if the third element is established, a court must "consider the relevant product and geographic market and the defendant's economic power in that market." *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 592 (Tex. App.—Austin 2007, pet. denied). In *Tex. Disposal*, the monopolization claim failed on this "essential element" because the plaintiff did not prove the alleged monopolist's "ability to lessen competition in that market" and sufficient details about the power of competitors in that market. *Id.* at 593.

**B. Dr. Williams's opinion on dangerous probability is no evidence.**

Dr. Williams admitted that he had not conducted studies or analyses of at least 20 factors necessary for developing a reliable opinion. He made no examination of pricing of FMS provided to self-storage facilities, much less any determination that Storable could charge supracompetitive prices. He acknowledged that Storable could not prevent other FMS providers from seeking customers. In addition, Dr. Williams simply repeated the mantra "That's certainly possible" when asked about inaccuracies in his numbers in estimating market shares, such as whether the number of U.S. facilities using Storable's FMS was likely substantially lower than the number Dr. Williams used, and whether the total number of U.S. facilities had grown since the one report Dr. Williams relied on. Tr. 87, 90. Notwithstanding the clear lack of confidence in the veracity of any of his numbers, Dr. Williams pointed to his PowerPoint slide and conclusorily decided that a denominator of 52,000 and a numerator of 36,000 would support SafeLease's position that Storable had 82% of the FMS market. Tr. 25, 103.

Dr. Williams's testimony on dangerous probability is comprised merely of the following conclusory statement:

> what I've concluded here is this kind of dangerous probability that if its allowed to continue, that there is I think a substantial risk that Storable would be successful in leveraging[2] its monopoly power from the FMS market to the tenant insurance market.

Dr. Williams did not collect data or conduct studies necessary to support this conclusion. He merely leapt from his invalid conclusion that Storable has a high market share to his conclusion that it has monopoly power. A "claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Burrow,* 997 S.W.2d at 235 (citation omitted).

Dr. Williams failed to collect necessary, reliable data because he did not:

---

[2] Dr. Williams offered no opinion about the probability of Storable achieving a monopoly in the tenant insurance market *without* leverage from the FMS market. Tr. 84.

- Communicate with the manager of any FMS provider, Dr. Williams's Testimony, Rough Tr. 71;[3]

- Communicate "with any storage operator about how they went about selecting the FMS that they used," Tr. 79;

- Gather data on the number of U.S. facilities that use Storable's FMS, beyond looking at one website that was not limited to U.S. facilitates, Tr. 25, resulting in his substantial error in arriving at any valid conclusions on Defendants' share of the market;

- Gather data on the number of self-storage facilities in the United States, beyond looking at a number in the Self-Storage Almanac that was outdated and acknowledged to have omitted many facilities, Tr. 60–62, 90, resulting in the error in calculations noted above. Dr. Williams did not even consider, let alone analyze sufficiently to justify disregarding, reports of a significantly higher number of facilities. For example, Dr. Williams did not consider that the Self Storage Association describes a TractIQ database with information on "over 68,000" self-storage facilities that are already operating or being constructed. Appx. A, DX365 at 2; Appx. B, SafeLease's Expert Disclosure at 68 (showing data Dr. Williams reviewed).

Dr. Williams also failed to conduct studies necessary to understand the economic power or options of Storable and its competitors, because he did not study any of the following critical factors:

- "how many FMS licensors … have entered the market and when they entered," Tr. 65;

- "how common it is for self storage operators to switch from one FMS to another," Tr. 65;

- "the cost of switching from one FMS provider," Tr. 66;

- "FMS prices," Tr. 64;

- "FMS margins," Tr. 64;

- "whether the prices for FMS have gone up or down," Tr. 64;

- "the market for storage facilities and how competitive that market is," Tr. 67;

- "the number of FMS providers that provide services to operators in the U.S.," Tr. 69;

- "the number of competitors in the tenant insurance market," Tr. 82;

- The biggest operators' "willingness to sell their FMS," Tr. 69;

- "what it takes to develop the software to get into the FMS business," Tr. 73; or

---

[3] Unless otherwise specified, all of this motion's citations to a transcript are citations to the rough transcript of Dr. Williams's testimony. Defendants have uploaded a rough version of the transcript to Dr. Williams's testimony to the Court's platform.

- whether the alleged leveraging plan was infeasible because an FMS limiting access to insurers would cause operators to switch FMS providers, Tr. 78.

Without these studies, Dr. Williams could not reliably opine on the probability of Storable achieving monopoly power. For example, Dr. Williams had no knowledge of Storable's ability to limit access to insurance providers without losing FMS market share, the number and abilities of competitors, and barriers to entry of new competitors. Dr. Williams did speculate that barriers to entry into the FMS market are high because of the difficulty of developing FMS software and the fact that the three largest operators have not yet directly licensed their FMS externally, but this speculation is no evidence because Dr. Williams admitted that he did not study what it takes to develop FMS software nor the willingness of the three largest operators to license their already developed FMS. Tr. 73, 69. He excluded the largest operators, even though they provide management services, including FMS, to other owners of self-storage facilities.

In summary, rather than rely on knowledge about the relevant markets or the companies and products at issue, Dr. Williams relied on general theories published in academic articles. Tr. 9, 31. This is insufficient. *See Ramirez*, 159 S.W.3d at 905–906 (excluding methodology that relied on general "laws of physics" rather than analyzing the particular product, and failed to cite specific studies).

Dr. Williams also offered an opinion that Storable's API price was a "choke price" for SafeLease. Tr. 50. However, this is no evidence because Dr. Williams admitted that he had done "no particular analysis" of this issue, had not analyzed SafeLease's financial condition or profitability, and had simply relied on the conclusory statement of SafeLease's CEO that SafeLease could not operate at that price. Tr. 52. Importantly, as revealed at other points in the hearing and undermining any testimony that SafeLease could not continue to exist without its free use of Storable's FMS platform, SafeLease has several ways to continue operating at the offered price, including:

- reducing the excessive amount of revenue it shares with operators,

- using the funding sources that have allowed it to overcome profit-margin obstacles for years,

- relying on the sources that provided SafeLease with ample funds in October 2024. DX 127, 128; Feb. 14 Tr. 92–93.

Dr. Williams studied none of these options and considered none of them in his conclusory opinion.

Unreliable opinions like this are excluded. Writing for the Court in *Houston Unlimited, Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820 (Tex. 2014), Justice Boyd explained that the expert testimony on market value was unreliable because of its speculative assumptions and analytical gaps. In *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 580–81 (Tex. 2006), the expert opinion was unreliable because while the expert mentioned relying on extensive studies, he did not identify evidence specific to the fire in question or explain why he ruled out alternative explanations. *See also Guadalupe-Blanco River Auth. v. Kraft,* 77 S.W.3d 805, 806–10 (Tex. 2002) (excluding appraisal method that was not tied to commonly accepted factors); *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 420–26 (Tex. 2020) (excluding a method of calculating reputational damage that was not sufficiently based on the actual facts of the defamation alleged).

Dr. Williams's method for calculating market share is unreliable for several additional reasons. *First*, instead of using the generally accepted method of measuring market share using revenue or output (or proxies such as number of storage units in self-storage facilities), Dr. Williams used the number of facilities ignoring the fact that facilities range from a few dozen units to over 700. *Second*, Dr. Williams used incorrect numbers, without necessary adjustments, for the number of Storable's facilities and the total number of self-storage facilities in the United States. In other words, both the numerator and denominator for his market-share equation were incorrect. *Third*, Dr. Williams unjustifiably omitted portions of the relevant market (both self-storage facilities and FMS providers) in a transparent attempt to reach a desired conclusion, i.e., excluding large operators in his market share explanation whose facilities could choose to use FMS and risk-protection products of other providers.

**408**

## IV. Conclusion.

For these reasons, Defendants respectfully request the Court find unreliable and therefore exclude or disregard the testimony and opinions of Dr. Williams as constituting no evidence of market share or the probability of Storable achieving monopoly power.

## V. Appendix.

| Tab | Description |
|-----|-------------|
| A | DX365, an exhibit showing database describing over 68,000 self-storage facilities |
| B | Plaintiff's Rule 195.5 Disclosures |

Respectfully submitted,

**PORTER HEDGES LLP**

By:    */s/ Ray T. Torgerson*
Ray T. Torgerson
SBN: 24003067
Neil Kenton Alexander
SBN: 00996600
Jonna N. Summers
SBN: 24060649
Elizabeth "Liza" Eoff
SBN 24095062
Lakshmi N. Kumar
SBN: 24144581
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
lkumar@porterhedges.com

**GREENBERG TRAURIG LLP**
Dale Wainwright
Texas Bar No. 00000049
Justin Bernstein
Texas Bar No. 24105462
300 West 6th Street, Suite 2050
Austin, Texas 78701
Telephone: (512) 320-7240
Facsimile: (512) 320-7240
dale.wainwright@gtlaw.com
bernsteinju@gtlaw.com

**Attorneys For Defendants**

## Certificate of Compliance

I hereby certify that this document complies with Local Rule 5(a) and contains 2,300 words, excluding the case caption, any index, table of contents or table of authorities, signature blocks, attached evidence, or any required certificates.

*/s/ Ray T. Torgerson*

## Certificate of Service

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon counsel of record in accordance with the Texas Rules of Civil Procedure on February 18, 2025.

*/s/ Ray T. Torgerson*

# APPX. A


(https://www.selfstorage.org/)

 (https://www.selfstorage.org/)

  



**Click Logo for More Info**



# Research & Data

**Research & Data**

SSA takes pride in providing members with fresh research and data. SSA data studies are revolutionizing the way owner-operators and managers look at our industry.

---



**Thank you to all that participated in our Traffic Study!**

We hope to have results to report at our Spring Conference & Trade Show in Orlando. Participants and members will have access to the new data soon.

For more information, please contact Mike Blackett @ mblackett@selfstorage.org (mailto:mblackett@selfstorage.org?subject=SSA%20Traffic%20Generation%20Study)

**The 2023 Self Storage Demand Study**

This 2023 edition of the SSA's Self Storage Demand Study tells us who uses self storage, how and why and most importantly projects future demand. It helps us to understand the current incidence of usage and how it is tied to area demographic characteristics. It provides us with a point of view on what drives demand, with insights on how customers use self storage. Over 300 pages with hundreds of tables and graphs packed with information you won't get anywhere else. Sold electronically. Member: $400 / Non-Member: $550

Buy it TODAY (/LinkClick.aspx?link=%2fProducts-Services%2fBooks&tabid=1150&portalid=0&mid=2799)

See a sample of the 2023 Demand Study here (/LinkClick.aspx?fileticket=Qm8AppFXjww%3d&portalid=0)



**413**

## 2023 Self Storage Demand Study Mapping/Query Tool

| UNIT SIZE | 2005 | | | 2007 | | | 2013 | | | 2017 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Urban | Suburban | Rural | Urban | Suburban | Rural | Urban | Suburban | Rural | Suburban | Urban | Rural |
| 5'x5' or smaller | 13.2% | 11.3% | 8.1% | 9.4% | 4.0% | 4.2% | 14.0% | 9.7% | 4.4% | 14.3% | 19.8% | 7.3% |
| 5'x10' | 22.0% | 26.1% | 21.3% | 33.8% | 15.8% | 10.6% | 27.1% | 22.5% | 17.3% | 20.1% | 27.2% | 16.9% |
| 10'x10' | 26.5% | 25.7% | 27.2% | 20.0% | 33.2% | 27.8% | 28.3% | 29.8% | 31.3% | 23.2% | 20.8% | 23.4% |
| 10'x15' | 14.3% | 10.1% | 14.9% | 9.1% | 14.2% | 15.9% | 12.8% | 16.1% | 18.5% | 14.7% | 9.5% | 18.8% |
| 10'x20' | 15.1% | 15.7% | 21.3% | 12.3% | 26.5% | 26.9% | 12.1% | 16.4% | 18.9% | 14.8% | 11.4% | 22.5% |
| 10'x30' or larger | 8.9% | 11.1% | 7.2% | 15.5% | 6.3% | 14.6% | 5.8% | 5.5% | 9.7% | 12.9% | 11.1% | 11.2% |
| TOTAL | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

| ACTUAL RENTAL LENGTH | 2005 | | | 2007 | | | 2013 | | | 2017 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Urban | Suburban | Rural | Urban | Suburban | Rural | Urban | Suburban | Rural | Suburban | Urban | Rural |
| Less than 3 months | 16.3% | 15.2% | 13.3% | 13.3% | 16.8% | 14.7% | 15.3% | 11.5% | 11.9% | 15.4% | 18.7% | 17.9% |
| 3 to 6 months | 23.4% | 26.0% | 20.0% | 25.1% | 23.5% | 25.2% | 19.5% | 18.9% | 13.6% | 19.1% | 20.4% | 19.8% |
| 7 months to 12 months | 16.0% | 22.5% | 29.4% | 17.7% | 19.5% | 18.2% | 18.8% | 17.2% | 18.8% | 17.2% | 16.6% | 16.6% |
| 1 to 2 years | 25.4% | 21.2% | 20.2% | 25.9% | 22.4% | 26.5% | 22.3% | 19.6% | 23.5% | 23.9% | 19.4% | 17.2% |
| Longer than 2 years | 18.9% | 15.1% | 17.1% | 18.0% | 17.8% | 15.4% | 24.0% | 32.8% | 32.2% | 24.4% | 24.9% | 28.4% |
| TOTAL | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

| PREFERRED PAYMENT METHOD | 2005 | | | 2007 | | | 2013 | | | 2017 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Urban | Suburban | Rural | Urban | Suburban | Rural | Urban | Suburban | Rural | Suburban | Urban | Rural |
| Cash | 16.2% | 7.8% | 17.6% | 11.1% | 7.5% | 11.8% | 6.4% | 3.3% | 15.7% | 6.9% | 4.8% | 6.2% |
| Check | 30.3% | 29.4% | 45.2% | 26.5% | 26.3% | 43.6% | 18.3% | 19.8% | 33.3% | 11.1% | 10.8% | 33.9% |
| Money Order | 2.1% | 1.7% | 1.5% | 2.4% | 1.3% | 2.3% | 3.0% | 1.2% | 0.7% | 2.0% | 2.8% | 1.7% |
| Credit Card | 25.5% | 33.4% | 18.0% | 27.1% | 25.0% | 20.1% | 20.2% | 34.4% | 26.0% | | | |

The 2023 Self Storage Demand Study Mapping (or Query) Tool takes the data sets from all six SSA Demand Studies (2005, 2007, 2013, 2017, 2020 and 2023) and puts them into a searchable and comparable format. Sold electronically, via email, in an Excel Macros file format. Sold electronically. Member: $500 / Non-Member: $750

Buy it TODAY (/LinkClick.aspx?link=%2fProducts-Services%2fBooks&tabid=1150&portalid=0&mid=2799)



(https://tractiq.com/)

*"TractIQ pulls together the best of all platforms and filters out the garbage in a way that provides a self-storage investor exactly the information they need." - Adam Roosien, JLL*

TractIQ (https://tractiq.com/) is a self-storage data platform that empowers investors, brokers, and operators to make smarter, more confident, data-driven decisions. The company proudly serves top-tier brokerages like Cushman & Wakefield, Matthews Real Estate, and Marcus & Mill (https://tractiq.com/)ichap, and notable investment companies such as 10Federal Storage, Spartan Investment Group, and Store Here.

TractIQ (https://tractiq.com/) provides comprehensive data on self-storage supply, demand indicators, and site risk factors. The platform includes information on over 68,000 operating storage facilities and construction sites, 30,000 with detailed pricing by unit type, and 35,000 with owner contact details. It also tracks many demand indicators, such as demographic data, 80,000+ housing starts, 300,000+ commercial construction projects, traffic counts, and major signal brand locations (Walmart, Starbucks, Whole Foods, etc.).



**Industry Focused Partner Program**

Moody's CRE is committed to positioning pivotal data at the heart of business decision-making, across diverse markets within the self storage sector. Through the Data Contributor Program, we're supporting participating owners, operators, and property managers by delivering valuable performance data and market insights.

**Real Time Insights for Participants**

Data is critical to the self storage industry, an asset class in commercial real estate that's experienced rapid growth and demonstrated resilience. The growing competitiveness and local market nuances add layers of complexity and risk to this sector, emphasizing the importance of adopting a data-informed approach for decision-making and strategizing. Covering 125 primary United States metropolitan markets and hundreds of submarkets, Moody's CRE offers extensive self storage data that can aid in risk mitigation and help you make better decisions.

See the Markets we cover **here (/LinkClick.aspx?fileticket=6Ax9rUOdmx4%3d&portalid=0)**.

**Identify Opportunities**

Contributing members can access property, new construction, and market data to efficiently identify over-and under-performing markets and properties.

**View Comprehensive Risks**

Monitor risk specific to your market, property type, or tenant.

**Monitor Sales Transactions**

Understand market news and gain better insights into sales transactions, such as true ownership information.

**HOW OUR DATA CONTRIBUTOR PARTNERSHIP PROGRAM WORKS**

**1**. **Partner Member Onboarding**

Once Partnership agreement is signed and returned, a user list is created for up to 5 members of your organization to have access to the Moody's CRE platform.

**2. Quarterly/Monthly Submission**

You download an XLS data file directly from your company's management software, and send it to us via a secured file transfer site.

**3. Contributor Platform Access**

Access is granted to the self storage markets based on the region(s) in which you contribute data. Training is available through our Customer Success Team.

**Discounted pricing is available for additional regions or sectors.**

Please **click here** (https://cre.moodysanalytics.com/data-contributor/) to learn more about this program.

 *© 2024 Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved.*

 (https://www.yardimatrix.com/Property-Types/Self-Storage)

(https://www.yardimatrix.com/Property-Types/Self-Storage)

**Yardi® Matrix Self Storage** is the industry's leading market intelligence platform for originating, pre-underwriting and managing assets for profitable loans and investments. Subscribers get access to property-level data for more than 27,000 storage facilities in 135 markets across the U.S.

**Key Features**

- Complete new supply pipeline information at the asset, competitive set and market level

- In place loans and expirations - construction, permanent and CMBS

- Full ownership and management information

- Complete site-level information

- Rents by storage unit size and rent comparable reporting

- Property sales information and sale comparable reporting

- Patented property improvement and location ratings systems

VIEW A SAMPLE REPORT HERE (https://www.yardimatrix.com/publications/download/File/1105-MatrixNationalSelfStorageMonthly-September2020)

If you have any questions, please contact Yardi Matrix by calling 480.663.1149 or email (mailto:https://www.yardimatrix.com/Contact-Us)

Find out more HERE (/LinkClick.aspx?link=https%3a%2f%2fwww.yardimatrix.com%2fProperty-Types%2fSelf-Storage&tabid=1150&portalid=0&mid=2799)



(https://www.storquest.com/property-management)





## About SSA

The **Self Storage Association** (SSA) is a not-for-profit tax-exempt organization formed in 1975 under Section 501-c-6 of the Internal Revenue Code. For over 40 years, the Association has served as the official trade organization and voice of the U.S. and international self storage industry.

## Social

 Follow us on **Facebook** (https://www.facebook.com/pages/Self-Storage-Association/89005666926)

 (https://www.youtube.com/channel/UCSkTZUCyawpnIVlQSagjYTQ)   Folow us on **Instagram** (https://www.instagram.com/selfstorageassociationusa/)

 Join us on **LinkedIn** (https://www.linkedin.com/company/self-storage-association-ssa---usa)

 Follow us on **Twitter** (https://twitter.com/selfstorageassn)

 See us on **YouTube** (https://www.youtube.com/channel/UCSkTZUCyawpnIVlQSagjYTQ)

## Navigation

ABOUT SSA (/About-SSA)

MEMBERSHIP (/Membership)

EVENTS & EDUCATION (/Events-Education)

PRODUCTS & SERVICES (/Products-Services)

NEWS & ADVOCACY (/News-Advocacy)

ADVERTISING & SPONSORSHIPS (/Advertising-Sponsorships)

LIBRARY (/Products-Services/Public-Library)

MAGAZINE (/LinkClick.aspx?link=http%3a%2f%2fwww.ssaglobe.org%2f&tabid=55&portalid=0&mid=434)

## Contact Us

**Self Storage Association Headquarters**

**1001 North Fairfax Street, Suite 505**

**Alexandria, VA 22314**

**Tel:** (703) 575-8000

**Toll Free:** (888) 735-3784

info@selfstorage.org (mailto:info@selfstorage.org)

Office hours: 8:30a - 5:00p EST, Mon-Fri

Copyright © 2025 by Self Storage Association    |    Privacy Policy (/About-SSA/Privacy-Policy)    |    Terms of Use (/About-SSA/Terms-of-Use)

# APPX. B

No. 25-BC03A-0001

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | THE BUSINESS COURT OF TEXAS |
| Plaintiff, | § § | |
| v. | § | THIRD DIVISION |
| | § | |
| STORABLE, INC., et al., | § § | |
| | § | |
| Defendants. | § | TRAVIS COUNTY, TEXAS |

## PLAINTIFF'S RULE 195.5 DISCLOSURES

Pursuant to the Tex. R. Civ. P. 195.5, plaintiff SafeLease Insurance Services LLC serves the following expert disclosures.

**Mr. Daniel Steinbrook**, Vice President, Elysium Digital, LLC, 2001 K Street NW, Suite 625 North, Washington, DC 20006, (617) 807-8533, who will offer opinions on the following:

1.      Cybersecurity concepts, software system performance, and programmatic data access methods. In addition to his testimony and education credentials, his IT duties at Elysium inform his opinions, including development, maintenance and deployment of internal and public-facing web applications; provisioning, monitoring, and migration of cloud software, including on Amazon Web Services; and building integrations with third-party software systems.

2.      Defendants' misuse of technical or cybersecurity terminology to mischaracterize or falsely represent SafeLease activities, which are being performed on behalf of its customers with their permission. For example, defendants misuse terms like "backdoors", "circumvented" and "hacking," which are understood in the industry to refer to vulnerabilities or malicious software that allow unauthorized access; "botnets" and "zombies," which are understood in the industry to refer to compromised machines that have been unknowingly harnessed by third parties to do their bidding; and "spamming," which is understood in the industry to refer to generating unwanted messages or content on a platform.

3.      A technical person in the industry would not reasonably understand the Terms of Service for SiteLink, storEDGE, or Easy Storage Solutions to prohibit third-party access or automation through legitimately obtained credentials. As a technical matter, the terms do not specify what kind of legitimate activity on behalf of a customer may not be automated. SafeLease did not transmit or store malicious code through any customer FMS system, nor did it automate the aggregation of data from their FMS systems.

4.      Storable's performance concerns are not well founded or supported. Easy Storage Solutions has had system issues unrelated to SafeLease access. Storable implemented techniques to resolve load and performance issues allegedly caused by SafeLease's access. Storable fails to

demonstrate that any issue with the load on its servers would be resolved if SafeLease accessed customer FMS systems through an API.

5.　　Storable's security concerns are not well founded or supported. Storable does not know what data, if any, SafeLease captured or stored from the accounts it had legitimate access to, offers no evidence that SafeLease accessed a customer account without getting permission from and being designated as an authorized user by that customer, and fails to demonstrate that accessing their customer systems through a UI versus an API would expose more sensitive data.

6.　　Storable's claims about the superiority of API access do not consider SafeLease's specific needs and use cases. Storable cites advantages for it as the provider, such as mechanisms for access controls and rate limiting, which are not specific to API-based access. An API was not available as an option to SafeLease when it first approached Storable, and other customers required custom development by Storable at additional cost to meet their business needs.

7.　　Differences in programmatic access functionality between FMS systems can have security and performance impacts, which Storable does not account for. For example, storEDGE has a publicly documented API, but SiteLink is older software where API functionality was added later, and ESS has no API at all. Because of these differences, it is not reasonable to extrapolate the security and performance implications of specific data access patterns across the three systems.

8.　　Even if Storable provided APIs that fulfill SafeLease's requirements, it would take time for SafeLease to adapt their processes. Moreover, vendors like SafeLease serving FMS customers need UI access to perform functions their customers expect them to perform. Storable acknowledges that some types of automated UI access can be "good" but fails to justify why access to authenticated (i.e. non-public) resources should be different. Notably, SafeLease's existing access method was to be maintained until sufficient API access was in place.

He is being compensated $650 per hour for his work in this case. His CV is attached as Exhibit A. A list of documents provided to, reviewed by, or prepared by him in anticipation of his testimony is attached as Exhibit B.

**Dr. Michael Williams**, Managing Director, Berkely Research Group LLC, 2200 Powell Street, Suite 1200, Emeryville, California 94608, (510) 874-5946, an antitrust economist who will testify regarding relevant markets, market or monopoly power, supra-competitive prices, raising rivals' costs, monopoly leveraging, and refusals to deal, including the following:

1.　　The two relevant antitrust markets here are the FMS market and tenant insurance market. For the FMS market, the relevant product market includes FMS products sold by Storable (storEDGE, SiteLink, and Easy Storage Solutions), as well as other providers like Cubby, SSM and U-Haul's WWS. This product market does not include software used by large self-storage operators that provide their own software which is not available for purchase by other operators. The relevant geographic market is the U.S. Operators in the U.S. can practically purchase FMS from providers anywhere in the U.S.

2.　　For the tenant insurance market, the relevant product market includes tenant insurance and tenant protection program products purchased by independent self-storage facilities.

These products are reasonably interchangeable. They provide similar coverage for similar types of hazards. A facility that purchases one would have no need to purchase the other. The relevant geographic market is the U.S. Operators can practically purchase tenant insurance from providers anywhere in the U.S.

3.     Defendants' share in the FMS market is about 82% based on currently available data from defendants and industry sources. This calculation excludes large self-storage facilities that provide their own FMS and do not sell it to third parties. Including such facilities, defendants' market share is about 69%.

4.     Market concentration in the FMS market, based on defendant's 82% market share and using a conservative estimate of the Herfindahl-Hirschman Index, is equal to 6,724. This value indicates a highly concentrated market.

5.     Defendants are leveraging monopoly power. This opinion is based on analyses of competitive benchmark prices using currently available data and other exclusionary practices or acts by defendants. Defendants offered an API price to SafeLease of $1.00/unit per month if the facility operator was not previously using a Storable insurance product, and $1.50/unit per month if the operator was using a Storable insurance product. These prices reflect leveraging of monopoly power. The $1.00 price exceeds a conservative estimate of the competitive benchmark price offered by Cubby by 567% and by SSM by 100%. The $1.50 price exceeds those benchmark prices by 900% and 200%, respectively.

6.     Based on these benchmark prices and the fact that, based on currently available data, defendants' current average API fee paid by other insurance providers is $0.25/unit per month, the prices offered to SafeLease are supra-competitive. This reflects leveraging of monopoly power in the ability to access FMS to the market for tenant insurance.

7.     Defendants' non-compete restrictions and penalty prices if the customer previously purchased tenant insurance from a Storable affiliate are exclusionary. This price difference is not attributable to a difference in defendants' forward-looking marginal costs of providing API access. The price difference demonstrates leveraging of monopoly power.

8.     Defendants' cutting off SafeLease from customer FMS systems is, from an economics perspective, the equivalent of charging an infinite price. There is no positive price, however large, at which defendants will allow SafeLease to access the customer systems as a customer-authorized user.

He is being compensated $850 per hour for his work in this case. His CV is attached as Exhibit C. A list of documents provided to, reviewed by, or prepared by him in anticipation of his testimony is attached as Exhibit D.

Date: February 9, 2025                    Respectfully submitted,

                                          */s/ R. Paul Yetter*
Judd E. Stone II                          R. Paul Yetter
State Bar No. 24076720                    State Bar No. 22154200
judd@stonehilton.com                      pyetter@yettercoleman.com
Christopher D. Hilton                     Susanna R. Allen
State Bar No. 24087727                    State Bar No. 24126616
chris@stonehilton.com                     sallen@yettercoleman.com
Alexander M. Dvorscak                     Luke A. Schamel
State Bar No. 24120461                    State Bar No. 24106403
alex@stonehilton.com                      lschamel@yettercoleman.com
STONE HILTON PLLC                         Shannon N. Smith
600 Congress Ave.                         State Bar No. 24110378
Austin, Texas 78748                       ssmith@yettercoleman.com
(737) 465-3897                            YETTER COLEMAN LLP
                                          811 Main Street, Suite 4100
                                          Houston, Texas 77002
                                          (713) 632-8000

### CERTIFICATE OF SERVICE

I certify that on the 9th day of February, 2025, this pleading was served by email to all counsel of record.

                                          */s/ Shannon N. Smith*
                                          Shannon N. Smith

# Exhibit A



## Daniel W. Steinbrook

Vice President

(617) 807-8533
daniel.steinbrook@aon.com
2001 K Street NW, Suite 625 North
Washington, DC 20006

## Professional Experience

- Elysium Digital, LLC, a subsidiary of Aon Corporation, Vice President, 2022 – Present
- Elysium Digital, LLC, a subsidiary of Aon Corporation, Director, 2019 – 2022
- Stroz Friedberg, LLC, an Aon company, Director, 2018 – 2019
- Stroz Friedberg, LLC, an Aon company, Manager, 2016 – 2018
- Stroz Friedberg, LLC, an Aon company, Senior Consultant, 2015 – 2016
- Elysium Digital, LLC, Computer Scientist, 2010 – 2015
- Elysium Digital, LLC, Consulting Computer Scientist, 2010
- Harvard Law School Berkman Center for Internet and Security, Summer Intern, 2009
- Harvard School of Engineering and Applied Sciences, Fall Teaching Fellow, 2008 – 2009
- Harvard School of Engineering and Applied Sciences, Summer Research Fellow, 2008

## Education

- S.M., Electrical Engineering, Harvard University, 2011
- A.B., Computer Science, Harvard University, 2011

## Training

- CopyrightX, Harvard Law School, 2015

## Patents

- Medical Image Viewing and Manipulation Contactless Gesture-Responsive System and Method. Alexander Bick, Ammar Sarwar, and Daniel W. Steinbrook. US Patent Application No. 14/006,866, filed September 23, 2013.

## Testimony

[1] *Wood et al. v. Mike Bloomberg 2020, Inc.*
U.S. District Court, Southern District of New York, Case No. 1:20-cv-02489
Was deposed and submitted expert report on behalf of Mike Bloomberg 2020 (represented by Proskauer Rose) in a class-action lawsuit involving issues related to interstate commerce and cloud computing, 2023.

[2] *Card Isle Corporation v. Farid et al.*
U.S. District Court, Northern District of Georgia, Case No. 1:21-cv-01971
Was deposed and submitted expert report on behalf of Card Isle Corporation (represented by Mitchell Sandler) on the structural and source-code-level similarity of web applications, 2022.

[3] *Opal Labs Inc. v. Sprinklr, Inc. et al.*
U.S. District Court, District of Oregon, Case No. 3:18-cv-01192
Testified at trial, was deposed and submitted expert report on behalf of Sprinklr, Inc. (represented by Tonkon Torp) on the security of user experience trade secrets, 2021.

[4] *Tradeshift, Inc. v. BuyerQuest, Inc.*
US District Court, Northern District of California, Case No. 3:20-cv-01294
Was deposed and submitted expert report on behalf of BuyerQuest, Inc. (represented by Gordon Rees Scully Mansukhani) in a contract dispute between SaaS vendors providing enterprise procurement software, 2021.

[5] *Asner et al. v. Raizada*
American Arbitration Association, Case No. 01-19-0001-2031
Testified at arbitration and submitted written expert testimony on behalf of Claimant (represented by Spencer Fane) on search engine optimization (SEO) in a matter involving online defamation, 2020, 2021.

[6] *Securities and Exchange Commission v. Mutual Benefits Corp. et al.*
U.S. District Court, Southern District of Florida, Case No. 0:04-cv-60573
Testified at hearing on behalf of Litai Assets, LLC (represented by AXS Law Group) on data interchange formats and the confidentiality of relational database structure, 2020.

[7] *Yosowitz v. Kay et al.*
In the District of Harris County, Texas, 334th Judicial District, Case No. 2018-37750
Submitted declarations on behalf of Laura Elizabeth Yosowitz (represented by Schlanger Silver Barg & Paine) in a trade secret matter involving misappropriation of source code for an online real estate platform, 2020.

[8] *Nuance Communications, Inc. v. International Business Machines Corporation*
U.S. District Court, Southern District of New York, Case No. 7:16-cv-05173
Submitted declaration on behalf of International Business Machines Corporation (represented by Quinn Emanuel Urquhart & Sullivan) in a breach of contract matter involving machine learning systems, 2017.

[9] *Government Employees Insurance Company et al. v. Dorchester Chiropractic, Inc. et al.*
U.S. District Court, District of Massachusetts, Case No. 1:13-cv-10744
Submitted expert report on behalf of Government Employees Insurance Company (represented by Smith & Brink) in an insurance fraud investigation regarding medical and billing records stored in database tables, 2015.

# Exhibit B

## Materials Considered

Plaintiff's First Amended Petition

Plaintiff's Second Amended Petition

Defendant's Answer

Plaintiff's Original Petition

SafeLease's Motion for a TRO

Jan. 16, 2025 Safelease v. Storable TI Hearing Transcript

Jan. 30, 2025 TRO Hearing Transcript

Transcript of Deposition of Charles Gordon

SAFELEASE0000573

SAFELEASE0000551

SAFELEASE0000571

SAFELEASE0000256

SAFELEASE0000722

SAFELEASE0000734

SAFELEASE0000748

SAFELEASE0000741

SAFELEASE0000328

SAFELEASE0000692

SAFELEASE0000602

SAFELEASE0000751

SAFELEASE0000323

SAFELEASE0000636

SAFELEASE0000678

SAFELEASE0000758

SAFELEASE0000001

SAFELEASE0000211

SAFELEASE0000275

SAFELEASE0000340

SAFELEASE0000576

SAFELEASE0000698

SAFELEASE0030326

SAFELEASE0000185

SAFELEASE0000781

SAFELEASE0000132

SAFELEASE0000280

SAFELEASE0000811

SAFELEASE0030335

SAFELEASE0000788

SAFELEASE0000647

SAFELEASE0000652

SAFELEASE0000214

SAFELEASE0000583

SAFELEASE0030333

SAFELEASE0001623

SAFELEASE0006476

SAFELEASE0030341

SAFELEASE0030342

SAFELEASE0030343

SAFELEASE0030344

SAFELEASE0030345

SAFELEASE0030346

SAFELEASE0030347

SAFELEASE0030348

SAFELEASE0030349

SAFELEASE0030350

SAFELEASE0030351

SAFELEASE0030352

SAFELEASE0030353

SAFELEASE0030354

SAFELEASE0030355

SAFELEASE0030356

SAFELEASE0030357

SAFELEASE0030358

SAFELEASE0030359

SAFELEASE0030360

SAFELEASE0030361

SAFELEASE0000258

SAFELEASE0000742

SAFELEASE0000019

SAFELEASE0000752

SAFELEASE0000050

STORABLE000001

STORABLE000010

STORABLE000028

STORABLE000079

STORABLE000094

STORABLE000109

STORABLE000111

STORABLE000138

STORABLE000167

STORABLE000195

STORABLE000224

STORABLE000252

STORABLE000279

STORABLE000307

STORABLE000335

STORABLE000364

STORABLE000374

STORABLE000376

STORABLE000378

STORABLE000394

STORABLE000074

STORABLE000076

SAFELEASE0000639

SAFELEASE0000655

SAFELEASE0000003

SAFELEASE0000004

SAFELEASE0000005

SAFELEASE0000013

SAFELEASE0000014

SAFELEASE0000022

STORABLE000535

STORABLE000543

STORABLE000554

STORABLE000524

STORABLE000526

STORABLE000423

STORABLE000425

STORABLE000429

STORABLE000433

STORABLE000440

STORABLE000442

STORABLE000444

STORABLE000446

STORABLE000448

STORABLE000449

STORABLE000450

STORABLE000451

STORABLE000459

STORABLE000461

STORABLE000464

STORABLE000469

STORABLE000596

STORABLE000597

STORABLE000598

STORABLE000599

STORABLE000600

STORABLE000601

STORABLE000602

STORABLE000603

STORABLE000604

STORABLE000605

STORABLE000606

STORABLE000607

STORABLE000608

STORABLE000609

STORABLE000611

STORABLE000612

STORABLE000613

STORABLE000614

STORABLE000615

STORABLE000616

STORABLE000617

STORABLE000618

STORABLE000620

STORABLE000621

STORABLE000622

STORABLE000623

STORABLE000624

STORABLE000625

STORABLE000626

STORABLE000627

STORABLE000628

STORABLE000629

STORABLE000630

STORABLE000631

STORABLE000632

STORABLE000633

STORABLE000634

STORABLE000635

STORABLE000640

STORABLE000642

STORABLE000643

STORABLE000644

STORABLE000645

STORABLE000646

STORABLE000647

STORABLE000648

STORABLE000649

STORABLE000652

STORABLE000655

STORABLE000657

STORABLE000660

STORABLE000661

STORABLE000662

STORABLE000663

STORABLE000664

STORABLE000665

STORABLE000666

STORABLE000667

STORABLE000670

STORABLE000673

STORABLE000674

STORABLE000675

STORABLE000792

STORABLE000793

SAFELEASE0000040

SAFELEASE0000042

SAFELEASE0000053

SAFELEASE0000058

SAFELEASE0000061

SAFELEASE0000135

SAFELEASE0000137

SAFELEASE0000140

SAFELEASE0000142

SAFELEASE0000145

SAFELEASE0000150

SAFELEASE0000246

SAFELEASE0000247

SAFELEASE0000255

SAFELEASE0000748

SAFELEASE0000784

STORABLE000045

STORABLE000048

STORABLE000051

SAFELEASE0000934

SAFELEASE0000935

SAFELEASE0000936

SAFELEASE0001070

SAFELEASE0030325

SAFELEASE0000907

STORABLE000689

STORABLE000704

STORABLE000719

STORABLE000740

STORABLE000769

STORABLE000772

STORABLE000794

STORABLE000798

STORABLE000800

STORABLE000676

STORABLE000396

STORABLE000401

STORABLE000406

STORABLE000411

STORABLE000416

STORABLE000479

STORABLE000485

STORABLE000494

STORABLE000498

STORABLE000502

STORABLE000519

STORABLE000556

STORABLE000571

STORABLE000580

STORABLE000588

STORABLE000418

SAFELEASE0000745

SAFELEASE0000746

SAFELEASE0000776

SAFELEASE0000777

SAFELEASE0000783

SAFELEASE0000785

SAFELEASE0000810

SAFELEASE0000856

SAFELEASE0000906

STORABLE000055

SAFELEASE0030332

STORABLE000801

STORABLE000807

STORABLE000864

STORABLE000949

STORABLE001028

STORABLE001032

STORABLE001034

STORABLE001040

STORABLE001059

STORABLE001085

STORABLE001085

STORABLE001086

STORABLE001088

STORABLE001091

STORABLE001094

STORABLE001096

STORABLE001099

STORABLE001102

STORABLE001103

STORABLE001105

STORABLE001108

STORABLE001136

STORABLE001228

STORABLE001285

STORABLE001287

STORABLE001286

STORABLE001296

storEDGE API documentation: https://api.storedgefms.com/docs/v1.html

Sitelink Setups

# Exhibit C



**438**

**MICHAEL A. WILLIAMS**
BERKELEY RESEARCH GROUP, LLC
2200 Powell Street, Suite 1200 | Emeryville, CA 94608

Direct: 925.200.5515
michael.williams@thinkbrg.com

## SUMMARY

Michael A. Williams, Ph.D. is a Managing Director at Berkeley Research Group, LLC (BRG). He specializes in analyses involving antitrust, industrial organization, and regulation. He has published articles in a number of academic journals, including the *Proceedings of the National Academy of Sciences, Science Advances*, *American Economic Review, Journal of Industrial Economics, International Journal of Industrial Organization, Journal of Law and Economics, American Law and Economics Review, Journal of Economics & Management Strategy, Review of Industrial Organization, Journal of Institutional and Theoretical Economics, Economics Letters, Journal of Public Economic Theory, Behavioral Science, Antitrust Bulletin, Physica A, Texas Law Review,* and *Yale Journal on Regulation.*

Dr. Williams been retained as an economic consultant by the U.S. Department of Justice, Antitrust Division, the U.S. Federal Trade Commission, and the Canadian Competition Bureau.

Previously, he was an economist with the U.S. Department of Justice, Antitrust Division. He holds a B.A. degree in economics from the University of California, Santa Barbara, and he received his M.A. and Ph.D. degrees in economics from the University of Chicago.

He has provided written and/or oral testimony before:

- United States District Court, Middle District of Alabama

- United States District Court, Western District of Arkansas

- United States District Court, Central, Northern, and Southern Districts of California

- United States District Court, District of Delaware

- United States District Court, Middle District of Florida

- United States District Court, Northern District of Georgia

- United States District Court, Eastern Division, District of Idaho

- United States District Court, Northern and Southern Districts of Illinois

- United States District Court, District of Kansas



- United States District Court, District of Massachusetts

- United States District Court, Eastern District of Michigan, Southern Division

- United States District Court, District of Minnesota

- United States District Court, District of New Jersey

- United States District Court, Eastern and Southern Districts of New York

- United States District Court, Eastern District of Pennsylvania

- United States District Court, Eastern District of Tennessee

- United States District Court, Northern and Southern Districts of Texas

- United States District Court, District of Utah

- United States District Court, Eastern District of Virginia

- United States Court of Federal Claims

- State of Connecticut, Superior Court

- State of New Mexico, Second Judicial District

- State of Nevada, Gaming Commission and State Gaming Control Board

- State of Vermont, Superior Court

- Public utilities commissions: Arkansas, Hawaii, Michigan, Minnesota, Missouri, Nebraska, New Mexico, Texas, and Washington

- The Netherlands, Amsterdam District Court


**EDUCATION**

| | |
|---|---|
| Ph.D., Economics | University of Chicago |
| M.A., Economics | University of Chicago |
| B.A., Economics | University of California, Santa Barbara |



**PRESENT POSITION**

Managing Director, Berkeley Research Group, LLC

**PREVIOUS POSITIONS**

Director, Competition Economics, LLC
Economist, U.S. Department of Justice, Antitrust Division

**U.S. DEPARTMENT OF JUSTICE CASES**

- **MERGER INVESTIGATIONS**

  - General Electric Company's acquisition of RCA.

  - Westwood One, Inc.'s acquisition of NBC Radio.

  - Turner Broadcasting System, Inc.'s attempted acquisition of CBS.

  - Norfolk Southern, Inc.'s acquisition of North American Van Lines.

  - Cooper Industries, Inc.'s acquisition of Westinghouse Electric, Corp.'s Lighting Fixture Business.

  - Southwestern Public Service Company's acquisition of New Mexico Electric Service Company.

  - ITT-Continental Baking Company's acquisition of Bost Bakery, Inc.

  - Williams Companies' acquisition of Northwest Energy, Corp.

  - Archer-Daniel-Midland's acquisition of Gold Kist's Valdosta, Georgia soybean processing plant.

- **PRICE FIXING**

  - United States of America v. Weeks Marine, Inc.

- **CONSENT DECREES**

- United States of America v. Wallpaper Institute

- United States of America v. Greyhound, Corp.

3



- United States of America v. Balley Manufacturing, Corp.


## PUBLICATIONS (PAST TEN YEARS)

1) "International Trade and the Survival of Mammalian and Reptilian Species," *Science Advances* (2022), vol. 8, no. 1 (with Tilman Klumpp and Hugo M. Mialon).

2) "Market Share Liability: Lessons from *New Hampshire v. Exxon Mobil*," *Journal of Environmental Law and Litigation* (2019), vol. 34, pp. 219-251 (with Justine S. Hastings).

3) "The Voting Rights of Ex-Felons and Election Outcomes in the United States," *International Review of Law and Economics* (2019), vol. 59, pp. 40-56 (with Tilman Klumpp and Hugo M. Mialon).

4) "Masters of the Universe: Bid Rigging by Private Equity Firms in Multibillion Dollar LBOs," *University of Cincinnati Law Review* (2018), vol. 87, pp. 29-76 (with Christopher M. Burke, Stephanie A. Hackett, David W. Mitchell, Simon J. Wilke, Melanie Stallings Williams, and Wei Zhao).

5) "Rules of Evidence and Liability in Contract Litigation: The Efficiency of the *General Dynamics* Rule," *Journal of Public Economic Theory* (2017), vol. 19, pp. 1154–1165 (with Vlad Radoias and Simon J. Wilkie).

6) "The OPEC of Potatoes: Should Collusive Agricultural Production Restrictions Be Immune From Antitrust Law Enforcement?," *Virginia Law & Business Review* (2017), vol. 11, pp. 399-450 (with Melanie Stallings Williams and Wei Zhao).

7) "Global Evidence on the Distribution of GDP Growth Rates," *Physica A* (2017), vol. 468, pp. 750-758 (with Grace Baek, Yiyang Li, Leslie Y. Park, and Wei Zhao).

8) "What is a But-For World?," *Antitrust* (2016), vol. 31, pp. 102-108 (with Justine S. Hastings).

9) "The Business of American Democracy: *Citizens United*, Independent Spending, and Elections," *Journal of Law and Economics* (2016), vol. 59, pp. 1-43 (with Tilman Klumpp and Hugo M. Mialon) (lead article).

10) "Global Evidence on the Distribution of Economic Profit Rates," *Physica A* (2016), vol. 458, pp. 356-363 (with Grace Baek, Leslie Y. Park and Wei Zhao).

11) "Fraud Cycles," *Journal of Institutional and Theoretical Economics* (2016), vol. 172, pp. 544-572 (with R. Preston McAfee and Jiong Gong).



12) "Counterintuitive Signs in Reduced Form Price Regressions," *ABA Economics Committee Newsletter* (2016), vol. 16, pp. 7-19 (with Yonghong An and Wei Zhao) (lead article).

13) "Brief of Economists and Other Social Scientists as Amici Curiae in Support of Respondents," *Tyson Foods, Inc. v. Peg Bouaphakeo, et al.*, U.S. Supreme Court No. 14-1146, September 29, 2015. Cited in Opinion of the Court, 577 U.S. ___ (2016).

14) "Leveling the Playing Field? The Role of Public Campaign Funding in Elections," *American Law and Economics Review* (2015), vol. 17, pp. 361-408 (with Tilman Klumpp and Hugo M. Mialon) (lead article) (awarded 2015 Distinguished Article Prize).

15) "Global Evidence on the Distribution of Firm Growth Rates," *Physica A* (2015), vol. 432, pp. 102-107 (with Brijesh P. Pinto and David Park).

16) "The Deterrent Effect of Cable System Clustering on Overbuilders: An Economic Analysis of *Behrend v. Comcast*," *Economics Bulletin* (2015), vol. 35, pp. 519-527 (with Philip J. Reny).

17) "Auctions and Bid Rigging," in *Oxford Handbook on International Antitrust Economics* (2015), vol. 2, eds. Roger D. Blair and D. Daniel Sokol, Oxford University Press, Chapter 20, pp. 498-522 (with Ken Hendricks and R. Preston McAfee).

18) "Evaluating Big Deal Journal Bundles," *Proceedings of the National Academy of Sciences* (2014), vol. 111, no. 26, pp. 9425-9430 (with Theodore C. Bergstrom, Paul N. Courant, and R. Preston McAfee).

19) Book Review, *Cartels, Competition and Public Procurement. Law and Economics Approaches to Bid Rigging*, by Stefan E. Weishaar, *Journal of Economic Literature* (2014), vol. 52, pp. 548-549 (with Brijesh P. Pinto).

20) "Oracle's Acquisition of PeopleSoft: *U.S. v. Oracle*," in *The Antitrust Revolution: Economics, Competition, and Policy* (2014), eds. John E. Kowka and Lawrence J. White, Oxford University Press, 6th ed. (with R. Preston McAfee and David S. Sibley).


**TESTIMONY AND EXPERT REPORTS (PAST FOUR YEARS)**

1) UNITED STATES DISTRICT COURT, DISTRICT OF MINNESOTA
   In Re: Cattle and Beef Antitrust Litigation

2) SUPERIOR COURT, STATE OF VERMONT
   State of Vermont v. 3M Company et al.

3) UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
   Elizabeth Belyea, et al. v. GreenSky, Inc.



4)  UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
Maximilian Klein, et al. v. Meta Platforms, Inc.

5)  UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF TEXAS
Quadvest, L.P. and Woodland Oaks Utility, L.P. v. San Jacinto River Authority.

6)  UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS
In Re: Turkey Antitrust Litigation.

7)  UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
In Re: Hard Disk Drive Suspension Assemblies Antitrust Litigation.

8)  UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA, FORT LAUDERDALE DIVISION
Alexiss Wright, et al., v. GreenSky, Inc.

9)  UNITED STATES DISTRICT COURT, DISTRICT OF MINNESOTA
In Re: Pork Antitrust Litigation.

10) UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
In Re: Google Play Store Antitrust Litigation.

11) UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF ILLINOIS
In Re: Broiler Chicken Antitrust Litigation.

12) UNITED STATES DISTRIT COURT, EASTERN DISTRICT OF MICHIGAN
In Re: FCA US LLC Monostable Electronic Gearshift Litigation.

13) THE NETHERLANDS, AMSTERDAM DISTRICT COURT
Follow-on-damages proceeding further to decisions of the European Commission (AT.39824 – Trucks).

14) UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF VIRGINIA
In Re: Peanut Farmers Antitrust Litigation.

15) UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF CALIFORNIA
Richard Bartlett et al. v. BP West Coast Products, LLC et al. (employed by Competition Economics, LLC).

16) UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
In Re: Apple Inc. Device Performance Litigation.

17) UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF FLORIDA
In Re: Disposable Contact Lens Antitrust Litigation.



18) UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NEW YORK
    In Re: Payment Card Interchange Fee and Merchant Discount Antitrust Litigation.

19) THE NETHERLANDS, AMSTERDAM DISTRICT COURT
    Unilever et al./Smurfit Kappa, DS Smith et al. (Cardboard).

20) UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS
    In Re: Dealer Management Systems Antitrust Litigation.

21) UNITED STATES DISTRICT COURT, NORTHERN DISTRICT OF CALIFORNIA
    In Re: Capacitors Antitrust Litigation.

# Exhibit D

**Bates Documents**

SAFELEASE0000001

SAFELEASE0000003

SAFELEASE0000004

SAFELEASE0000005

SAFELEASE0000013

SAFELEASE0000014

SAFELEASE0000029

SAFELEASE0000030

SAFELEASE0000031

SAFELEASE0000032

SAFELEASE0000037

SAFELEASE0000039

SAFELEASE0000040

SAFELEASE0000042

SAFELEASE0000047

SAFELEASE0000049

SAFELEASE0000050

SAFELEASE0000053

SAFELEASE0000054

SAFELEASE0000056

SAFELEASE0000057

SAFELEASE0000058

SAFELEASE0000061

SAFELEASE0000091

SAFELEASE0000092

SAFELEASE0000112

SAFELEASE0000117

SAFELEASE0000119

SAFELEASE0000132

SAFELEASE0000135

SAFELEASE0000137

SAFELEASE0000140

SAFELEASE0000142

SAFELEASE0000145

SAFELEASE0000150

SAFELEASE0000152

SAFELEASE0000182

SAFELEASE0000185

SAFELEASE0000188

SAFELEASE0000196

SAFELEASE0000198

SAFELEASE0000202

SAFELEASE0000206

SAFELEASE0000211

SAFELEASE0000214

SAFELEASE0000215

SAFELEASE0000217

SAFELEASE0000221

SAFELEASE0000225

SAFELEASE0000230

SAFELEASE0000233

SAFELEASE0000239

SAFELEASE0000243

SAFELEASE0000246

SAFELEASE0000247

SAFELEASE0000248

SAFELEASE0000249

SAFELEASE0000250

SAFELEASE0000251

SAFELEASE0000252

SAFELEASE0000253

SAFELEASE0000254

SAFELEASE0000255

SAFELEASE0000256

SAFELEASE0000258

SAFELEASE0000259

SAFELEASE0000261

SAFELEASE0000262

SAFELEASE0000264

SAFELEASE0000267

SAFELEASE0000271

SAFELEASE0000275

SAFELEASE0000277

SAFELEASE0000279

SAFELEASE0000280

SAFELEASE0000317

SAFELEASE0000323

SAFELEASE0000328

SAFELEASE0000332

SAFELEASE0000336

SAFELEASE0000337

SAFELEASE0000340

SAFELEASE0000551

SAFELEASE0000553

SAFELEASE0000568

SAFELEASE0000571

SAFELEASE0000573

SAFELEASE0000576

SAFELEASE0000583

SAFELEASE0000586

SAFELEASE0000602

SAFELEASE0000620

SAFELEASE0000636

SAFELEASE0000638

SAFELEASE0000639

SAFELEASE0000647

SAFELEASE0000650

SAFELEASE0000651

SAFELEASE0000652

SAFELEASE0000674

SAFELEASE0000677

SAFELEASE0000678

SAFELEASE0000683

SAFELEASE0000685

SAFELEASE0000686

SAFELEASE0000689

SAFELEASE0000692

SAFELEASE0000694

SAFELEASE0000696

SAFELEASE0000698

SAFELEASE0000701

SAFELEASE0000705

SAFELEASE0000710

SAFELEASE0000713

SAFELEASE0000717

SAFELEASE0000719

SAFELEASE0000720

SAFELEASE0000722

SAFELEASE0000724

SAFELEASE0000729

SAFELEASE0000733

SAFELEASE0000734

SAFELEASE0000738

SAFELEASE0000741

SAFELEASE0000742

SAFELEASE0000745

SAFELEASE0000746

SAFELEASE0000747

SAFELEASE0000748

SAFELEASE0000751

SAFELEASE0000752

SAFELEASE0000758

SAFELEASE0000761

SAFELEASE0000763

SAFELEASE0000764

SAFELEASE0000765

SAFELEASE0000776

SAFELEASE0000776

SAFELEASE0000777

SAFELEASE0000777

SAFELEASE0000778

SAFELEASE0000781

SAFELEASE0000783

SAFELEASE0000784

SAFELEASE0000785

SAFELEASE0000785

SAFELEASE0000786

SAFELEASE0000787

SAFELEASE0000788

SAFELEASE0000810

SAFELEASE0000811

SAFELEASE0000833

SAFELEASE0000856

SAFELEASE0000906

SAFELEASE0000906

SAFELEASE0000907

SAFELEASE0000910

SAFELEASE0000933

SAFELEASE0000933

SAFELEASE0000934

SAFELEASE0000935

SAFELEASE0000935

SAFELEASE0000936

SAFELEASE0000936

SAFELEASE0001017

SAFELEASE0001106

SAFELEASE0001138

SAFELEASE0001147

SAFELEASE0001219

SAFELEASE0001236

SAFELEASE0001242

SAFELEASE0001257

SAFELEASE0001267

SAFELEASE0001304

SAFELEASE0001450

SAFELEASE0002500

SAFELEASE0002618

SAFELEASE0030325

SAFELEASE0030325

SAFELEASE0030326

SAFELEASE0030362

SAFELEASE0030369

SAFELEASE0030381

SAFELEASE0030385

SAFELEASE0030389

SAFELEASE0030393

SAFELEASE0030398

SAFELEASE0030406

SAFELEASE0030417

SAFELEASE0030419

SAFELEASE0030421

SAFELEASE0030422

SAFELEASE0030425

SAFELEASE0030433

SAFELEASE0030436

SAFELEASE0030451

SAFELEASE0030455

SAFELEASE0030467

SAFELEASE0030468

SAFELEASE0030488

SAFELEASE0030497

SAFELEASE0030502

SAFELEASE0030504

SAFELEASE0030510

SAFELEASE0030517

SAFELEASE0030520

SAFELEASE0030545

SAFELEASE0030549

SAFELEASE0030570

SAFELEASE0030574

SAFELEASE0030584

SAFELEASE0030586

SAFELEASE0030590

SAFELEASE0030593

SAFELEASE0030597

SAFELEASE0030602

SAFELEASE0030606

SAFELEASE0030619

SAFELEASE0030362

SAFELEASE0030365

SAFELEASE0030369

SAFELEASE0030372

SAFELEASE0030378

SAFELEASE0030381

SAFELEASE0030385

SAFELEASE0030389

SAFELEASE0030393

SAFELEASE0030398

SAFELEASE0030403

SAFELEASE0030406

SAFELEASE0030410

SAFELEASE0030417

SAFELEASE0030419

SAFELEASE0030421

SAFELEASE0030422

SAFELEASE0030425

SAFELEASE0030429

SAFELEASE0030433

SAFELEASE0030436

SAFELEASE0030437

SAFELEASE0030440

SAFELEASE0030443

SAFELEASE0030447

SAFELEASE0030451

SAFELEASE0030455

SAFELEASE0030459

SAFELEASE0030463

SAFELEASE0030464

SAFELEASE0030467

SAFELEASE0030468

SAFELEASE0030488

SAFELEASE0030489

SAFELEASE0030490

SAFELEASE0030494

SAFELEASE0030497

SAFELEASE0030500

SAFELEASE0030502

SAFELEASE0030504

SAFELEASE0030507

SAFELEASE0030510

SAFELEASE0030514

SAFELEASE0030517

SAFELEASE0030520

SAFELEASE0030522

SAFELEASE0030526

SAFELEASE0030530

SAFELEASE0030536

SAFELEASE0030541

SAFELEASE0030545

SAFELEASE0030549

SAFELEASE0030552

SAFELEASE0030555

SAFELEASE0030559

SAFELEASE0030562

SAFELEASE0030566

SAFELEASE0030570

SAFELEASE0030573

SAFELEASE0030574

SAFELEASE0030577

SAFELEASE0030580

SAFELEASE0030584

SAFELEASE0030586

SAFELEASE0030590

SAFELEASE0030593

SAFELEASE0030597

SAFELEASE0030602

SAFELEASE0030606

SAFELEASE0030610

SAFELEASE0030615

SAFELEASE0030619

SAFELEASE0030623

SAFELEASE0030627

SAFELEASE0030628

SAFELEASE0030629

SAFELEASE0030631

SAFELEASE0030632

SAFELEASE0030633

SAFELEASE0030641

SAFELEASE0030659

SAFELEASE0030666

SAFELEASE0030674

SAFELEASE0030682

SAFELEASE0030689

SAFELEASE0030705

SAFELEASE0030729

SAFELEASE0030740

SAFELEASE0030781

SAFELEASE0030801

SAFELEASE0030803

SAFELEASE0030813

SAFELEASE0030832

SAFELEASE0030855

SAFELEASE0030867

SAFELEASE0030885

SAFELEASE0030906

SAFELEASE0030921

SAFELEASE0030938

SAFELEASE0030952

SAFELEASE0030964

SAFELEASE0030975

SAFELEASE0030993

SAFELEASE0031012

SAFELEASE0031029

SAFELEASE0031034

SAFELEASE0031054

SAFELEASE0031062

SAFELEASE0031075

SAFELEASE0031082

SAFELEASE0031093

SAFELEASE0031100

SAFELEASE0031110

SAFELEASE0031125

SAFELEASE0031129

SAFELEASE0031138

SAFELEASE0031155

SAFELEASE0031160

SAFELEASE0031172

SAFELEASE0031184

SAFELEASE0031189

SAFELEASE0031202

SAFELEASE0031215

SAFELEASE0031230

SAFELEASE0031240

SAFELEASE0031246

SAFELEASE0031258

SAFELEASE0031268

SAFELEASE0031270

SAFELEASE0031282

SAFELEASE0031292

SAFELEASE0031302

SAFELEASE0031304

SAFELEASE0031314

SAFELEASE0031321

SAFELEASE0031328

SAFELEASE0031336

SAFELEASE0031341

SAFELEASE0031352

SAFELEASE0031356

SAFELEASE0031359

SAFELEASE0031369

SAFELEASE0031374

SAFELEASE0031378

SAFELEASE0031384

SAFELEASE0031386

SAFELEASE0031401

SAFELEASE0031411

SAFELEASE0031416

SAFELEASE0031421

SAFELEASE0031423

SAFELEASE0031424

SAFELEASE0031426

SAFELEASE0031428

SAFELEASE0031435

SAFELEASE0031439

SAFELEASE0031445

SAFELEASE0031453

SAFELEASE0031455

SAFELEASE0031460

SAFELEASE0031462

SAFELEASE0031467

SAFELEASE0031468

SAFELEASE0031471

SAFELEASE0031473

SAFELEASE0031476

SAFELEASE0031477

SAFELEASE0031478

SAFELEASE0031481

SAFELEASE0031482

SAFELEASE0031483

SAFELEASE0031487

SAFELEASE0031489

SAFELEASE0031490

SAFELEASE0031491

SAFELEASE0031492

SAFELEASE0031497

SAFELEASE0031513

SAFELEASE0031524

SAFELEASE0031525

SAFELEASE0031526

SAFELEASE0031537

SAFELEASE0031538

SAFELEASE0031539

SAFELEASE0031541

SAFELEASE0031542

SAFELEASE0031543

SAFELEASE0031544

SAFELEASE0031545

SAFELEASE0031550

SAFELEASE0031551

SAFELEASE0031552

SAFELEASE0031553

SAFELEASE0031564

SAFELEASE0031576

SAFELEASE0031591

SAFELEASE0031601

SAFELEASE0031604

SAFELEASE0031611

SAFELEASE0031618

SAFELEASE0031624

SAFELEASE0031625

SAFELEASE0031630

SAFELEASE0031646

SAFELEASE0031657

SAFELEASE0031661

SAFELEASE0031675

SAFELEASE0031704

SAFELEASE0031723

SAFELEASE0031724

SAFELEASE0031727

SAFELEASE0031736

SAFELEASE0031739

SAFELEASE0031743

SAFELEASE0031752

SAFELEASE0031758

SAFELEASE0031760

SAFELEASE0031786

SAFELEASE0031795

SAFELEASE0031813

SAFELEASE0031834

SAFELEASE0031839

SAFELEASE0031850

SAFELEASE0031857

SAFELEASE0031862

SAFELEASE0031872

SAFELEASE0031879

SAFELEASE0031886

SAFELEASE0031893

SAFELEASE0031900

SAFELEASE0031907

SAFELEASE0031912

SAFELEASE0031917

SAFELEASE0031921

SAFELEASE0031929

SAFELEASE0031937

SAFELEASE0031941

SAFELEASE0031942

SAFELEASE0031948

SAFELEASE0031954

SAFELEASE0031958

SAFELEASE0031962

SAFELEASE0031968

SAFELEASE0031972

SAFELEASE0031983

SAFELEASE0031986

SAFELEASE0031989

SAFELEASE0031997

SAFELEASE0031999

SAFELEASE0032011

SAFELEASE0032013

SAFELEASE0032029

SAFELEASE0032032

SAFELEASE0032041

SAFELEASE0032046

SAFELEASE0032063

SAFELEASE0032066

SAFELEASE0032087

SAFELEASE0032094

SAFELEASE0032102

SAFELEASE0032105

SAFELEASE0032115

SAFELEASE0032131

SAFELEASE0032132

SAFELEASE0032146

SAFELEASE0032155

SAFELEASE0032162

SAFELEASE0032166

SAFELEASE0032171

SAFELEASE0032178

SAFELEASE0032189

SAFELEASE0032195

SAFELEASE0032198

SAFELEASE0032207

SAFELEASE0032210

SAFELEASE0032222

SAFELEASE0032232

SAFELEASE0032234

SAFELEASE0032249

SAFELEASE0032251

SAFELEASE0032263

SAFELEASE0032265

SAFELEASE0032273

SAFELEASE0032277

SAFELEASE0032280

SAFELEASE0032282

SAFELEASE0032285

SAFELEASE0032287

SAFELEASE0032307

SAFELEASE0032309

SAFELEASE0032337

SAFELEASE0032340

SAFELEASE0032358

SAFELEASE0032360

SAFELEASE0032377

SAFELEASE0032402

SAFELEASE0032420

SAFELEASE0032430

SAFELEASE0032442

SAFELEASE0032452

SAFELEASE0032463

SAFELEASE0032469

SAFELEASE0032477

SAFELEASE0032484

SAFELEASE0032496

SAFELEASE0032502

SAFELEASE0032512

SAFELEASE0032521

SAFELEASE0032527

SAFELEASE0032530

SAFELEASE0032538

SAFELEASE0032544

SAFELEASE0032547

SAFELEASE0032553

SAFELEASE0032557

SAFELEASE0032560

SAFELEASE0032598

SAFELEASE0032624

SAFELEASE0032635

SAFELEASE0032647

SAFELEASE0032659

SAFELEASE0032670

SAFELEASE0032673

SAFELEASE0032687

SAFELEASE0032700

SAFELEASE0032704

SAFELEASE0032711

SAFELEASE0032741

SAFELEASE0032775

SAFELEASE0032793

SAFELEASE0032815

SAFELEASE0032829

SAFELEASE0032852

SAFELEASE0032867

SAFELEASE0032875

SAFELEASE0032888

SAFELEASE0032892

SAFELEASE0032896

SAFELEASE0032900

SAFELEASE0032904

SAFELEASE0032908

SAFELEASE0032913

SAFELEASE0032917

SAFELEASE0032924

SAFELEASE0032927

SAFELEASE0032932

SAFELEASE0032934

SAFELEASE0032939

SAFELEASE0032943

SAFELEASE0032955

SAFELEASE0032956

SAFELEASE0032958

SAFELEASE0032960

SAFELEASE0032964

SAFELEASE0032966

SAFELEASE0032974

SAFELEASE0032977

SAFELEASE0032979

SAFELEASE0032989

SAFELEASE0032993

SAFELEASE0032997

SAFELEASE0033016

SAFELEASE0033021

SAFELEASE0033029

SAFELEASE0033032

SAFELEASE0033035

SAFELEASE0033058

SAFELEASE0033060

SAFELEASE0033069

SAFELEASE0033075

SAFELEASE0033077

SAFELEASE0033083

SAFELEASE0033089

SAFELEASE0033095

SAFELEASE0033114

SAFELEASE0033118

SAFELEASE0033127

SAFELEASE0033133

SAFELEASE0033134

SAFELEASE0033136

SAFELEASE0033139

SAFELEASE0033140

SAFELEASE0033145

SAFELEASE0033154

SAFELEASE0033155

SAFELEASE0033157

SAFELEASE0033160

SAFELEASE0033161

SAFELEASE0033167

SAFELEASE0033170

SAFELEASE0033174

SAFELEASE0033181

SAFELEASE0033189

SAFELEASE0033192

SAFELEASE0033194

SAFELEASE0033196

SAFELEASE0033197

SAFELEASE0033199

SAFELEASE0033204

SAFELEASE0033209

SAFELEASE0033218

SAFELEASE0033228

SAFELEASE0033232

SAFELEASE0033241

SAFELEASE0033243

SAFELEASE0033249

SAFELEASE0033262

SAFELEASE0033266

SAFELEASE0033270

SAFELEASE0033285

SAFELEASE0033290

SAFELEASE0033293

SAFELEASE0033295

SAFELEASE0033297

SAFELEASE0033300

SAFELEASE0033304

SAFELEASE0033308

SAFELEASE0033313

SAFELEASE0033314

SAFELEASE0033318

SAFELEASE0033325

SAFELEASE0033332

SAFELEASE0033336

SAFELEASE0033339

SAFELEASE0033346

SAFELEASE0033354

SAFELEASE0033357

SAFELEASE0033364

SAFELEASE0033368

SAFELEASE0033369

SAFELEASE0033370

SAFELEASE0033383

SAFELEASE0033395

SAFELEASE0033398

SAFELEASE0033403

SAFELEASE0033408

SAFELEASE0033413

SAFELEASE0033423

SAFELEASE0033424

SAFELEASE0033427

SAFELEASE0033434

SAFELEASE0033436

SAFELEASE0033445

SAFELEASE0033451

SAFELEASE0033454

SAFELEASE0033462

SAFELEASE0033466

SAFELEASE0033469

SAFELEASE0033470

SAFELEASE0033477

SAFELEASE0033480

SAFELEASE0033483

SAFELEASE0033486

SAFELEASE0033488

SAFELEASE0033498

SAFELEASE0033503

SAFELEASE0033507

SAFELEASE0033509

SAFELEASE0033511

SAFELEASE0033514

SAFELEASE0033522

SAFELEASE0033525

SAFELEASE0033532

SAFELEASE0033540

SAFELEASE0033542

SAFELEASE0033547

SAFELEASE0033552

SAFELEASE0033554

SAFELEASE0033560

SAFELEASE0033563

SAFELEASE0033571

SAFELEASE0033574

SAFELEASE0033579

SAFELEASE0033585

SAFELEASE0033590

SAFELEASE0033596

SAFELEASE0033601

SAFELEASE0033605

SAFELEASE0033627

SAFELEASE0033633

SAFELEASE0033642

SAFELEASE0033643

SAFELEASE0033645

SAFELEASE0033667

SAFELEASE0033670

SAFELEASE0033672

SAFELEASE0033676

SAFELEASE0033681

SAFELEASE0033682

SAFELEASE0033693

SAFELEASE0033697

SAFELEASE0033704

SAFELEASE0033709

SAFELEASE0033720

SAFELEASE0033730

SAFELEASE0033743

SAFELEASE0033748

SAFELEASE0033751

SAFELEASE0033761

SAFELEASE0033767

SAFELEASE0033773

SAFELEASE0033779

SAFELEASE0033784

SAFELEASE0033786

SAFELEASE0033791

SAFELEASE0033800

SAFELEASE0033803

SAFELEASE0033821

SAFELEASE0033826

SAFELEASE0033830

SAFELEASE0033834

SAFELEASE0033835

SAFELEASE0033844

SAFELEASE0033847

SAFELEASE0033855

SAFELEASE0033857

SAFELEASE0033864

SAFELEASE0033873

SAFELEASE0033879

SAFELEASE0033885

SAFELEASE0033887

SAFELEASE0033891

SAFELEASE0033897

SAFELEASE0033904

SAFELEASE0033913

SAFELEASE0033927

SAFELEASE0033931

SAFELEASE0033934

SAFELEASE0033936

SAFELEASE0033939

SAFELEASE0033948

SAFELEASE0033952

SAFELEASE0033956

SAFELEASE0033957

SAFELEASE0033961

SAFELEASE0033967

SAFELEASE0033969

SAFELEASE0033978

SAFELEASE0033984

SAFELEASE0033989

SAFELEASE0033993

SAFELEASE0033999

SAFELEASE0034001

SAFELEASE0034010

SAFELEASE0034013

SAFELEASE0034015

SAFELEASE0034022

SAFELEASE0034025

SAFELEASE0034032

SAFELEASE0034038

SAFELEASE0034041

SAFELEASE0034045

SAFELEASE0034046

SAFELEASE0034050

SAFELEASE0034062

SAFELEASE0034072

SAFELEASE0034076

SAFELEASE0034081

SAFELEASE0034091

SAFELEASE0034096

SAFELEASE0034099

SAFELEASE0034108

SAFELEASE0034110

SAFELEASE0034119

SAFELEASE0034140

SAFELEASE0034145

SAFELEASE0034149

SAFELEASE0034153

SAFELEASE0034157

SAFELEASE0034159

SAFELEASE0034163

SAFELEASE0034167

SAFELEASE0034172

SAFELEASE0034185

SAFELEASE0034189

SAFELEASE0034196

SAFELEASE0034204

SAFELEASE0034207

SAFELEASE0034210

SAFELEASE0034213

SAFELEASE0034220

SAFELEASE0034227

SAFELEASE0034237

SAFELEASE0034242

SAFELEASE0034245

SAFELEASE0034251

SAFELEASE0034257

SAFELEASE0034283

SAFELEASE0034287

SAFELEASE0034291

SAFELEASE0034298

SAFELEASE0034302

SAFELEASE0034307

SAFELEASE0034320

SAFELEASE0034327

SAFELEASE0034329

SAFELEASE0034333

SAFELEASE0034338

SAFELEASE0034345

SAFELEASE0034349

SAFELEASE0034352

SAFELEASE0034354

SAFELEASE0034355

SAFELEASE0034356

SAFELEASE0034366

SAFELEASE0034372

SAFELEASE0034378

SAFELEASE0034394

SAFELEASE0034405

SAFELEASE0034418

SAFELEASE0034425

SAFELEASE0034432

SAFELEASE0034435

SAFELEASE0034439

SAFELEASE0034440

SAFELEASE0034443

SAFELEASE0034447

SAFELEASE0034455

SAFELEASE0034463

SAFELEASE0034473

SAFELEASE0034476

SAFELEASE0034480

SAFELEASE0034485

SAFELEASE0034496

SAFELEASE0034501

SAFELEASE0034506

SAFELEASE0034513

SAFELEASE0034518

SAFELEASE0034522

SAFELEASE0034527

SAFELEASE0034541

SAFELEASE0034553

SAFELEASE0034556

SAFELEASE0034565

SAFELEASE0034571

SAFELEASE0034574

SAFELEASE0034584

SAFELEASE0034590

SAFELEASE0034593

SAFELEASE0034620

SAFELEASE0034623

SAFELEASE0034631

SAFELEASE0034640

SAFELEASE0034648

SAFELEASE0034651

SAFELEASE0034657

SAFELEASE0034659

SAFELEASE0034665

SAFELEASE0034670

SAFELEASE0034679

SAFELEASE0034683

SAFELEASE0034686

SAFELEASE0034690

SAFELEASE0034692

SAFELEASE0034700

SAFELEASE0034708

SAFELEASE0034717

SAFELEASE0034733

SAFELEASE0034736

SAFELEASE0034741

SAFELEASE0034745

SAFELEASE0034747

SAFELEASE0034750

SAFELEASE0034753

SAFELEASE0034759

SAFELEASE0034763

SAFELEASE0034770

SAFELEASE0034798

SAFELEASE0034804

SAFELEASE0034811

SAFELEASE0034814

SAFELEASE0034816

SAFELEASE0034822

SAFELEASE0034829

SAFELEASE0034842

SAFELEASE0034848

SAFELEASE0034855

SAFELEASE0034862

SAFELEASE0034864

SAFELEASE0034869

SAFELEASE0034877

SAFELEASE0034896

SAFELEASE0034901

SAFELEASE0034904

SAFELEASE0034907

SAFELEASE0034916

SAFELEASE0034920

SAFELEASE0034925

SAFELEASE0034928

SAFELEASE0034936

SAFELEASE0034945

SAFELEASE0034949

SAFELEASE0034958

SAFELEASE0034961

SAFELEASE0034963

SAFELEASE0034974

SAFELEASE0034982

SAFELEASE0034991

SAFELEASE0035003

SAFELEASE0035006

SAFELEASE0035009

SAFELEASE0035016

SAFELEASE0035026

SAFELEASE0035035

SAFELEASE0035039

SAFELEASE0035047

SAFELEASE0035054

SAFELEASE0035063

SAFELEASE0035071

SAFELEASE0035073

SAFELEASE0035093

SAFELEASE0035095

SAFELEASE0035110

SAFELEASE0035113

SAFELEASE0035129

SAFELEASE0035132

SAFELEASE0035138

SAFELEASE0035141

SAFELEASE0035145

SAFELEASE0035146

SAFELEASE0035152

SAFELEASE0035157

SAFELEASE0035162

SAFELEASE0035166

SAFELEASE0035171

SAFELEASE0035182

SAFELEASE0035185

SAFELEASE0035192

SAFELEASE0035194

SAFELEASE0035201

SAFELEASE0035204

SAFELEASE0035213

SAFELEASE0035219

SAFELEASE0035221

SAFELEASE0035225

SAFELEASE0035235

SAFELEASE0035258

SAFELEASE0035262

SAFELEASE0035274

SAFELEASE0035276

SAFELEASE0035280

SAFELEASE0035284

SAFELEASE0035291

SAFELEASE0035300

SAFELEASE0035310

SAFELEASE0035317

SAFELEASE0035320

SAFELEASE0035328

SAFELEASE0035343

SAFELEASE0035347

SAFELEASE0035351

SAFELEASE0035356

SAFELEASE0035361

SAFELEASE0035366

SAFELEASE0035372

SAFELEASE0035375

SAFELEASE0035378

SAFELEASE0035384

SAFELEASE0035385

SAFELEASE0035387

SAFELEASE0035392

SAFELEASE0035396

SAFELEASE0035397

SAFELEASE0035398

SAFELEASE0035400

SAFELEASE0035409

SAFELEASE0035411

SAFELEASE0035413

SAFELEASE0035419

SAFELEASE0035425

SAFELEASE0035455

SAFELEASE0035460

SAFELEASE0035463

SAFELEASE0035466

SAFELEASE0035476

SAFELEASE0035480

SAFELEASE0035487

SAFELEASE0035490

SAFELEASE0035494

SAFELEASE0035500

SAFELEASE0035507

SAFELEASE0035515

SAFELEASE0035517

SAFELEASE0035518

SAFELEASE0035522

SAFELEASE0035529

SAFELEASE0035547

SAFELEASE0035610

SAFELEASE0035612

SAFELEASE0035622

SAFELEASE0035626

SAFELEASE0035632

SAFELEASE0035637

SAFELEASE0035641

SAFELEASE0035650

SAFELEASE0035662

SAFELEASE0035665

SAFELEASE0035677

SAFELEASE0035688

SAFELEASE0035696

SAFELEASE0035703

SAFELEASE0035711

SAFELEASE0035714

SAFELEASE0035719

SAFELEASE0035728

SAFELEASE0035731

SAFELEASE0035738

SAFELEASE0035748

SAFELEASE0035753

SAFELEASE0035763

SAFELEASE0035781

SAFELEASE0035786

SAFELEASE0035789

SAFELEASE0035792

SAFELEASE0035800

SAFELEASE0035811

SAFELEASE0035816

SAFELEASE0035820

SAFELEASE0035822

SAFELEASE0035827

SAFELEASE0035832

SAFELEASE0035838

SAFELEASE0035842

SAFELEASE0035850

SAFELEASE0035865

SAFELEASE0035869

SAFELEASE0035872

SAFELEASE0035882

SAFELEASE0035887

SAFELEASE0035888

SAFELEASE0035890

SAFELEASE0035894

SAFELEASE0035896

SAFELEASE0035903

SAFELEASE0035906

SAFELEASE0035917

SAFELEASE0035921

SAFELEASE0035922

SAFELEASE0035933

SAFELEASE0035942

SAFELEASE0035944

SAFELEASE0035959

SAFELEASE0035960

SAFELEASE0035961

SAFELEASE0035962

SAFELEASE0035963

SAFELEASE0035964

SAFELEASE0035973

SAFELEASE0035979

SAFELEASE0035985

SAFELEASE0035998

SAFELEASE0036004

SAFELEASE0036005

SAFELEASE0036011

SAFELEASE0036021

SAFELEASE0036030

SAFELEASE0036039

SAFELEASE0036047

SAFELEASE0036056

SAFELEASE0036063

SAFELEASE0036075

STORABLE000001

STORABLE000010

STORABLE000028

STORABLE000045

STORABLE000048

STORABLE000051

STORABLE000055

STORABLE000074

STORABLE000076

STORABLE000079

STORABLE000094

STORABLE000109

STORABLE000111

STORABLE000138

STORABLE000167

STORABLE000195

STORABLE000224

STORABLE000252

STORABLE000279

STORABLE000307

STORABLE000335

STORABLE000364

STORABLE000374

STORABLE000376

STORABLE000378

STORABLE000394

STORABLE000396

STORABLE000401

STORABLE000406

STORABLE000411

STORABLE000416

STORABLE000418

STORABLE000423

STORABLE000425

STORABLE000429

STORABLE000433

STORABLE000440

STORABLE000442

STORABLE000444

STORABLE000446

STORABLE000448

STORABLE000449

STORABLE000450

STORABLE000451

STORABLE000459

STORABLE000461

STORABLE000464

STORABLE000469

STORABLE000479

STORABLE000485

STORABLE000489

STORABLE000494

STORABLE000498

STORABLE000502

STORABLE000519

STORABLE000524

STORABLE000526

STORABLE000535

STORABLE000543

STORABLE000554

STORABLE000556

STORABLE000571

STORABLE000580

STORABLE000588

STORABLE000596

STORABLE000596

STORABLE000597

STORABLE000597

STORABLE000598

STORABLE000598

STORABLE000599

STORABLE000599

STORABLE000600

STORABLE000601

STORABLE000602

STORABLE000603

STORABLE000604

STORABLE000605

STORABLE000606

STORABLE000607

STORABLE000608

STORABLE000609

STORABLE000611

STORABLE000612

STORABLE000612

STORABLE000613

STORABLE000613

STORABLE000614

STORABLE000614

STORABLE000615

STORABLE000616

STORABLE000617

STORABLE000618

STORABLE000620

STORABLE000621

STORABLE000622

STORABLE000623

STORABLE000624

STORABLE000625

STORABLE000626

STORABLE000627

STORABLE000628

STORABLE000629

STORABLE000630

STORABLE000631

STORABLE000632

STORABLE000633

STORABLE000634

STORABLE000635

STORABLE000640

STORABLE000642

STORABLE000643

STORABLE000644

STORABLE000645

STORABLE000646

STORABLE000647

STORABLE000648

STORABLE000649

STORABLE000652

STORABLE000655

STORABLE000657

STORABLE000660

STORABLE000660

STORABLE000661

STORABLE000662

STORABLE000663

STORABLE000664

STORABLE000665

STORABLE000666

STORABLE000667

STORABLE000670

STORABLE000673

STORABLE000674

STORABLE000674

STORABLE000675

STORABLE000675

STORABLE000676

STORABLE000689

STORABLE000704

STORABLE000719

STORABLE000740

STORABLE000769

STORABLE000772

STORABLE000792

STORABLE000792

STORABLE000793

STORABLE000794

STORABLE000798

STORABLE000800

STORABLE000801

STORABLE000807

STORABLE000813

STORABLE000817

STORABLE000821

STORABLE000824

STORABLE000827

STORABLE000831

STORABLE000835

STORABLE000840

STORABLE000844

STORABLE000848

STORABLE000852

STORABLE000853

STORABLE000854

STORABLE000861

STORABLE000864

STORABLE000949

STORABLE001026

STORABLE001027

STORABLE001028

STORABLE001032

STORABLE001033

STORABLE001034

STORABLE001040

STORABLE001058

STORABLE001059

STORABLE001061

STORABLE001064

STORABLE001065

STORABLE001066

STORABLE001069

STORABLE001074

STORABLE001075

STORABLE001077

STORABLE001083

STORABLE001085

STORABLE001086

STORABLE001088

STORABLE001091

STORABLE001094

STORABLE001096

STORABLE001099

STORABLE001102

STORABLE001103

STORABLE001105

STORABLE001108

STORABLE001111

STORABLE001115

STORABLE001120

STORABLE001128

STORABLE001132

STORABLE001136

STORABLE001141

STORABLE001145

STORABLE001150

STORABLE001154

STORABLE001158

STORABLE001161

STORABLE001165

STORABLE001169

STORABLE001172

STORABLE001176

STORABLE001180

STORABLE001185

STORABLE001189

STORABLE001194

STORABLE001199

STORABLE001203

STORABLE001207

STORABLE001211

STORABLE001215

STORABLE001219

STORABLE001224

STORABLE001228

STORABLE001232

STORABLE001236

STORABLE001240

STORABLE001244

STORABLE001253

STORABLE001257

STORABLE001261

STORABLE001267

STORABLE001271

STORABLE001275

STORABLE001281

STORABLE001283

STORABLE001285

STORABLE001286

STORABLE001287

STORABLE001288

STORABLE001296

STORABLE001297

**Depositions**

Deposition of Steven Stein (January 13, 2025)

Deposition of Charles Gordon (January 14, 2025)

**Case Documents**

Plaintiff's Verified Original Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction (December 31, 2024)

Temporary Restraining Order and Order Setting Hearing for Temporary Injunction (December 31, 2024)

Defendants' Motion to Dissolve Temporary Restraining Order (January 2, 2025)

Plaintiff's Opposition to Motion to Dissolve TRO (January 3, 2025)

Plaintiff's Motion for Expedited Discovery and Entry of Discovery Control Plan (January 6, 2025)

Plaintiff's Emergency Motion to Extend Temporary Restraining Order (January 6, 2025)

Plaintiff's Verified First Amended Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction (January 6, 2025)

Defendants' Response to Plaintiff's Motion for Expedited Discovery, Response to Motion to Extend TRO, and Reply in Support of Motion to Dissolve TRO (January 7, 2025)

Defendants' Motion to Quash (January 7, 2025)

Notice of Appearance of Counsel for Storable et al. (January 8, 2025)

Defendants' Bench Brief on Territorial Limits of Texas Antitrust Law (January 15, 2025)

Defendants' Bench Brief on Attempted Monopolization (January 15, 2025)

Defendants' Verified Answer, Affirmative Defenses, and Response in Opposition to Plaintiff's Application for Temporary Injunction and Counterclaims (January 15, 2025)

Transcript of Temporary Injunction Hearing (January 16, 2025)

Plaintiff's Hearing Brief on Scope of Texas Antitrust Law (January 17, 2025)

Plaintiff's Request for Findings of Fact and Conclusions of Law (January 22, 2025)

Notice of Appeal (January 23, 2025)

Request for Preparation of Reporter's Record (January 23, 2025)

Request for Preparation of Clerk's Record (January 24, 2025)

Plaintiff's Verified Second Amended Petition and Application for a Temporary Restraining Order, Temporary Injunction, and Permanent Injunction (January 28, 2025)

Notice of Removal to the Texas Business Court (January 29, 2025)

Hearing on Plaintiff's Emergency Application for Temporary Restraining Order and Temporary Injunction, and Alternative Motion for Reconsideration (January 30, 2025)

Defendants' Objection to Removal and Request for Hearing (January 30, 2025)

Defendants' Motion to Remand (January 31, 2025)

Notice of Hearing (January 31, 2025)

Plaintiff's Emergency Motion for Expedited Discovery and Entry of Discovery Control Plan (February 4, 2025)

**Third-Party Documents**

Belleflamme, P. and Peitz, M. (2015), "Industrial Organization: Markets and Strategies," *Cambridge University Press*, Chapter 16

Brennan, T. (1988), "Understanding 'raising rivals' costs," *The Antitrust Bulletin*, vol. 33, pp. 95-113

*Brown Shoe Co. v. United States* (1962)

Church, J. and Ware, R. (2000), "Industrial Organization: A Strategic Approach," *Irwin McGraw-Hill*, Chapter 22

Crocioni, P. (2008), "Leveraging of market power in emerging markets: a review of cases, literature, and a suggested framework," *Journal of Competition Law and Economics*, vol. 4, pp. 449-534

Hausman and Sidak (2007), "Evaluating market power using competitive benchmark prices instead of the Herfindahl-Hirschman Index," *Antitrust Law Journal*, pp. 387-407

Modern Storage Media, "Section 1: Industry Data," available at https://digital.modernstoragemedia.com/almanac/self-storage-almanac-2024db/section-1-industry-data/

Modern Storage Media, "Section 2: Industry Ownership," available at https://digital.modernstoragemedia.com/almanac/self-storage-almanac-2024db/section-2-industry-ownership/

Salop, S. and Scheffman, D. (1983), "Raising Rivals' Costs," *American Economic Review*, vol. 73, pp. 267-271

Schmalensee, R. (1987), "Standards for Dominant Firm Conduct: What Can Economics Contribute?" in *The Economics of Market Dominance* (D. Hay and J. Vickers, eds.), Oxford: Basil Blackwell, pp. 61-88

Sparefoot (2024), "U.S. Self-Storage Industry Statistics," available at https://www.sparefoot.com/blog/self-storage-industry-statistics/

Storable, "About Us," available at https://www.storable.com/about-us/

U.S. Department of Justice and the Federal Trade Commission (2023), *Merger Guidelines*, available at https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf

NO. 25-BC03A-0001

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES, LLC, | § § § | THE BUSINESS COURT OF TEXAS |
| *Plaintiff,* | § § | |
| v. | § § | THIRD DIVISION |
| | § | |
| STORABLE, INC., REDNOVA LABS, INC., (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP, | § § § § § § § | |
| *Defendants.* | § § | TRAVIS COUNTY, TEXAS |

## ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE OR DISREGARD

On this date, the Court considered Defendants' Motion To Exclude Or Disregard Opinions Of Dr. Williams On The Ground That They Are Unreliable And Constitute No Evidence (the "Motion"). Based on the Motion; the evidence, argument, and testimony presented at hearings on Plaintiff's application for temporary injunction; and any other filings and evidence related to the Motion, the Court finds that the Motion should be granted.

The Court finds that the testimony and opinions of Dr. Williams are unreliable and constitute no evidence.

Therefore, it is hereby ORDERED that the Motion is GRANTED, and that the testimony and opinions of Dr. Williams are excluded and disregarded.

Signed on this _____ day of _____, 2025.

_____
Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Dolores Brunelle on behalf of Ray Torgerson
Bar No. 24003067
dbrunelle@porterhedges.com
Envelope ID: 97490382
Filing Code Description: Motions - All Other
Filing Description: Motion to Exclude or Disregard Opinions of Dr. Williams on the Ground that they are Unreliable and Constitute No Evidence
Status as of 2/18/2025 12:09 PM CST

Associated Case Party: Storable, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Neil KentonAlexander | | kalexander@porterhedges.com | 2/18/2025 11:54:50 AM | SENT |
| Ray TTorgerson | | rtorgerson@porterhedges.com | 2/18/2025 11:54:50 AM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 2/18/2025 11:54:50 AM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 2/18/2025 11:54:50 AM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 2/18/2025 11:54:50 AM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 2/18/2025 11:54:50 AM | SENT |
| Liza Eoff | | leoff@porterhedges.com | 2/18/2025 11:54:50 AM | SENT |

Associated Case Party: SafeLease Insurance Services LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Courtney Smith | | csmith@yettercoleman.com | 2/18/2025 11:54:50 AM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 2/18/2025 11:54:50 AM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 2/18/2025 11:54:50 AM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 2/18/2025 11:54:50 AM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 2/18/2025 11:54:50 AM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 2/18/2025 11:54:50 AM | SENT |
| Judd Stone | | Judd@stonehilton.com | 2/18/2025 11:54:50 AM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 2/18/2025 11:54:50 AM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 2/18/2025 11:54:50 AM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 2/18/2025 11:54:50 AM | SENT |

Case Contacts

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Dolores Brunelle on behalf of Ray Torgerson
Bar No. 24003067
dbrunelle@porterhedges.com
Envelope ID: 97490382
Filing Code Description: Motions - All Other
Filing Description: Motion to Exclude or Disregard Opinions of Dr. Williams on the Ground that they are Unreliable and Constitute No Evidence
Status as of 2/18/2025 12:09 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Justin Bernstein | | bernsteinju@gtlaw.com | 2/18/2025 11:54:50 AM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 2/18/2025 11:54:50 AM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 2/18/2025 11:54:50 AM | SENT |

# Exhibit F

E-filed in the Office of the Clerk
for the Business Court of Texas
2/21/2025 4:33 PM **492**
Accepted by: Beverly Crumley
Case Number: 25-BC03A-0001

NO. 25-BC03A-0001

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES, LLC, | § § § § § | THE BUSINESS COURT OF TEXAS |
| *Plaintiff*, | § § | |
| v. | § | THIRD DIVISION |
| | § | |
| STORABLE, INC., REDNOVA LABS, INC., (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP, | § § § § § § § | |
| *Defendants*. | § § § | TRAVIS COUNTY, TEXAS |

**Objections To Temporary Injunction Order, Motion to Rule On Exclusion Of Opinions Of Dr. Williams, And Motion to Reconsider Based On Objections And Exclusion**

Defendants Storable, Inc.; RedNova Labs (d/b/a storEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP (collectively "Storable" or "Defendants") file this Objections to Temporary Injunction Order, Motion to Rule On Exclusion Of Opinions Of Dr. Williams, And Motion to Reconsider Based On Objections And Exclusion (Motion).

I.    **Introduction.**

On February 19, 2025, this Court signed a temporary injunction order (Order) that contains findings and conclusions, and enjoins Storable with the following language:

> As to SafeLease customers as of January 21, 2025, Defendants shall take no action to prevent, impede, or otherwise interfere with SafeLease's authorized-user access to mutual customers' data stored in FMS systems licensed from Defendants (i.e., storEDGE, SiteLink, and Easy Storage Solutions), as well as SafeLease's use of such data within the processes of the FMS systems, as authorized by and available to such customers and for the purpose of providing insurance services for such customers.
>
> This injunctive relief is subject to SafeLease maintaining SOC-2 certification of its data protection processes and only using customer data stored in FMS licensed from Defendants consistent with its customer agreements and historic practices.

1

*See* Order at 8.

Storable reserves all objections to any aspects of the injunction, and nothing in this Motion should be construed as agreeing to any aspect of the Order. However, rather than restate here all of Storable's arguments, this Motion focuses on a narrow set of the points that warrant reconsideration.

## II. This Court Should Rule On, And Reconsider The Order In Light Of, The Motion To Exclude.

On February 18, 2025, Storable filed its Motion To Exclude Or Disregard Opinions Of Dr. Williams On The Ground That They Are Unreliable And Constitute No Evidence. Storable requests that this Court rule on the Motion to Exclude, and use that ruling to reconsider the Order.

Excluding Dr. Williams's unreliable opinions should result in removing foundations of the Order, including findings that Storable engaged in "anticompetitive" conduct, is "leveraging market power in the FMS market to prevent and impede SafeLease from providing services to customers in the tenant insurance market," and was not "justified" in denying access. Order at ¶¶ 4, 6. As explained in the Motion to Exclude, those findings are not supported by any evidence.

## III. The Order Contains Findings That Improperly Decide The Ultimate Merits Without Due Process.

The purpose of a hearing on an application for temporary injunction is to determine whether the plaintiff has a "probable" right to recover, not to decide the "ultimate merits" of the plaintiff's claims. *See Abbott v. Anti-Defamation League Austin, Sw., & Texoma Regions*, 610 S.W.3d 911, 916–917 (Tex. 2020). For that reason, a "temporary injunction is defective when it purports to grant the same relief being sought upon final hearing." *Elliott v. Lewis*, 792 S.W.2d 853, 855 (Tex. App.—Dallas 1990, no writ).

The Order exceeds this authority by describing as confirmed, rather than "probable," many contested facts and legal conclusions, such as by stating:

2

- "SafeLease has pleaded **and proved** valid causes of action against Defendants," Order ¶ 1 (emphasis added);

- "Defendants intentionally interfere with existing SafeLease customer contracts through exclusionary, anticompetitive, or otherwise wrongful means," ¶ 4;

- Storable is "leveraging market power in the FMS market," ¶ 4;

- "Defendants' actions are not motivated by any alleged breach of their Terms of Service," ¶ 10;

- SafeLease accesses Storable's FMS "as an authorized user, consistent with the customers' own access and their rights to appoint authorized users," ¶ 12; and

- SafeLease operated with "Defendants' knowledge … in order to provide tenant insurance services." ¶ 17.

The Texas Constitution guarantees that "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land." Tex. Const. art. I, § 19. This protection extends to intangibles such as reputation. *Mosley v. Tex. Health & Human Servs. Comm'n*, 593 S.W.3d 250, 264 (Tex. 2019). The Order should be modified to remove decisions on the ultimate merits and findings of wrongdoing before the due process of a trial.

For these and other reasons, the Order incorrectly states that the "parties have agreed as to the form of this order." Order at 9. Storable has never, and does not now, agree to the form of the Order or of any of the temporary injunction orders that SafeLease proposed to this Court.

## IV. Conclusion.

Storable requests that the Court grant these objections and the motion to exclude the opinions of Dr. Williams, reconsider the Order, and issue a new order denying the temporary injunction in its entirety. In the alternative, if this Court does not reconsider the temporary injunction, Storable

requests that the injunction include the safeguards and corrections identified above. [1] Storable requests that this Motion be set for written submission.

<div align="center">Respectfully submitted,</div>

**PORTER HEDGES LLP**

By:    */s/ Ray T. Torgerson*
Ray T. Torgerson
SBN: 24003067
Neil Kenton Alexander
SBN: 00996600
Jonna N. Summers
SBN: 24060649
Elizabeth "Liza" Eoff
SBN 24095062
Lakshmi N. Kumar
SBN: 24144581
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
lkumar@porterhedges.com

**GREENBERG TRAURIG LLP**
Dale Wainwright
Texas Bar No. 00000049
Justin Bernstein
Texas Bar No. 24105462
300 West 6th Street, Suite 2050
Austin, Texas 78701
Telephone: (512) 320-7240
Facsimile: (512) 320-7240
dale.wainwright@gtlaw.com
bernsteinju@gtlaw.com

**Attorneys For Defendants**

---

[1] On February 20, 2025, SafeLease deposited a $6.6 million cash bond into the court registry. Storable plans to inquire into questions raised by the timing and amount of that deposit by conferring with SafeLease, after which Storable may raise an additional issue.

**Certificate of Compliance**

I hereby certify that this document complies with Local Rule 5(a) and contains 843 words, excluding the case caption, any index, table of contents or table of authorities, signature blocks, attached evidence, or any required certificates.

*/s/ Justin Bernstein*
Justin Bernstein

**Certificate of Service**

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon counsel of record in accordance with the Texas Rules of Civil Procedure on February 21, 2025.

*/s/ Justin Bernstein*
Justin Bernstein

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sylvia Dominguez on behalf of Justin Bernstein
Bar No. 24105462
sylvia.dominguez@gtlaw.com
Envelope ID: 97670247
Filing Code Description: Motions - All Other
Filing Description: Objections to temporary injunction order and motion to reconsider
Status as of 2/21/2025 5:03 PM CST

Associated Case Party: SafeLease Insurance Services LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Courtney Smith | | csmith@yettercoleman.com | 2/21/2025 4:33:28 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 2/21/2025 4:33:28 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 2/21/2025 4:33:28 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 2/21/2025 4:33:28 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 2/21/2025 4:33:28 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 2/21/2025 4:33:28 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 2/21/2025 4:33:28 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 2/21/2025 4:33:28 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 2/21/2025 4:33:28 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 2/21/2025 4:33:28 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Justin Bernstein | | bernsteinju@gtlaw.com | 2/21/2025 4:33:28 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 2/21/2025 4:33:28 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 2/21/2025 4:33:28 PM | SENT |

Associated Case Party: Storable, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Neil KentonAlexander | | kalexander@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |
| Ray TTorgerson | | rtorgerson@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sylvia Dominguez on behalf of Justin Bernstein
Bar No. 24105462
sylvia.dominguez@gtlaw.com
Envelope ID: 97670247
Filing Code Description: Motions - All Other
Filing Description: Objections to temporary injunction order and motion to reconsider
Status as of 2/21/2025 5:03 PM CST

Associated Case Party: Storable, Inc.

| Ray TTorgerson | | rtorgerson@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |
|---|---|---|---|---|
| Carolyn Reed | | creed@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |
| Liza Eoff | | leoff@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |

NO. 25-BC03A-0001

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES, LLC, | § § § | THE BUSINESS COURT OF TEXAS |
| *Plaintiff*, | § § | |
| v. | § § | THIRD DIVISION |
| | § | |
| STORABLE, INC., REDNOVA LABS, INC., (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP, | § § § § § § § | |
| *Defendants*. | § § | TRAVIS COUNTY, TEXAS |

## ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE AND RECONSIDER

On this date, the Court considered Defendants' Objections To Temporary Injunction Order, Motion to Rule On Exclusion Of Opinions Of Dr. Williams, And Motion to Reconsider Based On Objections And Exclusion (Motion). Based on the Motion; the evidence, argument, and testimony presented at hearings on Plaintiff's application for temporary injunction; and any other filings and evidence related to the Motion, the Court finds that the Motion should be granted.

The Court finds that the testimony and opinions of Dr. Williams are unreliable and constitute no evidence. Therefore, it is hereby ORDERED that the Motion is GRANTED, and that the testimony and opinions of Dr. Williams are excluded and disregarded.

The Court further finds that the objections raised in the Motion have merit and the February 19, 2025 Order Granting Temporary Injunction, should be reconsidered. Therefore, it is hereby ORDERED that the temporary injunction is dissolved, and that SafeLease's Application for Temporary Injunction and, in the Alternative, Motion for Reconsideration, is DENIED.

Signed on this _____ day of _____, 2025.

_____
Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sylvia Dominguez on behalf of Justin Bernstein
Bar No. 24105462
sylvia.dominguez@gtlaw.com
Envelope ID: 97670247
Filing Code Description: Motions - All Other
Filing Description: Objections to temporary injunction order and motion to reconsider
Status as of 2/21/2025 5:03 PM CST

Associated Case Party: SafeLease Insurance Services LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Luke A.Schamel | | lschamel@yettercoleman.com | 2/21/2025 4:33:28 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 2/21/2025 4:33:28 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 2/21/2025 4:33:28 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 2/21/2025 4:33:28 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 2/21/2025 4:33:28 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 2/21/2025 4:33:28 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 2/21/2025 4:33:28 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 2/21/2025 4:33:28 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 2/21/2025 4:33:28 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 2/21/2025 4:33:28 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Justin Bernstein | | bernsteinju@gtlaw.com | 2/21/2025 4:33:28 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 2/21/2025 4:33:28 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 2/21/2025 4:33:28 PM | SENT |

Associated Case Party: Storable, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Neil KentonAlexander | | kalexander@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |
| Ray TTorgerson | | rtorgerson@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Sylvia Dominguez on behalf of Justin Bernstein
Bar No. 24105462
sylvia.dominguez@gtlaw.com
Envelope ID: 97670247
Filing Code Description: Motions - All Other
Filing Description: Objections to temporary injunction order and motion to reconsider
Status as of 2/21/2025 5:03 PM CST

Associated Case Party: Storable, Inc.

| Ray TTorgerson | | rtorgerson@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |
|---|---|---|---|---|
| Carolyn Reed | | creed@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |
| Liza Eoff | | leoff@porterhedges.com | 2/21/2025 4:33:28 PM | SENT |

# Exhibit G

E-filed in the Office of the Clerk
for the Business Court of Texas
2/10/2025 9:01 AM **503**
Accepted by: Beverly Crumley
Case Number: 25-BC03A-0001

No. 25-BC03A-0001

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | THE BUSINESS COURT OF TEXAS |
| Plaintiff, | § § | |
| v. | § | THIRD DIVISION |
| STORABLE, INC., et al., | § § | |
| Defendants. | § § | TRAVIS COUNTY, TEXAS |

**PLAINTIFF'S HEARING BRIEF ON TEXAS ANTITRUST LAW**

Plaintiff SafeLease Insurance Services LLC respectfully submits this brief in advance of the temporary injunction hearing to address certain antitrust issues. It explains the relevance of federal antitrust law, the refusal-to-deal doctrine, monopoly leveraging, and the scope of the Texas Antitrust Act, as well as how these doctrines and principles apply here.

**1.      Texas follows federal antitrust precedent.**

Federal cases are instructive in applying the Texas Antitrust Act. It "shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with [its] purpose." TEX. BUS. & COM. CODE § 15.04. Since the Act is applied "in harmony with federal antitrust caselaw to promote competition for consumers' benefit," and state "caselaw is limited," courts "rely heavily on the jurisprudence of the federal courts." *The Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 688 (Tex. 2006) (footnote omitted).

Here, the relevant terms of state and federal law regarding monopolization are virtually identical. Under the Texas Antitrust Act, it is "unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." TEX. BUS. & COM. CODE § 15.05(b). The Sherman Act also makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce." 15 U.S.C. § 2. Precedent applying analogous claims under federal law is therefore

instructive for analyzing antitrust claims under Texas law. *See Caller-Times Pub. Co. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992) ("[W]e look to federal law interpreting section 2 of the Sherman Act for guidance in interpreting section 15.05(b) of the Texas Antitrust Act.").

The only substantive difference is that the federal statute applies to commerce "among the several States, or with foreign nations," while the Texas Antitrust Act is focused on competition and consumers in this State. But whether interstate commerce also is impacted does not rob a court of jurisdiction under the Texas Antitrust Act. The issue is whether competition or consumers here in Texas are impacted by the challenged conduct. *See* Part 4, *infra*.

**2.  Monopolists may not refuse to deal with rivals for exclusionary reasons.**

Defendants' refrain has been that firms are free to do business with whomever they choose and on any terms they prefer. Usually, that's true. But the law is not so absolute for a monopoly. A monopolist that voluntarily deals with a rival, but then refuses to do so for anticompetitive ends, violates the antitrust laws. That is the case here. Defendants' refusals to deal with SafeLease are part of an attempt to extend their software dominance to the market for tenant insurance.

Generally, refusal-to-deal claims require showing a prior, voluntary course of dealing that was terminated without a valid business reason. *See, e.g.*, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605-11 (1985). Such a refusal, if adopted to pursue monopoly power, violates the antitrust laws. *See, e.g.*, *Verizon Comm'ns., Inc. v. Law Offices of Curtis Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[A] refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2."); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992) ("If Kodak adopted its . . . policies [refusing to deal] as part of a scheme of willful acquisition of monopoly power, it will have violated § 2.").

The key is whether the refusal was for an exclusionary purpose. *See Aspen*, 472 U.S. at 602-03 (stressing "exclusionary" or "anticompetitive" intent). The refusal must be "prompted not

by competitive zeal but by anticompetitive malice." *Trinko*, 540 U.S. at 409. Courts look to whether "the monopolist's conduct [would] be irrational but for its anticompetitive effect." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1064 (10th Cir. 2013). That a refusal sacrificed short-term profits is relevant but not required. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 462 (7th Cir. 2020) (sacrificing profit "is relevant but should not always be dispositive" as it "is not necessary for conduct to be exclusionary") (cleaned up). This is because monopolizing conduct "is not necessarily costly to the defendant." Areeda & Hovenkamp, *Antitrust Law* ¶ 651b3 (2022).

And despite the name, a refusal-to-deal claim doesn't require an absolute refusal. "An offer to deal with a competitor only on unreasonable terms and conditions can amount to a practical refusal to deal." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004).

*Aspen* is a leading case for this doctrine. There, the defendant owned three of four mountain runs for skiing, and the plaintiff owned the fourth. 472 U.S. at 593-94. Despite being competitors, they had issued a joint all-area ski ticket for years, until the defendant demanded an increased share of the proceeds. When the plaintiff would not agree, the defendant cancelled the joint ticket, even refusing an offer to buy the defendant's tickets at retail price. These actions imperiled the plaintiff's ability to remain in business. The plaintiff sued, alleging monopoly abuse, and the jury found for it. The Supreme Court upheld the verdict: the "jury may well have concluded that [the defendant] elected to forgo . . . short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor." *Id.* at 608. The parties' history of dealings implied that they were beneficial for both parties and suggested that the refusal to deal sacrificed short-term profits, meaning it was for purely exclusionary reasons. *Id.* at 611.

So too here. The parties compete in the tenant insurance market. For three years, SafeLease served customers by accessing their data on customer FMS systems provided by Storable—with

customer permission and Storable support. This history of access benefited the parties and their mutual customers. Storable customers got to partner with an insurance vendor of their choice, so the access improved the attractiveness and marketability of defendants' FMS. And it benefited consumers by letting them choose a low-cost, high-quality insurance vendor.

Despite a long arrangement that benefited both sides and their mutual customers, Storable decided to abruptly cut off its insurance competitor's access to its customers' data on its customers' FMS systems. This about-face is "irrational but for its anticompetitive effect." *Novell*, 731 F.3d at 1064. It harms *Storable* customers: it prevents their customers' chosen vendor from providing vital services; it disrupts their business; it restricts their contract rights; and it puts their tenants at risk of loss. In doing so, this refusal harms defendants' own goodwill with their own customers.

In short, refusing to allow access that SafeLease used for years with consent by defendants and their customers reflects a sacrifice of "short-run benefits because [defendants] [are] more interested in reducing competition . . . over the long run by harming [their] smaller competitor." *Aspen*, 472 U.S. at 608. Storable's actions make no economic sense but for the anticompetitive end of driving a discount competitor from the market. Such actions for exclusionary reasons violate the Texas Antitrust Act. *See* TEX. BUS. & COM. CODE §15.05(b); *Aspen*, 472 U.S. at 602-03.

In response, defendants say there is another way to access the FMS systems: an API access agreement. They also claim to be justified in cutting off access. Neither excuse survives scrutiny.

First, the API access offer applies to only two of defendants' three FMS products, SiteLink and storEDGE. For the third, Easy Storage Solutions, defendants refuse to allow SafeLease any access on any terms to its customers' data on its customers' systems.

Second, the price offered is so unreasonable that it amounts to a refusal to deal. Defendants have demanded $1.00/unit per month, with a 50% penalty of $1.50/unit per month for any customer

that SafeLease wins from defendants. At this price, SafeLease would be driven out of business. It would leave SafeLease without enough money to cover insurance premiums, let alone overhead. And even if SafeLease could pay $1.00/unit, it could not afford to compete for *Storable* customers (from which it historically has won most of its switching customers) because of the 50% penalty. The penalty price equates to a non-compete term that would eliminate its largest pool of new customers. Therefore, an offer to deal on such "unreasonable terms and conditions amount[s] to a practical refusal to deal." *MetroNet*, 383 F.3d at 1132.

Third, the alleged justifications for cutting off SafeLease are pretextual. Defendants point to alleged security or performance concerns that justify their refusal to deal. Yet they knew of these alleged issues by April 2024 and never raised them with SafeLease before they abruptly cut off its access eight months later. They never asked SafeLease to adjust its practices to allay any concerns. Nor did they raise any such issue with the customers they claim to be protecting. They never said SafeLease posed any security threat, or asked whether it had authorized access, or accused anyone of violating terms of use agreements. They simply shut off access without a word of explanation.

Instead, defendants tried to convince customers, newly deprived of their chosen insurance partner, to switch to a Storable insurance product. Their actions belie any legitimate business or technical reason for refusing to deal with SafeLease. *See MCI Commc'ns*, 708 F.2d at 1133.

The parties competed in the tenant insurance business for more than three years. All that time, SafeLease served mutual customers by accessing customer data on its customers' systems with its customers' permission—and defendants' knowledge. Now, Storable is looking to land a kill-shot on a smaller competitor, despite years of beneficial dealings and the irreparable harm it is causing mutual customers. Defendants' purely exclusionary actions seek to reduce competition in the tenant insurance market and, therefore, violate Texas antitrust law.

### 3. Defendants' exclusion of SafeLease is classic monopoly leveraging.

Defendants' anticompetitive conduct is multifaceted in its illegality. Defendants are not only refusing to deal with a rival for purely exclusionary reasons, but also engaging in textbook monopoly leveraging. In short, Defendants cut off SafeLease from the FMS market, in which they are dominant, to gain market power in the related tenant insurance market, where they compete with their only discount competitor, SafeLease.

"Monopoly leveraging occurs when a firm uses its market power in one market to gain market share in another market other than by competitive means." *Covad Commc'ns Co. v. BellSouth Corp.*, 299 F.3d 1272, 1284 (11th Cir. 2002), *vacated on other grounds*, 540 U.S. 1147 (2004). *See also* Areeda, *Antitrust Law* ¶ 652 (where "defendant uses monopoly power in A to place rivals in B at a competitive disadvantage, perhaps by raising their costs or making their offerings less attractive"); *United States v. Griffith*, 334 U.S. 100, 106–09 (1948) (defendants used monopoly power in one market to acquire monopoly control of other markets). Here, defendants' actions hark back to one of the largest antitrust cases in history, *United States v. Microsoft Corp.*, where Microsoft exploited its dominant Windows operating system to harm competition and gain an advantage in a related market for web browsers. 253 F.3d 34, 47-48 (D.C. Cir. 2001).

Defendants are likewise leveraging their dominance in the FMS software market to stifle competition in the related tenant insurance market. With some 80% of the FMS market, they have fenced off SafeLease from all current or new customers who use defendants' FMS products. This exclusionary tactic gives defendants an open path to scoop up customers that SafeLease no longer can service. They are not trying to win customers through innovation, higher quality, or low prices. Rather, they are exploiting a crisis they created when they disabled SafeLease access. The strategy is to remove SafeLease from the field, not to out-compete it. This has no procompetitive upside.

Further proof of monopoly leveraging is the API-access terms they offer. Even ignoring that $1.00/unit is far above market levels, the $1.50 penalty has no purpose but to stop competition. So too with the express non-compete terms that defendants impose on firms that partner with them. These terms allocate defendants' customers only to themselves and shield them from competition from these rivals/partners. Penalty prices and non-compete terms are weapons that protect Storable turf from competitors and keep consumers trapped inside defendants' walled garden. Together, these terms accomplish a singular purpose: to eliminate competition over Storable customers.

Deals between competitors to divide customers are nakedly exclusionary. Such "customer allocation agreements are among the 'most elementary' violations . . . and are generally subject to a per se analysis." *Nitro Distrib., Inc. v. Alitor Corp.*, 565 F.3d 417, 423 (8th Cir. 2009); *see also, e.g.*, *Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995) (agreement between lawyers not to advertise in each other's cities was per se unlawful). Such exclusionary agreements or practices, which defendants have used to increase their power in the tenant insurance market, are made possible from their having and leveraging dominant power in the FMS market.

Absent relief from this Court, defendants' plan to leverage their monopoly to drive a low-price competitor from the market will succeed. It will remove both a much-needed check on prices for consumers and a competitor that plays a vital pro-consumer role in the market.

4.      **Relief under the Texas Antitrust Act is not limited just to Texas.**

Despite what defendants now may say, the parties agree on the law: the scope of the Texas Antitrust Act allows relief outside the State if it protects consumers or competition inside Texas.

The leading Texas case on this issue, *Harmar*, confirms that courts may grant relief under the Act that extends outside Texas so long as it "promotes competition within Texas or benefits Texas consumers." 218 S.W.3d at 674. Defendants have admitted this principle. Indeed, the Act states it plainly: "What the Act says, rather plainly we think, is that it is to be used to promote

competition in Texas, even if the trade or commerce involved extends outside Texas." *Id*. at 682. And that is what the Act says: no suit will be barred "on the grounds that the activity or conduct affects or involves interstate or foreign commerce." TEX. BUS. & COM. CODE § 15.21(a)(1).

What defendants won't admit is how relief here, to restrain *Texas* parties from engaging in *Texas*-based conduct that prevents *Texas* access, will protect *Texas* consumers and competition. That factual connection is why *Harmar* supports SafeLease's claim and requested relief. In short, antitrust violations are actionable under state law if aspects of the transaction implicate commerce in Texas. *See Pounds Photographic Labs, Inc. v. Noritsu Am. Corp.*, 818 F.2d 1219, 1224 (5th Cir. 1987). This is why one court upheld state-law allegations of a "'nationwide scheme' to thwart competition on a 'nationwide basis'" as "compatible with a claim for violations of only Texas antitrust law." *Settlement Funding, L.L.C. v. Rapid Settlements, Ltd.*, 851 F.3d 530, 535 (5th Cir. 2017). "[E]ven where a transaction primarily affects interstate commerce, the Texas antitrust statutes may apply if only a component of the transaction implicates intrastate commerce." *Id.*

Defendants have instead focused on the different facts in *Harmar*. There, soda bottlers in Arkansas, Louisiana, Oklahoma, and Texas sued Coca-Cola and its distributors in those states for allegedly anticompetitive deals with retailers. Each plaintiff was restricted to operate in assigned territories within the region, with two plaintiffs "operat[ing] entirely outside Texas." 218 S.W.3d at 675. Some defendants also operated entirely *outside* Texas. And many geographic markets were at issue; each plaintiff's "exclusive territory" was a "separate market." *Id.* at 675 n.4. As such, certain markets were, like many of the parties, entirely *outside* Texas. Yet the trial court enjoined defendants in all "specified counties in each of the four states," *id.* at 674, even though the injunction applied in markets and to parties wholly outside Texas.

The Supreme Court held that the relief, which would protect competition in non-Texas markets, exceeded the limits of the Act. In fact, some enjoined conduct was in markets outside Texas by non-Texas defendants against non-Texas plaintiffs. It was not enough that some conduct by some defendants against some plaintiffs happened to extend into Texas. The Act "does not say that it is to be used to promote competition outside Texas as long as the trade or commerce involved extends into Texas." *Id.* at 682. Indeed, the plaintiffs unsuccessfully tried to fix this problem by asking the Court to apply the antitrust law of the neighboring states for their out-of-state injury. *See id.* at 674-75 ("We also hold that Texas courts, as a matter of interstate comity, will not decide how another state's antitrust laws and policies apply to injuries confined to that state.").

The facts here are uniformly Texas-centric. SafeLease is a Texas company. It is suing defendants based in or controlled from Texas. It is challenging conduct planned and carried out in Texas, namely, cutting off a Texas competitor's access to FMS systems operated from Texas. *See* Defs' Ans. ¶¶ 3-6 (the principal place of business for Storable and its FMS providers is Austin). Access occurs *entirely* in Texas, where SafeLease operates. As relief, it is seeking to preserve a 3-year status quo of uninterrupted access so that it may compete in and from Texas, providing service to self-storage facilities and tenants in Texas—its top state—and elsewhere from Texas. The relief of re-enabling and not disabling SafeLease access is implemented by Storable from Texas.

In short, this case presents a classic case for relief under the Act. In the words of *Harmar*, the Act "is to be used to promote competition in Texas, even if the trade or commerce involved extends outside Texas," 218 S.W.3d at 682, and the relief sought "promotes competition within Texas or benefits Texas consumers." *Id*. at 674. Enjoining Texas defendants from taking actions here to monopolize a market that includes Texas, which will harm Texas consumers and competition, undoubtedly protects competition and consumers in this State.

Moreover, limiting relief to the borders of Texas would harm competition and consumers in Texas. The reason is simple. If defendants can cut off SafeLease's access to these Texas systems to service customers in 49 states, it would make no difference to SafeLease's viability that it has access in one state. It will be driven out of business long before trial, and the State will lose its discount tenant insurance provider. Harm to competition and consumers here would be profound.

In short, while defendants will claim that *Harmar* bars the requested relief as exceeding the bounds of the Texas Antitrust Act, the opposite is true. *Harmar* supports full relief under the Act, as this relief will stop Texas misconduct, protect Texas consumers and competition, and preserve a low-price Texas competitor.

Moreover, this relief is agnostic to any claimed burden to defendants. The Texas Antitrust Act, like the federal law, is a statute whose enforcement is in the public interest. It encourages and empowers private parties to sue to protect competition and consumers as private attorneys general. *Cf. Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746 (1977) (the Sherman Act encourages the creation of a set of "private attorneys general" to enforce the antitrust laws). Because of this, the antitrust laws do not balance the harm to a defendant against the public benefit; they instead balance only the procompetitive effects against the anticompetitive. So, it follows that any burden to a party in complying with these public-interest laws is irrelevant as a matter of law.

Date: February 10, 2025

Respectfully submitted,

*/s/R. Paul Yetter* ____

| | |
|---|---|
| Judd E. Stone II | R. Paul Yetter |
| State Bar No. 24076720 | State Bar No. 22154200 |
| judd@stonehilton.com | pyetter@yettercoleman.com |
| Christopher D. Hilton | Susanna R. Allen |
| State Bar No. 24087727 | State Bar No. 24126616 |
| chris@stonehilton.com | sallen@yettercoleman.com |
| Alexander M. Dvorscak | Luke A. Schamel |
| State Bar No. 24120461 | State Bar No. 24106403 |
| alex@stonehilton.com | lschamel@yettercoleman.com |
| STONE HILTON PLLC | Shannon N. Smith |
| 600 Congress Ave. | State Bar No. 24110378 |
| Austin, Texas 78748 | ssmith@yettercoleman.com |
| (737) 465-3897 | YETTER COLEMAN LLP |
| | 811 Main Street, Suite 4100 |
| | Houston, Texas 77002 |
| | (713) 632-8000 |

### CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on all counsel of record via the Court e-filing service and/or by email, on February 10, 2025.

*/s/Luke A. Schamel* _____
Luke A. Schamel

- 11 -

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alyssa Smith on behalf of R. Yetter
Bar No. 22154200
asmith@yettercoleman.com
Envelope ID: 97160803
Filing Code Description: No Fee Documents
Filing Description: Plaintiff's Hearing Brief
Status as of 2/10/2025 9:07 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Neil KentonAlexander | | kalexander@porterhedges.com | 2/10/2025 9:01:04 AM | SENT |
| Ray TTorgerson | | rtorgerson@porterhedges.com | 2/10/2025 9:01:04 AM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 2/10/2025 9:01:04 AM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 2/10/2025 9:01:04 AM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 2/10/2025 9:01:04 AM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 2/10/2025 9:01:04 AM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 2/10/2025 9:01:04 AM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 2/10/2025 9:01:04 AM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 2/10/2025 9:01:04 AM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 2/10/2025 9:01:04 AM | SENT |
| Judd Stone | | Judd@stonehilton.com | 2/10/2025 9:01:04 AM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 2/10/2025 9:01:04 AM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 2/10/2025 9:01:04 AM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 2/10/2025 9:01:04 AM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 2/10/2025 9:01:04 AM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 2/10/2025 9:01:04 AM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 2/10/2025 9:01:04 AM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 2/10/2025 9:01:04 AM | SENT |
| Liza Eoff | | leoff@porterhedges.com | 2/10/2025 9:01:04 AM | SENT |

# Exhibit H
# FILED UNDER SEAL

REPORTER'S RECORD
CAUSE NO. D-1-GN-24-010233

| | |
|---|---|
| SAFELEASE INSURANCE SERVICES, LLC, | ) IN THE DISTRICT COURT OF |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) TRAVIS COUNTY, TEXAS |
| STORABLE, INC., REDNOVA LABS (D/B/A storEDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP, | ) |
| Defendants. | ) 345TH JUDICIAL DISTRICT |

_____

**TEMPORARY INJUNCTION HEARING**

_____

On the 16th day of January, 2025, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Jessica Mangrum, Judge Presiding, held in Austin, Travis County, Texas.

Proceedings reported in computerized machine shorthand by a Texas Certified Shorthand Reporter, Certification Number 7076.

Wasn't he?

A    He's on our corporate development team, business development team.

Q    (Reading)  Would it be possible to get a quote for a pull only access of the SiteLink API.  And that means to be able to retrieve data from the SiteLink FMS system?

A    Yes.

Q    And your response -- your company's response, is:  We're not able to give read-only API access to SafeLease at this time.  Do you see where you said that?

A    Yes.

Q    Because you were not planning to add any additional providers until you -- until you had kind of worked through some internal assessment.  Right?

A    Yes.  So, pull only access to the API, that's not a thing that exists.  So, what he asked for isn't a thing.  And so, this situation where we're evaluating how to work with insurance providers going forward is, we were -- SafeLease was not the only other insurance provider asking us for access, and we were going through a process of figuring out, how do we price to value the actual services that we're providing to insurance providers going forward.  And so, this is exactly what

figure that out.

Q    But the answer was no.  Right?

A    For the time being.

Q    And so, you know and your company knew that SafeLease went to its customers and said, under the terms and conditions for SiteLink and storEDGE, you, Mr. Customer, can authorize SafeLease to access -- on your behalf to service you through the FMS system. Right?

A    No, I did not know that that's how they were doing it.

Q    Well, okay.  Let's go to Tab 7, Plaintiff's Exhibit 18.  Your salespeople -- let's go to Page 2. Your salespeople knew that SafeLease was asking customers to give them authority to service the customer by accessing the FMS systems.  Your salespeople knew that.  Didn't they?

A    They may have.

Q    Because here is an email in 2022 from your colleague, Kristen Zirkle, and she is what role?

A    I'm not sure.

Q    Senior account manager.  I skipped it.  Let me just give that to you.  Do you see that?  Senior account manager.

back as 2022, over three years ago, your team knew that SafeLease was getting authorized user permission from customers to service them using the FMS systems of your company?

A    I would not agree with that.

Q    Next -- oh, by the way, there are -- there are a number of insurance providers that have reached API access contracts with Storable, Inc. companies.  Have there not -- are there not?

A    Every other insurance provider in the self-storage industry, except for SafeLease --

(Simultaneous discussion)

Q    (BY MR. YETTER)  Okay.  Every other one.  Is that what you're telling us?

A    Yes.  Every other one who is trying to interface with our software has an API agreement with us.

(Simultaneous discussion)

Q    (BY MR. YETTER)  And --

A    -- that's because they --









that effort, after he was hired, started an investigation into security problems we were having with high amounts of traffic, unknown bots, systems being taken down, et cetera, and through that investigation determined that SafeLease was the main cause of these problems. And so, then, this presentation, which is months after that, not weeks, was a result of him finding who is the main culprit and a discussion about what to do about that.

Q   So, the first page of this presentation, says it's a strategic discussion of impact to insurance competitors, which aren't approved vendors from enhanced FMS security measures. Right?

A   Correct.

Q   So, you're talking about, you're going to do something with your FMS systems. True?

A     That is consistent with what we have been saying the whole time, yes.

Q     And every reference in this document is about SafeLease.  Isn't it?

A     Well, once you discover that one party is doing the vast majority of these unauthorized automated attempts at getting into our software, then, yes, you do focus on who that is.

Q     Let me just get back to the question I -- this is not about any insurance competitors or unapproved vendors.  This is all about SafeLease.  Isn't it?

A     It's not all about SafeLease.  There are others, too.  I am agreeing that they are the main one, which is why they're talked about frequently.

Q     Okay.  Now, you're talking about how you're going to cut them off.  Let's go to Page 4, and one of the things you realize is that there's going to be disruption in the marketplace when you cut off.  Don't you?

A     Potentially, and that's what we're trying to mitigate.

Q     Well, we'll get to that in a minute.

But the whole goal was to get SafeLease to pay you, Storable, what you wanted them to pay?

A     The goal was to get SafeLease to sign an API

agreement and access our platforms the same way that every other third-party vendor does, which is safety -- safely and -- subject to the safety and security standards of our cyber security protocols and the appropriate limitations of liability. For example, if they were to be breached, and then that breach enables a hack into our system, they need to be liable for that. That's just one example.

Q    The whole goal was to get SafeLease to sign an agreement to pay Storable money. Wasn't it?

A    And to access our systems the appropriate way.

Q    And, as you're sitting here today, you don't know whether SafeLease has ever accessed your systems in a malicious way. Do you?

A    I would say that abusing our systems and coming up with a hack to get in is malicious.

Q    You have never -- you've testified before in this case in a deposition earlier this week. Haven't you?

A    I did.

Q    And you -- and isn't it true that you do not know whether SafeLease has ever accessed information that it had no authority to access? Isn't that true?

A    We can't know exactly what SafeLease is doing because we have no visibility into their backdoor

Q   What were you -- you have another box that says, what are you telling operators.   True?

A   Yes.

Q   And you never told SafeLease, before you cut them off, that you were going to cut them off --

A   That's false.

Q   -- did you?  Did you?

A    No, I did.

Q    Is that -- was that in writing?

A    I called Steven and said:  Hey, we're putting in place security measures that may impact you.  He then asked me to send an email to him saying the same, and that email is definitely in the evidence.

Q    Fair enough.

Let's go to that next:  Tab 14, Plaintiff's 40.  You never said you were going to cut off SafeLease.  Did you?

A    I told -- I told him what we were doing to enhance our security.

Q    Mr. Gordon, did you ever tell Steven Stein or anyone at SafeLease that Storable was about to cut off their access to your FMS systems at any time before December 17th, 2024?

A    You have to --

Q    Did you, yes or no?

A    You have to take into account that we don't know exactly what they're doing.  So, it's impossible for me to say whether the security measures we were going to put in place were going to cut them off, limit them, affect them.  We knew that it was going to do something, but we didn't know exactly what.

Q    Did you ever tell them you were going to cut

customers. True?

A    Something both of us would like, I would think.

Q    And to ensure continuity of services and avoid customer frustration. Right?

A    That's what he said.

Q    At any point did you tell Mr. Stein that SafeLease was violating the terms of service?

A    We told Mr. Stein that we were enhancing our security measures and those were going to impact him and that we needed to get an API agreement in place.

Q    At any point did you tell Mr. Stein that SafeLease was violating the terms of service for any of the FMS systems in your company?

A    I don't believe we had an explicit conversation about that, no.

Q    At any point did you ask Mr. Stein to work with his group at SafeLease to adjust how they were accessing Storable's FMS systems to account for any impact that you believe you were feeling?

A    There is no way to adjust the way they're accessing our systems. You either use the API, or you don't. It's not -- like, I can -- that's like saying: Hey, Steven, can you hack my software differently, please?

Q    Mr. Gordon, I'm asking you, did you ever ask

anyone at SafeLease to adjust how SafeLease was accessing the FMS systems to avoid whatever you think was happening?

A    No, for the reason I just explained.

Q    At any point did you tell Mr. Stein or anyone at SafeLease that what SafeLease was doing was harming your system?

A    I'm not sure.

Q    At any point, other than asking -- demanding that SafeLease pay $1.00 or $1.50 per unit, did you ever ask SafeLease to take any other technical actions to account for whatever you believe was -- whatever disruption you believe was happening?

A    Yes.    We asked them repeatedly to sign an API agreement and become verified and contracted partners like everyone else in the ecosystem.

Q    Okay.    Respectfully, Mr. Gordon, my question was:  Did you ever ask them to take any technological steps to avoid what you believe -- whatever disruption you believe was happening ever?

A    Integrating through the API is a technological step.

Q    Now, last topic.    The one thing you demanded of SafeLease was to sign an API contract that had a price of $1.00 or $1.50 per unit.    True?

A    I do.

Q    Are these companies based all over the country?

A    They are.

Q    Are some international maybe even?

A    Indeed.

MR. TORGERSON:  All right.  If we could go to the insurance slide, please.

Q    (BY MR. TORGERSON)  Are you familiar with these risk product providers?

A    I am.

Q    And are they all over the country?

A    They are.

Q    And the Storable products that you've described, are they competitive and compete against, on a regular basis, these other companies?

A    We do.

Q    Of these companies that we see on this with logos on this page for risk product providers, do each of them have an API to access Storable's FMS?

A    Not every single person on this page, but most do.

Q    And if they don't have access via an API agreement, what do they do?

A    They must be operating manually.

Q    The companies that do have a relationship via

an API agreement, is that something that's even put on your website?

A    The integrated partners?

Q    Yes.

A    It is.

Q    Tell the Court about that, please.

A    Yeah.  We list all of our integrated partners across all the different categories that we do business in as our marketplace.  So, we're actually advertising the fact that we have choice in all of our different categories of business because that's a big thing that our customers want and care about.

Q    We heard about this, a little bit about opting out or excluding or excepting out of these tenant protection plans or tenant insurance.  This whole business that we've been talking about on the tenant side or on the insurance side, would you agree with me that it's premised on a requirement that the storage facility requires insurance in the first place?

A    Yes.

Q    Is that every storage facility that you're aware of?

A    Definitely not.

Q    And if a tenant has insurance in place already, whether in the form of homeowners in coverage or renters

Q    You understood that Mr. Stein at some point conveyed -- expressed his concern that these rates that you were asking for were not market?

A    I understand that he said that.

Q    Were they market from your opinion?

A    Yes.

taking on risk for their customers' stored goods, and that is the purpose for a company like ours and purpose for the coverage that we offer.

Q    Thank you, Mr. Stein.

Taking a step back, can you tell us just a little bit about your background?  Where did you grow up?

A    I grew up in Houston.

Q    And where did you go to college?

A    I went to UT Austin and graduated in 2017.

Q    And where do you live now?

A    About 15 blocks south of here.

Q    And when did SafeLease open for business?

A    We opened in late 2021.

Q    And how many employees were you at that time?

A    It was just me, and I hired our first executive; and from there we grew the team organically.

Q    And about how big is your team now?

A    Today, it's approximately 59 people.

Q    59?

A    Correct, full-time.

Q    And are you the owner of SafeLease?

A    I'm the majority owner, but our employees own the rest.

Q    And about how much is employee owned?

sell two -- these are two products. Right? We offer both tenant protection and tenant insurance. I believe we are the largest provider that offers both of those products. So, I think that's a helpful clarification, but we are a discount provider because, as I mentioned earlier, we have a number of different functions in the insurance base that are under one roof. We're able to offer -- offer a better price to our customers.

Q   Okay. So, what do you think your market share is for the tenant insurance space, if you're going to draw a distinction?

A   Probably in the low single digit percentage.

Q   What about in the TPP space?

A   It's hard to -- it's hard to say because I don't know exactly -- I don't have the specific breakout. I mean, we really do view these products interchangeably. We don't have any kind of separation on them internally.

Q   Well, what we do know is you tell the public that you're the largest provider of tenant insurance and protection plans. Right?

A   Well, it's because there's almost no one that provides both of those products. The tenant protection product is relatively new.

Q   Mr. Stein, let's go back to my original

coverages and benefits.

Q   And you believe that SafeLease's presence in this space has made it lower cost and actually made more money for operators.  True?

A   Yes.

Q   All right.  So, you had a positive impact on the market, you believe?

A   Yeah, and I think our customers would agree with that.

Q   Okay.  And you certainly have more customers now than you did in 2021?

A   Yes.

Q   All right.  Let's go back to -- let's go to DX-133, which is the email chain from October where we talked about this API negotiation.  You understand that an API agreement is the industry standard approach?

A   I mean, for -- for two back-end systems to talk to each other, I would agree with that.

Q   Well, that's important.  Back-end systems, what does that mean?

A   I mean, if you need a -- a back end of a software system, talk to the back end of another software system.

Q   What's the front end of the software system?

A   It's the user interface.

determined only by forward-looking costs. Firms that operate in competitive markets don't get to reach back in time and say, oh, I spent some money last year. I have some sunk cost. I'd really like to recoup them.

That's not what happens in competitive markets. Competitive prices are determined by --

(Simultaneous discussion)

MR. ALEXANDER: Your Honor, this, again, going into a narrative answer way beyond the scope of the question.

MS. EOFF: And, Your Honor, it's been well more than 10 minutes, so --

(Simultaneous discussion)

THE COURT: Yeah, you're at 15. So, I'm going to ask you to conclude.

MR. SCHAMEL: Yes, Your Honor. I will -- do you mind if I ask just two more questions, Your Honor?

THE COURT: Well, let's try one.

Q     (BY MR. SCHAMEL)  Based on your view of what the relevant antitrust market is and your -- what you have seen with respect to API pricing and Storable's removing SafeLease from FMS access, what is your view on the likelihood that Storable will be successful in obtaining substantial market share in an insurance

market if they're allowed to continue with their excluding and pricing schemes?

A    I would -- to me, it seems substantial because if they do impose this $1.00-$1.50 on companies in addition to Storable, then that, in my opinion, is a -- is a monopoly price that reflects their efforts to leverage their market power -- as was discussed earlier this morning, to leverage their market power from FMS into insurance.

MR. ALEXANDER:  Objection, Your Honor. Again, the answer went well beyond the scope of the question.  Once more, we move to strike all of this testimony for the reasons that I've previously stated. They haven't laid an adequate foundation for this witness' testimony, which includes not only the disclosure of all of the information still not disclosed that -- as required by Rule 195.5, and there's significant gaps in the logical inferences that he's attempted to make, which is exactly what is prohibited by Robinson and Havner.

THE COURT:  Okay.

I'll overrule the objections for the record.

And you can pass the witness.

MR. SCHAMEL:  Thank you, Your Honor.  I

Q    What's a ReCAPTCHA?

A    You've -- you've probably encountered it

before.   A little fire hydrant pops up or a little click the traffic lights to verify that you're human. Sometimes they're impossibly hard; sometimes they're pretty simple.







Q    From a security and stability standpoint --

A    Right.

Q    -- would you tell the Court why an API connection is important?

A    So, an API connection, we can target exactly what items we want someone to have access to.  We can apply throttles to it.  So, we might say, you can have access to the general ledger, for example, but you can only read it.  You can't write it.  You can't change it. You can't delete it.  We'll give you permissions on what

you can access, how fast you can access it.  That also helps keep our systems stable.

Q    Did -- were there discussions in-house about risk of data breach?

A    Yes.

Q    And how serious is that being taken in today's environment?

A    Very serious.

Q    And is that something that was concerning to you and Storable?

A    Of course.

Q    There's been discussion in this case, Mr. Fritcher, that you need an FMS platform in order to perform this tenant insurance business.  Do you agree

with that?

A    That's out of my sandbox.

Q    Okay.  Have you heard about obtaining reports to run those things manually?  Is that familiar?

A    That's -- (shaking head)

(Simultaneous discussion)

Q    (BY MR. TORGERSON)  Not your lane.

A    -- out of my lane.

Q    I'll stay out of it, Mr. Fritcher.

Did the servers, during your tenure in 2024, crash?

A    They have a few times.

Q    Tell the Court about that and about any alarms that you experienced.

A    So, any time servers are running hot we'll get notifications.  Somebody will have to get -- you know, somebody will get paged.  Somebody will have to go hop on there and figure out what's going on and solve the issue.

Q    So, in addition to the dollars out the door for server capacity, is it the case that Storable also had to expend persons and resources, time and resources?

A    Yeah, we've definitely spent quite a few hours on this.

Q    At the end of the day, with your investigation,

Mr. Fritcher, did you find any company other than SafeLease accessing your systems through the front door in an improper fashion?

A     SafeLease was by far the largest.

Q     And, to be clear, this type of access, these types of spikes, is that an appropriate way to come through the front door of an FMS system?

A     No, we expect users to be doing that --

(Simultaneous discussion)

Q     (BY MR. TORGERSON)   In your --

A     -- not automated.

Q     -- experience, sir, is there any legitimate use by SafeLease for automating this process and sending bots into our system?

A     Not through this -- not this method.   I would have used an API.

Q     In your opinion, does it create illegitimate opportunity and risks to Storable and its customers?

A     I mean, it does, and it's also fragile for future breakage, as well.   That's why we always want any -- any connection like that through an API.

Q     And what are the risks by way of a data breach? What are some of the types of information that Storable is concerned could be taken?

A     Driver's license number, financial information,

problem. We communicated to the business that SafeLease was identified, and as I understand it, communications with SafeLease were initiated.

Q   And when you say you communicated to the business, you're talking about your own company?

A   Correct.

Q   You personally and no one at your direction ever reached out to SafeLease to tell them: These are our specific security concerns. Did you?

A   I did not, personally.

Q   And you never asked anyone on your group to do that?

A   It wasn't my place to do so. I communicate to our business team who, as I understand it, was in communication with SafeLease on those topics.

Q   Now, in your investigation, you learned that SafeLease accessed the system as an authorized user from its customers. You learned that. Didn't you?

A   I never said it was an authorized user.

Q   You learned that its customers authorize SafeLease to access their data on your system. Did you not learn that?

A   I still would disagree about it being authorized because that's against our terms of service.

Q   So, you never checked with any customer about

A     That's one of them, yes.

Q     And did you know that SafeLease is a SOC 2 certified technology company?

A     Okay.  I did not know that.

MR. YETTER:  Thank you, Your Honor.  Pass the witness.

THE COURT:  Okay.

MR. TORGERSON:  One question, if I may.

THE COURT:  You may.

**REDIRECT EXAMINATION**

BY MR. TORGERSON:

Q     Is anyone authorized under Storable's terms of service to operate like SafeLease did in 2024?

A     No.

MR. YETTER:  No further questions.

THE COURT:  Okay.

MR. YETTER:  Nothing else, Your Honor. Thank you.

THE COURT:  Okay.

You may step down.  Thank you.

MR. TORGERSON:  May the witness be excused?

MR. YETTER:  Fine with us.

THE COURT:  Yes.

You are free to go.

**REPORTER'S CERTIFICATE**

STATE OF TEXAS                    )

COUNTY OF TRAVIS                  )


I, Janis Simon, Official Court Reporter in and for the 200th District Court of Travis, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

WITNESS MY OFFICIAL HAND this 30th day of January, 2025.

/s/ Janis Simon

Janis Simon, CSR
Texas CSR 7076
   Expires: 07/31/2026
Official Court Reporter
200th District Court
Travis County, Texas
P.O. Box 1748
Austin, Texas 78767
Telephone: (512) 854-9325

# Exhibit I

REPORTER'S RECORD

THE BUSINESS COURT OF TEXAS,

THIRD DIVISION

SAFELEASE INSURANCE          )
SERVICES, LLC,               )
                             )
        Plaintiff,           )
                             ) Cause No. 25-BC03A-0001
v.                           )
                             )
STORABLE, INC., et al.,      )
                             )
        Defendants.          )

_____

HEARING ON PLAINTIFF'S EMERGENCY APPLICATION FOR

TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,

AND ALTERNATIVE MOTION FOR RECONSIDERATION

(Via Zoom Videoconference)

_____

On the 30th day of January, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Melissa Andrews, Judge Presiding, held in Austin, Travis County, Texas;

The proceedings were reported remotely by machine shorthand.

Lorrie A. Schnoor, CSR, RDR, CRR

They've cut off access to any Storable facility management software platforms for SafeLease. They've deleted accounts that Storable's own customers set up and authorized SafeLease to use. And they've put us in a situation where it's absolutely impossible for us to service our customers.

Now, Storable allows its customers to have third-party vendors who log in to their system to help self storage facilities run their businesses. A whole host of different types of vendors and third-party suppliers and agents have to routinely log in to these software platforms for these facilities to run.

That could be accountants, it could be third-party call centers handling customer complaints, and insurers. Many insurers, to our knowledge, there's no other insurer who's been locked out of access to a Storable platform in the way that SafeLease has.

SafeLease -- you know, at first Storable began by blocking IP addresses. Then they've gone so far now as to disable and delete any accounts that have a Storable -- or a SafeLease email address in them. Their customers are asking them to provide SafeLease access to these accounts. And their customers have the right under the terms of service with Storable to designate authorized users to log in to the platform and

                        C E R T I F I C A T E

STATE OF TEXAS          )

COUNTY OF TRAVIS        )

        I, Lorrie A. Schnoor, Deputy Official Court Reporter in and for the Business Court of Texas, 3rd Division, State of Texas, do hereby certify that the foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all which occurred in open court or in chambers and were reported by me.

        I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

        I further certify that the total cost for the preparation of this Reporter's Record is $1,888 and will be paid by Yetter Coleman, LLP.

        WITNESS MY OFFICIAL HAND this the 31st day of January, 2025.

_____
LORRIE A. SCHNOOR, CSR 4642, RDR, CRR
Expiration Date: 1/31/26
Deputy Court Reporter, Business Courts
2330 Vernell Way
Round Rock, Texas 78664
512-914-2638

Lorrie A. Schnoor, CSR, RDR, CRR

# Exhibit J
# FILED UNDER SEAL

REPORTER'S RECORD

VOLUME 3 OF 13 VOLUMES


CAUSE NO. 15-25-00020-CV
TRIAL COURT CAUSE NO. 25-BC03A-0001
IN THE FIFTEENTH COURT OF APPEALS
Sitting at Austin, Texas


STORABLE, INC.; REDNOVA LABS, INC.
(D/B/A STOREDGE); SITELINK SOFTWARE, LLC;
EASY STORAGE SOLUTIONS, LLC; BADER CO.;
AND PROPERTY FIRST GROUP, LP

V.

SAFELEASE INSURANCE SERVICES, LLC

------------------------------------------------------------

REPORTER'S RECORD

FEBRUARY 11, 2025

------------------------------------------------------------

On the 11th day of February, 2025, the hearing on Discovery Motions and a Temporary Injunction came on to be heard in the above-entitled and -numbered cause; and the following proceedings were had before the Honorable Melissa Andrews, Judge Presiding, held in Austin, Travis County, Texas:

Proceedings reported by computerized stenotype machine; Reporter's Record produced by computer-assisted transcription.

purposes of the record, maybe instead of calling them ESS, we call them Extra Space because there is an ESS FMS at issue.

THE WITNESS: I understand.

Q. (By Mr. Schamel) Dr. Williams, you also looked at the issue of whether -- Storable's leveraging market power, correct?

A. That's correct.

Q. And when you are evaluating that here, what were some of the things that you looked at to try to evaluate whether they were leveraging monopoly power?

A. So the first question is how to -- when we look at the prices that Storable charges for API access, that is what is at issue, is there an accepted methodology that allows an economist to determine whether or not certain prices reflect substantial market power. And there are several different ways to do it, but one way that's very well accepted is described in this article in the Antitrust Law Journal by Professor Jerry Hausman and Greg Sidak. I should say, briefly, Professor Hausman is a world famous economist at MIT. And so, yes -- I'm trying to stay within the question. Yes, there is an accepted methodology.

Q. So you looked at competitive benchmark prices. And you kind of covered this, but why do economists look

at competitive benchmark prices?

A.    I think it's pretty common sense.  So if you're asking, hey, does an observed price reflect substantial market power, does an observed price reflect monopoly power, well, how can you tell?  There are several different ways to do it, but one way to do it is to find a competitive benchmark price that you can compare it to.  You can say, well, are they similar, are they different, is one a lot higher than the other.  That's what I've done, Your Honor; and I'll talk about it in a minute.

Q.    Dr. Williams, when you were looking at competitive benchmark prices, that was the prices for what here?

A.    For API access.

Q.    What were some of the prices you considered when trying to determine what the competitive benchmark price was?



THE COURT: May I ask a quick question? I think you said that Cubby does not provide insurance.

THE WITNESS: That's my understanding.

THE COURT: Do you know if SSM provides insurance?

THE WITNESS: My understanding is they do not.

Q.    (By Mr. Schamel)  Dr. Williams, what is your understanding of the prices that Storable offered to SafeLease for API access here?

A.    As you can see Storable offered, as I understand it, two prices to SafeLease.  $1 per unit per month if the facility operator was not using Storable's insurance product.  So we know already the linkage between these two markets, right.  There is a price for API access; but they're saying the price is -- Storable is saying, "Our price is conditional on something in a different market," in the insurance market.  Or it's $1.50 per unit if the facility operator was using a Storable insurance product.

Q.    And, Dr. Williams, when it says was using a Storable insurance product, is it your understanding that that means that SafeLease -- this will be a customer that SafeLease essentially won away from Storable?

A.    Right, that they -- until very recently, until the facility operator made the decision to switch from Storable to SafeLease, they had been a Storable customer for the insurance product; but upon switching, Storable's API price -- again you can see that linkage now, that the API price is going up not because of something like their software costs went up.  Their API

price is going up because of something going on in the second market, the tenant insurance market. It's, in my opinion, clearly exclusionary conduct; but we'll talk more about that.

Q. Now, you then did some comparison of the Cubby and SSM prices to the Storable prices; is that right?

A. That's correct.

Q. I'll ask the next question. So based on that comparison of these prices, what conclusion did that lead you to about the prices that Storable offered SafeLease?

A. So, again, remember -- you already know what I'm going to say, but it's all based on this Hausman/Sidak concept of evaluating whether or not a given price is a monopoly price or is the result of substantial market power by comparing it to a

competitive benchmark.  And now you've seen the first tranche of that, and there will be more.  But what my conclusion is is that the $1 and the $1.50 certainly are supra-competitive prices.  They're substantially in excess of the prices that Cubby and SSM have charged to SafeLease for the same product, API access.

THE COURT:  Do you mind if I slide in another question?

MR. SCHAMEL:  Absolutely.

THE COURT:  How did you choose Cubby and SSM as your benchmarks?

THE WITNESS:  That's what I was provided. If there were more, I would love to get them; but we're early in the litigation.  I'm showing you everything that I've seen.

Q.  (By Mr. Schamel)  Now, you kind of previewed this a little bit in one of your other answers.  Could you talk a bit about that 50 cents price difference and to you, as an economist, what the significance of that is?

A.  Yeah.  So, Your Honor, remember when we looked at the supply and demand curve and we said, well, what is the supply curve?  The supply curve is the forward looking cost to a firm of providing whatever product we're talking about.  Now, my understanding -- so just

ask yourself this question:  Is a 50 percent markup on the API price, is that connected to -- that's explicitly tied to something going on in a different marketplace, is that 50-cent difference attributable to Storable's forward looking marginal costs of providing API access; and the answer clearly is no.  It's a premium or a tax or a penalty, whatever you want to call it, that Storable is charging or wants to charge to SafeLease in one circumstance, and that circumstance being "You just took one of our insurance customers."  And to me, as an economist, that's absolutely exclusionary conduct.

THE COURT:  Do you mind if I ask another question?

MR. SCHAMEL:  Absolutely, Your Honor.

[REDACTED]

THE COURT: That answers my question. Thank you.

Q. (By Mr. Schamel) Now, Dr. Williams, so in a competitive market, then, can a firm normally charge forward looking costs like this? And by "this" I mean forward looking costs from a separate market.

A. Yeah. If a firm has a -- if firms are competing and they're -- and there might be an increase in all their forward looking costs, then it is not surprising that the market price is going to go up. Of course, as I talked about, that is a very different thing than what's going on here.

Q. And, Dr. Williams, in your view does this 50-cent penalty have any sort of an impact on competition or consumers?

A. Yeah. It has a deleterious effect because the API price is being increased for reasons that have nothing to do with the forward looking costs of providing the API services. Again, it is just a function of whether or not Storable did or did not lose

a customer to SafeLease. So that's unrelated to their forward looking cost of providing the API access. Of course, if -- if the $1.50 price is paid, then it is going to get passed to the storage operators. It's going to get passed through to ultimately the tenant insurance rates. So it's a harm to competition.

Q. Now, Dr. Williams, you also looked at API prices that Storable charges other insurance providers, correct?

A. Yes, that's correct.

MR. SCHAMEL: I think actually for this next part, Your Honor, we have to ask our -- this is outside/counsel only. So we need to remove some people from the courtroom.

THE COURT: I think we're going to have some people step out to maintain confidentiality for attorney's eyes only.

(Whereupon, after those people falling under the rule left the courtroom, the following proceedings commenced:)

THE COURT: Is everybody satisfied with who is in the courtroom right now?

MR. SCHAMEL: Yes.

MR. ALEXANDER: Yes, Your Honor.

Q. (By Mr. Schamel) So, Dr. Williams, what were

the -- what were some of the prices that you looked at in some of the other API contracts that Storable has with other insurance providers?

A.    Yeah.   So if you think about where we are, so we just did competitive benchmarks against some prices that independent FMS suppliers had offered to SafeLease. Now we're going to look at some of the other prices that Storable charges to -- for API access to other buyers.

And just to be clear, Your Honor, I've looked at all of them, every single one that was provided to me.   I'm going to show you all of them.

Q.    On your first bullet here you listed an October 2024 agreement.   Why did you list that October 2024 agreement on your slide?

A.    Well, it's a very recent transaction and it's a voluntary transaction between a willing buyer and a willing seller.   So to an economist that means it's a market price.   And what is the price?   The price is -- and you can see it was quite recent, October 2024.   It

And, Your Honor, the average number of units in these facilities, a conservative estimate of them is about 150.   It's actually higher than that. That's a conservative estimate.

If you say, well, what is the apples to apples of API price in terms of the per unit per month

[REDACTED]

also --

Q. So the -- just to make sure I understand and that we're clear, so there is a contract that Storable has with an insurance vendor from October 2024, a few months ago, where the equivalent price per unit is about [REDACTED]

A. Correct.

Q. And how does that compare to the price that Storable has offered SafeLease?

A. Well, obviously it's hugely smaller.

Q. And based on your understanding of the contracts, as well as testimony that you either reviewed or were present for, how does that compare to Storable's other API contracts?

A. So it's -- in a second I'm going to show you a bar chart that will show the average cost across all of the -- I think the short answer is that -- and you can see this box that I've culled out, which Your Honor has already read because it's from the transcript of the

earlier hearing.  But the question from Mr. Yetter:

"The vast majority of people, referring to the facilities owners, that have signed these agreements are at a price that is nowhere near the price that you demanded from SafeLease; isn't that true?"

Answer from Mr. Gordon:  "The majority of them, correct."

And, not surprisingly, Mr. Gordon was exactly right.  So if we go to the next slide --

Q.   Before we go to the next slide, can you remind for the record who Mr. Gordon is?

A.   Mr. Gordon is the CEO of Storable.

THE COURT:  Let me ask a question.  Just for my records and so I know what I'm looking at, this October 2024 transaction, do we know who the entity is on the other side of that?

MR. SCHAMEL:  I don't remember off the top of my head.

THE COURT:  If you'll figure it out later and let me know, so that if I see evidence related to that entity, I know what it's relevant to.

Q.   (By Mr. Schamel)  Now, Dr. Williams, you said you also prepared a chart summarizing the prices that you looked at for all of the API contracts, true?

A.   Yes.

Q.    Could you explain to the court what this chart is showing?

A.    Sure.  So if we just go left to right, Your Honor, so left is the $1.50 which we talked about earlier.  That's Storable's price to SafeLease for -- if the buyer was a prior Storable insurance client.  Then



dollar versus a dollar fifty?  Do you know what they're actually paying or is it based on -- how do you know -- if you are just looking at the contract, how do you know who is actually being charged a dollar and who is being charged a dollar fifty?



THE WITNESS:  I'm glad you asked that because it turns out -- I have been provided, Your



THE COURT:  Okay.

Q.  (By Mr. Schamel)  So, Dr. Williams, even at the $1 price, what does this chart and the data you looked at demonstrate to you about Storable's market power?

A.  So, again, go back to Hausman and Sidak.  The basic intuition here is we're going to evaluate whether or not a firm's prices exhibit substantial market power, whether or not they're supra-competitive, by comparing them to other benchmarks.  We have three benchmarks here.  We have the average price that Storable charges to other buyers, other API purchasers.  Insurance

companies that are purchasing API access.  We have these two prices that were offered to SafeLease.  The bar chart is pretty clear that both the dollar and the dollar fifty are substantially higher than all three of these benchmarks.  So my takeaway is, yeah, the dollar and the dollar fifty are -- those are effectively monopoly prices.  They are prices that reflect substantial market or monopoly power.

Q.   In addition to this dollar/a dollar fifty pricing and the 50-cent difference if a customer is one away from Storable, was there anything else in the testimony that you heard about the API terms that gave you any sort of concerns as an economist?

A.   Yeah.  So, Your Honor, if we look at the next slide -- and, obviously, as you know, I'm not an attorney and I'm not going to offer any legal opinions;



and that, to me as an economist, that's exclusionary conduct.

They're saying, look, we -- and how are they able to do this? Because ask yourself this question. Think about a world in which there were a hundred FMS suppliers and each one had a 1 percent market share, an intensely competitive marketplace, and

We know what would happen. It's not -- people would say, "I'm not going to agree to that. There is 99 other suppliers that won't ask me to sign that." But Storable is able to do that because their market share is so big because they have substantial market power.



Q.     Thank you, Dr. Williams.

            MR. SCHAMEL:  Your Honor, just to let you know, the October 2024 agreement, that was with a group called Cowan, C-O-W-A-N.  The exhibit would be Plaintiff's Exhibit 38.

            THE COURT:  Thank you:  And while we're paused, are we doing okay in terms of restroom breaks?

            MR. SCHAMEL:  We're very close to being done.

            THE COURT:  Let's do that, then.

Q.    (By Mr. Schamel)  Just to make sure I understand, Dr. Williams, so there is the 50-cent penalty price if you were to win a customer away from -- a Storable insurance customer away from it and there is

also the additional promise not to try to get them in the first place?  Is that kind of the arrangement you've described?

A.  Yeah, that's my understanding.

Q.  And that understanding is based at least on part on this testimony that you -- that was from Storable's CEO?

A.  Correct.

Q.  Let's talk really briefly about the removal of SafeLease's access.  As an economist -- one second.  Before I ask you that question, what is your understanding of what Storable has done to SafeLease's access?

A.  Well, I'm not a technical expert.  I'm not an expert in the underlying software.  But my understanding is that at the present time SafeLease has denied access to their FMS -- I'm sorry, Storable has denied access to SafeLease.  Sorry about that.  And I talked earlier about to an economist what is a refusal to deal.  It is basically there is just no price at which I'm going to do this.

Q.  And, Dr. Williams, so -- I think you were kind of getting to that, is the cutting off access.  That is essentially from an economics perspective a refusal to deal?

A.   Yes.

Q.   And what is then -- a refusal to deal -- what is the impact to competition on refusals to deal?

A.   Well, I mean, here it is a deleterious effect in the tenant insurance market because now, in my opinion, this exclusionary conduct has substantially reduced competition in the tenant insurance market, which I'll summarize in a moment.

Q.   And the prices that we were just looking at, I believe you used the term choke prices.  Would you say that, based on what you've seen, that Storable's prices are a choke price?

A.   My understanding is that at the price of a dollar, a dollar fifty, that that's really -- according to Mr. Stein that's really not a price at which they can operate.

MR. ALEXANDER:  Objection.  This is hearsay.  We're not hearing an expert opinion about anything.

THE COURT:  I'm going to sustain that one, and maybe we come at this from a different angle about choke price and maybe how you determine whether something is a choke price.  We talked about it earlier. Maybe we just refresh that, how he reached that conclusion.

question I was going to hopefully clear this up with.

THE COURT: I think I'm going to overrule the objection. So you have a record. He is an expert. I do think he can rely on hearsay, their contentions, as long as we understand that's what he's relying on. He's not testifying as to whether or not Mr. Stein is correct. He's saying he's relying on Mr. Stein's statement and, if it is correct, it would indicate to him for whatever reason to reach a price. So I'll consider it; but you have your ruling, too.

MR. ALEXANDER: Thank you, Your Honor.

FURTHER DIRECT EXAMINATION

QUESTIONS BY MR. SCHAMEL:

Q. Now, Dr. Williams, was there anything that you looked at in your review of the documents, especially some of the recently produced documents, that kind of confirmed any of your thoughts about the impact to consumers of Storable's actions?

A. Well, I know in the most recently produced tranche of documents from Storable I saw several e-mails to Storable from facilities owners in which the facilities owners were complaining that Storable was cutting off authorized users, including SafeLease. So that's the kind of, you know, disruption/harm to competition in the market for tenant insurance. I think

economist. And then in the second column, Your Honor, I have summarized how does this reduce competition in the tenant insurance market. Remember, it is all about -- that's the leveraging. That's the market into which allegedly Storable's monopoly power in the FMS market is being leveraged.

So what is the effect or what is the cause of the reduction? So the first one is refusal to deal. The second one is the supra-competitive pricing. You are raising your rivals' cost. The third one, the "50 percent penalty if you take one of ours customers," that's -- in my opinion that's clearly exclusionary conduct. And then the last one, "If you want to sign the API contract with us, you have to promise not to solicit any of our customers," to me that's clearly exclusionary conduct. And the net effect is that --

Q. I'll ask the next question. So for all of the -- for all of these is it your opinion this is evidence of monopoly leveraging?

A. Yes.

Q. And then -- so what is the net effect of this monopoly leveraging?

A. So it's -- the net effect is the extension of monopoly power from one market to another; and what I've concluded here is this kind of dangerous probability

that if it's allowed to continue, that there is, I think, a substantial risk that Storable would be successful in leveraging its monopoly power from the FMS market to the tenant insurance market.

MR. SCHAMEL: And, Your Honor, before we wrap up, I just wanted to read some exhibits into the record for the API agreements for your reference, if that's all right.

THE COURT: Yes, please.

MR. SCHAMEL: These are all already admitted. So it's Plaintiff's Exhibit 2, 3 -- I'm sorry. I think it's -- those are pages. Exhibits 2, 3, 5, 8, 10, 24, 26, 28, 30, 31, 32, 33, 37, 38, and 50. Those are all plaintiff exhibits. I'm sorry. I said 3 and 8 and those are pages. It is Exhibits 2 and 5, not 3 and 8.

(Counsel sotto voce discussion)

MR. SCHAMEL: I was mistaken again, Your Honor. It's Exhibits 2 through 3, Exhibits 5 through 8.

THE COURT: So you were reading those into the record for what purpose?

MR. SCHAMEL: Just to give you reference to API agreements for what he was relying on, Your Honor. And I think that's all the questions I have, Your Honor. Pass the witness.

understanding.

Q.   Or a renter's insurance policy?

A.   Again, if it meets the requirements that the facility owner puts in place.

Q.   But let's talk about Extra Space again.  If Extra Space started charging its tenants supra-competitive prices for its insurance, it might be able to do so for a time; is that right?

A.   I have not -- I don't have an opinion.  I haven't done any study of Extra Space.

Q.   But as an economist you would expect that if they -- that if they started charging supra-competitive prices in a competitive market, over time they would lose customers to other storage facilities, right?

A.   If it was a competitive market.

Q.   And you have no reason to believe that the self storage business is not a competitive market, right?

A.   Now you just switched markets.  Now you're talking about whether or not the self storage market is competitive.

Q.   Well, you've not done a study of the number of competitors in the tenant insurance market, have you?

A.   That is correct.  I do not have market shares for firms in the tenant insurance market.

Q.   Or the tenant protection plan product either?

A.    That is correct.  It's my understanding that Storable is the largest firm in the tenant insurance market.

Q.    But you can't tell us what share of the market they have, right?

A.    I don't recall seeing a statement from Storable as to what their market share was in tenant insurance. I do recall seeing a statement from Storable that they were the largest firm in the tenant insurance market.

Q.    You've seen the statement from SafeLease that they're the largest in tenant insurance and tenant protection, right?

A.    I think I know what you're referring to.  That was a statement in the prior hearing.  I think -- as I recall what Mr. Stern was saying was that it was the conjunction that -- the combination of those two things.

Q.    And you don't know whether that's right or wrong, do you?  You haven't done a study of market shares of any of these companies, correct?

A.    Well, let's be clear.  What is correct is I have not done a study of the market shares of firms in the tenant insurance market.  That is correct with the proviso that I understand Storable has represented that they are the largest firm in that market.

                    MR. ALEXANDER:  I want to inquire what your

plan is for the lunch break.

THE COURT: And do you mind if I ask a question? I think I heard testimony about Extra Space being the largest firm in the tenant insurance market and then I thought I heard testimony about whether Storable is the largest firm in the tenant insurance market.

THE WITNESS: If I said Extra Space was, then I misspoke. I have seen a document from Storable representing that they believe they are the largest firm in the tenant insurance market.

THE COURT: I may have made a mistake in my notes.

Q. (By Mr. Alexander) Just for clarification, but you don't know whether that's 5 percent, 10 percent, or 20 percent?

A. That is correct. I have not conducted a study of firms' market shares in the tenant insurance market.

Q. So you can't say -- it's not your testimony that they have monopoly power or anything close to it in tenant insurance?

A. Well, let's be careful. It certainly is not my opinion -- I have not offered the opinion, because I don't have the data yet, I have not offered the opinion that in terms of indirect evidence that Storable's

There's more self storage facilities today than there were a year ago?

A. I actually don't specifically recall seeing that. It's possible.

Q. If that's true, using a 2024 number for Storable and a 2023 number for the whole market, that would overstate Storable's share?

A. If it's true that there are more facilities -- that the denominator is bigger in 2024 than the number that -- the most recently available number to me, then, yeah, Storable's share would be a little bit smaller than I've reported; but, again, you are talking about data that doesn't exist yet.

MR. ALEXANDER: I'll object to the responsiveness of what is not available.

Q. And isn't it true that the Self Storage Almanac doesn't report anything about how many facilities use the FMS -- of each provider of FMS?

A. I believe that's correct.



Q. Are you aware of the fact that Storable has never refused to provide SafeLease with an API under any circumstances?

A. You know, I don't have a specific opinion on that.

Q. So you don't know?

A. My understanding is there have been denials of service.

Q. That didn't answer my question.

A. Again, I'm not a technical expert. My understanding is that --

Q. Excuse me -- go ahead.

Q.    How did you find out about that?

A.    I received -- well, I logged in -- every Monday morning I log in and go through my numbers, go through my reports, so I can get with my managers.  I then received an e-mail from SafeLease letting me know that they had been removed from the system, which sparked a little concern in my eyes just because how do we need to move forward at this point, what do I have to change. So that's how I found out.

Q.    You mentioned you were concerned when you found out.  Can you elaborate on what concerned you about it?

A.    How do we move forward?  If they don't have access, then what do I do?  What do I need to change? How do I need to work with my managers differently?  Do we need to start pulling reporting to send to you guys? What is going to change?

Q.    At that time had Storable discussed any of that with you or let you know about how any of that would change?

A.    Not at that time.

Q.    Did you have any idea before this that there was an issue with SafeLease being a user on your FMS account?

A.    I did not.

Q.    Just speaking at a high level , what has the

impact been on MyStorage on your day-to-day since that access was taken away?

A. It's just more work for us. We're having to pull the reporting to send over to SafeLease. They're sending back reports. Now we're having to go in and manually enter things that -- into our client's -- our tenant accounts. So it's just caused more work, more -- more human touching, which you know when humans get involved there can be a lot of errors made; and the last thing we want is obviously errors when it comes to our clients. We want to make sure our clients are covered and taken care of.

Q. Has there been any effect on your tenants or your clients yet?

A. Not yet.

Q. Are you concerned there might be if we continue on in this manner?

A. I won't allow it to happen. I'll make sure my clients are covered one way or the other.

Q. Did you end up getting an e-mail from Storable regarding the situation?

A. I did not. My managers and my owners did, and one of the owners forwarded it to me.

Q. And do you recall who that e-mail was from?

A. It's from Storable.

Q.    SiteLink, excuse me, which is one of Storable's three FMS platforms?

A.    I don't know how much they have.

Q.    Have you ever heard of ESS or storEDGE?

A.    I have heard of storEDGE.  We actually looked at switching to storEDGE at one point.

Q.    Are you aware of other FMS providers out there in the industry?

A.    Yes.

Q.    Could you give me some of those names?

A.    Tenant, Inc., Storage Commander.  What is another one I've talked to?  Well, those are two.

Q.    Do you believe there might be others that are out there as well?

A.    I know there are lots of them.  In Vegas at the trade show you meet a lot of these people. WebSelfStorage is another one.  There you go.

Q.    You also told us that you recently met with a number of insurance companies to try to evaluate that as well, right?

A.    When I was in Vegas I visited with several at their booths.

Q.    I think you said a lot of people?

A.    Yeah.  There is a ton of people at that conference.

Q.   Are there a ton of people in your mind that provide the TPP-type coverage that SafeLease provides to you now?

A.   There probably are.

Q.   And you testified, I believe, that you compared them and found SafeLease was the better deal?

A.   That's what I understand, yes.  SafeLease has so far offered me a better percentage split.

Q.   When you say a better percentage split, let's walk through that.  Is it the case that the average TPP price per unit per month is about $12?

A.   Yes.

Q.   And of that $12 how much does MyStorage retain percentage-wise?

A.   I'm not sure -- I know the percentage.  I'm not sure that is information that I should divulge of my clients.

Q.   Okay.  So let me just ask this first.  I'm going to ask my clients to step out to listen, so that they don't hear that information, and then I'll invite them back in because I respect your right to keep that information confidential.

A.   Yes.

MR. TORGERSON:  One moment.

THE COURT:  Before you answer, so can we

Q.    Again not wanting to air that dirty laundry, that is not something that Storable might want to splash on a website, fair?

A.    Fair.

Q.    You mentioned one of the first things that came to your mind when you learned of this decision to remove SafeLease's access, "How do we move forward."  You said, "We started pulling reports to send to SafeLease," right?

A.    Yes, sir.

Q.    And you said that some people are involved in that a little more hands on than before, right?

A.    Yes, sir.

Q.    And that has continued to work, right?

A.    It is just more time consuming, but it does work.

Q.    Right.  And I believe, to be clear, you said that it has not had any effect, no lapsed insurance, no damage, nothing like that, right?

A.    No, sir.

THE COURT:  Do you mind if I ask a question?

The process you have now of the reports, you are pulling the reports and sending it on to SafeLease, have you had any claims that have been

obviously was send out an e-mail to all of our customers; and I think we felt compelled to do that because we learned that many of the accounts had been de-activated. And, furthermore, we learned that our mutual customers were not informed of that. So we felt an obligation, first and foremost, to communicate to our customers what was going on and how we were going to try to continue to best serve them in this period.

Q. Let's look at that communication.

MR. HILTON: Can you please pull up Plaintiff's 123, Stacy? Thank you.

Q. There are many examples of this e-mail that SafeLease has in the record. This is one of them in evidence.

MR. HILTON: Scroll down to the next page, please.

Q. So that's the e-mail. First of all, this was forwarded from a customer, correct?

A. Yes, that is a customer.

Q. Benjamin Patton forwarded it to you?

A. Yes. I believe I was the "reply to" e-mail address on there. So I received the lion's share of responses to this e-mail.

Q. And then if we can go to the next page, he has what is called a colorful, animated response to this

e-mail?

A.   Yes.

Q.   And then he says, "I'm moving over to Cubby very soon."   What does that mean?   What is Cubby?

A.   Cubby is another FMS platform.

Q.   Was this sentiment from this customer unique?

A.   Definitely not unique, but we saw kind of a wide range of responses from folks.

MR. HILTON:   If we can scroll down to the actual -- there we go.   We'll start going through that.

Q.   So you're familiar with this e-mail from SafeLease?

A.   I am, yes.

Q.   Did you write this?

A.   I did not write it, no.

Q.   But you are familiar with it?   Do you agree with its contents?

A.   I do, yes.

Q.   What was the purpose of this communication in your view?

A.   The purpose -- from my perspective my main concern was, obviously, continuing to service our customers and alerting them that the accounts that they had provisions for us had been largely deactivated; and so, again, I felt an obligation -- I think we as a

businesses operate is they bill their tenants on the first of the month.  It is called monthly billing.  Some facilities do what is call anniversary billing.

But for monthly billing on the first, we have to transition plans over to SafeLease plans on the first.  We have to set up new customers to be able to sell SafeLease plans on the first of the month.  And so like if you can think about an account manager's role, they have these spikes in workload at the end of the month and first of the month because there are all these new customer setups and transitions.  We need to get reporting to be able to do billing and invoicing.  So it is the most critical time of any month.

Q.   What has it taken for SafeLease to survive without FMS access, particularly since the first temporary injunction -- the first temporary restraining order was lifted and we have been back in this world of no access?

A.   I think a lot of collaboration with our customers, asking them to do things that, again, they have come to us to do for them.  So us trying to handhold them through those tasks and responsibilities.

Q.   Do you think SafeLease can continue to operate this way indefinitely?

A.   I mean, we're going to have to hire many more

people if so.

Q.   Hire many more people why?

A.   Because a lot more kind of manual operations are required, a lot more interactions with customers are required.

Q.   Has SafeLease lost customers since January 21st because of Storable's actions in this ongoing dispute?

A.   Yes.

MR. HILTON:  I would like to pull up Plaintiff's Exhibit 170; but before we do, this hasn't been admitted yet.  I think I can admit it with this witness.  Looking at this clock, it's probably the last think I'll have time to do today.  I apologies.  Our time estimates were not accurate, but we're working on that.  This has been designated outside/counsel only.  So I would ask everyone on Storable's side except outside counsel to leave the courtroom.

THE COURT:  While they're leaving the courtroom, there is one housekeeping matter I would like to talk about quickly.  Earlier there was reference to a video that is Exhibit 177, a testimonial; but that is not one of the pre-admitted exhibits for this hearing.  So I wanted to determine whether or not you guys want that to be an admitted exhibit, and we should talk about.

THE STATE OF TEXAS

COUNTY OF HARRIS

          I, Kimberly Kidd, Deputy Court Reporter in and for the Business Court of Texas, Third Division, Travis County, Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

          I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence.

          I further certify that the total cost for te preparation of this Reporter's Record is $2,837.65 and was paid by Defendant.

          WITNESS my hand this the 12th day of March, 2025.

          /s/Kimberly Kidd
          Kimberly Kidd, Texas CSR No. 2437
          Expiration Date:  8/31/26
          Deputy Court Reporter
          1104 Londonderry Avenue
          Friendswood, Texas  77546
          kkidd295th@live.com

# Exhibit K
# FILED UNDER SEAL

# REPORTER'S RECORD

## VOLUME 4 OF 7 VOLUMES

## TRIAL COURT CAUSE NO. 25-BC03A-0001

## APPELLATE CASE NO. 15-25-00020-CV

_____

| | |
|---|---|
| SAFELEASE INSURANCE SERVICES, LLC | TEXAS BUSINESS COURT |
|      Plaintiff, | |
| v. | |
| STORABLE, INC., REDNOVA LABS, INC., (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP | DIVISION 3A |
| | TRAVIS COUNTY, TEXAS |
|     Defendants. | |

_____

## TEMPORARY INJUNCTION HEARING

_____

On the 13th day of February, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Melissa Andrews, Judge Presiding, held in person in Austin, Travis County, Texas.

Proceedings reported by stenographic machine shorthand.

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

Q.   Yes.

A.   Yes.

Q.   Okay.  Is any of that licensed outside the company?

A.   What do you mean by that?

Q.   License, like a contract that says:  User, operator, customer, you are allowed to use this, but subject to these licensing terms, terms of service, for example?

A.   Like, do we use third parties?

Q.   No, sir.  Does software or any type of intellectual property that has been developed internally at SafeLease, does it in turn license, allow people to use that, subject to certain rules?

A.   Yes.

Q.   And those are operators?

A.   Yes, storage facilities.

Q.   You expect -- do those come with terms of service?

A.   We have agreements that we put in place with facilities.

Q.   And those agreements lay out the rights and responsibilities of the respective parties, right?

A.   Yes.

Q.   SafeLease owns that intellectual property, right?

A.   I believe so.

Q.   And, therefore, they have a right to control and set the rules for how that technology can be used; true?

**A.** True.

**Q.** Do you agree with me that Storable is not the only FMS provider that suspended SafeLease's access to its FMS system, true?

**A.** What do you mean by suspended access?

**Q.** You have been blocked by another provider or warned about being blocked by another provider.

**A.** That's true.

**Q.** That's true. Let's look at DX-177, sir.

**THE COURT:** Can I ask a quick question for clarification? Blocked or warned, was it one or the other, both?

**THE WITNESS:** I believe warned. I don't know blocked. My understanding is that tenants, Your Honor, are still able to enroll in SafeLease plans. Existing tenants who have SafeLease insurance policies on this other system are still active. There are still insurance obligations that we must fulfill in the event of a loss.

**Q.** **(BY MR. TORGERSON)** So, we talked about this a little bit the other day. There is another FMS platform out there called WebSelfStorage or WSS; right?

**A.** Yes.

**Q.** And that is made available to the public by U-Haul, one of the large big five companies; right?

**A.** Yep.

Q. And on January 8, 2025, Russ Baldwin at U-Haul emailed the following message:

To whom it may concern: A recent audit found that several of our affiliates created user accounts for third-party insurance companies granting them access to WebSelfStorage accounts. Per the agreement, these affiliates have agreed to, quote, not allow any third-party program to hook up to, link with, integrate with, or be connected to any USS alien program, specifically including WSS software.

Do you see that?

A. I do.

Q. These affiliates, if they choose to participate in third-party programs, such as tenant insurance or tenant protection plans, have been directed to send any data or information needed by said third-party companies by a member of their team. They cannot and should not grant access to WSS directly to third-party companies themselves.

Do you see that?

A. I do.

Q. We have documented and removed all third-party usernames and passwords associated with these affiliate WSS accounts in an effort to stay in compliance with our user agreement.

Do you see that?

A. Uh-huh.

Q.   That's a yes?

A.   Yes.

Q.   SafeLease had usernames and passwords blocked or addressed in this way by WSS, true?

A.   I believe so, yes.

Q.   So, to be clear, SafeLease has effectively been blocked or restricted in access to WSS as a result of the reasons that are contained in this email on January 8, 2025, DX-177; right?

A.   Yes.  This is a very small part of our business.

Q.   That wasn't my question.  My question is:  You would agree with me that Storable is not the only FMS provider that has removed, blocked SafeLease's third-party access to its platform; true?

A.   I don't know that I would agree with how you phrase that, but the user accounts that our customers created for us.

Q.   Those were deleted by WSS?

A.   I don't know if they were deleted or deactivated, what the term is; but that is what I'm taking from this email.

Q.   Let's use the term "removed."  We have removed all third-party usernames and passwords, right?

A.   Yes.

Q.   And that's exactly what Storable did to you, right?

A.   I don't know, again, if it's exactly what they did or not.

THE COURT: This is a good time --

MR. TORGERSON: I'm almost done.

THE COURT: Okay.

Q. (BY MR. TORGERSON) You understand that those customers that terminated you, those 12 customers, there are other options for them in the market; right?

A. Sure.

Q. All right. And you know that there are other FMS providers out there, right?

A. I do, yes.

Q. And you agree with me that in some instances SafeLease has been recommending that their customers consider Cubby as a replacement FMS provider, true?

A. That is true.

Q. All right.

A. In the same way that Storable recommends their customers go to one of their insurance companies. I don't see it being any different.

Q. Okay. Let's look at DX-348. SafeLease has a head-of-talent job posting, right?

A. We do, yes.

Q. Does this report to you?

A. Does not.

Q. You are familiar with this posting?

A. I'm familiar with the role. I wouldn't say that I'm

you make less money and get reduced service, is that going to sway your customers' concerns about what is going on?

MR. TORGERSON: Objection. Calls for speculation as phrased.

MR. HILTON: Your Honor, I'm asking based on his understanding as to his communication with his customers, where a proposal like that would be responsive to their concerns.

THE COURT: I think there is a little bit of speculation built in there, but I think you can testify about your understanding of the industry and your customers and based on your past experience. So, maybe if we can just rephrase the question a little bit.

Q. (BY MR. HILTON) Sure. Let's say that I have kind of laid out the scenario there, reducing services, more work for customers, and you are asking for a reduced revenue share.

A. Sounds great. Where do I sign up?

No, of course, all of our customers are going to go elsewhere. There are many other providers that can offer the same revenue share. That is not the sole reason why a storage facility works with us. In fact, far from it.

Q. There was some discussion about requiring insurance and, you know, some suggestions as to the propriety of that. Are insurance requirements uncommon?

A. No. That is not something we created. That is not a SafeLease specific thing. That's been happening for years.

that Dr. Williams has established that Storable has market power in the FMS market.

Q. Has Dr. Williams evaluated competition in the market for insurance?

A. He has not.

Q. Has Dr. Williams looked at the number of insurers offering their services in the market for insurance?

A. He has not.

Q. Do you know how many of them there are?

A. So, we heard testimony on Tuesday from Mr. Rudkin who was talking about the -- going to Las Vegas for the trade show. He said there were a lot of options. And the information I have is looking at the Storable website, there is -- I think we talked about the website this morning. It lists the number of companies they are integrated with. So, that's a subset of the potential insurers.

There is 15 potential companies you can integrate with. Two of them belong to Storable. So, that's 13 plus one. And we know that SafeLease, also. So, at least 15, not to mention those that are in the market, but just not integrated with Storable.

MR. ALEXANDER: Mr. Carlock, can you put up Defendants' Exhibit 353? I'm sorry -- 352.

Q. (BY MR. ALEXANDER) Did you look at the website for Storable? They are showing their Marketplace integration.

A.    Yes.   They have this page called Software Integrations where they list all of the partners that are integrated with the FMS.   And if you scroll down, there is an option where you can -- it asks:   Find an integration.   And you can filter for risk, which corresponds to insurance.   And here you see there is 15 options that are integrated.

MR. ALEXANDER:   I'm not clear, Your Honor, whether this is in evidence.   We're going to offer this as Defendants' Exhibit 352.

MR. YETTER:   I don't think it's in evidence.

THE COURT:   Defendants' Exhibit 352 is admitted.

(Defendants' Exhibit No. 352 admitted)

Q.    (BY MR. ALEXANDER) Has Dr. Williams evaluated the price charged in the insurance market?

A.    No, he has not.

Q.    Has he established that Storable has any monopoly power in that market or the ability to affect competition in that market?

A.    Not really, no.

Q.    Has Dr. Williams established that -- how many potential customers are in this storage facility -- how many of the potential customers for insurance are in the storage facilities managed by Storable?

A.    No, he has not looked at the number of units that were managed by Storable.

Q.   In your opinion, does the integration of 13 competing insurers into the Storable FMS products, Store Link and storEDGE, demonstrate that Storable has the ability or has been trying to foreclose competition in that market?

A.   No, on the contrary.  When you have those integrated insurers, it makes it easier for them to be picked by your FMS customers.  And so the fact that there is 13 other options that they are integrating with and not just -- you know, they could say:  Hey, we're going to have our two products are integrated, but nothing else.  So, like, that's an option.  Not every ecosystem needs to be opened.  Some can be closed.  And so here there is 13 additional options for customers to pick from, which seems to be the opposite of foreclosing in that market.

Q.   So, for you as an economist, what would you understand as the rationale for offering these different alternatives to your own in turn?

A.   Yeah.  So, based on, you know, what I have heard and the descriptions on the website and my knowledge of platforms, is that having third-party vendors or complimenters can make those platforms more valuable.  And my understanding is that is part of the SiteLink and storEDGE business to be integrated to make their FMS more valuable.

Q.   More valuable to whom?

A.   To the operators who are licensing the FMS.

Q.   Does that also make it more valuable to Storable?

A.   Is that -- well, if it -- you know, if -- if the FMS platform is more -- creates more value for its users, then it's potentially a way for Storable to recoup some of that value. So, yes.

Q.   Do you have an understanding of why Storable developed APIs to provide access to loan their platform to third-parties?

A.   Yes, I understand that there was demand from both the operators and the insurers.  The APIs make it easier to get the data access; and, you know, you can kind of configure things in a different way.  I know there is some companies that have their kind of specialized APIs where you can say:  Hey, I want this API to be different; can you customize it for me?  So, yeah, the API is here to make things easier for the insurers and the operators.

Q.   What are the alternatives to having an API for insurers?

A.   I understand you can get reports; and that's how, like, for instance, Storable, some of their companies don't have an API; and so the way they run their business is to get access to those reports.

Q.   Are there -- are there benefits to being integrated beyond just having the data access?

A.   Yes.  So, like, you know, you are part of the -- you know, you are going to be there on the website.  Your name is

going to be there. You are going to be recognized as a -- kind of a trusted vendor. And you're -- it's a lot -- it's going to be easier for you to set things up in that way. And so that means that if I'm an insurer, if I'm integrated, I'm more likely to get demand for my product than if I'm not integrated with a platform, everything else equal.

Q. Have you seen any evidence that the insurers value having API access?

A. Yes.

THE COURT: I'm going to interrupt quickly. I want to be careful not to go too far outside of the scope of the expert's expertise. So, just keep that in mind as we are moving forward, especially on our time constraint.

Q. (BY MR. ALEXANDER) Does it -- from an economic perspective, does it make sense that Storable would charge for access to an API; and if so, why?

A. If the API is providing value to both the operators and insurers, saving them costs, then, yes, that would make sense. I'm sorry. Just saving them costs or increasing demand. So, yes.

Q. Now, Mr. Williams offered the opinion that prices offered for API access are supracompetitive. Do you agree with that analysis?

A. I don't.

Q. Can you explain to the Court how you analyzed that

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

API, the benchmark for that should be the Cubby API or the SSM, who are vastly different prices.

Q.   (BY MR. ALEXANDER) And with respect to the value that comes from an API agreement, would any particular FMS, would factors include quality of the service you are getting; correct?

A.   Presumably, yes.

Q.   Right.  What about the number of customers that you are going to potentially be able to get on that platform versus another platform?

A.   That could matter, too.  So, for instance, if you think that there's a fixed cost for integration, because you need your engineers to kind of dibble up something, if you are going to get ten customers with one or a thousand with another one, the fixed cost is not going to be worth as much for the first one.  And so you are not going to want to pay as much for the API because you have to incur fixed costs; and so that takes it away from the benefits of it.

So, that could be a reason as to why, depending on how big is the customer who you are going to give access to, you could charge -- it would be a different value for APIs.

Q.   So, would the quality of the prospects that are on that network or that FMS platform, would that affect, to an economist, what an insurance company would want to be willing to pay for that access?

A. Right. So, I think it's important think that the API -- there seems to be two different aspects of it. One is purely technical integration in terms of how do I pull data, right? Like instead of getting the reports, I'm able to get access to the system; and that's cheaper for me.

But one other part is, okay, now you are a part of the platform. You are advertised on the website. It's a turn-key solution. It's a lot easier. And there is some aspect of that that is related to demand.

And so those are different services, and so they would have different value, depending on how much is one versus the other on a given platform.

Q. So, Dr. Williams criticized the difference between the buck and the buck-fifty. And he said -- I believe he said there wasn't any justification for that. Do you remember that?

A. He said there was no cost justification for that.

Q. No cost justification. Do you agree with that framework?

A. So, as I mentioned earlier, one of my things that I did in grad school was quantity marketing. And I was a TA for a marketing class, and we taught students pricing. And one of the things we taught them was do not do cost-plus pricing. When you do pricing, you need to think about the value that you are providing to the customer. And so I wasn't quite sure why Dr. Williams thought that the only difference in price should

Q.   Yeah.  So, let's just talk about the $1.50 for a minute.  You disagreed with Dr. Williams that -- when he said there is no cost -- FMS cost basis for the extra 50 cents or 50 percent; right?

A.   Yeah, he said there was no cost difference; and so there was no justification for the price difference.

Q.   Now, of course, you haven't found a cost reason for the extra 50 percent -- 50 cents; have you?

A.   I have not.

Q.   And the cost of acquiring the existing insurance customers at Storable is not a cost of the Storable FMS system, is it?

A.   No, it's not.

Q.   So, whatever sunk cost they may have in acquiring Storable Insurance customers is no reason for Storable FMS to charge more money for access, is it?

A.   I think that depends.  I think the way I think about it is:  Are the investments that were made by the insurer, is that increasing the value of those customers to the person that is signing the API?  That is the question.

Q.   Okay.  Let's talk about that.  So, Storable Insurance, you are saying, has made some investments in getting customers; right?

A.   That's my understanding, yes.

Q.   And in a normally competitive world, a company

charges a price that tries to recover as much of their sunk cost as competition allows; right?

A. I mean that's what you are trying to do, but you are not pricing based on sunk cost.

Q. Exactly, because that's the sunk cost fallacy that you told the Judge about; isn't it?

A. Right.

Q. Because companies in a competitive marketplace might as well kiss their sunk costs goodbye because you can't -- in a competitive marketplace, you can't price based on how much you spent to get the value; can you?

A. Right. But I think here what's important is that when you think about pricing for a company, you are not doing cost-plus pricing. So, you are thinking what value am I providing consumers compared to the competition.

Q. Exactly. That's why you call it fallacy, because sunk costs are irrelevant to what value customers -- or what price customers are willing to pay in a competitive marketplace; true?

A. Right. I think I'm trying to make a different point is that you would want to consider -- I agree with you the investments are sunk, yes, totally, for sure, sunk cost fallacy, all of this.

I think the question is that you will want to consider -- and I don't have an answer to that. I'm just

saying you would want to consider when Storable is thinking about its pricing, it's not pricing based on costs; right? It's thinking what is different value that is being brought up by the API and by the integration.

So, for instance -- and I think that's a really -- that was very interesting in the documents. I understand that there was -- as part of the negotiation, there was a pricing scheme that was differentiating existing customers from new customers.

Q. Do you mind if we get to that in just one minute?

A. Yeah.

Q. Because I have that.

A. Okay.

Q. But let's get back to the point that maybe Storable is charging that extra 50 cents, 50 percent for winning Storable Insurance customers. They are charging that on the FMS side because of some -- they are more valuable customers. Is that what you are trying to say?

A. Yes. It may be easier to -- yeah, it may be easier to get access to them. There may be less marketing costs.

Q. Do you see any evidence that winning a Storable Insurance customer is somehow easier or more valuable than winning any other insurance customer in the marketplace? Do you see any evidence of that?

A. Well, I'm actually talking hypothetically and --

of things.  So, that's one way in gaining traction in the industry with a new product.

Another way is to offer great pricing, et cetera, to build your business and so on.  One of the things that I do know, because I know so many people in the industry, we're friends and we all talk.  That is what this industry truly is about, like people helping people.

I know that MiniCo has a better price than I do.  I know Deans & Homer have a better price than I do.  I know all of that.  I know that I probably pay a little bit more for my API access fee than what they do.

Q.    Okay.  Let's talk about that.  Do you mind sharing with the Court what you pay to Storable under your API agreement for TPP?

A.    Sure.  Let me start with where we started at though.

Q.    Sure.

A.    So, where we started was they gave a proposal to me of what the API access was.  I had 20 stores at the time or something.  So, I mapped it all out in an Excel worksheet to try to figure out what it would cost me based on what their proposal was.  At the time, they proposed a percentage of the revenue that I was going to collect.

Q.    Did that work for you?

A.    No.

Q.    Did you counter them?



A.   I more than countered them.  So, the reason it didn't work for me is I would have made no money under Storage Shield. So, I mapped it out using MyStorage, using my database and all of that.

**Q.** And do you pay that willingly?

**A.** I do.

**Q.** Do you like paying that fee?

**A.** I do not like paying that.

**Q.** Do you wish it were lower?

**A.** I wish it was free, but it's not. But I -- so, let me be clear with you.

**Q.** Do you understand it?

**A.** I do. And what I understand, because I run similar businesses and, like, if you look at my total platform of StorSuite, technically speaking, my total platform competes exactly, except for the property management software stuff, with Storable platform.

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422



Q.   What does that mean?

A.   I can't get ahold of anybody on the phone.  I can't get anything fixed that's their problem versus our problem.  It's quite the challenge to get somebody on the phone, where I can call Bobby Lish tomorrow and have somebody on my problem just like that.  And to me, the difference between my platform and Storable's platform is I'm more of a service-oriented person.  So, I go with Storable because they give me service.  Case closed.

Q.   Is there value to you even at the $1.50 level?

A.   I'm willing to pay more for better service, and I hope that people in our industry would pay me more for better service.

Q.   Now, do you believe in data privacy and security, especially in light of your recent hack incident?

A.   I probably do more now than I did just week, but yes.

Q.   Do you believe that APIs are the way to go?

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

232

A.   I would say yes.  Like, the biggest thing there is it takes time, energy, effort, money, all the resources on hand to build all of that stuff out.  And to me, that's what I'm paying for.  I'm paying for the luxury of having that, that I don't have to do it.

Q.   Do you respect Storable's efforts to protect tenants?

A.   Yes, a lot.  On the Pinnacle search property site, absolutely.

Q.   At a general level, you understand what this dispute is about?

A.   Yes.

Q.   Do you think it's reasonable for SafeLease to continue to expect to receive access to these systems for free?

A.   Not at all.

Q.   And you mentioned that you own these personal properties.  In addition to SiteLink, what other FMS providers have you used over time with regard to your personal properties?

A.   Me, personally, I have used QuikStor.  I've used WebSelfStorage.  I've used SiteLink -- were the three ones that I have used in the past.

Q.   Now, you mentioned the Marketplace --

A.   So, I also want to be clear about that.  SiteLink by far is the best, in my opinion.

Q.   Fair enough.  Does Storage Shield have full

administrative access via its operators' credentials into people's FMS?

A. No.

Q. Is the solution to that, from your perspective, an API agreement?

A. Yes. So, obviously, I could have done that myself. If I wanted to skirt the system, I could have done that myself. I don't do that.

Q. Do you believe that SafeLease is attempting, based on your understanding, is attempting to skirt the system? Does that create risk, in your mind?

A. It absolutely -- it creates a risk for the platform for Storable; but it creates a risk for the end user, the consumer. And bluntly, the reason I'm here is because I want to see what's best for the industry.

Q. And do you regard Storable's pricing to be some sort of a penalty or somehow anticompetitive, based on your experience in the industry?

A. Not at all.

Q. Do some in the industry disagree with you and view it another way?

A. Yes. So, obviously, I keep my ear to the ground. I'm involved, totally involved in the industry; and I hear all kinds of stuff. I hear things like, you know, that they are creating this big conglomerate and so on. And, you know, I

myself. Somebody like myself that has 21 properties, I'm in the top 100 companies in the United States for storage with only 21 properties.

Q. From your perspective, Mr. Manes, if somebody doesn't like that Storable is charging for APIs in a TPP or tenant insurance base, what options do they have?

A. They can go someplace else.

Q. And what other FMS providers are out there, other than the ones you mentioned?

A. There is probably 20 or 30 of them. There is Tenant, Inc. There is Self Storage Manager. There is -- so, I do know Storage Commander has a couple now under one platform, like Dominaco, SaraSoft, like there is Canovis. There is Cubby that I mentioned. A bunch of these guys are new in our industry, but there is a whole bunch of them.

Q. Okay. Do you believe also that there are a number of competitors in the tenant insurance and tenant protection plan space?

A. Yeah, there is probably 20 or 30 of those, too.

Q. Okay. And so you mentioned the Marketplace. Do you mean the Marketplace that's on the website for Storable?

A. Yes.

Q. Is your company listed there?

A. Yes.

Q. What is your understanding of that listing? How do

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

A. Yeah. I don't want to -- I want to be good to people. I wake up every day to try to be a good person.







245

**Q.** Did Storable ever tell you that there was an older grandfathered-in group of insurance providers?

**A.** No. What they -- so, I'll tell what you happened back then, is I created Storage Shield for my own properties in probably 2020 or something like that. And then I sold 14 properties to one of the publicly traded companies and went down to six properties.

And at that time, I broke up with one of my business partners; and we took Storage Shield to the Texas Self Storage Association conference; and we started offering it to everybody else at that point because the revenue versus expenses for myself to run it internally disappeared because I sold 14 properties.

So, we started offering it to the industry. And I offered it to the industry. I sold in September 2021. It was in October of 2021 that I started offering it to the industry, and it was two years later that I signed that API agreement with Storable.

So, I was operating out in the public openly for a year, year and a half or something like that, getting very little traction. I didn't really start getting any traction

THE STATE OF TEXAS:

COUNTY OF AUSTIN:

### CERTIFICATE OF COURT REPORTER

I, DONNA A. GOREE, Official Court Reporter in and for the Texas Business Court, Division 3A of Austin County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-entitled and numbered cause, all of which occurred in open court and were stenographically reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND on this the 11th day of March, 2025.

/s/ *Donna Goree*
_____
DONNA A. GOREE, CSR, RPR, CRR
Official Court Reporter
Texas Business Courts
Austin County, Texas
3721 Carmen Avenue
Rancho Viejo, Texas  78575
(979) 533-0422
Certificate No. 3909
Expiration Date: 07/31/2025

# Exhibit L
# FILED UNDER SEAL

**REPORTER'S RECORD**

**VOLUME 5 OF 7 VOLUMES**

**TRIAL COURT CAUSE NO. 25-BC03A-0001**

**APPELLATE CASE NO. 15-25-00020-CV**

| | |
|---|---|
| SAFELEASE INSURANCE SERVICES, LLC | TEXAS BUSINESS COURT |
| Plaintiff, | |
| v. | |
| STORABLE, INC., REDNOVA LABS, INC., (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP | DIVISION 3A |
| Defendants. | TRAVIS COUNTY, TEXAS |

**TEMPORARY INJUNCTION HEARING**

On the 14th day of February, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Melissa Andrews, Judge Presiding, held in person in Austin, Travis County, Texas.

Proceedings reported by stenographic machine shorthand.

that the term that you have heard?

A. It's not regularly used. I don't think it would be a mischaracterization. Occasionally, one deals on price. But I would like to think it's a combination of reasons why someone would work with us. Of course, price is always important in the insurance world.

Q. Do you agree that SafeLease offers highly competitive prices?

A. We do, yes.

Q. And the term "discount provider," is that, in fact, a term that Storable has called SafeLease in its papers in this litigation?

A. That's correct.

Q. About how many of your customers use the Storable product as their FMS?

A. I think it's now 1,800 facilities.

Q. Do you know about what percentage of your customers use a Storable FMS?

A. It's approximately 70 percent.

Q. 70 percent?

A. That's correct.

Q. Do you, SafeLease, ever access the customer's Facility Management Software without their permission?

A. Never. We wouldn't be able to. The customer has to create the credentials.

to avoid potential disruption?

A.    I did, yes.

Q.    We can see here you wrote as an -- find -- pardon me. You listed a couple of ideas including, one, Storable allow SafeLease to access the Storable APIs; and then the second bullet point where Storable doesn't need SafeLease as an approved vendor.  And then you made some requests to get explanation about the planned security changes.  Is that fair?

A.    Yes, that's correct.

Q.    Did you end up having a conversation with Storable about the price for potential API access?

A.    We did, yes.  There was some emails on that.

Q.    When it came to these API-related discussions, did you get any proposed terms besides price?

A.    No.  The only thing that was shown to us was price per unit; and there were no terms associated with what calls would be available with an API, whether or not there would be a non-compete, anything like that.

MS. ALLEN:  We can take down this exhibit.

Q.    (BY MS. ALLEN) And what were the price terms that Storable proposed?

A.    They were requesting $1 per every protected unit, unless that protected unit was previously with a Storable insurance company, in which case it would be $1.50; and that's per month -- per unit, per month.

Q.   For the charge of $1, would that 20- or 30-percent margin allow you -- of profit allow you to continue to operate SafeLease?  Would you be able to continue to keep the lights on?

A.   No, and in many cases we have less.  It depends on the risk of the facility, as to how much that percentage share is; but, no, we would not be in business if we only had 20 cents to work with.

Q.   Is it fair to say that, under those API price proposals, SafeLease would go out of business?

A.   That's correct.  Those were not serious proposals. They know that we just simply could not accept those.

Q.   Were you given any API terms, economic even, for ESS access?

A.   No.  ESS doesn't have an API.  And so Mr. Lish was clear that they would be making no proposal at all for ESS.

Q.   I believe we've heard some testimony on this, but does SafeLease have API agreements with other FMS providers besides Storable?

A.   We do, yes.

Q.   And who are those agreements with?

A.   We have Cubby and SSM.

Q.   And you were here for Dr. Williams' testimony.  Those were the two API agreements that he discussed?

A.   That's correct.

testified under oath that if Storable had signed an API agreement with you at 45 cents, it's likely we would have been able to work something out?  Did you say that under oath?

A.   Again, if they had presented an agreement to -- you are saying if we had signed an agreement.  And I'm saying that if we had signed an agreement, we would have an agreement.

But again, prices just weren't -- if they would have presented something to us at 45 cents, it's very possible we could have worked out an agreement; but I don't know what other terms.  They never presented other terms to us.

Q.   Mr. Stein, did you previously testify under oath in this case, before it was removed to this Business Court, that if Storable had signed an API agreement with you at 45 cents, it's likely you would have been able to work something out, yes or no?  Did you say that previously?

A.   I don't know exactly those words.  It's possible.

Q.   All right.  The record will reflect.  We'll cite that later.

You know that Storable wanted $1, $1.50; right?

A.   That is what they signaled.

option to choose another FMS provider, don't they?

A.   It's very difficult because Storable has also bought a payments company that require a link to use their payment system.  And they make that -- they locked down that payment data, which makes it very difficult to migrate.

Q.   Yeah, Mr. Stein, that wasn't my question.

You understand that there are other FMS companies that they can switch to, right?

A.   Sure.

Q.   And SafeLease, you heard Mr. Kinet said has been actively encouraging people to go look at Cubby; right?

A.   That's correct.

Q.   All right.  Let's look at this document, DX-348, head of talent associate?  You testified that this was for some other parent company; is that right?

A.   That's right.

Q.   It doesn't say anything about that.  This is on SafeLease logo talking about SafeLease only, right?

A.   Yeah, it was posted to the SafeLease applicant tracking system.  But this is a senior role, and they operate at the parent-company level.

Q.   But it doesn't say that anywhere on this.

A.   I'm not sure what you mean by "this"; but, no, we're not specifically talking about the various subsidiaries.

Q.   This says this is a job posting for SafeLease head of

A.   I think it depends on the bond.   But I think in general, the liquidity question, yeah, we've got -- we've got enough for probably a couple of months of payroll.   It's not really clear what size bond you're talking about.

Q.   If an injunction issues in this case, you understand a bond is going to be required, right, in an amount to be determined; fair?

A.   That's fair.

Q.   If SafeLease can't pay it because it has no money, can you represent to this Court that you will make sure that it will be caused to be paid by some entity under your control?

A.   I think, depending on the size of the bond, we could make that representation.

MR. TORGERSON:  Pass the witness.

THE COURT:  Before you pass, I do have a few questions.   I just want to give you both a chance to ask your questions.   I don't want to ask a question you're planning on asking.   And then if there is any follow-up, I will let cross complete it; and then it will be fair for redirect.

Just a few quick questions.   The first one is: Since January 1, have you processed any insurance claims of tenants of mutual customers between SafeLease and Storable?

THE WITNESS:  We have, yes, Your Honor. Although, I'm sure there are others that are in a pending status which, but for our ability to access information, would

have been processed.

THE COURT: And that was possible. From your answer, I did think that that --

THE WITNESS: It is, but it requires a lot more work on the facility owner's part to clearly get that information to us.

THE COURT: So, there has been a lot of discussion of SafeLease -- I'm not saying using FMS platforms. But to my mind, there is distinction between accessing the data, which maybe belongs to the facility or the tenant, and using the features of the software. And so I'm trying to get a sense in my mind of how much of each of those things is happening.

I understand a lot of times we're talking about accessing the data; but it sounds like sometimes we're talking about, say, Lease Editor or maybe using a specific software sent in an email. So, if you could just give me your perspective on how much is accessing the data and how much of it is using, you know, a feature of the software essentially.

THE WITNESS: Sure. Yeah, so our customers -- we're essentially a third-party manager that sits behind the counter that are managing leases. We're requested to do that for the insurance aspects of the business.

And so while there is a large amount of data then that is getting pulled to operate the insurance piece of

We have done more than 15 merger and acquisition transactions, totaling in the billions of dollars. And I have never been in court once.

And the reason for that is because we have been extremely reasonable to deal with. We have negotiated in good faith with hundreds of different parties. We have worked out business resolutions on every dispute we've ever had until this situation.

Contrast that with Mr. Stein. He is ten years younger than me, and this is the second or third major lawsuit that I know about.

Q. Mr. Gordon, let's take a look, if we can, at the timeline that we prepared. This has been shared with counsel. Tell us the story of how Storable came to be. You mentioned -- you mentioned it started in your dorm room. Tell us that, if you would?

A. Sure. So, back in 2008, my cofounder Mario Feghali and I started one of our predecessor companies, Sparefoot; and we spent the first ten years of that journey basically building Sparefoot into a comparison shopping website for self-storage facilities. So, think like a booking.com or hotel.com for storage.

And along that journey we got to know our customers really well. And we understood that they were using in most cases five, six, seven different technology vendors to

run their business.  And we knew that there was -- there were a lot of pain points in daily operations between all those different vendors and systems; and we thought there could be an opportunity to bring all that together into one comprehensive platform to simplify the daily lives of our customers, make them more efficient and more profitable.

So, we knew that to kind of execute that strategy we needed to bring together the FMS platforms, along with other vendors like websites, like insurance, like access control, and many of the other things that we now do today.

Q.   What does Storable do and what are its various business lines?

A.   Sure.  So, Storable today is a fully integrated technology company that serves self-storage facilities from their software and a variety of other products, to include insurance, to include payments, to include access control, websites, options and more.  We also do the same thing in the marina industry and in the RV park and campground industry.

Q.   Explain, if you would, the brief history of each of the three FMS platforms and how they came under the Storable umbrella?

A.   Sure.  So, in 2018 we acquired SiteLink; and that was our first major transaction.  And after we acquired SiteLink is when we rebranded the combined company to Storable.  Later that year we acquired storEDGE, and then in 2020 we acquired Easy

Storage Solutions.

Q. Describe, if you would, the difference between these three platforms and why they remain separate?

A. Sure. So, Easy Storage Solutions is our economy product, if you will. It's for the lower end of the storage industry who is typically operating a single facility at a time.

You know, mom and pops, smaller facilities, they need less functionality and features. They are not trying to do complicated tasks, generally speaking. And for that, they expect and need a lower price. So, Easy is kind of our stripped down version, if you will.

Q. On this timeline, did you have input on its preparation?

A. Yes.

MR. TORGERSON: Defendants move to admit Defendants' 366.

MR. YETTER: No objection.

THE COURT: Defendants' Exhibit 366 is admitted.

(Defendants` Exhibit No. 366 admitted)

Q. (BY MR. TORGERSON) We've talked about ESS. Tell us about SiteLink and storEDGE respectively and how they do.

A. Sure. So, SiteLink is our oldest platform; but it is also our most configurable, I'll say. It has 20 plus years of functionality built into it. That means that any way a storage

operator can dream up to run their business, SiteLink can be configured to do that. And it is amazing how many different ways people can dream up to run their business.

StorEDGE is our more modern product, and it's fully browser based; and it, you know, has some more modern features and functionality that our customers want and expect. But, yeah, SiteLink and storEDGE kind of serve the same segment; but they are just different flavors, if you will.

Q. Upon their acquisition or since their acquisition, Mr. Gordon, have these platforms been improved in some sense?

A. Yeah. We invest, have invested, and continue to invest more every year tens of millions of dollars in research and development.

Q. And specifically -- and we are at a high level -- what kind of improvements are you doing? What are you spending that money on?

A. Sure. So, we are investing in everything from new features, new functionality, platform stability, to cybersecurity, and much more.

Q. Let's talk about security. Were there issues with these platforms after you acquired them?

A. Yes. Cybersecurity is constantly an issue.

Q. Right. And were there particular issues, by way of example, with SiteLink about exposing certain data when you acquired it?

And so the way we treat each other, the way we talk about each other, the way we conduct business means a lot; and that's even true with our competitors.

Q.   Mr. Gordon, to your knowledge, do some of these FMS providers, in addition to Storable, provide for and enter into API agreements?

A.   Yes.

Q.   And just give us some examples of some that you know do API agreements; and then explain what the range of cost is for those API agreements, that you know of.

A.   Yeah.  So, we have seen several examples here in this case, just a range of API prices for insurance with different FMS providers for SafeLease.  But I know that if, for example, like Tenant, Inc., has lots of API agreements with everyone who -- from a website provider to an auction provider to an insurance provider; and they probably have different prices for all of those.  That's just one example.  Same thing would be true with any of them.

Q.   Are some offered for free?

A.   That's my understanding.

Q.   What is the tradeoff, to your understanding, why they offer for free?

A.   Probably because they are not providing very much value.

Q.   And are there instances where Storable's insurance

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

products, the companies Bader and StorSmart, do they have APIs with some of these FMS providers?

A.   No.

Q.   What kind of -- do they have any relationship at all?

A.   There are -- I wouldn't say they have relationships with the other FMS's directly; but we do have customers of our insurance products who use different FMS providers.

Q.   Oh, that's a fair point.  And do you have an API agreement in those instances?

A.   No.

Q.   All right.  I apologize.  Are there other competitors in the insurance space?

A.   Many.

Q.   Let's go to the next slide.  We see Storable here. What are some other competitors that we see listed here?  And let's be clear on whether it's the tenant insurance or TPP space, to the extent you know.

A.   Sure.  So, in SBOA, it's a tenant insurance competitor.  Xercor is tenant insurance.  Cornerstone is tenant insurance.  MiniCo, I believe, is tenant insurance, as well. Storage Shield is a protection plan.  And I'm trying to look around here.

Q.   And of these listed, are some of them integrated with Storable?

A.   Most of them are.

Q.    And what does that mean?

A.    That means they have an API agreement that they have signed with us that governs their access to the platforms.

MR. TORGERSON:  Can we look at Defendants' Exhibit No. 352?

Q.    (BY MR. TORGERSON) All right.  I'm showing you Defendants' Exhibit 352, which we believe is admitted into evidence.  Do you recognize this document?

A.    Yes, I do.

Q.    What is it?

A.    It's a page on our website that lists all of our -- we call The Marketplace.  It lists all of the different third parties that integrate with our FMS platforms.

Q.    And what types of industries do those run across?

A.    Well, I think there is probably more than a dozen different categories of vendors that we integrate with; but it could be any of ones like I've mentioned so far today, like the access control, the things that we do.  But also there is things like call centers and third-party management.

MR. TORGERSON:  Can we go to the next page?  You see other businesses.  Keep going.  There we go.

Q.    (BY MR. TORGERSON) We see insurance companies like Savvy, MiniCo, and Storage Shield posted here?

A.    Correct.

Q.    Mr. Gordon, explain to the Court why Storable, as a

company that has tenant insurance and TPP programs, why it would publicly advertise for other companies on its own website, competitors?

A.     Yeah, it's a great question; and it's really important.  Storable -- one of Storable's main value propositions to our customers in the industry is that we provide choice amongst vendors in all these different categories we're talking about.

Our customers want to be able to choose.  They want to be able to consider their different options.  They want there to be competition.  They want our platform to enable that choice.

If we were to say you are not allowed to have choice, you have to use our product or you can only use this one or two choices, that would be bad for our business.  People would leave.  They would go to a different FMS provider who promised them that choice.

Q.     Does it -- could Storable require that a facility using its FMS products also buy Storable's insurance?

A.     No.

Q.     Can a storage facility require that its tenants take out insurance?

A.     Yes.

Q.     Do they do that, in your experience?

A.     They can require that the tenants are covered by

insurance. You can't force them to buy your plan.

Q. Got it. And does the opportunities for coverage to tenants also extend to homeowner's and renter's insurance?

A. Yes. So, the way it works, which I think has been explained a few times, but for clarity, if you -- if the storage facility requires that you, as a tenant, are covered, can you either provide proof of your own private insurance, which could be from Nationwide or could be from any other big insurance company, or you can buy theirs.

Q. In Storable's tenant insurance and TPP business, are there relationships, agreements in place, where you work with a facility that does not even have an FMS platform?

A. Yes.

Q. And what is the solution? How do you do your job there?

A. They manually send us reports.

Q. Like has been described in this case up to this point?

A. Yes.

Q. Is that workable?

A. It is.

Q. Is that how the world used to work before these FMS platforms?

A. It is.

Q. There have been a lot of discussion in the terms of

service about the DEI provision in Section 4.5 and the definition of "user."  For the benefit of the Court, would you explain your perspective on reasons that distinguish a legitimate third-party user working for the business of the facility versus what you understand SafeLease to be doing?

A.   Sure.  Generally speaking, just to be clear, this concept of accessing our systems as an authorized user, in my mind, it's a concept made up by SafeLease for this lawsuit.  I have never heard any other vendor say this to me before.  This is not a commonly accepted thing.  It's not real.

SafeLease has come up with this idea to get around our terms of service that make it clear that if you are running a third-party business, you have to have an API agreement with us.  Everyone in the storage industry understands that.  I think we heard that from Mr. Manes earlier.

Q.   To your knowledge, does any other insurance provider out there have separate administrative level access, to your knowledge, without -- period -- other than SafeLease?

A.   So, it is possible that there are some -- someone else who has an administrator access account.  But to my knowledge, there is nobody else who has built an entire business by creating thousands and thousands of usernames and creating an entire computerized system to automate their way in.

Q. Instead, is it the case that these other insurance company competitors enter into an API agreement to access your platforms?

A. Everyone else does that.

Q. All right. Have you lost FMS customers in the last year?

A. Yes.

Q. How many?

A. Just under 1,000.

Q. And why? What reasons?

A. So, there is a variety of reasons why we would lose -- sorry. There is a variety of reasons why we would lose an FMS customer, but I would say the most prevalent ones are price. So, maybe they find a better deal on a different FMS competitor.

Two, they complain about our product functionality. They say that: I like this other company that is innovating faster or it has XYZ feature that you don't have.

And three, even though we try to be really service oriented and I think we do a pretty good job of it, sometimes people complain about service.

Q. Mr. Gordon, let's turn to API agreements. Is it the case that -- does Storable have API agreements with other companies at the buck/buck-fifty model?

A. We do.



**Q.** Explain to the Court the value of a Storable insurance customer with regard to this pricing model.

**A.** Sure. So, I think there is a few components to that, and this is important. First is that you have to put yourself in the shoes and mindset of a self-storage owner. Historically, they may not know about the existence of tenant insurance or tenant protection at all.

Our team has spent years and years going out to market, talking to our customers, educating them about what this concept is in the first place. Once we convince them that this is a good idea for them to do, then we bring them into our team. We spend time and resources training them up so that their managers can understand so that they can go amend all of

their leases to include the language that they need to have. We get that all set up in the system. We then help them get their enrollment rate up. We help them start making more money from this platform.

And so generally speaking, a customer that has been on Storable insurance has benefited from all of this investment that we have put in; and, therefore, they are producing more than the average customer and are more valuable to a different insurance company if they were to then take that customer from us.

Q. That last point that you made, Mr. Gordon, had we heard evidence from different witnesses in this proceeding about value to them of trying to take Storable's customers?

A. So --

Q. Even at the higher end?

A. Yes, Mr. Manes said that he is still willing to pay that because it's worth it.

Q. What about for Mr. Kinet?

A. So, this is -- Mr. Kinet said that -- and then actually Mr. Stein today also confirmed that 65 to 70 percent of all the new customers they sign up every month are coming from Storable platforms. To me, that's not surprising because the ones that are our customers are more valuable because they are better at selling tenant insurance and they are going to benefit more from this type of offering that they have. And

then I think about the fact that Storable only has about 30 percent of our FMS customers using our insurance.

Q. Say that again. And what is the importance of that statistic?

A. Only 30 percent of Storable's FMS customers use our insurance products; and that's combined, both tenant insurance and TPP. But yet 65 percent of SafeLease's new sales, 65 to 70 percent are coming from our 30 percent.

Q. Are there costs associated with instituting and maintaining API connections for these competitors out there?

A. Absolutely.

Q. Tell us about that briefly.

A. So, the API is not just a, you know, piece of the software that sits there and takes care of itself. It is highly used, millions and millions of interactions with it on a daily basis. It is something -- it is a feature or functionality that requires a high level of support.

We field questions from third parties who are using our API all the time; and we have to constantly be improving it, adding new features to it, investing in it, and making it more secure.

Q. Mr. Gordon, in these various agreements that we've talked about for APIs with your competitors in the tenant insurance and TPP space, have you offered caps?

A. We have to, some of them.

659

**Q.** And some of those are in place?

**A.** Yes.

**Q.** Are those negotiated just depending on the deal?

**A.** Correct.

**Q.** And let's talk about the negotiations specifically with SafeLease. We know that originally the dollar/dollar-fifty model was proposed. Was that the beginning of the process?

**A.** That was the beginning.

**Q.** Did you ever say take it or leave it?

**A.** No.

**Q.** At some point did those discussions continue?

**A.** Yes.

**Q.** Have they been continuing even recently?

**A.** They have.

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

Q.    Is the API only about data access, or are there other factors, other dimensions like, for example, demand generation?

A.    Yes.  So, API access certainly is, in a major way, about access to our systems; but it's also about getting the verified approved-by-Storable stamp of approval.  And that's something that our integrated third parties care a lot about because customers come to us and they say:  Are these other third parties legitimate?  Can I work with them?  Have you vetted them?

Q.    In your opinion --

A.    And we share them on The Marketplace, of course.

Q.    In your opinion, are there reasons why your API connections or your API agreements might be more valuable than, say, that of Cubby; and why?

A.    Yes.  So, the amount of work required by a third-party to finish a new integration with an FMS platform is not significantly different, whether it would be integrating with a Cubby or a SiteLink, let's call it.

However, with SiteLink and our FMS ecosystem, you are getting exposure to maybe 100 times more facilities by doing the same amount of work.  So, it's far more valuable than integrating with Cubby.

Q.    Why can't ESS have an API connection?

A.   So, we have made the strategic choice -- and this is not a change.  This has always been true -- for ESS to not have an API at all because there is significant costs associated with having that API, maintaining it, and supporting the network of third parties; and as a way the keep our costs down on ESS, we have decided to not build that.

Q.   Okay.

A.   And the reason we're keeping costs down on ESS, to be clear, is so that we can continue to offer the lower price of ESS to our customers.

THE COURT:  Can I ask you real quick:  Are there any exhibits associated with that?

MR. TORGERSON:  I'm sorry?

61

customers?

A.    This email was designed and written specifically to rile up the customer base --

Q.    And did it work?

A.    -- and pit them against Storable.

Q.    Did it work?

A.    Yes, it definitely worked.

Q.    And if you'll just scroll through here, look through here on the first page.  Let's look at the bottom half.

Just give us some highlights of your reaction to this.  Do you think this is -- in sum and substance, do you think this is a true or honest and accurate interpretation of the situation?

A.    Absolutely not.

Q.    Give us some examples right here on the first page.

A.    Storable is violating the rights you have already paid for.  That is not true.

You have the right to appoint authorized users like SafeLease.  That is not true.

You own your insurance data and can decide how to use it.  We have never done anything that suggests that that's not the case.

You have the right to share your insurance data with SafeLease.  That's also true, just not through a back door into our system.

Q.   Instead, what is the solution there?

A.   The solution would be to have an API agreement.

Q.   Or the operator could do what?

A.   Or they could email the reports; and SafeLease could tell them:  Hey, I need you to go execute XYZ action in the system; and the operator could do it.

Q.   Go to the next page, if you would.  And just at a high level again, these other things about, you know, excuses and demanding a ransom, what was your reaction to these?  And point out any false information that you believe exists here.

A.   Well, expect Storable to make excuses, to me, suggests that they, of course, know that we're going to respond to their false claims.  And they are trying to get ahead of that and make us look bad before we even have a chance to defend ourselves.  So, that's what that is.

Demanding a ransom is ridiculous to me because they know full well that we are not actually charging $1.50 per unit per month to our existing customer base.  And that's actually something I did want to mention.

Specifically, we heard Mr. Stein earlier say that -- you asked, Your Honor, how many -- what percent of SafeLease's customer base would the $1.50 apply to versus the $1; and he said 70 percent would be $1.50.  That is patently not true.

We have made it very clear to them that the back

MR. TORGERSON: Sure. Yes. Apologies.

(Parties enter courtroom.)

Q. (BY MR. TORGERSON) Let's go to the end. You had some -- you wanted some options to be laid out in the top half. We are making the following promises, one, two, three. Walk us through that.

A. Sure. So, in this email and also in the many subsequent conversations that I had with customers trying to get them to calm down based on what SafeLease had told them, I made it very clear that we are not taking the position that you have to leave SafeLease. You can continue to use SafeLease for as long as you want, and we are totally okay with that. You just can't continue to let them access our system the same way they have been in the past. You might have to send them some reports manually. You might have to take some actions in your system that they tell you you need to do; but you do not have to stop using SafeLease.

Q. You made that abundantly clear in the first one?

A. I did. And any conversation I've had with anyone, I've made that abundantly clear, too, to including Mr. Rudkin who was here. I had that explicit conversation with him.

Q. And in your conversation with Mr. Rudkin and these other customers, did you convey the importance of maintaining -- the importance of the security of the system?

A. Yes. So, the way I did describe it to Mr. Rudkin and

others is imagine -- we have learned here in the last few days that SafeLease has thousands of different administrator logins to our system.

Imagine that SafeLease was hacked by a bad actor and that hacker now has access to those thousands of administrator passwords in our system. Imagine they figured that out, log into some of Storable's platforms, and cause a massive data breach across all of our customers and their tenants' PII. Well, we have no contract with SafeLease that gives us any kind of contractual liability for that situation. So, we and our customers will be fully left holding the bag if SafeLease is breached.

Q. SafeLease has made the accusation that it's being unfairly targeted and singled out. Is there a reason why SafeLease finds itself in the position that it's in?

A. Because they have been unwilling to do business with us like the hundreds of other people in the industry who do it the right way.

Q. In addition to this response, which we just looked at 207, did Storable generate help articles for each of the three platforms?

A. We did. Despite what I would -- you know, they keep claiming we attacked them. I would contend the opposite.

But despite the fact that we feel like they are the ones attacking us and trying to pit our customers against

us via their email that was extremely defamatory, we still published new help articles that explained how our customers can go out and automate sending a report to SafeLease and generally make it easy for them to continue doing business with them.

Q.   Let's look at DX-228, and let's split the screen with 229.  This is for Easy Storage as 228, and 229 is SiteLink. Are these the help articles?

A.   Yes.

Q.   And then real quick, the DX-230 is the storEDGE help article.  What do these do?

A.   These are new help articles we've put out that helped make it clear to our customers how to leverage the functionality that had already been in place for them, which is they can automate sending in reports to third-party insurance vendors.

Q.   Mr. Gordon, to be clear, even though these were recently published, has this information and this process always been available to operators and to SafeLease?

A.   Yes.

Q.   Let's talk about SafeLease's plea of poverty in this case.  In your dealings with Mr. Stein and/or SafeLease, has there been ever a question about their liquidity?

A.   Not in my mind.

Q.   And to the contrary, what have you gained or gleaned

MR. YETTER: Just take a minute. On page -- let's actually go to Page 12. And one of the things that you report on Page 12 of Defendants' Exhibit 204 -- it's at No. 8.3.10 -- is that customer users do not have -- 8.3.10. You, Storable, report to this agency that your "customer users do not have access to cardholder data in the in-scope system," your FMS system. Did you realize that?

A. Yes.

Q. So, if they can't get it, then SafeLease can't get it; can they?

A. Not supposed to be able to.

Q. Now, we have heard more than once that the point of what Storable decided to do over the last three months is to get SafeLease to sign an API contract so SafeLease pays Storable money; right?

A. And accesses our systems in the secure and industry standard way.

Q. Let's break those two apart. But one of the things you think is that SafeLease should pay you money, right?

A. I do.

Q. Now, of course, your customers pay you money for the rights to use the FMS systems; don't they?

A. They do.

Q. And under the terms of those systems, SiteLink and storEDGE, they have the right to name authorized users; don't

THE COURT: Okay. So, there was some testimony that storEDGE -- Storable -- sorry -- can change its terms of service at any time. So, have you changed your terms of service at any point since this lawsuit started?

THE WITNESS: We have not yet.

THE COURT: Okay. That's the end of my questions.

MR. YETTER: Can I ask one follow-up --

THE COURT: Yes.

MR. YETTER: -- that was related to one of the questions?

**FURTHER CROSS-EXAMINATION**

BY MR. YETTER:

MR. YETTER: Thank you. Pass the witness.

**REDIRECT EXAMINATION**

BY MR. TORGERSON:

Q. Just a few cleanup, if we can. It's true you can change the terms of service tomorrow to limit the number of

Q.   (BY MS. EOFF) In preparation of your testimony today, did you withdraw some information from the ESS database?

A.   I instructed someone to, yes.

Q.   Is that the information that we have on the screen here?

A.   Yes.

Q.   Is this a record that was made at or near the time by someone with knowledge?

A.   Yes.

Q.   And this was a record that was kept in the regular course of a regularly conducted business activity?

A.   Yeah, it's out of our normal database.

Q.   So, it's excerpted from your normal database?

A.   Correct.

Q.   And making the record was a regular docketing activity?

A.   Yes.

          MS. EOFF:  Your Honor, at this time we move to admit this Defendants' Exhibit 362.

          MR. YETTER:  No objection.

          THE COURT:  Defendants' 362 is admitted.  There were no objections, and it's admitted.

          (Defendants' Exhibit No. 362 admitted.)

Q.   (BY MS. EOFF) Mr. Fritcher, during your time at Storable, have you investigated SafeLease's use and access of

Storable's various FMS platforms?

     A.    Yes, I have.

     Q.    Can you please explain briefly for the Judge the first part of that investigation, which related to the architectural changes to the system based on their behavior?

     A.    Sure.  So, back in April '24, I was looking for, you know, brand new company, trying to figure out what is going on with the system, why am I hearing reports about a dozen issues; and we came across some bot activity.

          Bot activity in the system of high percentage of the traffic going into the applications was automated, and we were digging into why that was the case, because normally if you have an application, you want it to be used by your customers, not automation scripts and bots.

          **MS. EOFF:**  And, Emilio, would you please pull up Defendants' Exhibits 77 and 78 and put them side-by-side.

     Q.    **(BY MS. EOFF)** When you first noticed SafeLease's activity on the system, did you notice something that said with a big sign, hey, this is SafeLease doing this?

     A.    So, first you see this big spike that looks automated to us; and then we go and we dig into what is behind that spike.  Through one big click, we get a big list of IP's off this system and then we looked at the list of IP's in our databases to see which users they were tied to.  And all the users that we looked up all had SafeLease email addresses.

Q.   And when we look at Defendants' Exhibit No. 77 in the top left corner, there is a date that says October 24th.  Is that the date of this spike?  Oh, excuse me -- the top right corner.

A.   Yes.







THE STATE OF TEXAS:

TEXAS BUSINESS COURTS:


## CERTIFICATE OF COURT REPORTER

I, DONNA A. GOREE, Official Court Reporter in and for the Texas Business Courts, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-entitled and numbered cause, all of which occurred in open court and were stenographically reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND on this the 12th day of March, 2025.


/s/ *Donna Goree*
_____
DONNA A. GOREE, CSR, RPR, CRR
Official Court Reporter
Texas Business Courts
3721 Carmen Avenue
Rancho Viejo, Texas 78575
(979) 533-0422
donna.goree.csr3909@gmail.com
Texas Certification No. 3909
Expiration Date: 07/31/2025

# Exhibit M

# Terms of Service

**TERMS OF SERVICE**
**Revised: January 23, 2023**

Easy Storage Solutions, LLC ("ESS," "we," "our," or "us") is happy to provide you with access to its self-storage business solutions accessible through the website and associated domains of www.storageunitsoftware.com and other custom domains, related software, content, and services, including all versions and upgrades thereto, and any third-party services that we may procure on your behalf (collectively, the "Services"). Your use of the Services is subject to and governed by the terms and conditions in these Terms of Service (the "Terms"). We may, at our discretion, update the Terms at any time. You can access and review the most current version of the Terms at the URL for this page, by clicking on the "Terms of Service" link within the Services, or as we otherwise make available.

PLEASE REVIEW THE TERMS CAREFULLY. BY REGISTERING FOR AN ACCOUNT OR OTHERWISE ACCESSING OR USING THE SERVICES, YOU AGREE TO BE BOUND BY THE TERMS, INCLUDING ANY UPDATES OR REVISIONS POSTED HERE OR OTHERWISE COMMUNICATED TO YOU. IF YOU ARE ENTERING INTO THESE TERMS ON BEHALF OF A COMPANY OR OTHER LEGAL ENTITY, YOU REPRESENT AND WARRANT THAT YOU ARE AUTHORIZED AND LAWFULLY ABLE TO BIND SUCH ENTITY TO THESE TERMS, IN WHICH CASE THE TERM "YOU" SHALL REFER TO SUCH ENTITY. IF YOU DO NOT HAVE SUCH AUTHORITY, OR IF YOU DO NOT AGREE WITH THE TERMS, YOU MAY NOT ACCESS OR USE THE SERVICES,

**THE TERMS REQUIRES FINAL AND BINDING ARBITRATION TO RESOLVE ANY DISPUTE OR CLAIM ARISING OUT OF OR RELATING IN ANY WAY TO THE TERMS, OR YOUR ACCESS TO OR USE OF THE SERVICES,** INCLUDING THE VALIDITY, APPLICABILITY OR INTERPRETATION OF THE TERMS, AND YOU AGREE THAT ANY SUCH CLAIM WILL BE RESOLVED ONLY ON AN INDIVIDUAL BASIS AND NOT IN A CLASS, CONSOLIDATED OR REPRESENTATIVE ACTION, ARBITRATION OR OTHER SIMILAR PROCESS. PLEASE REVIEW SECTION 19 CAREFULLY TO UNDERSTAND YOUR RIGHTS AND OBLIGATIONS WITH RESPECT TO THE RESOLUTION OF ANY CLAIM.

# OTHER AGREEMENTS

Your access to and use of the Services is subject to the ESS Privacy Policy (the "Privacy Policy"), any usage or other policies relating to the Services we post or otherwise make available to you (collectively, "Additional Terms"), which are hereby incorporated by reference, and you agree to be bound by the Additional Terms.

Defendant's

Ex. 1

# GRANT OF RIGHTS

Subject to and conditioned upon your compliance with these Terms (including all Additional Terms), ESS grants you a limited, non-exclusive, non-transferable, non-sublicensable, revocable license: (a) to access and view pages within the Services (b) to the extent that the Services provides access to any online software,

STORABLE000001

only in the form found within the Services, in each case only for your internal business purposes.

# PERSONAL INFORMATION; REGISTRATION; ACCOUNT

You acknowledge and agree that by accessing or using the Services, ESS may receive certain information about you, including personal information, and ESS may collect, use, disclose, store and process such information in accordance with these Terms.

In registering for the Services, you agree to: (i) provide true, accurate, current and complete information about yourself (the "Registration Data"); and (ii) maintain and promptly update the Registration Data to keep it true, accurate, current and complete. If you provide any information that is untrue, inaccurate, not current or incomplete, or ESS reasonably suspects that you have done so, ESS may suspend or terminate your account.

You may not share your account or password with anyone. You are fully responsible for all activities that occur under your account, whether or not you authorized the particular use or user, and regardless of your knowledge of such use. You agree to notify ESS immediately of any unauthorized use of your account or password or any other similar breach of security.

# RESPONSIBILITY FOR CONTENT

You acknowledge and agree that all information, data, data records, databases, text, software, music, sounds, photographs, images, graphics, videos, messages, scripts, tags and other materials accessible through the Services, whether publicly posted or privately transmitted ("Content"), are the sole responsibility of the person from whom such Content originated. This means that you, and not ESS, are entirely responsible for all Content that you upload, post, email, transmit or otherwise make available through the Services ("Your Content"), and other users of the Services, and not ESS, are similarly responsible for all Content they upload, post, email, transmit or otherwise make available through the Services ("User Content"). To the extent that you submit any Content, you represent and warrant that: (i) you have all necessary right and authority to grant the rights set forth in these Terms with respect to Your Content; and (ii) Your Content does not violate any duty of confidentiality owed to another party, or the copyright, trademark, right of privacy, right of publicity or any other right of any other party. You acknowledge and agree that the Services are not intended as a data warehouse ESS has no obligation to make redundant copies of or to back up Your Content, and that you are solely responsible for backing up Your Content should you feel the need to do so. You acknowledge and agree that you may not have access to Your Content through ESS or the Services following the expiration or termination of these Terms.

You shall not upload, post, email, transmit or otherwise make available any Content that: (i) is illegal, harmful, threatening, abusive, harassing, tortious, defamatory, vulgar, obscene, libelous, invasive of another's privacy, hateful or otherwise objectionable; (ii) may not be made available under any law or under contractual or fiduciary relationships (such as confidential or proprietary information learned as part of an employment relationship or under a non-disclosure agreement); (iii) infringes any patent, trademark, trade secret, copyright or other proprietary right of any party; (iv) consists of unsolicited or unauthorized advertising, promotional materials, junk mail, spam, chain letters, pyramid schemes, commercial electronic messages or any other form of solicitation; (v) contains software viruses or any other code, files or programs designed to interrupt, destroy or limit the functionality of any software or hardware; or (vi) consists of information that you know or have reason to know is false or inaccurate.

# SUPPORT

Except as generally described on our website or as otherwise explicitly agreed by ESS in any applicable Additional Terms, ESS is not obligated to provide you any support for the Services and ESS make no specific service level guarantees. In the event that ESS voluntarily provides you with any support beyond our basic descriptions or that is not explicitly agreed by ESS in any applicable Additional Terms, it shall not be deemed a commitment by ESS to provide you any support in the future, and ESS may choose, in its sole discretion, to discontinue such support at any time and for any reason without any liability to you.

# RIGHTS TO CONTENT

STORABLE000002

royalty-free, fully-paid-up, non-exclusive, sublicensable, transferable license to use, reproduce, modify, adapt, create derivative works from, publicly perform, publicly display, distribute, make and have made Your Content (in any form and any medium, whether now known or later developed) as necessary to (i) provide access to the Services to you and other users; and (ii) monitor and improve the Services. To the extent you have made Your Content accessible to others within your organization through the Services, you acknowledge and agree that ESS may continue to make Your Content accessible to others within your organization through the Services even after you have deleted your user account or the applicable portion of Your Content from your user account.

Except with respect to Your Content, you acknowledge and agree that, as between you and ESS, ESS owns all rights, title and interest (including all intellectual property rights) in the Services, and all improvements, enhancements or modifications thereto, including all Content and other materials therein. The Services is protected by U.S. and international copyright, trademark, patent and other intellectual property laws and treaties. ESS reserves all rights not expressly granted to you.

As used herein, "Aggregate Data" means Your Content that has been aggregated in a manner that does not reveal any personal information and cannot reasonably be used to identify you, your organization or its customers or vendors as the source of such data. You acknowledge and agree that ESS may collect or generate Aggregate Data in connection with providing you with access to or use of the Services, and, subject to your provision of consent, you hereby grant ESS and its service providers a perpetual, irrevocable, worldwide, royalty-free, fully-paid-up, non-exclusive, sublicensable, transferable license to use, reproduce, modify, adapt, create derivative works from, publicly perform, publicly display, distribute, make and have made Aggregate Data (in any form and any medium, whether now known or later developed) for any lawful purpose.

Except with respect to Your Content and subject to the limited rights expressly granted to you in Section 2, you may not: (i) use, reproduce, modify, adapt, create derivative works from, publicly perform, publicly display, distribute, make, have made, assign, pledge, transfer or otherwise grant rights to the Services; (ii) reverse engineer, disassemble, decompile or translate, or otherwise attempt to derive the source code, architectural framework or data records of any software within or associated with the Services; (iii) frame or utilize any framing technique to enclose any Content; (iv) access the Services for the purpose of developing, marketing, selling or distributing any product or service that competes with or includes features substantially similar to the Services or any products or services offered by ESS; (v) rent, lease, lend, sell or sublicense the Services or otherwise provide access to the Services as part of a service bureau or similar fee-for-service purpose; (vi) remove or obscure any proprietary notice that appears within the Services; or (vii) use the Services in any manner or for any purpose that infringes, misappropriates, or otherwise violates any intellectual property right or other right of any person, or that violates any applicable law.

You acknowledge and agree that we may record calls between you or your agents and us (or between your current or prospective tenants and us) for quality assurance and training purposes, including when a call is placed on hold ("Call Recordings"). Any Call Recordings are our sole and exclusive property and may be retained or destroyed by us at our sole discretion. We may use Call Recordings for any lawful business purpose, in accordance with our Privacy Policy. Unless otherwise required by applicable law, rule, regulation or court order, we have no obligation to provide you with any Call Recordings.

You acknowledge that the Services, these Terms, Call Recordings and any other confidential information provided by us constitutes valuable proprietary information and trade secrets ("Confidential Information"). You agree to preserve the confidential nature of any Confidential Information you receive by retaining and using it in confidence. You may use Confidential Information solely for your internal business use in connection with your use of Services, and you may not provide such Confidential Information to any third party, except with our prior written consent.

## USER CONDUCT

In connection with your access to or use of the Services, you shall not:

impersonate any person or entity, including ESS personnel, or falsely state or otherwise misrepresent your affiliation with any person or entity;

forge headers or otherwise manipulate identifiers in order to disguise the origin of any Content transmitted through the Services;

act in a manner that negatively affects the ability of other users to access or use the Services;

STORABLE000003

infrastructure;

interfere with or disrupt the Services or servers or networks connected to the Services, or disobey any requirements, procedures, policies or regulations of networks connected to the Services;

use spiders, crawlers, robots, scrapers, automated tools or any other similar means to access the Services, or substantially download, reproduce or archive any portion of the Services;

sell, share, transfer, trade, loan or exploit for any commercial purpose any portion of the Services, including your user account and password; or

violate any applicable local, state, provincial, federal or international law or regulation.

# FEES

You are solely responsible for any data, usage and other charges assessed by mobile, cable, internet or other communications services providers for your access to and use of the Services. Some features of the Services are free to use, but fees may apply for premium features and other components. If there is a fee listed for any portion of the Services, by accessing or using that portion, you agree to pay the fee. Your access to the Services may be suspended or terminated if you do not make payment on time or in full.

For all Services you agree to pay the specified fees and you authorize us to charge you according to the monthly plan level you choose and any other charges you may incur in connection with your use of the Services. A valid credit card or ACH account may be required for you to use the Services on a month-to-month basis. The Services are billed in advance on a monthly basis and such fees are non-refundable. There will be no refunds or credits for partial months, or for months unused with an open account. We reserve the right to change rates upon thirty (30) days' notice. Such notice may be provided at any time by posting the changes to our website or by email.

1. The service period for each of our Services that you have selected to receive will begin on the day your payment method is charged and will continue until the day before your next charge is scheduled. If you do not cancel the applicable Services at least forty-eight (48) hours prior to your next scheduled charge, your payment method will be charged.

# TENANT PROTECTION PLANS

ESS administers self-storage tenant protection plans ("Tenant Protection Plans") in certain U.S. states. As a condition of providing our Tenant Protection Plans to your tenants, You, the self-storage operator, represent that you require all tenants to maintain insurance or our tenant property protection coverage for stored personal property at your premises during your tenants' rental terms. Tenants may purchase a Tenant Protection Plan from You directly in-person, via the online rental process, or they may be enrolled in the Tenant Protection Plan by You or Your representative(s) or through other services provided by ESS to verify adequate coverage of stored property is maintained by the tenant. As part of enrollment in the Tenant Protection Plan, the tenant shall agree to an addendum to their rental agreement (the "Lease Addendum") outlining a property protection plan under which the self-storage owner/operator assumes limited liability for loss or damage to certain personal property stored by such tenant at the applicable property, as more particularly described in the Lease Addendum. You, the self-storage owner/operator, accept all risks and responsibility associated with direct communications and representations made by You to your tenants regarding the Tenant Protection Plans. Fees for the Tenant Protection Plans will be invoiced periodically on the tenant's account directly in the ESS software. When a tenant pays for the Tenant Protection Plan, that money is considered "collected." You, the self-storage owner/operator, will keep a portion of the "collected" fees, and ESS will deduct the remaining balance of all "collected" fees monthly for the previous month from your account as ESS's compensation for administering the Tenant Protection Plans. You, the self-storage owner/operator, may opt out of or cancel the availability of the Tenant Protection Plans at any time and for any reason by notifying Easy Storage Solutions via email at tenantprotection@storageunitsoftware.com or via phone at 435-673-2979. ESS will, at its own expense and during the term of this agreement, maintain a policy that insures the coverage amount as described in each applicable Lease Addendum. Coverage under the policy is subject to the terms, conditions and limits of the policy. To receive a copy of the policy, please submit a request to Easy Storage Solutions at tenantprotection@storageunitsoftware.com.

STORABLE000004

# PAYMENT PROCESSING

Easy Storage Payments is an optional feature of our Services. Payment processing services on Easy Storage Solutions are fulfilled by our Partner Providers, Stripe and Payrix. Easy Storage Payments is subject to the Stripe Connected Account Agreement, which includes the Stripe Terms of Service (collectively, the "Stripe Services Agreement") or Payrix, and are subject to the Payrix Terms of Service. By agreeing to these terms and/or continuing to use the Services in conjunction with Easy Storage Payments, you agree to be bound by the Partner Provider terms, and the same may be modified by our Partner Providers from time to time. As a condition of Easy Storage Solutions enabling payment processing services through a Partner Provider, you agree to provide ESS accurate and complete information about you and your business, and you authorize ESS to share such information and transaction information related to your use of the payment processing services provided by our Partner Providers.

Easy Storage Solutions acknowledges its responsibility for the protection of all cardholder data that it possesses or otherwise stores, processes, or transmits on behalf of our customers. Easy Storage Solutions is in compliance with all requirements of the PCI DSS, and has implemented  appropriate data protection measures to ensure a level of security commensurate to the risks.

# ACCESS CONTROL

Access control equipment is an optional feature of our Services. Easy Storage Solutions is only a distributor of such equipment and does not manufacture or install access control equipment. You should consult with licensed professional contractors with respect to the installation and use of access control equipment.  In the event that such equipment is damaged by accident, by gross negligence or during installation, you agree that Easy Storage Solutions shall not be held liable.  You represent that you are fully aware of the risks and hazards connected with any and all activities pertaining to the installation of access control systems and that such activities include the risk of injury and even death, and voluntarily assumes full responsibility for any risks of loss, property damage, or personal injury, including death, that may be sustained as a result of such activities to the fullest extent allowed by law.

# SUGGESTIONS

If you elect to provide or make available to ESS any suggestions, comments, ideas, improvements or other feedback relating to the Services ("Suggestions"), you hereby grant ESS and its service providers a perpetual, irrevocable, worldwide, royalty-free, fully-paid-up, non-exclusive, sublicensable, transferable license, to use, reproduce, modify, adapt, create derivative works from, publicly perform, publicly display, distribute, make, have made, assign, pledge, transfer or otherwise grant rights in your Suggestions in any form and any medium (whether now known or later developed), without credit or compensation to you.

# LINKS AND EXTERNAL MATERIALS

The Services may provide links or other connections to other websites or resources. You acknowledge and agree that ESS does not endorse and is not responsible for any content, advertising, products, services or other materials on or available through such sites or resources ("External Materials"). External Materials are subject to different terms of use and privacy policies. You are responsible for reviewing and complying with such terms of use and privacy policies. You further acknowledge and agree that ESS shall not be liable for any damage or loss resulting from or arising out of use of or reliance on any External Materials.

# MODIFICATIONS TO THE SERVICES

ESS reserves the right to modify, suspend or discontinue the Services or any product or service to which it connects, with or without notice, and ESS shall not be liable to you or to any third party for any such modification, suspension or discontinuance. ESS may at its sole discretion from time to time develop patches, bug fixes, updates, upgrades and other modifications to improve the performance of the Services or related services ("Updates"). ESS may develop Updates that require installation by you before you continue to access or use the Services or related services. Updates may also be automatically installed without providing any additional notice to you or receiving any additional consent from you. The manner in which Updates may be automatically downloaded and installed is determined by settings on your device and its operating system.

STORABLE000005

# INDEMNIFICATION

You shall indemnify, defend and hold ESS and its affiliates, and each of their officers, directors, employees, agents, partners and licensors (collectively, "ESS Parties") harmless from and against any claim, demand, loss, damage, cost, liability and expense, including reasonable attorneys' fees, resulting from or arising out of: (a) Your Content; (b) your violation of these Terms, any law or regulation, or any rights (including intellectual property rights) of another party; or (c) your use of the Services.

# DISCLAIMERS

YOUR USE OF THE SERVICES IS AT YOUR SOLE RISK. THE SERVICES IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, WITH ALL FAULTS. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, ESS PARTIES EXPRESSLY DISCLAIM ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED OR ARISING FROM STATUTE, COURSE OF DEALING, USAGE OF TRADE OR OTHERWISE, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT. ESS PARTIES MAKE NO WARRANTY OR REPRESENTATION THAT: (i) THE SERVICES WILL MEET YOUR REQUIREMENTS; (ii) ACCESS TO THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE OR ERROR-FREE; (iii) THE INFORMATION, CALCULATIONS AND ANY RESULTS THAT MAY BE OBTAINED FROM ACCESS TO OR USE OF THE SERVICES WILL BE ACCURATE, RELIABLE, CURRENT OR COMPLETE; OR (IV) ANY ACCESS CONTROLS INCLUDED IN THE SERVICES ("ACCESS CONTROLS") MAY NOT BE COMPROMISED OR CIRCUMVENTED OR THAT THE ACCESS CONTROLS WILL PREVENT ANY PROPERTY LOSS. YOU ACKNOWLEDGE AND AGREE THAT YOU ARE SOLELY RESPONSIBLE FOR VERIFYING THE ACCURACY AND COMPLETENESS OF ALL CONTENT SUBMITTED TO OR OBTAINED FROM THE SERVICES BEFORE TAKING ANY ACTION BASED UPON SUCH CONTENT, INCLUDING MAKING ANY PAYMENTS OR COLLECTING ANY AMOUNTS BASED THEREON. YOU ASSUME ALL RISK ASSOCIATED WITH THE SUITABILITY, INSTALLATION AND PERFORMANCE OF THE ACCESS CONTROLS AND AND OTHER THIRD-PARTY COMPONENTS, HARDWARE, SOFTWARE AND SERVICES THAT YOU SELECT.

Any model contracts, forms or other documents ESS makes available for your use with your customers ("Model Contracts") are provided for informational purposes only and should not be relied on as legal advice. Nothing herein constitutes the establishment of an attorney-client relationship between you and ESS or anyone involved in the drafting of the Model Contracts and you should seek the advice of legal counsel prior to use of the Model Contracts. By utilizing the Model Contracts, you: (i) assume full responsibility for any loss, damage, or liability resulting from the use of the Model Contracts; and (ii) release ESS and the authors of the Model Contracts, their contributors, agents, licensees, successors and assigns from any and all known or unknown claims, demands or causes of action that may arise, at any time, out of or relating to your use of any of the Model Contracts.

# LIMITATION OF LIABILITY

THE ESS PARTIES SHALL NOT BE LIABLE FOR ANY LOST PROFITS OR COST OF COVER, OR INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, INCLUDING DAMAGES ARISING FROM ANY TYPE OR MANNER OF COMMERCIAL, BUSINESS OR FINANCIAL LOSS, EVEN IF THE ESS PARTIES HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE. IN NO EVENT SHALL THE ESS PARTIES' TOTAL LIABILITY TO YOU FOR ALL CLAIMS ARISING FROM OR RELATING TO THESE TERMS OR YOUR ACCESS TO OR USE OF (OR INABILITY TO ACCESS OR USE) THE SERVICES EXCEED THE GREATER OF FIFTY DOLLARS ($50) OR THE AMOUNT PAID BY YOU TO ESS FOR ACCESS TO THE SERVICES WITHIN THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE DATE ON WHICH THE APPLICABLE CLAIM AROSE.

# TERMINATION

Subject to the Additional Terms, if you violate these Terms, all rights granted to you under these Terms shall terminate immediately, with or without notice to you. Upon termination of these Terms for any reason: (i) you must immediately uninstall and cease using the Services; (ii) ESS, in its sole discretion, may remove and discard Your Content and delete your user account; (iii) any provision that, by its terms, is intended to survive the expiration or termination of these Terms shall survive such expiration or termination; and (iv) all rights granted to you under these Terms shall immediately terminate, but all other provisions shall survive termination. You are solely responsible for the proper cancellation of your account. You may cancel your account at any time by calling or emailing ESS.

STORABLE000006

These Terms shall be governed by and construed and enforced in accordance with the laws of the State of Texas, without regard to conflict of laws principles. The United Nations Convention on Contracts for the International Sale of Goods is specifically excluded from application to these Terms.

## BINDING ARBITRATION AND CLASS ACTION WAIVER

ALL CLAIMS (AS DEFINED IN ABOVE) SHALL BE RESOLVED BY BINDING ARBITRATION RATHER THAN IN COURT, EXCEPT THAT YOU MAY ASSERT CLAIMS IN SMALL CLAIMS COURT (DEFINED FOR THE PURPOSES OF THESE TERMS AS A COURT OF LIMITED JURISDICTION THAT MAY ONLY HEAR CLAIMS NOT EXCEEDING $5,000) IF YOUR CLAIMS ARE WITHIN THE COURT'S JURISDICTION. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND COURT REVIEW OF AN ARBITRATION AWARD IS LIMITED.

The arbitration shall be conducted by the American Arbitration Association (AAA) under its then-applicable Commercial Arbitration Rules or, as appropriate, its Consumer Arbitration Rules. The AAA's rules are available at http://www.adr.org/. The arbitrator will, among other things, have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any Claims. Payment of all filing, administration and arbitrator fees shall be governed by the AAA's rules. The arbitration shall be conducted in the English language by a single independent and neutral arbitrator. For any hearing conducted in person as part of the arbitration, you agree that such hearing shall be conducted in Austin, Texas or, if the Consumer Arbitration Rules apply, another location reasonably convenient to both parties with due consideration of their ability to travel and other pertinent circumstances, as determined by the arbitrator. The decision of the arbitrator on all matters relating to the Claim shall be final and binding. Judgment on the arbitral award may be entered in any court of competent jurisdiction.

WE EACH AGREE THAT ALL CLAIMS (AS DEFINED ABOVE) SHALL BE RESOLVED ONLY ON AN INDIVIDUAL BASIS AND NOT IN A CLASS, COLLECTIVE, CONSOLIDATED OR REPRESENTATIVE ACTION, ARBITRATION OR OTHER SIMILAR PROCESS AND EXPRESSLY WAIVE ANY RIGHT TO HAVE A CLAIM DETERMINED OR RESOLVED ON A CLASS, COLLECTIVE, CONSOLIDATED OR REPRESENTATIVE BASIS. IF FOR ANY REASON THE PROVISIONS OF THE PRECEDING SENTENCE ARE HELD TO BE INVALID OR UNENFORCEABLE IN A CASE IN WHICH CLASS, COLLECTIVE, CONSOLIDATED OR REPRESENTATIVE CLAIMS HAVE BEEN ASSERTED, THE PROVISIONS OF THIS SECTION 19 REQUIRING BINDING ARBITRATION SHALL LIKEWISE BE UNENFORCEABLE AND NULL AND VOID. IF FOR ANY REASON A CLAIM PROCEEDS IN COURT RATHER THAN IN ARBITRATION, WE EACH WAIVE ANY RIGHT TO A JURY TRIAL AND AGREE THAT SUCH CLAIM SHALL BE BROUGHT ONLY IN A COURT OF COMPETENT JURISDICTION IN AUSTIN, TEXAS. YOU HEREBY SUBMIT TO THE PERSONAL JURISDICTION AND VENUE OF SUCH COURTS AND WAIVE ANY OBJECTION ON THE GROUNDS OF VENUE, FORUM *NON-CONVENIENS* OR ANY SIMILAR GROUNDS WITH RESPECT TO ANY SUCH CLAIM.

Notwithstanding anything to the contrary, you and ESS may seek injunctive relief and any other equitable remedies from any court of competent jurisdiction to protect our intellectual property rights, whether in aid of, pending or independently of the resolution of any dispute pursuant to the arbitration procedures set forth in this Section 19.

If ESS implements any material change to this Section 19, such change shall not apply to any Claim for which you provided written notice to ESS before the implementation of the change

## LEGAL COMPLIANCE

You represent and warrant that you are not: (a) located in a country that is subject to a U.S. Government embargo or designated by the U.S. Government as a "terrorist supporting" country; and (b) listed on any U.S. Government list of prohibited or restricted parties, including the Specially Designated Nationals List.

## U.S. GOVERNMENT ENTITIES

This section applies to access to or use of the Services by a branch or agency of the United States Government. The Services includes "commercial computer software" and "commercial computer software documentation" as such terms are used in 48 C.F.R. 12.212 and qualifies as "commercial items" as defined in 48 C.F.R. 2.101. Such items are provided to the United States Government: (a) for acquisition by or on behalf of civilian

STORABLE000007

Support - (435) 656-1990 | E-mail Us

of the Department of Defense, consistent with the policies set forth in 48 C.F.R. 227.7202-1 and 227.7202-3. The United States Government shall acquire only those rights set forth in these Terms with respect to the such items, and any access to or use of the Services by the United States Government constitutes: (a) agreement by the United States Government that that such items are "commercial computer software" and "commercial computer software documentation" as defined in this section; and (b) acceptance of the rights and obligations herein.

## NO THIRD-PARTY BENEFICIARIES

You agree that, except for ESS Parties and as otherwise expressly provided in these Terms, there shall be no third-party beneficiaries to these Terms.

## QUESTIONS

Call (435) 656-1990 or email support@storageunitsoftware with any questions about our Terms.

## GENERAL PROVISIONS

These Terms (together with the Additional Terms) constitute the entire agreement between you and ESS concerning your access to and use of the Services. It supersedes all prior and contemporaneous oral or written negotiations and agreements between you and ESS with respect to such subject matter. In the event of any conflict between or among these Terms and any Additional Terms to which these Terms refers, the terms and conditions of these Terms shall take precedence and govern. These Terms may not be amended by you except in a writing executed by you and an authorized representative of ESS. For the purposes of these Terms, the words "such as," "include," "includes" and "including" shall be deemed to be followed by the words "without limitation." You may not assign or delegate any right or obligation under these Terms without the prior written consent of ESS. The failure of ESS to exercise or enforce any right or provision of these Terms shall not constitute a waiver of such right or provision. If any provision of these Terms is held to be invalid or unenforceable under applicable law, then such provision shall be construed, limited, modified or, if necessary, severed to the extent necessary to eliminate its invalidity or unenforceability, without in any way affecting the remaining parts of these Terms. Any prevention of or delay in performance by ESS hereunder due to labor disputes, acts of god, governmental restrictions, enemy or hostile governmental action, fire or other casualty or other causes beyond its reasonable control shall excuse the performance of its obligations for a period equal to the duration of any such prevention or delay.

Company

About Us
Support
Privacy Policy
Terms Of Service

Quick Links

Press
Associations
Partners
Contact Us

Reviews

Google
Capterra
Software Advice
Get App



STORABLE000008

Support - (435) 656-1990 | E-mail Us

**STORABLE000009**

# Exhibit N

# SITELINK TERMS OF USE

## Master Subscription Agreement General Terms and Conditions

*Effective as of December 31, 2019*

This Master Subscription Agreement is comprised of these General Terms and Conditions, Additional Terms of Service, when elected, and the Order Form, all of which are collectively referred to as the "**Agreement**" and is a legally binding agreement between SiteLink software, LLC (the "Company") and you.

This Agreement governs your access to and use of the Services. By accepting this Agreement, either by clicking a box indicating your acceptance or by executing an order form that references this Agreement, you agree to the terms of this Agreement. If you are entering into this Agreement on behalf of a company or other legal entity, you represent that you have the authority to bind such legal entity and its affiliates to these terms and conditions. If you do not have such authority, or if you do not agree with these terms and conditions, you must not accept this Agreement and may not use the Services.

Defendant's

Ex. 2

exhibitsticker.com

## Definitions.

"**Bundled Services**" means a combination of Services (each, a "**Component**") that is licensed as a package.

"**Content**" means information obtained by us from our content licensors or publicly available sources and provided to you pursuant to an Order Form, as more fully described in the Documentation.

"**Documentation**" means our online user guides, documentation, and help and training materials, as updated from time to time, accessible via www.sitelink.com/support-help

STORABLE000010

**"Facilities"** means a distinct self-storage facility at a single location which contains individual Units set forth in the Order Form for which the Services relate.

**"Fees"** means the agreed upon fee the Services or Supplemental Services to be paid by you to us as set forth in an applicable Order Form.

**"Malicious Code"** means code, files, scripts, agents or programs intended to do harm, including, for example, viruses, worms, time bombs and Trojan horses. Additionally, any file, script, program, browser plug-in, browser helper or extension, or any robot or application designed to scrape and collect data or automate the entry of data into or out of Services.

**"Model Contracts"** means any model contracts, forms or other agreement provided by the Company to you, for your use with your end users.

**"Order Form"** means an ordering document specifying the Services to be provided hereunder that is entered into between you and us, including any addenda and supplements thereto. By entering into an Order Form hereunder, an Affiliate agrees to be bound by the terms of this Agreement as if it were an original party hereto.

**"Personally Identifiable Information"** means any information that can be associated with or traced to any individual, including an individual's name, address, telephone number, e-mail address, credit card information, social security number or other similar specific factual information, regardless of the media on which such information is stored (e.g., on paper or electronically).

**"Services"** means any of the Company service offerings described in Section 2 (Services) below and specified in and Order Form either on a subscription basis or otherwise as stated in an Order Form. Services include Supplemental Services and/or Professional Services.

**"Supplemental Services"** means the non-reoccurring services that are ordered by you, for a fee such as customer specific consulting, configuration, implementation, migration, setup fees, website customization or other professional services as specified in an applicable Order Form.

**"Units"** means the number of separate rentable self-storage units, parking spaces, storage containers, or lockers set forth in the Order Form for which the Services relate. Units shall not include Post Office boxes or similar boxes to which mail is delivered by a mail carrier.

**"User"** means an individual who is authorized by you to use a Service, for whom you have ordered the Service, and to whom you have supplied a user identification and

STORABLE000011

password. Users may include, for example, your employees, consultants, contractors and agents, and third parties with which you transact business.

**"we," "us" or "our"** means the Company.

**"you" or "your"** means the company or other legal entity for which you are accepting this Agreement.

**"Your Data"** means electronic data and information submitted by or for you to the purchased Services or collected and processed by or for you using the purchased Services, excluding Content and Non-Salesforce.com Applications.

# 2.1 Services.

We offer the Services listed in Exhibit A through our proprietary software as a service platform that we host for our customers. Products may be added to this Agreement as they become available but only products subscribed to on an Order Form will be available to you. To subscribe for a Service, you must execute an Order Form for that Service. You are only entitled to use the Services for which you have subscribed and paid and your use of the Services is subject to your compliance with all terms and conditions of the Agreement. You acknowledge and agree that we reserve the right to modify the Services (or any part thereof) from time to time and that we shall not be liable to you or to any third party for any modification to the Services.

# 2.1 Additional Services.

**2.1.1. No Fee Customer Support.** Provided you have paid all Fees payable by you for the Services under an applicable Order Form, We will use commercially reasonable efforts to provide, at no additional charge to you, technical support services to you and your Users who have subscribed to the Services.

**2.1.2. No Fee Training.** Provided you have paid all Fees payable by you for the Services under an applicable Order Form, We shall make available our standard training services (by way of remote, live or recorded training sessions) to your designated, named and authorized Users as well as provide tutorials which are accessible via the Marketing Websites at no additional charge.

**2.1.3. Expanding the Services.** From time to time we may make available on a general release basis additional service offerings. Any such additional service offering would be available on a general release basis, and should you wish to subscribe, access or use

STORABLE000012

such service, such will be memorialized in a new applicable Order Form. Nothing in this Section 2.1.3 should be construed to imply or promise that additional functionality, features, products will be available. Rather, in the event that new services are made available, such Services shall be subject to these General Terms of Services and any additional terms and conditions that may specifically apply to such additional Services.

**2.1.4  Tenant Protection Plans.** The Company administers self-storage tenant protection plans ("Tenant Protection Plans") in certain U.S. states as an Additional Service to self-storage operators. You, the self-storage owner/operator, may elect to offer our Tenant Protection Plans to your tenants after completing an Order Form or specific Tenant Protection Plan Agreement.  As a condition of providing our Tenant Protection Plans to your tenants, You represent that you require all tenants to maintain insurance or our tenant property protection coverage for stored personal property at your premises during your tenants' rental terms.  Your tenants may purchase a Tenant Protection Plan from You directly in-person, via the online rental process, or they may be enrolled in the Tenant Protection Plan by You or Your representative(s) or through other services and/or technologies provided by the Company to verify adequate coverage of stored property is maintained by the tenant. You represent that you will cooperate with and adhere to the Company's services, technologies, and terms of the Tenant Protection Plan Agreement in the provision of the Company's Tenant Protection Plan to your tenants.  As part of enrollment in the Tenant Protection Plan, the tenant shall agree to an addendum to their rental agreement (the "Lease Addendum") outlining a property protection plan under which the self-storage owner/operator assumes limited liability for loss or damage to certain personal property stored by such tenant at the applicable property, as more particularly described in the Lease Addendum. In the event You offer the Company's Tenant Protection Plan after converting from a tenant insurance program or third-party tenant protection plan you previously provided to your tenants storing property at your facilities, and to avoid any lapse of coverage for your tenants, the tenant may be enrolled in our Tenant Protection Plan by a notice process whereby the tenant shall accept and agree to the Lease Addendum by otherwise not providing evidence of valid stored property insurance coverage.  The tenant may opt-out of coverage provided under the Company's Tenant Protection Plan at any time by providing evidence of valid stored property insurance coverage to You in an acceptable manner communicated to the tenant.  You, the self-storage owner/operator, accept all risks and responsibility associated with direct communications and representations made by You to your tenants regarding the Tenant Protection Plans.  Fees for the Tenant Protection Plans will be invoiced periodically on the tenant's account directly in the SiteLink management software. When a tenant pays for the Tenant Protection Plan, that money is considered "collected." You, the self-storage owner/operator, will keep a portion of the "collected" fees, and We will deduct the remaining balance of all "collected" fees monthly for the previous month from your account as the Company's compensation for

STORABLE000013

administering the Tenant Protection Plans. You, the self-storage owner/operator, may opt out of or cancel the availability of the Tenant Protection Plans for any reason via written notice provided to the Company at least forty-five (45) days prior to the cancellation date by notifying the Company via email at policyservices@storable.com or via phone at 888-611-4778. We will, at our own expense and during the term of this Agreement, maintain a policy that insures the coverage amount as described in each applicable Lease Addendum. Coverage under the policy is subject to the terms, conditions and limits of the policy. To receive a copy of the policy, please submit a request to the Company at policyservices@storable.com.

## 3. Fees.

**3.1 Service Fees.** You shall pay the Fees for the Services in the amount set forth in the Order Form and according to the billing frequency stated in the Order Form. Service Fees shall be due and payable on the date of the invoice and must be received by us within the payment terms established in the applicable Order Form. Fees may be increased at our discretion after the initial term stated in the applicable Order Form upon notice to you.

**3.2 Late Payments.** You acknowledge that your failure to pay any fees or charges when due may result in suspension or termination of the Services. If you fail to pay any of the Fees in a timely manner, we will notify you and you will have a thirty (30) day cure period (the "**Payment Cure Period**") in which you can bring your account up-to-date. If you fail to bring your account up-to-date (including any late fees) within the Payment Cure Period, we will terminate your access to the Services. If you fail to pay any of the Fees or charges due hereunder, the Company reserves the right to engage a collections agency to collect the fees and charges and you acknowledge and agree that you shall pay all costs incurred by us in connection with the collection of such past due amounts, including, without limitation, reasonable attorneys' and collections agencies' fees plus interest in an amount equal to the lesser of 1.50% per month or the maximum rate permitted by applicable law.

**3.3 Taxes.** You shall be responsible for all sales tax, use tax, value added taxes, withholding taxes and any other similar taxes and charge of any kind imposed by federal, state or local governmental entity on the transactions contemplated by the Agreement. When we have the legal obligation to pay or collect taxes for which you are responsible, pursuant to this Section 3, the appropriate amount shall be invoiced to and thereafter paid by you unless you provide us with a valid tax exemption certificate authorized by the appropriate taxing authority before invoice is sent.

## 4. Your Rights and Restrictions.

STORABLE000014

**4.1. Right to Access and Use the Services.** Subject to the terms and conditions of the Agreement, and upon timely payment of all applicable Fees set forth in an Order Form, we hereby grant to you a non-exclusive, non-transferable, limited right to access and use (and permit your Users to use) the Services to which you have subscribed solely for your internal business purposes.

**4.2. Authorized Users.** You may designate and authorize as many Users as you wish under the Agreement. You (i) are responsible for your Users' compliance with the Agreement, and (ii) shall use commercially reasonable efforts to

prevent unauthorized access to or use of the Services and shall notify us immediately of any such unauthorized access or use. It is your responsibility to remove access to the Services if authorized status of a User or designated employee changes.

**4.3. Your Responsibilities and Restrictions.** You are responsible for all activities that occur under your use of the Services and the use by your Users. You shall: (i) have sole responsibility for the accuracy, quality, integrity, legality, reliability, and appropriateness of all data and content that you submit for your use of the Services; (ii) use commercially reasonable efforts to prevent unauthorized control or tampering or any other unauthorized access to, or use of, the Services and notify us promptly of any unauthorized use or security breach; (iii) comply with all applicable local, state, federal, and foreign laws (including laws regarding privacy and protection of personal or consumer information) in using the Services; (iv) to the extent applicable, comply with all applicable rules of credit card associations (including American Express, MasterCard and Visa); and (v) obtain and maintain all computer hardware, software and communications equipment needed to access the Services and pay all access charges (e.g., ISP fees) incurred by you in connection with your use of the Services. You may not, and you shall ensure your Users do not, (i) disassemble, reverse engineer, decompile or otherwise attempt to decipher any code in connection with the Services, or modify, adapt, create derivate works based upon, or translate the Services; (ii) license, sublicense, sell, rent , assign, distribute, time share transfer, lease, loan, resell, distribute or otherwise commercially exploit, grant rights in or make the Services available to any third party; (iii) use the Services except as expressly authorized hereunder or in violation of any applicable laws; (iv) engage in any illegal or deceptive trade practices with respect to the Services;

(v) circumvent or disable any security or other technical features or measures of the Services or any other aspect of

the Software or, in any manner, attempt to gain or attain unauthorized access to the Services or its related computer systems or networks; (vi) use the Services to transmit infringing, libelous, obscene, threatening, Malicious Code, or otherwise unlawful, unsafe,

STORABLE000015

abusive or tortious material, or to store or transmit material in violation of third-party privacy rights; (vii) use the Service to store or transmit any Malicious Code or unsolicited messages in violation of applicable laws; or (viii) interfere with or disrupt the integrity or performance of the Services or third-party data contained therein.

**4.4. Reservation of Rights.** No other rights are granted except as expressly set forth in the Agreement. The Agreement is not a sale and does not convey any rights or ownership in, or to, the Services or any underlying software. We own all right, title, and interest, including all intellectual property rights, in and to the Services and the underlying software and any and all updates, upgrades, modifications, enhancements, Content, improvements or derivative works thereof, and in any idea, know-how, and programs developed by us or our licensors during the course of performance of the Services.

**4.5. Data Exchange Interface ("DEI") Rights.** The Company provides an advanced DEI exclusively for customer internal use. Any use by a third party, affiliate, agent of customer, or any use to develop a commercial product, requires a separate third-party DEI agreement, which will expressly memorialize the rights and uses thereunder.

**4.6. Our Use of Anonymous Data.** You agree that the Company may use the data generated by and stored on our servers anonymously, for our own internal business purposes, including but not limited to the development of anonymous marketing and sales collateral materials, statistical analysis of data regarding rental rates, unit availability, traffic sources, vacancy, and other relevant data to construct yield optimization models, and publication solely in an aggregated form of operating data in industry benchmark reports. You shall at all times retain ownership of your data.

# 5. Term and Termination.

**5.1. Term.** The term of the Services varies depending on the Services subscribed to or obtained and shall be set forth on the Order Form.

**5.2. Notification of Non-Renewal.** Written notice of non-renewal by you must be submitted to the Company at the address in the preamble.

**5.3. Termination for Cause.** Either party may terminate the Agreement and all Services under an existing Order Form (i) if the other party breaches any of its material obligations under the Agreement and such breach is not cured within thirty (30) days of receipt of notice from the non-breaching party or (ii) if the other party becomes insolvent or bankrupt, liquidated or is dissolved, or ceases substantially all of its

STORABLE000016

business. We may terminate the Agreement immediately in the event of a breach of Section 4.3 (Your Responsibilities and Restrictions) above.

**5.4. Termination for Convenience.** You may terminate the Agreement, all the Services, or any individual Component of a Services Bundle, at any time for any reason, upon fifteen (15) days' written notice to the Company.

**5.5. Effect of Termination**. Upon a termination of the Agreement or any Service, you will immediately discontinue use of the applicable Services, cease to represent in any form that you are a user of the terminated Services, and destroy all our Confidential Information in your possession. Neither party shall be liable for any damages resulting from a

termination of the Agreement or any subscriptions to Services as provided for herein; provided, however, that the termination of the Agreement shall not affect any claim arising prior to such termination.

**5.6. Handling of Your Data in the Event of Termination.** You acknowledge and agree that following expiration or termination of any of your subscriptions to the Services, we may immediately deactivate all affected and related Services and that we shall have no obligation to continue to store your data during any period of suspension or termination or to permit you to retrieve such data. You further agree that we shall not be liable to you or to any third party for any termination of your access to the Services or deletion of your data pursuant to this Agreement. **Following the termination of your right to use the Services for any reason other than termination for cause by us, you shall be entitled to take advantage of any post-termination assistance we may generally make available with respect to the Services, such as data retrieval arrangements we may elect to make available.** We may also endeavor to provide you with unique post-suspension or post-termination assistance, but we shall be under no obligation to do so.

**5.7. Exemption from Return of Data.** Notwithstanding anything to the contrary in this Section 5. (Term and Termination) the Company shall not be required to return to customer or destroy those copies of the customer data or customer Confidential Information which copies were created pursuant to our automatic archiving and backup procedures and the removal of which is not technically reasonable.

# 6. Downtime and Service Suspensions.

STORABLE000017

**685**

In addition to our rights to terminate or suspend our Services (each, a "**Service Suspension**") to you, you acknowledge that: (i) your access to and use of the Services may be suspended for the duration of any unanticipated, unscheduled, or scheduled downtime or unavailability of any portion or all of the Services for any reason; and (ii) we shall also be entitled, without any liability to you or related third parties, to suspend access to any portion of the Services at any time. Without limitation, we shall have no liability whatsoever for any damage, liabilities, losses (including any loss of data or profits) or any other consequences that may occur as a result of any Service Suspension. To the extent we are able, we will endeavor to provide you email notice of any Service Suspension and to post updates on our bulletin board regarding resumption of the Services following any such Service Suspension, but we shall have no liability for the manner in which we may do so or if we fail to do so.

## 7. Representations and Warranties.

**7.1. Mutual Representations and Warranties.** Each party hereby represents and warrants to the other party that (i) it has all necessary authority to enter into and perform its obligations under the Agreement without the consent of any third party or breach of any contract or agreement with any third party, (ii) all persons performing any obligations hereunder have entered into all necessary agreements in order for it to comply with the terms and conditions of the Agreement, and (iii) it shall comply in all material respects with all laws applicable to the Services.

## 7.2. Disclaimer of Warranties.

EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS SECTION 7, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WE MAKE NO OTHER WARRANTIES, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, IN LAW OR FROM A COURSE OF DEALING OR USE OF TRADE, AS TO ANY MATTER, INCLUDING THOSE OF MERCHANTABILITY, SATISFACTORY QUALITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. WE DO NOT WARRANT THAT THE SERVICES WILL MEET ALL OF YOUR REQUIREMENTS, INCLUDING ACCOUNTING REQUIREMENTS, OR THAT THE USE OF THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE. THE SERVICES ARE PROVIDED TO YOU ON AN "AS IS" BASIS AND YOUR USE OF SERVICES IS AT YOUR OWN RISK, INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY LAWS OR REGULATIONS RELATED TO PROPERTY MANAGEMENT. THE PARTIES EXPRESSLY ACKNOWLEDGE THAT THE DISCLAIMER OF WARRANTY CONSTITUTES AN ESSENTIAL PART OF THE AGREEMENT. WE SHALL HAVE NO OBLIGATION OR OTHER

STORABLE000018

LIABILITY WITH REGARD TO ANY ERROR OR NON-COMPLIANCE WITH A WARRANTY THAT IS CAUSED BY YOUR BREACH OF THIS AGREEMENT.

WE DISCLAIM ANY REPRESENTATIONS OR WARRANTIES THAT YOUR USE OF THE SERVICES WILL SATISFY OR ENSURE COMPLIANCE WITH ANY LEGAL OBLIGATIONS OR LAWS OR REGULATIONS. THIS DISCLAIMER APPLIES TO BUT IS NOT LIMITED TO ANY FEDERAL OR STATE STATUTES OR REGULATIONS THAT MAY BE APPLICABLE TO YOU. YOU ARE SOLELY RESPONSIBLE FOR ENSURING THAT YOUR USE OF THE SERVICES IS IN ACCORDANCE WITH APPLICABLE LAW.

IF YOU ARE DISSATISFIED WITH THE SERVICES OR THIS AGREEMENT, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE SERVICES.

## 8. Confidentiality.

**8.1. Definition of Confidential Information.** "**Confidential Information**" means all information disclosed by a party ("**Disclosing Party**") to the other party ("**Receiving Party**"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure. Your Confidential Information includes your Data; our Confidential Information includes the Services and Content; and Confidential Information of each party includes the terms and conditions of this Agreement and all Order Forms (including pricing), as well as business and marketing plans, technology and technical information, product plans and designs, and business processes disclosed by such party. However, Confidential Information does not include any information that (i) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party, (ii) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party, (iii) is received from a third party without breach of any obligation owed to the Disclosing Party, or (iv) was independently developed by the Receiving Party.

**8.2. Protection of Confidential Information.** The Receiving Party will use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but not less than reasonable care) (i) not to use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement, and (ii) except as otherwise authorized by the Disclosing Party in writing, to limit access to Confidential Information of the Disclosing Party to those of its and its Affiliates' employees and contractors who need that access for purposes consistent with this Agreement and who have signed confidentiality agreements with

STORABLE000019

the Receiving Party containing protections no less stringent than those herein. Neither party will disclose the terms of this Agreement or any Order Form to any third party other than its Affiliates, legal counsel and accountants without the other party's prior written consent, provided that a party that makes any such disclosure to its Affiliate, legal counsel or accountants will remain responsible for such Affiliate's, legal counsel's or accountant's compliance with this Section 8.2.

**8.3. Compelled Disclosure.** The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent compelled by law to do so, provided the Receiving Party gives the Disclosing Party prior notice of the compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure. If the Receiving Party is compelled by law to disclose the Disclosing Party's Confidential Information as part of a civil proceeding to which the Disclosing Party is a party, and the Disclosing Party is not contesting the disclosure, the Disclosing Party will reimburse the Receiving Party for its reasonable cost of compiling and providing secure access to that Confidential Information.

# 9. Indemnification.

**9.1. Indemnification for Infringement.** Subject to Section 9.4, we shall, at our expense, defend you against any third party claim brought against you which alleges that the Services infringe any US patent issued to a third party as of the Effective Date or infringe any copyright, trademark or trade secret of any third party (collectively referred to as the "**Infringing Item**"). In the event an injunction is sought or obtained against use of the Infringing Item or in our opinion is likely to be sought or obtained, we shall, at our option and expense, either (i) procure for you and your named Users the right to continue to use the Services, or (ii) replace or modify the Services to make their use non-infringing while being capable of substantially performing the same function. In the event subsections (i) and (ii) above are not commercially practicable, we may terminate the Services and refund any prepaid, but unused Service Fees. We shall not be obligated to defend or be liable for any costs or damages under this Section 9.1 if the alleged infringement arises out of or is in any manner attributable to (i) any unauthorized modification of any Services by you (or any of your Users) or (ii) use of Services in combination with services and products not provided or authorized by the Company if such infringement would have been avoided without such modification or combination or (iii) compliance with your designs or instructions or (iv) a claim that does not state with specificity that the Services are the subject of the claim (each an "**Excluded Claim**").

STORABLE000020

**9.2. Indemnification for Data Security and Privacy.** Subject to Section 9.4, and during the term of your subscription to the Services, we shall, at our expense, defend you against any third party claim brought against you which allege our gross negligence in preventing unauthorized access to, or our willful misconduct in disclosing, Personally Identifiable Information of your customers in our possession or control. This indemnity will not apply to the extent that such claim, arises from or relates to your negligence or willful misconduct or that of your agents or representatives, or to the extent liability is disclaimed or limited by either party under the Agreement. The indemnity obligations set forth in this section are contingent upon your proving our gross negligence or willful misconduct has directly and proximately resulted in the unauthorized access to or disclosure of Personally Identifiable Information of your customers in our possession or control.

**9.3. Your Indemnification.** You agree to indemnify, hold harmless, and defend us and all our employees, officers, directors and agents from any and all claims, demands, suits, proceedings, investigations, damages, costs, expenses, losses, and any other liabilities (including reasonable attorneys' fees, court costs and expenses) arising out of or relating to (i) your use of the Services, (ii) an Excluded Claim, (iii) any content provided by you, (iv) any actual or alleged breach by you of any representation, warranty, covenant or obligation under the Agreement, (v) your use of the Model Contracts; or (vi) your gross negligence or willful misconduct. Your indemnification obligations under this Section 9.3 shall survive any termination or expiration of the Agreement.

**9.4. Notification and Cooperation.** The indemnifying party's obligations to the indemnified party under this Section 9 above are conditioned upon (i) indemnified party notifying indemnifying party promptly in writing within 30 days, upon knowledge of any claim, for which it may be entitled to indemnification under the Agreement; (ii) to the extent applicable, indemnified party ceasing use of the claimed infringing Services upon receipt of notice of same; (iii) indemnified party permitting indemnifying party to have the sole right to control the defense and settlement of any such claim (provided that indemnifying party may not settle any claim without the indemnified party's consent unless the settlement unconditionally releases indemnified party from all liability); (iv) indemnified party providing reasonable assistance to indemnifying party, at indemnifying party's expense, in the defense of such claim; (v) indemnified party not entering into any settlement agreement or otherwise settling any such claim without indemnifying party's express prior written consent or request; and (vi) indemnified party complying with any settlement or court order made in connection with the claim (related to the future use of any infringing materials). Indemnified party may participate in the defense or settlement of a claim with counsel of its own choice and at its own expense.

STORABLE000021

**9.5. Exclusive Remedy.** This Section 9 states the indemnifying party's sole liability to, and the indemnified party's exclusive remedy against, the other party for any type of claim described in this Section.

# 10. Limitation on Liability.

10.1 EXCEPT WITH RESPECT TO DAMAGES ARISING IN CONNECTION WITH A BREACH OF SECTION 4.3 (YOUR RESPONSIBILITIES AND RESTRICTIONS) OR 11 (PERSONAL INFORMATION AND PRIVACY STATEMENT), TO THE MAXIUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL EITHER PARTY'S TOTAL CUMULATIVE LIABILITY ARISING OUT OF OR RELATED TO THE AGREEMENT EXCEED THE SUM OF THE AMOUNTS PAID BY YOU FOR THE SERVICES GIVING RISE TO THE LIABILITY DURING THE ONE YEAR PERIOD IMMEDIATELY PRECEEDING THE DATE THE CAUSE OF ACTION AROSE.

10.2. EXCEPT WITH RESPECT TO DAMAGES ARISING IN CONNECTION WITH A BREACH OF SECTION 4.3 OR 11, TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT SHALL EITHER PARTY HERETO, ITS LICENSORS OR SUPPLIERS, HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY LOST PROFITS OR COST OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES OR FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY OR INCIDENTAL DAMAGES, HOWEVER CAUSED AND BASED ON ANY THEORY OF LIABILITY (INCLUDING NEGLIGENCE), ARISING OUT OF THE AGREEMENT, THE PERFORMANCE OR NONPERFORMANCE BY EITHER PARTY OF ITS OBLIGATIONS HEREUNDER, WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

10.3. BECAUSE SOME STATES/JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, THE ABOVE LIMITATION MAY NOT APPLY TO YOU, IN WHICH CASE OUR LIABILITY SHALL BE LIMITED TO THE MAXIMUM EXTENT PERMITTED BY LAW.

# 11. Personal Information and Privacy Statement.

You will comply with all applicable privacy and other laws, rules, regulations and guidelines relating to protection, collection, use and distribution of Personally Identifiable Information of any person. You will post a privacy statement on the page where you collect Personally Identifiable Information (**"Privacy Statement"**) that complies with all applicable laws, rules, regulations and guidelines and, at a minimum, notifies users of the Personally Identifiable Information collected, how it will be used and how it will be secured and identifies the collection (via cookies, web beacons and

STORABLE000022

other applicable means) and use of information gathered in connection with the Services and obtains prior informed consent (opt-in) before utilizing any tracking technologies, to the extent required by applicable laws and regulations. Such Privacy Statement shall also include technical information related to collection, transmission and storage of Personally Identifiable Information provided by us through the Services. If required by applicable data protection legislation or other law or regulation, you will inform third parties that you are providing their Personally Identifiable Information to us for processing and will ensure that any required third parties have given their consent to such disclosure and processing. You agree to comply with the descriptions and provisions of the Privacy Statement.

## 12. Miscellaneous.

**12.1. Model Contracts.** The Model Contracts are provided for informational purposes only and should not be relied on as legal advice. Nothing herein constitutes the establishment of an attorney-client relationship between you and the Company or anyone involved in the drafting of the Model Contracts. The Company makes no claims, promises, or guarantees about the accuracy, completeness, or adequacy of anything contained in the Model Contracts. If you use the Model Contracts, you should seek the advice of legal counsel to develop a contract that meets your specific needs. As state and local laws may differ, any legal questions should be referred to appropriate legal counsel. By utilizing the Model Contracts, you: (i) assume full responsibility for any loss, damage, or liability resulting from the use of the Model Contracts; and (ii) release the Company and the authors of the Model Contracts, their contributors, agents, licensees, successors and assigns from any and all known or unknown claims, demands or causes of action that may arise, at any time, out of or relating to your use of any of the Model Contracts.

**12.2. Independent Parties.** You and the Company are independent contractors. The Agreement does not create any joint venture, partnership, agency or employment relationship between the parties. You shall be solely responsible for managing your employees and for any and all compensation, taxes, benefits and liabilities to your employees and any of your other representatives or service providers. Neither you nor any of your employees, representatives, or service providers shall make any representations, warranties or guarantees with respect to us, the Agreement or the Services other than as expressly authorized by us in writing.

**12.3. Assignment.** Neither the Agreement nor any of your rights or obligations under the Agreement may be assigned or transferred, by operation of law or otherwise, without our prior written consent, unless assigned to a successor in interest, or pursuant to a merger, corporate reorganization, or a sale or transfer of all or

STORABLE000023

**691**

substantially all of your assets of which you provide us notice at least thirty (30) days prior to the consummation of the transaction and such transaction does not involve a competitor of the Company. You and the Company will negotiate the cost of this assignment upon the notification of the change. An assignment by you based on any other circumstances requires our prior consent, which consent shall not be unreasonably withheld. We may freely assign this Agreement without your consent provided that the Services continue to operate as outlined in this Agreement. Subject to the foregoing, this Agreement shall bind and inure to the benefit of the parties, their respective successors and permitted assigns.

**12.4. Force Majeure.** Neither party will be responsible for any delay, interruption or other failure to perform under the Agreement due to acts beyond the control of the responsible party, but only for so long as such conditions persist. Force majeure events include, but are not limited to: natural disasters (e.g. lightning, earthquakes, hurricanes, floods); wars, riots, terrorist activities, and civil commotions; a local exchange carrier's activities, and other acts of third parties; explosions and fires; embargoes, strikes, and labor disputes; governmental decrees; failures of telecommunications providers or internet service providers; failures of third party suppliers, service providers or vendors; and any other cause beyond the reasonable control of a party.

**12.5. Choice of Law.** The Agreement and any dispute arising out of or in connection with the Agreement shall be governed by and construed under the laws of the State of Texas, without regard to the principles of conflict of laws. All disputes arising out of or related to the Agreement shall be subject to the exclusive jurisdiction and venue of the Texas state and federal courts, and the parties consent to the personal and exclusive jurisdiction of these courts.

12.6.**E-mail and Notices.** You further agree that we may provide any and all notices, statements and other communications to you through either e-mail, mail, express delivery service, or delivered by a recognized commercial carrier addressed to the address last designated on the Agreement. You are responsible for providing us with any updated contact information.

**12.7. No Waiver; Cumulative Remedies.** No failure or delay by either party in exercising any right under this Agreement shall constitute a waiver of that right. Other than as expressly stated herein, the remedies provided herein are in addition to, and not exclusive of, any other remedies of a party at law or in equity.

**12.8. Severability.** If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision shall be modified by the court and interpreted so as best to accomplish the objectives of the original provision to the

STORABLE000024

fullest extent permitted by law, and the remaining provisions of this Agreement shall remain in full force and effect.

**12.9. Entire Agreement.** To the maximum extent permitted by applicable law, this Agreement, together with the documents referenced herein and all Order Forms constitute the entire agreement between the parties as to its subject matter, and supersede all previous and contemporaneous agreements, proposals or representations, written or oral, concerning the subject matter of this Agreement. No representation, undertaking or promise shall be taken to have been given or be implied from anything said or written in negotiations between the parties prior to this Agreement except as expressly stated in this Agreement. Neither party shall have any remedy in respect of any untrue statement made by the other upon which that party relied in entering into this Agreement (unless such untrue statement was made fraudulently) and that party's only remedy in respect of any untrue statement shall be for breach of contract as provided in this Agreement. You acknowledge and agree that Your agreement hereunder is not contingent upon the delivery of any future functionality or features not specified herein or in an Order Form or dependent upon any oral or

written, public or private comments made by Us with respect to future functionality or features for the Services. In the event of any conflict between the provisions in these General Terms of Service and any Order Form or Additional Terms of Service, the terms of this Master Service Agreement shall prevail, to the extent of such conflict. No terms or conditions stated in Your purchase order or in any other of Your order documentation shall be incorporated into or form any part of this Agreement, and all such terms or conditions shall be null and void.

**12.10. Export.** Both parties agree to comply with applicable US export and import laws and regulations. You shall not permit your Users to access or use the Services in violation of any U.S. export embargo, prohibition or restriction.

**12.11. Publicity.** We reserve the right to name you as a user of Our Services on Our marketing and promotional materials unless you opt out of such disclosure on an applicable Order Form.

**12.12. Links to Third-Party Sites.** The Services or our website may include links to third party sites ("**Linked Sites**"). The Linked Sites are not under our control and we are not responsible for the contents of any Linked Site, including without limitation any link contained in a Linked Site, or any changes or updates to a Linked Site or the Services provided via a Linked Site. We are providing these links to you only as a convenience, and the inclusion of any link does not imply endorsement by us of the site or any associated services provided by the site.

STORABLE000025

**693**

**12.13. Enhancement Requests.** We may, but have no obligation to, consider your suggestions or requests regarding new functionality or features of the Services (**"Enhancement Requests"**). All modifications proposed or requested in an Enhancement Request shall be our sole and exclusive property. We may, in our sole discretion, include such modifications in a future version of the Services, but our acceptance and consideration of an Enhancement Request shall not obligate us to include in any version of the Services any modifications proposed or requested in such Enhancement Request.

**12.14. Trademarks.** You acknowledge and agree that this Agreement does not convey to you any right, title, or interest in or to any of our trademarks or trade names. You shall not use or attempt to register any of our trademarks or trade names or any trademarks or trade names that are confusing similar to them.

**12.15. Conflicts.** In the event of any conflict between these General Terms and Conditions and any other component of the Agreement, these General Terms and Conditions will take precedence with regard to your rights and obligations with respect to the Services.

# EXHIBIT A – SERVICES & SUPPLEMENTAL SERVICES

1. The Order Form that you have executed identifies (a) the Fees payable by you to the Company for the specific Services (Bundled or Supplemental) purchased, (b) the term of your Services, and (c) the payment terms of the Fees payable by you to the Company.

**HOME / PRIVACY**



| ABOUT US | SOLUTIONS | PRODUCTS | RESOURCES | News |
|---|---|---|---|---|
| Our Story | Marketing | Management Software | Help | Contact |
| Our Culture | Operations | | Learn | Support |
| Leadership | | Access Control | Connect | |

STORABLE000026

Corporate
Responsibility

Careers

Storage
Marketplace

Insurance
Solutions

Facility
Websites

Payment
Processing

Request
a Demo

Storage
Beat



© Copyright 2025 Storable.
All rights reserved.

**Privacy | Security**

STORABLE000027

**The Business Court of Texas,
Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § § | |
| *Plaintiff,* | § § | Cause No. 25-BC03A-0001 |
| *v.* | § § | |
| STORABLE, INC., et al., | § § § | |
| *Defendants.* | § | |

---

**Storable's Emergency Motion for a Partial Stay of the
June 13, 2025 Court-Ordered Production Deadline**

---

Defendants Storable, Inc.; RedNova Labs (d/b/a storEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP (collectively "Storable") respectfully move the Court on an emergency basis for a partial stay of the June 13, 2025 production deadline set forth in the Court's May 28, 2025 Discovery Order as to Storable's response to Plaintiff's Request for Production No. 10 and would respectfully show the Court as follows.

**Summary**

This Court's May 28, 2025 Discovery Order requires Storable to produce its FMS customer list by June 13, 2025 in response to Plaintiff's Request for Production No. 10. That list is a trade secret, competitively sensitive, and among the most valuable assets that Storable has. The Court should stay the June 13, 2025 deadline for Storable to respond to Request No. 10 pending this Court's ruling on Defendants' Partial Motion for Summary Judgment on SafeLease's Attempted Monopolization Claim, scheduled for hearing on July 1, 2025. The customer list is relevant only to SafeLease's claim for attempted monopolization. Additionally, as the Court knows, there is a

pending appeal of the Court's Amended Order Granting Temporary Injunction which places this Court's jurisdiction at issue. Either of these rulings would eliminate any reason to produce this trade secret to SafeLease, the disclosure of which would gravely threaten Storable's business.

Also, importantly, the parties are engaged in ongoing settlement discussions with the assistance of mediator Alan F. Levin, following a mediation on June 4, 2025. If the continued talks resolve this matter, there is no need for the production of a trade secret in a dispute between two competitors.

A stay would not prejudice SafeLease, which has never requested production by any date certain. The parties have not even commenced production of any documents as they are continuing to negotiate the relevant search terms and custodians. With that landscape and a June 2026 trial date, there is no immediate need for the production of a trade secret when forthcoming rulings may remove the need for production. Moreover, Storable's requested stay would be limited to its response to Plaintiff's Request for Production No. 10, and would not impact the June 13, 2025 deadline as to the other requests at issue in the May 28 Discovery Order.

### Relevant Background

The May 28, 2025 Discovery Order requires Storable to produce to SafeLease by June 13, 2025 documents sufficient to show the name, city, state, and ZIP code of all self-storage facilities using Storable's FMS as of December 30, 2024 in response to SafeLease's Request for Production Number 10. SafeLease has claimed that it needs this FMS customer list to calculate the market share in its alleged FMS services market for purposes of its attempted monopolization claim under the Texas Antitrust Act. SafeLease has not claimed any other need for this list.

Storable respectfully disagrees with the May 28 Discovery Order and believes that more complete briefing and evidence will persuade the Court to revisit its ruling. Accordingly, Storable will be promptly filing a motion to reconsider to ensure that all necessary facts are before the Court

in this dispute over the unnecessary disclosure of one of Storable's most valuable trade secrets.[1]

If the Court declines to reconsider the May 28 Discovery Order, Storable will have to pursue a petition for writ of mandamus in the Court of Appeals to protect against disclosure of this highly sensitive trade secret to its competitor.

In the meantime, as the Court is aware, Storable has moved for partial summary judgment on SafeLease's attempted monopolization claim, which is the only claim for which SafeLease contends the FMS customer list is relevant. The partial summary judgment motion is set for hearing on July 1, 2025. *See* Notice of Hearing (Jun. 5, 2025). Storable also has appealed the temporary injunction issued in this matter, which places this Court's jurisdiction at issue. If this Court grants Storable's motion for partial traditional summary judgment or the Court of Appeals determines that this Court lacks jurisdiction, there will no longer be any basis for producing the FMS customer list, either because it will no longer be relevant to any remaining claims and therefore not discoverable or because this Court will lack jurisdiction to compel such production.

Further, Storable will also move to reconsider the Court's April 15, 2025 Order denying its Motion to Modify the Protective Order to exclude Plaintiff's outside general counsel, Mr. Adam Locke, from accessing Storable's "Outside Counsel's Eyes Only" ("OCEO") materials—in light of this Court's recent decision in *Westlake Longview Corp. v. Eastman Chemical Co.*, Cause No. 24–BC11B–0023, Opinion on Motion for Protective Order, 2025 Tex. Bus. 19 (May 16, 2025). If

---

[1] The Court noted in the May 28, 2025 Discovery Order that Storable did not claim that the customer list was a trade secret. Respectfully, Storable's response to SafeLease's pre-motion letter was subject to strict length limitations under the local rules. The Court ruled on this discovery dispute based solely on those letters, rather than requesting further briefing. Further briefing would have clarified that Storable's customer list is a trade secret. Customer lists or similar information are commonly recognized as trade secrets. *Houston Livestock Show & Rodeo, Inc. v. Dolcefino Comm'cns, LLC*, 702 S.W.3d 675, 690 (Tex. App.—Houston [1st Dist.] 2024, no pet.) ("Courts generally recognize that customer lists or financial information that can be used to obtain customers or to negotiate pricing or fees to obtain an advantage in the market qualifies as a trade secret.").

no stay is issued and Storable is otherwise required to produce its FMS customer list, reconsideration of the April 15, 2025 order would prevent Mr. Locke from accessing the list.

Finally, following the May 28, 2025 Discovery Order, the parties conducted a mediation on June 4, 2025. No impasse was declared and settlement discussions are continuing. Since a settlement was not reached at the June 4 mediation itself, however, the June 13, 2025 deadline under the Discovery Order remains operative.

In light of all the above ongoing and forthcoming developments, Storable requests a stay of the June 13, 2025 deadline for production in response to Plaintiff's Request No. 10 under the May 28 Discovery Order.

### Legal Standard

A trial court may issue any protective order "in the interest of justice" to protect the movant from undue burden, unnecessary expense, harassment, or annoyance. TEX. R. CIV. P. 192.6(b). Such limitations may include modifications of the timing of discovery. *Id.* Similarly, the Court is also permitted to schedule discovery to occur in appropriate phases. TEX. R. CIV. P. 190.4(b)(1)–(2).

### Argument and Authorities

The May 28 Discovery Order subjects Storable an extraordinary burden and the interests of justice overwhelmingly support a stay. The Court should stay the June 13, 2025 production deadline until the latest of this Court's ruling on Storable's motion for partial summary judgment on SafeLease's attempted monopolization claim, this Court's rulings on Defendants' forthcoming motions to reconsider the Court's May 28 or April 15 rulings, or the Court of Appeals' decision and mandate on Storable's appeal of the temporary injunction.

***Undue burden***. The Court's May 28 Discovery Order compels Storable to produce its FMS customer list. This document is a trade secret and its disclosure under any circumstance

represents a substantial threat to Storable—a threat that is especially serious in a case against a hostile competitor. It is settled law that a trade secret is only subject to production in discovery if "the party seeking production [shows] reasonable necessity for the requested materials." *In re Union Pac. R. Co.*, 294 S.W.3d 589, 592 (Tex. 2009). "A person has a **privilege** to refuse to disclose and prevent other persons from disclosing a trade secret." TEX. R. EVID. 507(a) (emphasis added). Storable's forthcoming motion to reconsider the May 28 Discovery Order will address the considerations relevant under Texas law for determining whether a trade secret exists; however, as a general matter, "[c]ourts generally recognize that customer lists or financial information that can be used to obtain customers or to negotiate pricing or fees to obtain an advantage in the market qualifies as a trade secret." *Houston Livestock Show & Rodeo, Inc. v. Dolcefino Comm'cns, LLC*, 702 S.W.3d 675, 690 (Tex. App.—Houston [1st Dist.] 2024, no pet.).

Further, the risk of improper disclosure of Storable's FMS customer list is material, and neither the Agreed Protective Order nor confidentiality/OCEO designations can address that risk. Notably, if the Court of Appeals determines that this Court lacks jurisdiction, the Agreed Protective Order will become void—leaving **no protection whatsoever** in place for the interim period until the case can be remanded and a new protective order entered. This inherent risk of disclosure—due simply to the procedural posture of the case—is undeniable and would inflict even greater undue burden on Storable. And this Court would not be able to prevent that risk in the event that it lacks jurisdiction over this case.

The Court's May 28 Discovery Order suggested that disclosing the FMS customer list to SafeLease would not be problematic because SafeLease does not compete in the FMS market. Discovery Order (May 28, 2025) at n. 2. Respectfully, disclosing this list to any competitor would raise significant risks for Storable. Disclosing it to SafeLease in particular raises even greater risks

given SafeLease's history of misusing and abusing access to Storable's FMS platforms and data. While SafeLease does not compete in the FMS space, SafeLease competes to provide tenant insurance to the facilities using Storable's FMS. According to SafeLease, approximately 70% of its customers use a Storable FMS (*see* Feb. 14, 2025 Tr. 28:17-21 (Stein)), so providing SafeLease with the Storable's FMS facility list would give one of Storable's tenant insurance competitors a rich source for targeting potential customers, including those that use Storable's tenant insurance products. **SafeLease has also been encouraging its tenant insurance customers to switch from Storable's FMS to Cubby, a different FMS platform** (*see* Feb. 13, 2025 Tr. 82:11-14 (Kinet)), so providing SafeLease with Storable's FMS customer list could unfairly enable them to target more Storable FMS customers. Accordingly, disclosing the FMS facility list to SafeLease is highly likely to harm Storable's business.

*Interests of justice.* The interests of justice support a stay of the June 13 deadline for multiple reasons.

First, if this Court grants Storable's motion for partial summary judgment on SafeLease's attempted monopolization claim or the Court of Appeals determines that this Court lacks jurisdiction, the need for production of the customer list will become moot, either because Storable's FMS market share—the only issue for which SafeLease's asserted any need for the customer list—will no longer be at issue or because this Court will no longer have jurisdiction to order discovery. Similarly, if this Court reconsiders the May 28 Discovery Order, that ruling too would obviate the need for disclosure of the list. It would be fundamentally unjust to force Storable to disclose one of its most valuable trade secrets when a ruling in Storable's favor on any one of these matters would remove the need for disclosure altogether.

Second, if this Court were to grant Storable's motion to reconsider its April 15, 2025 Order regarding access to Outside Counsel's Eyes Only (OCEO) information, that ruling would bar SafeLease's general counsel, Mr. Locke, from viewing OCEO materials. Thus, to the extent Storable must ultimately produce its FMS customer list (which would, if produced, be considered OCEO), it would be unjust to compel Storable to produce the list before the Court determines whether there are grounds for reconsidering denying Locke access to the list—because Locke would be able to see the list before a potential ruling from the Court barring him from doing so.

Third, the parties are engaged in settlement discussions with the assistance of a mediator. If those discussions result in a settlement, there will no longer be a need for Storable to produce its FMS customer list in this matter. Staying the June 13, 2025 production deadline would thus not only prevent a potentially needless and irreparable disclosure of Storable's trade secret—it would also prevent the disclosure of Storable's trade secret from being improperly used as leverage in settlement negotiations.

Finally, requiring production of the customer list would constitute irreparable harm—i.e., it can never be taken back. A stay should issue to avoid inflicting irreparable harm to Storable.

### The Court Should Act on an Emergency Basis

Storable would suffer irreparable harm if required to comply with the June 13, 2025 deadline because producing a trade secret to a competitor is irreversible. That result may be entirely unnecessary if this Court or the Court of Appeals rule in Storable's favor on any of the pending matters discussed above. This Court should act on an expedited basis to stay the June 13 deadline before it expires.

### Conclusion

Storable respectfully requests that the Court issue a stay of the June 13, 2025 production deadline set forth in its May 28, 2025 Discover Order, and the stay should expire 10 days after the

latest of: a ruling on Storable's motion for partial summary judgment on SafeLease's attempted monopolization claim; a mandate from the Court of Appeals in Storable's pending appeal; a ruling on Storable's forthcoming motion to reconsider the Court's May 28, 2025 Discovery Order; or a ruling on Storable's forthcoming motion to reconsider the Court's April 15 Order denying modification of the Protective Order.

Respectfully submitted June 6, 2025.

/s/ Katherine G. Treistman
Katherine G. Treistman
State Bar No. 00796632
Andrew D. Bergman
State Bar No. 24101507
Mikaila Skaroff (admitted *pro hac vice*)
John Holler (admitted *pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
700 Louisiana Street, Suite 4000
Houston, Texas 77002–2755
Tel.: (713) 576–2400
Fax: (713) 576–2499
Katherine.Treistman@arnoldporter.com
Andrew.Bergman@arnoldporter.com
Mikaila.skaroff@arnoldporter.com
John.holler@arnoldporter.com

Ray T. Torgerson
State Bar No. 24003067
Neil Kenton Alexander
State Bar No. 00996600
Jonna N. Summers
State Bar No. 24060649
Elizabeth "Liza" Eoff
State Bar No. 24095062
Lakshmi N. Kumar
State Bar No. 24144581
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Tel.: (713) 226–6000
Fax: (713) 226–6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com

leoff@porterhedges.com
ljumar@porterhedges.com

Dale Wainwright
State Bar No. 00000049
Justin Bernstein
State Bar No. 24105462
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel.: (512) 320–7240
Fax: (512) 320–7240
Dale.wainwright@gtlaw.com
bernsteinju@gtlaw.com

*Counsel for Defendants*

**Certificate of Conference**

The Parties conferred regarding the relief requested in the foregoing motion, and counsel for Plaintiff indicated that Plaintiff is opposed.

/s/ Katherine G. Treistman
Katherine G. Treistman

**Certificate of Compliance**

I hereby certify that this document complies with Local Rule 5(a) and contains 2,366 words, excluding the case caption, any index, table of contents or table of authorities, signature blocks, attached evidence, or any required certificates.

/s/ Katherine G. Treistman
Katherine G. Treistman

**Certificate of Service**

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon counsel of record in accordance with the Texas Rules of Civil Procedure on June 6, 2025.

/s/ Katherine G. Treistman
Katherine G. Treistman

E-filed in the Office of the Clerk
for the Business Court of Texas
6/6/2025 8:10 PM
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

705

**The Business Court of Texas,
Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | §§§§§§§§§§§ | |
| *Plaintiff,* | | |
| *v.* | | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | | |
| *Defendants.* | | |

---

**Storable's Motion for Reconsideration of The Court's April 15, 2025 Order
Denying Modification of the Protective Order**

---

Defendants Storable, Inc.; RedNova Labs (d/b/a storEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP (collectively "Storable") respectfully submits this Motion for Reconsideration of the Court's April 15, 2025 Order Denying Storable's Motion to Modify the Protective Order in this case and would respectfully show the Court as follows.

**Summary**

The Court's April 15, 2025 Order denied Storable's request to modify the Agreed Protective Order to exclude Plaintiff's outside general counsel, Mr. Adam Locke ("Locke"), from accessing materials marked "Outside Counsel's Eyes Only" ("OCEO"). However, on May 16, 2025, this Court issued an intervening decision in *Westlake Longview Corp. v. Eastman Chemical Co.*, 2025 Tex. Bus. 19 (May 16, 2025) addressing the factors this Court would consider in denying counsel access to Attorneys' Eyes Only ("AEO") materials under a protective order—which have equal or greater force regarding materials designated OCEO, which is an ever greater limitation on access to only certain attorneys for a party. Most, if not all, of those factors squarely apply to

Locke. The Court should reconsider its April 15 Order based on the intervening *Westlake* decision and modify the Protective Order to exclude Locke from reviewing Storable's OCEO materials.

## Legal Standard

**Motions to reconsider.** A trial court "retains continuing control over its interlocutory orders and has the power to set those orders aside at any time before a final judgment is entered." *Fruehauf Corp. v. Carrillo*, 848 S.W.2d 83, 83 (Tex. 1993). This control includes the "authority to change or modify any interlocutory order or judgment until the judgment becomes final." *Rush v. Barrios*, 56 S.W.3d 88, 98 (Tex. App.—Houston [14th] 2001, pet. denied).

**Denying access to AEO/OCEO.** Whether to grant counsel access to AEO or OCEO designated material "requires balancing of the parties' competing interests." *Westlake*, 2025 Tex. Bus. 19 ¶ 14. While the *Westlake* decision addresses access to such materials by in-house counsel, it acknowledges that "[f]ederal courts have generally held that the same test applies whether the counsel at issue is in house or outside counsel[.]" *Id.* at n.16; *see also* Discovery Order (May 28) at 2 n.3 (same). The two factors that the Court considers in balancing the relevant interests include (1) the risk of inadvertent disclosure or misuse; and (2) the need for access. *Westlake*, 2025 Tex. Bus. 19 ¶ 14.

## Argument and Authorities

The record before the Court proves that there is a potent risk of inadvertent disclosure or misuse if Locke is permitted to access Storable's OCEO materials and a minimal need for his access under the circumstances. The Court should deny Locke access to those materials.

If, however, Court determines that the existing record is insufficient to make a decision, Storable is prepared to depose Locke regarding this matter and will renew and supplement this motion with that evidence.

**I.      Locke's Access to Storable's OCEO Materials Poses a Risk of Inadvertent Disclosure or Misuse**

Locke's access to Storable's OCEO materials creates a material risk of inadvertent disclosure or misuse of these materials.  Storable is not accusing Locke of contempt.  Rather, its concern is what the Court identified in *Westlake*, which is that even counsel who "actively endeavor to abide by their legal and ethical obligations" can be subject to a "risk of inadvertent disclosure as well as the reality that even if in-house counsel does not disclose information, they may still unconsciously take it into account when providing legal advice on matters outside of this litigation." *Westlake*, 2025 Tex. Bus. 19 ¶ 14 & n.17 (quoting *In re Deutsche Bank Tr. Co. Ams.*, 605 F.3d 1373, 1378 (Fed. Cir. 2010) ("[I]t is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so")).

Locke's role and history with SafeLease render him unfit to access Storable's most confidential and competitive secrets, which are and would be designated as OCEO.  Virtually all of the "[e]xamples of evidence that courts have relied on in denying attorney access to AEO information" that the *Westlake* Court identified are present here, while virtually none of the "examples of evidence that courts have relied on in granting attorney access to AEO information" are present.  *Westlake*, 2025 Tex. Bus. 19 ¶¶ 17–18.

**A.      The Types of Evidence Supporting Denial of Access Identified by This Court in *Westlake* Are Present in This Case**

The Court's decision in *Westlake* identified several types of evidence on which courts have denied counsel access to AEO materials.  Many of those same types of evidence are present in this case.

### 1. Locke Advises SafeLease on a Gamut of Legal Issues

The first type of evidence that this Court identified as supporting denial of access is an attorney's responsibility for "advising his employer on a gamut of legal issues, including contracts, marketing, and employment." *Westlake*, 2025 Tex. Bus. 19 ¶ 17 (citing *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992)). Here, Locke has testified that he has "provided legal advice on various issues to SafeLease." Declaration of A. Locke (Apr. 11, 2025) ¶ 35 (attached as **Exhibit A**); *see also* A. Locke Letter to K. Treistman (Mar. 26, 2025) at 2 (attached as **Exhibit B**) ("since July 2023 . . . I provided general legal advice to my longtime client [SafeLease]"). Locke also admits that he offers a broad range of services to his outside-general-counsel clients like SafeLease:

> While I handle disputes, I also advise them on a variety of legal issues: e.g., employment and labor issues, regulatory issues, investigations, and commercial agreements. Some of my clients either don't have the resources to hire in-house counsel or simply appreciate my flexibility, so they rely on me for general legal advice. **SafeLease falls into this category**.

*Id.* at 3 (emphasis added).

### 2. Locke Has Worn Multiple Hats—Both Business and Legal—For SafeLease

The next type of evidence that this Court identified as supporting denial of access is the attorney having served "as both general counsel and outside counsel for the company, ha[ving] served an affiliate in a purely business capacity, played a major role in the company's core business . . . and [having] worked directly under the company's owner." *Westlake*, 2025 Tex. Bus. 19 ¶ 17 (citing *ST Sales Tech Hldgs., LLC v. Daimler Chrysler Co., LLC*, 2008 WL 5634214, at *3–4 (E.D. Tex. Mar. 14, 2008). Locke checks these boxes too.

First, he originally served as outside counsel to SafeLease beginning in 2021. A. Locke Decl. (**Ex. A**). ¶ 13. In April 2022, he joined SafeLease as its General Counsel and Chief

Operating Officer. *Id.* He then resigned from SafeLease in July 2023 and moved back into an outside counsel role. *Id.* ¶¶ 17–18. In other words, Locke has been moving through a revolving door to and from SafeLease for the past four years.

Second, in addition to serving as SafeLease's Chief Operating Officer and General Counsel, Locke appears to have also served as Chief Operating Officer and General Counsel to Etude Capital, LLC. *See Zoominfo: Adam Locke*, https://www.zoominfo.com/p/Adam-Locke/2887510203 (screenshot attached as **Exhibit C**) ("As General Counsel for both SafeLease and Etude Capital, Locke provided legal advisory and guidance. Prior to these roles, they served as Chief Operating Officer & General Counsel for Etude Capital and as Chief Operating Officer for SafeLease, demonstrating applied knowledge of operational strategies."). Etude Capital is SafeLease's parent company and LLC manager, and its founder, President, and LLC member-manager is Steven Stein, who is also the founder and CEO of SafeLease. *See* SafeLease Certificate of Formation (attached as **Exhibit D**) (listing Etude Insurance Holdings LLC as a manager); Etude Insurance Holdings LLC Certificate of Formation (attached as **Exhibit E**) (listing Etude Capital as manager); Etude Capital, LLC Certificate of Formation (attached as **Exhibit F**) (listing Stein as the member-manager).[1]

Third, Locke played a material role in SafeLease's business in his roles as outside counsel, inside General Counsel, and Chief Operating Officer. A press release issued by SafeLease when it hired Locke as General Counsel and COO explained that when Locke had previously worked "as an outside advisor," "he gained **expert knowledge of SafeLease's products, market**

---

[1] *See also* INSIDE SELF STORAGE, *SafeLease Launches Reputation Management Tool for Self Storage*, INSIDE SELF STORAGE, *Etude Capital Launches Joint Venture to Invest in Self-Storage* (Jan. 12, 2024), https://www.insideselfstorage.com/suppliers-products/safelease-launches-reputation-management-tool-for-self-storage (SafeLease is a "subsidiary of Etude Capital"); https://www.insideselfstorage.com/self-storage-investing-real-estate/etude-capital-launches-joint-venture-to-invest-in-self-storage (quoting "Steven Stein, founder and preside of Etude Capital").

**positioning, and the value the company delivers to its customers.**" *Press Release: SafeLease Hires Adam Locke as Chief Operating Officer* (Jul. https://www.safelease.com/resources/safelease-hires-adam-locke-as-chief-operating-officer (attached as **Exhibit G**) (emphasis added). Then, as General Counsel and COO, Locke was to "focus on ensuring the company's strategic business objectives are met by increasing operational capabilities and driving efficiencies across all functional departments." *Id.*

Fourth, Locke would have worked directly under SafeLease's **parent company**, Etude Capital, as its General Counsel and Chief Operating Officer and would have been extensively involved in both the business and legal affairs of SafeLease's controlling entity. And in his roles as General Counsel and Chief Operating Officer of both SafeLease and Etude Capital, Locke would have worked directly under Steven Stein, who is the founder and chief executive of both companies.

### 3. Locke Has Frequent Contact With SafeLease's Leadership, and SafeLease Claims this Case is Critical to its Future

This next type of evidence that this Court identified as supporting denial of access to AEO materials is the "evidence of the frequency and intensity of interactions between in-house counsel and company leadership and the critical nature of the litigation to the company's future." *Westlake*, 2025 Tex. Bus. 19 ¶ 17 (citing *Autotech Techs. Ltd. P'Ship v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 410 (N.D. Ill. 2006)). Such evidence is palpably present in this case.

First, Locke was not a low-ranking employee or in-house counsel of SafeLease—he was its General Counsel and Chief Operating Officer. It is axiomatic that an individual in this role would have direct, frequent, and extensive contact with the CEO. Indeed, Locke's role as General Counsel and Chief Operating Officer of SafeLease's parent company—which shares the same chief executive as SafeLease, Steven Stein—makes even more clear that Locke was and continues

to be in extremely close contact with Stein. This is no less true after July 2023 when Locke transitioned to being an "outside" general counsel; indeed, by all appearances SafeLease has no in-house attorneys and Locke is its sole general counsel. *Cf. id.* ("It is one thing to be in-house counsel in a company with several layers of management with whom interaction and involvement may be episodic and may well be topically limited. It is quite another where a company's two attorneys take their ultimate instructions in the litigation from a single individual, who is, for all intents and purposes, the corporation, and who is intimately involved in every facet of the litigation.").

Second, SafeLease has repeatedly represented to the Court that this case is not only "critical" to its future—but that it is essential to its very existence. On February 11, 2025, Plaintiff's Counsel stated on the record that "this case and this dispute is a matter of not just importance to SafeLease but literally existential urgency. It is the company's future and current existence, and we very much appreciate the court's attention to this." Feb. 11, 2025 Hr'g Tr. at 83:8–12.[2] Locke's extensive, multi-year history with SafeLease at the highest levels of its business and legal department—and those of its parent company—support denying him access to OCEO materials in this case, given its purported seriousness to SafeLease. *Cf. Autotech Techs. Ltd. P'Ship*, 237 F.R.D. at 411 ("[I]t is [the attorney's] unique role in [the plaintiff], his enveloping participation in the litigation, the absence of safeguards resulting from a layered managerial hierarchy, and the criticality of the outcome of the litigation to the possible economic destiny of

---

[2] *See also* Jan. 16, 2025 Hr'g Tr. at 291:15–21 ("[Plaintiff's Counsel:] On behalf of my client, respectfully, we don't want to sue for damages. We want to have a trial where we're still in business, we're still able to service our customers, and we have a fair and square trial. If they prove their defenses and their counterclaims, more power to them. If we prove ours, we prevail, but we will not survive until trial, Your Honor, without this protection."); Feb. 18, 2025 Hr'g Tr. at 28:5–7 ("[Plaintiff's Counsel:] Both our chief revenue officer and our chief executive testified that its just a matter of time before we go out of business."); *id.* at 29:2–6 ("[Plaintiff's Counsel:] Obviously, SafeLease is going to be put out of business; and the innovative low price competitor will be gone.").

[the plaintiff] and [the attorney] personally that make it appropriate to restrict in-house counsel's access to [the defendant's] confidential customer information.").

### 4. Locke Directed Legal and Business Affairs For SafeLease and Was Responsible for Matters Relevant to this Case

This next category of evidence that this Court identified as supporting denial of access to AEO materials is evidence "that the attorney was director of legal and business affairs for the company"; was "responsible for supervising its efforts [regarding matters relating to the subject of the case]"; and "reported directly to company's general counsel, even though she did not handle product development contracts or other corporate matters." *Westlake*, 2025 Tex. Bus. 19 ¶ 17. Again, Locke checks all of these boxes and then some.

First, Locke plainly directed legal and business affairs for SafeLease as its Chief Operating Officer and General Counsel from January 2022 through July 2023—a time period which falls within the relevant case time period. *See* Exhibit L to Defs' Reply in Support of Mot. to Modify Protective Order at 3 (SafeLease's discovery requests listing a relevant time period from August 1, 2021 to present).

Second, as Chief Operating Officer, Locke was responsible for supervising matters within SafeLease that are directly relevant to this case. For example, Locke's emails from 2023 show that he was responding directly to complaints by self-storage facility owners that SafeLease was improperly accessing their facility's SiteLink FMS system. *See* TI Hearing DX-47 at 2. His response addresses and demonstrates his knowledge regarding, among other things: SafeLease's personnel who purportedly access facilities' FMS; storage of, third-party access to, and disclosure of tenant information; SafeLease's user passwords; SafeLease's use of automation when accessing the FMS; and security measures SafeLease purportedly takes when accessing the FMS. *Id.*

Third, Locke did not merely "report directly" to SafeLease's general counsel—he **was** the General Counsel, as well as the Chief Operating Officer. Even now, he still concedes that he is SafeLease's "outside general counsel." Ex. B ("Mr. Yetter said at the February 11 TI hearing that SafeLease's 'outside general counsel is Adam Locke.' This is true.").

### 5. Locke Oversaw and Advised SafeLease's Leaders on Similar Litigation

The final type of evidence that this Court identified as supporting the denial of access to AEO materials is "evidence that an attorney oversaw and advised the company's business leaders on strategy for litigation of the same type as the pending case, even though the attorney was not involved in pricing, product design, sales, marketing, distribution, or day-to-day operations." *Westlake*, 2025 Tex. Bus. 19 ¶ 17 (citing *Ecolab Inc. v. IBA, Inc.*, 2024 WL 3650464, at *1 (D. Minn. May 19, 2024)). Locke is—again—all of the above and more. Specifically, Locke represents yet another company of which Stein is the President, Capital Storage Holdings, LLC, in the matter *Capital Storage Holdings LLC v. Sparebox Self Storage, LLC*, cause No. 2022–71323 (151st Jud. Dist., Harris County). *See* Excepts of Filings from Cause 2022–71323 (attached as **Exhibit H**) at PDF 14 (Capital Storage Holdings, LLC's third amended petition at p.7 stating that Stein is its president); *id.* at PDF 25 (Capital Storage Holdings, LLC's third amended petition at p.18 listing Locke as its counsel of record). The pleadings and other filings in that case show that Stein and Locke are employing tactics similar to those they have used in this case—i.e., attempting to negotiate a business deal with another party and then proceeding to file suit against the other party when that deal falls apart. *See id.* at PDF 31–33 (the Defendant's summary judgment motion at p.1–3). Those tactics were unsuccessful in the *Capital Storage* case. *See id.* at PDF 43 (order granting summary judgment for Defendant).

Locke's involvement in the *Capital Storage* case is continuing to this day, *see id.* at PDF 3 (docket sheet). Indeed, the case was originally filed when Locke was still serving as SafeLease's Chief Operating Officer and General Counsel, and thus he plainly **did** have involvement in SafeLease's day-to-day operations at that time. The *Capital Storage* case is also still ongoing now and further highlights the depth of the relationship between Locke and Stein, the multiple overlapping hats that Locke wears in connection with Stein's ventures, and the impossibility of reasonably "walling off" knowledge that Locke would gain from Storable's OCEO materials.

**B.      The Types of Evidence Supporting Granting of Access Identified by this Court in *Westlake* are Not Present in this Case**

None of the categories of evidence that this Court identified in *Westlake* as reasons for which an attorney may be granted access to AEO materials are present in this case. These types of evidence include proof that the attorney had no involvement in competitive or business matters and focused on "purely legal issues"; that he "had no financial interest" in the company, past non-legal involvement that was "incidental and largely dated," and did not provide services involving "competitive decision-making." *See Westlake*, 2025 Tex. Bus. 19 ¶ 18. But none of this applies to Locke because he was a C-level business executive for SafeLease during the relevant time period for this case, and his duties were not purely legal in nature.

The *Westlake* decision also notes that an attorney's location in a different state from the company's relevant operations and the events alleged in the case may support granting access. Here, both Mr. Locke and SafeLease—as well as Storable—are located in Texas.

**II.      Locke Has No Legitimate Need to Access Storable's OCEO Materials**

There is no legitimate reason why SafeLease needs Locke to access OCEO materials—and certainly none that can outweigh the substantial risks that Locke's access would create. This Court's decision in *Westlake* explained that denying counsel's access to AEO materials would

cause undue hardship in and "extremely complex" case "at an advanced stage" of litigation where outside counsel were newly retained and where the case is "complex" with "highly technical matters" on which the attorney's counsel's insights are particularly important. *Id.* ¶ 19. This is not the case here. First, this case is at an early stage in which SafeLease is represented by two fully capably outside law firms, Yetter Coleman and Stone Hilton, from which many attorneys have already appeared on SafeLease's behalf.

Second, while this case may have some complexity, Locke does not have, nor does he claim to have, any special experience rendering his insights particularly essential. His background is that of a litigator not unlike SafeLease's counsel from Yetter Coleman or Stone Hilton. He has never claimed to have any highly technical skills that would be applicable in this type of case. Rather, he has conceded that he is SafeLease's outside general counsel who provides it with general legal advice.

## III. Other Considerations Support Denying Access

Other considerations, in addition to the types of evidence the Court identified in *Westlake*, further support denying Locke access to Storable's OCEO materials.

First, most of the Court's analysis in *Westlake* involved "Attorneys' Eyes Only" (AEO) materials. But in this case, the Parties agreed to a protective order with an even greater level of protection at the second tier—"Outside Counsel's Eyes Only" (OCEO)—meaning, at minimum, not even all party attorneys would have access to the opposing party's OCEO documents. The parties could have chosen to agree to an AEO tier instead, but did not do so. The Court's weighing of the record evidence should be conducted in view of this reality. Indeed, the mere existence of an OCEO tier in the Protective Order presupposes that at least the parties' general counsels would not be expected not have access to one another's OCEO documents.

Second, if Storable had known that Locke would seek to access OCEO materials, it would not have agreed to the Protective Order in its current form. But Storable did not know this, and in fact expected the exact opposite in light of Plaintiff's counsel's repeated representations that Locke would be excluded from OCEO materials. *See, e.g.*, Def's Motion to Modify Protective Order (Apr. 4, 2025) at 1–3; Defs' Reply In Support Motion to Modify Protective Order (Apr. 14, 2025) at 1–2, . Storable agreed to the protective order with the understanding, provided by Plaintiff's counsel repeatedly in open court, that Locke would be excluded from OCEO. This matters because, without Storable's agreement, SafeLease would have been required to prove good cause for entry of a protective order over the Storable's objection. Thus, while Storable has the burden to justify any modification to the Agreed Protective Order, the Court should not alleviate SafeLease's burden to show that good cause exists for Locke to have access to OCEO materials. This is especially important here, when SafeLease avoided having to meaningfully comply with this burden in the first instance by securing Storable's consent to the Agreed Protective Order based on the false pretense that SafeLease was excluding Locke from OCEO materials.

## IV. Storable is Prepared to Promptly Notice Locke's Deposition if the Court Requires Additional Testimony Regarding His Role

Finally, while Storable believes that this motion is amply supported by the record and attached evidence, to the extent the Court believes that any further evidence is necessary, Storable will depose Locke regarding his role(s) at or representing SafeLease.

### Conclusion

Storable respectfully requests that the Court reconsider its April 15, 2025 Order, modify the Agreed Protective Order in this case to exclude Locke from accessing Storable's OCEO materials, and grant all other relief to which it may justly be entitled. A proposed order accompanies this motion.

Respectfully submitted June 6, 2025.

*/s/ Katherine G. Treistman*
Katherine G. Treistman
State Bar No. 00796632
Andrew D. Bergman
State Bar No. 24101507
Mikaila Skaroff (*admitted pro hac vice*)
John Holler (*admitted pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
700 Louisiana Street, Suite 4000
Houston, Texas 77002–2755
Tel.: (713) 576–2400
Fax: (713) 576–2499
Katherine.Treistman@arnoldporter.com
Andrew.Bergman@arnoldporter.com
Mikaila.skaroff@arnoldporter.com
John.holler@arnoldporter.com

Ray T. Torgerson
State Bar No. 24003067
Neil Kenton Alexander
State Bar No. 00996600
Jonna N. Summers
State Bar No. 24060649
Elizabeth "Liza" Eoff
State Bar No. 24095062
Lakshmi N. Kumar
State Bar No. 24144581
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Tel.: (713) 226–6000
Fax: (713) 226–6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
ljumar@porterhedges.com

Dale Wainwright
State Bar No. 00000049
Justin Bernstein
State Bar No. 24105462
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel.: (512) 320–7240

Fax: (512) 320–7240
Dale.wainwright@gtlaw.com
bernsteinju@gtlaw.com

*Counsel for Defendants*

## Certificate of Conference

The Parties conferred regarding the relief requested in the foregoing motion, and counsel for Plaintiff indicated that Plaintiff is opposed.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

## Certificate of Compliance

I hereby certify that this document complies with Local Rule 5(a) and contains 3,898 words, excluding the case caption, any index, table of contents or table of authorities, signature blocks, attached evidence, or any required certificates.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

## Certificate of Service

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon counsel of record in accordance with the Texas Rules of Civil Procedure on June 6, 2025.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

# Exhibit A

**The Business Court of Texas**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § | |
| *Defendants.* | § § § | |

**DECLARATION OF ADAM LOCKE**

1.      My name is Adam Locke, and I am over 18 years of age and competent to make this declaration.

2.      The facts set forth in this declaration are based on my personal knowledge, and are true and correct.

<u>My Background and Current Practice</u>

3.      I have been licensed to practice law in Texas since 2012.

4.      I have operated my law firm, Lockelaw PLLC, since founding it in December 2019.

5.      Prior to founding Lockelaw, I was a counsel at Akin Gump Strauss Hauer & Feld LLP in New York City from 2016 to 2019. Prior to working at Akin Gump, I was an associate in the Kansas City offices of Shook, Hardy & Bacon LLP and Rouse Hendricks German May PC from 2015 to 2016. Before working at Shook, I was an associate in the Houston office of Susman Godfrey LLP from 2013 to 2015.

6.      I served as a law clerk to the Honorable Carolyn Dineen King of the United States Court of Appeals for the Fifth Circuit from 2012 to 2013.

7.      I graduated from Yale Law School and received my Juris Doctor in 2012.

8.     At Lockelaw, my law practice consists of commercial litigation, employment litigation, arbitration, investigations, regulatory advice, and legal due diligence for credit investors.

9.     On a limited basis, Lockelaw also offers outside general counsel services. "Outside general counsel services" refers to serving as a first point of contact for my business and investor clients, providing general legal advice on the issues they encounter on a regular basis when possible, and referring specialized work to other outside counsel as needed.

10.     I do not offer business advice to my clients or advise on commercial issues, such as the suitability of price terms in agreements.

11.     My law firm has represented dozens of clients, including investment managers, startups, public companies, family-owned businesses, and individuals.

<u>My Relationship with SafeLease</u>

12.     SafeLease became a client of Lockelaw PLLC in 2021.

13.     In April 2022, I joined SafeLease as its General Counsel and Chief Operating Officer.

14.     While employed by SafeLease, with SafeLease's permission, I maintained my law firm and certain clients I had served since founding my law firm.

15.     Over the year I was employed with SafeLease, demand for my legal services from outside clients grew, and I could not service these clients while employed with SafeLease.

16.     In June 2023, I resigned from SafeLease and no longer had any in-house or business role with SafeLease.

17.     Following my resignation from SafeLease, I began to represent SafeLease as outside counsel through Lockelaw PLLC.

18.     I remain outside counsel to SafeLease, a role I have had since July 2023.

19.	I do not provide commercial advice to SafeLease, make business decisions for SafeLease, or participate in non-legal, commercial decision-making with SafeLease.

20.	I am not involved in SafeLease's general business operations or discussions, which are operations handled by and discussions maintained by SafeLease's internal business leaders.

21.	I do not participate in SafeLease's business operations or discussions because my role as outside counsel is to provide legal advice.

22.	Lockelaw PLLC is not a business consultancy, and I do not run a business consultancy.

23.	In addition, I do not participate in SafeLease's business operations or discussions because, as SafeLease's outside counsel, were I to give SafeLease business advice, any claims arising out of such advice would not be covered by my professional malpractice insurance, which exclusively covers claims relating to legal advice.

24.	As a small firm owner, I do not and cannot expose myself to risks associated with giving business advice to my law firm clients, which would be outside of my circle of competence.

<u>My Relevant Communications with Storable's Counsel Before I Filed an Appearance</u>

25.	I have personal knowledge of the facts stated in SafeLease's response to Storable's motion to modify the agreed protective order and to compel disclosure of a list of certain documents that I have reviewed as counsel of record in this action, which response this declaration supports.

26.	Storable has known that I am outside counsel to SafeLease since before this case was filed.

27.	On December 6, 2024, I had coffee with Neil Verma, Storable's General Counsel. During this meeting, Mr. Verma told me that he and Storable's CEO, Chuck Gordon, understood

that I was independent of SafeLease and was operating an outside law firm. I confirmed to Mr. Verma that I was and had been representing SafeLease as outside counsel through my law firm, Lockelaw PLLC, since the summer of 2023. I explained to Mr. Verma at this meeting high-level details about why I had left SafeLease, the nature of my client base and services, and confirmed that I was outside counsel to SafeLease among many other clients of my firm.

28.     Mr. Verma noted that he would like to retain me on behalf of Storable in the future once his department had the resources to do so. Mr. Verma suggested that such an arrangement might not be possible at that time due to potential conflicts, but that the situation could change. I indicated to Mr. Verma that I appreciated the kind words and consideration, but there likely was a conflict.

29.     Once this lawsuit was filed, Mr. Verma and I engaged in multiple rounds of settlement discussions. I believe these good faith settlement talks were enabled by my being on equal footing with Mr. Verma, in that I had refrained from filing a notice of appearance and gaining access to discovery materials that he could not view as in-house counsel under a Rule 11 agreement.

30.     A 21-minute-long settlement call I had with Mr. Verma on February 3, 2025, was memorable because it was far more negative in tone from our other settlement calls, which were generally polite and constructive.

31.     Based on the negative tone of the February 3 call, I informed Mr. Verma that I would file a notice of appearance in the action if settlement talks continued to break down or failed. Mr. Verma responded for me to "go ahead" and do what I needed to do.

32.     On March 7, 2025, Storable's new lead counsel, Katherine Treistman, called me.

33. Ms. Treistman knows me from when I began my career in private practice in 2013 at Susman Godfrey LLP, the litigation boutique where Ms. Treistman was then a partner.

34. On the March 7 call, I spoke with Ms. Treistman for twenty minutes. On the call, Ms. Treistman told me she wanted to reconnect with me and discuss her approach towards this litigation. Ms. Treistman told me that she hoped the parties could take a more constructive approach to this litigation, a statement with which I agreed.

35. Ms. Treistman also inquired into my relationship to SafeLease, specifically asking me if I was "in house" counsel. I informed Ms. Treistman that I was not "in house" but had been outside counsel to SafeLease since July 2023. I explained to Ms. Treistman that, like many litigators at private firms, I provided legal advice on various issues to SafeLease, my longtime client, through my firm, Lockelaw PLLC, where I have represented dozens of other clients.

36. Following my explanation, Ms. Treistman said she "got it," indicating she understood the outside counsel arrangement between me and SafeLease.

37. Also following my explanation, Ms. Treistman told me that all settlement communications from me going forward needed to be directed to her, not Mr. Verma.

38. Now that I could no longer engage in settlement discussions with Mr. Verma, I felt that I no longer had any reason not to file a notice of appearance.

<u>I File an Appearance and Afterward Receive Access to OCO Materials</u>

39. On March 24, Storable indicated that it would seek permanent sealing of dozens of exhibits and hundreds of pages of testimony in this case.

40. To assist with the sealing issue and related briefing, I decided to file an appearance. Before gaining access to any OCO materials, I reviewed the Protective Order.

41. On March 24, 2025, at 6:25 PM CDT, I filed and served my notice of appearance in this action, becoming counsel of record to SafeLease.

42. On March 24, 2025, at 6:54 PM CDT, I first received access to OCO materials.

43. Following receipt of the OCO materials, I reviewed some of them.

My Relevant Communications with Storable's Counsel After I Filed an Appearance

44. On March 25, 2025, I participated in a meet and confer about the parties' motions to seal.

45. On that call, my co-counsel introduced me as outside counsel to SafeLease.

46. Later on the call, I noted that defendants' OCO designations appeared overbroad, citing an email defendants produced and marked OCO where Storable executives discussed an email they had received from the parties' mutual customer. I noted that there was nothing in the email that appeared confidential, certainly nothing that would warrant an OCO designation.

47. At the end of the March 25 call, without prompting or explanation, Storable's counsel, Andrew Bergman, said the following to me and my co-counsel: "my clients do not accept your characterization of Mr. Locke as outside counsel."

48. I was surprised by this, given that weeks earlier, I told Ms. Treistman I was outside counsel, and even explained my relationship to SafeLease, and she said that she understood my role and invited me to participate in settlement talks directly with her, outside counsel to outside counsel.

49. I ended the call by saying that Mr. Bergman was entitled to "raise it with the Court."

50. On March 25, 2025, lead counsel for Storable, Ms. Treistman, sent the first of two letters demanding that I immediately and permanently stop viewing Storable's OCO materials and disclose what OCO materials I had reviewed.

51. Ms. Treistman reiterated her clients' demands to me on a March 28 phone call and in a March 31 letter.

52. Both of Ms. Treistman's letters mischaracterize my relationship to SafeLease as "not outside counsel" and as someone "extensively involved in Plaintiff's business" or involved in SafeLease's "general business activities."

53. I informed Ms. Treistman in response to her letters that I am outside counsel to SafeLease, have been since July 2023, and am not involved in SafeLease's business activities.

54. I assured Ms. Treistman in several written responses to her letters and on the March 28 call that I had abided by the Agreed Protective Order in this case and always would do so.

55. On the March 28 phone call, Ms. Treistman said to me that even with no access to OCO materials, I could "do everything that Mr. Yetter could do in the litigation—take depositions, represent [SafeLease] at hearings," etc.

56. I disagreed with Ms. Treistman and responded that any counsel of record needs full access to discovery materials to zealously represent their clients.

57. Storable's counsel at Arnold and Porter emailed me on April 3 (at 9:42 pm) and said that, in her March 31 letter, Ms. Treistman had requested to know when I first viewed OCO materials in this case.

58. In this April 3 email, Storable's counsel alleged that I had failed to respond to Ms. Treistman's request for the date and time I first accessed OCO materials; however, prior to the April 3 email, Storable's counsel had never asked me to disclose when I first gained access to OCO materials in this litigation.

My Appearance Benefits SafeLease in this Litigation

59. In this action, the hourly rate I charge SafeLease is the lowest charged by any member of SafeLease's trial team.

60. Of the members of SafeLease's trial team, just two have litigated longer than me.

# Exhibit B

**LOCKELAW**

2617 Bissonnet, Ste. 503, Houston, Texas 77005
Tel: 713-832-0242 • Fax: 713-565-4709

Attorney Adam Locke
Direct: 713-832-0243 • adam@lockelaw.com

March 26, 2025

Katherine Ginzburg Treistman
Arnold & Porter Kaye Scholer LLP
700 Louisiana Street, Suite 4000
Houston, TX 77002-2755

Via email: katherine.treistman@arnoldporter.com

    Re:    *SafeLease Ins. Servs., LLC v. Storable, Inc., et al.*, Cause No. 35-BC03A-0001 (Tex. Bus. Ct. 3d Div.)

Dear Katherine:

I received a copy of the cease and desist letter you sent yesterday to my co-counsel, Paul Yetter, which demanded action of me and my law firm within 24 hours. The letter, which suggests that I may violate a Court order, reflects a serious misunderstanding of my outside counsel relationship with SafeLease, of my law firm serving dozens of clients, of my ongoing role in the litigation prior to your appearance, and of my own professional ethics, which I believe you know well. I will respond to your letter in some detail in the hope of avoiding another needless dispute in this important litigation.

## 1. **I Have Honored and Will Continue to Honor the Agreed Protective Order.**

First and foremost, I'm writing to assure your clients that my appearing as an attorney of record for SafeLease in this matter will not compromise the protections in the Agreed Protective Order. Please be assured that I will faithfully abide by all obligations the Court has imposed on counsel of record relating to materials defendants have designated as Outside Counsel Eyes Only ("OCO"). I have read the Agreed Protective Order, and I acknowledge that my access to OCO materials comes with strict limitations — *all* of which I will honor. In particular, your clients can rest assured that I will honor the following obligations:

- I will use OCO materials *only* to prepare for, try, and appeal this matter.

- I will *not* use OCO materials to advise SafeLease on business or legal matters.

- I will *not* disclose OCO materials to SafeLease employees, agents, or affiliates.

- I will disclose OCO materials, and offer advice based on it, *only* as permitted by the Protective Order.

I understand that the above obligations are just some of the limitations on my conduct pursuant to the Protective Order. For example, I recognize that accessing OCO materials in this litigation may limit my participation in business dealings or negotiations between the parties if they implicate OCO information. Accordingly, I will ensure that I am walled off from dealings or negotiations between the parties where, for example, my participation or advice may give or appear to give SafeLease an unfair advantage because of knowledge of OCO materials.

In short, I fully understand and take seriously the limitations in the Protective Order. I will protect your clients' non-public, proprietary, or sensitive business or financial information that is designated as OCO. And I will adhere strictly to the limits imposed on me as an attorney of record for SafeLease. These are commitments that I share with all other counsel of record in this case.

## 2. **I Am Outside Counsel for SafeLease and Have Been Since July 2023.**

As you know, from our 20-minute phone call on March 7, 2025, which you initiated and I welcomed, I am outside counsel for SafeLease. On that call, you asked if I was "in house" at SafeLease. I replied that I was not. I explained that I had been outside counsel for SafeLease since July 2023, that like many litigators at private firms, I provided general legal advice to my longtime client (which I have represented since 2021), and that through my law firm Lockelaw PLLC, I represent dozens of clients — of which SafeLease was just one.

Following my explanation, you responded that you "got it" and understood I was — like many lawyers in private practice — representing a longtime client in an array of matters, as its de facto "outside general counsel." To my surprise, your letter suggests you now don't understand my role. If so, please allow me to further explain my role and history with SafeLease.

I launched my firm in 2020, during the height of the pandemic, with a handful of clients who helped me keep the lights on. SafeLease was not one of them. I did not begin representing SafeLease until 2021. After a year of working with SafeLease, I was invited to join the company as Chief Operating Officer and General Counsel. I accepted this invitation, but even while employed by SafeLease, with SafeLease's permission, I maintained my firm and a limited roster of loyal clients. By 2023, demand for my services had grown, and I felt a strong pull back to private practice. By June, SafeLease's CEO, Steven Stein, and I had come to a mutual decision where I would continue to represent SafeLease as outside counsel but would no longer have any in-house role or relationship with SafeLease. My decision had real consequences: as part of my departure and transition, I forfeited a significant amount of company stock and benefits. I did so in order to build an independent firm and serve a broader range of clients as outside counsel.

Thankfully, my law firm, Lockelaw PLLC, has done reasonably well. I have represented dozens of clients since mid-2023. They range from individuals and startups to investment funds and public companies. I offer my clients a variety of legal services. While I handle disputes, I also advise them on a variety of legal issues: e.g., employment and labor issues, regulatory issues, investigations, and commercial agreements. Some of my clients either don't have the resources to hire in-house counsel or simply appreciate my flexibility, so they rely on me for general legal advice. SafeLease falls into this category.

SafeLease's reliance on me for general legal advice does not transform me into an in-house lawyer for SafeLease. As a simple Google search will show, countless lawyers at large law firms — *including your fine firm* — serve as "outside general counsel" for their clients, including clients where they previously served in an in-house role. My arrangement is hardly unique, and your letter's suggestion that my prior operating role with SafeLease somehow disqualifies me from representing SafeLease as its counsel in this action is baseless.

My role for SafeLease is not news to Storable. Storable knew that I operated a law firm independently of SafeLease before this dispute arose in December 2024. Indeed, Storable's in-house general counsel, Neil Verma, joined me for coffee on the morning of December 6, 2024, before Storable cut off SafeLease's authorized user accounts. During our coffee meeting, he noted that he and Storable's CEO Chuck Gordon knew I was working independently of SafeLease, and it would be great for Storable to hire me if it wouldn't pose a conflict (I politely noted it would).

In short, for Storable to now suggest that I am not independent of SafeLease — and that my past role excludes me from being its outside counsel — is misguided and ignores my recent discussions with both you and Storable.

3. **Mr. Yetter's Comment Does Not Transform Me into an In-House Lawyer.**

Finally, your letter notes that Mr. Yetter said at the February 11 TI hearing that SafeLease's "outside general counsel is Adam Locke." This is true. My legal services can be more or less categorized as falling under "outside general counsel" services, as I explained above. Your letter then notes that Mr. Yetter said, "when we get into outside/counsel only, we will ask [him] to be excused." It seems to suggest, incorrectly, that Mr. Yetter's statement implies that I am not "outside counsel" to SafeLease or cannot become counsel of record in this action.

Simply put, Mr. Yetter's reference to "outside/counsel only" was a reference to the Protective Order's distinction between discovery materials designated for counsel of record in this action (i.e., OCO) and materials that all other lawyers, advisors, etc. are able to see (including

materials marked as merely "confidential"). At the time of the hearing, I was not counsel of record in this action, as I had not filed an appearance for SafeLease.

While my client felt that a good-faith settlement was possible, I was not counsel of record for SafeLease and did not have access to OCO materials. As such, I was in a position to maintain equal footing with Mr. Verma so that he and I could engage in good faith efforts to resolve this dispute. Regrettably, those efforts failed. And just weeks ago, you told me on our phone call that I was not to direct any further settlement communications to Mr. Verma, but rather to talk only to you — outside counsel to outside counsel — about settlement.

Respectfully, your letter tries to contort Mr. Yetter's reference to the Protective Order into an admission that I am not outside counsel to SafeLease, despite admitted evidence to the contrary.

Lastly, let me add my hope that your own experience with me and my professional ethics is consistent with the contents and assurances of this letter. A dozen years ago, after clerking for the Fifth Circuit, I started my legal career at a (then-small) commercial litigation boutique where you were a respected partner. As I've told you, I always thought highly of you. Recently, on our call, you offered very kind words to me, which I greatly appreciated. Those kind words, and your personal experience with me on which they were based, are at odds with the tone and suggestions of your letter. Based on what you know about me, and on what I have shared with you in this response, I sincerely hope that this much is clear: the demands in your letter are unfounded.

I trust that this resolves any legitimate concerns that Storable may have.

Sincerely,

Adam Locke

# Exhibit C



## Adam Locke

Owner at Syndicase

⊘ Reliable Data

✉ Email  a***@syndicase.com     📞 Phone (***) ***-****     📱 Mobile (***) ***-****

**Reveal Contact Info for Free**     📄 Export

**Biography**     Company     Experience     Similar Profiles     FAQ

## Who is Adam Locke

Adam Tyler Locke is the Founder and Managing Member of LockeLaw, representing businesses, investors, entrepreneurs, inventors, and creators. Their background demonstrates versatile expertise in legal and operational leadership, particularly within finance and consumer services sectors. Locke is based in Houston, Texas.

As General Counsel for both SafeLease and Etude Capital, Locke provided legal advisory and guidance. Prior to these roles, they served as Chief Operating Officer & General Counsel for Etude Capital and as Chief Operating Officer for SafeLease, demonstrating applied knowledge of operational strategies.

Locke's experience extends to the investment sector as the Owner of Syndicase, where they focus on investments in legal assets, including litigation, arbitration, and bankruptcy claims. Their work at Syndicase also encompasses advising fund managers on investments in legal assets, contributing to deal flow within litigation finance.

Earlier in their career, Locke practiced law at Akin Gump as Counsel, and as an Associate at Shook Hardy & Bacon and Susman Godfrey. These assignments have included a focus on commercial litigation. Locke is an Attorney with the State Bar of Texas and holds a law degree from Yale. Read less

## Adam Locke Current Workplace


**Syndicase**
2020-present (5 years)

**Address**  United States

**Number of Employees**  7

**Industry**

( Finance )

## View Colleagues


**Oscar Garcia**
Director, Claims
📞 Phone   ✉ Email

# Exhibit D

| | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $300 | <br>**Certificate of Formation**<br>**Limited Liability Company** | **Filed in the Office of the**<br>**Secretary of State of Texas**<br>**Filing #: 803671015 07/02/2020**<br>**Document #: 980767350002**<br>**Image Generated Electronically**<br>**for Web Filing** |

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## SafeLease Insurance Services LLC

### Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

### OR

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
## Steven    Stein

C. The business address of the registered agent and the registered office address is:

**Street Address:**
## 7204 Avenue B
## STE 2E  Bellaire  TX  77401

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

### OR

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑ A. The limited liability company is to be managed by managers.

### OR

☐ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name) **Etude Insurance Holdings LLC**

Address: **2802 Timmons Ln. #27600    Houston  TX, USA  77227-77227**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

## Organizer

The name and address of the organizer are set forth below.

**Steven Stein**     **2802 Timmons Ln #27600 Houston, TX 77227**

## Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Steven Stein**

Signature of Organizer

**FILING OFFICE COPY**

# EXHIBIT E

| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $300 | <br>**Certificate of Formation**<br>**Limited Liability Company** | **Filed in the Office of the**<br>**Secretary of State of Texas**<br>**Filing #: 803667980 06/30/2020**<br>**Document #: 980235460003**<br>**Image Generated Electronically**<br>**for Web Filing** |
| --- | --- | --- |

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Etude Insurance Holdings LLC

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

## Etude Capital LLC

### OR

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
## 2802 Timmons Ln #27600    Houston  TX  77227

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

### OR

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑A. The limited liability company is to be managed by managers.

### OR

☐B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name) **Etude Capital LLC**

Address: **2802 Timmons Ln #27600    Houston  TX, USA  77227**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

## Organizer

The name and address of the organizer are set forth below.

**Steven Stein**      **2802 Timmons Ln #27600 Houston, TX 77227**

## Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Steven Stein**

Signature of Organizer

**FILING OFFICE COPY**

# EXHIBIT F



| | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $300 | **Certificate of Formation**<br>**Limited Liability Company** | **Filed in the Office of the**<br>**Secretary of State of Texas**<br>**Filing #: 801708199 12/28/2012**<br>**Document #: 459173780002**<br>**Image Generated Electronically**<br>**for Web Filing** |

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Etude Capital LLC

### Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

#### OR

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
## Steven  Isaac  Stein

C. The business address of the registered agent and the registered office address is:

**Street Address:**
## 7204 Avenue B.
## Suite 2E  Bellaire  TX  77401

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

#### OR

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☐ A. The limited liability company is to be managed by managers.

#### OR

☑ B. The limited liability company will not have managers. Management of the company is reserved to the members. The names and addresses of the governing persons are set forth below:

Managing Member 1: **Steven  Isaac  Stein**   Title: **Managing Member**

Address: **7204 Avenue B.    Bellaire  TX, USA  77401**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

## Organizer

The name and address of the organizer are set forth below.

**Steven Isaac Stein** <u>**7204 Avenue B. Bellaire, TX 77401**</u>

## Effectiveness of Filing

☑A. This document becomes effective when the document is filed by the secretary of state.

## OR

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Steven Isaac Stein**

Signature of Organizer

**FILING OFFICE COPY**

# EXHIBIT G



Products      Company      Resources      Contact          Facility Login      File Claim

July 20, 2022

**PRESS RELEASE**

# SafeLease Hires Adam Locke as Chief Operating Officer

   

*Experienced leader will focus on operational efficiencies, risk management, and ongoing compliance to accelerate company growth*

- *Locke has a strong track record of driving efficiencies and managing complex processes at law firms and early-stage companies*

- *His experience as an outside general counsel and corporate attorney brings a new perspective to the SafeLease leadership team and positions the company to effectively manage risk*

AUSTIN, July 20,2022 – SafeLease, the leader in self-storage tenant protection, is pleased to announce the appointment of Adam Locke as the company's Chief Operating Officer. Locke will focus on ensuring the company's strategic business objectives are met by increasing operational capabilities and driving efficiencies across all functional departments.

Locke worked with SafeLease as an outside advisor prior to joining the company as its COO. During that time, he gained expert knowledge of SafeLease's products, market positioning, and the value the company delivers to its customers.

"SafeLease is excited to bring Adam on board to spearhead new operational initiatives," says Steven Stein, Founder and CEO at SafeLease. "His deep regulatory acumen and

cross-functional strengths complement our fast-growing product, sales, and marketing functions."

"SafeLease is well-positioned to redefine risk management solutions for the commercial real estate industry," says Locke. "The space SafeLease is innovating in is ripe for disruption. With such a talented team and tremendous market opportunity, I was thrilled to join. I look forward to working with my new colleagues to ensure the company reaches its full potential."

Prior to joining SafeLease, Locke owned and ran a boutique law firm where he was outside general counsel to tech startups, commercial real estate firms, and investment managers. Locke also owned and operated an advisory firm focused on legal assets. He has advised on transactions totaling over $200 million.

Locke began his career as a litigator and advisor at corporate law firms and clerked for a federal appellate judge. He earned a law degree from Yale.

Click here to read the press release on Cision PR Newswire.

**747**

Email                                                          **Submit**

**Products**                **Company**           **Resources**      **Contact**

Commercial Insurance        About Us             Blog               Licenses

800 Brazos Street           Tenant Protection &  Careers            Events             Storage Unit Brochure
Suite 320                   Insurance
Austin, TX 78701                                 Security Center                       Outdoor Unit
                            Reputation                                                 Brochure
855.657.2338                Management

                                                                                       **Facility Login**

                                                                                       ┌─────────────────┐
                                                                                       │   **File Claim** │
                                                                                       └─────────────────┘

© 2025 SafeLease Insurance Services LLC. All rights reserved.                                          Privacy Policy

# EXHIBIT H

**HCDistrictclerk.com**      CAPITAL STORAGE HOLDINGS LLC vs. SPAREBOX SELF STORAGE LLC     6/6/2025

Cause: 202271323      CDI: 7      Court: 151

## APPEALS

No Appeals found.

## COST STATMENTS

No Cost Statments found.

## TRANSFERS

No Transfers found.

## POST TRIAL WRITS

No Post Trial Writs found.

## ABSTRACTS

No Abstracts found.

## SERVICE

No Service found.

## NOTICES

No Notices found.

## SUMMARY

| CASE DETAILS | |
|---|---|
| **File Date** | 10/31/2022 |
| **Case (Cause) Location** | |
| **Case (Cause) Status** | Disposed (Final) |
| **Case (Cause) Type** | FRAUD |
| **Next/Last Setting Date** | N/A |
| **Judgment For** | FINAL SUMMARY JUDGMENT SIGNED |
| **Judgment Date** | 7/12/2024 |
| **Jury Fee Paid Date** | N/A |

| CURRENT PRESIDING JUDGE | |
|---|---|
| **Court** | 151st |
| **Address** | 201 CAROLINE (Floor: 11) HOUSTON, TX 77002 Phone:8329272455 |
| **JudgeName** | ERICA R. HUGHES |
| **Court Type** | Civil |

## ACTIVE PARTIES

| Name | Type | Post Jdgm | Attorney |
|---|---|---|---|
| CAPITAL STORAGE HOLDINGS LLC | PLAINTIFF - CIVIL | | PETERSON, DAVID MICHAEL |
| CAPITAL STORAGE HOLDINGS LLC | CROSS DEFENDANT | | PETERSON, DAVID MICHAEL |

| | | |
|---|---|---|
| SPAREBOX SELF STORAGE LLC | DEFENDANT - CIVIL | FIELDING, JEREMY |
| SPAREBOX SELF STORAGE LLC | CROSS PLAINTIFF | FIELDING, JEREMY |
| DAVIDSON KEMPNER CAPITAL MANAGEMENT LP | DEFENDANT - CIVIL | PORTER, CHRISTOPHER D. |
| DAVIDSON KEMPNER AFFILIATED ENTITY 1 | DEFENDANT - CIVIL | PORTER, CHRISTOPHER D. |
| THE DAVIDSON KEMPNER-APPOINTED SPAREBOX BOARD MEMBERS | DEFENDANT - CIVIL | PORTER, CHRISTOPHER D. |
| BROWN, JUDSON | PRO HAC VICE ATTORNEY | |
| 1301 PENNSYLVANIA AVE, N.W., WASHINGTON, DC | | |
| NEWMAN, DEBORAH | PRO HAC VICE ATTORNEY | |
| 51 MADISON AVENUE, 22ND FLOOR, NEW YORK, NY 10010 | | |
| FINESTONE, BENJAMIN I. | PRO HAC VICE ATTORNEY | |
| 51 MADISON AVENUE, 22ND FLOOR, NEW YORK, NY 10010 | | |
| HOWARD, STEVEN C. | MEDIATOR | HOWARD, STEVEN C. |
| MCGLYNN, MEGAN L. | PRO HAC VICE ATTORNEY | |
| 1301 PENNSYLVANIA AVENUE, N.W., WASHINGTON, DC 20004 | | |
| SIMPSON, RICHARD | PRO HAC VICE ATTORNEY | |
| 1301 PENNSYLVANIA AVENUE, N.W., WASHINGTON, DC 20004 | | |
| YOO, SAHNG-AH | PRO HAC VICE ATTORNEY | |
| 1301 PENNSYLVANIA AVENUE, N.W., WASHINGTON, DC 20004 | | |
| MCCARRICK, TERENCE JOHN | PRO HAC VICE ATTORNEY | |
| 1301 PENNSYLVANIA AVENUE, N.W., WASHINGTON, DC 20004 | | |

## INACTIVE PARTIES

No inactive parties found.

## JUDGMENT/EVENTS

| Date | Description | Order Signed | Post Jdgm | Pgs | Volume /Page | Filing Attorney | Person Filing |
|---|---|---|---|---|---|---|---|
| 5/21/2025 | ORD SIGNED GRANTING FINDINGS OF FACT/CONCLUSIONS OF LAW | 5/21/2025 | | 1 | | | |
| 5/9/2025 | ORDER SIGNED AWARDING ATTORNEY FEES | 5/9/2025 | | 1 | | | |
| 2/13/2025 | ORDER SIGNED SETTING ASIDE ORDER | 2/13/2025 | | 1 | | | |
| 2/13/2025 | ORDER GRANTING MOTION FOR NEW TRIAL IN PART SIGNED SEE ORDR | 2/13/2025 | | 1 | | | |

| Date | Description | Date | | Party | |
|---|---|---|---|---|---|
| 1/8/2025 | MOTION NEW TRIAL | | 0 | PETERSON, DAVID MICHAEL | CAPITAL STORAGE HOLDINGS LLC |
| 12/9/2024 | ORDER SIGNED GRANTING PARTIAL ATTORNEY FEES SEE ORDER | 12/9/2024 | 2 | | |
| 12/5/2024 | HEARING HELD FOR ANOTHER COURT | | 0 | | |
| 11/18/2024 | HEARING HELD FOR ANOTHER COURT | | 0 | | |
| 7/12/2024 | NO COSTS ALLOCATED | | 0 | | |
| 7/12/2024 | FINAL SUMMARY JUDGMENT SIGNED | 7/12/2024 | 2 | | |
| 7/10/2024 | ORDER GRANTING MOTION TO TAKE JUDICIAL NOTICE SIGNED | 7/10/2024 | 1 | | |
| 7/7/2024 | ORDER SIGNED DENYING EXCLUSION OF EXPERTS OPINIONS | 7/7/2024 | 1 | | |
| 7/7/2024 | ORDER SIGNED GRANTING IN PART EXCLUSION OF EXPERTS OPINIONS | 7/7/2024 | 2 | | |
| 7/7/2024 | ORDER SIGNED DENYING MOTION TO STRIKE PLEADING | 7/7/2024 | 3 | | |
| 7/7/2024 | ORDER FOR INTERLOCUTORY SUMMARY JUDGMENT SIGNED | 7/7/2024 | 2 | | |
| 7/3/2024 | ORDER GRANTING APPEARANCE PRO HAC VICE SIGNED | 7/3/2024 | 3 | | |
| 6/15/2024 | DOCKET CONTROL/PRETRIAL ORDER SIGNED | 6/15/2024 | 6 | | |
| 5/16/2024 | ORDER GRANTING APPEARANCE PRO HAC VICE SIGNED | 5/16/2024 | 2 | | |
| 3/25/2024 | DOCKET CONTROL/PRETRIAL ORDER SIGNED | 3/25/2024 | 3 | | |
| 3/6/2024 | ORDER SIGNED GRANTING PREFERENTIAL TRIAL SETTING | 3/6/2024 | 2 | | |
| 2/5/2024 | ANSWER COUNTER CLAIM | | 0 | PETERSON, DAVID MICHAEL | CAPITAL STORAGE HOLDINGS LLC |
| 1/23/2024 | ORDER GRANTING APPEARANCE PRO HAC VICE SIGNED | 1/23/2024 | 1 | | |
| 1/22/2024 | ORDER GRANTING APPEARANCE PRO HAC VICE SIGNED | 1/22/2024 | 2 | | |
| 1/12/2024 | COUNTER CLAIM | | 0 | FIELDING, JEREMY | SPAREBOX SELF STORAGE LLC |
| 1/12/2024 | AMENDED ANSWER THIRD AMENDED ORIGINAL PETITION | | 0 | FIELDING, JEREMY | SPAREBOX SELF STORAGE LLC |
| 11/29/2023 | ORDER SIGNED RESETTING TRIAL | 11/29/2023 | 6 | | |
| 11/28/2023 | DOCKET CONTROL/PRETRIAL ORDER SIGNED | 11/28/2023 | 2 | | |
| 11/28/2023 | ORDER SIGNED GRANTING TRIAL CONTINUANCE | 11/28/2023 | 2 | | |

| Date | Description | Date 2 | Count | Attorney | Party |
|---|---|---|---|---|---|
| 10/18/2023 | ORDER SIGNED GRANTING REFERRAL TO MEDIATION | 10/18/2023 | 2 | | |
| 10/2/2023 | ORD SGN GRNTNG PROTECTION FROM DISCOVERY REQUEST | 10/2/2023 | 9 | | |
| 10/2/2023 | ORDER SIGNED CONFIDENTIAL AGREEMENT | 10/2/2023 | 9 | | |
| 10/2/2023 | THIRD AMENDED ORIGINAL PETITION | | 0 | PETERSON, DAVID MICHAEL | CAPITAL STORAGE HOLDINGS LLC |
| 7/18/2023 | ORDER SIGNED GRANTING SPECIAL APPEARANCE | 7/18/2023 | 2 | | |
| 7/18/2023 | PARTIAL DISMISSAL ON DEFENDANT'S MOTION | 7/18/2023 | 2 | | |
| 7/11/2023 | ORDER GRANTING APPEARANCE PRO HAC VICE SIGNED | 7/11/2023 | 2 | | |
| 7/10/2023 | ORDER GRANTING APPEARANCE PRO HAC VICE SIGNED | 7/10/2023 | 2 | | |
| 7/3/2023 | SECOND AMENDED ANSWER SECOND AMENDED ORIGINAL PETITION | | 0 | PORTER, CHRISTOPHER D. | DAVIDSON KEMPNER AFFILIATED ENTITY 1 |
| 7/3/2023 | SECOND AMENDED ANSWER SECOND AMENDED ORIGINAL PETITION | | 0 | FIELDING, JEREMY | SPAREBOX SELF STORAGE LLC |
| 7/3/2023 | SECOND AMENDED ANSWER SECOND AMENDED ORIGINAL PETITION | | 0 | PORTER, CHRISTOPHER D. | DAVIDSON KEMPNER CAPITAL MANAGEMENT LP |
| 7/3/2023 | SECOND AMENDED ANSWER SECOND AMENDED ORIGINAL PETITION | | 0 | PORTER, CHRISTOPHER D. | THE DAVIDSON KEMPNER-APPOINTED SPAREBOX BOARD MEMBERS |
| 6/26/2023 | ORDER SIGNED DENYING MOTION TO STRIKE PLEADING | 6/26/2023 | 2 | | |
| 6/26/2023 | ORDER SIGNED DENYING FINAL SUMMARY JUDGMENT | 6/26/2023 | 2 | | |
| 6/7/2023 | SECOND AMENDED ORIGINAL PETITION | | 0 | MAYER, ERIC J. | CAPITAL STORAGE HOLDINGS LLC |
| 3/24/2023 | FIRST AMENDED ORIGINAL PETITION | | 0 | MAYER, ERIC J. | CAPITAL STORAGE HOLDINGS LLC |
| 3/13/2023 | ORD SGN DENYING PROTECTION FROM DISCOVERY REQUEST | 3/13/2023 | 2 | | |
| 1/31/2023 | ORDER SIGNED GRANTING MOTION T0 DISMISS IN PART SEE D/S | 1/31/2023 | 2 | | |
| 1/31/2023 | PARTIAL DISMISSAL ON DEFENDANT'S MOTION | 1/31/2023 | 2 | | |
| 12/6/2022 | ORDER GRANTING APPEARANCE PRO HAC VICE SIGNED | 12/6/2022 | 2 | | |
| 11/30/2022 | DESIGNATED TRIAL READY | | 0 | | |
| 11/30/2022 | DOCKET CONTROL/PRETRIAL ORDER SIGNED | 11/30/2022 | 3 | | |

| 11/28/2022 | ANSWER ORIGINAL PETITION | 0 | PORTER, CHRISTOPHER D. | DAVIDSON KEMPNER AFFILIATED ENTITY 1 |
| 11/28/2022 | ANSWER ORIGINAL PETITION | 0 | PORTER, CHRISTOPHER D. | THE DAVIDSON KEMPNER-APPOINTED SPAREBOX BOARD MEMBERS |
| 11/28/2022 | ANSWER ORIGINAL PETITION | 0 | FIELDING, JEREMY | SPAREBOX SELF STORAGE LLC |
| 11/28/2022 | ANSWER ORIGINAL PETITION | 0 | PORTER, CHRISTOPHER D. | DAVIDSON KEMPNER CAPITAL MANAGEMENT LP |
| 10/31/2022 | ORIGINAL PETITION | 0 | MAYER, ERIC J. | CAPITAL STORAGE HOLDINGS LLC |

## SETTINGS

| Date | Court | Post Jdgm | Docket Type | Reason | Results | Comments | Requesting Party |
|---|---|---|---|---|---|---|---|
| 1/30/2023 08:00 AM | 151 | | Submission Docket (Local Rule 12) | DISMISS (MOTION TO) | Granted In Part | OS 1/31/23 | FIELDING, JEREMY |
| 3/13/2023 08:00 AM | 151 | | Submission Docket (Local Rule 12) | PROTECTION FROM DISCOVERY REQUEST (MOTION FOR) | Denied | OS 3/13/23 | PORTER, CHRISTOPHER D. |
| 3/13/2023 10:00 AM | 151 | | Law Day Docket | SPECIAL APPEARANCE (MOTION FOR)(TRCP 120A) | Passed | PER NTC TO PASS HEARING 3/1/23 | PORTER, CHRISTOPHER D. |
| 3/27/2023 08:00 AM | 151 | | Submission Docket (Local Rule 12) | SUMMARY JUDGMENT-FINAL (MOTION FOR) (TRCP 166A) | Passed | PASSED BY KARYN COOPER 3/25/2023 | FIELDING, JEREMY |
| 6/12/2023 08:00 AM | 151 | | Submission Docket (Local Rule 12) | SUMMARY JUDGMENT-FINAL (MOTION FOR) (TRCP 166A) | Denied | OS 6/26/23 | |
| 6/12/2023 11:30 AM | 151 | | Law Day Docket | SUMMARY JUDGMENT-FINAL (MOTION FOR) (TRCP 166A) | Re-Set | PER CRT. DKT CANCELED. MVD 2 AM DKT | FIELDING, JEREMY |
| 6/26/2023 08:00 AM | 151 | | Submission Docket (Local Rule 12) | STRIKE PLEADING (MOTION TO) (TRCP 168) | Denied | OS 6/26/23 | FIELDING, JEREMY |
| 7/17/2023 10:30 AM | 151 | | Law Day Docket | SPECIAL APPEARANCE (MOTION FOR)(TRCP 120A) | Granted | OS 7/18/23 | PORTER, CHRISTOPHER D. |
| 12/08/2023 09:00 AM | 151 | | Trial Coordinators Docket | DOCKET CALL (MOTION FOR) | Passed | | |
| 1/01/2024 09:00 AM | 151 | | Trial Setting | TRIAL ON MERITS (MOTION FOR) | Continuance Granted | O/S 11-28-23 | |
| 6/27/2024 10:00 AM | 151 | | Law Day Docket | EXCLUDE EXPERTS OPINIONS (MOTION TO) | Denied | OS 7/7/24 | |
| 6/27/2024 10:00 AM | 151 | | Law Day Docket | STRIKE PLEADING (MOTION TO) (TRCP 168) | Denied | OS 7/7/24 | |
| 6/27/2024 10:00 AM | 151 | | Law Day Docket | EXCLUDE EXPERTS OPINIONS (MOTION TO) | Granted In Part | OS 7/7/24 | |

| 6/27/2024 10:00 AM | 151 | Law Day Docket | SUMMARY JUDGMENT-FINAL (MOTION FOR) (TRCP 166A) | Granted | OS 7/12/24 | |
|---|---|---|---|---|---|---|
| 6/27/2024 10:00 AM | 151 | Law Day Docket | SUMMARY JUDGMENT-PARTIAL (MOTION FOR) (TRCP 166A) | Granted | OS 7/7/24 | |
| 6/27/2024 10:00 AM | 151 | Law Day Docket | SUMMARY JUDGMENT-PARTIAL (MOTION FOR) (TRCP 166A) | Granted | OS 7/7/24 | |
| 7/01/2024 08:00 AM | 151 | Submission Docket (Local Rule 12) | TAKE JUDICIAL NOTICE (MOTION TO) | Re-Set | PER AMD NTC FILED 6/25/24 | PETERSON, DAVID MICHAEL |
| 7/08/2024 08:00 AM | 151 | Submission Docket (Local Rule 12) | TAKE JUDICIAL NOTICE (MOTION TO) | Granted | OS 7/10/24 | PETERSON, DAVID MICHAEL |
| 7/15/2024 09:00 AM | 151 | Trial Setting | TRIAL ON MERITS (MOTION FOR) | Passed | DISPOSED (FINAL) | |
| 11/11/2024 09:00 AM | 151 | Law Day Docket | ATTORNEYS FEES (MOTION FOR) | Re-Set | RESETTING TO 11/18/24 AT 3:30PM | FIELDING, JEREMY |
| 11/18/2024 03:30 PM | 151 | Law Day Docket | ATTORNEYS FEES (MOTION FOR) | Granted In Part | OS 12/9/24 | FIELDING, JEREMY |
| 12/05/2024 02:00 PM | 151 | Law Day Docket | STATUS CONFERENCE (MOTION FOR) | Hearing Held | | FIELDING, JEREMY |
| 2/12/2025 11:30 AM | 151 | Law Day Docket | NEW TRIAL (MOTION FOR) | Denied | | HALEPOTA, SHAHMEER |
| 5/07/2025 10:00 AM | 151 | Law Day Docket | NEW TRIAL (MOTION FOR) | Granted In Part | | FIELDING, JEREMY |

## DOCUMENTS

| Number | Document | Post Jdgm | Date | Pgs |
|---|---|---|---|---|
| 120873907 | Letter to Judge Hughes on Complying with Rule 298 | | 06/03/2025 | 3 |
| 120876818 | Defendant Sparebox Self Storage, LLC's Proposed Findings of Fact and Conclusions of Law on its Motion for Entry of an Attorney's Fee Award | | 06/03/2025 | 15 |
| 120663285 | Plaintiff's Request For Findings Of Fact And Conclusions Of Law | | 05/21/2025 | 4 |
| 120684645 | ORD SIGNED GRANTING FINDINGS OF FACT/CONCLUSIONS OF LAW | | 05/21/2025 | 1 |
| 120473530 | ORDER SIGNED AWARDING ATTORNEY FEES | | 05/09/2025 | 1 |
| 120414310 | [Proposed] Order Granting Defendant Sparebox Self Storage, Llcs Motion For Entry Of An Attorneys Fees Award | | 05/07/2025 | 3 |
| 120421265 | Proposed Order On Defendant Sparebox Self Storage, Llcs Motion For Entry Of An Attorneys Fees Award | | 05/07/2025 | 1 |
| 120363673 | Plaintiff's Supplemental Declaration of Kelsi Stayart White | | 05/05/2025 | 8 |
| 120384347 | Defendant Sparebox Self Storage, LLC's Supplemental Brief in Support of Motion for Entry of Attorney's Fees Award | | 05/05/2025 | 10 |
| ·> 120384348 | Exhibit 1 | | 05/05/2025 | 28 |
| ·> 120384349 | Exhibit 2 | | 05/05/2025 | 3 |
| 119065905 | 151 Notice of Hearing (In-Person) | | 02/20/2025 | 1 |
| 119106678 | Joint Notice of Hearing | | 02/20/2025 | 5 |
| 118950863 | ORDER GRANTING MOTION FOR NEW TRIAL IN PART SIGNED SEE ORDR | | 02/13/2025 | 1 |
| | ORDER SIGNED SETTING ASIDE ORDER | | 02/13/2025 | |

CAUSE NO. 2022-71323

| | | |
|---|---|---|
| CAPITAL STORAGE HOLDINGS LLC | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| SPAREBOX SELF STORAGE, LLC | § | |
| | § | |
| *Defendant*. | § | 151st JUDICIAL DISTRICT |

## Third Amended Petition

Plaintiff Capital Storage Holdings LLC makes the following allegations against Defendant SpareBox Self Storage, LLC:

### Parties

1. Capital Storage Holdings LLC ("Capital Storage") is a Delaware limited liability company with its principal place of business in Houston, Texas.

2. SpareBox Self Storage, LLC ("SpareBox") is a Delaware limited liability company with its principal place of business in Denver, Colorado.

### Discovery Level and Rule 47 Statement

3. Capital Storage requests that this case be treated as a Level 2 case (TEX. R. CIV. P. 190.3) for discovery purposes.

4. Pursuant to Rule 47, Capital Storage states that it seeks monetary relief that exceeds $1,000,000 and that the maximum amount claimed is $240,000,000 exclusive of costs, expenses, interest, and attorneys' fees.

### Jurisdiction and Venue

5. Jurisdiction is proper because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

1

6. Venue is proper against SpareBox because Section 17.8 of the signed Purchase and Sale Agreement ("Agreement") that is the basis of Capital Storage's claims against SpareBox provides for exclusive venue in the state courts of Harris County, Texas:

> THIS AGREEMENT WILL BE CONSTRUED, PERFORMED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. THE PARTIES AGREE THAT ANY ACTION IN CONNECTION WITH THIS AGREEMENT SHALL BE BROUGHT AND MAINTAINED IN THE STATE COURTS IN HARRIS COUNTY, TEXAS, AND THE PARTIES HEREBY CONSENT AND AGREE TO THE JURISDICTION OF SUCH COURTS.

7. Because the parties agreed that the state courts of Harris County, Texas are the exclusive venue for "any action in connection with this agreement," this case is not removable to federal court.

8. In addition, four of the self-storage businesses that SpareBox contracted to purchase from Capital Storage are located in Harris County, Texas.

9. In addition, the Agreement constitutes a "major transaction" under TEX. CIV. PRAC. REM. C. § 15.020 because it is evidenced by a written agreement under which SpareBox is obligated to pay and Capital Storage is entitled to receive consideration with an aggregate stated value equal to or greater than $1 million. As described above, the parties to the "major transaction" at issue agreed in writing that a suit arising from the transaction shall be brought in Harris County, Texas. As a result, this action is subject to "Mandatory Venue" under Subchapter B of Section 15 of the Texas Civil Practice and Remedies Code. Because Capital Storage's claims arise from the same transaction, occurrence, or series of transactions or occurrences, and at least one of the claims is governed by the mandatory venue provisions of Subchapter B, the mandatory venue provisions apply to all claims in this suit. TEX. CIV. PRAC. REM. C. § 15.004.

Waiver of Jury Trial

10. The parties to the Agreement waived their right to jury trial under Section 17.14: "THE PARTIES HERETO KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT AND AGREE THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY."

Facts

Capital Storage Marketed Its Self-Storage Businesses for Sale to Potential Buyers**.**

11. Capital Storage owns self-storage businesses across the country. These self-storage businesses typically rent storage units to tenants, including individuals and businesses. The tenants pay fees to the self-storage business in exchange for a secure space to store items and possessions.

12. In late 2021 and early 2022, Capital Storage began exploring a potential sale of twenty-two of its self-storage businesses located in Texas, Florida, and Oklahoma. In January 2022, Capital Storage entered into a listing agreement with Cushman & Wakefield ("Cushman"), whereby Cushman would engage in a sophisticated marketing process of Capital Storage's self-storage businesses to potential buyers. Cushman led the bidding and marketing process, and Capital Storage received the final round of letters of intent from interested buyers on March 25, 2022. Numerous potential buyers submitted letters of intent with competitive deal terms.

SpareBox Submitted a Letter of Intent Touting Its "Dedicated Equity and a Committed Debt Facility" and Ability to Close Quickly.

13. SpareBox submitted a letter of intent to Capital Storage. On its website, SpareBox holds itself out as "[s]ponsored by Rizk Ventures and led by industry veterans Steve Treadwell and Chuck James."

3

14. SpareBox knew that Capital Storage would be selecting from among several competitive offers submitted by capable buyers. As a result, SpareBox not only offered compelling deal terms—purchase price and closing deadline—but also included information and arguments to persuade and convince Capital Storage to select SpareBox instead of the competing bidders.

15. SpareBox's March 25 letter of intent offered $321,000,000 for Capital Storage's self-storage businesses, with closing taking place no more than thirty days after the end of the inspection period. In its offer, SpareBox boasted that "SpareBox is the best buyer" for Capital Storage's businesses because "[w]e have dedicated equity and a committed debt facility that allows us to move quickly with acquisitions."

16. SpareBox's financial representations were, unsurprisingly, extremely important (and enticing) to Capital Storage from a seller's perspective. SpareBox represented that SpareBox had control of an undisclosed amount of cash to use in the transaction (i.e., "[w]e [SpareBox] have dedicated equity") and that SpareBox controlled a "committed debt facility" of "$500 million," which was more than 1.5 times the entire proposed purchase price. And Capital Storage was obviously very interested in the benefit that SpareBox touted from its "dedicated equity" and "committed debt facility": that SpareBox could "move quickly with acquisitions."

17. SpareBox's offer letter went on to describe SpareBox's "sponsor"—Rizk Ventures—and its track record. SpareBox also noted that "SpareBox has acquired all of its assets with the same equity and debt source," again emphasizing its committed financing for the Capital Storage deal. Indeed, SpareBox noted it "has a $500 million acquisition facility through JP Morgan" that would be utilized to fund the deal. The offer letter made a single passing reference to an investor in SpareBox—"SpareBox was founded in August of 2020 via joint venture between Rizk Ventures,

4

SpareBox's sponsor, and a multi-billion-dollar asset manager"—but otherwise focused exclusively on Rizk Ventures and SpareBox's management team.

18. And to avoid any doubt about the deal closing, SpareBox described its history of acquisitions: "Combined, SpareBox's team has acquired over a thousand self-storage properties, and together at SpareBox, the team has acquired over one hundred properties. To date, SpareBox has yet to have a failed deal or a re-trade of a seller."

19. Further emphasizing the import of the SpareBox "management team" as the decisionmakers and leaders of the proposed deal, SpareBox claimed that "SpareBox's management team has significant economic upside in the performance of its properties, and hence, is committed to thoughtfully managing its properties."

20. As part of its buyer selection process, Capital Storage performed its diligence on SpareBox, the SpareBox decisionmakers and "management team" identified in its letter of intent—Chief Executive Officer Steve Treadwell, Chief Financial Officer and Chief Investment Officer Kate Matheny, and Chief Operating Officer Chuck James—as well as SpareBox's "sponsor" Rizk Ventures and its founder and Chief Executive Officer Thomas Rizk. Unsurprisingly, Capital Storage performed no due diligence on the "multi-billion-dollar asset manager" mentioned in passing in SpareBox's letter: the identity of this "asset manager" was not disclosed to Capital Storage, and SpareBox's representations to Capital Storage were clear regarding SpareBox's ability to act, SpareBox's available financing, and the identity of the SpareBox decisionmakers.

21. Specifically, and further confirming SpareBox's representations regarding the identity of its decisionmakers, Capital Storage requested a standard buyer interview with SpareBox's proffered decisionmakers. That call was held on March 29, 2022, with SpareBox being represented by Steve Treadwell, Kate Matheny, and Thomas Rizk. As is typical in a buyer interview, Capital

Unofficial Copy Office of Marilyn Burgess District Clerk

Storage's Steven Stein asked SpareBox about the financing it uses to close deals, the executive team's biographies and experience, and the decisionmakers' relative roles regarding SpareBox's transactions. Among other things, SpareBox responded that their way of closing was to use its committed financing line with JP Morgan and later transition from the revolver to permanent financing. The SpareBox call participants were represented to be in complete control of the counterparty to the transaction.

22. On March 29, 2022, Capital Storage requested that SpareBox submit another letter of intent at $323,000,000, which SpareBox did on March 30, 2022.

Capital Storage Chose SpareBox and the Parties Signed the Purchase and Sale Agreement.

23. SpareBox's attempts to persuade Capital Storage were successful: The combination of the deal terms offered by SpareBox along with its arguments and representations regarding its "dedicated equity" and "committed debt facility" and the experience of SpareBox's decisionmakers led Capital Storage to select SpareBox's offer instead of the other potential buyers' offers, including a competing offer at very close to the same price ($321 million).

24. SpareBox and JP Morgan—the provider of SpareBox's "committed" "$500 million acquisition facility"—performed their buyer-side due diligence by inspecting the books, records, and properties of the twenty-two self-storage businesses being sold by Capital Storage. During this time, SpareBox and Capital Storage continued to negotiate a final purchase and sale agreement to govern SpareBox's purchase of Capital Storage's self-storage businesses. During those negotiations, Capital Storage negotiated with the SpareBox management team identified in SpareBox's letter of intent.

25. One negotiated aspect of the purchase and sale agreement was remedies for default. In its letter of intent, which it used to secure binding exclusivity with respect to the transaction, SpareBox proposed that Capital Storage would receive a $10,000,000 deposit as liquidated

damages if SpareBox defaulted by failing to close. Believing that this amount would be adequate security for the counterparty and failure-to-close risk, Capital Storage signed the letter of intent and granted exclusivity to SpareBox. The $10,000,000 deposit was an agreed default remedy until May 10, 2022. On that day, SpareBox Chief Executive Officer Steve Treadwell and Chief Financial and Investment Officer Kate Matheny called Capital Storage's President, Steven Stein. SpareBox's executives told Mr. Stein that SpareBox could not get the necessary approvals from its investors, including the "multi-billion-dollar asset manager" later revealed to be Davidson Kempner Capital Management LP ("Davidson Kempner"), to move forward with the deal unless Capital Storage agreed to reduce the agreed-upon $10,000,000 deposit amount. Mr. Treadwell specified on that call that SpareBox's equity sponsors would authorize SpareBox to move forward with the deal with full authority to close if Capital Storage agreed to reduce the deposit that would be available to Capital Storage upon a failure to close by SpareBox. Relying on those representations from SpareBox, especially (but not only) the assurances that SpareBox would have full authority to *close* the transaction without needing further approvals, Mr. Stein re-negotiated the previously agreed-to deposit amount, reducing it to $3,000,000 in a draft purchase and sale agreement delivered on May 13, 2022.

26. In getting Capital Storage to agree to reduce the deposit, SpareBox falsely assured Capital Storage that SpareBox had received final and unequivocal approval from all necessary parties to enter into the Agreement and close the transaction and complete the sale — and thus was Capital Storage's true counterparty, one ready, willing, and able to close. In reliance on SpareBox's false representations of fact, and believing it could properly assess its counterparty risk, Capital Storage agreed to a reduced $3,000,000 deposit that could serve as liquidated damages for SpareBox's failure to close. If SpareBox had not falsely represented to Capital Storage that it had all the

necessary financing and final and unequivocal approvals to close the transaction — namely, if SpareBox had not falsely presented itself as Capital Storage's sole and serious counterparty — Capital Storage would not have accepted any deposit less than $10,000,000 as liquidated damages for SpareBox's failure to close. Indeed, if SpareBox had been truthful about the actual counterparties and the continuing ability of a non-contractual party to control SpareBox and its abilities to perform under the parties' contract, Capital Storage would have done additional diligence into the actual counterparties, weighed the very different risk profile than what had been presented, and likely moved onto one of the other interested bidders at a similar or identical price to SpareBox's offer.

27. As the parties finalized the terms of the Agreement, SpareBox's Chief Financial and Investment Officer Kate Matheny told Capital Storage on May 14, 2022 that SpareBox would need both its sponsor (Rizk Ventures) and its investor (Davidson Kempner) to formally approve the PSA to SpareBox before execution: "Rizk [Ventures] is signed off on your PSA and I've been tracking down DK [Davidson Kempner] for their sign off." Both prior to execution and, as described below, in the Agreement itself, SpareBox represented to Capital Storage that it had obtained final and unequivocal approval from all of the necessary parties for SpareBox to execute and perform the agreement. And Capital Storage understood that those approvals were obtained by Capital Storage's agreement to reduce the deposit amount, as described above.

28. Capital Storage and SpareBox each executed the Agreement, with an effective date of May 17, 2022. Specifically, Capital Storage was bound to the Agreement by its managing member, Capital Storage Partners LLC; and SpareBox was bound to the Agreement by its managing member, Rizk Ventures Self Storage, LLC. In exchange for SpareBox's purchase price of

$323,000,000, Capital Storage agreed to sell to SpareBox all of the issued and outstanding membership interests in twenty-two self-storage businesses:

- 51st STORAGE LLC, a Delaware limited liability company;

- 71st STORAGE LLC, a Delaware limited liability company;

- DESSAU STORAGE LLC, a Delaware limited liability company;

- DOLLAR STORAGE LLC, a Delaware limited liability company;

- EAGLE'S NEST STORAGE LLC, a Delaware limited liability company;

- FM1460 STORAGE LLC, a Delaware limited liability company;

- FM2978 STORAGE LLC, a Delaware limited liability company;

- FM471 STORAGE LLC, a Delaware limited liability company;

- FULTON STORAGE LLC, a Delaware limited liability company;

- GATLIN STORAGE LLC, a Delaware limited liability company;

- HWY41 STORAGE LLC, a Delaware limited liability company;

- HWY66 STORAGE LLC, a Delaware limited liability company;

- JUNCTION STORAGE LLC, a Delaware limited liability company;

- LITTLE YORK STORAGE LLC, a Delaware limited liability company;

- MCHARD STORAGE LLC, a Delaware limited liability company;

- N MAIN STORAGE LLC, a Delaware limited liability company;

- NW FREEWAY STORAGE LLC, a Delaware limited liability company;

- NW27 STORAGE LLC, a Delaware limited liability company;

- SABO STORAGE LLC, a Delaware limited liability company;

- SHELL STORAGE LLC, a Delaware limited liability company;

- SUMMERFIELD STORAGE LLC, a Delaware limited liability company; and

Unofficial Copy Office of Marilyn Burgess District Clerk

9

- WALZEM STORAGE LLC, a Delaware limited liability company.

29. In Section 8.1, Capital Storage made twenty-six detailed representations and warranties regarding each of the self-storage businesses that it was selling to SpareBox.

30. In Section 8.2, SpareBox made just six representations and warranties to Capital Storage.

31. In Section 8.2(b) ("Authority"), SpareBox represented and warranted to Capital Storage that "The execution and delivery of this Agreement and the performance of Purchaser's obligations hereunder have been (or shall be as of the Closing) *duly authorized by all necessary action* on the part of the Purchaser and *this Agreement constitutes the legal, valid and binding obligation of Purchaser*, *enforceable against Purchaser* in accordance with its terms, except as such enforceability may be limited by general equitable principles and principles governing creditors' rights generally. To Purchaser's knowledge, *no authorization, consent, or approval of any Authority or any other person or entity is required for* the execution and delivery by Purchaser of this Agreement or *the performance of its obligations* hereunder." (emphases added).

32. Similarly, in Section 8.2(e) ("Consents"), SpareBox represented to Capital Storage that "*No consent, waiver, approval or authorization is required from any person or entity* (that has not already been obtained) *in connection with the execution and delivery of this Agreement* by Purchaser *or*, subject to Section 5.4 [Inspection Period], *the performance by Purchaser* of the transactions contemplated hereby." (emphases added). SpareBox's valid and binding representations were consistent with what Capital Storage had previously been told: *all necessary approvals had been obtained from Rizk Ventures and Davidson Kempner.*

On the Eve of Closing, SpareBox Told Capital Storage that It Would Not Close the Deal Because SpareBox's Investor—Davidson Kempner—No Longer Liked the Terms.

33. Closing under the Agreement was set to occur on Monday, July 18, 2022. Both parties appeared to be heading towards the Closing without issue. Capital Storage took numerous steps

Unofficial Copy Office of Marilyn Burgess District Clerk

in reliance on the parties' agreement to have the self-storage businesses ready to transfer at Closing to SpareBox, including terminating certain management agreements and making disruptive personnel and operational adjustments. And SpareBox continued to assure Capital Storage that not only was SpareBox prepared for Closing by accessing its dedicated and committed financing but that its enthusiasm for the deal had only grown as Closing approached.

34. But on the eve of Closing, SpareBox indicated for the first time that it would not close the transaction as the parties had agreed. Less than 24 hours before the scheduled Closing, SpareBox informed Cushman that its "95% outside investor" would be having a special investment committee meeting at which this investor was expected to rescind approval of the deal and prevent SpareBox from performing the Closing.

35. On July 18, SpareBox failed to show at Closing and went silent. That evening, Steven Stein, the President of Capital Storage's managing member, emailed SpareBox's Chief Financial and Investment Officer, Kate Matheny (the "Purchaser's Representative" under the Agreement): "Hi Kate, What's going on?"

36. SpareBox's CFO responded that same night: "I'm trying to figure it out myself. I was out of the country last week and things seemed to have gone totally sideways while I was gone." Matheny then explained: "Our 95% investor [Davidson Kempner] is struggling with our debt terms as it relates to our going in cap rate." Matheny described the self-storage businesses as "killing it" (i.e., doing extremely well). But despite that fact, Matheny stated that "they [Davidson Kempner] believe the debt pricing has changed so much that *we could be overpaying*." (emphasis added). Matheny claimed that SpareBox was working with JP Morgan—the provider of SpareBox's oft-touted "$500 million acquisition facility"—"on different ideas to bring down the costs/spread" and

11

that Davidson Kempner was somehow intervening to "elevate things at JPM today in hopes of getting these terms settled" for SpareBox.

37. After the agreed-upon Closing deadline had lapsed – in breach of the Agreement – Capital Storage learned that Davidson Kempner's investment committee held a meeting the morning of July 18 and voted against allowing SpareBox to proceed with the required Closing under the Agreement. Upon information and belief, SpareBox followed Davidson Kempner's command and did not close the transaction despite the parties' previous agreement.

38. Capital Storage did not understand how Davidson Kempner—which was (1) not a party to the Agreement; (2) not the "sponsor" of SpareBox, which was and is held out to be Rizk Ventures; (3) not the "managing member" of SpareBox, which was and is held out to be Rizk Ventures; (4) not one of the parties that negotiated with Capital Storage; and (5) not granted the right or ability to interfere with SpareBox's promises and obligations—could prevent SpareBox from closing a deal that SpareBox had entered into and whose own executives insisted that they still wanted to close. Capital Storage's confusion at Davidson Kempner's veto was compounded by the fact that SpareBox had represented—both prior to the execution of the Agreement and expressly in the Agreement itself—that it had already obtained all required consents and approvals to close the parties' transaction.

39. In the wake of July 18, the parties entered a stalemate, with SpareBox providing little information to Capital Storage other than that SpareBox was at the whim of its "investor" and was not being allowed to close. Finally, on July 22, 2022, Capital Storage instructed its counsel to send a letter to SpareBox stating that Capital Storage expected SpareBox to stand by its agreement and close the deal, outlining the potential consequences to SpareBox and Davidson Kempner for

12

not closing the deal, and requesting confirmation by 5:00pm on July 26, 2022 that SpareBox intended to proceed with the transaction.

40. July 26 came and went with no response from SpareBox. Finally, on July 28, 2022, Capital Storage received a letter from counsel for SpareBox. This letter was striking for numerous reasons, including: (1) SpareBox claiming that its CFO's representations in writing to Capital Storage on July 18 regarding its "investor's" struggles with the debt terms and belief that SpareBox would be overpaying—quoted verbatim from the email—were not true; (2) SpareBox claiming that its prior representations that SpareBox wanted to close the transaction but that it was being prevented from doing so by Davidson Kempner were entirely false; (3) SpareBox claiming that "[b]efore closing, however, SpareBox itself decided not to close the transaction" despite all prior representations to the contrary; (4) SpareBox claiming that it still has all consents and approvals necessary to close the transaction, despite Davidson Kempner's veto being the precise stated reason for its failure to close; (5) SpareBox now reframing Davidson Kempner's involvement in killing the deal as limited and indirect, namely: "[a] Davidson Kempner affiliated entity owns 95% of SpareBox and, accordingly, has the right to appoint a majority of directors of SpareBox's board"; and (6) threatening that SpareBox will counterclaim "numerous breaches of the parties' Agreement" by Capital Storage, which were all based on patently false and verifiably incorrect allegations.

41. Following receipt of SpareBox's letter, the parties' inability to resolve this dispute through commercial negotiations, and SpareBox's continued refusal to abide by the clear terms of the Purchase and Sale Agreement that the parties signed, Capital Storage was left with no choice but to protect its rights through litigation.

42. All conditions precedent have been performed or have occurred.

13

Claims

Count One: Fraudulent Inducement and Fraud

43. Capital Storage re-alleges and incorporates by reference the allegations set forth above.

44. SpareBox made material misrepresentations to Capital Storage in order to induce Capital Storage to sign the Agreement. And SpareBox continued to make material misrepresentations after signing the Agreement. Among other things, SpareBox represented that its performance under the Agreement had been duly authorized; that SpareBox needed no additional authorization, consent, or approval or any other person or entity to perform its obligations under the Agreement; and that SpareBox did not need to obtain any consent, waiver, approval, or authorization (that had not already been received) from any person or entity to perform the transactions contemplated by the Agreement. SpareBox also misrepresented its financing and the role that Davidson Kempner plays in SpareBox's decision-making, control, and ability to act. As part of getting Capital Storage to enter into the Agreement, SpareBox misrepresented itself as the sole and serious counterparty to Capital Storage in the transaction under the Agreement.

45. SpareBox's misrepresentations were made with knowledge of their falsity.

46. SpareBox made its misrepresentations with the intention that Capital Storage should rely on or act upon the misrepresentations.

47. Capital Storage relied on SpareBox's misrepresentations, including but not limited to initially selecting SpareBox's offer from the other competitive bids; continuing to negotiate with SpareBox exclusively rather than re-engaging with other competitive bidders; entering into the Agreement with SpareBox; negotiating and including certain terms in the agreement with SpareBox (including but not limited to the amount of SpareBox's deposit under Section 4.1,

14

Section 13.1, Section 13.2, Section 13.3, and Section 17.13); and Capital Storage's own substantial performance under the Agreement.

48. Capital Storage entered into a binding agreement—the Purchase and Sale Agreement—based on SpareBox's misrepresentations.

49. SpareBox continued its misrepresentations throughout Capital Storage's performance under the Agreement, including that SpareBox had the authority and ability to perform the Closing, that SpareBox had access to sufficient financing to perform the Closing, and that SpareBox intended to perform the Closing.

50. Capital Storage performed under the Agreement based on these continued misrepresentations.

51. Capital Storage has been damaged by SpareBox's misrepresentations.

<div align="center">Count Two: Declaratory Judgment</div>

52. Capital Storage re-alleges and incorporates by reference the allegations set forth above.

53. As described above, SpareBox committed fraud specifically targeted towards the Agreement's liquidated damages provision in Section 13.2 and its amount in Section 4.1.

54. The liquidated damages provision in the Agreement was the result of fraud.

55. Capital Storage seeks a Declaratory Judgment that the liquidated damages provision in the Agreement was the result of fraud and that, as a result, SpareBox cannot rely on or enforce the liquidated damages provision (including Section 13.2 and its amount in Section 4.1) against Capital Storage.

<div align="center">Count Three: Breach of Contract</div>

52. Capital Storage re-alleges and incorporates by reference the allegations set forth above.

53. Capital Storage and SpareBox entered into a valid, enforceable Agreement.

<div align="center">15</div>

Unofficial Copy Office of Marilyn Burgess District Clerk

54. Capital Storage has honored the terms of and has fully performed its obligations under the Agreement from the date of execution through the present day.

55. SpareBox breached its contractual obligations to Capital Storage by failing to perform the Closing (in Schedule 1.1, defined as "the consummation of the purchase and sale of the Acquired Interests contemplated by this Agreement, as provided for in Article X."), including but not limited to SpareBox's obligation to pay $323,000,000 for Capital Storage's twenty-two self-storage businesses.

56. SpareBox's representations and warranties in Sections 8.2(b) and 8.2(e) were false. The performance of SpareBox's obligations was not "duly authorized," and SpareBox required the "authorization, consent, or approval" of another person or entity to perform its obligations. Similarly, SpareBox required the "consent, waiver, approval or authorization" from another person or entity to perform the transactions contemplated by the Agreement, including but not limited to the Closing.

57. Capital Storage has been damaged by SpareBox's failure to perform the Closing as required by the Agreement and SpareBox's breach of its representations and warranties.

58. Capital Storage acknowledges that this Court has held that Section 13.2 contains a liquidated damages provision that forecloses a breach a of contract claim. However, as described above, Capital Storage seeks a Declaratory Judgment that the liquidated damages provision was the result of fraud and cannot, therefore, be enforced or relied upon by SpareBox. Capital Storage's breach of contract claim is premised upon the liquidated damages provision being found to be the result of fraud.

16

Attorney's Fees/Court Costs

59. Capital Storage has been required to retain Susman Godfrey, LLP and Adam Locke to pursue its claims against the defendants in this lawsuit. Accordingly, and pursuant to Chapters 37 and 38 of the Civil Practice & Remedies Code, Section 17.2 of the Agreement, and any other applicable statutes and common law, Capital Storage requests an award of its reasonable attorneys' fees, expenses, and costs of court.

Prayer For Relief

60. WHEREFORE, PREMISES CONSIDERED, Capital Storage prays that SpareBox be cited to answer and appear and that upon final hearing, Capital Storage have and recover judgment against SpareBox for:

- Actual damages;

- A declaratory judgment that the liquidated damages provision in the Agreement was the result of fraud and that, as a result, SpareBox cannot rely on or enforce the liquidated damages provision (including Section 13.2 and its amount in Section 4.1) against Capital Storage;

- Pre-judgment interest at the highest, lawful rate;

- Post-judgment interest at the highest, lawful rate;

- Court costs;

- Reasonable attorneys' fees and expenses; and

- All other relief to which it may show itself entitled under law or equity.

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By:   /s/ David M. Peterson
      Eric J. Mayer
      State Bar No. 13274675
      Shawn L. Raymond
      State Bar No. 24009236

17

Unofficial Copy Office of Marilyn Burgess District Clerk

David M. Peterson
State Bar No. 24056123
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 653-7873
Fax:  (713) 654-6666
dpeterson@susmangodfrey.com

Adam T. Locke
State Bar No. 24083184
2617 Bissonnet Street, Ste. 503
Houston, Texas 77005
Telephone:  (713) 832-0243
Fax:  (713) 565-4709
adam@adamlockelaw.com

Attorneys for Plaintiff Capital Storage Holdings
LLC

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 2, 2023 a true and correct copy of the above and foregoing instrument was properly forwarded to all counsel of record through e-filing in accordance with Rule 21 of the Texas Rules of Civil Procedure.

<div align="right">

*/s/* David M. Peterson
David M. Peterson

</div>

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Michael Leone on behalf of David Peterson
Bar No. 24056123
mleone@susmangodfrey.com
Envelope ID: 80169452
Filing Code Description: Amended Filing
Filing Description: Third Amended Petition
Status as of 10/3/2023 8:28 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Eric JMayer | | emayer@susmangodfrey.com | 10/2/2023 5:17:53 PM | SENT |
| Shawn Raymond | | sraymond@susmangodfrey.com | 10/2/2023 5:17:53 PM | SENT |
| David Peterson | | dpeterson@susmangodfrey.com | 10/2/2023 5:17:53 PM | SENT |
| Michael ALeone | | mleone@susmangodfrey.com | 10/2/2023 5:17:53 PM | SENT |
| Karyn Cooper | | karyn.cooper@kirkland.com | 10/2/2023 5:17:53 PM | SENT |
| Deborah Newman | | deborahnewman@quinnemanuel.com | 10/2/2023 5:17:53 PM | SENT |
| Benjamin Finestone | | benjaminfinestone@quinnemanuel.com | 10/2/2023 5:17:53 PM | SENT |
| Cameron Kelly | | cameronkelly@quinnemanuel.com | 10/2/2023 5:17:53 PM | SENT |
| Daniel Myerson | | danielmyerson@quinnemanuel.com | 10/2/2023 5:17:53 PM | SENT |
| Elise Miller | | elmiller@susmangodfrey.com | 10/2/2023 5:17:53 PM | SENT |
| Adam Locke | | adam@adamlockelaw.com | 10/2/2023 5:17:53 PM | SENT |
| Megan McGlynn | | megan.mcglynn@kirkland.com | 10/2/2023 5:17:53 PM | SENT |
| Judson Brown | | judson.brown@kirkland.com | 10/2/2023 5:17:53 PM | SENT |
| Jeremy Fielding | | jeremy.fielding@kirkland.com | 10/2/2023 5:17:53 PM | SENT |
| Aysha MSpencer | | aysha.spencer@kirkland.com | 10/2/2023 5:17:53 PM | SENT |
| Richie Simpson | | richie.simpson@kirkland.com | 10/2/2023 5:17:53 PM | SENT |
| Daniel Hopper | | danhopper@quinnemanuel.com | 10/2/2023 5:17:53 PM | ERROR |
| Rusty Edgington | | rustyedgington@quinnemanuel.com | 10/2/2023 5:17:53 PM | SENT |
| Christopher  Porter | | chrisporter@quinnemanuel.com | 10/2/2023 5:17:53 PM | SENT |

Unofficial Copy Office of Marilyn Burgess District Clerk

## CAUSE NO. 2022-71323

CAPITAL STORAGE HOLDINGS LLC,      §   IN THE DISTRICT COURT OF,

     *Plaintiff*,      §

         v.      §

SPAREBOX SELF STORAGE, LLC;      §
DAVIDSON KEMPNER CAPITAL      §
MANAGEMENT LP;      §   HARRIS COUNTY, TEXAS
DAVIDSON KEMPNER AFFILIATED      §
ENTITY 1; AND      §
THE DAVIDSON KEMPNER-APPOINTED      §
SPAREBOX BOARD MEMBERS,      §

     *Defendants*.      §

     §   151st JUDICIAL DISTRICT
     §

## **DEFENDANT SPAREBOX SELF STORAGE, LLC'S**
## **MOTION FOR TRADITIONAL SUMMARY JUDGMENT**

Copy from re:SearchTX

**TABLE OF CONTENTS**

**INTRODUCTION**...............................................................................................................1

**BACKGROUND** ...............................................................................................................2

**LEGAL STANDARD** .......................................................................................................3

**SUPPORTING EVIDENCE** ............................................................................................4

**ARGUMENT**....................................................................................................................4

**PRAYER**...........................................................................................................................8

Copy from re:SearchTX

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agar Corp., Inc. v. Electro Circuits Int'l, LLC*,
    580 S.W.3d 136 (Tex. 2019)................................................................................................5

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*,
    572 S.W.3d 213 (Tex. 2019)...........................................................................................7, 8

*Cohen v. Arthur Anderson, LLP*,
    106 S.W.3d 304 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ...................................3, 4, 7

*Debes v. Gen. Star Indem. Co.*,
    2014 WL 3384679 (Tex. App.—Beaumont July 10, 2014, no pet.)........................................3

*Gonzales v. American Title Co. of Houston*,
    104 S.W.3d 588 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)..................................4, 5

*Great Hans, LLC v. Liberty Bankers Life Ins. Co.*,
    2019 WL 1219110 (Tex. App.–Dallas Mar. 15, 2019, no pet.)..............................................8

*Int'l Bus. Machines Corp. v. Lufkin Indus., LLC*,
    573 S.W.3d 224 (Tex. 2019)................................................................................................4

*Munoz v. Safeco Ins. Co. of Indiana*,
    2016 WL 4898271 (N.D. Tex. Mar. 17, 2016) ......................................................................7

*North Presidio, LLC v. Lowe's Home Ctrs., LLC*,
    808 F. App'x 275 (5th Cir. 2020) .......................................................................................8

**Rules**

Tex. R. Civ. P. 166a....................................................................................................3, 4

Copy from re:SearchTX

**INTRODUCTION**

This is a straightforward contract dispute that can be resolved solely on the basis of an agreed limitation-of-liability provision in a Purchase and Sale Agreement (the "Agreement") between SpareBox Self Storage, LLC ("SpareBox") and Capital Storage Holdings LLC ("Capital Storage"). In the Agreement, the parties specifically agreed that Capital Storage's "sole and exclusive remedy" would be SpareBox's $3 million escrow deposit "in the event the Closing of the transaction provided for herein does not occur … by reason of any default of" SpareBox. Ex. 1-A, Agreement § 13.2. And the parties expressly "waive[d] any right to sue the other for incidental, special, exemplary, consequential, or punitive damages for matters arising under the Agreement." *Id.* § 13.3. Under Texas law, the Agreement provided SpareBox the option to close the transaction and purchase 22 self-storage businesses from Capital Storage, or not to close and forfeit its $3 million escrow deposit to Capital Storage. SpareBox ultimately opted not to close the transaction. Instead of claiming the negotiated remedy, however, Capital Storage sued SpareBox for breach, fraud, and conspiracy. And despite the agreed-upon damages cap and waivers in the Agreement, Capital Storage seeks its alleged benefit-of-the-bargain, consequential, and exemplary damages.

This Court dismissed Capital Storage's contract claims in light of the Agreement's sole-and-exclusive-remedy provision. Although the Court did not dismiss Capital Storage's fraud and conspiracy claims, the Court at that time was limited to the facts alleged in the petition and the parties' Agreement. SpareBox now seeks summary judgment based on undisputed evidence that it has unconditionally tendered the $3 million escrow deposit to Capital Storage. Accordingly, Capital Storage has access to the full amount the parties agreed would be its "sole and exclusive remedy" if the "Closing … does not occur." And under well-settled Texas law, the Agreement's

Copy from re:SearchTX

express terms bar Capital Storage from seeking any further damages for its fraud and conspiracy claims, including the benefit-of-the-bargain, consequential, and exemplary damages it requests.

## BACKGROUND

On May 18, 2022, the parties executed the Agreement, under which SpareBox put forward a $3 million deposit in exchange for the option to buy 22 of Capital Storage's self-storage businesses for $323 million. Ex. 1, Decl. of S. Treadwell, CEO, Rizk Ventures Self Storage, LLC ("Treadwell Decl.") ¶ 5-6. The Agreement set out each party's remedies in the event the sale did not close as a result of the other party's default. *See* Ex. 1-A, Agreement. Relevant here, § 4.1 of the Agreement required SpareBox to deposit $3 million in escrow with First American Title Insurance Company ("First American"). Section 13.2 then provided that if the closing did not occur:

> by reason of any default of Purchaser, and if such default is not cured within three (3) Business Days from written notice thereof from Seller to Purchaser, Seller may, *as Seller's sole and exclusive remedy, terminate this Agreement and receive the Deposit* as liquidated damages, and thereafter, Seller and Purchaser have no further rights or obligations hereunder, except with respect to the Termination Surviving Obligations.

*Id.* § 13.2 (emphasis added). SpareBox subsequently deposited $3 million with First American. Treadwell Decl. ¶ 8; *see also* Ex. 1-C, May 18, 2022 Receipt for Deposit.

The parties continued to perform their due diligence, but SpareBox ultimately decided not to close the deal. Treadwell Decl. ¶ 10. At that point, SpareBox forfeited its $3 million deposit. And to avoid any ambiguity, on February 20, 2023 SpareBox wrote to Capital Storage, copying the title company, First American, to "confirm" that, although Capital Storage had yet to claim the deposit, "the $3 million deposit is still in the escrow account at First American, … the deposit is available to [Capital Storage] to obtain at [its] convenience, and … SpareBox unequivocally

2

releases the full amount to [Capital Storage]." Ex. 1-B, Feb. 20, 2023 Letter from S. Treadwell to S. Stein, President, Capital Storage.

Instead of simply claiming the deposit it had negotiated as part of the Agreement, Capital Storage filed this lawsuit seeking additional remedies. As to SpareBox, Capital Storage alleged breach of contract (Count One); fraudulent inducement and fraud (Count Two); and fraud conspiracy (Count Six). Capital Storage also requested a declaratory judgment concerning the remedies available under the Agreement (Count Three).[1]

Based only on Capital Storage's petition and the parties' Agreement, this Court on January 31, 2023, dismissed Capital Storage's breach-of-contract and declaratory-judgment claims. *See* 1/31/2023 Order at 1. The Court permitted only the fraud and related conspiracy claims to proceed against SpareBox. At the time, the Court could not and did not consider evidence establishing that SpareBox had unequivocally relinquished any claim to its $3 million deposit.

## LEGAL STANDARD

Summary judgment is appropriate when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). A defendant can establish it is entitled to summary judgment by "disprov[ing] at least one element of the plaintiff's theory of recovery." *Debes v. Gen. Star Indem. Co.*, 2014 WL 3384679, at *2 (Tex. App.—Beaumont July 10, 2014, no pet.). "When a movant conclusively negates a necessary element of the nonmovant's claim, the nonmovant, to avoid summary judgment, must then introduce evidence

---

[1] Capital Storage also sued Davidson Kempner, SpareBox Investor, and SpareBox Board members Andrew Shore and Jigar Shah, alleging tortious interference (Count Four) and conspiracy to tortiously interfere (Count Five). On November 28, 2022, Davidson Kempner, SpareBox Investor, Shore, and Shah entered a special appearance contesting this Court's authority to exercise personal jurisdiction over them. *See* Defendants Davidson Kempner, SpareBox Investor, Andrew Shore, and Jigar Shah's Special Appearance and General Denial.

3

Copy from re:SearchTX

that raises a fact issue on the element the movant is trying to negate." *Cohen v. Arthur Anderson, LLP*, 106 S.W.3d 304, 306 (Tex. App.—Houston [1st Dist.] 2003, no pet.). "If the nonmovant fails to introduce such evidence, *i.e.*, if the summary judgment evidence establishes that there are no genuine issues of material fact, then summary judgment is proper." *Id.*

## SUPPORTING EVIDENCE

Pursuant to Texas Rule of Civil Procedure 166a(d), SpareBox gives notice of its intent to use the following evidence in support of its motion for summary judgment. Attached to this motion are:

- Exhibit 1: Declaration of Steve Treadwell, CEO, Rizk Ventures Self Storage, LLC

- Exhibit 1-A: May 2022 Purchase and Sale Agreement, attached to Treadwell Declaration as Exhibit A.

- Exhibit 1-B: May 18, 2022 Receipt for Deposit, attached to Treadwell Declaration as Exhibit B.

- Exhibit 1-C: Letter from Steve Treadwell, CEO, Rizk Ventures Self Storage, to Steven Stein, President, Capital Storage (Feb. 20, 2023), attached to Treadwell Declaration as Exhibit C.

- Exhibit 1-D: February 3, 2023 First American File Balance Sheet, attached to Treadwell Declaration as Exhibit D.

- Exhibit 2: Capital Storage's Initial Disclosures

## ARGUMENT

SpareBox is entitled to summary judgment on its tort claims—for fraud and conspiracy—because Capital Storage cannot establish it suffered any injury. To establish its fraud claim, Capital Storage must prove*, inter alia*, that SpareBox's alleged misrepresentations "caused injury." *Int'l Bus. Machines Corp. v. Lufkin Indus.*, *LLC*, 573 S.W.3d 224, 228 (Tex. 2019). Capital Storage's conspiracy claim turns on a similar showing because "civil conspiracy is a derivative action premised on an underlying tort." *Gonzales v. American Title Co. of Houston*, 104 S.W.3d 588, 594 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *see also id.* ("The borrowers' failure

4

Copy from re:SearchTX

to offer summary judgment evidence of any underlying tort … causes their claim of conspiracy to fail."); *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019) ("Civil conspiracy requires an underlying tort that has caused damages."). In short, both of Capital Storage's remaining claims against SpareBox require it to prove damages. Capital Storage, however, cannot make that showing. SpareBox has already tendered to Capital Storage its maximum possible remedy under the Agreement: the $3 million escrow deposit.

The Agreement expressly limits Capital Storage to recovering only SpareBox's deposit. Section 13.2 provides that the deposit is Capital Storage's "sole and exclusive remedy" "[i]n the event the Closing of the transaction provided for herein does not occur as herein provided by reason of any default" by SpareBox. And § 13.3 bars both parties from seeking "incidental, special, exemplary, consequential or punitive damages for matters arising under this Agreement." These provisions limit Capital Storage's recovery, including for the fraud and conspiracy claims it has pled, to the escrow deposit that SpareBox has tendered to Capital Storage.

Through these tort claims, Capital Storage unquestionably seeks benefit-of-the-bargain and consequential damages that allegedly arise because "the Closing of the transaction provided for herein d[id] not occur" due to SpareBox's "default"—*i.e.*, its failure to close in accordance with the provisions in Article X. Ex. 1-A, Agreement § 13.2. Capital Storage's petition makes this plain. It alleges that SpareBox represented that "SpareBox had the authority and ability *to perform the Closing*, that SpareBox had access to sufficient financing *to perform the Closing*, and that SpareBox intended *to perform the Closing*." Pet. ¶ 54 (emphases added). And the prayer for relief seeks actual and exemplary damages resulting from SpareBox's failure to close and, alternatively, specific performance of the Agreement. *See id.* ¶ 81. In short, Capital Storage's tort claims derive

Copy from re:SearchTX

from the Agreement and SpareBox's failure to close—which is why Capital Storage tellingly seeks in tort the same contract damages it sought for SpareBox's failure to close.

Capital Storage's initial disclosures—served after this Court's decision dismissing the contract claims—confirm its chosen remedy is based on SpareBox's failure to close. Those disclosures make clear that Capital Storage's tort claims and dismissed contract claims rely on the very same theory of harm: that Capital Storage suffered injury because "SpareBox failed to perform Closing." Ex. 2, Capital Storage's Initial Disclosures, at 3. In those disclosures, Capital Storage identified two "amounts and methods of calculating economic damages" for its fraud and conspiracy claims against SpareBox. The first "method" seeks benefit-of-the-bargain damages for "SpareBox's fail[ure] to perform Closing"—specifically, the alleged $50 million difference between the Agreement price and the alleged market value of the self-storage businesses "at the time that SpareBox failed to perform Closing." *Id.* The second "method" seeks $74 million in consequential damages representing the difference between the alleged market value of the self-storage businesses at present and the alleged purchase price Capital Storage "would have" obtained from "other buyers" had Capital Storage known SpareBox's representation regarding their "authority and ability to perform the closing" were, according to Capital Storage, false. *Id.*; Pet. ¶ 54.

Capital Storage's "methods and amounts" of tort damages sought are prohibited by the Agreement. They exceed the agreed $3 million escrow deposit that § 13.2 mandates is the cap on Capital Storage's recovery "in the event the Closing of the transaction … does not occur." Ex 1-A, Agreement § 13.2. And they run afoul of § 13.3's express prohibition on exemplary and consequential damages. *Id.* § 13.3. The undisputed evidence confirms that SpareBox has made the $3 million escrow deposit, SpareBox has unequivocally relinquished any claim to that deposit,

6

Copy from re:SearchTX

and the deposit is available to Capital Storage whenever it chooses to obtain those funds. *See* Ex. 1-B, Feb. 20, 2023 Letter from S. Treadwell to S. Stein. As a result, Capital Storage cannot establish any injury that entitles it to damages beyond the amount it may already claim in the form of SpareBox's deposit. *See, e.g.*, *Munoz v. Safeco Ins. Co. of Indiana*, 2016 WL 4898271, at \*2 (N.D. Tex. Mar. 17, 2016) (granting summary judgment, in part because certain claims were not "actionable as a matter of law" where the plaintiff could not establish damages beyond amount that had already been satisfied). SpareBox, therefore, is entitled to summary judgment. *See also Cohen*, 106 S.W.3d at 307 (summary judgment appropriate where there was no fact issue "as to the existence and amount of damages … incurred with respect to the fraud claim").

It is no answer to argue that a contractual limitation-of-liability provision cannot limit tort liability. Texas courts recognize that such provisions limit claims sounding in both contract and tort (including fraud) because there is a "strongly embedded public policy favoring freedom of contract" and "courts must respect and enforce the terms of a contract that parties have freely and voluntarily made." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 230, 232 (Tex. 2019). The Texas Supreme Court has "never held … that fraud vitiates a limitation-of-liability clause" and has instead held that parties may contract to limit any recovery from a claim of fraud. *Id.* at 232; *see also id.* at 233 ("[T]he parties bargained to limit punitive damages, and we must hold them to that bargain.").

In *Bombardier*, the Texas Supreme Court explained that it made no sense to allow the plaintiffs to seek damages based on a contract while simultaneously allowing them to circumvent that contract's limitation-of-liability provision. The *Bombardier* plaintiffs chose not to "seek[] recission of the [relevant contracts] based on [the defendant's] fraudulent conduct" and instead "tried to enforce the [contracts], seeking an award of actual damages, while at the same time

Copy from re:SearchTX

seeking to strike the limitation-of-liability clauses" to receive an additional award beyond what the contracts permitted. *Id.* at 232. The Texas Supreme Court rejected that gambit. It held that "the plaintiffs cannot both have the contract" as a basis for seeking their claimed damages "and defeat it too." *Id.* (alteration adopted and quotations omitted). "[T]he valid limitation-of-liability clauses," it ruled, "must stand." *Id.*

Other courts have followed suit, recognizing that provisions limiting damages in a purchase and sale agreement are valid and enforceable notwithstanding allegations of fraud. *See, e.g.*, *North Presidio, LLC v. Lowe's Home Ctrs., LLC*, 808 F. App'x 275, 275 (5th Cir. 2020) (summary judgment appropriate where sale agreement limited recovery as to contract, fraud, and other "non-contractual claims"); *Great Hans, LLC v. Liberty Bankers Life Ins. Co.*, 2019 WL 1219110, at *9 (Tex. App.–Dallas Mar. 15, 2019, no pet.) (holding that a "damages-limitation clause" in a purchase and sale agreement is "valid and enforceable").

Here too the parties' "valid limitation-of-liability clauses must stand." *Bombardier*, 572 S.W.3d at 232. As in *Bombardier*, Capital Storage may not seek damages from SpareBox's failure to close while simultaneously seeking to "strike the limitation-of-liability clauses." *Id.* Put differently, Capital Storage "cannot both have the contract and defeat it too." *Id.* (alteration adopted and quotations omitted). Sections 13.2 and 13.3 apply with full force to limit Capital Storage's recovery to, at most, $3 million. And because SpareBox relinquished its $3 million deposit as soon as it decided not to close, Capital Storage is already entitled to that maximum possible damages award. Capital Storage therefore cannot establish any injury—a necessary element of its remaining claims—and SpareBox is entitled to summary judgment.

## PRAYER

Though discovery has only just commenced in this case, Capital Storage's remaining claims are ripe for judgment now—saving the parties and the Court time, money and resources

8

Copy from re:SearchTX

that will not change the outcome of these claims. Both claims fail as a result of a straightforward legal question that turns on the plain language of the Agreement and the undisputed facts. SpareBox respectfully asks this Court to grant summary judgment in favor of SpareBox on Capital Storage's remaining claims against SpareBox for fraud and conspiracy.

Copy from re:SearchTX

DATED:   February 27, 2023

Respectfully submitted,

KIRKLAND & ELLIS LLP

*/s/ Jeremy A. Fielding*
Jeremy A. Fielding, P.C.
State Bar No. 24040895
jeremy.fielding@kirkland.com
Aysha M. Spencer
State Bar No. 24132584
aysha.spencer@kirkland.com
4550 Travis Street
Dallas, Texas 75205
Tel:  (214) 972-1770
Fax:  (214) 972-1771

AND

Judson Brown, P.C. (*pro hac vice*)
judson.brown@kirkland.com
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel:  (202) 389-5000
Fax:  (202) 389-5200

*Attorneys for SpareBox Self Storage, LLC*

Copy from re:SearchTX

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2023, a true and correct copy of the foregoing document was served upon all parties via eFile in accordance with Rule 21a of the Texas Rules of Civil Procedure.

/s/ *Jeremy Fielding*
Jeremy Fielding

11

Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Karyn Cooper on behalf of Jeremy Fielding
Bar No. 24040895
karyn.cooper@kirkland.com
Envelope ID: 73164811
Status as of 2/28/2023 8:13 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Jeremy Fielding | | jeremy.fielding@kirkland.com | 2/27/2023 6:16:38 PM | SENT |
| Eric JMayer | | emayer@susmangodfrey.com | 2/27/2023 6:16:38 PM | SENT |
| Shawn Raymond | | sraymond@susmangodfrey.com | 2/27/2023 6:16:38 PM | SENT |
| David Peterson | | dpeterson@susmangodfrey.com | 2/27/2023 6:16:38 PM | SENT |
| Michael ALeone | | mleone@susmangodfrey.com | 2/27/2023 6:16:38 PM | SENT |
| Karyn Cooper | | karyn.cooper@kirkland.com | 2/27/2023 6:16:38 PM | SENT |
| Aysha MSpencer | | aysha.spencer@kirkland.com | 2/27/2023 6:16:38 PM | SENT |
| Daniel Hopper | | danhopper@quinnemanuel.com | 2/27/2023 6:16:38 PM | SENT |
| Deborah Newman | | deborahnewman@quinnemanuel.com | 2/27/2023 6:16:38 PM | SENT |
| Richie Simpson | | richie.simpson@kirkland.com | 2/27/2023 6:16:38 PM | SENT |
| Benjamin Finestone | | benjaminfinestone@quinnemanuel.com | 2/27/2023 6:16:38 PM | SENT |
| Rusty Edgington | | rustyedgington@quinnemanuel.com | 2/27/2023 6:16:38 PM | SENT |
| Christopher  Porter | | chrisporter@quinnemanuel.com | 2/27/2023 6:16:38 PM | SENT |

Copy from re:SearchTX

5/15/2024 10:15 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 87796814
By: Keeley Hodgins
Filed: 5/15/2024 10:15 PM

**790**

CAUSE NO. 2022-71323

| | | |
|---|---|---|
| **CAPITAL STORAGE HOLDINGS LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **HARRIS COUNTY, TEXAS** |
| | § | |
| **SPAREBOX SELF STORAGE, LLC** | § | |
| | § | |
| *Defendant.* | § | **151st JUDICIAL DISTRICT** |
| | § | |

### ~~[PROPOSED]~~ ORDER GRANTING
### DEFENDANT SPAREBOX SELF STORAGE, LLC'S
### TRADITIONAL AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

Having considered Defendant SpareBox Self Storage, LLC's ("SpareBox's") Traditional and No-Evidence Motion for Summary Judgment against Plaintiff Capital Storage Holdings LLC ("Capital Storage"), all responses and replies, and the applicable authorities and evidence, the Court **GRANTS** the Motion. Capital Storage's claims for fraud and fraudulent inducement (Count I), breach of contract (Count II), and declaratory judgment (Count III) are therefore **DISMISSED WITH PREJUDICE.**[**]

**SO ORDERED.**

Dated:

Signed: 7/12/2024   _M, M~_

_____
Judge Presiding

[**] The Court does not believe that Plaintiff has adduced more than a scintilla of evidence of:

(1) Justifiable reliance given that Sparebox always had the right to not close and to forfeit its $3 million;
(2) causation of its benefit of the bargain measure of damages as articulated in its briefing and summary judgment evidence; or
(3) a proper measure of "value presented" as being the full purchase prices as opposed to some other value that contemplated the $3 million escrow forfeiture option in the contract.

Unofficial Copy Office of Marilyn Burgess District Clerk

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Karyn Cooper on behalf of Jeremy Fielding
Bar No. 24040895
karyn.cooper@kirkland.com
Envelope ID: 87796814
Filing Code Description: Motion (No Fee)
Filing Description: SpareBox Self Storage, LLC's Traditional and No-Evidence Motion for Summary Judgment
Status as of 5/16/2024 8:15 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Karyn Cooper | | karyn.cooper@kirkland.com | 5/15/2024 10:15:59 PM | SENT |
| Eric JMayer | | emayer@susmangodfrey.com | 5/15/2024 10:15:59 PM | SENT |
| Shawn Raymond | | sraymond@susmangodfrey.com | 5/15/2024 10:15:59 PM | SENT |
| David Peterson | | dpeterson@susmangodfrey.com | 5/15/2024 10:15:59 PM | SENT |
| Michael ALeone | | mleone@susmangodfrey.com | 5/15/2024 10:15:59 PM | SENT |
| Rachel Solis | | rsolis@susmangodfrey.com | 5/15/2024 10:15:59 PM | SENT |
| Deborah Newman | | deborahnewman@quinnemanuel.com | 5/15/2024 10:15:59 PM | SENT |
| Benjamin Finestone | | benjaminfinestone@quinnemanuel.com | 5/15/2024 10:15:59 PM | SENT |
| Cameron Kelly | | cameronkelly@quinnemanuel.com | 5/15/2024 10:15:59 PM | SENT |
| Elise Miller | | elmiller@susmangodfrey.com | 5/15/2024 10:15:59 PM | SENT |
| Jerry Klaristenfeld | | jklaristenfeld@susmangodfrey.com | 5/15/2024 10:15:59 PM | SENT |
| Adam Locke | | adam@adamlockelaw.com | 5/15/2024 10:15:59 PM | SENT |
| Jeremy Fielding | | jeremy.fielding@kirkland.com | 5/15/2024 10:15:59 PM | SENT |
| Aysha MSpencer | | aysha.spencer@kirkland.com | 5/15/2024 10:15:59 PM | SENT |
| Richie Simpson | | richie.simpson@kirkland.com | 5/15/2024 10:15:59 PM | SENT |
| Kimberly Chervenak | | kchervenak@kirkland.com | 5/15/2024 10:15:59 PM | SENT |
| Megan McGlynn | | megan.mcglynn@kirkland.com | 5/15/2024 10:15:59 PM | SENT |
| Judson Brown | | judson.brown@kirkland.com | 5/15/2024 10:15:59 PM | SENT |
| Daniel Hopper | | danhopper@quinnemanuel.com | 5/15/2024 10:15:59 PM | ERROR |
| Rusty Edgington | | rustyedgington@quinnemanuel.com | 5/15/2024 10:15:59 PM | SENT |
| Christopher Porter | | chrisporter@quinnemanuel.com | 5/15/2024 10:15:59 PM | SENT |
| Daniel Myerson | | danielmyerson@quinnemanuel.com | 5/15/2024 10:15:59 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cathy Hodges on behalf of Katherine Ginzburg Treistman
Bar No. 796632
catherine.hodges@aporter.com
Envelope ID: 101745753
Filing Code Description: Motions - All Other
Filing Description: Storable's Motion for Reconsideration of the Court's April 15, 2025 Order Denying Modification of the Protective Order
Status as of 6/9/2025 8:23 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 6/6/2025 8:10:39 PM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 6/6/2025 8:10:39 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 6/6/2025 8:10:39 PM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 6/6/2025 8:10:39 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 6/6/2025 8:10:39 PM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 6/6/2025 8:10:39 PM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 6/6/2025 8:10:39 PM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 6/6/2025 8:10:39 PM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 6/6/2025 8:10:39 PM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 6/6/2025 8:10:39 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 6/6/2025 8:10:39 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 6/6/2025 8:10:39 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 6/6/2025 8:10:39 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 6/6/2025 8:10:39 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 6/6/2025 8:10:39 PM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 6/6/2025 8:10:39 PM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 6/6/2025 8:10:39 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 6/6/2025 8:10:39 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 6/6/2025 8:10:39 PM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 6/6/2025 8:10:39 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 6/6/2025 8:10:39 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/6/2025 8:10:39 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cathy Hodges on behalf of Katherine Ginzburg Treistman
Bar No. 796632
catherine.hodges@aporter.com
Envelope ID: 101745753
Filing Code Description: Motions - All Other
Filing Description: Storable's Motion for Reconsideration of the Court's April 15, 2025 Order Denying Modification of the Protective Order
Status as of 6/9/2025 8:23 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/6/2025 8:10:39 PM | SENT |
| Cathy Hodges | | catherine.hodges@aporter.com | 6/6/2025 8:10:39 PM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 6/6/2025 8:10:39 PM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 6/6/2025 8:10:39 PM | SENT |
| Adam Locke | | adam@lockelaw.com | 6/6/2025 8:10:39 PM | SENT |
| John Holler | | john.holler@arnoldporter.com | 6/6/2025 8:10:39 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 6/6/2025 8:10:39 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 6/6/2025 8:10:39 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 6/6/2025 8:10:39 PM | SENT |
| Julia C.Risley | | jrisley@yettercoleman.com | 6/6/2025 8:10:39 PM | SENT |

**The Business Court of Texas,
Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § | |
| *Plaintiff,* | § § | |
| *v.* | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § § | |
| *Defendants.* | § | |

---

**Storable's Motion for Partial Reconsideration of the May 28, 2025 Discovery Order**

---

Defendants Storable, Inc.; RedNova Labs (d/b/a storEDGE); Sitelink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP (collectively, "Storable") respectfully move the Court for partial reconsideration of its May 28, 2025 Discovery Order ("Discovery Order"), specifically regarding Plaintiff's Request for Production No. 10, and would show as follows.

**Summary**

The Court's Discovery Order compels Storable to produce its FMS customer list. This document is highly confidential, a trade secret, and among Storable's most valuable assets. This Court should reconsider its ruling in accordance with applicable law on the protection of trade secrets, which requires SafeLease to prove it has a specific need for the list. It cannot do that. And SafeLease's purported needs for the list would be fully satisfied by the reasonable alternatives that Storable offered and SafeLease inexplicably refused. Moreover, Storable has moved for partial summary judgment on SafeLease's attempted monopolization claim, the only claim for which SafeLease contends that Storable's FMS customer list is needed. If the Court grants summary judgment, it will obviate any need that SafeLease has for Storable's FMS customer list. No

discovery of this list is necessary to grant summary judgment for Defendants on that claim. Compelling production of a trade secret that is not reasonably needed is an abuse of discretion, and the Court should reconsider its ruling to avoid committing such an error in this case.

**Relevant Background**

SafeLease's Request for Production No. 10 requested Storable's FMS customer list, including the addresses for each customer. Storable objected. Counsel for the parties conferred regarding this and other requests on May 7, 2025. SafeLease's **only** purported need for the list is to analyze market power in its alleged FMS market—specifically, to calculate Storable's market share in that alleged market. To meet that stated need, Storable offered to provide the total number of its FMS customers, including a breakdown by state. However, SafeLease insisted that its experts needed the full list, including customers' addresses, in order to "verify" the entries.

To address SafeLease's "verification" concerns, Storable offered three alternatives: (1) providing certification from a Storable executive that the list is complete and accurate; (2) giving a neutral, secure third party temporary access to the list to confirm its accuracy; or (3) arranging for SafeLease's expert to review the list while it remains in Storable's possession. SafeLease rejected these alternatives but did not meaningfully explain why. Instead, SafeLease sought relief from the Court.

In SafeLease's pre-motion letter, it restated the purported need to "verify" the number of FMS customers. A. Locke Letter to Court (May 16, 2025) at 1. The letter went on to explain that production of the list was "relevant and proportional to the needs of the case" and "critical for defining the relevant antitrust market and assessing Storable's market power and competitive impact of its conduct." *Id.* The letter did not explain, however, why the list was "critical" for any of these purposes or why SafeLease rejected Storable's offers. *See id.*

On May 28, 2025, the Court issued its Discovery Order requiring Storable to produce its FMS customer list by June 13, 2025. The Discovery Order was based only on the parties' pre-motion letters; no other briefing or evidence was submitted. Regarding the customer list, the Court reasoned that the agreed protective order would be adequate to protect Storable's interests. Discovery Order at 2.

On June 2, 2025, Storable filed a motion for partial summary judgment on SafeLease's claim for attempted monopolization. That motion demonstrates that Storable has no dangerous probability of monopolizing the **tenant insurance market** as a matter of law. Defs' Mot. for Partial Sum. Jmt. (Jun. 2, 2025) at 11–14. It also demonstrates that Storable has not harmed competition in the tenant insurance market as a matter of law, that its conduct is neither anticompetitive nor predatory, and that Storable does not have specific intent to monopolize the tenant insurance market. *Id.* at 14–24. Summary judgment on any of these grounds would be fatal to SafeLease's attempted monopolization claim—yet **none** of them implicate Storable's share of the alleged FMS market. In other words, neither Storable's FMS customer list nor any "verification" of that list will help SafeLease survive Storable's partial motion for summary judgment. The summary judgment motion is set for hearing on July 1, 2025.

On June 4, 2025, the parties conducted a mediation with the assistance of mediator Alan F. Levin. A settlement was not reached, but no impasse was declared and the parties are continuing to discuss possible settlement of this case. Because a resolution is unlikely to be reached prior to the June 13 production deadline, Storable now files this motion for partial reconsideration of the Discovery Order. Storable has also filed an emergency motion to stay the June 13, 2025 deadline.

## Legal Standard

**Motions to reconsider.**  A trial court "retains continuing control over its interlocutory orders and has the power to set those orders aside at any time before a final judgment is entered." *Fruehauf Corp. v. Carrillo*, 848 S.W.2d 83, 83 (Tex. 1993).

**Disclosure of a trade secret.**  "A person has a privilege to refuse to disclose and to prevent other persons from disclosing a trade secret owned by that person, unless the court finds that non-disclosure will tend to conceal fraud or otherwise work injustice." TEX. R. EVID. 507(a).  "Trial courts should apply Rule 507 as follows:  First, the party resisting discovery must establish that the information is a trade secret.  The burden then shifts to the requesting party to establish that the information is necessary for a fair adjudication of its claims." *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 613 (Tex. 1998) (orig. proceeding).  "If the information is a trade secret and the requesting parties do not need it, an order that requires disclosure is a clear abuse of discretion." *In re Union Pac. R. Co.*, 294 S.W.3d 589, 592 (Tex. 2009) (orig. proceeding).

## Argument and Authorities

The Court should reconsider its ruling compelling production of Storable's FMS customer list and instead adopt one or more of Storable's proposed alternatives to full disclosure.

I.    **Storable's FMS Customer List is a Trade Secret**

Storable's FMS customer list is plainly a trade secret.  Under Texas law, a trade secret means:

> [A]ll forms and types of information, including … any … **list of actual or potential customers or suppliers**, … , and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if:
>
> > (A) the owner of the trade secret has taken reasonable measures under the circumstances to keep the information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainably through proper means by, another person who can obtain economic value from the disclosure or use of the information.

TEX. CIV. PRAC. & REM. CODE § 134A.002(6) (emphasis added).

A customer list is expressly listed among the types of documents eligible for trade secret protection. Storable's FMS customer list satisfies both of the requirements to be considered a trade secret. "Courts generally recognize that customer lists or financial information that can be used to obtain customers or to negotiate pricing or fees to obtain an advantage in the market qualifies as a trade secret." *Houston Livestock Show & Rodeo, Inc. v. Dolcefino Commc'ns, LLC*, 702 S.W.3d 675, 690 (Tex. App.—Houston [1st Dist.] 2024, no pet.).

### A.     Storable Takes Reasonable Measures to Keep the List a Secret

Storable takes reasonable measures to keep its FMS customer list a secret. In the declaration attached as **Exhibit A**, Storable's CEO Chuck Gordon explains in detail Storable's efforts to maintain the secrecy of its FMS customer list. This list does not exist as a standalone document and only select few Storable employees have the ability to aggregate the data underlying the list. Ex. A ¶ 5. This list exists only in electronic format; no hard copies are created, and electronic versions of the list are not created for any other purposes and thus are not disseminated outside of Storable. *Id.*

Storable maintains strict privacy and security policies for its employees to protect trade secrets and other proprietary materials, including those in electronic format such as customer lists. *Id.* ¶ 6; Ex. A-1. For example, Storable provides all of its staff with securely configured company laptops. Ex. A-1 at 27. Storable's employees are required to use their company-issued laptops for their work and are strictly prohibited from conducting company business on personal computers. *Id.*

While Storable allows employees to use personal smartphones to access email and other business applications when they are not able to use their company-issued laptops, employees are prohibited from saving confidential company information on those personal devices. *Id.* Storable provides its employees with guidelines to ensure that their use of those devices for work is secure. *Id.* at 27–28.

Storable takes security awareness among its employees seriously. Staff members are required to undergo security awareness training at least twice each year, and new hires are trained promptly upon starting. *Id.* at 28. Storable also conducts simulated "phishing" exercises to raise awareness among employees regarding security practices; any employee who fails the exercise is required to undergo remedial training. *Id.* Storable also regularly publishes a security awareness newsletter. *Id.* These measures are reasonably adequate to maintain the secrecy of the Storable's trade secrets, including its customer lists. *See, e.g.*, *Reilly v. Premier Polymers, LLC*, 2020 WL 7074253, at *5–6 (Tex. App.—Houston [14th Dist.] Dec. 3, 2020, pet. dism'd) (trade secret found where party exercised information security practices including password protection and access limitations).

B.      **The List Derives Independent Economic Value from its Secrecy**

Storable's FMS customer list is extremely value to Storable as a general matter and because the information it contains is neither generally known nor readily ascertainable. The list is among the most competitively sensitive items in Storable's possession. Ex. A ¶ 7. Its disclosure would threaten Storable's business—both its core FMS business and its businesses for tenant insurance and other products it sells to its FMS customers.

First, Storable's FMS customer list covers all its FMS customers—thousands of facilities—and is the core of an FMS business that Storable has spent years to build and maintain. This list has been built from countless hours of sales, marketing, and support and millions of dollars of

building, updating, and continually improving its FMS platforms. *Id.* It is also valuable due to its secrecy. Storable made significant effort and investment to identify these facilities and to successfully win and maintain them as FMS customers. *Id.* ¶¶ 8–9. Storable's competitors did not do this work or make these investments. *Id.* If a competitor obtained the list, it would unfairly be able to use Storable's labor to steal Storable's customers. The list would provide a treasure trove of potential customer leads, insight into Storable's presence in different geographic regions, and a wealth of information that SafeLease could unfairly use to its advantage. *Id.* ¶¶ 9–11. Without this list, the competitor may not otherwise know that a facility is a Storable customer or be able to leverage that information in its negotiations with potential customers. *See id.* This is precisely why "[c]ourts generally recognize that customer lists . . . that can be used to obtain customers . . . qualif[y] as a trade secret." *Houston Livestock Show & Rodeo, Inc.*, 702 S.W.3d at 690.

Second, production of the list to SafeLease illustrates both the value of the list and the threat to Storable's business if it is disclosed. While SafeLease does not compete against Storable directly in the FMS market, it draws approximately 70% of its insurance customers from Storable's FMS customer pool. Feb. 14 Tr. 28:17-21. SafeLease and Storable **do** compete for tenant insurance customers, so giving SafeLease access to Storable's FMS customer list would directly enable SafeLease to target Storable customers. *See* Ex. A ¶¶ 8, 10. Further, SafeLease has admitted that it is actively encouraging its current and prospective insurance customers that are also Storable FMS customers to switch from Storable's FMS to other competitors' FMS platforms. Feb. 13 Tr. 82:11-14.[1] Providing SafeLease with this list would unfairly enable them to further that current, ongoing effort.

---

[1] The prospect of Storable's FMS customers switching to other FMS providers is a real one: Storable lost almost 1,000 FMS customers in the last year alone. Feb. 14 Tr. 151:5–21; *see also* Jan. 16 Tr. 134:24–135:10.

II.    **SafeLease Has No Legitimate Need for Storable's FMS Customer List**

SafeLease has not met its burden of showing that it needs the FMS customer list for this case. *Cont'l Tire, Inc.*, 979 S.W.2d at 613.  To meet that burden, SafeLease "cannot merely assert unfairness but must demonstrate with specificity exactly how the lack of the information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat." *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732–33 (Tex. 2003) (orig. proceeding).  SafeLease's purported "need" for the list is inadequate for several reasons.

First, SafeLease has not articulated any legitimate basis why it needs the name and address of each facility served by Storable's FMS, rather than the total number of facilities served, which Storable offered to provide and SafeLease rejected.  SafeLease's counsel claim that SafeLease's economic expert wants to "verify" the accuracy of the entries in the list to determine Storable's FMS market share.  But it is entirely unclear why this "verification" is necessary.  At the prior TI hearings, SafeLease's economics expert calculated market share using an estimate of the total number of facilities served by Storable's FMS without complaint.  Jan. 16 Tr. 221:1–7; Feb. 11 Tr. 120:3–16.  He did this even though Storable had produced a more specific calculation of facilities using its FMS as of December 2024.  *See* DX–198.  It is thus a mystery as to "exactly how" the lack of the list will impair SafeLease's case on the merits.  *Bridgestone/Firestone, Inc.*, 106 S.W.3d at 732–33.

Second, it is unclear what any supposed "verification" of the list would entail unless SafeLease contacts thousands of facilities and asks them what FMS platform they use, which the facility owners obviously have no obligation to disclose.  Unless SafeLease plans to issue subpoenas to myriad storage facilities that would at best reveal information harmful to SafeLease's

case (i.e., that a facility was mistakenly included on the list and does not count toward Storable's market share), the purported need for "verification" is questionable at best.

Third, Storable's partial motion for summary judgment—which challenges SafeLease's attempted monopolization claim on grounds unrelated to Storable's alleged FMS market share—further renders production of Storable's FMS customer list unnecessary.

Fourth, Storable offered SafeLease multiple, alternative verification methods. *See supra* at 2. Any of these methods would fully satisfy SafeLease's purported need to verify the list.

### III. The May 28 Order's Reasons for Compelling Production of the List Were in Error

Respectfully, the reasons for compelling production of Storable's FMS customer list were in error and the Court should reconsider them on a fuller presentation of the issues.

First, the Court explained that the agreed protective order in this case would protect Storable's confidentiality interest in the FMS customer list. Discovery Order at 2. Unfortunately, it does not. Trade secrets are privileged against **disclosure**. TEX. R. EVID. 507. Disclosure under a protective order would violate the privilege.[2] Also, the protective order would be void if the Court of Appeals holds that this Court lacks jurisdiction in the pending appeal.

Second, the Court noted in the Discovery Order that Storable did not assert that the information in the list is a trade secret. Discovery Order at 2 n.1. While Storable's response to SafeLease's pre-motion letter did not use the term "trade secret," further briefing beyond the pre-motion letters would have clarified the precise nature of Storable's confidentiality interest in its FMS customer list—which is why Storable has filed this motion to reconsider.

Finally, the Court also suggested in the Discovery Order that disclosure of the FMS customer list to SafeLease would be appropriate because "SafeLease does not compete in the FMS

---

[2] The ongoing dispute over the adequacy of the protective order in this case is another reason why the Court should not compel production of Storable's trade secret.

market." Discovery Order at 2 n.2. Respectfully, that fact does not render Storable's trade secret discoverable. Moreover, as described above, disclosure of the list to SafeLease would likely harm Storable's business in the tenant insurance space where it competes with SafeLease and in the FMS space in light of SafeLease's efforts to get Storable's FMS customers to switch to competing FMS providers.

## Conclusion

Storable requests that the Court reconsider the May 28 Discovery Order and order that Storable may respond to SafeLease's Request for Production No. 10 by providing the total number of its FMS facility customers with a breakdown by state and any other relief to which it may lawfully be entitled.

Respectfully submitted June 9, 2025.

/s/ Katherine G. Treistman
Katherine G. Treistman
State Bar No. 00796632
Andrew D. Bergman
State Bar No. 24101507
Mikaila Skaroff (admitted *pro hac vice*)
John Holler (admitted *pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
700 Louisiana Street, Suite 4000
Houston, Texas 77002–2755
Tel.: (713) 576–2400
Fax: (713) 576–2499
Katherine.Treistman@arnoldporter.com
Andrew.Bergman@arnoldporter.com
Mikaila.skaroff@arnoldporter.com
John.Holler@arnoldporter.com

Ray T. Torgerson
State Bar No. 24003067
Neil Kenton Alexander
State Bar No. 00996600
Jonna N. Summers
State Bar No. 24060649
Elizabeth "Liza" Eoff
State Bar No. 24095062
Lakshmi N. Kumar

State Bar No. 24144581
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Tel.: (713) 226–6000
Fax: (713) 226–6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
ljumar@porterhedges.com

Dale Wainwright
State Bar No. 00000049
Justin Bernstein
State Bar No. 24105462
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel.: (512) 320–7240
Fax: (512) 320–7240
Dale.wainwright@gtlaw.com
bernsteinju@gtlaw.com

*Counsel for Defendants*

## Certificate of Conference

The Parties conferred regarding the relief requested in the foregoing motion, and counsel for Plaintiff indicated that Plaintiff is opposed.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

## Certificate of Compliance

I hereby certify that this document complies with Local Rule 5(a) and contains 2,910 words, excluding the case caption, any index, table of contents or table of authorities, signature blocks, attached evidence, or any required certificates.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

## Certificate of Service

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon counsel of record in accordance with the Texas Rules of Civil Procedure on June 9, 2025.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

# Exhibit A

**807**

## The Business Court of Texas,
## Third Division

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § | |
| *Plaintiff,* | § § | |
| *v.* | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § § | |
| *Defendants.* | § | |

## DECLARATION OF CHARLES GORDON IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL RECONSIDERATION OF THE COURT'S MAY 28, 2025 DISCOVERY ORDER

1. My name is Charles ("Chuck") Gordon, my date of birth is February 23, 1987, and my business address is 10900 Research Blvd Ste 160C PMB 3099, Austin, Texas 78759. I submit this declaration in support of Defendants' Motion to Reconsider the Court's May 28, 2025 Discovery Order. I am of sound mind and competent to make the statements in this declaration.

2. I am CEO of Defendant Storable, Inc. ("Storable"), which is the parent company of the other named Defendants in this action. I have served as CEO of Storable since its formation. As part of my job responsibilities, I am familiar with the types of information that Storable keeps confidential and which, if made public, could harm Storable's business or ability to compete in the marketplace.

3. I understand that Request for Production ("RFP") No. 10 in Plaintiff's First Set of RFPs requests documents sufficient to show all self-storage facilities that use Storable's facility management software ("FMS"), including the addresses for those facilities ("Storable Facility List" or "List"). In response to RFP No. 10, Storable proposed providing SafeLease with the total number of facilities using Storable's FMS, broken down by state. Storable also proposed mechanisms to verify the accuracy of these facility counts.

4. I further understand that the Court has ordered the production of documents sufficient to show the name, city, state, and ZIP code of all self-storage facilities using Storable's FMS platforms as of December 30, 2024.

5. The Storable Facility List that Plaintiff requests in RFP No. 10 and the Court has ordered to be produced is a commercially sensitive trade secret owned by Storable. Storable has taken reasonable measures to maintain the confidentiality of this List. The List is not publicly known or available and cannot be ascertained from other generally available sources. The List is not a standalone document but rather pulled from Storable's data. Only a very limited number of employees within Storable are permitted to aggregate the data from which the List is created. The

List could be created in electronic format only; no hard copies of it exist and or would ever be otherwise disseminated outside of Storable.

6.       Storable maintains strict information privacy and security practices and policies for its employees in order to protect trade secret and other proprietary materials.  These practices and policies are set forth in more detail in the Storable Employee Handbook, a true and correct copy of which is attached as Exhibit A-1.

7.       The Storable Facility List is one of the most commercially sensitive pieces of information in Storable's possession and one of the most valuable assets that Storable owns and goes to the heart of its business.

8.       The List covers all facilities that use Storable's FMS platforms and therefore it contains thousands of entries.  The risks to Storable of disclosing this List to a competitor are significant and could lead to significant competitive harm to Storable.  Giving this List to a competitor is like giving the competitor the keys to our company.  For example, disclosure of this list could enable Storable's competitors to identify, target, and attempt to steal Storable's FMS customers, as well as Storable's non-FMS business with those customers.  Disclosure of this List could harm Storable's goodwill with its customers and the valuation of the company as a whole.

9.       Much of the List's value derives from the fact that the collective information it contains is not publicly known or accessible.  Storable has made extensive efforts to build and expand its FMS customer base over the years.  If Storable's competitors obtained the List, they would unfairly be able to use the List to harm Storable's business.  The List would provide Storable's competitors with thousands of potential customer leads, information regarding Storable's presence in different geographic areas, and other competitive intelligence.  For example, the List would identify Storable FMS customers that a FMS competitor could try to steal.  Without the List, this FMS competitor would otherwise not even know that certain customers use Storable's FMS and not be able to leverage that inside information in negotiating with these potential customers.

10.       The risks of disclosing this List to SafeLease in particular are even greater.  The risk that SafeLease will misuse the information in this List is material.  SafeLease has obtained and abused its unauthorized access to Storable's platform for years, so the threat that SafeLease will use this trade secret to harm Storable's business is serious.  If SafeLease obtained this List, it could use it to attempt to poach tenant insurance and tenant protection customers that use Storable FMS platforms.

11.       Even if SafeLease's counsel properly maintained the confidentiality of this List, the risk of an inadvertent disclosure and the magnitude of harm from any such disclosure are significant. This is particularly true given that there are less risky alternatives that would provide SafeLease with the information they are purportedly seeking. Even an inadvertent disclosure of all or part of this List could threaten the core of Storable's business.

Docusign Envelope ID: 511404A7-7FB6-4F2E-A1EB-79F743A17E8C

I declare under penalty of perjury that the foregoing is true and correct. Executed in Austin, Texas, on the 9th day of June, 2025.

DocuSigned by:

*Charles Gordon*

B921BB50FAAA469...

Charles "Chuck" Gordon

# Exhibit A-1



# Storable Employee Handbook

## 2024

# Table of Contents

**Core Policies** ...................................................................................................................... **04**

**1.0** **Welcome** ........................................................................................................................ **04**

1.1 A Welcome Letter from Chuck Gordon, CEO.................................................................. 04

1.2 Storable's Commitment to Sustainability..................................................................... 05

1.3 Storable's Commitment to DEIB.................................................................................. 05

**2.0** **Introductory Language and Policies**.................................................................................. **06**

2.1 At-Will Employment................................................................................................... 06

2.2 Ethics Code............................................................................................................... 06

2.3 Vision & Values ......................................................................................................... 07

**3.0** **Hiring and Orientation Policies** ....................................................................................... **08**

3.1 EEO Statement and Non-harassment Policy................................................................ 08

3.2 Disability Accommodation ......................................................................................... 11

3.3 Religious Accommodation .......................................................................................... 12

3.4 Conflicts of Interest .................................................................................................. 12

3.5 Employment of Relatives ........................................................................................... 12

3.6 Romance in the Work ................................................................................................. 13

3.7 Employee Referrals ................................................................................................... 13

3.8 Background Check Policy ............................................................................................ 14

**4.0** **Wage and Hour Policies** .................................................................................................. **15**

4.1 Attendance Policy ..................................................................................................... 15

4.2 Overtime................................................................................................................... 15

4.3 Pay Periods and Pay Dates......................................................................................... 15

4.4 Paycheck Deductions ................................................................................................ 16

4.5 Recording Time ......................................................................................................... 16

4.6 Job Abandonment...................................................................................................... 17

4.7 Death Benefit............................................................................................................ 17

4.8 Support for Nursing Mothers ..................................................................................... 17

4.9 Travel Expenses ........................................................................................................ 18

4.10 Out of State Travel Expense Policy............................................................................ 19

4.11 Life Happens Loan Program ...................................................................................... 20

**5.0** **Conduct, Performance and Discipline**............................................................................... **21**

5.1 Outside Employment ................................................................................................. 21

5.2 Standards of Conduct................................................................................................. 21

5.3 Criminal Activity/Arrests ........................................................................................... 22

5.4 Disciplinary Process................................................................................................... 23

5.5 Post-Employment Reference Policy............................................................................. 23

**6.0** **General Policies** ....................................................................................................................... **24**

6.1 Acceptable Use Policy ....................................................................................................... 24

6.2 Computer Security and Copying of Software ................................................................. 29

6.3 Non-solicitation Non-smoking/No distribution Policy .................................................. 30

6.4 Personal Appearance ......................................................................................................... 30

6.5 Social Media Policy ........................................................................................................... 31

6.6 Artificial Intelligence Usage Policy ................................................................................. 33

**7.0** **Benefits** ................................................................................................................................. **34**

7.1 Paid Time Off ..................................................................................................................... 34

   7.1.2 Unlimited Flex Time Off ........................................................................................... 35

   7.1.3 Volunteer Time Off .................................................................................................... 35

   7.1.3 Rest, Relax and Recharge Time Off ......................................................................... 35

   7.1.4 Entering Time Off ...................................................................................................... 35

7.2 Holidays ............................................................................................................................. 35

7.3 Leaves of Absence .............................................................................................................. 36

   7.3.1 FMLA ........................................................................................................................... 36

   7.3.2 Family Care Leave ...................................................................................................... 40

   7.3.3 Jury Duty Leave .......................................................................................................... 41

   7.3.4 Voting and Election Leave .......................................................................................... 41

   7.3.5 Witness Leave ............................................................................................................. 41

   7.3.6 Bereavement Leave .................................................................................................... 42

   7.3.7 Witness and Victim of Crimes and Domestic Violence Leave ................................ 42

   7.3.8 Personal Leave ........................................................................................................... 43

   7.3.10 Other Statutory Leaves ........................................................................................... 44

7.4 Temporary Personnel ........................................................................................................ 44

7.5 Unemployment Compensation Insurance Policy ........................................................... 44

7.6 Workers' Compensation Insurance Policy ....................................................................... 44

7.7 COBRA ................................................................................................................................ 45

7.8 Military Leave (USERRA) ................................................................................................... 45

**8.0** **Safety and Hazards** ............................................................................................................. **46**

8.1 General Safety Policy ......................................................................................................... 46

8.2 Policy Against Workplace Violence .................................................................................. 46

8.3 Weapons Policy ................................................................................................................... 47

8.4 Illegal Drug Policy ............................................................................................................. 48

8.5 Alcohol Policy ..................................................................................................................... 49

**9.0** **Trade Secrets and Inventions** ............................................................................................. **50**

9.1 Confidentiality and Nondisclosure of Trade Secrets ...................................................... 50

**Acknowledgment of Receipt and Review** .............................................................................. **51**

## 1.1 A Welcome Letter from Chuck Gordon, CEO

*What's up STORABLE!*

**Welcome and congratulations!**

You are a part of a high-performance, fun-loving organization where we love to win. I hope (and know) that your time with Storable will be personally rewarding and professionally challenging. I take a lot of pride in what we have built over the years and am eager to see how you're going to make an impact to help us achieve our vision of being the #1 tech brand in storage and marinas.

We have Storriors all across the United States and Storable complies with all federal and state employment laws, which is reflected in this handbook. The Organization also complies with any applicable local laws, although there may not be an express written policy regarding those laws contained in the handbook.

The employment policies and benefits summaries in this handbook are for all team members. State law may provide for policy variances under circumstances other than those outlined in this handbook.

Consult the State Posters on the Warehouse for the state in which you reside for information on any such policy variance.

You should know that this handbook supersedes any previously issued handbooks or policy statements and all inconsistent oral or written statements dealing with the subjects discussed herein. The Organization reserves the right to interpret, modify, or supplement the provisions of this handbook at any time. The Handbook is available on the Company Intranet and we will notify Storriors of amendments to the policies, but it is your responsibility to familiarize yourself with the handbook. Neither this handbook nor any other communication by a management representative or other, whether oral or written, is intended in any way to create a contract of employment.

> Seriously – please take the time now to read this handbook carefully.

- Once you're done, sign the acknowledgement at the end to show that you have read, understood, and agree to the contents of this handbook, which sets out the basic rules and guidelines concerning your time with us.

- I know you understand that no employee handbook can address every possible situation in the workplace – but that's why we've selected responsible and conscientious team members. We expect you to use sound judgment and act with integrity in all that you do.

Thanks again for deciding to be a part of a great team!

All the best,

**Chuck Gordon, CEO**
Storable

## 1.2    Storable's Commitment to Sustainability

Storable believes in a future where everyone can Do More and Be More and we know that the future won't create itself. That's why we've set a vision for sustainable corporate citizenship that forms the basis of our decisions by focusing on environmental awareness, business ethics, diversity, equity, inclusion, belonging and community involvement.

Our key drivers are fostering openness, sustainable thinking and respect. We value everyone and strive to work as one team. We invest significantly in our people and our working environment by creating and maintaining a psychologically safe and healthy workplace and ensuring ongoing professional and personal development.

## 1.3    Storable's Commitment to DEIB

 **Vision**

At Storable, we prioritize our culture of inclusion, respect and care, intended to enhance the lives of our employees, customers and communities, and reflect the diverse world we inhabit.

Our commitment is to encourage diverging perspectives, equitable opportunities, and inclusive environments. Enabling every Storrior to be more of who they are, feel valued as their authentic selves, and that they belong.

 **Strategic Objectives**

➡ **Diversity** - Ensure the Storrior ecosystem reflects our diverse world and celebrate that diversity

➡ **Equity** - Ensure every Storrior has fair access to the opportunities and resources necessary to develop and achieve their own unique career path

➡ **Inclusion & Belonging** - Foster a culture of belonging, where every Storrior is accepted and valued as their authentic self, and is empowered to do their best work





## 2.1 At-Will Employment

Your employment with us is on an "at-will" basis. This means your employment may be terminated at any time, with or without notice and with or without cause. We're all about reciprocity, so we also respect your right to leave us at any time, with or without notice and with or without cause.

To be crystal clear, nothing in this handbook or any other Organization document should be understood as creating a contract, guaranteed or continued employment, a right to termination only "for cause," or any other guarantee of continued benefits or employment.

## 2.2 Ethics Code

Storable will conduct business honestly and ethically wherever operations are maintained. We strive to improve the quality of our services, products, and operations and will maintain a reputation for honesty, fairness, respect, responsibility, integrity, trust and sound business judgment. Our managers and team members are expected to adhere to high standards of business and personal integrity as a representation of our business practices.

We expect that officers, directors and team members will not knowingly misrepresent the Organization and will not speak on behalf of the Organization unless specifically authorized.

The confidentiality of trade secrets, proprietary information, and similar confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.) about the Organization or operations, or that of our customers or partners, is to be treated with discretion and only disseminated on a need-to-know basis (see policies relating to privacy).

Violation of the Code of Ethics can result in discipline, up to and including termination of employment. The degree of discipline imposed may be influenced by the existence of voluntary disclosure of any ethical violation and whether or not the violator cooperated in any subsequent investigation.





## 2.3 Vision & Values

**Our Vision - To be the number one technology brand in storage and marinas.**

➜ **Our Core Purpose and why we exist** - We help Storage and Marina Operators run better businesses.

➜ **What we do** - As the undisputed industry leader, we offer the only all-in-one, fully integrated suite of storage technology products that include software, marketing services, payment processing, insurance and access control. We are constantly innovating and improving our current products while creating new offerings and pursuing additional verticals.

➜ **Our Values** - We... play well with others, embrace change, are driven and have a whole-hearted customer focus.



### We play well with others by...

Exemplifying team before self, being quick to praise and slow to gloat, valuing and embracing different perspectives, being someone people enjoy working with.



### We are driven by...

Having a bias for action, relentlessly pursuing the betterment of our customers, the company and ourselves, having a "game-time" mentality, having a passion to win.



### We embrace change by...

Looking forward instead of dwelling on the past, being up for a new challenge no matter how daunting, constantly adapting to win.



### We have a wholehearted customer focus by...

Having a customer first mentality across the entire business, delivering a world class customer experience, always being there for our customers.



**3.0** **Hiring and Orientation Policies**

## **3.1** EEO Statement and Non-harassment Policy

 

### Equal Opportunity Statement

Storable is committed to the principles of equal employment. We are committed to complying with all federal, state, and local laws providing equal employment opportunities and all other employment laws and regulations.

Storable has a strict policy against all types of workplace harassment, including sexual harassment and other forms of workplace harassment based upon an individual's sex (including pregnancy, childbirth, or related medical conditions), gender, gender expression, ethnicity, race, religion, creed, color, national origin or ancestry, citizenship status, physical or mental disability, genetic information, marital status, age, sexual orientation, AIDS/HIV status, military service, veteran status, caste, or any other status protected by federal, state, or local laws.

We will conduct a prompt and thorough investigation of all allegations of discrimination, harassment, or retaliation, or any violation of the Equal Employment Opportunity Policy in a confidential manner, to the extent possible. The Organization will take appropriate corrective action, if and where warranted.

The Organization prohibits retaliation against team members who provide information about, complain about, or assist in the investigation of any complaint of discrimination or violation of the Equal Employment Opportunity Policy.

We are all responsible for upholding this policy. You may discuss questions regarding equal employment opportunity with your manager, any member of management, or People Operations.



### Policy Against Workplace Harassment

No employee will discriminate against or harass any individual, or allow discrimination or harassment to go unreported.

Storable has a strict policy against all types of workplace harassment, including sexual harassment and other forms of workplace harassment based upon an individual's sex (including pregnancy, childbirth, or related medical conditions), gender, gender expression, ethnicity, race, religion, creed, color, national origin or ancestry, citizenship status, physical or mental disability, genetic information, marital status, age, sexual orientation, AIDS/HIV status, military service, veteran status, caste, or any other status protected by federal, state, or local laws.

All forms of harassment of, or by, team members, vendors, visitors, customers and clients are strictly prohibited and will not be tolerated.



 **Sexual Harassment**

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when

**1** Submission to such conduct is made either explicitly or implicitly as a term or condition of an individual's employment;

**2** Submission to, or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or

**3** Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

While it is not possible to identify every act that constitutes or may constitute sexual harassment, the following are some examples of sexual harassment:

- Unwelcome requests for sexual favors;
- Lewd or derogatory comments or jokes;
- Comments regarding sexual behavior or the body of another;
- Sexual innuendo and other vocal activity such as catcalls or whistles;
- Obscene letters, notes, emails, invitations, photographs, cartoons, articles, or other written or pictorial materials of a sexual nature;
- Repeated requests for dates after being informed that interest is unwelcome;
- Retaliating against another for refusing a sexual advance or reporting an incident of possible sexual harassment to the Organization or any government agency;
- Offering or providing favors or employment benefits such as promotions, favorable evaluations, favorable assigned duties or shifts, etc., in exchange for sexual favors; and
- Any unwanted physical touching or assaults or blocking or impeding movements.



 ## Other Harassment

Storable has a strict policy against all types of workplace harassment, including sexual harassment and other forms of workplace harassment based upon an individual's sex (including pregnancy, childbirth, or related medical conditions), gender, gender expression, ethnicity, race, religion, creed, color, national origin or ancestry, citizenship status, physical or mental disability, genetic information, marital status, age, sexual orientation, AIDS/HIV status, military service, veteran status, caste, or any other status protected by federal, state, or local laws.

Again, while it is not possible to list all the circumstances that may constitute other forms of workplace harassment, the following are some examples of conduct that may constitute workplace harassment:

- The use of disparaging or abusive words or phrases, slurs, negative stereotyping, or threatening, intimidating, or hostile acts that relate to the above protected categories;

- Written or graphic material that insults, stereotypes, or shows aversion or hostility towards an individual or group because of one of the above protected categories and that is placed on walls, bulletin boards, email, voicemail, or elsewhere on our premises, or circulated in the workplace; and

- A display of symbols, slogans, or items that are associated with hate or intolerance towards any select group.



## Reporting Discrimination and Harassment

If you feel that you have witnessed or have been subjected to any form of discrimination or harassment, immediately notify your manager, any member of management, or People Operations.

The Organization prohibits retaliation against team members who, based on a reasonable belief, provide information about, complain, or assist in the investigation of any complaint of harassment or discrimination.

We will promptly and thoroughly investigate any claim and take appropriate action where we find a claim has merit. To the extent possible, we will retain the confidentiality of those who report suspected or alleged violations of the harassment policy.

Discipline for violation of this policy may include, but is not limited to, reprimand, suspension, demotion and termination. If the Organization determines that harassment or discrimination occurred, corrective action will be taken to effectively end the harassment. As necessary, the Organization may monitor any incident of harassment or discrimination to assure the inappropriate behavior has stopped. In all cases, the Organization will follow up as necessary to ensure that no individual is retaliated against for making a complaint or cooperating with an investigation



## 3.2  Disability Accommodation

Storable complies with the Americans with Disabilities Act (ADA), the Pregnancy Discrimination Act, the Pregnant Workers Fairness Act and all other applicable state and local fair employment practices laws, and is committed to providing, subject to the provisions of such laws, equal employment opportunities to qualified individuals with disabilities, including disabilities related to pregnancy, childbirth and related conditions.

Consistent with this commitment, we will provide reasonable accommodation to otherwise qualified individuals where appropriate to allow the individual to perform the essential functions of the job unless doing so would create an undue hardship on the business.

 **Accommodation Process**

If you are requesting accommodation because of your disability, it is your responsibility to notify your manager, department leader or People Operations.

Employees who request accommodations may be asked to have a physician complete an ADA Medical Provider Report Form.

After receiving your request, we will actively engage in an interactive dialogue with you to determine the precise limitations of your disability, examine the essential functions of your job and explore potential reasonable accommodations that could overcome those limitations. Where appropriate, we may need to obtain additional information from your medical provider. All medical information received in connection with a request for accommodation will be treated as confidential. In addition, Storable may ask employees to provide information about their educational qualifications and work experience if their reassignment to another position is considered as an accommodation.

We encourage you to suggest specific reasonable accommodations that you believe would allow you to perform your job. However, we aren't required to make the specific accommodation requested by you and may provide an alternative accommodation, to the extent any reasonable accommodation can be made without imposing an undue hardship on us.

Determinations regarding accommodations are made jointly by People Operations and your Manager/Department Leader. Such determinations are made on a case-by-case basis.

If leave is provided as a reasonable accommodation, such leave may run concurrently with leave under the federal Family and Medical Leave Act and/or any other leave where permitted by state and federal law.

The Organization will not discriminate or retaliate against team members for requesting an accommodation.



## 3.3 Religious Accommodation

We are dedicated to treating team members equally and with respect and we recognize the diversity of their religious beliefs. All team members may request accommodation when their religious beliefs cause a deviation from our dress code or the individual's schedule, basic job duties, or other aspects of employment. We will consider the request, but reserve the right to offer our own accommodation to the extent permitted by law. Some, but not all, of the factors that will be considered are cost, the effect that an accommodation will have on current established policies and the burden on operations — including other team members — when determining whether to provide an accommodation. At no time will we question the validity of a person's belief.

If you require religious accommodation, speak with your manager or People Operations.

## 3.4 Conflicts of Interest

We are concerned with conflicts of interest that create actual or potential job-related concerns, especially in the areas of confidentiality, customer relations, safety, security and morale. If there is any actual, potential, or perceived conflict of interest between you and a competitor, supplier, distributor, or contractor, you must disclose it to your manager, or department leader.

If an actual or potential conflict of interest is determined to exist, we will take such steps as we deem necessary to reduce or eliminate this conflict.

## 3.5 Employment of Relatives

To avoid nepotism, we will not hire, promote or transfer family members or significant others into the same department, enterprise-wide. Department is defined as anyone reporting into a single VP. For the purposes of this policy, family members are defined as: spouse, partner, significant other, mother, father, son, daughter, sister, brother, grandparent, aunt, uncle, cousin, nephew or niece and any step or in-law variations therein.

Given Storable's growth through acquisition, the Company excludes acquisitions from the definition of 'hire' or 'transfer' above.

Family members or significant others who are in the same reporting line or department through an acquisition will be allowed to remain in-place, but may not be transferred, promoted or otherwise moved into another role which may be in violation of this policy.

It is the responsibility of each employee to contact their manager or People Operations with any potential or existing personal relationship which falls under the definitions provided so the Company can decide how best to address the situation. If you have any questions about this policy or whether or not a referral may fall under it, please reach out to your People Operations Business Partner.

## 3.6 Romance at Work

We understand that true love is true love and there is nothing anyone can do about it. However, please try not to engage in a romantic relationship with your coworkers. It has the potential to create unnecessary drama and distraction which leads to a messy work situation. If you decide to be in a relationship with another employee, you must report the relationship to People Operations.

Of course, if there is ever any kind of intimate relationship between a Storable leader and their direct or indirect report, that is obviously not okay, and situations like this will be resolved very quickly as it is absolutely a terminable offense. Please don't make that mistake; it won't be fun for anyone.

## 3.7 Employee Referrals

We think you're great and we're willing to bet your referrals are great too. We encourage you to refer qualified candidates to open positions. Given our nepotism policy, if you refer a family member you must **talent@storable.com** for awareness.

If you refer a candidate who is subsequently hired and completes 90 days of regular, active service, you will receive Storabills (see structure below).

To be eligible for an active referral, you must personally know the candidate and upload the candidate into our ATS (applicant tracking system) where you'll answer a few questions about them.

If the candidate applies, they must indicate you as their referral source on their primary employment application. The bonus does not apply to part-time roles or internships.

Passive referrals are for when you connect your social network(s) in the ATS to share jobs and someone applies using that link and is hired. You don't need to know them and you'll still. get a referral bonus.

To be eligible for the bonus, your referral must be hired and have completed 90 days of successful employment with Storable and both of you must be employees at the time of the payout. Your bonus will be paid out via Storabills in Bucketlist.

### Referral Bonus Structure:

- For passive referrals (via social postings): **500 Storabills**
- For the majority of roles + active referral: **1500 Storabills**
- For Engineering, Product, Director or above + active referral: **2500 Storabills**



## 3.8 Background Check Policy

All offers of employment (full-time, part-time and seasonal) at Storable are contingent upon clear results of a thorough background check. Background checks will be conducted on all final candidates and on all employees who are promoted, as deemed necessary.

**Background checks will include:**

- Social Security Number Trace: validates the applicant's Social Security number, date of birth and former addresses.
- Nationwide Criminal Database Search
- Sex Offender Registry Search
- County and Federal Criminal Court Search: includes review of criminal convictions and probation.

**The following factors will be considered for applicants with a criminal history:**

- The nature of the crime and its relationship to the position.
- The time since the conduct, conviction and/or completion of the sentence.
- The number (if more than one) of convictions.
- Any mitigating factors.

**The following additional background searches will be required if applicable to the position:**

Credit History: confirms candidate's credit history. This search will be run for positions that involve management of Storable funds and/or handling of cash or credit cards.

 **Procedure**

People Operations will order the background check upon receipt of the signed offer letter and required authorization and an employment screening service will conduct the checks. A designated People Operations representative will review all results.

The People Operations representative will notify the hiring manager regarding the results of the check. In instances where negative or incomplete information is obtained, the appropriate management and the Chief People Officer will assess the potential risks and liabilities related to the job's requirements and determine whether the individual should be hired. The candidate will be contacted and offered the opportunity to provide additional information.

If a decision not to hire or promote a candidate is made based on the results of a background check, there may be certain additional Fair Credit Reporting Act (FCRA) or state requirements that will be handled by People Operations in conjunction with the employment screening service (if applicable).

All background check information will be kept confidential. Background check information will be maintained in a file separate from employees' personnel files for a minimum of five years. Storable complies with all applicable federal, state, and local laws regarding background checks.

Storable reserves the right to modify this policy at any time without notice.



## 4.1  Attendance Policy

Stuff happens. We get it. If you know ahead of time that you will be absent or late, you must provide reasonable advance notice to your manager. You may be required to provide documentation of any medical or other excuses for being absent or late where permitted by applicable law.

Failure to provide reasonable notice or adhere to the attendance policy and maintain consistent and sustained attendance may result in discipline, up to and including termination.

Absences resulting from approved leave or approved accommodations are exceptions to the policy.

## 4.2  Overtime

Our workweek is Sunday at 12:00 am - Saturday at 11:59 pm. If you are nonexempt, you will be paid overtime in accordance with federal and state law. All overtime must be approved in advance, in writing, by your manager.

At certain times we may require you to work overtime. We will attempt to give as much notice as possible in these instances. However, advance notice may not always be possible.

Failure to work overtime when requested or working unauthorized overtime may result in discipline, up to and including termination

Unless otherwise required or exempted by law, overtime pay of one and one-half times your regular rate of pay is paid for any hours worked in excess of 40 hours in a workweek. Holiday Pay, Vacation days/PTO and other absences do not count as time worked for computing overtime.

## 4.3  Pay Periods and Pay Dates

The standard pay period is semi-monthly for all team members. Pay dates are on the 5th and the 20th of the month, but are subject to change. If a payday falls on a Saturday or a holiday (unless the holiday is a Sunday), you will be paid on the preceding workday. If payday falls on a Sunday, you will be paid on the next workday.

Review your paycheck for accuracy. If you find an issue, report it to your manager or department leader immediately.

## 4.4  Paycheck Deductions

Storable is required by law to make certain deductions from your pay each pay period. This includes income and unemployment taxes, Federal Insurance Contributions Act (FICA) contributions (Social Security and Medicare) and any other deductions required under law or by court order for wage garnishments. The amount of your tax deductions will depend on your earnings and the number of exemptions you list on your federal Form W-4 and applicable state withholding form. You may also authorize voluntary deductions from your paycheck, including contributions for insurance premiums, retirement plans, spending accounts, or other services. Your deductions will be in your wage statement.

We will not make deductions to your pay that are prohibited by federal, state, or local law. If you have any questions about deductions from your pay, contact your manager or department leader. You will be reimbursed in full for any isolated, inadvertent, or improper deductions, as defined by law. If an error is found, there will be an adjustment, which will be paid no later than your next regular payday.

## 4.5  Recording Time

All nonexempt team members are required to report their hours accurately. It is a condition of employment that all nonexempt team members record every minute of their time worked. You must "clock in" when you are ready to commence work, "clock out" when you leave work for lunch, clock in when you return ready for work, and clock out when you finish work for the day. You are required to notify your manager or the payroll department of any pay discrepancies, unrecorded or misrecorded work hours, or involuntary missed meal or break periods within 30 days.

No work shall be performed prior to clocking in at the start of the work day, during a lunch break while clocked out, or after clocking out at the end of the work day.

In other words, working "off the clock" is strictly prohibited. No one in the Organization has the authority to ask, or encourage, or suggest that you should work "off the clock." If at any point you believe you are being pressured to work "off the clock" by anyone at Storable, please notify People Operations or the Chief Executive Officer immediately.

Falsification of time records or recording time for other team members may result in discipline up to and including termination of employment.





## 4.6 Job Abandonment

If you fail to show up for work or call in with an acceptable reason for the absence for a period of three consecutive days, you may be considered to have abandoned your job and voluntarily resigned from the Organization.

## 4.7 Death Benefit

Peace of mind is important at Storable. For that reason, we've decided to provide a Death Benefit to all eligible Storriors. Even if you have life insurance, it can take time for the paperwork to process and for payments to be issued, and in that interim your family may still have financial needs. So, in the event of your death and as soon as administratively practicable, your primary beneficiary will be eligible to receive a one-time payment equivalent to one month of your pay or salary, absent any applicable withholdings or deductions. This is above and outside of any Life Insurance you may have or be eligible for.

## 4.8 Support for Nursing Mothers

Storable recognizes the health advantages of breastfeeding for infants and mothers. To show our support in the workplace, we provide a supportive environment to enable breastfeeding employees to express their milk during work hours. This includes a company-wide lactation support program. We subscribe to the following support policy. Storable is committed to prohibiting retaliation against employees requesting to take break time under this policy

**Storable Responsibilities**

All breastfeeding employees who choose to continue providing their milk for their infants after returning to work will receive:

 ### Milk Expression Breaks

Eligible employees may take a reasonable amount of break time to accommodate the employee's need to express breast milk for your nursing child. You can work with your manager on a schedule that allows you the time needed for milk expression while still accomplishing your daily work.

Employees who use their regular paid rest breaks as their lactation breaks are paid during the rest breaks.

If you use an unpaid meal break or additional non-working time to express breast milk, generally such time will be unpaid unless required by applicable law. Employees who are required to record time must clock in and out for their lactation breaks in accordance with Storable's timekeeping policy.

Exempt employees may be provided break time with pay when necessary to comply with state and federal wage and hour laws.





### Breastfeeding Equipment

Storable's insurance carrier pays 100% for a new breast pump if the employee selects an in network provider. For any breastfeeding parents, Storable will reimburse the employee up to $50 for a hands-free breast pump to provide the opportunity for every breastfeeding parent to receive a hands-free pump at no cost. For more information please contact People Operations.



### Education

Please contact Cigna and enroll in the Healthy Pregnancies Healthy Babies (HPHB) program for support.  This extensive program is a comprehensive management program that provides support throughout your pregnancy.



### Communication with Managers

If you wish to breastfeed or express milk during the workday, please work with your manager on a schedule that allows you the time needed for milk expression so that you can still accomplish your work.

## 4.9  Travel Expenses

Travel expenses are the reasonable and necessary expenses incurred by team members when traveling on approved Storable business trips.

The guidelines below are an abbreviated version of the full Travel & Expense policy. For more information see the full Travel & Expense Policy.

**Travel Expenses**

The Organization pays the actual amounts incurred for appropriate expenses when you are on travel assignments. **Examples of typical expenses include the following:**

- Airline tickets
- Meals and lodging
- Car rental, taxi fare or rideshare charges
- Business supplies and services
- Associated gratuities
- Other expenses necessary to achieve the business purposes

**Family Members**

Team members may be permitted to bring guests along with them on work travel provided Storable does not incur any additional expense as a result and team member productivity and work product are not impacted.

**Air Travel**

Storable pays for economy or tourist class airfares when traveling domestically or on Organization business. If an employee wishes to fly in any other class, they will be responsible for the difference in fare. For international travel, see the complete travel policy.

**Hotels**

Neither in-room movies nor refreshment bars are approved Organization expenses.





**⊙ Rental Cars**

You are to use rental firms having existing relationships with the Organization and, where feasible, have negotiated discount rates. Available reasonable transportation is to be used.

**⊙ Personal Vehicles**

When using your own vehicle for business purposes, you must maintain insurance coverage as required by law. Travel between your home and a local office is not considered to be business travel. You may not use your personal vehicle for business travel without authorization. You will be reimbursed for vehicle use at the standard IRS mileage rate.

**⊙ Reporting**

Report approved expenses and include a description of the expense, its business purpose, date, place and the participants. Receipts are required for all expenses in excess of $75.00.

**⊙ Travel Reservations**

Airline travel, rental cars and hotels must be booked through the corporate designated travel agency in order to be reimbursed.

## 4.10 Out of State Travel Expense Policy

Storable recognizes that there might be occasions when a Storrior, or the partner or family member of a Storrior ("Family Member"), needs access to health care that is not provided within the state in which they reside.

This policy is intended to support and provide financial assistance to Storriors who must travel out of state in order to obtain necessary health care services.

 ### Financial Support

Eligible Storriors may receive reimbursement of expenses incurred in traveling to a location where necessary health care services may be obtained. Such reimbursements will not exceed $5,000.00 in the aggregate, over the course of an employee's career. Storable will reimburse expenses under this policy for:

⊙ Travel to and from the location where necessary health care services are provided (including travel costs for a companion for the employee's own health care services)

⊙ Accommodation near the location of the services

⊙ Child care services needed when seeking access to health care

⊙ Receipts must be provided

Storriors can apply for such financial support by filling out the Storable Healthcare Travel Reimbursement Program Application found on the Warehouse, indicating only the amount of money spent for the above purposes. Such applications will be treated confidentially, and no questions will be asked concerning the health care treatment sought (nor should any such information be provided voluntarily to Storable). While Storable relies on its Storriors to use this policy in good faith, abuse of this policy will result in disciplinary action, up to and including termination of employment.



## Time Off

Storriors are able to use Flexible Vacation while accessing these services. This includes ability to take up to 5 days off for travel, preparation for and receipt of health care services, and recovery time. If more than 5 days is needed, leave may be available under another Storable policy.

Leave requests related to the need to access health care or to assist a family member in accessing health care will be approved without question and treated confidentially.



## Eligibility

Storriors will be eligible for the benefits under this policy if:

- They must travel out of state in order to obtain health care services for their own medical condition, and the Storrior is enrolled in Storable medical plans

- Their family member must travel out of state in order to obtain health care services for a family member's medical condition, and the family member is enrolled in Storable medical plans

- All receipts are available

## 4.11 Life Happens Loan Program

### Overview

Whether it's a busted water heater, an unexpected vet bill or something else that results in a significant, unexpected financial hit - you shouldn't have to worry about paying interest charges on a credit card, or wondering how you'll pay for it at all. That's why Storriors have access to the Life Happens Loan Program (LHLP).

With the LHLP you can be reimbursed for eligible expenses (up to $1,500.00) and agree to repay the borrowed amount directly from your paycheck over the next 12 months, on a schedule and payment plan that you will agree to.

### Details

To keep the program open and accessible, you may only have one LHLP out at any time. After repaying your commitment, you become eligible to use the LHLP again. Should you leave Storable prior to repaying your full obligation, the balance would be deducted from your last paycheck.

The purpose of the program is to help with unforeseen expenses as a result of catastrophic loss or accidents, not for routine purchases, planned expenses or gifts.

### Eligibility and Application

To be eligible for the LHLP Storriors must have at least one year of service and must be in good standing, which means not in an active Performance Improvement Plan or in an active step of Discipline.

To apply for the LHLP contact your People Operations Business Partner or send an email to Popssharedservices@storable.com, you will be asked to provide documentation of the expense and sign an agreement regarding your borrowed amount and repayment terms. If you have any questions about the Program or your eligibility for it, please contact your People Operations Business Partner.



## 5.1  Outside Employment

Outside employment that creates a conflict of interest or that affects the quality or quantity of your work performance or availability at Storable is prohibited.

We understand that you may seek additional employment during off-hours, but in all cases, we expect that Storable remains your only full time job or any outside employment will not affect your job performance, work hours, or availability, or otherwise adversely affect your ability to effectively perform your duties. Any conflicts should be reported to your manager or department leader. Failure to adhere to this policy may result in discipline up to and including termination.

## 5.2  Standards of Conduct

We want to create a work environment that promotes job satisfaction, respect, responsibility, and integrity for all our team members, clients, customers and other stakeholders. We all share in the responsibility of maintaining and improving the quality of our work environment. By deciding to work here, you agree to follow our rules.

While it is impossible to list everything that could be considered misconduct in the workplace, what is outlined here is a list of common-sense infractions that could result in discipline, up to and including immediate termination of employment. This policy is not intended to limit our right to discipline or termination team members for any reason permitted by law.

Examples of inappropriate conduct include:

➔ Violation of the policies and procedures set forth in this handbook.

➔ Possessing, using, distributing, selling, or negotiating the sale of illegal drugs or other controlled substances.

➔ Being under the influence of illegal drugs during working hours on Organization property (including in Organization vehicles), or on Organization business.

➔ Inaccurate reporting of the hours worked by you or any other team members.

➔ Providing knowingly inaccurate, incomplete, or misleading information when speaking on behalf of the Organization or in the preparation of any employment-related documents including, but not limited to, job applications, personnel files, employment review documents, intra-company communications, or expense records.

➔ Taking or destroying Organization property.

➔ Possession of potentially hazardous or dangerous property (where not permitted) such as firearms, weapons, chemicals, etc., without prior authorization.

➔ Fighting with, or harassment of any fellow employee, vendor, or customer.



- Disclosure of Organization trade secrets and proprietary and confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development information, customer lists, patents, trademarks, etc.) of the Organization or its customers, contractors, suppliers, or vendors.

- Refusal or failure to follow directions or to perform a requested or required job task.

- Refusal or failure to follow safety rules and procedures.

- Excessive tardiness or absences.

- Unprofessional on-camera behavior (smoking, vaping, failure to dress according to the policy, etc.)

- Working unauthorized overtime.

- Solicitation of fellow employees during working time.

- Failure to dress according to Organization policy.

- Use of obscene or harassing language in the workplace.

- Engaging in outside employment that interferes with your ability to perform your job at this Organization.

- Refusal or failure to cooperate in an internal investigation.

- Lending keys or key cards to Organization property to unauthorized persons.

Nothing in this policy is intended to limit your rights under the National Labor Relations Act, or to modify the at-will employment status where at-will is not prohibited by state law.

## 5.3  Criminal Activity/Arrests

Involvement in criminal activity during employment, whether on or off Storable property, may result in disciplinary action including suspension or termination of employment. Disciplinary action depends upon a review of all factors involved, including whether or not the action was work-related, the nature of the act, or circumstances that adversely affect attendance, performance or public trust in the Organization. Any disciplinary action is not dependent upon the disposition of any case in court.

You are expected to be on the job, ready to work, when scheduled. Inability to report to work as scheduled as a result of an arrest may lead to disciplinary action, up to and including termination of employment.

Any disciplinary action taken will be based on information reasonably available. This information may come from witnesses, police, or any other source as long as management has reason to view the source as credible.



## 5.4  Disciplinary Process

The Organization encourages a system of progressive discipline depending on the type of prohibited conduct.

The Discipline Policy applies to all Storable team members. Under the Discipline Policy, progressive discipline steps will be followed in employee disciplinary matters except in matters the Organization, its representatives, or its management determine need to be addressed outside the progressive system.

Appropriate action will be determined based on factors such as severity, frequency and degree of deviation from expectations. Because of the great variety of situations that may arise, the Company may need to make decisions related to employment in a manner other than as provided in this policy. Importantly, there may be particular situations in which the seriousness of an offense justifies bypassing one or more of the steps of discipline summarized herein.

Disciplinary actions may take place in several forms. The forms of disciplinary action provided under this policy are: Oral/Verbal Reminder; Written Reminder; Final Reminder/ Decision-Making Leave; and Termination.

People Operations must be consulted beforehand when disciplinary action with an employee is necessary. In certain cases, merit reviews and economic adjustments may be affected for employees in a formal step of discipline.

## 5.5  Post-Employment Reference Policy

Storable policy is to confirm dates of employment and job title only. With written authorization, the Organization will confirm compensation. Forward any requests for employment verification to our People Operations Shared Services team at everification@storable.com.



## 6.1 Acceptable Use Policy

 **Overview**

Computer systems are provided to Storable staff in order to allow them to perform their job responsibilities quickly and efficiently. However, the use of these systems also introduces risks to the business if they are not used in accordance with established Company policies.

It is not the intention of this policy to impose restrictions that are contrary to the Organization's established culture of openness, trust and integrity. Rather, this policy is intended to protect employees, partners and the Company itself from illegal or damaging actions by individuals, either knowingly or unknowingly.

 **Scope**

This policy applies to the use of information, electronic and computing devices, and network resources to conduct Company business or interact with internal networks and business systems, whether owned or leased by Storable, the employee, or a third party. All employees, contractors, consultants, temporary, and other workers at Storable and its subsidiaries are responsible for exercising good judgment regarding appropriate use of

corporate information, electronic devices, and network resources in accordance with Company policies, standards, and all applicable laws and regulations. This policy applies to employees, contractors, consultants, temporaries, and other workers at Storable, including all personnel affiliated with third parties. It also applies to all data and equipment that is owned or leased by Storable and its subsidiaries.

 **Policy**

All Company computer resources, including but not limited to desktops, laptops, software, operating systems, storage media, emails, files and data are the property of Storable. These systems are to be used for business purposes in serving the interests of the Company, its clients, and customers in the course of normal business operations.

Effective security is a team effort involving the participation and support of every employee who deals with electronic information and/or information systems. It is the responsibility of every computer user to read, understand and abide by this policy, and to conduct their activities accordingly. Specific guidance for end user acceptable use may be found in the standards established for this policy.



 ## Standards

When using Company computer resources, users are expected to respect the rights of other users, protect the confidentiality and integrity of Company data, use computer resources only for purposes related to the business, and observe all relevant laws and regulations. The use of Company systems, equipment and networks for any illegal activity is strictly prohibited.

Users are responsible for safeguarding systems and the confidentiality, integrity and availability of information within their control. Before leaving the area of a workstation where a user is logged in, the user must either log out of the workstation or lock the screen.

Users must promptly report any unexpected system behavior or irregularities noticed in any computer system to the ITOps Help Desk. Additionally, users must report any suspected or actual system intrusion, hack, malware, or other computer security incident.

Copyright protections must be observed at all times including for photographs, videos, books and software. Hardware and software installed on any Storable computer or network must be licensed to the Company, and must be used in accordance with licensing agreements and Storable policies.

Staff may not install any unauthorized programs or software on any Storable computer without the explicit permission of the ITOps department.

Staff are responsible for exercising good judgment regarding the personal use of Company computer systems. Excessive personal use of Company resources is not permitted and should be kept to a minimum. Individual departments are responsible for creating guidelines concerning the acceptability of personal use of the Internet and email during work hours. In the absence of such policies, and if there is any uncertainty, employees should err on the side of professional conduct and business-use of Company assets and resources.

Staff are expected to protect Company computing resources and take precautions to prevent situations that may result in the damage or loss of any computer system. This includes always keeping Company laptops and other mobile devices in the user's possession or in a secured location, not using them in a way that increases the risk of damage to the system, and not allowing them to be used by unauthorized individuals (e.g. children, spouses, friends).

 ## Data Protection

Company information that is non-public must be protected at all times. Non-public information is classified as confidential and must be protected from disclosure, modification, and access by unauthorized individuals. All data that is created, stored or maintained by Storable is considered confidential unless it has been explicitly made available for public consumption through authorized channels. Refer to the **Storable Data Protection and Classification Policy** for details.

Under no circumstances are staff allowed to transmit unprotected cardholder data, including PANs (credit card numbers), by end user messaging technologies such as email, instant messaging, SMS, or chat. Additionally, staff may not copy or move cardholder data onto their local hard drive or removable storage unless explicitly authorized by their supervisor for a defined business need.

Staff may not share confidential information outside of the Company without written approval from the Vice President, Technology.



Staff must notify their manager and ITOps immediately in the event that:

1. They become aware of, or suspect, that confidential information has been lost, stolen or otherwise disclosed in a manner that violates this policy.

2. They become aware of, or suspect, that a Company computer system has been lost or stolen.

3. They become aware of, or suspect that an access token, key card or other device used to access a Storable office facility has been lost or stolen.

 ## Privacy and Monitoring

For security, quality control and network maintenance purposes, authorized individuals within the Organization may monitor and inspect Company equipment, systems, and network traffic at any time. Users are prohibited from taking any action to tamper with or circumvent security or monitoring systems, damage or alter any computing or network resource, gain or seek to gain unauthorized access to any computing and network resource, or engage in any type of spoofing activity.

The voicemail, email, internal chat, office internet circuits, and all data transmitted or received through these systems, is the exclusive property of the Organization. Staff should not have any expectation of privacy when using Storable computing resources (including cloud-based applications such as email, chat, video conference, and phone), and the Organization may restrict the use of, and access to, any computing resources at any time.

The Organization reserves the right to access, monitor, intercept, and/or review all data transmitted, received, or downloaded over its systems or network. Any individual who is given access to the Organization's computer systems or network is hereby given notice that the Organization will exercise this right periodically, without prior notice and without prior consent.

To prevent the inadvertent access and display of potentially confidential information by 3rd party apps, smart devices or more, staff should NOT:

1. Create or edit Storable calendar invites for Storable events to include personal (non-business related) calendars or those of spouses and significant others.

2. Forward business emails from their Storable email account to their personal email account.

Storable's right to monitor extends to all Company-managed property, including, but not limited to laptops, desktops, tablets, facsimiles, and telecommunication systems. This includes 'private', 1-on-1 direct chat or email messages sent using the Organization's property or systems. Deleted information may be kept on back-up media and recovered for any purpose at a later date.

Storable has the right and sole discretion to monitor, identify and block access to any internet sites on Company-managed systems, including, but not limited to sites containing sexually explicit or other material deemed inappropriate by the Company. The Organization also has the right and sole discretion to determine whether the use of computer resources is appropriate and to restrict access to Company computer resources at any time.

By accessing and/or using Storable computer resources, users expressly waive any and all rights of privacy in anything they create, store, send, or receive.



**The interests of the Organization in monitoring and intercepting data include, but are not limited to:**

➡ Protection of Organization trade secrets, proprietary, and similar confidential commercially -sensitive information (e.g. financial or sales records/reports, marketing or business strategies/ plans, product development, customer lists, patents, trademarks, etc.).

➡ Managing the use of the computer systems.

➡ Monitoring and prohibiting behavior in violation of this and other policies.

➡ Assisting team members in the management of electronic data during periods of absence.

 ## Personal Computing Devices

Storable provides all staff with a Company -managed laptop or workstation that may be used when at one of Storable's office locations, or when working remotely. These laptops have been securely configured and are managed by ITOps so that they remain in a secure state. Staff are expected to utilize their Company -issued laptop when conducting Company business and should refrain from using personal computing equipment, even when working from home.

Staff may use personal computing devices such as a smartphone to access email, chat and other business applications when they are not able to use their Company-issued laptop for such access. Under no circumstances are staff allowed to save confidential company information, especially credit card data or personally identifiable information on their personal device.

Situations that could result in confidential information being saved to a personal device include:

● Clicking on a link in a Slack message to open a document
● Clicking on an attachment or a link in an email

In the event that a personal computing device is used to conduct Storable business, staff are expected to follow the below guidelines with respect to the configuration of the device:

➡ Configure all personal computing devices with a password, passcode, PIN, fingerprint scan, facial recognition or other form of authentication.

➡ Report the loss of any personal computing device used to access Storable data or applications to the ITOps team so that user credentials can be reset as needed.

➡ Prior to replacing or discarding any personal computing device used to access Storable data or applications, perform a factory reset of the device, wipe the hard disk of all data, or physically destroy the hard disk as appropriate.

➡ Configure devices to automatically lock the screen after 15 minutes (or less) of inactivity.



Ensure that disk encryption is enabled on all personal computing devices used to access Storable data or applications:



### Smartphones

→ **iPhone** - Modern versions of the Apple iPhone are encrypted by default when a passcode is set. Confirm your device is encrypted by scrolling to the bottom of the Settings > Touch ID & Passcode screen. You should see the "Data protection is enabled" message. Note that the menu may be slightly different depending on the version of IOS installed.

→ **Android** - Most smartphones running Android 5.0 or higher that have a PIN code assigned will be encrypted. Confirm your device is encrypted by going to Settings > Security > Advanced > Encryption and Credentials. Note that the menu may be slightly different depending on the version of Android installed.





### Laptops/Desktop

→ **Windows** - It is beyond the scope of this document for a complete discussion of disk encryption for Windows devices. There are a variety of ways to encrypt your Windows device. One of the most common is with Bitlocker which comes installed on Pro and Enterprise versions of Windows 7 or later, but is not available on Home editions of Windows. If running a Home edition of Windows 10, you may be able to use Windows device encryption, but only if your system meets the hardware requirements. There are also third-party tools that can be used for disk encryption on Windows. The best option is to use your Storable laptop when conducting Storable business which is already encrypted.

→ **Apple** - Your Apple laptop/desktop includes a utility called FileVault that can be used for disk encryption. This can be done by going to  System Preferences > Security & Privacy > FileVault. The best option is to use your Storable laptop when conducting Storable business which is already encrypted.

 ## Security Awareness

Information security is the responsibility of all staff at Storable. As such, the company will provide staff with security training designed to teach them how to detect and avoid common cyber threats. The awareness program will include the following at a minimum:

→ Staff will undergo security awareness training at least twice per calendar year which must be completed within 30 days of being assigned.

→ All new hires will be assigned security awareness training which must be completed within 30 days of their start date.

→ At least six times per calendar year staff will undergo simulated phishing exercises which are not announced in advance. Any staff who fails the simulated phishing exercise will be provided remedial training on how to detect and avoid phishing emails.

→ A security awareness newsletter will be created and shared with all Storable staff at least six times per calendar year.



 **Violations**

Any team members who violate this policy will be subject to corrective action, up to and including termination of employment. If necessary, the Organization will also advise law enforcement officials of any illegal conduct.

## 6.2  Computer Security and Copying of Software

Software programs purchased and provided by Storable are to be used only for creating, researching and processing materials for Organization use. By using Organization hardware, software, and networking systems you assume personal responsibility for their use and agree to comply with this policy and other applicable Organization policies, as well as city, state and federal laws and regulations

All software acquired for or on behalf of the Organization, or developed by Organization team members or contract personnel on behalf of the Organization, is and will be deemed Organization property. It is the policy of the Organization to respect all computer software rights and to adhere to the terms of all software licenses to which the Organization is a party. The Director of Information Technology Operations is responsible for enforcing these guidelines.

You may not illegally duplicate any licensed software or related documentation. Unauthorized duplication of software may subject you and/or the Organization to both civil and criminal penalties under the United States Copyright Act. To purchase software, obtain your manager's approval. All software acquired by the Organization must be purchased through Information Technology Operations.

You may not duplicate, copy, or give software to any outsiders including clients, contractors, customers and others. You may use software on local area networks or on multiple machines only in accordance with applicable license agreements entered into by the Organization.

For additional information and details around the organization's expectations around our electronic systems, networks, data security or acceptable use of the above refer to the **Security and Compliance space on Confluence.**





## 6.3  Non Solicitation/No Distribution Policy

To avoid disruption of business operations or disturbance of team members, visitors, and others, Storable has implemented a Non Solicitation/No Distribution Policy. For purposes of this policy, "solicitation" includes, but is not limited to, selling items or services, requesting contributions and soliciting or seeking to obtain membership in or support for any organization. Solicitation performed through verbal, written, or electronic means is covered by the Non Solicitation/No Distribution Policy.

You are prohibited from soliciting other team members during your assigned working time. For this purpose, working time means the time during which either you or the team members who are the object of the solicitation are expected to be actively engaged with assigned work. You may conduct solicitations during your lunch period or other authorized non working time, so long as you do so when the other team members are also on non-working time.

Electronic distribution of materials is prohibited during work time. Literature that violates the company's equal employment opportunity (EEO) and non harassment policies (including threats of violence), or is knowingly and recklessly false, is never permitted.

This policy is not intended to restrict the statutory rights of team members, including the right to discuss terms and conditions of employment.

Violations of this policy should be reported to your manager or department leader.



## 6.4  Personal Appearance

Your personal appearance reflects on the reputation, integrity and public image of Storable. All team members are required to report to work neatly groomed and dressed. You are expected to maintain personal hygiene habits that are generally accepted in the community, including clean clothing, good grooming and personal hygiene and appropriate attire for the workplace and the work being performed. Use common sense and good judgment in determining what to wear to work.

The Organization will make every effort to reasonably accommodate team members with disabilities or with religious beliefs that make it difficult for them to comply fully with the personal appearance policy. Contact your manager or People Operations to request a reasonable accommodation.

Failure to comply with the personal appearance standards may result in being asked to leave meetings to take corrective action. Repeated violations may result in disciplinary action, up to and including termination of employment.



## 6.5 Social Media Policy

At Storable, we recognize that technology provides unique opportunities to participate in interactive discussions and share information using a wide variety of social media. However, use of social media also presents certain risks and carries with it certain responsibilities. To minimize risks to the Organization, you are expected to follow our guidelines for appropriate use of social media.

This policy applies to all team members who work for the Organization.


### Guidelines

For purposes of this policy, social media includes all means of communicating or posting information or content of any sort on the Internet, including to your own or someone else's blog, personal website, Twitch or Youtube channel, social networking or affinity website, forum, message board or a Slack channel, whether associated or affiliated with the Organization, as well as any other form of electronic communication.

Organization principles, guidelines, and policies apply to online activities just as they apply to other areas of work. Ultimately, you are solely responsible for what you communicate on social media.

You may be personally responsible for any litigation that may arise should you make unlawful defamatory, slanderous, or libelous statements against any customer, manager, owner, or team members of the Organization.


### Know and Follow the Rules

Ensure your postings are consistent with these guidelines. Postings that include unlawful discriminatory remarks, harassment, and threats of violence or other unlawful conduct will not be tolerated and may subject you to disciplinary action up to and including termination.


### Be Respectful

The Organization cannot force or mandate respectful and courteous activity by team members on social media during non working time. If you decide to post complaints or criticism, avoid using statements, photographs, video, or audio that reasonably could be viewed as unlawful, slanderous, threatening, or that might constitute unlawful harassment.

Examples of such conduct might include defamatory or slanderous posts meant to harm someone's reputation or posts that could contribute to a hostile work environment on the basis of race, sex, disability, age, national origin, religion, veteran status, or any other status or class protected by law or Organization policy.





## Maintain Accuracy and Confidentiality

When posting information:

➡ Maintain the confidentiality of trade secrets, intellectual property, and confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.) related to the Organization.

➡ If posting photos or videos from inside a Storable office or meeting, ensure you're not unknowingly violating the point above (whiteboards, screens, dashboards, etc).

➡ Do not create a link from your personal blog, website, or other social networking sites to an Organization website that identifies you as speaking on behalf of the Organization.

➡ Never represent yourself as a spokesperson for the Organization. If the Organization is a subject of the content you are creating, do not represent yourself as speaking on behalf of the Organization. Make it clear in your social media activity that you are speaking on your own behalf.

➡ Respect copyright, trademark, third-party rights and similar laws and use such protected information in compliance with applicable legal standards.



## Media Contacts

If you are not authorized to speak on behalf of the Organization, do not speak to the media on behalf of the Organization. Direct all media inquiries for official Organization responses to Marketing or People Operations.



## Retaliation and Your Rights

Retaliation or any other negative action is prohibited against anyone who, based on a reasonable belief, reports a possible deviation from this policy or cooperates in an investigation. Those who retaliate against others for reporting a possible deviation from this policy or for cooperating in an investigation will be subject to disciplinary action, up to and including termination.

Nothing in this policy is designed to interfere with, restrain, or prevent team members from communications regarding wages, hours, or other terms and conditions of employment, or to restrain team members in exercising any other right protected by law. All team members have the right to engage in or refrain from such activities.



## 6.6  Artificial Intelligence Usage Policy

The increasing popularity of artificial intelligence tools has provided unique opportunities to adopt new technologies that aid our mission and increase our productivity when possible. We understand it also presents risks and we want to ensure responsible use to protect employees, clients, customers and the company.

The use of generative AI chatbots and other AI technologies will generally be allowed while performing work for Storable. To minimize risks to the Organization, you are expected to follow our guidelines for appropriate and ethical use of AI technologies.

This policy applies to all Storable employees, contractors, and third parties of the business who use or have access to Storable data and/or information systems.

**All employees are expected to adhere to the following best practices when using AI tools:**

**Privacy and Data Security:** Employees must prioritize the protection of personal and confidential data when using AI tools, and must take appropriate measures to safeguard data from unauthorized access, disclosure, alteration, or destruction, or use of such information for the purpose of improving the AI platform (unless appropriately deidentified). Be sure to exercise discretion when sharing information. Sensitive or confidential company data must not be shared with any AI tool without prior approval from the VP of Technology. Finally, any data collected, processed, or shared with any AI tool must adhere to privacy laws and regulations.

**Accountability and Human Oversight:** While AI tools can assist decision-making, ultimate responsibility and accountability for decisions lie with you. Individuals must exercise critical judgment and use AI as a tool to enhance their work, rather than relying solely on automated outputs. Regular human oversight is essential to identify and rectify potential biases or errors in AI-generated results.

**Data Sharing and Third Parties:** When sharing data with third-party AI providers or collaborators, employees must, prior to their use, ensure appropriate data protection measures are in place. Contracts or agreements should clearly define the purpose, scope, and security measures for data sharing, and third-party compliance with data privacy regulations must be verified prior to engagement.

**Evaluation of AI Tools:** Employees should use only reputable and approved AI tools and be cautious when using tools developed by individuals or companies without established reputations. Any AI tool used by employees must meet our security and data protection standards. Prior to the implementation or use of any AI tool, a request must be submitted to the ITOps help desk (help@storable.com). Such requests will include a review of the tool's security features, terms of service, and privacy policy.

**Lawful and Ethical Use:** All individuals utilizing AI tools must comply with applicable laws, regulations, ethical guidelines, and Company Employee Handbook. AI usage should not infringe upon the rights of individuals, discriminate against any group, or engage in any illegal or unethical activities.

- With the ubiquity of note-taking tools and AI assistants, it's smart to assume conversations are being documented. If you're not comfortable with this, then please be sure to note this at the start of the meeting.

- When sending AI Companion meeting notes out, you must review content for accuracy to avoid misunderstandings and misrepresentation of what was discussed.

For the full policy, please see the AI Tool Usage Policy.

Violations of this policy may result in disciplinary action, up to and including termination of employment.



## 7.0 Benefits

###  7.1 Paid Time Off

 **Unlimited Flexible Time Off**

We champion the philosophy of trusting full-time team members to take the time off they need with the expectation that what they need is "reasonable" and balances individual needs, team needs and the needs of the business. To that end, the Company has adopted a flexible policy, in which each regular, full-time employee is afforded the flexibility to take time off for personal vacation, leisure time, or for personal or family illnesses and appointments that fall outside of FMLA, ADA, or Personal Leave reasons.

Under this policy, time off is considered scheduled or unscheduled. Scheduled FTO is pre-planned and pre-approved, excused absences. Unscheduled FTO is when an employee needs to be out of the office unexpectedly with no notice. The amount of scheduled FTO found to be reasonable is greater than the amount of unscheduled FTO found to be reasonable.

With that said, the Company does have some guidelines and expectations:

➡ Every employee should be taking a minimum of 3 weeks of Flexible Time Off each year, not including Company Holidays. We want to encourage time away to rest and recharge as it's important for our personal and mental well-being.

➡ Employees are expected to give the Company as much notice as possible under the circumstances. When an employee needs to be out of the office unexpectedly, they must call in on workdays as soon as they are aware of the need. Excessive unscheduled FTO may result in requests being declined or considered unexcused.

➡ Time off requests must be submitted in ADP and each manager has the right and is expected to communicate to you what is reasonable and how they will evaluate your time off requests. A manager has the right to decline a time off request if it may put our business goals at risk or unfairly burden the remainder of the team.

➡ Employees are expected to be productive during the time they spend working, to meet and exceed established goals and to refrain from abusing this policy.

The maximum length of any single period of paid time off under this policy is two weeks unless otherwise pre-approved by the employee's manager and People Operations. If an employee wishes to take off more than two consecutive weeks, the employee must follow the Leave of Absence policy below and any such leave may be unpaid.

Employees do not "accrue" flexible time off or other paid time off days as in traditional PTO plans; therefore, employees will not be compensated for "unused" flexible time off or unscheduled time off upon termination under this policy.





## Volunteer Time-Off

Storable believes strongly in supporting team members who want to Do More in their communities. For that reason, every regular, full-time employee is eligible to take up to 8 hours of paid time off to volunteer in their community or for a non-profit organization of their choice. This time may be broken up and used as smaller, 4-hour increments if desired. Volunteer hours do not roll over at the end of the year and may not be combined with other forms of time-off without explicit approval of management.

Of course, all time-off requests must be submitted in ADP for approval and business needs will ultimately dictate availability of time-off.



## Rest, Relax & Recharge (RRR) Time-Off

Mental health is important at Storable and we believe in taking time away to engage in self-care. All regular, full-time employees are eligible to take up to 8 hours of Rest, Relax and Recharge paid time off. To encourage their regular use, these hours do not rollover year over year and must be used within the calendar year. Use them on your birthday, a random Wednesday, or whenever you just need to take a break from it all.

Of course, all time-off requests must be submitted in ADP as soon as practicable for approval and business needs will ultimately dictate availability of time-off.

 ## Entering Time-Off

All time-off should be entered in the ADP WorkforceNow platform.  For any time off, employees are expected to obtain prior approval from their manager. The length of notice required may vary depending on your department and the way your work is scheduled, so be sure to visit with your manager to make sure you know what's expected.

## 7.2  Holidays

Storable US team offers the following paid holidays each year:

- New Year's Day
- Martin Luther King Jr Day
- Memorial Day
- Juneteenth
- Independence Day
- Labor Day
- Thanksgiving Day
- Friday after Thanksgiving
- Christmas Eve
- Christmas Day

For the majority of our teams whose regular work schedule is Monday through Friday, when a holiday falls on a Saturday, it is observed the preceding Friday. Holidays falling on a Sunday will be observed the following Monday.

Given our desire to support our clients seven days a week, the Client Support team observes holidays on the actual dates on which they fall.

If you are a non-exempt employee and you are asked to work on a Company Holiday, you will be eligible to earn pay at 1.5x your regular rate in addition to your regular Holiday pay.



## 7.3  Leaves of Absence

 **Leaves of Absence in General**

The following guidelines are applicable to all types of leaves of absence:

- Leaves of absence may be requested by all regular, full-time employees or regular part-time employees.

- Employees must give at least a 30-day notice to their manager of the employee's intent to take a leave of absence for foreseeable events.

- Thirty (30) days notice is not required in all cases, as with a premature birth, sudden changes in a medical condition or the availability of a child for adoption, death of a family member, etc. In cases such as these, the employee must give as much notice as is practicable.

- Requests for medical leaves of absence are submitted to our third party partner and should indicate the type of leave being applied for, the duration of the leave, and should be accompanied by the required documents.

- Employees who take a sudden leave of absence prior to receiving approval for a leave are required to submit a request for leave within five business days of their first day out.

- Employees who do not initiate a request within the first five days of being out will be considered as having voluntarily resigned and will be notified in writing by their manager and People Operations.

- No holiday pay will be paid for holidays falling within a leave of absence.

- With the exception of military leave, employees who do not report back to work or contact the Company within two (2) working days following the expiration of an approved leave of absence will be considered as having voluntarily resigned and will be notified in writing by their manager with a copy of the notification letter going to People Operations.

- People Operations is responsible for tracking the amount of time taken for any leave of absence during a calendar year, including intermittent leave as provided by the FMLA.

- The Company prohibits employees from engaging in outside employment while on leave.

 **FMLA (Family Medical Leave Act) Leave**

The Company recognizes that it is important for employees to have leave for serious medical conditions, to participate in early child care, to care for family members who have serious health conditions, for situations relating to the military deployment of an employee's family members, and to care for certain family members who have suffered injuries or illness as a result of their military service.

Accordingly, as required by law and if the Company is a "covered employer" as defined under the Family and Medical Leave Act of 1933 ("FMLA"), the Company will permit eligible employees to take family or medical leave, in accordance with the terms of this policy and the FMLA.



**Eligibility**

To qualify for FMLA leave, you must:

1. Have worked for the Company for at least 12 months, though it need not be consecutive;

2. Worked at least 1,250 hours in the last 12 months; and

3. Be employed at a worksite that has 50 or more employees within 75 miles.

If you have any questions about your eligibility for FMLA leave, please contact People Operations.

**Basic FMLA Leave**

An eligible employee shall be entitled to take up to twelve (12) weeks of unpaid leave in a twelve (12) month period for any of the following reasons:

→ To care for a newborn child or the placement of a child with the employee for adoption or foster care;

→ To care for spouse, child, or parent of the employee who has a serious health condition; and

→ Because of the employee's own serious health condition, which renders an employee unable to perform the essential functions of his/her position.

An employee's annual twelve (12) week entitlement to Basic FMLA leave will be calculated using a rolling calendar method. This means that the Company will measure backward twelve (12) months from the date the employee uses Basic FMLA leave to determine the amount of leave to which the employee will be entitled, up to a maximum of twelve (12) weeks in any twelve (12) month period. Leave due to the birth of a child or placement of a child in your home for adoption or foster care can be taken in one continuous twelve (12) week segment within twelve (12) months of the birth or placement of the child or the the bonding time can be taken as intermittent leave within twelve (12) months of the birth or placement of the child.

For employees requesting leave to care for an immediate family member with a serious health condition, the Company may require the employee to submit proof of the familial relationship, such as a birth certificate or marriage license. Any such document will be promptly returned to the employee after it has been reviewed.

**Military Family Leave**

In addition to the Basic FMLA Leave described above, eligible employees may be entitled to take unpaid leave related to military service. An eligible employee may be entitled to take up to twelve (12) weeks of unpaid leave if the employee's spouse, son, daughter, or parent is a member of the National Guard, Reserves, or a regular component of the Armed forces, and on covered active duty or called to covered active duty.

An eligible employee may alternatively be entitled to take up to 26 weeks of unpaid leave in a single 12-month period to care for their ill or injured spouse, child, parent or next of kin (closest blood relative), who is a covered servicemember

The federal and state laws and regulations governing military leave and military family leave change frequently. If you have any military related leave request, please check with People Operations to determine eligibility under the then current applicable rules.

### Notice of Leave

If your need for FMLA leave is foreseeable, you must give the Company at least 30 days prior written notice. If this is not possible, you must at least give notice as soon as practicable (within one to two business days of learning of your need for leave). Failure to provide such notice may be grounds for delaying FMLA covered leave, depending on the particular facts and circumstances.

FMLA requests are to be submitted to the third party partner and the employee is expected to furnish all requested information to the third party in order to review and approve or deny the request. Additionally, if you are planning a medical treatment or a series of treatments, you must consult with the Company first regarding the dates of such treatment to work out a mutually agreeable schedule.

### Certification of Need for Leave

If an employee requests medical leave based upon his/her own serious health condition, or the serious health condition of a spouse, child or parent, the Company may require, in its discretion, that the employee submit a medical certification, in a form approved by the Company, which must be completed by the employee's or family member's health care provider, as appropriate, regarding the serious health condition.

When you request leave, the Company will notify you of the requirement for medical certification and when it is due (at least 15 days after you request leave). If you provide at least 30 days' notice of medical leave, you should also provide the medical certification before leave begins. Failure to provide requested medical certification in a timely manner may result in denial of FMLA-covered leave until it is provided.

The Company, at its expense, may require an examination by a second health care provider designated by the Company. If the second health care provider's opinion conflicts with the original medical certification, the Company, at its expense, may require a third, mutually agreeable, health care provider to conduct an examination and provide a final and binding opinion.

The Company may require subsequent medical recertification. Failure to provide requested certification within 15 days, if such is practicable, may result in a delay of further leave until it is provided.

In addition, the Company will require employees to submit periodic recertifications of the serious health condition. These recertifications will be required every thirty (30) days or until the minimum duration of the last certification has elapsed, whichever period is longer. Any medical certification must be returned by the employee within 15 days or the Company may delay the commencement or continuation of the leave until the certification is submitted.

The Company also reserves the right to require certification from a covered military member's health care provider if you are requesting military caregiver leave and certification in connection with military exigency leave.



### Designation of Leave; Leave Unpaid

FMLA leave is unpaid. The Company reserves the right to designate any FMLA eligible leave as FMLA leave.

Absences that exceed two (2) weeks and qualify as FMLA leave under this policy shall be designated by the Company as FMLA leave, and shall be unpaid, unless the employee is eligible for pay pursuant to the Company's Family Care Leave Policy.

### Reporting While on Leave

If you take leave because of your own serious health condition or to care for a covered relation, you must contact the Company every thirty (30) days regarding the status of the condition and your intention to return to work. In addition, you must give notice as soon as practicable (within two business days if feasible) if the dates of leave change or are extended or initially were unknown.

### Medical and Other Benefits

During approved FMLA leave, the Company will maintain your health benefits as if you continued to be actively employed and will pay for the premiums during an unpaid leave. You must pay the Company back your portion of the premium upon returning to work through a repayment plan established between you and People Operations.  If you elect not to return to work for at least 30 calendar days at the end of the leave period, you  will be required to reimburse the Company for the cost of the health benefit premiums paid by the Company for maintaining coverage during your unpaid leave, unless you cannot return to work because of a serious health condition or other circumstances beyond your control.

### Intermittent and Reduced Schedule Leave

If medically necessary, FMLA leave taken for a serious health condition may be taken intermittently (in separate blocks of time due to a serious health condition) or on a reduced leave schedule (reducing the usual number of hours you work per workweek or workday). FMLA leave may also be taken intermittently or on a reduced leave schedule for a qualifying exigency relating to covered military service. Employees must make reasonable efforts to schedule leave for planned medical treatment so as not to unduly disrupt the Company's operations. Leave due to qualifying exigencies may also be taken on an intermittent basis.

The Company will reduce your salary based on the amount of time actually worked. In addition, while you are on an intermittent or reduced schedule leave, the Company may temporarily transfer you to an available alternative position that better accommodates your leave schedule and has equivalent pay and benefits.

Moreover, the Company reserves the right to temporarily transfer an employee requesting intermittent or reduced schedule leave to an alternative position which better accommodates the recurring periods of leave, with no decrease in pay or benefits.

### Returning From Leave; Restoration to Employment

If you take leave because of your own serious health condition (except if you are taking intermittent leave), you are required, as are all employees returning from other types of medical leave, to provide medical certification that you are fit to resume work. Otherwise, you will not be permitted to resume work until it is provided.



An employee who takes family or medical leave in accordance with this policy shall have the right to return to the position he/she held prior to the leave or, in the discretion of the Company, to an equivalent position with the same pay, benefits and terms and conditions of employment. However, in certain cases, "key employees" of the Company may be denied restoration when the Company determines that restoration will result in substantial and grievous economic harm to the Company. A "key employee" is a salaried employee who is among the highest paid 10 percent of all the Company's employees within 75 miles of the employee's worksite.

 ## Family Care Leave

Storable wants to help relieve some of the sources of stress that can accompany becoming a parent or caring for aging family members. Therefore, our full time employees are eligible for one fully-paid Family Care Leave per year for the birth or adoption of a child, the placement of a child with the employee for foster care, as well as for the care of an elderly parent or dependent.

After returning to work from a Family Care Leave, all team members are once again eligible to take reasonable Flex Time Off in accordance with the company's time off policy.

All such leaves of absence will run concurrently with FMLA where applicable and are subject to the same documentation requirements and approval process.

If you need to apply for a Family Care Leave or have a question, comment or suggestion, please feel free to reach out to People Operations.

### Paid Parental Leave

For the birth or adoption of a child or the placement of a child with the employee for foster care, eligible employees will receive paid leave to enable the employee to care for and bond with a newborn or a newly adopted or newly placed child. Under this policy, primary caregivers will qualify for up to 12 weeks of fully paid parental leave and secondary caregivers will qualify for up to six weeks of fully-paid parental leave.

This time can be taken anytime within one year of the date of your child's birth or adoption.

Storable also offers a Ramp Back Program to ease the transition back to full time work. The Ramp Back Program allows employees to work part-time at 100% pay for up to four weeks after your return to work date.

Nursing mothers are also supported by Storable. For more information, please check out our Breastfeeding Support Policy.

### Paid Caregiver Leave

If an employee has a need to serve as the primary caregiver for an aging parent or other loved one, eligible employees will receive up to four weeks of paid caregiver leave.




## Jury Duty Leave

Storable encourages team members to fulfill their civic duties related to jury duty. If you are summoned for jury duty, notify your manager or department leader as soon as possible to make scheduling arrangements.

You will not incur any deduction in pay for a partial week's absence due to jury duty. Time taken for Jury Duty should be entered and approved in advance by your manager through the ADP WorkforceNow platform.

The Organization reserves the right to require team members to provide proof of jury duty service to the extent authorized by law.

The Organization will not retaliate against team members who request or take leave in accordance with this policy.


## Voting and Election Official Leave

**We believe in being good citizens!**

Employees who are eligible to vote in any municipal, county, state, or federal political party primary or general election, any special election, or in any state election where propositions are submitted to a popular vote, may take a reasonable time of paid time off to vote on election day if they do not have sufficient time outside of working hours to vote. The time when you can go to vote will be at the discretion of your manager or department leader, consistent with applicable legal requirements.

Employees who serve as appointed members of a local electoral board, as election judges, as assistant general registrars, or as officers of election may take the necessary paid time off to serve at a polling place on election day or at a meeting of the electoral board following the election to ascertain the results of such election.


## Witness Leave

Storable realizes that, on occasion, team members may be subpoenaed to appear in a civil, criminal, legislative, or administrative proceeding. In such cases, you will be provided leave to attend. Notify your manager or department leader as soon as possible to make scheduling arrangements. Time taken for Witness Leave should be entered and approved in advance by your manager through the ADP WorkforceNow platform.

The Organization reserves the right to require team members to provide proof of the need for leave to the extent authorized by law.

The Organization will not retaliate against team members who request or take leave in accordance with this policy.



 **Bereavement Leave**

We understand that employees may need time off in the event of a death in the family. This policy is intended to promote a common understanding and application of time off for bereavement purposes so that employees can assist with necessary arrangements, attend funeral services, or handle other affairs immediately associated with the event.

In the event of a death in your immediate family (spouse, mother, father, son, daughter, brother, sister, grandparent, grandchild, stepparent, stepchild, or your spouse's mother, father, son, daughter, brother, sister, grandparent, grandchild, stepparent or stepchild), regular, full-time employees may receive up to five days (40 hours), or more in accordance with state law, of normally scheduled work-time off with full pay and benefits for the above-mentioned bereavement purposes.

This policy is also intended to cover bereavement or loss as a result of miscarriage, an unsuccessful round of intrauterine insemination or of an assisted reproductive technology procedure, a failed adoption match, or a diagnosis that negatively impacts pregnancy or fertility.

Employees are expected to notify their manager or manager of any need for time off in accordance with normal absence request procedures. Time taken for Bereavement should be entered and approved in advance by your manager through the ADP WorkforceNow platform.

Additional time off, or the use of other leave, may be granted with appropriate notice and approval by your manager.

Time off taken under this policy does not run concurrently with FMLA. Employees must use available Bereavement Leave until exhausted.

## Witness and Victim of Crimes and Domestic Violence Leave

Storable will grant you 10 days of leave, or more in accordance with state law, if you have an obligation to participate in criminal legal proceedings either as a victim, a witness or because you or a close family member were victimized by a criminal act, or if you or a close family member is a victim of a crime of domestic violence, sexual violence, stallking or abuse.

Storable will pay for 10 days of leave and additional approved time off per state law that exceeds 10 days under this policy will be unpaid. Under certain circumstances under this policy, you may be eligible to apply for Short Term Disability and/or FMLA.

Time off under this policy can be taken for the reasons indicated below.

**Crime Victim:**

- Obtain or attempt to obtain an order of protection, an injunction against harassment, or any other injunctive relief to help ensure the health, safety, or welfare of the victim or their child;
- Appear in court or attend any proceedings related to the crime or delinquent act;
- Consult with the district attorney regarding the underlying crime;
- Participate in a police investigation related to the underlying crime; or
- Exercise the victim's rights under applicable law.



**Domestic Violence:**

- Seek legal assistance in addressing issues arising from the violence or prepare for and attend and prepare for court related proceedings arising from that crime.

- Attend court-related proceedings arising from the violence

- Seek medical attention or treatment for injuries caused by the Qualifying Crime;

- Receive applicable victim support services;

- Take steps to increase their safety from future Qualifying Crimes, including by securing temporary or permanent relocation;

If your need for leave is foreseeable, you must give Storable seven days notice of your need for leave. If your need for leave is not foreseeable, you must notify your supervisor as soon as practicable. Storable reserves the right to require you to provide proof of the need to attend the criminal proceedings to the extent authorized by law.

To the extent permitted under law, Storable will treat all information related to an employee's leave pursuant to this policy as confidential. Storable will not discriminate or retaliate against employees for requesting or taking leave in compliance with this policy.

For purposes of this policy, "family member" means a spouse, domestic partner, child, stepchild, child of registered domestic partner or spouse, sibling, step-sibling, parent/guardian/or custodian of the victim, step-parent, grandparent, grandchild, aunt, uncle, niece, nephew, sibling-in-law, parent-in-law, child-in-law, or any other person related to the victim by consanguinity or affinity within the third degree. For purposes of this policy, a "legal representative" is an individual designated to represent the victim's interests by either the victim themselves or a court in which the crime is being or could be prosecuted.

 ## Personal Leave

Leaves of absence may also be granted for compelling personal reasons (i.e., necessary and immediate personal business which cannot be handled outside of normal work hours). Personal leave may be granted on a case-by-case basis by a VP level or above member of People Operations and may not exceed three (3) weeks unless otherwise approved by a VP level or above member of People Operations. Absences that exceed two (2) weeks under this policy will be unpaid.

In granting such leaves, consideration is given to whether the Company can spare the services of the requesting employee and still achieve a satisfactory work schedule, whether the employee's work performance is satisfactory and proper advance notice has been provided.

A personal leave of absence is granted at the sole discretion of the Company and provides the Company with the means to allow an employee to be reinstated with past service credit. It is important to remember that re-employment after a personal leave of absence is not guaranteed.



 **Other Statutory Leaves**

The Company complies with all federal and state laws regarding leaves of absences. Accordingly, employees may also be eligible for leave in accordance with the Pregnancy Discrimination Act and the Americans with Disabilities Act. Any such leave may run concurrently with other leave where permitted by state and federal law.

Additionally, state law may provide for leaves of absence under circumstances other than those outlined above. Consult the state posters for the state in which you reside for information on any such leave.

Please contact People Operations if you would like more information regarding taking such a leave.

 **7.4 Temporary Personnel**

Temporary team members are hired for a specific period or specific work project, not to exceed 3 months in duration. Storable reserves the right to extend the duration of temporary employment where necessary. Temporary team members are not eligible for benefits unless specified otherwise in this handbook or in the benefit plan summaries or specifically required by law.

 **7.5 Unemployment Compensation Insurance Policy**

Unemployment compensation insurance is paid for by Storable and provides temporary income for team members who have lost their job under certain circumstances. Eligibility for unemployment compensation will, in part, be determined by the reasons for your separation from the Organization.

## 7.6 Workers' Compensation Insurance Policy

Workers' compensation is a no-fault system designed to provide benefits to all team members for work-related injuries. Workers' compensation insurance coverage is paid for by employers and governed by state law. The workers' compensation system provides for coverage of medical treatment and expenses, occupational disability leave, and rehabilitation services, as well as payment for lost wages due to work-related injuries. If you are injured on the job while working at Storable, no matter how slightly, you are to report the incident immediately to your manager or department leader. Consistent with applicable state law, failure to report an injury within a reasonable period of time could jeopardize your claim for benefits.

To receive workers' compensation benefits, notify your manager or department leader immediately of your claim. If your injury is the result of an on-the-job accident, you must complete a statement and participate in any follow-up investigation. You will be required to submit a medical release before you can return to work.



## 7.7 COBRA

The Consolidated Omnibus Budget Reconciliation Act (COBRA) provides the opportunity for eligible Storable team members and their beneficiaries to continue health insurance coverage under the Organization health plan when a "qualifying event" could result in the loss of eligibility. Qualifying events include resignation, termination of employment, death of an employee, reduction in hours, a leave of absence, divorce or legal separation, entitlement to Medicare, or where a dependent child no longer meets eligibility requirements.

Contact People Operations to learn more about your COBRA rights.

## 7.8 Military Leave (USERRA)

Storable complies with applicable federal and state law regarding military leave and re-employment rights. Unpaid military leave of absence will be granted to members of the uniformed services in accordance with the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA; with amendments) and all applicable state law. You must submit documentation of the need for leave to People Operations. When returning from military leave of absence, you will be reinstated to your previous position or a similar position, in accordance with state and federal law. You must notify your manager or department leader of your intent to return to employment based on requirements of the law. For more information regarding status, compensation, benefits, and reinstatement upon return from military leave, contact People Operations.




8.1 **General Safety Policy**

It is the responsibility of all team members to maintain a healthy and safe work environment. Report all safety hazards and occupational illnesses or injuries to your manager or department leader as soon as reasonably possible and complete a statement or injury report as needed. Failure to follow our health and safety rules may result in disciplinary action, up to and including termination of employment.

8.2 **Policy Against Workplace Violence**

As the safety and security of our team members, vendors, contractors, and the general public are in the best interests of Storable, we are committed to working with our team members to provide a work environment free from violence, intimidation, bullying and other disruptive behavior.



**Violence & Threats of Violence**

We will not tolerate acts or threats of violence, harassment, intimidation, and other disruptive behavior, either physical or verbal, that occurs in the workplace or other areas. This applies to management, co-workers, team members, and non-employees such as contractors, customers and visitors.

Workplace violence can include oral or written statements, gestures, or expressions that communicate a direct or indirect threat of physical harm, damage to property, or any intentional behavior that may cause a person to feel threatened.



**Prohibited Conduct**

Prohibited conduct includes, but is not limited to:

- Physically injuring another person.

- Threatening to injure a person or damage property by any means, including verbal, written, direct, indirect, or electronic means.

- Taking any action to place a person in reasonable fear of imminent harm or offensive contact.

- Possessing, brandishing, or using a firearm on Organization property or while performing Organization business except as permitted by state law.

- Violating a restraining order, order of protection, injunction against harassment, or other court order.

- violently tossing or throwing company property.





### Reporting Incidents of Violence

Report to your manager or People Operations, in accordance with this policy, any behavior that compromises our ability to maintain a safe work environment. All reports will be investigated immediately and kept confidential, except where there is a legitimate need to know. You are expected to cooperate in any investigation of workplace violence.



### Violations

Violating this policy may subject you to criminal charges as well as discipline up to and including immediate termination of employment.



### Retaliation

Victims and witnesses of workplace violence will not be retaliated against in any manner. In addition, you will not be subject to discipline for, based on a reasonable belief, reporting a threat or for cooperating in an investigation.

If you initiate, participate, are involved in retaliation, or obstruct an investigation into conduct prohibited by this policy, you will be subject to discipline up to and including termination.

If you believe you have been wrongfully retaliated against, immediately report the matter to People Operations.

## 8.3  Weapons Policy

To ensure that Storable maintains a workplace safe and free of violence for all team members, the Organization prohibits the possession or use of dangerous weapons on organization property, including anywhere that company business is conducted, such as customer locations, client locations, trade shows, restaurants, company event venues and so forth.

All Storable team members are subject to this provision, as well as contract workers and temporary employees as well as visitors and customers on company property.

Weapons include, but are not limited to, guns, knives or swords with blades over four inches in length, explosives and any chemical whose purpose is to cause harm to another person.

Regardless of whether an employee possesses a concealed weapons permit (CCW) or is allowed by law to possess a weapon, weapons are prohibited on any company property. They are also banned in any location in which the employee represents the company for business purposes, including those listed above.

Possession of a weapon can be authorized by the company's CEO to allow security personnel or a trained employee to have a weapon on company property when this possession is determined necessary to secure the safety and security of company employees. Only the CEO, or his designee, may authorize the carrying of or use of a weapon.

Any employee in violation of this policy will be subject to disciplinary action, up to and including termination.



## 8.4  Illegal Drug Policy

Storable considers drug abuse a serious matter that will not be tolerated. The Organization absolutely prohibits team members from using, selling, possessing, or being under the influence of illegal drugs, or a controlled substance or prescription drug not medically authorized while at their job, on Organization property, or while on work time.

Therefore, it is our policy that:

1. You may not report to work under the influence of illegal drugs, or any controlled substance or prescription drug not medically authorized.

2. You may not possess or use illegal drugs, or any controlled substance or prescription drug not medically authorized while on company property or on company business.

We also caution against the use of prescribed or over-the-counter medication, which can affect your ability to perform your job safely, or the use of prescribed or over-the-counter medication in a manner violating the recommended dosage or instructions from the doctor. You must have a valid prescription for any prescription medication used while working for the Organization. Inform your manager or department leader prior to working under the influence of a prescribed or over-the-counter medication that may affect your ability to perform your job safely. If the Organization determines that the prescribed or over-the-counter medication does not pose a safety risk, you will be allowed to work.

Failure to comply with these guidelines concerning prescription or over-the-counter medication may result in disciplinary action, up to and including termination of employment.

 ### For Cause/Reasonable Suspicion Testing

A drug and alcohol test will be conducted where there is reason to believe that an employee may be in violation of the Company's Drug or Alcohol policies. All for cause/reasonable suspicion tests should be performed as soon as practicable from the determination of the need to test.

Failure on the part of an employee to provide a sample, or otherwise submit to a drug and alcohol test, after being notified, will subject the employee to termination.



## 8.5 Alcohol Policy

Whether or not to drink alcoholic beverages is entirely a personal decision. No employee is expected to drink because alcohol is served at an Organization event or function, nor is employment conditional upon your decision to drink alcoholic beverages. In all situations, an employee's conduct when consuming alcoholic beverages is solely their responsibility. The company is not in a position to alter the consequences, legal or otherwise, of irresponsible alcohol consumption.

All employees must ensure that their performance at work and their judgment are not impaired by alcohol. It is unacceptable for employees to report to work or perform their job impaired or intoxicated by alcohol.

If an employee chooses to drink alcohol on approved occasions while conducting company business, he or she is expected to do so responsibly.

An employee's decision to drink alcoholic beverages at a company-related function includes an obligation to get home safely. It is every employee's responsibility to be sure they are able to drive safely. If there are any doubts, arrange alternative transportation.

Failure to adhere to the alcohol policy, including driving a vehicle while impaired after consuming alcohol at a Company event, may be grounds for discipline up to and including termination.





## 9.1  Confidentiality and Nondisclosure of Trade Secrets

As a condition of employment, you are required to sign an Employee Proprietary information Agreement to protect the confidentiality of trade secrets, proprietary information, and confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development, customer lists, patents, trademarks, etc.) related to the Organization.

Access to this information should be limited to a "need to know" basis and should not be used for personal benefit, disclosed, or released without prior authorization from management. If you have information that leads you to suspect that team members or competitors are obtaining such information, you are required to inform your manager, department leader or People Operations.

Violation of this policy may result in discipline or termination and may subject the violator to civil liability.





By signing below, I acknowledge that I have received a copy of the Storable Employee Handbook (handbook) and that I have read it, understand it and agree to comply with it. I understand that the Organization has the maximum discretion permitted by law to interpret, administer, change, modify, or delete the rules, regulations, procedures, and benefits contained in the handbook at any time without notice.

No statement or representation by a manager, department leader, or any other employee, whether oral or written, can supplement or modify this handbook. Changes can only be made if approved in writing by the Chief People Officer of the Organization. I also understand that any delay or failure by the Organization to enforce any rule, regulation, or procedure contained in the handbook does not constitute a waiver on behalf of the Organization or affect the right of the Organization to enforce such rule, regulation, or procedure in the future.

I understand that neither this handbook nor any other communication by a management representative or other, whether oral or written, is intended in any way to create a contract of employment. I further understand that, unless I have a written employment agreement signed by an authorized Organization representative, I am employed "at-will" (to the extent permitted by law) and this handbook does not modify my "at-will" employment status. This handbook supersedes any previous handbook or policy statements, whether written or oral, issued by Storable.

If I have any questions about the content or interpretation of this handbook, I will contact People Operations.

**Date** _____

**Signature** _____

**Print Name** _____



# Summary of Changes to 2024 Storable Universal Handbook

1. Edited Chuck's welcome letter - Pg 5 - Indicated we have State posters to view for information about state policy variances

2. Edited Chuck's welcome letter - Pg 5 - Included where the Handbook can be found and articulated it's the employee's responsibility to familiarize themselves with the handbook and monitor communications about amendments; this update enables us to make changes to the handbook without annual acknowledgements by Storriors

3. Disability Accommodation - Pg 12 - Added that Storable complies with the Pregnant Workers Fairness Act

4. Disability Accommodation - Pg 12 - Updated the Accommodation Request Process

5. Pay Periods and Pay Dates - Pg 16 - Changed Pay Dates to the 5th and 20th of the month.

6. Privacy and Monitoring - Pg 27 - Clarified the right of the company to monitor user communications when using company systems and applications (including chat and email).

7. Artificial Intelligence Usage Policy - Pg 34 - Added new policy

8. Unlimited Flexible Time Off - Pg 35 - Specified that our unlimited time off policy is intended for vacation and occasional illness, not to be counted towards LOAs.

9. Unlimited Flexible Time Off - Pg 35 - Provided more distinction between Scheduled Time Off and Unscheduled Time Off under the Unlimited Policy

10. Unlimited Flexible Time Off - Pg 35 - Reworded the guidelines slightly and changed the 3-4 week guideline to "every employee should be taking a minimum of 3 weeks of Flexible Time Off each year" to further encourage taking time off

11. Rest, Relax & Recharge (RRR) Time-Off - Pg 37 - Removed the 90 day service eligibility requirement

12. Paid Parental Leave - Pg 43 - Added more detail around the Ramp Back program and specified what this program can look like for all Storriors; it allows employees to work part-time at 100% pay for up to four weeks upon return to work

13. Voting Leave - Pg 43 - Expanded to include Voting and Election Leave

14. Bereavement Leave - Pg 44 - Expanded what qualifies for a bereavement leave, clarified that time off taken under this policy does not run concurrently with FMLA, and added to view the State Posters for variances.

15. Witness and Victim of Crimes and Domestic Violence Leave - Pg 45 - Added new policy





**The Business Court of Texas,**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff,* | § | |
| v. | § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § | |
| *Defendants.* | § | |

## Notices of Written Submission and Briefing Schedules

**Motion for Partial Stay.** Storable's Emergency Motion for a Partial Stay of the June 13, 2025 Court-Ordered Production Deadline is set for written submission on **Thursday, June 12, 2025, at 2 p.m.** Any response should be filed by the submission deadline.

**Motion for Reconsideration of April 15 Order.** Storable's Motion for Reconsideration of the Court's April 15, 2025 Order Denying Modification of the Protective Order is set for written submission on **Thursday, June 19, 2025, at 2 p.m.** Any response should be filed by **Monday, June 16, 2025**, and any reply should be filed by the submission deadline.

**Motion for Reconsideration of May 28 Order.** Storable's Motion for Partial Reconsideration of the May 28, 2025 Discovery Order is set for written submission

on **Monday, June 23, 2025**. Any response should be filed by **Thursday, June 19, 2025,** and any reply should be filed by the submission deadline.

Date signed: June 10, 2025

_____
Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

E-filed in the Office of the Clerk
for the Business Court of Texas 865
6/12/2025 10:48 AM
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

**The Business Court of Texas**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § | |
| *Defendants.* | § § | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL STAY OF PRODUCTION DEADLINE

Defendants hope to avoid their production deadline for key evidence. On May 28, the Court ordered them to produce by tomorrow documents sufficient to show names and addresses of self-storage facilities using Storable's FMS platforms. A week later, they returned with a self-created "emergency," new arguments, and a request to stay the order. Defendants simply want delay. For months, they have stalled on merits discovery, waiting weeks to be available to confer, refusing to produce documents in response to targeted requests, delaying search term negotiations, and filing a bevy of motions asking the Court to reconsider decided issues despite no changed circumstances.

The motion to stay is more of the same. It aligns with Defendants' ongoing efforts to delay and evade their discovery obligations. The Court should deny the motion.

### PROCEDURAL BACKGROUND

After extended conferrals, Defendants refused to produce material called for by RFP 10, which asks for a list of their FMS self-storage customers. On May 16, SafeLease filed its discovery letter noting that the information is "critical for defining the relevant antitrust market and assessing Storable's market power and competitive impact of its conduct—all core issues." Pltf's Disc. Letter at 1. Defendants responded on May 23 and didn't budge. *See* Defs' Disc. Letter at 1. At no

point did they argue that documents responsive to RFP 10 were or had trade secrets – not in their Responses and Objections, the meet and confers, many emails between counsel, or their letter to the Court. Indeed, they never said or wrote the words "trade secret." Ex. 1 (Defs' R&Os); Ex. 2 (email exchange).

On May 28, the Court ordered Defendants to produce by June 13 documents sufficient to show the name/addresses of facilities using Storable's FMS platforms as of December 30, 2024.

On June 2, Defendants moved for partial summary judgment on SafeLease's attempted monopolization claim. Notably, they claim SafeLease has no proof of the competitive impact of their conduct. "There is no evidence. . . that Storable's conduct had any market-wide effect—and *no further discovery could show this*." Defs' Mot. Partial Summ. J. at 15 (emph. added).

On June 6, a week before their production deadline and two weeks before SafeLease's MSJ response is due, Defendants sought emergency relief to stay their June 13 deadline for RFP 10. At the same time, they moved for reconsideration of the Court's April 15 ruling on the protective order. On June 9, they moved for reconsideration of the Court's May 28 order to produce.

## APPLICABLE LEGAL STANDARDS

"Trial courts have broad discretion to decide whether to permit or deny discovery" and "abuse that discretion only if their decision is 'so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.'" *In re Dream Dallas, LLC*, 2024 WL 1154139, at *2 (Tex. App.—Dallas Mar. 18, 2024, no pet.) (cite omitted).

## ARGUMENT AND AUTHORITIES

Defendants' efforts to avoid their production duties are baseless for at least five reasons. (1) The existing Protective Order fully protects sensitive documents. (2) Defendants did not argue, waived, and have no basis now to claim that the documents are trade secrets. (3) SafeLease would

be prejudiced by delay, especially given the pending MSJ. (4) Staying the deadline because of the parties' recent mediation, which Defendants pushed for, would be counterproductive and would discourage mediation. (5) The Court already confirmed that *all* outside counsel can view Outside-Counsel's-Eyes-Only (OCEO) documents.

**1. The Protective Order Properly Protects Highly Confidential Documents.**

The Protective Order properly safeguards the parties' confidentiality interests by allowing information to be produced as Confidential or OCEO. Producing documents as OCEO provides extra protection and ensures that especially sensitive documents will not be seen by employees of the opposing party. This includes "trades secrets." Prot. Order ¶3 (OCEO information "includes trade secrets or other non-public, proprietary, or sensitive business or financial information."). *Contra* Mot. at 5-7 (alleging, without basis, that SafeLease may misuse the information). In fact, in ordering Defendants to produce documents responsive to RFP 10, the Court noted: "The agreed protective order in this case contains 'confidential' and 'outside counsel's eyes only' (OCEO) designations, both available to Storable to protect its confidential information as appropriate." Disc. Order (May 28, 2025) at 2.

Defendants erect a strawman: the Protective Order *might* be voided, "leaving no protection whatsoever in place for the interim period until the case can be remanded and a new protective order entered." Mot. at 5. In addition to being wrong, this position goes too far. It undermines the Court's power to make any ruling in this case. The Court already considered and denied the motion to remand. *See* Order (Feb. 10, 2025). Invoking the possibility that at some future point there *might* be a remand hardly entitles a party to avoid future discovery, much less ignore all other orders issued by the Court. Indeed, the statute allowing for an interlocutory appeal on a temporary injunction expressly does *not* grant a stay of ongoing trial court proceedings. Rather, it

contemplates that all pretrial proceedings—like discovery—go forward during the appeal, just as the Court ordered here. *See* Tex. Civ. Prac. & Rem. Code §51.014(a)(4), (b).

Regardless, Defendants' appellate argument about the remand issue is off base. As noted in SafeLease's appellee brief, no statute authorizes an interlocutory appeal of a remand denial, which is reviewed before final judgment only through a mandamus petition. *ETC Field Servs., LLC v. Tema Oil & Gas Co.*, 710 S.W.3d 379, 380-81 (Tex. App.—Austin [15th Dist.] 2025, no pet.) ("No statute authorizes an interlocutory appeal of a remand order from the business court," so review of a remand order can be obtained only by a petition for writ of mandamus.). Defendants never filed for mandamus, briefed those standards, or invoked original appellate jurisdiction. As such, there is no legitimate concern that the protective order will be voided.

Finally, there is ample backup protection. The parties earlier signed a Rule 11 agreement *substantively identical* as to the designation and treatment of Confidential and OCEO documents. Ex. 3 (email exchange where parties "agree to abide by the protections of the PO for documents designated Confidential or Outside Counsel's Eyes Only"). They signed the agreement during proceedings in the District Court, and they proceeded under it through the temporary injunction hearing here. Ex. 4 (2/11/25 Tr. 234:4-6 (defense counsel recognizing an exhibit "has been designated by [SafeLease] under the Rule 11 agreement, which is *acting like a protective order*") (emph. added). The parties then filed that signed agreement with this Court, including all relevant OCEO and Confidential designation restrictions and protections. *See* 2/20/25 Prop. Agreed Prot. Order. Defendants never mention this agreement.

No concerns regarding the Protective Order justify staying Defendants' deadline.

### 2. Defendants Waived the Argument that the Documents Are Trade Secrets.

Defendants waived their new argument that documents responsive to RFP 10 are trade secrets.

"An objection that is not made within the time required . . . is waived unless the court excuses the waiver for good cause shown." Tex. R. Civ. P. 193.2(e). Moreover, a party "seeking protection of information by a claim of privilege has the burden to plead and prove the applicable privilege." *In re Cauley*, 437 S.W.3d 650, 655 (Tex. App.—Tyler 2014, no pet.); *see also Macy v. Waste Mgmt., Inc.*, 294 S.W.3d 638, 651 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (trial court did not abuse its discretion in declining to reconsider ruling where "movant cites no additional evidence 'beyond that available to him'" at the time of the original ruling).

Here, Defendants made not a peep about trade secrets until this motion to stay. They did not claim the documents are trade secrets in their Objections and Responses to SafeLease's RFPs; nor during multiple conferrals among counsel; nor during the exchange of multiple emails between counsel on the topic of RFP 10; nor in their discovery response letter to the Court. *See* Ex. 1; Ex. 2. Not once. Remarkably, Defendants blame their failure, in part, *on the Court* and its "strict length limitations" for discovery letters. Mot. at 3 n.1. But, to state the obvious, it takes only six words to say, "The requested documents are trade secrets." Had Defendants truly refused production on those grounds, they could and should have said so before this motion.

Defendants now claim they were just about to say those six words. "Further briefing would have clarified that Storable's customer list is a trade secret." Mot. at 3 n.1. Every litigant can say that its omitted point was coming next. But the Business Court rules are clear that after discovery letters are filed, the Court may "issue an order if the Court, in its discretion, determines no further briefing is necessary." L.R. 4(d)(4). Defendants were not entitled to further briefing, did not ask for further briefing, and were on notice prior that the Court may decide the dispute based solely on

the letters. In fact, Defendants did not make a trade-secret claim because this information is *not* a trade secret. Regardless, they waived the point as a matter of established procedure and law.[1]

Defendants seek a second bite at the apple on arguments they chose not to make timely.

**3. SafeLease Will Be Prejudiced by Delay.**

Defendants rely on their own discovery delay to justify further discovery delay. They argue that delay will not prejudice SafeLease because the "parties have not even commenced production of any documents as they are continuing to negotiate the relevant search terms and custodians." Mot. at 2. But SafeLease provided its proposed search terms over a month ago for Defendants to use to search its documents and followed up several times. Defendants have yet to respond to the terms substantively, instead rejecting them as "facially overbroad" without elaboration on all but two terms. *See* Ex. 5. Delay does not justify more delay, especially with an MSJ pending.

Moreover, SafeLease made a production this week, including its own list of customers by name, state, and number of occupied units. Defendants' RFP 15 asks for "Documents sufficient to show Your existing Customers as of January 21, 2025." SafeLease agreed to produce the data. Ex. 6 at 7. Importantly, this data relates to the market in which the parties actively compete—the insurance market. Production of SafeLease's customer list is even *more* sensitive than the FMS information that Defendants must produce because the parties compete in the insurance market while only Defendants compete in the FMS market.

Lastly, the irony of Storable moving for summary judgment on no evidence grounds, while trying to avoid its document production deadline, is stark. *See* Mot. at 1 (admitting "The customer list is relevant only to SafeLease's claim for attempted monopolization"). Five days after the May 28 order, Defendants filed their MSJ in part on no-evidence grounds. *See, e.g.,* Defs' Mot. Partial

---

[1] Defendants raise their substantive trade-secret argument in their pending motion to reconsider, and SafeLease will address this argument in response to that motion.

Summ. J. at 15 ("There is no evidence that the many other tenant insurance providers are not competitive or that Storable's conduct had any market-wide effect—and no further discovery could show this."). As SafeLease said in its May 16 discovery letter, it seeks documents responsive to RFP 10 because "It is critical for defining the relevant antitrust market and assessing Storable's market power and competitive impact of its conduct—all core issues." Pltf's Disc. Letter at 1.

SafeLease will be prejudiced if it has to defend against the MSJ while Defendants refuse to produce documents relevant to the claims they seek to dismiss. The production deadline of June 13 will allow SafeLease to have the documents responsive to RFP 10 for one week before its MSJ response brief deadline. Delay will prejudice SafeLease because it further shortens the window in which it can analyze, or at least reference, this important information.

### 4. Staying Production because of Mediation Would Discourage Mediation.

Storable boldly invokes recent mediation discussions in support of delay. Granting a stay on those grounds would both punish SafeLease for its good faith efforts to resolve this case through mediation and dissuade future litigants from engaging in alternative dispute resolution.

Defendants justify delay based on the parties' settlement discussions following a June 4, 2025 mediation. Mot. at 2. The parties have not agreed to a stay, and SafeLease does not want one. Staying Defendants' deadline would unfairly punish SafeLease for agreeing to settlement discussions and be contrary to public policy, which encourages parties to peaceably resolve disputes. *See LaLonde v. Gosnell*, 593 S.W.3d 212, 225-26 (Tex. 2019) (noting "the state's strong public policy favoring the peaceable resolution of disputes" and "encourage[ing]" mediation); *In re Vinson*, 632 S.W.3d 1, 3 (Tex. App.—El Paso 2019, no pet.) ("It is the policy of this state to

encourage the peaceable resolution of disputes and the early settlement of pending litigation through voluntary settlement procedures.").[2]

Moreover, in invoking the status of the mediation to this Court, Defendants violated the rules of that mediation, in which they promised to "maintain the confidentiality of the mediation" and to not "rely on, or introduce as evidence" any "views expressed or suggestions made by another party with respect to a possible settlement of the dispute." Mediation Attorney Agreement. Allowing one side to invoke the existence of settlement discussions to get a one-sided stay would undercut the effectiveness of mediation and cast suspicion on the "good faith" nature of any such discussions going forward. The Court should reject this excuse by Defendants.

### 5. Outside Counsel Properly May View OCEO Documents.

As is clear in the Protective Order and already confirmed, all outside counsel of record are entitled to view documents produced as OCEO. *See* Prot. Order ¶¶ 3, 5-6; Order Denying Mot. to Modify (Apr. 15, 2025). Defendants also ask the Court to reconsider its April 15 Order and to stay Defendants' production deadline until after it rules on the motion for reconsideration. "If no stay is issued and Storable is otherwise required to produce its FMS customer list, reconsideration of the April 15, 2025 order would prevent Mr. Locke from accessing the list." Mot. at 3-4. But the motion for reconsideration raises no intervening facts about Adam Locke nor intervening binding precedent. Instead, Defendants rely solely on *Westlake Longview Corp. v. Eastman Chemical Co.*, 2025 Tex. Bus. 19 (May 16, 2025), a non-binding opinion by this Court sitting by designation on

---

[2] *See also Cooper Notification, Inc. v. Twitter, Inc.*, 2010 WL 5149351, at *4 (D. Del. Dec. 13, 2010) ("The Court is troubled by Defendants' attempt to use settlement discussions as a sword to defeat [Plaintiff's] desire to proceed with litigation rather than succumb to a stay. There is a strong and long-standing public policy favoring settlement and Defendants' use of settlement efforts in this manner is in direct tension with this policy."); *Worldcom Network Servs., Inc. v. Metro Access, Inc.*, 205 F.R.D. 136, 143 (S.D.N.Y. 2002) ("The law is clear that settlement discussions do not suspend discovery or excuse compliance with an explicit court order.").

- 8 -

a sister court. It does not alter Locke's status as outside counsel or attorney of record, nor does it affect the propriety of his access to OCEO documents.

No stay is warranted by Defendants re-arguing already decided issues.

<div align="center">

**CONCLUSION**

</div>

The Court should deny the Emergency Motion for a Partial Stay.

Date: June 12, 2025                                      Respectfully submitted,

                                                         _/s/ R. Paul Yetter_
Judd E. Stone II                                         R. Paul Yetter
State Bar No. 24076720                                   State Bar No. 22154200
judd@stonehilton.com                                     pyetter@yettercoleman.com
Christopher D. Hilton                                    Susanna R. Allen
State Bar No. 24087727                                   State Bar No. 24126616
chris@stonehilton.com                                    sallen@yettercoleman.com
Alexander M. Dvorscak                                    Luke A. Schamel
State Bar No. 24120461                                   State Bar No. 24106403
alex@stonehilton.com                                     lschamel@yettercoleman.com
STONE HILTON PLLC                                        Shannon N. Smith
600 Congress Ave.                                        State Bar No. 24110378
Austin, Texas 78748                                      ssmith@yettercoleman.com
(737) 465-3897                                           Julia C. Risley
                                                         State Bar No. 24132932
Adam T. Locke                                            jrisley@yettercoleman.com
State Bar No. 24083184                                   YETTER COLEMAN LLP
adam@lockelaw.com                                        811 Main Street, Suite 4100
LOCKELAW PLLC                                            Houston, Texas 77002
2617 Bissonnet Street, Suite 503                         (713) 632-8000
Houston, Texas 77005
(713) 832-0243

                                                         ATTORNEYS FOR PLAINTIFF

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

I certify that a copy of the foregoing was served on all counsel of record via the Court e-filing service and/or by email, on June 12, 2025.

                                                         _/s/ Luke Schamel_
                                                         Luke Schamel

**CERTIFICATE OF COMPLIANCE**

I certify that this document complies with Local Rule 5(a) and contains 2425 words, not including the case caption, any index, table of contents or table of authorities, signature blocks, attached evidence, or any required certificates.

*/s/ Luke Schamel*
Luke Schamel

# Exhibit 1

**The Business Court of Texas,**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff,* | § § | |
| | § | Cause No. 25-BC03A-0001 |
| *v.* | § § | |
| STORABLE, INC., et al., | § § | |
| *Defendants.* | § § | |

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF SAFELEASE INSURANCE SERVICES, LLC'S FIRST MERITS REQUEST FOR PRODUCTION**

Defendants Storable, Inc.; RedNova Labs, Inc.; SiteLink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP ("Storable" or "Defendants") hereby submit the following objections and responses to the First Set of Merits Requests for Production served by Plaintiff SafeLease Insurance Services, LLC ("SafeLease" or "Plaintiff"). These responses will be amended and/or supplemented in accordance with the Texas Rules of Civil Procedure.

**OBJECTIONS TO DEFINITIONS**

1. Storable objects to each of SafeLease's Definitions as overbroad, unduly burdensome, and unreasonable to the extent that SafeLease seeks information outside the scope of discovery or otherwise purports to impose discovery obligations beyond those set forth in the Texas Rules of Civil Procedure. Storable will therefore construe these requests as seeking non-privileged information within the bounds of the Texas Rules of Civil Procedure.

2. Storable objects to the Definition of "API" as vague and ambiguous.

3. Storable objects to the Definition of "Authorized User" as inaccurate and argumentative.

4. Storable objects to the Definitions of "Defendants," "you," and "your" as overbroad, unduly burdensome, and unreasonable to the extent SafeLease seeks information in the possession, custody, or control of any third-party or all/any employees. Storable further objects to these definitions to the extent they include Storable's attorneys, agents,

consultants, representatives, and advisors, whether past or present, who have facilitated or provided legal advice to Storable. Storable will therefore construe the requests as seeking non-privileged, responsive documents in the possession, custody, or control of Storable.

5. Storable objects to the Definitions of "Document," and/or "Documents," to the extent such Definitions cause any request to seek irrelevant information, render any request overbroad, unduly burdensome, or disproportionate to the needs of this case, are duplicative, or purport to require the disclosure of information protected by the attorney-client privilege, the work-product doctrine, or other applicable immunities. Storable will construe requests employing these definitions as seeking non-privileged information, reasonably giving words their ordinary meaning consistent with the Texas Rules of Civil Procedure.

6. Storable objects to the Definition of "Facility management software" in that it improperly characterizes facility management software as covering only products offered by Defendants.

7. Storable objects to the Definition of "Facility management software market" as calling for a legal conclusion.

8. Storable objects to the Definition of "Tenant insurance" as vague and ambiguous.

9. Storable objects to the Definition of "Tenant insurance market" as vague and ambiguous and calling for a legal conclusion.

## OBJECTIONS TO INSTRUCTIONS

1. Storable objects to each of SafeLease's Instructions as overbroad, unduly burdensome, and unreasonable to the extent that SafeLease seeks information outside the scope of discovery or otherwise purports to impose discovery obligations beyond those set forth in the Texas Rules of Civil Procedure, including with respect to the production of native documents. Storable will therefore construe these requests as seeking non-privileged information within the bounds of the Texas Rules of Civil Procedure.

2. Storable objects to SafeLease's Instructions to the extent that it seeks information that is not in Storable's possession, custody, or control.

## RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION

**Request for Production No. 1:**

All documents that reflect communications with any customer, tenant, or other third-party (including consultants and the like) regarding SafeLease. This includes complaints or feedback regarding SafeLease's access to your facility management software, discussions about purported performance or security issues caused by SafeLease's access to your facility management software, discussions about any technical restrictions put in place to limit SafeLease's access to

2

your facility management software, and discussions about switching from your tenant insurance products or offerings to SafeLease's tenant insurance products or offerings.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. This Request seeks expansive information not related to the dispute at issue in this case. Storable further objects to the phrase "communications . . . regarding SafeLease" as vague and ambiguous. Storable further objects that this Request seeks confidential information of non-parties to this lawsuit. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 2:**

All documents reflecting your internal communications regarding SafeLease. This includes communications regarding SafeLease's access to your facility management software, competition with SafeLease over tenant insurance customers, any competitive analysis of SafeLease, any antitrust implications of restricting SafeLease's access to your facility management software, discussions incident to any business negotiations between you and SafeLease (including API access negotiations and discussion of any potential acquisition), and any performance or security issues caused by SafeLease's access to your facility management software.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. This Request seeks expansive information not related to the dispute at issue in this case. Storable further objects to the phrase "communications regarding SafeLease" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any

information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 3:**

All documents reflecting your communications with SafeLease regarding access to your facility management software, including any performance, stability, privacy, or security issues allegedly caused by the same.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects that this Request seeks information that is already in the possession of SafeLease.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 4:**

All documents reflecting your communications with board members, investors, or senior management regarding SafeLease. This includes reports submitted to a director, investor, or senior management regarding SafeLease, any approvals or directives issued by a board member regarding your dealings with SafeLease, and any communications your employees or agents had with a director, investor, or senior management regarding SafeLease.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. This Request seeks expansive information not related to the dispute at issue in this case. Storable further objects to the phrase "communications . . . regarding SafeLease" as vague and ambiguous. Storable further objects that this Request is duplicative and cumulative of

Request No. 2. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 5:**

All documents reflecting communications with board members, investors, or senior management regarding your market share in the facility management software market or tenant insurance market.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the phrase "communications . . . regarding your market share" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 6:**

All documents reflecting analysis or documentation of your market share in the tenant insurance market or facility management software market.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 7:**

All documents relating to your business plans, strategies, initiatives, or analyses concerning your market share in the tenant insurance market, including about acquiring Third-Party Insurance Vendors, restricting Third-Party Insurance Vendors from accessing your facility management software, and establishing fees for API access to your facility management software for Third-Party Insurance Vendors.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to everything after "including" as cumulative. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 8:**

All documents relating to your business plans, strategies, initiatives, or analyses concerning how to gain or maintain your market share in the facility management software market, including cross-

selling of facility management software with any other product and restricting or controlling access to any other product or service offered by you.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 9:**

All documents concerning your strategy, decision making, business plans, or analyses concerning API access pricing for Third-Party Insurance Vendors or SafeLease.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the term "API access pricing" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 10:**

Documents sufficient to show all self-storage facilities that use your facility management software, including addresses for those facilities.

7

**RESPONSE:**

Storable objects to this Request as seeking irrelevant information, overbroad, unduly burdensome, and not proportional to the needs of the case, as well as on the basis that it seeks confidential, proprietary, and commercially sensitive information of the highest degree. This Request seeks expansive information not related to the dispute at issue in this case. Storable further objects that this Request seeks confidential information of non-parties to this lawsuit. Storable further objects to the extent this Request seeks documents outside of Storable's possession, custody, or control.

Subject to and without waiving the foregoing objections, Storable will not produce documents in response to this Request.

**Request for Production No. 11:**

Documents sufficient to show all self-storage facilities that you contend constitute the relevant market for purposes of this dispute.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the term "relevant market" as vague and ambiguous. Storable further objects to this Request as calling for a legal conclusion. Storable further objects to the extent this Request seeks documents outside of Storable's possession, custody, or control.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 12:**

Documents sufficient to show all Authorized Users on your storEDGE and SiteLink facility management software during the relevant time period.

8

**RESPONSE:**

Storable objects to this Request as seeking irrelevant information, overbroad, unduly burdensome, and not proportional to the needs of the case, as well as on the basis that it seeks confidential, proprietary, and commercially sensitive information of the highest degree. This Request seeks expansive information not related to the dispute at issue in this case. Storable further objects that this Request seeks confidential information of non-parties to this lawsuit. Storable further objects to the extent this Request seeks documents outside of Storable's possession, custody, or control.

Subject to and without waiving the foregoing objections, Storable will not produce documents in response to this Request.

**Request for Production No. 13:**

All documents reflecting any efforts by you to acquire customers from SafeLease, including any business plans or strategies regarding the same.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. This Request seeks expansive information not related to the dispute at issue in this case. Storable further objects to the phrase "efforts by you to acquire customers" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 14:**

All documents reflecting your policies and procedures for granting, maintaining, tracking, or terminating Authorized User access to your facility management software applicable at any point during the relevant time period.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the terms "tracking" and "access" as vague and ambiguous.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 15:**

All documents relating to the planned, actual, or potential removal or restriction of SafeLease or any Third-Party Insurance Vendor from accessing your facility management software as an Authorized User or otherwise, including plans, strategies, and reasoning for any such removal or restriction.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the term "accessing" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

10

**Request for Production No. 16:**

All documents regarding your decision to remove the third-party producer option or custom insurance module from the SiteLink marketplace.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the undefined terms "third-party producer option" and "custom insurance model" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 17:**

Documents sufficient to show each Third-Party Insurance Vendor with access to the SiteLink custom third-party insurance module at any time during the relevant time period, along with the dates such access was available.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the undefined term "SiteLink custom third-party insurance module" as vague and ambiguous. Storable further objects to the term "access" as vague and ambiguous. Storable further objects that this Request seeks confidential information of non-parties to this lawsuit.

Subject to and without waiving the foregoing objections, Storable responds that it will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 18:**

Documents sufficient to show each Third-Party Insurance Vendor with access to your Easy Storage Solutions facility management software at any time during the relevant time period, along with the dates such access was available.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the term "access" as vague and ambiguous. Storable further objects that this Request seeks confidential information of non-parties to this lawsuit.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 19:**

All documents relating to identification, diagnosis, analysis, or consideration of any purported security, privacy, performance, stability, or related issue caused by SafeLease's access to your facility management software.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable objects to the term "related issue" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 20:**

All documents evidencing any technical security measures implemented by you to manage, disable, limit, restrict, or block SafeLease's access to your facility management software.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case, as well as on the basis that it seeks confidential, proprietary, and commercially sensitive information of the highest degree. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will not produce documents in response to this Request.

**Request for Production No. 21:**

Documents sufficient to show the occurrence of and reason for any system outage, interruption, slowdown, or other material performance issue on your facility management software from 2021 to present.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to this Request as overbroad in time to the extent it seeks documents prior to August 1, 2021. Storable further objects to this Request as overbroad in scope to the extent it seeks documents on "any system outage, interruption, [or] slowdown," regardless of materiality.

13

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 22:**

Documents sufficient to show the capabilities of the storEDGE and SiteLink APIs, including the customer data available to Third-Party Insurance Vendors who access storEDGE and SiteLink via API and the reports Third-Party Insurance Vendors are able to generate through access to storEDGE and SiteLink via API.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the term "capabilities" as vague and ambiguous. Storable further objects that this Request seeks confidential information of non-parties to this lawsuit. Storable further objects to this Request to the extent it seeks to require Storable to create documents not in existence.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 23:**

All documents related to your negotiations with SafeLease for API access to your facility management software, including pricing proposals, fee schedules, and communications with any person reflecting the pricing structure offered to SafeLease.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects that this Request seeks information that is already in the possession of SafeLease. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product

14

doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 24:**

All documents regarding the restoration or restriction of SafeLease's access to your facility management software in response to the issuance or expiration of any court order.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the term "access" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 25:**

All documents related to any communications with any journalist, reporter, media outlet, or website regarding SafeLease or this dispute.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to this Request as duplicative of Request No. 1. Storable further objects to the extent this Request calls for the disclosure of any information

protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

Respectfully submitted April 21, 2025.

/s/ Mikaila Skaroff
Katherine G. Treistman
State Bar No. 00796632
Andrew D. Bergman
State Bar No. 24101507
**ARNOLD & PORTER KAYE SCHOLER LLP**
700 Louisiana Street, Suite 4000
Houston, Texas 77002–2755
Tel.: (713) 576–2400
Fax: (713) 576–2499
Katherine.Treistman@arnoldporter.com
Andrew.Bergman@arnoldporter.com

Mikaila Skaroff (*admitted pro hac vice*)
Colorado Bar No. 60688
**ARNOLD & PORTER KAYE SCHOLER LLP**
1144 Fifteenth St, Suite 3100
Denver, Colorado 80202
Tel.: (303) 863–1000
Fax: (303) 863–2301
Mikaila.Skaroff@arnoldporter.com

Ray T. Torgerson
State Bar No. 24003067
Neil Kenton Alexander
State Bar No. 00996600
Jonna N. Summers
State Bar No. 24060649
Elizabeth "Liza" Eoff
State Bar No. 24095062
Lakshmi N. Kumar
State Bar No. 24144581
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002

Tel.: (713) 226–6000
Fax: (713) 226–6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
ljumar@porterhedges.com

Dale Wainwright
State Bar No. 00000049
Justin Bernstein
State Bar No. 24105462
**GREENBERG TRAURIG LLP**
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel.: (512) 320–7240
Fax: (512) 320–7240
Dale.wainwright@gtlaw.com
bernsteinju@gtlaw.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record on April 21, 2025.

/s/ Mikaila Skaroff
Mikaila Skaroff

# Exhibit 2

6/12/25, 8:45 AM — Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production - Smit…

**895**

 Outlook

## Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production

**From** Adam Locke <adam@lockelaw.com>

**Date** Wed 5/14/2025 6:04 PM

**To** Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>

**Cc** Risley, Julia <jrisley@yettercoleman.com>; Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>; Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; rtorgerson@porterhedges.com <rtorgerson@porterhedges.com>; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; Dale.Wainwright@gtlaw.com <Dale.Wainwright@gtlaw.com>; bernsteinju@gtlaw.com <bernsteinju@gtlaw.com>

---

**External Sender** - From: (Adam Locke <adam@lockelaw.com>)          [Learn More](#)

This message came from outside your organization.

---

Counsel,

Storable's account of the May 7 call is selective and incomplete, especially as to the grounds SafeLease gave for its challenged RFPs.

In addition, Storable's view on its discovery obligations — including what constitutes a business record — is mistaken.

As for Storable's position on SafeLease's RFP 20: it appears that Storable is proposing to produce a subset of what was requested in SafeLease's narrowed request. This will not suffice.

SafeLease made good faith efforts to narrow its requests, which were rejected, and unfortunately the parties are at an impasse. SafeLease will move to compel on its RFPs 10, 12, and 20.

As for Storable's position on Messrs. Kumar and Post, will Storable represent that neither director has a Storable email address?

Regards,
Adam

**896**

On Wed, May 14, 2025 at 5:01 PM Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com> wrote:

> Counsel,
>
> We write to respond to SafeLease's proposed modifications to its RFPs, provide additional information, and request additional information from SafeLease.
>
> **Storable's Responses and Objections to SafeLease's First Set of RFPs**
>
> Request No. 10 (list of all facilities served by Storable FMS)
>
> On the May 7 meet and confer, SafeLease provided only two bases for requesting a full list of facilities served by Storable's FMS and the full addresses for those facilities. *First*, SafeLease stated that it needed the facility list to calculate Defendants' FMS market share. *Second*, SafeLease stated that it needed the location of Defendants' FMS customers to assess Defendants' defense that the Texas Antitrust Act only allows SafeLease to seek an injunction as to customers or business wholly located in Texas.
>
> Given the stated relevance of Request No. 10, Storable offered to produce: 1) the total number of facilities served by Storable's FMS; and 2) a breakdown of the number of facilities served by state. As we described on the meet and confer, Storable's proposal provides all necessary information related to SafeLease's two stated bases for this request. The total number of facilities will enable SafeLease to calculate Defendants' FMS market share. And the state-level breakdown will enable SafeLease to determine the number of facilities that would be covered by an injunction on the antitrust claim limited to Texas (if such an injunction were to issue).
>
> SafeLease has not claimed that Storable's proposal does not satisfy the stated relevance for this request. Instead, on the meet and confer, SafeLease claimed that it needed the full facility list with addresses to verify the accuracy of Defendants' facility counts. To address this point, Storable stated that a Storable employee would likely be willing to certify the accuracy of the figures. Alternatively, Storable proposed providing the full list to a third party that could verify the figures' accuracy. Either of these proposals would fully address SafeLease's claimed need to verify the figures, but SafeLease appears to have rejected both proposals.

6/12/25, 8:45 AM    Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production - Smit…

**897**

SafeLease's proposed modifications to Request No. 10 continue to request overbroad information irrelevant and not proportional to SafeLease's stated bases for this request. Storable's original proposal still provides SafeLease with all the information necessary to the stated relevance of this request. SafeLease has not explained the relevance or need for documents "sufficient to show" all facilities served by Storable's FMS, when the total facility count suffices for market share calculations, and Defendants have offered multiple ways to verify the facility count. And SafeLease has provided no legitimate basis for continuing to seek city and ZIP code information for each facility.

Accordingly, in response to Request No. 10 as modified, Storable reiterates its willingness to produce documents sufficient to show: 1) the total number of facilities served by Storable's FMS; and 2) a breakdown of the number of facilities served by state. Storable also reiterates its willingness to consider the verification methods previously described. Additionally, Storable is willing to provide SafeLease's outside economists with temporary, restricted access to its full facility list, on an outside-economist-only basis, to enable them to verify the accuracy of Storable's facility counts. This full facility list could not be provided to or otherwise shared, in whole or in part, with SafeLease's inside or outside counsel or any other SafeLease employee or representative. The facility list would remain at all times in Storable's possession.

Request No. 12 (list of all Storable authorized users)

On the May 7 meet and confer, SafeLease stated that it needs the full list of all Storable authorized users to determine whether "SafeLease is being singled out" by Storable. As Storable explained on the meet and confer, if this is the stated relevance of the request, it is vastly overbroad. We also explained that it is unclear how having an authorized user list enables SafeLease to determine whether SafeLease is allegedly being singled out, or whether any authorized user was ever removed.

Given the stated relevance of Request No. 12, Storable offered to produce: 1) the total number of authorized users on its FMS platforms; and 2) information showing whether other tenant insurance companies have authorized users. Storable's proposal satisfies SafeLease's stated relevance for this Request.

SafeLease's proposed modification to Request No. 12 – namely, requesting documents showing "all third-party" authorized users, instead of "all" authorized users – is vague and ambiguous. SafeLease does not define "third party"; in theory, it could refer to all FMS customers, in which case it would not meaningfully limit the request. Request No. 12 as modified also continues to be overbroad, unduly burdensome, and not proportional to SafeLease's stated need, and it continues to seek irrelevant information. Storable does not have a way to determine the full universe of users that are "third parties," so the request would require Storable to create a document that does not exist and may not be capable of being created.

6/12/25, 8:45 AM      Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production - Smit…

**898**

On further discussion with our client, we understand that Storable does not maintain lists of authorized users. While it may be possible for Storable to pull a list of all authorized users from its FMS systems, we understand that has not been done, nor does it need to be done in response to a request for production. Thus, Storable intends to amend its response to Request No. 12 to reflect that it does not possess such documents in the ordinary course of business. However, in the interest of cooperation and in response to Request No. 12 as modified, Storable reiterates its willingness to produce documents sufficient to show: 1) the total number of authorized users on its FMS platforms; and 2) information showing whether other tenant insurance companies have authorized users.

Request No. 20 (Storable's technical security measures)

As described on our May 7 meet and confer, Storable is willing to produce certain responsive documents in response to this request. In response to the specific questions you raised on our meet and confer, Storable can confirm that it has and is willing to produce documents showing when it took specific security measures that affected SafeLease.

**SafeLease's Responses and Objections to Storable's First Set of RFPs**

Request No. 34 (non-necessary customer data accessed by SafeLease)

For purposes of this request, Storable proposes the following definition of "access": "Access" means the full definition of access according to Merriam-Webster: https://www.merriam-webster.com/dictionary/access#dictionary-entry-2, including "to get at : to gain access to: such as … to be able to use, enter, or get near (something)." This definition encompasses, inter alia, data that SafeLease either pulls or is able to view when utilizing Storable's FMS systems.

Given this clarification, please confirm whether SafeLease will amend its response to this request and produce any responsive documents.

Request No. 41 (how SafeLease uses access to Storable's FMS to market/sell its products)

We do not recall agreeing to propose a definition of "access" for this request but are amenable to doing so and would propose the same definition of "access" listed above for Request No. 34.

6/12/25, 8:45 AM                    Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production - Smit…

**899**

Further, as noted below, Storable clarified at the May 7 meet and confer that this request would cover documents where, e.g., SafeLease represents to prospective customers that it is connected to or can readily integrate with FMS systems.

Please confirm whether SafeLease will produce documents responsive to this request.

Request No. 4 (competition in relevant markets alleged by SafeLease)

As explained on the meet and confer, SafeLease's attempted monopolization claim put competition in the alleged tenant insurance and FMS markets squarely at issue.  An RFP requesting documents related to competition in both of those alleged markets is highly relevant and proportional to the needs of this case, not overbroad.

Notwithstanding, to address SafeLease's concern about breadth, Storable proposes using the following search terms for this request:

- (compet* OR win* OR los* OR gain* OR steal* OR beat* OR kill* OR crush* OR wreck* OR annihilat* OR destroy* OR fight* OR shift* OR switch* OR chang* OR leverag*) AND ((tenant w/5 insurance) OR (tenant w/5 protect*) OR TPP OR Alchemy OR Aon OR "Deans & Homer" OR Deans OR Homer OR MiniCo OR SafeLease OR "Safe Lease*" OR SafeStor OR Savvy OR SnapNsure OR "Storage Protectors" OR "Storage Shield" OR Tripemco OR "World Insurance" OR Xercor OR FMS OR "facilities management software" OR "facility management software" OR Storable OR storEDGE OR Sitelink OR "Easy Storage Solutions" OR ESS OR CCStorage OR Cubby OR Innago OR Kinnovis OR Monument OR RentPost OR "Self Storage Manager" OR "Storage Commander" OR "Tenant Inc" OR "Unit Trac" OR WebSelfStorage OR Yardi)

Please let us know if you agree to these search terms for this request.

Request No. 16 (SafeLease's prospective/new customers as of 1/21/25)

Storable is amenable to SafeLease's proposal to produce documents sufficient to show its current customers as of the present.  Notwithstanding this agreement, Storable reserves the right to evaluate the sufficiency and responsiveness of SafeLease's production in response to the request as written.

6/12/25, 8:45 AM          Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production - Smit…

**900**

<u>Requests Nos. 20 and 21</u> (how and when SafeLease accessed Storable's FMS)

Please confirm whether SafeLease is willing to produce generalized/high-level documents and a summary of dates/times that SafeLease accessed Storable's FMS.

We are available to further meet and confer on any of the above requests.  Additionally, Storable requests a meet and confer on SafeLease's Responses and Objections to Storable Requests Nos. 30 and 37, which we did not get a chance to discuss on May 7, as well as Requests Nos. 5, 7, 8, 11, 22, 35, 36, and 42.  Please let us know when you are available to meet and confer this week or early next.

**Search Terms and Custodians for SafeLease's Requests**

With regard to the separate discussion about search terms, to clarify, while Storable represented that we were planning to use search terms, we did not represent that we had prepared finalized terms that we were ready to share.  We are continuing to collect documents and are running iterations of search terms against them, including SafeLease's proposed terms.  While we believe SafeLease's proposed terms are facially overbroad, we are continuing to evaluate them as well as our draft proposed terms in good faith.

However, Storable agrees to proceed with eight of the ten custodians proposed by SafeLease. Arvindh Kumar and David Post are not Storable employees, and Storable does not have possession, custody, or control over their documents such that they are not proper custodians.

Thanks,

Mikaila

_____

Mikaila Skaroff
Associate | Bio

**901**

1144 Fifteenth Street | Suite 3100
Denver, CO 80202-2848
T: +1 303.863.2310
Mikaila.Skaroff@arnoldporter.com
www.arnoldporter.com | LinkedIn

---

**From:** Skaroff, Mikaila
**Sent:** Friday, May 9, 2025 4:13 PM
**To:** Risley, Julia <jrisley@yettercoleman.com>; Adam Locke <adam@lockelaw.com>; Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>
**Cc:** Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; zzz.External.rtorgerson@porterhedges.com <rtorgerson@porterhedges.com>; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; zzz.External.Dale.Wainwright@gtlaw.com <Dale.Wainwright@gtlaw.com>; zzz.External.bernsteinju@gtlaw.com <bernsteinju@gtlaw.com>; Lakshmi N. Kumar <lkumar@porterhedges.com>
**Subject:** RE: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production

Counsel,

Thank you for your response.  Due to scheduling conflicts, we will respond by Wednesday, May 14.

Thanks,

Mikaila

**902**

**Mikaila Skaroff**
Associate | Bio

1144 Fifteenth Street | Suite 3100
Denver, CO 80202-2848
T: +1 303.863.2310
Mikaila.Skaroff@arnoldporter.com
www.arnoldporter.com | LinkedIn

---

**From:** Risley, Julia <jrisley@yettercoleman.com>
**Sent:** Thursday, May 8, 2025 8:52 PM
**To:** Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>; Adam Locke <adam@lockelaw.com>; Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>
**Cc:** Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; zzz.External.rtorgerson@porterhedges.com <rtorgerson@porterhedges.com>; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; zzz.External.Dale.Wainwright@gtlaw.com <Dale.Wainwright@gtlaw.com>; zzz.External.bernsteinju@gtlaw.com <bernsteinju@gtlaw.com>; Lakshmi N. Kumar <lkumar@porterhedges.com>
**Subject:** RE: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production

<div style="border:2px solid red; display:inline-block; padding:4px;">External E-mail</div>

Counsel,

**903**

Thank you for yesterday's meet and confer and for your email. We write to propose modifications to Plaintiff's requests 10, 12, and 20, to provide additional information regarding SafeLease's responses to Defendants' requests, as well as to clarify some information in your email below.

Plaintiff's Request 10: As we said on yesterday's call, SafeLease does not agree to Defendants' proposal to provide only the total number of facilities and a breakdown by state. But SafeLease is willing to, without waiver, amend this request to: Documents sufficient to show all self-storage facilities that use your facility management software, including the City, State, ZIP, and FMS for those facilities, as of December 30, 2024. **Please let us know by Monday, May 12, whether Defendants will produce documents responsive to this amended request**.

Plaintiff's Request 12: We discussed with our client Defendants' proposal to produce a subset of the requested data as well as the total number of authorized users. SafeLease is willing to, without waiver, amend this request to: Documents sufficient to show all third-party Authorized Users on your facility management software as of December 30, 2024. **Please let us know by Monday, May 12, whether Defendants will produce documents responsive to this amended request**.

Plaintiff's Request 20: Defendants agreed to produce some responsive documents, such as high-level documents (i.e., documents such as logs, emails, and chat messages showing what was done, when it was done, by whom, and how it was done), but would not agree to produce things like responsive computer code. We stated that we would discuss your proposal with our client. SafeLease is willing to agree at this time that Defendants do not need to produce computer code in response to this request. **Please let us know by Monday, May 12, whether Defendants are willing to produce responsive documents sought by this request, given SafeLease's agreement that computer code need not be produced.** If there are any particular categories of documents, other than code, that Defendants are unwilling to produce in response to this request, please let us know.

Defendants' Request 41: As discussed on the call, please provide a proposed definition of "access" so that Plaintiff can better understand what documents may be responsive to Defendants' framing of this request.

Defendants' Request 4: We appreciate Defendants' agreement to provide search terms for this request. However, SafeLease notes that although it is willing to consider Defendants' search terms, it maintains that this request is overbroad.

6/12/25, 8:45 AM          Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production - Smit…

**904**

<u>Defendants' Request 16</u>: SafeLease will produce documents sufficient to show its current customers.

-

Thank you,

Julia


**Julia C. Risley | Associate | Yetter Coleman LLP**

811 Main Street, Suite 4100, Houston, Texas 77002

(D) 713.632.8006 | (M) 508.272.5088 | jrisley@yettercoleman.com

---

**From:** Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>
**Sent:** Thursday, May 8, 2025 4:57 PM
**To:** Adam Locke <adam@lockelaw.com>; Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>; Risley, Julia <jrisley@yettercoleman.com>
**Cc:** Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; rtorgerson@porterhedges.com; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com; Lakshmi N. Kumar <lkumar@porterhedges.com>
**Subject:** RE: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production

Counsel,


Thank you for the productive meet and confer yesterday.  This email serves to memorialize the discussion.

6/12/25, 8:45 AM          Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production - Smit…

905

**Storable's Responses and Objections**

1. Request No. 10 (list of all facilities served by Storable FMS)
    a. Storable proposed the production of the total number of facilities nationally and a breakdown by state if needed.  Storable also proposed possible verification mechanisms, whether by Storable or through a third party.
    b. SafeLease agreed to bring Storable's proposals back to its client.  Storable agreed to rediscuss with its client possible verification mechanisms.
2. Request No. 12 (list of all Storable authorized users)
    a. Storable proposed the production of the total number of authorized users and information showing whether other tenant insurance companies have authorized users.
    b. SafeLease agreed to bring Storable's proposal back to its client.
3. Request No. 20 (Storable's technical security measures)
    a. Storable proposed the production of documents sufficient to show types of security measures that have been used to block SafeLease's access to Storable's FMS.
    b. SafeLease asked if Storable has a) documents showing when it took specific actions to block SafeLease or b) audit logs of security measures taken, and whether it would be willing to produce those documents.
    c. SafeLease agreed to bring Storable's proposal back to its client.  Storable agreed to bring back SafeLease's questions as to those two categories of documents to its client.

**SafeLease's Responses and Objections**

1. Request No. 34 (non-necessary customer data accessed by SafeLease)
    a. SafeLease interpreted "access" to mean the data it pulled from Storable's FMS systems but would be willing to entertain a different definition/framing of the request.
    b. Storable agreed to send SafeLease a proposed definition of "access" for purposes of just this RFP.
2. Request No. 41 (how SafeLease uses access to Storable's FMS to market/sell its products)
    a. Storable clarified that the request is intended to cover documents where, e.g., SafeLease represents to prospective customers that it is connected to or can readily integrate with FMS systems.
    b. SafeLease agreed to go back to its client, indicating that with this clarification, there likely are documents that it will produce.
3. Request No. 4 (competition in relevant markets alleged by SafeLease)
    a. Storable agreed to propose search terms for this request.
4. Request No. 16 (SafeLease's prospective/new customers as of 1/21/25)
    a. SafeLease agreed to ask its client about ways to narrow the request, including potentially limiting its prospective relations claim to mutual Storable and SafeLease customers or a specific list of customers, which would then allow Storable to tailor the request.
5. Requests Nos. 20 and 21 (how and when SafeLease accessed Storable's FMS)
    a. SafeLease agreed to go back to its client to confirm whether it would be able to produce generalized/high-level documents and a summary of dates/times that SafeLease accessed Storable's FMS, as a starting point.

6/12/25, 8:45 AM     Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production - Smit…

**906**

**Search Terms**

1. SafeLease agreed to send Storable proposed search terms for SafeLease's requests later this week.  Storable agreed to send proposed search terms back to make sure that the parties are in agreement under the ESI protocol.

Finally, while Storable maintains that the positions it offered on the meet and confer are reasonable and sufficient, we will discuss with our client the issues raised by SafeLease to determine if there are ways the parties can reach a compromise on these RFPs.  We expect that SafeLease will do the same.

We look forward to discussing these issues with you further sometime next week.

Thanks,

Mikaila

_____

Mikaila Skaroff
Associate | Bio

1144 Fifteenth Street | Suite 3100
Denver, CO 80202-2848
T: +1 303.863.2310
Mikaila.Skaroff@arnoldporter.com
www.arnoldporter.com | LinkedIn

---

**From:** Adam Locke <adam@lockelaw.com>
**Sent:** Tuesday, May 6, 2025 7:57 AM
**To:** Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>
**Cc:** Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone

6/12/25, 8:45 AM        Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production - Smit…

**907**

<judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>; Risley, Julia <jrisley@yettercoleman.com>; Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; zzz.External.rtorgerson@porterhedges.com <rtorgerson@porterhedges.com>; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; zzz.External.Dale.Wainwright@gtlaw.com <Dale.Wainwright@gtlaw.com>; zzz.External.bernsteinju@gtlaw.com <bernsteinju@gtlaw.com>; Lakshmi N. Kumar <lkumar@porterhedges.com>

**Subject:** Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production

External E-mail

Thanks, Mikaila. Very helpful. Look forward to discussing tomorrow.

**From:** Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>
**Date:** Tuesday, May 6, 2025 at 8:40 AM
**To:** Adam Locke <adam@lockelaw.com>
**Cc:** Yetter, Paul <pyetter@yettercoleman.com>, Allen, Susanna <sallen@yettercoleman.com>, Schamel, Luke <lschamel@yettercoleman.com>, Smith, Shannon <ssmith@yettercoleman.com>, Smith, Alyssa <asmith@yettercoleman.com>, Chris Hilton <chris@stonehilton.com>, Judd E. Stone <judd@stonehilton.com>, Alexander M. Dvorscak <alex@stonehilton.com>, Bonnie Chester <bonnie@stonehilton.com>, Smith, Courtney <csmith@yettercoleman.com>, Risley, Julia <jrisley@yettercoleman.com>, Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>, Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>, rtorgerson@porterhedges.com <rtorgerson@porterhedges.com>, Carolyn Reed <creed@porterhedges.com>, Dolores Brunelle <dbrunelle@porterhedges.com>, Elizabeth "Liza" Eoff <leoff@porterhedges.com>, Jonna N. Summers <jsummers@porterhedges.com>, Dale.Wainwright@gtlaw.com <Dale.Wainwright@gtlaw.com>, bernsteinju@gtlaw.com <bernsteinju@gtlaw.com>, Lakshmi N. Kumar <lkumar@porterhedges.com>

**908**

**Subject:** RE: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production

Adam,


On tomorrow's call, Storable would primarily like to discuss SafeLease's responses and objections to Storable's requests for production nos. 4, 16, 20, 21, 30, 34, 37, and 41. We may also ask high-level questions about SafeLease's responses and objections to other requests for production.


Thanks,

Mikaila

————————
Mikaila Skaroff
Associate | Bio


1144 Fifteenth Street | Suite 3100
Denver, CO 80202-2848
T: +1 303.863.2310
Mikaila.Skaroff@arnoldporter.com
www.arnoldporter.com | LinkedIn

---

**From:** Adam Locke <adam@lockelaw.com>
**Sent:** Monday, May 5, 2025 11:43 AM
**To:** Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>
**Cc:** Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>; Risley, Julia <jrisley@yettercoleman.com>; Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; zzz.External.rtorgerson@porterhedges.com <rtorgerson@porterhedges.com>; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; zzz.External.Dale.Wainwright@gtlaw.com

6/12/25, 8:45 AM          Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production - Smit…

**909**

<[Dale.Wainwright@gtlaw.com](mailto:Dale.Wainwright@gtlaw.com)>; [zzz.External.bernsteinju@gtlaw.com](mailto:zzz.External.bernsteinju@gtlaw.com) <[bernsteinju@gtlaw.com](mailto:bernsteinju@gtlaw.com)>; Lakshmi N. Kumar <[lkumar@porterhedges.com](mailto:lkumar@porterhedges.com)>

**Subject:** Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production

External E-mail

Thanks, Mikaila. We'll do our best to discuss your clients' concerns. It would help if they disclosed what those concerns are as soon as possible. If we learn what the issues are Wed morning, that won't optimize for a productive call — agree?

I trust that the two weeks your clients have had to think about their R&O to plaintiffs RFPs is more than enough time, such that they'll be prepared to adopt a definitive position on whether they'll produce, or offer a reasonable compromise.

On Mon, May 5, 2025 at 12:22 PM Skaroff, Mikaila <[Mikaila.Skaroff@arnoldporter.com](mailto:Mikaila.Skaroff@arnoldporter.com)> wrote:

> Storable will be prepared to discuss its responses and objections to SafeLease's requests for production nos. 10, 12, and 20. We also expect to discuss SafeLease's responses and objections to Storable's first set of requests for production. Please confirm you agree to do so on this call. We will send the specific requests we would like to discuss in advance of the call.
>
> Thanks,
>
> Mikaila
>
> **Mikaila Skaroff**
> Associate | [Bio](Bio)

6/12/25, 8:45 AM          Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production - Smit…

**910**

1144 Fifteenth Street | Suite 3100
Denver, CO 80202-2848
T: +1 303.863.2310
Mikaila.Skaroff@arnoldporter.com
www.arnoldporter.com | LinkedIn

---

**From:** Adam Locke <adam@lockelaw.com>
**Sent:** Monday, May 5, 2025 7:03 AM
**To:** Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>
**Cc:** Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>; Risley, Julia <jrisley@yettercoleman.com>; Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; zzz.External.rtorgerson@porterhedges.com <rtorgerson@porterhedges.com>; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; zzz.External.Dale.Wainwright@gtlaw.com <Dale.Wainwright@gtlaw.com>; zzz.External.bernsteinju@gtlaw.com <bernsteinju@gtlaw.com>; Lakshmi N. Kumar <lkumar@porterhedges.com>
**Subject:** Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production

External E-mail

Counsel, let's please confirm the scope of this meet and confer. My client will be raising your clients' refusal to commit to producing documents responsive to plaintiff's RFPs 10, 12, and 20. My client expects that your clients will ensure counsel on the call are prepared to discuss those RFPs. Please confirm this will be the case. If your clients do not intend to confer Wednesday on plaintiff's RFPs 10, 12, and 20, please let me know now. Absent a response, we'll go into the M&C expecting to discuss these RFPs. If it turns out that your clients' position on the call is to refuse to discuss them until after

6/12/25, 8:45 AM                Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production - Smit…

**911**

our planned mediation, my client will note this refusal to confer in good faith when we move to compel. Thanks.

---

**From:** Adam Locke <adam@lockelaw.com>
**Date:** Monday, May 5, 2025 at 7:24 AM
**To:** Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>
**Cc:** Yetter, Paul <pyetter@yettercoleman.com>, Allen, Susanna <sallen@yettercoleman.com>, Schamel, Luke <lschamel@yettercoleman.com>, Smith, Shannon <ssmith@yettercoleman.com>, Smith, Alyssa <asmith@yettercoleman.com>, Chris Hilton <chris@stonehilton.com>, Judd E. Stone <judd@stonehilton.com>, Alexander M. Dvorscak <alex@stonehilton.com>, Bonnie Chester <bonnie@stonehilton.com>, Smith, Courtney <csmith@yettercoleman.com>, Risley, Julia <jrisley@yettercoleman.com>, Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>, Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>, rtorgerson@porterhedges.com <rtorgerson@porterhedges.com>, Carolyn Reed <creed@porterhedges.com>, Dolores Brunelle <dbrunelle@porterhedges.com>, Elizabeth "Liza" Eoff <leoff@porterhedges.com>, Jonna N. Summers <jsummers@porterhedges.com>, Dale.Wainwright@gtlaw.com <Dale.Wainwright@gtlaw.com>, bernsteinju@gtlaw.com <bernsteinju@gtlaw.com>, Lakshmi N. Kumar <lkumar@porterhedges.com>
**Subject:** Re: SafeLease v. Storable – Meet and Confer Regarding Defendants' R&Os to Plaintiff's First Merits Requests for Production

Let's do Wednesday at 12. Thanks.

On Mon, May 5, 2025 at 7:18 AM Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com> wrote:

**912**

Counsel,

Counsel for Storable is available to meet and confer on Wednesday 12-1 or 2-4 CT and Thursday 1:30-3 CT.

Thanks,

Mikaila

_____

Mikaila Skaroff
Associate | Bio

1144 Fifteenth Street | Suite 3100
Denver, CO 80202-2848
T: +1 303.863.2310
Mikaila.Skaroff@arnoldporter.com
www.arnoldporter.com | LinkedIn

**From:** Adam Locke <adam@lockelaw.com>
**Sent:** Saturday, May

# Exhibit 3

**Allen, Susanna**

---

| | |
|---|---|
| **From:** | Eoff, Elizabeth F. <LEoff@porterhedges.com> |
| **Sent:** | Thursday, January 16, 2025 8:10 AM |
| **To:** | Allen, Susanna |
| **Cc:** | Smith, Shannon; Torgerson, Ray T.; Yetter, Paul; Schamel, Luke; Smith, Alyssa; Alexander, Ken; Summers, Jonna N.; Kumar, Lex N.; Brunelle, Dolores; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com; Smith, Shannon; Torgerson, Ray T.; Yetter, Paul; Schamel, Luke; Smith, Alyssa; Alexander, Ken; Summers, Jonna N.; Kumar, Lex N.; Brunelle, Dolores |
| **Subject:** | Re: Letter Ruling D-1-GN-24-010233 |
| **Attachments:** | image001.png; Agreed Protective Order(1189825.1).docx |

---

**External Sender** - From: ("Eoff, Elizabeth F." <LEoff@porterhedges.com>)
This message came from outside your organization.

Learn More

Yes, confirmed.

On Jan 16, 2025, at 7:59 AM, Allen, Susanna <sallen@yettercoleman.com> wrote:

Hi Liza, can you please confirm that you are signed off on the Protective Order? If so, we can upload for the Court this morning as a proposed order.

Thanks,
Susanna

**- Susanna**
**Yetter Coleman LLP**
**713.632.8009 (office)**
**662.801.9185 (mobile)**

**From:** Smith, Shannon <ssmith@yettercoleman.com>
**Sent:** Sunday, January 12, 2025 9:06 AM
**To:** Eoff, Elizabeth F. <LEoff@porterhedges.com>; Allen, Susanna <sallen@yettercoleman.com>; Torgerson, Ray T. <RTorgerson@porterhedges.com>; Yetter, Paul <pyetter@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>
**Cc:** Alexander, Ken <KAlexander@porterhedges.com>; Summers, Jonna N. <JSummers@porterhedges.com>; Kumar, Lex N. <LKumar@porterhedges.com>; Brunelle, Dolores <DBrunelle@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com
**Subject:** RE: Letter Ruling D-1-GN-24-010233

Liza,

See attached.

Thanks,

Shannon

**Shannon Smith | Associate | Yetter Coleman LLP**
811 Main Street, Suite 4100, Houston, Texas 77002
(D) 713.632.8066 | (M) 281.770.2697 | (O) 713.632.8000 | www.yettercoleman.com

---

**From:** Eoff, Elizabeth F. <LEoff@porterhedges.com>
**Sent:** Saturday, January 11, 2025 8:52 PM
**To:** Smith, Shannon <ssmith@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Torgerson, Ray T. <RTorgerson@porterhedges.com>; Yetter, Paul <pyetter@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>
**Cc:** Alexander, Ken <KAlexander@porterhedges.com>; Summers, Jonna N. <JSummers@porterhedges.com>; Kumar, Lex N. <LKumar@porterhedges.com>; Brunelle, Dolores <DBrunelle@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com
**Subject:** RE: Letter Ruling D-1-GN-24-010233

Shannon,

Y'all have suggested the last few rounds of edits. Please send us a clean and we can sign off.

Thanks.

**Elizabeth F Eoff** | Associate
**Porter Hedges LLP**

---

1000 Main St, 36th Floor | Houston, TX 77002
**t** 713.226.6732     **c** 281.630.6388
**e** LEoff@porterhedges.com
Bio • Web • V-Card

---

**From:** Smith, Shannon <ssmith@yettercoleman.com>
**Sent:** Saturday, January 11, 2025 8:46 PM
**To:** Eoff, Elizabeth F. <LEoff@porterhedges.com>; Allen, Susanna <sallen@yettercoleman.com>; Torgerson, Ray T. <RTorgerson@porterhedges.com>; Yetter, Paul <pyetter@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>
**Cc:** Alexander, Ken <KAlexander@porterhedges.com>; Summers, Jonna N. <JSummers@porterhedges.com>; Kumar, Lex N. <LKumar@porterhedges.com>; Brunelle, Dolores <DBrunelle@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com
**Subject:** RE: Letter Ruling D-1-GN-24-010233

Thank you, Liza. We agree. Please send us a clean copy of the PO, and we will review and affix a signature on our end.

Thanks!

Shannon

**Shannon Smith | Associate | Yetter Coleman LLP**

2

811 Main Street, Suite 4100, Houston, Texas 77002
(D) 713.632.8066 | (M) 281.770.2697 | (O) 713.632.8000 | www.yettercoleman.com

---

**From:** Eoff, Elizabeth F. <LEoff@porterhedges.com>
**Sent:** Saturday, January 11, 2025 8:38 PM
**To:** Smith, Shannon <ssmith@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Torgerson, Ray T. <RTorgerson@porterhedges.com>; Yetter, Paul <pyetter@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>
**Cc:** Alexander, Ken <KAlexander@porterhedges.com>; Summers, Jonna N. <JSummers@porterhedges.com>; Kumar, Lex N. <LKumar@porterhedges.com>; Brunelle, Dolores <DBrunelle@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com
**Subject:** RE: Letter Ruling D-1-GN-24-010233


Shannon,

These changes are acceptable to us.

We agree to abide by the protections of the PO for documents designated Confidential or Outside Counsel's Eyes Only. Please confirm you agree.

Best,

Liza

**Elizabeth F Eoff** | Associate
**Porter Hedges LLP**

---

1000 Main St, 36th Floor | Houston, TX 77002
**t** 713.226.6732   **c** 281.630.6388
**e** LEoff@porterhedges.com
Bio • Web • V-Card

---

**From:** Smith, Shannon <ssmith@yettercoleman.com>
**Sent:** Saturday, January 11, 2025 6:39 PM
**To:** Eoff, Elizabeth F. <LEoff@porterhedges.com>; Allen, Susanna <sallen@yettercoleman.com>; Torgerson, Ray T. <RTorgerson@porterhedges.com>; Yetter, Paul <pyetter@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>
**Cc:** Alexander, Ken <KAlexander@porterhedges.com>; Summers, Jonna N. <JSummers@porterhedges.com>; Kumar, Lex N. <LKumar@porterhedges.com>; Brunelle, Dolores <DBrunelle@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com
**Subject:** RE: Letter Ruling D-1-GN-24-010233

Thanks for the quick response, Liza. The attached redline adds our requested changes to paragraph 24. The rest of the redlines are the same as the last version I circulated. Please confirm that these additional changes are acceptable.

Thanks!

Shannon

CAUSE NO. D-1-GN-24-010233

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES, LLC, | § § § | IN THE DISTRICT COURT |
| *Plaintiff,* | § § | |
| v. | § § | |
| STORABLE, INC., REDNOVA LABS, INC. (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP, | § § § § § § § | 345TH JUDICIAL DISTRICT |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |

## [PROPOSED] AGREED PROTECTIVE ORDER

In order to expedite the flow of discovery material, facilitate the prompt resolution of disputes over confidentiality, adequately protect material entitled to be kept confidential, and ensure that protection is afforded only to material so entitled, entry of this Agreed Protective Order pursuant to Texas Rule of Civil Procedure 192.6 is merited. This Protective Order applies to materials produced in advance of the Temporary Injunction hearing and functions as the operative Protective Order for this matter until such time as this Order is amended or replaced.

It is hereby ORDERED that:

1. All Confidential Information and Outside Counsel's Eyes Only Information produced or exchanged by the parties in the course of this litigation, including information produced by third parties/non-parties, shall be used solely for the purpose of preparation, trial, and appeal of this litigation and for no other purpose whatsoever, and shall not be disclosed to any person except in accordance with the terms hereof.

2. "Confidential Information" as used herein means any information of any type,

1

kind, or character which is designated as "Confidential" by any of the supplying or receiving parties, including third parties/non-parties supplying said information, whether it be a document, information contained in a document, discovery materials, information or testimony revealed during a deposition, or otherwise.

3.     "Outside Counsel's Eyes Only Information" as used herein means any information that is "Confidential" as described herein and additionally may not be disclosed to anyone except the Qualified Persons described in Paragraph 6, *infra.* "Outside Counsel's Eyes Only Information" includes trade secrets or other non-public, proprietary, or sensitive business or financial information.  More specifically, an "Outside Counsel's Eyes Only" designation means that the materials so denoted may not be disclosed to any party or employee, representative, or affiliate of a party, except by agreement or a subsequent Order by this Court.

4.     In designating information as "Confidential" or "Outside Counsel's Eyes only," a party or third party/non-party supplying information will make such designation only as to that information that it in good faith believes contains "Confidential" or "Outside Counsel's Eyes Only" information.  Information or material which is available to the public, including industry materials, advertising materials, and the like shall not be classified as "Confidential" or "Outside Counsel's Eyes Only."

5.     "Qualified Persons" as used herein for "Confidential Information" means:

(a) Attorneys of record for the parties in this litigation and employees and/or agents of such attorneys to whom it is necessary that the information be shown for purposes of this litigation;

(b) Actual or potential independent experts or consultants (and their administrative or

2

clerical staff) engaged in connection with this litigation (which shall not include the current employees, officers, members, or agents of the parties or affiliates of the parties) who have signed a document in the form of Exhibit A attached hereto (such signed document to be maintained by the attorney retaining such person);

(c) The parties and their respective in-house counsel, paralegals, legal staff or experts;

(d) The Court and its staff, including court reporters;

(e) Vendors engaged by the parties or the parties' respective counsel, including independent copy services, printers, or illustrators, and court reporters for the purpose of this litigation who have signed a document in the form of Exhibit A attached hereto (such signed document to be maintained by the attorney retaining such person);

(f) The authors and original recipients of the documents or information unless any such person no longer has a right to access or possess any such documents or information by virtue of a change in employment, position, or other circumstance;

(g) The designated corporate representative for the party that produced the documents or information as "Confidential" or "Outside Counsel's Eyes Only"; or

(h) By agreement of the parties, or if this Court so elects, any other person designated as a Qualified Person by order of this Court, after notice to all the parties and hearing.

6. For "Outside Counsel's Eyes Only Information," "Qualified Persons" includes (a),

(b), and (d) - (h).

7.     Documents produced in this action may be designated by any party or parties or by any third party and/or non-party producing said documents as "Confidential" or "Outside Counsel's Eyes Only" information by marking each page of the document(s) with the word(s) "Confidential" or "Outside Counsel's Eyes Only."  However, for documents produced in electronic native form, such as Excel spreadsheets, the designation may be affixed to the drive, disk, or other medium on which the documents or materials are produced or in the file names without marking each page of the documents or materials "Confidential" or "Outside Counsel's Eyes Only."

8.     In lieu of marking the original of a document, if the original is not produced, the designating party may mark the copies that are produced or exchanged.

9.     Information disclosed at (a) the deposition of a party or one of its present or former officers, directors, employees, agents or independent experts retained by counsel for the purpose of this litigation, or (b) the deposition of a third party (which information pertains to a party) may be designated by any party, including a third party/non-party disclosing said information or being deposed, as "Confidential" or "Outside Counsel's Eyes Only" information by indicating on the record at the deposition that the testimony is "Confidential" or "Outside Counsel's Eyes Only" and is subject to the provisions of this Order.

10.     Any party or third party/non-party disclosing said information or being deposed may also designate said information disclosed at such deposition as "Confidential" or "Outside Counsel's Eyes Only" by notifying all of the parties, in writing within 30 days of receipt of the transcript, of the specific pages and lines of the transcript which should be

treated as "Confidential" or "Outside Counsel's Eyes Only" thereafter. Each party shall attach a copy of such written notice or notices to the face of the transcript and each copy thereof in his possession, custody or control. All deposition transcripts shall be treated as "Confidential" for a period of 30 days after the receipt of the transcript, apart from any portions designated on the record as "Outside Counsel's Eyes Only," which portions shall be treated as Attorneys' Eyes Only.

11. To the extent possible, the court reporter shall segregate into separate transcripts information designated as "Confidential" or "Outside Counsel's Eyes Only" with blank, consecutively-numbered pages being provided in a non-designated main transcript. The separate transcript containing "Confidential" or "Outside Counsel's Eyes Only" information shall have page numbers that correspond to the blank pages in the main transcript.

12. "Confidential" or "Outside Counsel's Eyes Only" information shall not be disclosed or made available by the receiving party to persons other than Qualified Persons as delineated above. Notwithstanding the foregoing, nothing in this Protective Order restricts the ability of a party and/or third party/non-party to review, disclose, or disseminate its own documents or information as it sees fit.

13. Documents produced prior to entry of this Protective Order may be retroactively designated "Confidential" or "Outside Counsel's Eyes Only" by notice in writing of the designated class of each document by Bates number within 30 days of the entry of this Protective Order. Documents unintentionally produced without designation as "Confidential" or "Outside Counsel's Eyes Only" may be retroactively designated in the same manner and shall be treated appropriately from the date written notice of the designation is provided to the receiving party. The

burden shall be on the party claiming confidentiality to prove the confidential nature of the documents.

14. Documents to be inspected shall be treated as "Confidential" during inspection. At the time of copying for the receiving parties, such inspected documents shall be marked or stamped prominently "Confidential" or "Outside Counsel's Eyes Only" by the producing party.

15. If a receiving party learns of any unauthorized disclosure of "Confidential" or "Outside Counsel's Eyes Only," the party shall immediately upon learning of such disclosure inform the producing party of all pertinent facts relating to such disclosure and shall make all reasonable efforts to prevent disclosure by each unauthorized person who received such information.

16. Nothing herein shall prevent disclosure beyond the terms of this Protective Order if each party or third party/non-party designating the information as "Confidential" or "Outside Counsel's Eyes Only" consents in writing to such disclosure or, if the Court orders such disclosure. Nor shall anything herein prevent any counsel of record from utilizing "Confidential" or "Outside Counsel's Eyes Only" information in the examination or cross-examination of any person who is indicated on the document as being an author, source or recipient of the "Confidential" or "Outside Counsel's Eyes Only" information, or if counsel has a reasonable belief that such person was an author, source or recipient of "Confidential" or "Outside Counsel's Eyes Only" information irrespective of which party or third party/non-party produced such information.

17. A party shall not be obligated to challenge the propriety of a designation as "Confidential" or "Outside Counsel's Eyes Only" at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. In the event that any party to this litigation disagrees at

any stage of these proceedings with the designation by the designating party of any information as "Confidential" or "Outside Counsel's Eyes Only" or the designation of any person as a Qualified Person, the parties shall first try to resolve such dispute in good faith on an informal basis, such as production of redacted copies. If the dispute cannot be resolved, the objecting party may invoke this Protective Order by objecting in writing to the party or third party/non-party who has designated the document or information as "Confidential" or "Outside Counsel's Eyes Only" or designated any person as a Qualified Person. The designating party shall be required to move the Court for an order preserving the designated status of such information or person within 30 business days of receipt of the written objection. The disputed information shall remain "Confidential" or "Outside Counsel's Eyes Only" unless and until the Court orders otherwise. Failure to move for an order shall constitute a termination of the restricted status of such item unless the parties otherwise agree. The party or third party/non-party objecting to disclosure bears the burden of proof to establish the confidentiality of the document.

18.  The parties may, by stipulation, provide for exceptions to this Protective Order, and any party may seek an order of this Court modifying this Protective Order.

19.  Nothing shall be regarded as "Confidential" or "Outside Counsel's Eyes Only" information if it is information that either:

(a) is in the public domain at the time of disclosure supported by appropriate evidence; or

(b) becomes part of the public domain through no fault of the other party, as supported by appropriate evidence.

20.  To the extent documents containing "Confidential" Information or "Outside

Counsel's Eyes Only" Information are filed before trial, in this or any other Court, or the substance of "Confidential" or "Outside Counsel's Eyes Only" Information is revealed in papers filed in this or any other Court, or in the transcript of any proceedings, those documents, materials, or transcripts shall be filed in camera in an envelope marked "CONFIDENTIAL," and this Order serves as a temporary sealing order, sealing such "Confidential" or "Outside Counsel's Eyes Only" Information under Rule 76a without the need for a separate motion or order. The temporary sealing order provided for under this paragraph will expire thirty days following the filing of the "Confidential" or "Outside Counsel's Eyes Only" Information unless the Designating Party moves for an order permanently sealing such material in accordance with Rule 76a prior to the expiration of such thirty-day period and thereafter complies with the permanent sealing requirements of Rule 76a. The party filing such materials in camera shall include the Bates Numbers of the specific documents used in the pleading filed and served to ensure the other parties will know which "Confidential" or "Outside Counsel's Eye Only" materials are being filed in camera. Any pleading or attachment filed in camera shall be served on Counsel by email.

21. Unless otherwise agreed to in writing by the parties or ordered by the Court, all proceedings involving or relating to "Confidential" or "Outside Counsel's Eyes Only" documents or information shall be subject to the provisions of this Protective Order.

22. After the conclusion of this litigation and any appeal thereof, any "Confidential" or "Outside Counsel's Eyes Only" documents and all copies or reproductions of such documents produced by a party or third party/non-party in the possession of any of the "Qualified Persons" shall be returned to the producing party or third party/non-party within 60

days of receipt of a timely written request by said producing party or third party/non-party, except as this Court may otherwise order or to the extent such information was used as evidence at the trial. As far as the provisions of any protective orders entered in this action restrict the communication and use of the documents produced thereunder, such orders shall continue to be binding after the conclusion of this litigation, except (a) that there shall be no restriction on documents that are used as exhibits in open court, and (b) that a party may seek the written permission of the producing party or order of the Court with respect to dissolution or modification of such protective orders. Alternatively, at the conclusion of this litigation, in lieu of the actual physical return of "Confidential" or "Outside Counsel's Eyes Only" documents, counsel for each party may provide a certification certifying that (1) all experts and any other person(s) receiving "Confidential" or "Outside Counsel's Eyes Only" documents have been instructed to delete or destroy all documents; and (2) all "Confidential" or "Outside Counsel's Eyes Only" documents in the possession of counsel have been deleted or destroyed.

23. Any party designating any person as a "Qualified Person" shall have the duty to reasonably ensure that such person observes the terms of this Protective Order.

24. For purposes of the Temporary Injunction hearing currently scheduled to take place on January 16, 2025, or any subsequent hearing in the case, if any party intends to discuss or offer a document or information marked as "Outside Counsel's Eyes Only," the offering party must alert opposing counsel and the Court of its intent to discuss or offer the document or information, and all persons who are not authorized under this Order to view the document will be excused during any discussion of such document or information. For purposes of any trial before a jury, the parties will propose to the Court an appropriate protocol for handling of such document or information.

Signed this ____ day of _____, 2025.

_____
Judge Presiding

**APPROVED AS TO FORM AND ENTRY REQUESTED:**

/s/ Ray T. Torgerson
Ray T. Torgerson SBN: 24003067
N. Kenneth Alexander SBN: 00996600
Jonna N. Summers SBN: 24060649
Elizabeth "Liza" Eoff SBN: 24095062
Lakshmi N. Kumar SBN: 24144581
Porter Hedges LLP
1000 Main Street, 36Th Floor
Houston, Texas 77002
713-226-6650
713-226-6250 (fax)
rtorgerson@porterhedges.com
kalexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
lkumar@porterhedges.com

**ATTORNEYS FOR DEFENDANTS**

/s/ R. Paul Yetter
R. Paul Yetter SBN: 22154200
Susanna R. Allen SBN: 24126616
Luke A. Schamel SBN: 24106403
Shannon N. Smith SBN: 24110378
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002
713-632-8000
pyetter@yettercoleman.com
sallen@yettercoleman.com
lschamel@yettercoleman.com
ssmith@yettercoleman.com

**ATTORNEYS FOR PLAINTIFFS**

CAUSE NO. D-1-GN-24-010233

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES, LLC, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| STORABLE, INC., REDNOVA LABS, INC. (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP, | § | 345TH JUDICIAL DISTRICT |
| | § | |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |

## EXHIBIT A

### AGREEMENT TO BE BOUND BY TERMS OF PROTECTIVE ORDER

My name is, _____, my date of birth is _____, and my address is, _____. I have read and am familiar with the terms of the Protective Order concerning the records and testimony produced by the respective parties in this case, and I agree to abide by all terms of said Protective Order and not to reveal or otherwise communicate any of the information disclosed to me pursuant thereto to anyone except in accordance with the terms of said Protective Order. I agree not to make any use of that information or materials other than for the purpose of this litigation.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Executed in _____ County, State of _____

Date:

# Exhibit 4

REPORTER'S RECORD

VOLUME 3 OF 13 VOLUMES

CAUSE NO. 15-25-00020-CV
TRIAL COURT CAUSE NO. 25-BC03A-0001
IN THE FIFTEENTH COURT OF APPEALS
Sitting at Austin, Texas

STORABLE, INC.; REDNOVA LABS, INC.
(D/B/A STOREDGE); SITELINK SOFTWARE, LLC;
EASY STORAGE SOLUTIONS, LLC; BADER CO.;
AND PROPERTY FIRST GROUP, LP

V.

SAFELEASE INSURANCE SERVICES, LLC

------------------------------------------------------------

REPORTER'S RECORD

FEBRUARY 11, 2025

------------------------------------------------------------

On the 11th day of February, 2025, the hearing on Discovery Motions and a Temporary Injunction came on to be heard in the above-entitled and -numbered cause; and the following proceedings were had before the Honorable Melissa Andrews, Judge Presiding, held in Austin, Travis County, Texas:

Proceedings reported by computerized stenotype machine; Reporter's Record produced by computer-assisted transcription.

the hearing or just you looked around and no one else was in there?

MR. YETTER: No, the hearing, itself, was not closed. It was a public hearing; but certain aspects of testimony, because they were marked Outside Attorney's Eyes Only, the party representatives that couldn't hear it had to step out. The court -- I don't think the court ever said that "The courtroom is now sealed," but I think there were no other representatives in the courtroom but the parties. So we knew who was there.

MR. TORGERSON: I would agree with that characterization. I will say that I'm not sure that the judge ever -- Mangrum ever actually signed the protective order and there were several loose ends left in Travis County, as the court was aware.

MR. YETTER: On that point, Your Honor, just by way of further explanation, the parties conferred about a protective order. We agreed on one. We both signed it and we submitted it; but counsel is correct, it was never entered. As far as we know it was never entered by the court.

So it is probably on your docket. At some point the court should consider it; and if you have any questions, we can answer them. But we have been acting

and producing discovery pursuant to that as a rule -- essentially a Rule 11 agreement.

THE COURT: Sure. And I want to conform to that as much as I can. I'm just a little bit concerned about -- especially with respect to judicial notice. I don't want to take judicial notice of something. That's going to make it a record in this proceeding and there is no sealing order and that could be problematic for you guys. 76(a) is pretty stringent and requires a lot that hasn't happened yet.

MR. TORGERSON: If I may, that was defendants' request; and what we will do is confer and get back to you.

THE COURT: So you guys talk about it, and I'll probably do it however is best suited to your needs for the case.

Are you ready for plaintiff's?

MS. ALLEN: Yes. My apologies again for misplacing my papers. So plaintiff moves to admit Exhibit Nos. 1 through 20, Plaintiff's Exhibit 22 through 40, Plaintiff's Exhibit 42 through 71, Plaintiff's Exhibit 93 through 101, Plaintiff's Exhibit 103 through 144, Plaintiff's Exhibit 147 through 171, Plaintiff's Exhibit 173 through 175, and Plaintiff's Exhibits 181 and 182. And they're not

MR. TORGERSON: Well, in particular the contract is in evidence and I would like to show it to him, just to confirm the percentage split. He signed it, and it's been produced in this case. It has been designated by them under the Rule 11 agreement, which is acting like a protective order.

And to be clear there are really sort of two issues that I hear Mr. Hilton raising. His company's internal confidential information, I'm not going there at all. This is commercial information between the plaintiff SafeLease and MyStorage.

MR. HILTON: If he's going to talk about an exhibit that's in evidence that is subject to the protective order, no issue.

THE COURT: I think maybe to get started, because that way you don't feel like you're on the spot and having to decide these control issues for the first time.

THE WITNESS: Okay.

THE COURT: Since it's already in evidence, we'll go at it that way and make everybody most comfortable.

MR. TORGERSON: Yes, Your Honor.

(Whereupon, after those people falling under the rule left the courtroom, the following

# Exhibit 5

 Outlook

---

## RE: SafeLease v. Storable - Proposed Search Terms and Custodians

---

**From** Schamel, Luke <lschamel@yettercoleman.com>

**Date** Thu 6/5/2025 10:31 AM

**To** Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>; Adam Locke <adam@lockelaw.com>; Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Smith, Shannon <ssmith@yettercoleman.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <Bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>; Risley, Julia <jrisley@yettercoleman.com>

**Cc** Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; rtorgerson@porterhedges.com <rtorgerson@porterhedges.com>; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; Dale.Wainwright@gtlaw.com <Dale.Wainwright@gtlaw.com>; bernsteinju@gtlaw.com <bernsteinju@gtlaw.com>; Lakshmi N. Kumar <lkumar@porterhedges.com>

Thank you for sending these proposed search terms.  Unfortunately, they are clearly underinclusive.  There are at least three major problems with them.  First, the terms used do not appear to cover all our RFPs.  For example, it is highly unlikely that your proposed terms would capture documents responsive to SafeLease's RFPs 4, 14, 21, 25, 26, 27, 28, or 30.  Second, they fail to capture responsive documents that we already know exist based on discovery for the TI hearings.  We ran the terms against the documents you already produced, and these terms do not capture, for example:

- multiple customer communications about SafeLease (RFP 1), such as Storable000459, -0609, -1281, and -1297;
- virtually any of the dozens of technical and related documents regarding alleged SafeLease-caused security, privacy, performance, stability, or related issues (RFP 19), such as Storable000423, -0440, -0442, -0602, -0604, -0606, -0618, -0635, -0640, -0649, -0652, -0655, -0657, -0667, or -0670; and
- several slide decks on your plans to remove SafeLease's or other insurance vendors' FMS access (RFP 15), such as Storable000519, and -0526.

These are just examples of responsive documents that your terms don't capture.  Terms that don't capture such clearly responsive documents are insufficient, and that these obviously relevant documents are not captured suggests that you did not test your proposed terms to see whether they effectively capture responsive documents.

Third, one of your search strings returns no results because it has a syntax error (e.g., too many or misplaced parentheses).  This also suggests that you did not test these terms to see if they are reasonable and effective before proposing them.

We therefore can't agree to these terms as sufficient.  These terms also appear to be limited only to SafeLease's first RFPs—were these intended to capture documents for only that set of RFPs?  We think it is reasonable and more efficient to have the terms the parties agree to use cover both SafeLease's first and second set of RFPs.

The proposed terms we sent you on May 9th covered both sets of RFPs.  It doesn't appear as if you have attempted to incorporate any of those proposed terms in yours—e.g., you appear to have completely excluded any of our search terms related to competition/antitrust issues.  Although you stated generally that you believe our proposed terms are overbroad, you have not addressed almost any of the terms individually to explain why you have apparently rejected them, other than pointing out that you believe that one "OR" search string is overbroad and that another string would effectively cover all board materials.  As an initial matter, that any of these search strings might capture documents with, as you say, "no relevance to this case" is no reason to reject them wholesale.  Many good and targeted search terms will inevitably capture some irrelevant documents, which you will of course have the opportunity to filter out through your own internal review before producing.  And if your concern

is that the terms are severely overbroad, we would gladly consider a narrowed alternative if you would propose it. But rejecting the terms without offering any alternative to capture the same types of responsive documents is effectively refusing to produce those documents, which is unwarranted. In any event, we don't believe our terms are overbroad. For any terms on which you disagree, please point them out and explain why you disagree so that we can work together productively to come to an agreement.

You have now had our proposed terms for nearly a month; please send back your edits and comments on our proposed terms promptly. If you are claiming that any are overbroad and burdensome, include any hit counts and other burden-related analysis you conducted. If we can quickly reach an agreement to use either the terms we proposed or terms substantially like them, that will moot the issues discussed above with your underinclusive proposed terms.

In the meantime, even without agreed-upon search terms, you can begin sending us your productions in response to our requests where we sought only "documents sufficient to show…." This includes RFPs 10, 11, 12, 17, 18, 21, 22, 32, and 33. For some of these RFPs, search terms may be helpful, but they aren't needed to begin collecting and producing responsive documents. Please promptly start making productions of those responsive documents. Thanks.

Best,
Luke

---

**From:** Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>
**Sent:** Friday, May 23, 2025 6:02 PM
**To:** Adam Locke <adam@lockelaw.com>; Schamel, Luke <lschamel@yettercoleman.com>; Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <Bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>; Risley, Julia <jrisley@yettercoleman.com>
**Cc:** Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; rtorgerson@porterhedges.com; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com; Lakshmi N. Kumar <lkumar@porterhedges.com>
**Subject:** RE: SafeLease v. Storable - Proposed Search Terms and Custodians

---

**External Sender** - From: ("Skaroff, Mikaila"        <u>Learn More</u>
<u>Mikaila.Skaroff@arnoldporter.com</u>)
This message came from outside your organization.

Counsel,

Attached are Storable's proposed search terms for SafeLease's First Set of Requests for Production ("RFPs"). Storable reserves the right to adjust these terms as necessary as we continue to collect and process documents.

Thanks,
Mikaila

---

Mikaila Skaroff

Associate | Bio

**Arnold & Porter**

1144 Fifteenth Street | Suite 3100
Denver, CO 80202-2848
T: +1 303.863.2310
Mikaila.Skaroff@arnoldporter.com
www.arnoldporter.com | LinkedIn

---

**From:** Skaroff, Mikaila
**Sent:** Monday, May 19, 2025 7:22 PM
**To:** Adam Locke <adam@lockelaw.com>; Schamel, Luke <lschamel@yettercoleman.com>; Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <Bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>; Risley, Julia <jrisley@yettercoleman.com>
**Cc:** Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; zzz.External.rtorgerson@porterhedges.com <rtorgerson@porterhedges.com>; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; zzz.External.Dale.Wainwright@gtlaw.com <Dale.Wainwright@gtlaw.com>; zzz.External.bernsteinju@gtlaw.com <bernsteinju@gtlaw.com>; Lakshmi N. Kumar <lkumar@porterhedges.com>
**Subject:** RE: SafeLease v. Storable - Proposed Search Terms and Custodians

Counsel,

"Facially overbroad" means that the overbreadth of SafeLease's proposed terms is clear and obvious from the terms themselves without further investigation. For instance, SafeLease proposed the string "unauthorized OR unsupported OR misus! OR hijack! OR non-approv! OR unapprov!," which would capture any document containing the word "unsupported," "misuse," or "hijack," etc. regardless of the context. SafeLease also included a string that would effectively cover all board materials. These requests are clearly overbroad as they would cover many documents with no relevance or relation to this case. Similar issues arise with the majority of SafeLease's proposed terms.

As to your question on the proposed custodians, Arvindh Kumar and David Post do not have Storable email addresses.

Thanks,
Mikaila

Mikaila Skaroff
Associate | Bio

**Arnold & Porter**

1144 Fifteenth Street | Suite 3100
Denver, CO 80202-2848
T: +1 303.863.2310
Mikaila.Skaroff@arnoldporter.com
www.arnoldporter.com | LinkedIn

---

**From:** Adam Locke <adam@lockelaw.com>
**Sent:** Friday, May 16, 2025 8:18 PM
**To:** Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>
**Cc:** Schamel, Luke <lschamel@yettercoleman.com>; Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>; Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Smith, Shannon

<ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <Bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>; Risley, Julia <jrisley@yettercoleman.com>; Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>; zzz.External.rtorgerson@porterhedges.com <rtorgerson@porterhedges.com>; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; zzz.External.Dale.Wainwright@gtlaw.com <Dale.Wainwright@gtlaw.com>; zzz.External.bernsteinju@gtlaw.com <bernsteinju@gtlaw.com>; Lakshmi N. Kumar <lkumar@porterhedges.com>; Holler, John <John.Holler@arnoldporter.com>

**Subject:** Re: SafeLease v. Storable - Proposed Search Terms and Custodians

External E-mail

Counsel,

What does "facially overbroad" mean? What about SafeLease's terms is overbroad? Please offer examples so we can try to get aligned and avoid delaying progress in this case. Note: we've agreed to Storable's terms for its RFP 4, which were no less broad than what we proposed.

Not opposed to Holler's application.

Thanks for checking on the directors.

Best,
Adam

On Fri, May 16, 2025 at 8:31 PM Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com> wrote:

> Counsel,
>
> Storable does not agree to SafeLease's proposed terms for SafeLease's RFPs as they are facially overbroad. However, as noted, Storable is continuing to evaluate them as well as our draft proposed terms in good faith. We expect to be in a position to share our proposed terms for SafeLease's RFPs next week. As we have not yet aligned on search terms, we cannot provide a time frame on when we expect to start producing documents. Further, after we align on terms, it will take us some time to review documents for responsiveness and privilege and prepare productions. We plan to make rolling productions as our review progresses, as permitted under the parties' ESI protocol.
>
> As to your question on the proposed custodians, we are still confirming with our client whether Arvindh Kumar or David Post have Storable email addresses.
>
> Finally, please let us know if SafeLease is unopposed to the filing of John Holler's pro hac vice application.
>
> Regards,
> Andrew
>
> Andrew D. Bergman
> Senior Associate | Bio

**939**

## Arnold & Porter

700 Louisiana Street | Suite 4000
Houston, TX 77002-2755
T: +1 713.576.2430
Andrew.Bergman@arnoldporter.com
www.arnoldporter.com | LinkedIn

---

**From:** Schamel, Luke <lschamel@yettercoleman.com>
**Sent:** Thursday, May 15, 2025 5:08 PM
**To:** Adam Locke <adam@lockelaw.com>; Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>
**Cc:** Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <Bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>; Risley, Julia <jrisley@yettercoleman.com>; Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; zzz.External.rtorgerson@porterhedges.com <rtorgerson@porterhedges.com>; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; zzz.External.Dale.Wainwright@gtlaw.com <Dale.Wainwright@gtlaw.com>; zzz.External.bernsteinju@gtlaw.com <bernsteinju@gtlaw.com>; Lakshmi N. Kumar <lkumar@porterhedges.com>; Holler, John <John.Holler@arnoldporter.com>
**Subject:** RE: SafeLease v. Storable - Proposed Search Terms and Custodians

<div style="border:1px solid red; display:inline-block; padding:2px;">External E-mail</div>

You responded on a separate thread on Wednesday:

> With regard to the separate discussion about search terms, to clarify, while Storable represented that we were planning to use search terms, we did not represent that we had prepared finalized terms that we were ready to share. We are continuing to collect documents and are running iterations of search terms against them, including SafeLease's proposed terms. While we believe SafeLease's proposed terms are facially overbroad, we are continuing to evaluate them as well as our draft proposed terms in good faith.
>
> However, Storable agrees to proceed with eight of the ten custodians proposed by SafeLease. Arvindh Kumar and David Post are not Storable employees, and Storable does not have possession, custody, or control over their documents such that they are not proper custodians.

For the custodians, Adam asked whether Mr. Kumar and Mr. Post have Storable email addresses; can you please confirm this one way or the other?

As for the terms, can you please confirm whether your response means that you agree to the proposed terms we sent last Friday? And can you please share the terms you've already prepared and are already running, plus any others that you propose? We understand that the terms you created may not be "final," but under the ESI protocol, we need to agree upon the terms so that they can be finalized. You said more than a week ago that you had already come up with some terms, yet have not shared any with us.

Please also let us know when you expect to start producing documents responsive to our March 21, 2025 requests. We understand that the production may be rolling. Thanks.

Best,
Luke

**From:** Schamel, Luke
**Sent:** Wednesday, May 14, 2025 3:09 PM
**To:** Adam Locke <adam@lockelaw.com>; Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>
**Cc:** Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <Bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>; Risley, Julia <jrisley@yettercoleman.com>; Treistman, Katherine Ginzburg <katherine.treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; rtorgerson@porterhedges.com; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com; Lakshmi N. Kumar <lkumar@porterhedges.com>; john.holler@arnoldporter.com
**Subject:** RE: SafeLease v. Storable - Proposed Search Terms and Custodians

Following up on the below.  Apologies if I missed it, but I haven't seen a response.  Thanks.

Best,
Luke

---

**From:** Schamel, Luke
**Sent:** Monday, May 12, 2025 3:05 PM
**To:** Adam Locke <adam@lockelaw.com>; Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>
**Cc:** Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <Bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>; Risley, Julia <jrisley@yettercoleman.com>; Treistman, Katherine Ginzburg <katherine.treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; rtorgerson@porterhedges.com; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com; Lakshmi N. Kumar <lkumar@porterhedges.com>; john.holler@arnoldporter.com
**Subject:** RE: SafeLease v. Storable - Proposed Search Terms and Custodians

Following up on my Friday email.  Can you please share with us the search terms you've already prepared and let us know whether you agree to the terms and custodians we proposed?  Thanks.

Best,
Luke

---

**From:** Adam Locke <adam@lockelaw.com>
**Sent:** Friday, May 9, 2025 6:54 PM
**To:** Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>
**Cc:** Schamel, Luke <lschamel@yettercoleman.com>; Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <Bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>; Treistman, Katherine Ginzburg <katherine.treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; rtorgerson@porterhedges.com; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; Dale.Wainwright@gtlaw.com;

**941**

bernsteinju@gtlaw.com; Lakshmi N. Kumar <lkumar@porterhedges.com>; john.holler@arnoldporter.com
**Subject:** Re: SafeLease v. Storable - Proposed Search Terms and Custodians

Counsel,

I am certain I heard that Storable had "prepared search terms" at the M&C. Apparently those terms were not finalized.

We need to work in good faith to keep discovery on track and not delay. This is what the Court will expect. As for finalized terms, Storable should commit to a date early next week.

Thanks,
Adam

On Fri, May 9, 2025 at 5:21 PM Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com> wrote:

> Counsel,
>
> Thank you for sending these.  At the meet and confer, we stated that we plan to run search terms to identify responsive documents, not that we had already finalized our proposed terms.  We will send our proposed terms to you as soon as practicable.
>
> Thank you,
>
> Mikaila
>
> _____
>
> Mikaila Skaroff
> Associate | Bio
>
> **Arnold&Porter**
> 1144 Fifteenth Street | Suite 3100
> Denver, CO 80202-2848
> T: +1 303.863.2310
> Mikaila.Skaroff@arnoldporter.com
> www.arnoldporter.com | LinkedIn
> _____
>
> **From:** Schamel, Luke <lschamel@yettercoleman.com>
> **Sent:** Friday, May 9, 2025 11:59 AM

**To:** Treistman, Katherine Ginzburg <Katherine.Treistman@arnoldporter.com>; Bergman, Andrew D. <Andrew.Bergman@arnoldporter.com>; zzz.External.rtorgerson@porterhedges.com <rtorgerson@porterhedges.com>; Carolyn Reed <creed@porterhedges.com>; Dolores Brunelle <dbrunelle@porterhedges.com>; Elizabeth "Liza" Eoff <leoff@porterhedges.com>; Jonna N. Summers <jsummers@porterhedges.com>; zzz.External.Dale.Wainwright@gtlaw.com <Dale.Wainwright@gtlaw.com>; zzz.External.bernsteinju@gtlaw.com <bernsteinju@gtlaw.com>; Lakshmi N. Kumar <lkumar@porterhedges.com>; Skaroff, Mikaila <Mikaila.Skaroff@arnoldporter.com>
**Cc:** Adam Locke <adam@lockelaw.com>; Yetter, Paul <pyetter@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Smith, Shannon <ssmith@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>; Chris Hilton <chris@stonehilton.com>; Judd E. Stone <judd@stonehilton.com>; Alexander M. Dvorscak <alex@stonehilton.com>; Bonnie Chester <bonnie@stonehilton.com>; Smith, Courtney <csmith@yettercoleman.com>
**Subject:** SafeLease v. Storable - Proposed Search Terms and Custodians

External E-mail

Counsel,

Attached are proposed custodians and search terms for SafeLease's first merits RFPs.  Please let us know if you have any edits or need to discuss.  Also, on our meet and confer Wednesday you said that you had already prepared some search terms—can you please share those with us today?  Thanks.

Best,
Luke

**Luke A. Schamel | Associate | Yetter Coleman LLP**
811 Main Street, Suite 4100, Houston, Texas 77002
(O) 713.632.8072 | (M) 585.201.2818 | lschamel@yettercoleman.com

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com

# Exhibit 6

**The Business Court of Texas**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff,* | § | |
| v. | § | Cause No. 25-BC03A-0001 |
| | § | |
| STORABLE, INC., et al., | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'**
**FIRST REQUEST FOR PRODUCTION**

TO:    All defendants through their counsel, Katherine Treistman, Arnold & Porter Kaye Scholer LLP, 700 Louisiana St., Suite 4000, Houston, Texas 77002; Ray T. Torgerson, Porter Hedges LLP, 1000 Main St., 36th floor, Houston, Texas 77002; Dale Wainwright, Greenberg Traurig LLP, 300 W. 6th St., Suite 2050, Austin, Texas 78701.

Pursuant to Tex. R. Civ. P. 196, Plaintiff SafeLease responds to Defendant Storable, Inc.'s First Request for Production. Plaintiff reserves the right to supplement and/or amend the below objections and responses consistent with the Texas Rules of Civil Procedure and to supplement its production in response to each of the below requests throughout the litigation as additional documents may be located.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1.    Plaintiff objects to the definition of "Plaintiff," "You," and "Your" as vague and overbroad because the definition includes "its agents, representatives, . . . partners, corporate agents, subsidiaries, affiliates, or any other person acting in concert with them or under their control, whether directly or indirectly." Plaintiff will interpret "Plaintiff," "You," and "Your" to mean SafeLease Insurance Services, LLC and its officers, directors, and employees.

2.    Plaintiff objects to the definition of "Customer" and "Customers" as overbroad because it includes all self-storage owners and operators whether a business relationship exists with that owner or operator or not. Plaintiff will interpret "Customer" or "Customers" to mean self-storage owners or operators with whom Plaintiff has contracted to provide tenant insurance or protection plans.

3.    Plaintiff objects to the definition of "Communication" as vague and confusing because it includes the "transmittal," "sending," "receipt," or "exchange" of information rather than just the information that was transmitted, sent, received, or exchanged. Plaintiff also objects to "Communication" as vague and confusing because it includes "nods of the head or other signal." Plaintiff will produce responsive documents as they are defined under Texas Rule of Civil

Procedure 192.3(b) and the parties' Agreed Proposed ESI Protocol, including letters, faxes, emails, and other types of instant messaging.

4.    Plaintiff objects to the definition of "Person" as overly broad and confusing because it includes "all predecessors or successor in interest."

5.    Plaintiff objects to the definition of "concerning," "reflecting," "referencing," and "relating to" as overly broad and confusing because it seeks to define these words by using the words themselves. Plaintiff interprets the meanings of these words consistently with how it has defined similar words ("refer," "relate," "pertain," and "concern") in its own definitions.

## RESPONSES TO FIRST REQUESTS FOR PRODUCTION

1.    All Documents reflecting any business plan, strategic plan, pricing strategy, marketing plan, compensation plan, or competitive analysis relating to Your business or Your alleged markets for FMS and tenant insurance or any products or competitors therein.

> **Response:** Plaintiff objects to this request as overly broad and vague because what the scope of documents "reflecting" a, e.g., business or strategic plan includes is unclear. Plaintiff will construe "reflecting" to mean "concerning." Plaintiff further objects to this request as overly broad and vague because it appears to include any strategy or planning document in Plaintiff's possession whether relevant to any claim or issue in this case or not. Plaintiff objects to "compensation plan" as vague because it is unclear whether it refers to the compensation of SafeLease employees or the compensation to customers in connection with tenant participation in a SafeLease plan. Plaintiff also objects to this request as compound, and therefore vague and confusing, because it seeks various plans and analyses and is unclear what it seeks regarding "Your alleged markets for FMS and tenant insurance or any products or competitors therein." Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control sufficient to show its pricing strategy for tenant insurance and tenant protection, its marketing of tenant insurance and tenant protection, and its business plan, to the extent such documents exist. Plaintiff will also produce responsive, non-privileged competitive analyses relating to the markets for FMS and tenant insurance in its possession, custody, and control, if such documents exist. Plaintiff is willing to meet and confer regarding the remainder of this request, including for any plans relating to the "alleged markets for FMS and tenant insurance or any products or competitors therein."

2.    All Documents supporting Your alleged tenant insurance market, including both the product and geographic components of that alleged market.

> **Response:** Plaintiff objects to the extent this request asks it to marshal its evidence prior to discovery completion. Plaintiff objects that this request seeks expert discovery, which Plaintiff will produce in accordance with the applicable scheduling order entered in this case. Plaintiff objects to this request as duplicative of request 1. Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-

work product privileges. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged, non-expert documents in its possession, custody, and control, if such documents exist.

3.      All Documents relating to market shares in Your alleged markets for FMS and tenant insurance.

**Response:** Plaintiff objects to the extent this request asks it to marshal its evidence prior to discovery completion. Plaintiff objects that this request seeks expert discovery, which Plaintiff will produce in accordance with the applicable scheduling order entered in this case. Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged, non-expert documents in its possession, custody, and control, if such documents exist.

4.      All Documents relating to competition in the United States for tenant insurance products, tenant protection products, and FMS, as those terms are used in the Second Amended Petition.

**Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to the extent this request asks it to marshal its evidence prior to discovery completion. Plaintiff objects that this request seeks expert discovery, which Plaintiff will produce in accordance with the applicable scheduling order entered in this case. Plaintiff objects to this request as overbroad and vague as to what it seeks because it includes "all documents relating to competition" without defining or limiting "competition." Plaintiff objects to this request as vague as to what it seeks when it says "as those terms are used in the Second Amended Petition." Not all the preceding phrases are included in the Second Amended Petition. Subject to and without waiving these objections, Plaintiff responds: Given the confusing and seemingly overbroad nature of this request, Plaintiff is unsure what the request is seeking, but is willing to meet and confer to try to understand what types of documents Defendants are trying to discover.

5.      All Documents supporting Your allegations that Defendants' conduct has harmed competition in Your alleged tenant insurance market, including all Documents indicating that Defendants' conduct has excluded any competitor from accessing that alleged market.

**Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to the extent this request asks it to marshal its evidence prior to discovery completion. Plaintiff objects that this request seeks expert discovery, which Plaintiff will produce in accordance with the applicable scheduling order entered in this case. Plaintiff objects to this request as vague and confusing because it seeks information regarding how Defendants' conduct has excluded any competitor from accessing that alleged market, though it is unclear how Defendants are defining a "competitor" given that such a firm would appear to not yet compete with Defendants. Plaintiff interprets this portion of Defendants' request as seeking documents indicating that Defendants' conduct has excluded *potential* competitors from

accessing the tenant insurance market. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged, non-expert documents in its possession, custody, and control, if such documents exist.

6.      All Documents relating to Your ability to serve Customers that use one of Defendants' FMS platforms without authorized user access from those Customers or Defendants.

> **Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects that this request is overly broad and vague as to what it seeks when it requests "[a]ll Documents relating to Your ability to serve Customers." Plaintiff interprets this request as seeking documents sufficient to show how, if at all, Plaintiff acquires the information needed to provide tenant insurance or tenant protection plans to a customer's tenants if that customer uses one of Defendants' FMS platforms but Plaintiff is unable to access the FMS platform as an authorized user. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control, if such documents exist.

7.      All Documents relating to You directly or indirectly accessing or using any FMS platform operated by any FMS provider other than Defendants, including any Communications, agreements, terms or conditions, or costs associated with such access or use.

> **Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as overly broad, unduly burdensome, and vague because it appears to seek all documents relating to every customer, every communication, and every agreement related to a non-Storable FMS, as well as all documents related to every instance of Plaintiff's accessing a non-Storable FMS. This request is overbroad because it is unclear what documents related to non-Storable FMSs and to customers who use non-Storable FMSs *wouldn't* fall under this request. All such documents are not relevant to this case, and collecting all such materials would be unduly burdensome and costly. Plaintiff therefore interprets this request to be seeking API or similar access agreements between Plaintiff and non-Storable FMS providers, and related documents and communications. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control, if such documents exist.

8.      All Documents relating to any software plans or other efforts made by any FMS provider other than Defendants to require that You access their FMS platform(s) via an API, including any concerns that any such FMS provider expressed about You accessing their FMS platform(s) via a method other than an API, as well as any credentialing (i.e., user identifications, passwords), layer restrictions, proprietary systems, and automation related to accessing any such FMS platform.

> **Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request to the extent it seeks user identifications and passwords. Plaintiff objects that this request is a compound request and therefore is vague and confusing. It is unclear from this request

whether Defendants seek information regarding SafeLease's or the FMS platforms' "credentialing (i.e., user identifications, passwords), layer restrictions, proprietary systems, and automation." Plaintiff will interpret this portion of the request as seeking documents regarding the methods by which Plaintiff accesses FMS platforms other than Defendants' platforms. Plaintiff objects to this request as vague because it seeks documents relating to "software plans" without defining "software plans," and the meaning of this phrase is not obvious or clear. Plaintiff interprets this request as seeking documents related to any non-Storable FMS provider's requiring Plaintiff to access that provider's FMS via an API. Subject to and without waiving these objections, Plaintiff will produce non-privileged documents in its possession, custody, and control related to any non-Storable FMS provider's requiring Plaintiff to access that provider's FMS via an API, if such documents exist. Plaintiff is willing to meet and confer to understand what else, if anything, Defendants seek in response to this request.

9.      All Documents relating to Your efforts, duties, and obligations to safeguard confidential, sensitive, or private Customer or tenant personally identifiable information ("PII"), including the source of such duties or obligations (*i.e.*, contract, statute, or SOC-2 or other industry certification), measures You take or should take to protect PII, and communication with Your SOC-2 compliance vendor. *See* 2d Am. Pet. ¶ 50.

> **Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as overly broad and vague as to what it seeks because it requests documents regarding the measures Plaintiff "should take" without identifying the source of the purported duty. Plaintiff objects that this request calls for legal conclusions to determine Plaintiff's "duties" and "obligations" based in "contract" or "statute." Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control sufficient to show its procedures or protocols to safeguard confidential, sensitive, or private Customer or tenant personally identifiable information and communications with its SOC-2 compliance vendor regarding Plaintiff's obtaining or maintaining its certification, if such documents exist.

10.      All Documents relating to how You serve or have served Customers that do not use an FMS platform.

> **Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as overly broad and vague as to what it seeks because it requests documents relating to how plaintiff "serve[s] or [has] served" customers without defining "serve." Subject to and without waiving these objections, Plaintiff will produce documents in its possession, custody, or control relating to Customers without an FMS platform to whom it has provided tenant insurance or tenant protection services, if such documents exist.

11.      All Documents reflecting what Customer or tenant data has been and is currently being accessed, collected, or stored by You. *See* 2d Am. Pet. ¶¶ 50, 52.

**Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects that this request is overly broad and unduly burdensome because it appears to be seeking not just documents concerning the type of information Plaintiff accesses, but also the data itself. Plaintiff objects to this request as overly broad, unduly burdensome, and vague as to what it seeks because it appears to seek all tenant insurance and tenant protection plan documents for every SafeLease customer because these documents all reflect customer and tenant data that SafeLease has accessed. Plaintiff therefore interprets this request to seek documents sufficient to show what types of information Plaintiff accesses to provide tenant insurance to its customers. Subject to and without waiving these objections, Plaintiff will produce documents in its possession, custody, or control sufficient to show what types of information Plaintiff accesses to provide tenant insurance to its customers, if such documents exist.

12. All Documents relating to the retention of and all efforts to safeguard data You have obtained from Defendants' FMS platforms through Your Customers' accounts.

**Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as redundant and duplicative of requests 9 and 11. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control sufficient to show what types of data, if any, SafeLease obtains through Defendants' FMS platforms via customer accounts and procedures or protocols to safeguard such data, if such documents exist.

13. All Documents relating to policies or procedures You use when accessing Defendants' FMS platforms, and all internal Communications, training materials, and materials for use with Customers relating to how You access Defendants' FMS platforms and the implications thereof.

**Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as vague and confusing because it is unclear what Defendants mean by "the implications thereof." Plaintiff objects to this request as vague because documents relating to policies or procedures Plaintiff uses *when* accessing Defendants' platforms appears to include policies or procedures unrelated to access to Defendants' FMS platforms. Plaintiff interprets this request to mean policies or procedures *for* accessing Defendants' FMS platforms. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control relating to policies or procedures Plaintiff uses for accessing Defendants' FMS platforms, and internal communications, training materials, and materials for use with customers relating to how Plaintiff accesses Defendants' FMS platforms, if such documents exist.

14. All Documents relating to any offer made by a party to this Lawsuit to purchase the business assets or equity of any other party to this Lawsuit, in whole or in part.

**Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as not relevant to the claims or defenses in this case to the extent it seeks documents and communications relating to Plaintiff's business strategy in negotiations with Defendants. Plaintiff objects to this request as overbroad and unduly burdensome to the extent it requests materials already in Defendants' possession, custody, and control. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control, if such documents exist.

15.     Documents sufficient to show Your existing Customers as of January 21, 2025.

**Response:** Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control sufficient to show the requested information, if such documents exist.

16.     Documents sufficient to show Your prospective and/or new Customers as of January 21, 2025.

**Response:** Plaintiff objects to this request as vague and unclear as to what it seeks to the extent it requests information on "prospective" customers without defining "prospective," given that any self-storage facility that is not a current SafeLease customer is, in some sense, a "prospective" customer. Plaintiff objects to this request as vague to the extent it requests documents relating to "new Customers as of January 21, 2025" without specifying whether it seeks a list solely of SafeLease's customers who became customers between January 21, 2025, and an unspecified earlier date or whether it seeks a list of SafeLease's customers who became customers after January 21, 2025. Plaintiff also objects to this request as overbroad and unduly burdensome because it is unclear what relevance who SafeLease's prospective or "new Customers" are has to any claim or defense in this case. Subject to and without waiving these objections Plaintiff responds that it will not be producing any documents in response to this request at this time, but is willing to meet and confer to understand the intended scope and relevance of this request.

17.     All Documents relating to complaints about You, including complaints about Your customer service, claim administration, claim adjustment, claim adjudication, pricing, billing, access to FMS platforms, or other aspects of the competitiveness of Your products and services.

**Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as vague because it is unclear what "other aspects of the competitiveness of Your products and services" means. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control relating to complaints about Plaintiff's customer service, claim administration, claim adjustment, claim adjudication, pricing, billing, or access to FMS platforms, if such documents exist.

18.     Documents sufficient to show the identity and number of Customers You have successfully acquired from Defendants.

**Response:** Plaintiffs object to this request as unduly burdensome because it seeks documents that are equally available to Defendants. Plaintiff further objects to this request as vague and confusing to the extent it requests documents regarding Customers SafeLease has "successfully acquired" from Defendants; SafeLease interprets this request to relate to Customers who have chosen to stop using a tenant insurance product offered by Defendants and switch to a tenant insurance product offered by Plaintiff. Subject to and without waiving this objection, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control sufficient to show the requested information, if such documents exist.

19.     All Documents relating to any self-storage owner or operator switching from one of Defendants' FMS platforms to another FMS provider, including any communications You had with any existing or potential Customers or other FMS providers about such a switch.

**Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as vague and unclear as to what it seeks because it requests information related to "potential" customers without defining "potential," given that any self-storage facility that is not a current SafeLease customer is, in some sense, a "potential" customer. Plaintiff also objects to this request as unduly burdensome because Defendants are in a better position than Plaintiff to know who has switched from one of Defendants' FMS systems to a competitor. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control relating to any self-storage owner or operator switching from one of Defendants' FMS platforms to another FMS provider, if such documents exist.

20.     All Documents relating to how and when You accessed or used Defendants' FMS platforms before November 1, 2024, including the frequency, duration, method, and any automation and how You "further tailored" Your operations to make Your access of FMS "even more narrow and efficient." *See* 2d Am. Pet. at ¶ 52.

**Response:** Plaintiff objects that this is an improper compound request and, as a result, it is unclear what information it seeks. Plaintiff also objects to this request as overly broad and unduly burdensome because it seeks extensive information, including the frequency and duration of every instance in which Plaintiff accessed or used Defendants' FMS platforms. Plaintiff objects that this request is unduly burdensome because the information it seeks is equally or more accessible to Defendants as the operators of the FMS platforms. Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Subject to and without waiving these objections, Plaintiff responds: Given the confusing, compound, and overly burdensome nature of this request, Plaintiff will not be producing documents in response at this time, but is willing to meet and confer to try to understand what relevant materials the request is actually seeking.

21.     All Documents relating to how and when You accessed or used Defendants' FMS platforms (i) between December 17, 2024 and February 19, 2025 and (ii) since February 19, 2025, including the credentialing (*i.e.*, user identifications, passwords), frequency, duration, method, and any automation as to each joint Customer of You and any Defendant.

**Response:** Plaintiff objects to this request as overly broad to the extent it includes credentialing such as user identifications and passwords. Plaintiff objects that this is an improper compound request and, as a result, it is unclear what information it seeks. Plaintiff also objects to this request as overly broad and unduly burdensome because it seeks extensive information, including the frequency and duration of every instance in which Plaintiff accessed or used Defendants' FMS platforms. Plaintiff objects that this request is unduly burdensome because the information it seeks is equally or more accessible to Defendants as the operators of the FMS platforms. Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Subject to and without waiving these objections, Plaintiff responds: Given the confusing, compound, and overly burdensome nature of this request, Plaintiff will not be producing documents in response at this time, but is willing to meet and confer to try to understand what relevant materials the request is actually seeking.

22.     Documents sufficient to show the automation software or tools You have used or currently use to access Defendants' FMS platforms.

**Response:** Plaintiff objects to this request as overly broad and vague because it seeks documents sufficient to show "automation software or tools" without defining this phrase. Plaintiff interprets this request as seeking documents sufficient to show the technical methods Plaintiff has used or currently uses to access Defendants' FMS platforms. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control sufficient to show the requested information, if such documents exist.

23.     Documents sufficient to identify Customers who do not or did not authorize You to have full administrative access to any FMS platform.

**Response:** Plaintiff objects to this request as vague and confusing because it appears to be seeking documents that would not exist given that authorization was not given. Plaintiff objects to this request as vague because it seeks information regarding "full administrative access" without defining this term; it is unclear what level of access Defendants consider to be "full administrative." Subject to and without waiving this objection, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control sufficient to identify customers, if any, who have declined or limited Plaintiff's access to their FMS accounts, if such documents exist.

24.     All Documents reflecting or substantiating Your alleged damages, including lost existing or prospective clients, out of pocket expenses, additional overhead, actual or potential exposure for lapsed or denied insurance policies or claims, or harm to goodwill.

**Response:** Plaintiff objects to the extent this request asks it to marshal its evidence prior to discovery completion. Plaintiff objects that this request seeks expert discovery, which Plaintiff will produce in accordance with the applicable scheduling order entered in this case. Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Subject to and without waiving these

objections, Plaintiff will produce responsive, non-privileged, non-expert documents in its possession, custody, and control, if such documents exist.

25.     All Documents relating to any internal or third-party appraisal or valuation of You, including all 409A valuations and material provided to the appraiser or valuator.

>   **Response:** Plaintiff objects to this request as overly broad and not relevant to any claims or defenses at issue in this case. Plaintiff's valuation is not at issue in this case. Plaintiff further objects to this request as unduly burdensome and vague because it seeks "any internal or third-party appraisal or valuation" without defining these terms. Subject to and without waiving these objections, Plaintiff will produce the current 409A report for Incase Holdings, Inc.

26.     Documents sufficient to show the ownership, relationship, affiliation, and organization of the following entities: (a) Plaintiff; (b) Incase Holdings, Inc.; (c) Etude Reinsurance Company; (d) ProCure Technologies, Inc.; (e) Etude Capital, LLC; (f) Etude Capital Storage Holdings; (g) Capital Storage Holdings, LLC; and (h) Etude Storage Partners.

>   **Response:** Plaintiff objects to this request as overly broad, unduly burdensome, and not relevant to any claims or defenses at issue in this case. Entities (b) through (h) are not parties here and any relationships they may have with Plaintiff are irrelevant. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control sufficient to show the organizational affiliation of the listed entities, if such documents exist.

27.     Documents sufficient to show the sources of funds received or contemplated to financially support You, regardless of source (*i.e.*, Etude Capital, Incase Holdings, Steven Stein individually, and any third parties), including the reasons and need for the financial support.

>   **Response:** Plaintiff objects to this request as overly broad and not relevant to the claims at issue in this case. Plaintiff's funding sources are not at issue in this case. Plaintiff objects to this request as vague because it seeks information about funds "contemplated to financially support" Plaintiff without explaining who is "contemplating" these funds. Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Subject to and without waiving these objections, Plaintiff will produce financial statements sufficient to show SafeLease's funding that are in its possession, custody, and control, if such documents or funding exists.

28.     All Documents relating to any Communications with any journalist, reporter, media outlet, or website regarding any Defendant, this Lawsuit, or any party's positions in this Lawsuit, including any marketing campaigns related to any Defendant.

>   **Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as overly broad because it includes communications related to any defendant, regardless of whether the communications occurred before the defendant was affiliated with Storable or not. Plaintiff objects to this request as not relevant to the claims and defenses at issue in this case. Subject to and without waiving these objections, Plaintiff will produce

- 10 -

responsive, non-privileged documents in its possession, custody, and control, if such documents exist.

29. All Documents relating to or referring to any Communications with current or prospective Customers regarding any Defendant, this Lawsuit, any party's positions in this Lawsuit, or any marketing campaigns geared towards any Defendant.

> **Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as overly broad because it includes communications related to any defendant, regardless of whether the communications occurred before the defendant was affiliated with Storable or not. For Defendants other than Storable, Plaintiff interprets this request as limited to communications or marketing campaigns that occurred after this lawsuit was filed. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control, if such documents exist.

30. All Documents relating to or referring to any Communications with Scott Griffin or Chelsea McDaniel regarding any FMS platforms or Defendants, including but not limited to discussions about non-compete agreements and any Storable product or its pricing.

> **Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as overly broad, vague, and unduly burdensome because it includes communications "regarding any FMS platforms or Defendants" without limitation, which appears to include *all* communications related to any defendant—regardless of whether the communications occurred before the defendant was affiliated with Storable or not—and to any FMS platform, whether those communications have any relevance to a claim or defense in this case or not. Subject to and without waiving these objections, Plaintiff responds: Plaintiff will not be producing documents in response to this request at this time, but is willing to meet and confer to try to understand what relevant information this request is seeking.

31. All Documents relating to Your financial condition, financial performance, and creditworthiness, including all audited and unaudited financial statements.

> **Response:** Plaintiff objects to this request as overly broad and not relevant to any claims or defenses at issue in this case because it appears to include all financial documents regarding Plaintiff. Plaintiff interprets this request to seek its balance sheets, income statements, cash flow statements, and statements of shareholders' equity. Subject to and without waiving these objections, Plaintiff will produce its current unaudited financial statement.

32. All Documents relating to or referring to Your employee and contractor hiring process, including any background checks, reviews of such employees or contractors, and a list of all current persons with access to Customer data from Defendants' FMS platforms.

> **Response:** Plaintiff objects to this request as overly broad, unduly burdensome, and seeking irrelevant information. Employee background checks, employee reviews, and the names of all employees with access to customer data are not relevant to any claim or

- 11 -

defense in this case and would include sensitive personal employee information. Having to search for, collect, and then redact this information would be needlessly burdensome and costly for Plaintiff given the irrelevance of any such documents. Subject to and without waiving the foregoing objections, Plaintiff will produce non-privileged documents in its possession, custody, and control sufficient to show its background check process and the SafeLease employee roles associated with levels of access to customer data from Defendants' FMS platforms.

33.     All Documents relating to Communications with Customers about the level of access obtained by their grant of administrative credentials to You.

**Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as overly broad and vague because it requests documents relating to communications regarding "the level of access" without defining "level of access." Plaintiff will interpret this request as seeking communications with customers regarding granting SafeLease administrative access to an FMS platform. Subject to and without waiving this objection, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control, if such documents exist.

34.     All Documents relating to any Customer data (including any general ledgers of Customers) that You accessed that are not necessary for the provision of tenant insurance or tenant protection plans.

**Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as overly broad because it seeks "*All* Documents relating to any Customer data" when a subset of those documents would likely suffice. Plaintiff further objects to this request as overbroad and unduly burdensome to the extent it calls for documents or information in Defendants' possession, custody, or control. Subject to and without waiving these objections, Plaintiff states that no such documents exist.

35.     All Documents relating to Your agreements, negotiations, or consideration of potential agreements with any FMS provider, including Communications with such providers.

**Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as overly broad, unduly burdensome, and irrelevant because it includes documents and communications relating to negotiations and potential agreements with any FMS provider, regardless of whether Plaintiff and the FMS provider entered into an agreement. Plaintiff objects to this request as vague because it is unclear what "*consideration* of potential agreements" encompasses. SafeLease further objects to this request as overbroad and unduly burdensome to the extent it calls for documents already in Defendants' possession, custody, and control. Subject to and without waiving these objections, Plaintiff will produce API agreements between Plaintiff and any FMS provider that are in its possession, custody, and control, if such documents exist.

36.    All Documents relating to Your negotiations and business strategy with respect to any prospective agreement with any Defendant.

> **Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as overly broad because it seeks documents relating to Plaintiff's business strategy in negotiations with Defendants, regardless of whether those negotiations are ongoing or the information relates to settlement discussions. Plaintiff also objects to this request as overly broad because the request is not limited to a particular prospective agreement and instead encompasses "any prospective agreement" with any defendant, regardless of whether the defendant was associated with Storable at the time of the prospective agreement or whether the agreement has any relevance to any claim or defense in this case. Plaintiff also objects because this request is trying to seek the negotiation strategies of a negotiation counter-party through discovery, which have no relevance to this case and are improper. Plaintiff interprets this request to seek documents related to API negotiations with any defendant. Subject to and without waiving these objections, Plaintiff will produce any communications between Plaintiff and any defendant relating to a prospective API agreement that are in its possession, custody, and control, if such documents exist.

37.    All Documents relating to Communications with or about potential investors in Your business, including Your assertion that You "turned down investors to stay true to Your vision."

> **Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as overly broad and irrelevant because it encompasses any documents relating to communications with or about potential investors regarding any aspect of Plaintiff's business without limitations. Plaintiff objects to this request as vague because it claims that Plaintiff asserted that it "turned down investors to stay true to Your vision" without citing a source for this alleged assertion. Subject to and without waiving these objections, Plaintiff responds: Plaintiff will not be producing documents in response to this request at this time but is willing to meet and confer to try to understand the relevance of this request.

38.    All Documents relating to any data incident or security breaches You have experienced.

> **Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as vague because it appears to include data incidents or security breaches to third party businesses such as FMS providers that indirectly impact Plaintiff's business. Plaintiff objects to this request as vague because it seeks documents relating to any "data incident" without defining "data incident" or describing how it differs from a security breach; Plaintiff interprets the phrases to be synonyms. Plaintiff also interprets this request as seeking document relating to any security breaches of SafeLease's systems. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control, if such documents exist.

39.     All Documents relating to any Communications with state regulators, including state departments of insurance, about You or any Defendant, including licensing requirements and disclosures.

> **Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff objects to this request as overly broad because it seeks documents relating to communications with state regulators rather than seeking only the actual communications. Plaintiff further objects to this request as overly broad and unduly burdensome in seeking "*All* Documents relating to any Communications with state regulators," which encompasses a huge swath of communications on a wide array of topics not relevant to this dispute. Plaintiff objects to this request as not relevant to the claims or defenses in this case because SafeLease's regulatory process and licensing requirements are not at issue in this case. Subject to and without waiving these objections, Plaintiff will produce documents sufficient to show its licensing status in the states in which it operates.

40.     Documents sufficient to show Your relationship with Obsidian Insurance.

> **Response:** Plaintiff will produce responsive, non-privileged documents in its possession, custody, and control sufficient to show the business relationship between SafeLease and Obsidian Insurance, if such documents exist.

41.     All Documents relating to how You use access to Defendants' FMS platforms or data obtained from such FMS platforms to help You market or sell Your products or services.

> **Response:** Plaintiff objects to this request as overly broad and vague because it is unclear what defendants mean by "market or sell . . . products or services." Plaintiff interprets this request as seeking documents related to Plaintiff's using its access to Defendants' FMS platforms or data on those platforms to generate new business with new customers. Subject to and without waiving these objections, Plaintiff responds that no such documents exist.

42.     All Documents relating to Communications with Your Customers about Your ability to access any Defendant FMS platform.

> **Response:** Plaintiff objects to this request to the extent it calls for information protected by the attorney-client or attorney-work product privileges. Plaintiff also objects to this request as vague because it is unclear what is meant by communications about SafeLease's "ability" to access one of Defendants' FMS platforms. Plaintiff interprets this request to be seeking communications with SafeLease's customers about its technological capabilities to access any Storable FMS. Subject to and without waiving these objections, Plaintiff will produce responsive, non-privileged communications in its possession, custody, and control, if such documents exist.

Date: April 28, 2025                          Respectfully submitted,

Judd E. Stone II                              /s/ R. Paul Yetter
State Bar No. 24076720                        R. Paul Yetter
judd@stonehilton.com                          State Bar No. 22154200
Christopher D. Hilton                         pyetter@yettercoleman.com
State Bar No. 24087727                        Susanna R. Allen
chris@stonehilton.com                         State Bar No. 24126616
Alexander M. Dvorscak                         sallen@yettercoleman.com
State Bar No. 24120461                        Luke A. Schamel
alex@stonehilton.com                          State Bar No. 24106403
STONE HILTON PLLC                             lschamel@yettercoleman.com
600 Congress Ave., Suite 2350                 Shannon N. Smith
Austin, Texas 78701                           State Bar No. 24110378
(737) 465-3897                                ssmith@yettercoleman.com
                                              YETTER COLEMAN LLP
Adam T. Locke                                 811 Main Street, Suite 4100
State Bar No. 24083184                        Houston, Texas 77002
adam@lockelaw.com                             (713) 632-8000
LOCKELAW PLLC
2617 Bissonnet Street, Suite 503
Houston, Texas 77005
(713) 832-0243                                ATTORNEYS FOR PLAINTIFF

### CERTIFICATE OF SERVICE

I certify that a copy of this response was served on all counsel of record via the Court's electronic filing system on April 28, 2025.

/s/ Luke A. Schamel
Luke A. Schamel

- 15 -

**Automated Certificate of eService**
This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Alyssa Smith on behalf of R. Yetter
Bar No. 22154200
asmith@yettercoleman.com
Envelope ID: 101933933
Filing Code Description: Answer/Response
Filing Description: SafeLease Response to Motion to Stay Discovery
Order
Status as of 6/12/2025 11:00 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 6/12/2025 10:48:14 AM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 6/12/2025 10:48:14 AM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 6/12/2025 10:48:14 AM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 6/12/2025 10:48:14 AM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 6/12/2025 10:48:14 AM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 6/12/2025 10:48:14 AM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 6/12/2025 10:48:14 AM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 6/12/2025 10:48:14 AM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 6/12/2025 10:48:14 AM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 6/12/2025 10:48:14 AM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 6/12/2025 10:48:14 AM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 6/12/2025 10:48:14 AM | SENT |
| Judd Stone | | Judd@stonehilton.com | 6/12/2025 10:48:14 AM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 6/12/2025 10:48:14 AM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 6/12/2025 10:48:14 AM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 6/12/2025 10:48:14 AM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 6/12/2025 10:48:14 AM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 6/12/2025 10:48:14 AM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 6/12/2025 10:48:14 AM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 6/12/2025 10:48:14 AM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 6/12/2025 10:48:14 AM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/12/2025 10:48:14 AM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alyssa Smith on behalf of R. Yetter
Bar No. 22154200
asmith@yettercoleman.com
Envelope ID: 101933933
Filing Code Description: Answer/Response
Filing Description: SafeLease Response to Motion to Stay Discovery Order
Status as of 6/12/2025 11:00 AM CST

Case Contacts

| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/12/2025 10:48:14 AM | SENT |
|---|---|---|---|---|
| Cathy Hodges | | catherine.hodges@aporter.com | 6/12/2025 10:48:14 AM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 6/12/2025 10:48:14 AM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 6/12/2025 10:48:14 AM | SENT |
| Adam Locke | | adam@lockelaw.com | 6/12/2025 10:48:14 AM | SENT |
| John Holler | | john.holler@arnoldporter.com | 6/12/2025 10:48:14 AM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 6/12/2025 10:48:14 AM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 6/12/2025 10:48:14 AM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 6/12/2025 10:48:14 AM | SENT |
| Julia C.Risley | | jrisley@yettercoleman.com | 6/12/2025 10:48:14 AM | SENT |

**The Business Court of Texas,**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff,* | § § | |
| *v.* | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § § | |
| *Defendants.* | § § | |

---

**Storable's Reply in Support of Emergency Motion for a Partial Stay of the June 13, 2025 Court-Ordered Production Deadline**

---

Storable respectfully submits this reply in support of the Emergency Motion for a Partial Stay of the June 13, 2025 Court-Ordered Production Deadline and to address certain points raised in SafeLease's response.

First, the protective order and OCEO provisions will not adequately protect Storable's trade secrets in its FMS facility customer list. Trade secrets are a privilege. TEX. R. EVID. 507. In order to obtain them in discovery, SafeLease has the burden to prove why they are **necessary**—otherwise they are protected against disclosure, and it is an abuse of discretion to order their production. *See* Storable's Mot. to Reconsider Discovery Order (Jun. 9, 2025). SafeLease has never explained why the list is necessary given the multiple alternatives that Storable offered to provide SafeLease with the information it needs to determine Storable's FMS market share short of identifying every one of Storable's FMS customers. At minimum, a stay of the production deadline is warranted so that the Court can at least see if SafeLease can meet its burden.

Second, SafeLease's response acknowledges that this Court's jurisdiction is presently at issue in the Court of Appeals, and it does not dispute that the agreed protective order in this case

would be void if the Court of Appeals determines that jurisdiction is lacking. Resp. at 3. Rather, SafeLease simply argues that Storable will not prevail on appeal. Resp. at 4. However, that is an issue for the Court of Appeals to decide. In the meantime, "[i]f a court orders a person to disclose a trade secret, it **must** take any protective measure required by the interests of the privilege holder and the parties and to further justice." TEX. R. EVID. 507(c) (emphasis added). Those interests favor a short deferral of Storable's deadline to produce this trade secret to ensure that this Court has jurisdiction to enforce its protective order.

Third, SafeLease attempts to equate its own insurance customer list with Storable's FMS customer list, which SafeLease purportedly produced.[1] This is apples and oranges. SafeLease's customer list is relevant because SafeLease alleges that Storable tortiously interfered with its contracts **with those customers**. Storable has a right to take discovery of who those customers are, and to know whether they or the contracts that SafeLease alleges that it has with them, even exist. By contrast, Storable's FMS customer list, which identifies Storable's FMS customers, is not relevant. The identities of those FMS customers are not relevant to SafeLease's claims; SafeLease only needs to know the total **number** of those customers for purposes of determining Storable's FMS market share. The Court should not be persuaded by the false equivalency between the two lists.[2]

Fourth, Storable did not waive its trade secret protection. Again, trade secrets are a privilege. TEX. R. EVID. 507. The Texas Rules of Civil Procedure do not require a party to object to discovery requests on the basis of a privilege. TEX. R. CIV. P. 193.2(f). The ordinary procedure

---

[1] Incidentally this production occurred at 10:13 AM, today June 12, 2025, almost immediately before SafeLease filed its response to the stay motion at 10:50 AM. As of this filing, Storable has not even had the opportunity to meaningfully review this production.

[2] SafeLease's response admits that its customer list is also highly sensitive. Resp. at 6. That SafeLease chose to forgo whatever privilege it may have had with respect to its own customer list does not mean that Storable should have to do so for its FMS customer list. SafeLease cites no authority otherwise.

under the rules is that Storable may withhold the document, produce a privilege log asserting the privilege (along with any other privileges as to other documents), and SafeLease could challenge any privilege assertions at that time. TEX. R. CIV. P. 193.3. Indeed, Storable has raised its privilege claim even earlier than it otherwise would have been required to in its briefing on the stay motion and its motion to reconsider the Court's discovery order. The fact that SafeLease is attempting to short circuit the ordinary procedures under the rules and obtain advance production of a privileged document is another reason why a stay is warranted. In any event, Storable stated in its pre-motion letter—and previously told SafeLease when meeting and conferring—that the list was "highly confidential"; that it did not use the magic word "trade secret" is not a waiver of Storable's right to assert this privilege, which it has now plainly done.

Fourth, SafeLease complains of the "irony" that Storable is moving for "no evidence" partial summary judgment on the attempted monopolization claim, while objecting to producing a single document related to that claim. Resp. at 6. This argument is wrong because Storable has moved for **traditional** summary judgment, not no-evidence summary judgment. It is also a red herring. Storable's FMS customer list is not relevant to Storable's Motion for Partial Summary Judgment and SafeLease does not need it to respond to that motion. Notwithstanding SafeLease's unsupported statements, the list relates only to *one element* of SafeLease's attempted monopolization claim: whether Storable's has monopoly power in the alleged FMS market.[3] Resp. at 1. But Storable's Motion for Partial Summary Judgment does not move on that element. That Motion is exclusively focused on the failure of multiple **other, required elements** of

---

[3] SafeLease also states but fails to explain how the list is "critical" to "defining the relevant antitrust market" or assessing the "competitive impact of [Storable's] conduct." Resp. at 7. The list is not necessary much less "critical" for either purpose. Further, Storable's Motion for Partial Summary Judgment does not move on SafeLease's failure to properly define relevant antitrust markets, so even if the list were relevant to that element, SafeLease would not be prejudiced by staying production of the list until after the motion is heard and decided.

SafeLease's attempted monopolization claim, including whether SafeLease has a dangerous probability of monopolizing the alleged tenant insurance market or an intent to monopolize that market. SafeLease seems to imply that the Storable's *FMS* facility list is somehow relevant to showing a "market-wide effect" for *tenant insurance*. Resp. at 6–7. It is not. In short, obtaining Storable's FMS facility customer list would not help SafeLease avoid summary judgment on other elements of this claim. The summary judgment motion is set for hearing on July 1, 2025. A stay of the deadline to produce the list is warranted until after the Court rules on that motion.

<u>Finally</u>, a stay would not cause prejudice. To deflect from its failure to show why production of the list is necessary, SafeLease accuses Storable of delaying discovery generally. That is wrong. Storable has diligently participated in extensive meet and confers and detailed discussions regarding discovery objections, search terms, custodians, and other matters. Those discussions are partially reflected in the communications attached to SafeLease's response at Ex. 2—which demonstrate the volume and complexity of discovery in this case. SafeLease's complaint about an alleged delay is untenable at the early stage in discovery.

## Conclusion

Storable requests that the Court grant its motion for an emergency stay of the June 13, 2025 production deadline as to SafeLease's Request for Production No. 10.

Respectfully submitted June 12, 2025.

<div style="text-align: right;">

*s/ Katherine G. Treistman*
Katherine G. Treistman
State Bar No. 00796632
Andrew D. Bergman
State Bar No. 24101507
John Holler (*admitted pro hac vice*)
Mikaila Skaroff (*admitted pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
700 Louisiana Street, Suite 4000
Houston, Texas 77002–2755
Tel.: (713) 576–2400

</div>

Fax: (713) 576–2499
Katherine.Treistman@arnoldporter.com
Andrew.Bergman@arnoldporter.com

Ray T. Torgerson
State Bar No. 24003067
Neil Kenton Alexander
State Bar No. 00996600
Jonna N. Summers
State Bar No. 24060649
Elizabeth "Liza" Eoff
State Bar No. 24095062
Lakshmi N. Kumar
State Bar No. 24144581
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Tel.: (713) 226–6000
Fax: (713) 226–6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
ljumar@porterhedges.com

Dale Wainwright
State Bar No. 00000049
Justin Bernstein
State Bar No. 24105462
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel.: (512) 320–7240
Fax: (512) 320–7240
Dale.wainwright@gtlaw.com
bernsteinju@gtlaw.com

*Counsel for Defendants*

## Certificate of Conference

The Parties conferred regarding the relief requested in the foregoing motion, and counsel for Plaintiff indicated that Plaintiff is opposed.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

## Certificate of Compliance

I hereby certify that this document complies with Local Rule 5(a) and contains 1,372 words, excluding the case caption, any index, table of contents or table of authorities, signature blocks, attached evidence, or any required certificates.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

## Certificate of Service

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon counsel of record in accordance with the Texas Rules of Civil Procedure on June 2, 2025.

*/s/ Katherine G. Treistman*
Katherine G. Treistman



# The Business Court of Texas, Third Division

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § | |
| *Plaintiff,* | § | |
| v. | § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § | |
| *Defendants.* | § § | |

---

## Order Partially Granting Emergency Stay and Additional Relief

---

Before the Court is Storable's Emergency Motion for a Partial Stay of the June 13, 2025 Court-Ordered Production Deadline (the Motion). The Court **PARTIALLY GRANTS** the Motion and **ORDERS** that, for purposes of Request for Production (RFP) No. 10 only, Storable's June 13, 2025 production deadline is stayed until **June 24, 2025**, during which time Storable's pending motions for reconsideration of the Court's April 15 and May 28 discovery orders will be submitted to the Court.

Because the stay pushes the production deadline until after SafeLease's June 20, 2025 deadline to respond to Storable's motion for partial summary judgment, the Court extends that deadline to **July 11, 2025** and extends Storable's summary-

judgment reply deadline from June 27, 2025 to **July 18, 2025**. Court staff will

contact the parties about resetting the summary-judgment hearing.

Date signed: June 12, 2025

_____
Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

E-filed in the Office of the Clerk
for the Business Court of Texas
6/16/2025 7:27 PM **969**
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

**The Business Court of Texas**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff*, | § | |
| v. | § | Cause No. 25-BC03A-0001 |
| | § | |
| STORABLE, INC., et al., | § § | |
| *Defendants*. | § § | |

**PLAINTIFF'S RESPONSE TO MOTION FOR RECONSIDERATION**
**OF ORDER DENYING MODIFICATION OF PROTECTIVE ORDER**

- 1 -

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... ii

Factual Background ...................................................................................................... 2

Applicable Legal Standards ......................................................................................... 2

Argument and Authorities............................................................................................ 3

1.  The motion cites no new law. ..................................................................... 3

2.  The motion raises no changed facts or new concerns............................... 3

3.  *Westlake* sheds no new light on these unchanged facts and original concerns...................... 5

4.  SafeLease will suffer hardship without Locke's continued access......................................... 9

Conclusion .................................................................................................................. 11

Certificate of Service .................................................................................................. 12

Certificate of Compliance ........................................................................................... 12

<p align="center">**TABLE OF AUTHORITIES**</p>

<div align="right">**Page(s)**</div>

**Federal Cases**

*Advanced Magnesium Alloys Corp. v. Dery*,
  2021 WL 2915112 (S.D. Ind. May 5, 2021) ........................................................................10

*Affymetrix, Inc. v. Illumina, Inc.*,
  2005 WL 1801683 (D. Del. July 28, 2005) ........................................................................12

*Autotech Techs. Ltd. P'Ship v. Automationdirect.com, Inc.*,
  237 F.R.D. 405 (N.D. Ill. 2006).....................................................................................9, 10

*Blackbird Tech LCC v. Serv. Lighting & Elec. Supplies, Inc.*,
  2016 WL 2904592 (D. Del. May 18, 2016).........................................................................12

*Blythe v. Offshore Serv. Vessels, L.L.C.*,
  423 F. Supp. 3d 299 (E.D. La. 2019).............................................................................5, 7

*Ecolab Inc. v. IBA, Inc.*,
  2024 WL 3650464 (D. Minn. May 19, 2024).......................................................................11

*Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*,
  2011 WL 13202057 (N.D. Tex. Feb. 10, 2011)....................................................................12

*Intel Corp. v. VIA Techs., Inc.*,
  198 F.R.D. 525 (N.D. Cal. 2000)........................................................................................12

*Matsushita Elec. Indus. Co., Ltd. v. United States*,
  929 F.2d 1577 (Fed. Cir. 1991)...........................................................................................12

*PSI Marine, Inc. v. Seahorse Docking LLC*,
  2024 WL 5077849 (D. Conn. Dec. 11, 2024)......................................................................13

*Sony Computer Entm't Am., Inc. v. NASA Elecs. Corp.*,
  249 F.R.D. 378 (S.D. Fla. 2008).........................................................................................10

*ST Sales Tech Hldgs., LLC v. Daimler Chrysler Co.*,
  LLC, 2008 WL 5634214 (E.D. Tex. Mar. 14, 2008).....................................................8, 9, 13

*Uniloc 2017 LLC v. Cardo Sys., Inc.*,
  2019 WL 13472203 (E.D. Tex. May 22, 2019)....................................................................13

**State Cases**

*1776 Energy Partners, LLC v. Marathon Oil EF, LLC*,
    692 S.W.3d 564 (Tex. App.—San Antonio 2023, no pet.)....................................................4, 7

*In re BP Prods. N. Am., Inc.*,
    244 S.W.3d 840 (Tex. 2008).......................................................................................7

*In re GreatAmerica Leasing Corp.*,
    294 S.W.3d 912 (Tex. App.—Corpus Christi–Edinburg 2009, no pet.)...................................4

*Hoover Slovacek LLP v. Walton*,
    206 S.W.3d 557 (Tex. 2006)......................................................................................12

*Macy v. Waste Mgmt., Inc.*,
    294 S.W.3d 638 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)................................5, 7

*Westlake Longview Corp. v. Eastman Chem. Co.*,
    2025 Tex. Bus. 19 (May 16, 2025) ............................................................... *passim*

This Court decided that all outside counsel of record may access Outside Counsel Eyes Only (OCEO) documents, including Adam Locke. Defendants now seek to reconsider and reverse that decision despite there being no change in facts or governing law. Their motion is baseless.

<center>FACTUAL BACKGROUND</center>

The motion raises no new facts about Locke's access to OCEO data or new concerns. This is reflected by the motion omitting a factual section. Defendants simply want a different ruling.

Locke is a seasoned, skilled, and respected young litigator. He still runs his own law firm, Lockelaw PLLC, of which SafeLease is one of many clients. He is not an employee of SafeLease or its CEO. And he provides no commercial advice to SafeLease, makes no business decisions for it, and is part of none of its non-legal decision-making. *See* Pltf. Resp. Mot. to Modify at 1-2. Since the April 15 order, he has continued zealously to represent SafeLease in this case, conferring with defense counsel, negotiating discovery and other disputes, and prosecuting his client's claims.

Most important, Locke remains committed to abiding by the Court's protective order. He participates in no SafeLease business dealings or negotiations that implicate OCEO information. *Id.* at 5. In short, the dispositive facts that underlie the Court's order are unchanged.

<center>APPLICABLE LEGAL STANDARDS</center>

To be sure, no court is required to reconsider prior rulings or even reach the substance of a motion to reconsider. *See 1776 Energy Partners, LLC v. Marathon Oil EF, LLC*, 692 S.W.3d 564, 586 (Tex. App.—San Antonio 2023, no pet.). Courts "are not required to reconsider prior rulings," and "it is not an abuse of discretion to refuse such petitions." *In re GreatAmerica Leasing Corp.*, 294 S.W.3d 912, 915 n.2 (Tex. App.—Corpus Christi–Edinburg 2009, no pet.).

This is especially true for motions to reconsider that raise no new facts. *See Macy v. Waste Mgmt., Inc.*, 294 S.W.3d 638, 651 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (no abuse

to decline to reconsider ruling where "movant cites no additional evidence 'beyond that available to him'" at the time of first ruling). "When there exists no independent reason for reconsideration other than mere disagreement with a prior order, reconsideration is a waste of judicial time and resources and should not be granted." *Blythe v. Offshore Serv. Vessels, L.L.C.*, 423 F. Supp. 3d 299, 304 (E.D. La. 2019). Merely disagreeing with a ruling, like defendants do here, is not enough.

### ARGUMENT AND AUTHORITIES

Defendants ask the Court to reverse its April 15 order but raise new no law or facts. They point to the same facts and raise the same concerns that the Court carefully considered earlier. The only new point they raise is the Court's ruling in *Westlake Longview Corp. v. Eastman Chem. Co.*, 2025 Tex. Bus. 19 (May 16, 2025). But *Westlake* creates no new law. Rather, it faithfully applies long-established precedent from other jurisdictions, all of which existed when defendants filed their original motion, to facts different from those here. The Court is well familiar with that case law, as well as the key facts in both cases, and may deny the motion summarily. Defendants simply reargue the same facts under new labels. Nothing has changed; nor should the result.

1. **The motion cites no new law.**

Defendants cite *Westlake* as intervening new authority, suggesting that it changes the law this Court should apply. Not so. Indeed, the motion cites the cases that *Westlake* cites, all of which existed before this case. Defendants could have cited the same cases and made the same points in their original motion but chose not to. A litigant's decision not to raise legal arguments earlier is hardly good cause or a valid basis for reconsideration. *See Macy*, 294 S.W.3d at 651. Here, although the *Westlake* decision is certainly new, the law the Court considered is established.

2. **The motion raises no changed facts or new concerns.**

The parties fully briefed whether Locke's access to documents creates a risk of disclosure or misuse. *See* Mot. at 2. Indeed, defendants' repeated reliance on Locke's declaration as supposed

3

support belies any newness to their motion. The Court carefully considered the facts stated in that declaration when deciding this issue the first time. The motion rehashes old arguments and raises nothing new.

In brief, Locke's access poses no risk of disclosure or misuse. His access is no different from any other outside counsel's. As amply proved, he is *not* employed by SafeLease and has no business role in the company. *See* Resp. to Mot. to Modify at 2. Through his law firm, he provides outside counsel services to SafeLease and other clients. These are the same sort of services provided to clients by prominent law firms like defense counsel. *Id.* at 2 n.1. He gives no commercial advice to SafeLease, makes no business decisions for it, and is not involved in its commercial decision-making. *Id.* at 2. He has given unequivocal assurances that he accepts the limitations that the protective order puts on him and will abide by those limitations. In fact, he was clear that accessing OCEO materials limits his "participation in business dealings or negotiations between the parties if they implicate OCO information." *Id.* at 5.

Defendants now worry that Locke "unconsciously" *might* take OCEO data "into account when providing legal advice on matters outside of this litigation." Mot. at 3. Of course, that risk exists for all outside counsel on both sides. It is not unique to Locke, and it is no reason to treat him differently from all other outside counsel of record. He is just as committed to safeguarding the confidentiality of all sensitive materials exchanged between the parties.

Because nothing about the claimed risk of deliberate or inadvertent disclosure or misuse has changed or applies uniquely to Locke, reconsideration on that basis is unjustified.

Yet defendants try to use this Court's decision in *Westlake* to repackage meritless concerns. With no change in law or facts, they strain to put new labels on old concerns to re-urge an already decided issue. This repackaging without any "additional evidence 'beyond that available to [them]'

at the time of the original ruling" is not persuasive. *Macy*, 294 S.W.3d at 651. Rather, the motion, based on mere disagreement with the ruling, is "a waste of judicial time and resources and should not be granted." *Blythe*, 423 F. Supp. 3d at 304.

The Court would not abuse its discretion by denying the motion without considering its substance. *See 1776 Energy*, 692 S.W.3d at 586. The Court should do so.

### 3. *Westlake* sheds no new light on these unchanged facts and original concerns.

Even were the Court to reach the substance of this motion, *Westlake* would not change the outcome given the same facts and no change in law.

First, *Westlake* itself is not controlling. Defendants handwave over the specific facts in that dispute. Neither its facts nor its holding applies here. As the Court well knows, the dispute in *Westlake* was whether (1) the protective order should have two tiers and (2) *in-house* counsel could access the higher AEO tier. *Id.* ¶2. The Court denied access to the AEO tier because the parties presented no evidence on whether *in-house* counsel should have access. *Id.* ¶20.

Here, unlike in *Westlake*, the issues were thoroughly briefed and fully supported by proof. And, unlike in *Westlake*, the protective order already was in effect, and it had been *agreed* by the parties. Courts often resolve disputes over what should be included in a draft protective order. But when "the parties conclude an agreement," like they did here, the Supreme Court says that "the court should not lightly ignore their bargain." *In re BP Prods. N. Am., Inc.*, 244 S.W.3d 840, 846 (Tex. 2008). *Westlake* therefore sheds no new light on the facts of this dispute.

Second, the types of evidence that *Westlake* says can be relevant to denying an attorney access to sensitive documents are not present here, as shown by *Westlake* and the cases it relies on. As *Westlake* says, the core question is, given the attorney's role, whether she "is involved in the client's 'competitive decision-making.'" 2025 Tex. Bus. 19 ¶16. Here, Locke is clear that his role and advice is limited to legal matters, not commercial decisions. No evidence disputes that.

5

Trying to re-label facts the Court already considered according to the types of evidence *Westlake* identifies does not change this simple fact: Locke is not a competitive decision-maker.

Nonetheless, defendants claim that five types of evidence support hamstringing Locke's role in this case. They are wrong. They cite his *past* in-house roles to try to bar him from seeing OCEO documents when representing SafeLease in his *current* role as outside counsel through his law firm. But his current role is the one that matters. Even if Locke's past role might have justified denying him access two years ago, his present role as outside counsel and law firm owner does not. The five types of evidence that defendants cite simply do not exist here.

**Type 1**. Defendants point to Locke's "advising his employer on a gamut of legal issues, including contracts, marketing, and employment." Mot. at 4, quoting *Westlake*. But SafeLease is *not* his employer. Defendants' position would mean that virtually all outside general counsel, who routinely advise clients on "a gamut of legal issues," presumptively would be barred from seeing OCEO information for a longtime client in litigation. That is not the law.

**Type 2**. Defendants point to Locke having once served as "general counsel and outside counsel for the company, [having] served an affiliate in a purely business capacity, played a major role in the company's core business . . . and [having] worked directly under the company's owner." *Id*. at 4, quoting *Westlake*. *Westlake* cites *ST Sales Tech Hldgs., LLC v. Daimler Chrysler Co.*, LLC, 2008 WL 5634214 (E.D. Tex. Mar. 14, 2008), for this factor. In *ST Sales*, that factor was relevant where the attorney was uniquely and inextricably intertwined in the client's core business of patent assertion, which would have failed to operate but for the attorney's commercial guidance. The *ST Sales* lawyer's role was that of a "competitive decisionmaker," akin to a business executive, and went "well-beyond the typical role of outside counsel, even outside counsel who might work with an entity for years." *Id*. at *5. In contrast, Locke's declaration is unequivocal that he fills the

usual role of outside general advisor and litigator to a longtime client and is *not* a competitive decision-maker. Defendants cite no facts to the contrary. Rather, because he is not a competitive decision-maker, Locke's story is hardly unique: lawyers routinely transition from in-house to outside counsel roles, and the mere fact that a lawyer served a client in an in-house role, as Locke did, does not serve as a lifetime bar from representing the client against a competitor.

**Type 3**. Defendants point to the "frequency and intensity of interactions between in-house counsel and company leadership and the critical nature of the litigation to the company's future." Mot. at 6, quoting *Westlake*. They focus on Locke's past job and make unfounded assumptions about his current work for SafeLease and its CEO. For this factor, *Westlake* relied on *Autotech Techs. Ltd. P'Ship v. Automationdirect.com, Inc.*, 237 F.R.D. 405 (N.D. Ill. 2006), which offers no support for defendants' position. *Autotech* says *nothing* about restricting access for outside counsel or condemning as a risk of disclosure a close attorney-client relationship from a prior job. There, all agreed that access would be unrestricted for *outside* counsel. *Id.* at 406. The only question was whether access should be restricted for *in-house* counsel who were or might in the future be involved in competitive decision-making—indeed, the court began its analysis noting the important difference: "Where in-house counsel are involved in competitive decision making, . . . the risk of inadvertent disclosure is obviously higher than for retained counsel." *Id.* at 408.

Locke is not in-house counsel or involved in competitive decision-making—he is outside counsel and professionally independent. The influence that SafeLease or any client can apply to him is no different than any other outside counsel in this litigation. Indeed, at least one court has rejected a similar attempt to extend this concern about independence beyond in-house counsel as "off base": *Autotech* "recognize[s] that a lawyer who is involved in competitive decision making

for his *employer* would have a very difficult time compartmentalizing the information he has access to and not allowing confidential information learned through litigation influence the business advice he gives his *employer*." *Advanced Magnesium Alloys Corp. v. Dery*, 2021 WL 2915112, at *2 n.2 (S.D. Ind. May 5, 2021) (emphasis added).

What's more, the relationship at issue in *Dery* is closer than the one alleged here—the person granted access was *married* to the plaintiff's president—yet it created no risk of disclosure. *Id.* at *1 (emphasis added). If being married to a party's president doesn't create a risk of disclosure, having a four-year professional relationship with a former employer and current client doesn't either.

**Type 4**. Defendants point to evidence "'that the attorney was director of legal and business affairs for the company'; was 'responsible for supervising its efforts [regarding matters relating to the subject of the case]'; and 'reported directly to company's general counsel, even though she did not handle product development contracts or other corporate matters.'" Mot. at 8, quoting *Westlake*. Here, again, defendants focus on Locke's *prior* job. The case *Westlake* relied on for this point, *Sony Computer Entm't Am., Inc. v. NASA Elecs. Corp.*, 249 F.R.D. 378 (S.D. Fla. 2008), says nothing about a lawyer's past in-house job erecting a permanent bar to participating in discovery after becoming outside counsel. If it had, this would run contrary to common practice. Given the evidence that he is professionally independent of SafeLease, and not a commercial or competitive decision-maker, Locke's past role does not bar his current access.

**Type 5**. Defendants point to "evidence that an attorney oversaw and advised the company's business leaders on strategy for litigation of the same type as the pending case, even though the attorney was not involved in pricing, product design, sales, marketing, distribution, or day-to-day operations." Mot. at 9, quoting *Westlake*. They say Locke's representation of a different company

in another case means he cannot see OCEO materials here because SafeLease's CEO is president of the other company. But that case is not "of the same type" as this case. The other case is a fraud dispute involving a failed acquisition. Mot., Ex. H at 64-66. So, whether Locke advised litigation strategy there is irrelevant to his ability to access documents here. While defendants claim the same "tactics" are being used—as statement as vague as it is incorrect—neither *Westlake* nor the case it cites, *Ecolab Inc. v. IBA, Inc.*, 2024 WL 3650464 (D. Minn. May 19, 2024), say anything about "tactical" similarity. Nor does either case discuss—let alone base its holding—on whether the attorney represents clients with overlapping officers.

In any event, the tactics point is a throwaway. Defendants make it just to recycle their past accusation that SafeLease filed this suit in bad faith to gain leverage in negotiations. Mot. at 9. The Court has heard the evidence, of course, and decided to the contrary.

\*        \*        \*

In short, *Westlake* changes nothing about the facts that the Court already considered. The motion ignores current facts and dwells on the past. Stripped of its rhetoric, defendants' position is that Locke will not or cannot honor the protective order. Every fact in the record says otherwise.

**4.  SafeLease will suffer hardship without Locke's continued access.**

The motion fails to show Locke is involved in competitive decision-making or poses any more risk of disclosure or misuse than any other outside counsel. Indeed, Defendants do not even argue Locke is involved in competitive decision-making. Locke's uncontroverted declaration establishes he is not. *See* Locke Decl. ¶¶19-21. "Unrebutted statements made by counsel asserting that he does not participate in competitive decisionmaking, which the court has no reason to doubt, form a reasonable basis to conclude that counsel is isolated from competitive decisionmaking." *Intel Corp. v. VIA Techs., Inc.*, 198 F.R.D. 525, 529 (N.D. Cal. 2000); *accord Matsushita Elec. Indus. Co., Ltd. v. United States*, 929 F.2d 1577, 1580 (Fed. Cir. 1991). Accordingly, the Court

need not address whether Locke's access to OCEO materials should be limited. *See Affymetrix, Inc. v. Illumina, Inc.*, 2005 WL 1801683, at *2 (D. Del. July 28, 2005) (conducting no need-for-access analysis after finding no risk of disclosure).

But were the Court to reach this step, the only conclusion is that there is a significant need: SafeLease will suffer hardship if Locke is denied access. A party suffers hardship when it is "prevented from using the attorneys of its choice." *Blackbird Tech LCC v. Serv. Lighting & Elec. Supplies, Inc.*, 2016 WL 2904592, at *5 (D. Del. May 18, 2016). "Public policy strongly favors a client's freedom to employ a lawyer of his choosing." *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 562 (Tex. 2006). For this analysis, courts consider whether the attorney has "a unique set of experiences, breadth of knowledge, and specialized qualifications that make his fully informed advise essential to outside counsel's ability to zealously and effectively represent" the client. *Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*, 2011 WL 13202057, at *5 (N.D. Tex. Feb. 10, 2011) (cleaned up).

Recognizing that the evidence cuts against them, the motion reverts to double-speak about Locke's expertise. For example, it quotes a press release about his "expert knowledge of SafeLease's products, market positioning, and the value the company delivers to its customers" to argue that he should be denied access. Mot. at 5-6. Then it says he "does not have, nor does he claim to have, any special experience rendering his insights particularly essential," to argue that he has no need for access. *Id.* at 11. Defendants cannot have it both ways.

The unrebutted evidence is that Locke has special knowledge about SafeLease's business, making him indispensable here. He has worked with SafeLease longer than its other counsel of record. *See* Locke Decl. ¶12. His history with and knowledge of SafeLease will aid discovery in

this complex dispute. Its ability to prosecute its case will be significantly harmed if he is not allowed to evaluate OCEO documents using his knowledge and experience.

Moreover, denying him access to this information would de facto deny SafeLease its counsel of choice, since defendants have applied OCEO designations on virtually all of their productions thus far, even where this designation was highly suspect. *See, e.g.*, Locke Decl. ¶46 (noting document marked OCEO even though it did not appear to be confidential).

The motion claims that because the case "is at an early stage" and SafeLease has "two fully capably [*sic*] outside law firms," there is no hardship. Mot. at 11. Not so. Other counsel is significant where the excluded attorney has no unique role, and the risk of disclosure is "very high." *ST Sales*, 2008 WL 5634214, at *8; *see also Uniloc 2017 LLC v. Cardo Sys., Inc.*, 2019 WL 13472203, at *5 (E.D. Tex. May 22, 2019). Neither is true here. As discussed above, Locke has developed special industry and company knowledge that makes him a unique advocate for SafeLease in this litigation. Moreover, Locke has repeatedly affirmed his professional independence and his commitment to the protective order. Under these circumstances, the stage of litigation and presence of other counsel does not affect the balancing test. *See PSI Marine, Inc. v. Seahorse Docking LLC*, 2024 WL 5077849, at *3 (D. Conn. Dec. 11, 2024) (granting access despite other counsel because the attorney had "litigation experience, and plaintiffs have asked her to serve as a trusted liaison to help them understand and weigh the advice of her co-counsel").

SafeLease needs Locke as its counsel, and he needs to access OCEO materials.

<div align="center">

**CONCLUSION**

</div>

The Court should deny the motion for reconsideration of its April 15, 2025 order.

Date: June 16, 2025                                    Respectfully submitted,

                                                       */s/ R. Paul Yetter*
Judd E. Stone II                                       R. Paul Yetter
State Bar No. 24076720                                 State Bar No. 22154200
judd@stonehilton.com                                   pyetter@yettercoleman.com
Christopher D. Hilton                                  Susanna R. Allen
State Bar No. 24087727                                 State Bar No. 24126616
chris@stonehilton.com                                  sallen@yettercoleman.com
Alexander M. Dvorscak                                  Luke A. Schamel
State Bar No. 24120461                                 State Bar No. 24106403
alex@stonehilton.com                                   lschamel@yettercoleman.com
STONE HILTON PLLC                                      Shannon N. Smith
600 Congress Ave.                                      State Bar No. 24110378
Austin, Texas 78748                                    ssmith@yettercoleman.com
(737) 465-3897                                         Julia C. Risley
                                                       State Bar No. 24132932
Adam T. Locke                                          jrisley@yettercoleman.com
State Bar No. 24083184                                 YETTER COLEMAN LLP
adam@lockelaw.com                                      811 Main Street, Suite 4100
LOCKELAW PLLC                                          Houston, Texas 77002
2617 Bissonnet Street, Suite 503                       (713) 632-8000
Houston, Texas 77005
(713) 832-0243

                                                       ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on all counsel of record via the Court e-filing service and/or by email, on June 16, 2025.

                                                       */s/ Luke Schamel*
                                                       Luke Schamel

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with Local Rule 5(a) and contains 3,339 words, not including the case caption, any index, table of contents or table of authorities, signature blocks, attached evidence, or any required certificates.

                                                       */s/ Luke Schamel*
                                                       Luke Schamel

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alyssa Smith on behalf of R. Yetter
Bar No. 22154200
asmith@yettercoleman.com
Envelope ID: 102078571
Filing Code Description: No Fee Documents
Filing Description: SafeLease Response to Motion to Reconsider April 15 Order
Status as of 6/17/2025 9:02 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 6/16/2025 7:27:46 PM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 6/16/2025 7:27:46 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 6/16/2025 7:27:46 PM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 6/16/2025 7:27:46 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 6/16/2025 7:27:46 PM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 6/16/2025 7:27:46 PM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 6/16/2025 7:27:46 PM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 6/16/2025 7:27:46 PM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 6/16/2025 7:27:46 PM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 6/16/2025 7:27:46 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 6/16/2025 7:27:46 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 6/16/2025 7:27:46 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 6/16/2025 7:27:46 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 6/16/2025 7:27:46 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 6/16/2025 7:27:46 PM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 6/16/2025 7:27:46 PM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 6/16/2025 7:27:46 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 6/16/2025 7:27:46 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 6/16/2025 7:27:46 PM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 6/16/2025 7:27:46 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 6/16/2025 7:27:46 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/16/2025 7:27:46 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alyssa Smith on behalf of R. Yetter
Bar No. 22154200
asmith@yettercoleman.com
Envelope ID: 102078571
Filing Code Description: No Fee Documents
Filing Description: SafeLease Response to Motion to Reconsider April 15 Order
Status as of 6/17/2025 9:02 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/16/2025 7:27:46 PM | SENT |
| Cathy Hodges | | catherine.hodges@aporter.com | 6/16/2025 7:27:46 PM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 6/16/2025 7:27:46 PM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 6/16/2025 7:27:46 PM | SENT |
| Adam Locke | | adam@lockelaw.com | 6/16/2025 7:27:46 PM | SENT |
| John Holler | | john.holler@arnoldporter.com | 6/16/2025 7:27:46 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 6/16/2025 7:27:46 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 6/16/2025 7:27:46 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 6/16/2025 7:27:46 PM | SENT |
| Julia C.Risley | | jrisley@yettercoleman.com | 6/16/2025 7:27:46 PM | SENT |

E-filed in the Office of the Clerk
for the Business Court of Texas **986**
6/17/2025 6:52 PM
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

**The Business Court of Texas,**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § | |
| *Plaintiff,* | § § | |
| *v.* | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § § | |
| *Defendants.* | § § | |

---

**Storable's Motion for Extension of Stay and Reply Deadline**

---

Defendants Storable, Inc.; RedNova Labs (d/b/a storEDGE); SiteLink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP (collectively, "Storable") respectfully submit this motion for an extension of the stay of the deadline to produce Storable's FMS customer list and the motion for summary judgment reply deadline set forth in the Court's June 12, 2025 Order Partially Granting Emergency Stay and Additional Relief ("Stay Order"). Storable would show as follows.

**Summary**

Storable's Motion for Partial Summary Judgment ("Partial MSJ") regarding SafeLease's attempted monopolization claim does not implicate Storable's FMS customer list. The customer list is **only** potentially relevant—but not necessary—to establishing Storable's **FMS** market share, which, in turn, is relevant only to whether Storable has monopoly power in the alleged FMS market. But Storable's Partial MSJ does not move on that element. Rather, Storable requests summary judgment as to other, mandatory elements of SafeLease's attempted monopolization claim. Granting summary judgment for Defendants as to any of these elements would be fatal to this claim.

The Court should therefore grant two extensions. First, the Court should extend the stay of the deadline to produce Storable's FMS customer list through its decision on Storable's Partial MSJ. In the alternative, if the Court needs further assurance that the list is not relevant to the Partial MSJ, it should at a minimum extend the stay until it has received the MSJ briefs and determines, if at all, that production of the FMS customer list is necessary to fairly adjudicate the Partial MSJ. If the Court can grant summary judgment for Defendants on SafeLease's attempted monopolization claim without production of the FMS customer list, ordering production of the list, which is a trade secret, is not necessary and would be in error. Determining whether additional evidence is needed to rule on a summary judgment motion after receiving the parties' submissions is consistent with the standard procedures for summary judgment motions under Rule 166a(g).

Extending the stay at least until the Court has reviewed the parties briefing on the Partial MSJ will also serve the interest of judicial economy by avoiding the need for emergency motions, responses, hearings, or requests for appellate relief regarding the stay in the event the Court does not reconsider the May 28 Discovery Order and the stay is dissolved, as it otherwise would be, on June 24.

Second, Storable requests a one-week extension of its deadline to file a MSJ reply to July 25, 2025 due to pre-planned absences of members of Storable's counsel team. Storable is available for a hearing on the summary judgment motion promptly after briefing is complete during the week of July 28, 2025.

Plaintiff opposes the requested extension of the stay but does not oppose the requested extension of the reply deadline.

<div align="center">**Relevant Background**</div>

Storable filed its Partial MSJ on June 2, 2025. The Court's May 28, 2025 Discovery Order ("Discovery Order") set a deadline of June 13, 2025 for Storable to produce its FMS customer list

in response to SafeLease's Request for Production No. 10. The June 12 Stay Order stayed that deadline until June 24, 2025, which is the day after the submission date for the second of Storable's two pending motions for reconsideration related to the Discovery Order. The June 12 Stay Order also *sua sponte* granted an extension of SafeLease's time to file a response to Storable's Partial MSJ to July 11, 2025 "[b]ecause the stay pushes the production deadline until after SafeLease's [then-current] June 20, 2025 deadline to respond to Storable's motion for partial summary judgment." Stay Order. The Stay Order also extends Storable's deadline to file a reply in support of its Partial MSJ to July 18, 2025.

Storable's FMS customer list is not relevant to the Partial MSJ on SafeLease's attempted monopolization claim. The Partial MSJ requests summary judgment on multiple elements of SafeLease's attempted monopolization claim, specifically that:

(1) Storable has no dangerous probability of monopolizing the **tenant insurance** market;

(2) Storable's conduct did not harm competition **for tenant insurance**;

(3) Storable's conduct is not anticompetitive or predatory because Storable has not excluded or refused to deal **with SafeLease** and because this conduct has **legitimate business justifications**; and

(4) Storable does not have a specific intent to monopolize the **tenant insurance market**.

Defs' Partial MSJ (Jun. 2, 2025).

Storable carefully targeted these elements not only for their failure on the merits but also because they do not implicate its FMS customer list in any way. All these elements relate to the effect or implications of Storable's conduct in the alleged **tenant insurance** market only. Storable's FMS customer list is not relevant to any of these elements or implicated by any of Storable's arguments in its Partial MSJ.

**Legal Standard**

*Discovery stays.*  A trial court may issue any protective order "in the interest of justice" to protect the movant from undue burden, unnecessary expense, harassment, or annoyance.  Tex. R. Civ. P. 192.6(b).  Such limitations may include modifying the timing of discovery.  *Id.*  Similarly, the Court may also schedule discovery in appropriate phases.  Tex. R. Civ. P. 190.4(b)(1)–(2).

*Production of a trade secret.*  "A person has a privilege to refuse to disclose … a trade secret owned by the person, unless the court finds that nondisclosure will tend to conceal fraud or otherwise work injustice."  Tex. R. Evid. 507(a). Therefore, once the party resisting discovery establishes that the information is a trade secret, "[t]he burden then shifts to the requesting party to establish that the information is **necessary** for a fair adjudication of its claims." *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 613 (Tex. 1998) (orig. proceeding) (emphasis added).

**Argument and Authorities**

I.      **The Court Should Extend the Stay Through its Decision on the Partial MSJ, or, Alternatively, at Least Until it Has Considered the Full Briefing on the Partial MSJ**

The interests of justice overwhelmingly support deferring production of Storable's FMS customer list—a trade secret—until after the Court has determined whether SafeLease's attempted monopolization claim can be disposed of on grounds that do not implicate this list.  If it can, as Storable has requested in its Partial MSJ, the list will no longer be discoverable, let alone **necessary** to any claim, as it must be to overcome Storable's trade secret privilege.  *See* Tex. R. Civ. P. 192.3(a) ("a party may obtain discovery regarding any matter that is not privileged and is relevant to the subject matter of the pending action"); *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 613  (trade secret may be produced only if "necessary for a fair adjudication" of the requesting party's claims or defenses).

SafeLease does not contend that the FMS customer list is relevant to any claim except the attempted monopolization claim. The list is not necessary for a fair adjudication of the Partial MSJ on that claim. The only element of SafeLease's attempted monopolization claim to which the list is allegedly relevant is "assessing Storable's market power" in the FMS market—specifically, determining Storable's FMS market share. Plaintiff's Opp. to Stay Mot. at 7 (June 12, 2025). Storable did not move for summary judgment on that element in its Partial MSJ. SafeLease attempted to argue around this point in its Opposition to Storable's stay motion[1]—but it **did not dispute** that Storable's Partial MSJ does not raise any issues that implicate Storable's FMS market share. Rather, SafeLease seemed to imply that Storable's **FMS** facility list is somehow relevant to showing a "market wide effect" for **tenant insurance**. *Id.* at 7. It is not, and SafeLease provided no explanation otherwise. Obtaining Storable's FMS customer list would not help SafeLease avoid summary judgment on multiple elements of its attempted monopolization claim.[2]

Accordingly, the Court should extend the stay of the production deadline for Storable's FMS customer list until after a decision on Storable's Partial MSJ. Alternatively, if the Court needs further assurance that the FMS customer list is not relevant to the Partial MSJ, the Court

---

[1] SafeLease stated but did not and cannot explain how the list is "critical" to "defining the relevant antitrust market" or assessing the "competitive impact of [Storable's] conduct." Plaintiff's Opp. to Stay Mot. at 7 (June 12, 2025). The list is not necessary—much less "critical"—for either purpose. Storable's *FMS* facility list is not relevant to the competitive impact of Storable's conduct in the alleged *tenant insurance* market. Defs' Reply to Stay Mot. at 2, 4 (June 12, 2025). And Storable's Partial MSJ does not move for summary judgment on SafeLease's failure to properly define relevant antitrust markets, so even if the list were relevant to that element, SafeLease would not be prejudiced by staying production of the list until after the Partial MSJ is heard and decided. *Id.* at 3 n.3.

[2] SafeLease is also wrong that Storable's Partial MSJ is a "no-evidence" motion. Plaintiff's Opp. to Stay Mot. at 6 (Jun. 12, 2025). It is not. Storable moved for traditional summary judgment on SafeLease's attempted monopolization claim. SafeLease cannot transform a traditional summary judgment motion into a no-evidence motion by selectively quoting parts of the Partial MSJ which correctly explain that the challenged elements of SafeLease's attempted monopolization claim fail as a matter of law. *See id.* Even if Storable had moved for no-evidence summary judgment, such a motion may be targeted only at "one or more essential elements" of a claim and "must state the elements as to which there is no evidence." Tex. R. Civ. P. 166a(i). None of the elements identified in the Partial MSJ implicate Storable's market share in the FMS market.

should extend the stay until the Court has received complete briefing on the Partial MSJ and has determined, if at all, that production of the FMS customer list is necessary to fairly adjudicate the Partial MSJ. If the Court can grant summary judgment for Defendants on SafeLease's attempted monopolization claim without production of the FMS customer list, ordering production of the list, which is a trade secret, is not necessary and would be in error.

Staying production of Storable's trade secret until the Court's decision on the Partial MSJ—or at least until the Court has reviewed the parties' briefing on the Partial MSJ and has determined, if at all, that the FMS customer list is necessary to fairly adjudicate that motion—is consistent with settled law in Texas that it is error to require production of a trade secret unless and until the requesting party proves that "the lack of the information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat." *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732–33 (Tex. 2003) (orig. proceeding). Consideration of the parties' summary judgment briefs and supporting evidence before determining whether additional discovery is necessary is also consistent with the ordinary procedures for resolving summary judgment motions under Rule 166a(g).

Extending the stay will also serve the interests of judicial economy by avoiding the need for Storable to submit emergency motions or other expedited filings regarding the stay, which would be necessary to protect its trade secret if the stay dissolves on June 24, 2025 pursuant to the Stay Order.

II.     **The Court Should Grant Storable an Additional Seven Days for the MSJ Reply**

Separate from the stay, Storable requests an extension of seven days to file its reply in support of the Partial MSJ (from July 18 to July 25, 2025) due to pre-planned absences of Storable's counsel team that were not implicated under the original briefing schedule prior to the Stay Order. SafeLease has indicated that it is not opposed to the requested extension of Storable's

reply deadline. Storable is prepared to be available for and appear at a hearing on the Partial MSJ during the week of July 28, 2025 if the Court grants Storable's requested extension for its reply.

**Conclusion**

Storable requests that the Court extend the stay of the deadline to produce Storable's FMS customer list until after a decision on the Partial MSJ (or, alternatively, until one week after the Court has received Storable's MSJ reply and determined, if at all, that production of the FMS customer list is necessary to fairly adjudicate the Partial MSJ), grant a 7-day extension for Storable's reply in support of the Partial MSJ, and grant any other relief to which Storable may justly be entitled.

Respectfully submitted June 17, 2025.

*/s/ Katherine G. Treistman*
Katherine G. Treistman
State Bar No. 00796632
Andrew D. Bergman
State Bar No. 24101507
Mikaila Skaroff (admitted *pro hac vice*)
John Holler (admitted *pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
700 Louisiana Street, Suite 4000
Houston, Texas 77002–2755
Tel.: (713) 576–2400
Fax: (713) 576–2499
Katherine.Treistman@arnoldporter.com
Andrew.Bergman@arnoldporter.com
Mikaila.skaroff@arnoldporter.com
John.holler@arnoldporter.com

Ray T. Torgerson
State Bar No. 24003067
Neil Kenton Alexander
State Bar No. 00996600
Jonna N. Summers
State Bar No. 24060649
Elizabeth "Liza" Eoff
State Bar No. 24095062

Lakshmi N. Kumar
State Bar No. 24144581
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Tel.: (713) 226–6000
Fax: (713) 226–6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
ljumar@porterhedges.com

Dale Wainwright
State Bar No. 00000049
Justin Bernstein
State Bar No. 24105462
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel.: (512) 320–7240
Fax: (512) 320–7240
Dale.wainwright@gtlaw.com
bernsteinju@gtlaw.com

*Counsel for Defendants*

## Certificate of Conference

The Parties conferred regarding the relief requested in the foregoing motion, and counsel for Plaintiff indicated that Plaintiff is opposed to Defendants' request for an extension of the stay but that Plaintiff is unopposed to the extension of the deadline to file a reply in support of its motion for partial summary judgment.

*s/ Katherine G. Treistman*
Katherine G. Treistman

## Certificate of Compliance

I hereby certify that this document complies with Local Rule 5(a) and contains 2,070 words, excluding the case caption, any index, table of contents or table of authorities, signature blocks, attached evidence, or any required certificates.

*s/ Katherine G. Treistman*
Katherine G. Treistman

## Certificate of Service

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon counsel of record in accordance with the Texas Rules of Civil Procedure on June 17, 2025.

*s/ Katherine G. Treistman*
Katherine G. Treistman

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cathy Hodges on behalf of Katherine Ginzburg Treistman
Bar No. 796632
catherine.hodges@aporter.com
Envelope ID: 102132940
Filing Code Description: Motions - All Other
Filing Description: Defendants' Motion for Extension of Stay and MSJ Reply Deadline
Status as of 6/18/2025 8:48 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 6/17/2025 6:52:01 PM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 6/17/2025 6:52:01 PM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 6/17/2025 6:52:01 PM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 6/17/2025 6:52:01 PM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 6/17/2025 6:52:01 PM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 6/17/2025 6:52:01 PM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 6/17/2025 6:52:01 PM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 6/17/2025 6:52:01 PM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 6/17/2025 6:52:01 PM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 6/17/2025 6:52:01 PM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 6/17/2025 6:52:01 PM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 6/17/2025 6:52:01 PM | SENT |
| Judd Stone | | Judd@stonehilton.com | 6/17/2025 6:52:01 PM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 6/17/2025 6:52:01 PM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 6/17/2025 6:52:01 PM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 6/17/2025 6:52:01 PM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 6/17/2025 6:52:01 PM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 6/17/2025 6:52:01 PM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 6/17/2025 6:52:01 PM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 6/17/2025 6:52:01 PM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 6/17/2025 6:52:01 PM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/17/2025 6:52:01 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Cathy Hodges on behalf of Katherine Ginzburg Treistman
Bar No. 796632
catherine.hodges@aporter.com
Envelope ID: 102132940
Filing Code Description: Motions - All Other
Filing Description: Defendants' Motion for Extension of Stay and MSJ Reply Deadline
Status as of 6/18/2025 8:48 AM CST

Case Contacts

| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/17/2025 6:52:01 PM | SENT |
|---|---|---|---|---|
| Cathy Hodges | | catherine.hodges@aporter.com | 6/17/2025 6:52:01 PM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 6/17/2025 6:52:01 PM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 6/17/2025 6:52:01 PM | SENT |
| Adam Locke | | adam@lockelaw.com | 6/17/2025 6:52:01 PM | SENT |
| John Holler | | john.holler@arnoldporter.com | 6/17/2025 6:52:01 PM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 6/17/2025 6:52:01 PM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 6/17/2025 6:52:01 PM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 6/17/2025 6:52:01 PM | SENT |
| Julia C.Risley | | jrisley@yettercoleman.com | 6/17/2025 6:52:01 PM | SENT |

**The Business Court of Texas**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff*, | § | |
| v. | § | Cause No. 25-BC03A-0001 |
| | § | |
| STORABLE, INC., et al., | § § | |
| *Defendants*. | § § | |

### PLAINTIFF'S RESPONSE TO MOTION FOR PARTIAL RECONSIDERATION OF MAY 28, 2025 DISCOVERY ORDER

Defendants' disagreement with the Court's orders is no reason to serially relitigate them, which wastes judicial and party resources. Here, they ask for another bite at the apple by raising an argument that they now say they chose to hold back before. Their decision has consequences, of course, as regret over strategy is no basis for reconsideration. In any event, the new trade secret claim is too late and unsupported, and worries about harm are just speculation that SafeLease will not adhere to the Protective Order. Reconsideration of this order is unwarranted and needless.

### LEGAL STANDARD

Courts are not required to reconsider prior rulings and may deny a motion to reconsider without reaching its substance. *1776 Energy Partners, LLC v. Marathon Oil EF, LLC*, 692 S.W.3d 564, 586 (Tex. App.—San Antonio 2023, no pet.). "[I]t is not an abuse of discretion to refuse" a motion to reconsider. *In re GreatAmerica Leasing Corp.*, 294 S.W.3d 912, 915 n.2 (Tex. App.—Corpus Christi–Edinburg 2009, no pet.) (orig. proceeding). Motions to reconsider are particularly discouraged when they raise "arguments which could, and should, have been made before the judgment issued." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863 (5th Cir. 2003); *accord Macy v. Waste Mgmt., Inc.*, 294 S.W.3d 638, 651 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

**ARGUMENT AND AUTHORITIES**

The motion is a series of one- or two-liners that often fail to cite authority or meaningfully analyze the issues they raise. It asserts speculative worries about whether defendants' information will be protected by an order they helped draft. And it fails to grapple with the fact that they waived any trade secret privilege and never established that their FMS customer list is a trade secret.

**1.    Defendants have waived their claim of trade secret privilege.**

The Court need not address the merits of the trade-secret claim because it was waived. Defendants repeatedly and consciously decided *not* to raise the privilege despite the need to do so earlier. Thus, defendants are barred from raising it now. If the Court accepts their word that they knew about and decided to assert the privilege later, the only conclusion is that they failed to preserve that privilege. The Court should deny the reconsideration motion.

**A.    Defendants have not preserved their claim of trade secret privilege.**

A failure to raise a privilege is a failure to preserve it. Under Rule 193.3, to "preserve a privilege from written discovery," the party must state that "information or material responsive to the request or required disclosure has been withheld" and "the privilege or privileges asserted." Tex. R. Civ. P. 193.3(a). If they do not, the privilege is forfeited. *See In re Anderson*, 163 S.W.3d 136, 141 (Tex. App.—San Antonio 2005, no pet.) (orig. proceeding); *In re Soto*, 270 S.W.3d 732, 734-35 (Tex. App.—Amarillo 2008, no pet.) (orig. proceeding).

Here, defendants withheld requested documents but never stated they were withholding them because of privilege, as required. They did not state it in their Objections and Responses, in multiple conferrals and emails about the requests, or in their discovery letter to the Court. *See* Ex. 1 to Resp. to Emerg. Mot. to Stay (June 6, 2025); Ex. 2 to Resp. to Emerg. Mot. to Stay (June 6, 2025). "Trade secret" was not mentioned until their Emergency Motion for Stay, filed 46 days after their Objections and Responses. *Compare Scrivner v. Casseb*, 754 S.W.2d 354, 358 (Tex.

App.—San Antonio 1988, no writ) (privilege unpreserved when asserted 40 days after discovery requests). That was far too late.

Even if their initial failures to timely raise privilege could be excused, their failure to raise it in their discovery letter cannot be. Per local court rules, once discovery letters are filed, the Court may "issue an order if the Court, in its discretion, determines no further briefing is necessary." L.R. 4(d)(4). Defendants were thus on notice that if they did not raise privilege in their letter, they may be ordered to produce without any adjudication of privilege. Their deliberate omission is forfeiture. *See Anderson*, 163 S.W.3d at 141; *Soto*, 270 S.W.3d at 734-35.

Defendants claim "ordinary procedure" allows them to argue other objections and then raise privilege if they lose. Defs.' Reply ISO Emerg. Mot. to Stay at 2-3 (June 12, 2025). But this was not a situation where defendants may have been ordered to produce documents only some of which were privileged. They claim the *entire* list is a trade secret, so they had no reason to hold back any privilege claim.

Because defendants did not preserve privilege, the Court should deny reconsideration.

**B.      Defendants have waived their claim of trade secret privilege.**

Defendants also waived privilege because, as they admit, they chose not to assert it at the appropriate time. "Waiver is the intentional relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right." *In re RSR Corp.*, 568 S.W.3d 663, 666 (Tex. 2019) (orig. proceeding) (quoting reference omitted). When a party makes "a tactical, yet erroneous, decision" not to make a certain argument, it is waived. *Id.*

Here, defendants' repeated failure to raise privilege is intentional conduct inconsistent with that claimed right, and they *admit* they consciously chose not to assert privilege in their letter brief:

> The Court noted in the May 28, 2025 Discovery Order that Storable did not claim that the customer list was a trade secret. Respectfully, Storable's response to SafeLease's pre-motion letter was subject to strict length limitations under the local

rules. The Court ruled on this discovery dispute based solely on those letters, rather than requesting further briefing. Further briefing would have clarified that Storable's customer list is a trade secret.

Defs.' Emerg. Mot. for Stay at 3, n.1 (June 6, 2025).

Defendants' *choice* not to argue privilege is an "intentional relinquishment of a right actually known." *In re RSR Corp.*, 568 S.W.3d at 666. That they "would have" claimed privilege if allowed "further briefing" is immaterial. Defs.' Emergency Mot. for Stay at 3, n.1 (June 6, 2025). They argued other points without asking for more briefing or words. That's textbook waiver.

**2.      Defendants agreed to a Protective Order that specifically protects trade secrets.**

Procedural bars aside, reconsideration based on concerns over whether the information will be protected is unwarranted. Defendants do not argue that the Protective Order is inadequate, but only worry SafeLease will ignore it. They helped draft that Order, which fully protects confidential information including trade secrets.

The Protective Order adequately protects defendants' interests by covering information designated as Outside Counsel's Eyes Only Information ("OCEO"). Prot. Order ¶3 (Feb. 27, 2025). This includes "trade secrets," which "may not be disclosed to any party or employee, representative, or affiliate of a party, except by agreement or a subsequent Order by this Court." *Id.* Obviously, defendants anticipated disclosure of trade secrets and agreed to appropriate safeguards. They do not challenge those safeguards now.

Instead, defendants speculate that SafeLease might *violate* the Protective Order. Mot. at 7. They worry SafeLease will use the list to target potential customers, but don't explain how an FMS customer list will reveal *insurance* customers. Rejecting a similar argument that protective orders are *per se* inadequate to protect trade secrets, the Supreme Court instructed courts to instead consider "specific, fact-based grounds for believing that trade secrets may be disclosed in violation

of its protective order." *In re Continental Gen. Tire, Inc.*, 979 S.W.2d 609, 614 (Tex. 1998) (orig. proceeding). Defendants here identify no such grounds.

Without grounds to doubt the terms of the Protective Order, defendants instead speculate it might cease to exist: "the protective order would be void if the Court of Appeals holds that this Court lacks jurisdiction in the pending appeal." Mot. at 9. This one-sentence throwaway cites no authority and can be ignored.

In any event, the pending appeal will not void the Protective Order because defendants challenge the removal's timeliness not jurisdiction. *See* Ex 1, Appellants' Br. at 16-18 (Apr. 17, 2025). A failure to timely remove is a "procedural defect—not a jurisdictional one." *Quintero Cmty. Ass'n Inc. v. F.D.I.C.*, 792 F.3d 1002, 1007 (8th Cir. 2015) (quote omitted). Thus, even if they win a remand, the Protective Order will *not* be void for lack of jurisdiction.

Finally, even if it is somehow voided, the parties' Rule 11 agreement—which they relied on through the injunction hearing here—will remain effective and provides *identical* protections *See* Ex. 2 (parties "agree to abide by the protections of the PO for documents designated Confidential or Outside Counsel's Eyes Only"); Ex. 3, Feb. 11, 2025 Tr. 234:4-6 (defense counsel recognizing "the Rule 11 agreement . . . is acting like a protective order"). The parties filed that signed agreement with the Court. *See* Prot. Order (Feb. 20, 2025).

The Protective Order adequately protects Defendants' confidentiality interests. Their worries that it will be flouted or voided are baseless.

**3.      Defendants have not established that their customer list is a trade secret.**

Under Tex. R. Evid. 507, a party asserting trade secret privilege "has the burden of proving that the discovery information sought qualifies as a trade secret." *In re Bass*, 113 S.W.3d 735, 737 (Tex. 2003) (orig. proceeding).

"Trade secret" is defined by the Texas Uniform Trade Secret Act. It includes business information, such as actual or potential customer lists, if "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." Tex. Civ. Prac. & Rem. Code §134A.002(6). This definition is "instructive to" a Rule 507 analysis. *Houston Livestock Show & Rodeo, Inc. v. Dolcefino Commc'ns, LLC*, 702 S.W.3d 675, 686 (Tex. App.—Houston [1st Dist.] 2024, no pet.).

To be sure, "information that a firm compiles regarding its customers may enjoy trade secret status under Texas law." *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 466 (Tex. App.—Austin 2004, pet. denied). "But this does not mean that trade secret status automatically attaches to any information that a company acquires regarding its customers[.]" *Id.* To be a trade secret, a customer list must have "actual or potential independent economic value to third parties because it is generally unknown and not readily ascertainable through proper means." *HTS Serv. Inc. v. Abedin*, 2025 WL 899844, at *4 (Tex. App.—Houston [14th Dist.] Mar. 25, 2025, no pet.). "Courts generally recognize that customer lists or financial information that can be used to obtain customers or to negotiate pricing or fees to obtain an advantage in the market qualifies as a trade secret." *Houston Livestock*, 702 S.W.3d at 690. A customer list is entitled to *no* protection when the resisting party fails to show "the value of the information to [itself] and its competitors or how the information presents an opportunity to obtain an advantage over competitors." *In re Desa Heating, L.L.C.*, 2006 WL 1713489, at *2-3 (Tex. App.—Fort Worth June 22, 2006) (orig. proceeding) (cleaned up).

A customer list presents no advantage to competitors when the customers belong to a "well-defined" and "readily ascertained class." *Research Equip. Co., Inc. v. C.H. Galloway & Sci. Cages,*

*Inc.*, 485 S.W.2d 953, 956 (Tex. App.—Waco 1972, no writ); *SCM Corp. v. Triplett Co.*, 399 S.W.2d 583, 587 (Tex. App.—San Antonio 1966, no writ). *See also DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 684 (Tex. 1990) (party "failed to show that its customers could not readily be identified by someone outside its employ" or "that such knowledge carried some competitive advantage"); *Allan J. Richardson & Assocs., Inc. v. Andrews*, 718 S.W.2d 833, 837 (Tex. App.—Houston [14th Dist.] 1986, no writ) ("trade secret status does not automatically attach to a client list"; it "must be information that is not publicly available or readily ascertainable by independent investigation"); *Kana Energy Servs., Inc. v. Jiangsu Jinshi Mach. Group Co.*, 565 S.W.3d 347, 355-56 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (no trade secret in customer identities ascertainable through internet searches and phone calls).

For example, customers of a window cleaning business are not a trade secret. "Everyone having show windows must clean them and will probably engage a professional window cleaner if the latter will do the work well enough and cheap enough." *SCM*, 399 S.W.2d at 587. Likewise, auto insurance customers are readily ascertainable because they own a car. *Id.* Such customer lists "are not a trade secret" because "everyone knows [these customers] buy from someone." *Id.* But an exterminator's customer list could be a trade secret because "most property owners" don't require extermination services, "and the ones who do need such service, do not advertise the fact," so a "list of such prospects can be compiled only at considerable expense." *Id.*

Here, defendants fail to show that their customer list has economic value to third parties beyond their conclusory say-so. Like auto-insurance or window-cleaning customers, FMS customers belong to a "well-defined" and "readily ascertained" class. *Research Equip.*, 485 S.W.2d at 956; *SCM*, 399 S.W.2d at 587; *Allan*, 718 S.W.2d at 837. Defendants provide FMS *only* to self-storage facilities, and almost all self-storage facilities use an FMS product. So, to identify

potential FMS customers, one need only identify self-storage facilities. That's not difficult to do. Indeed, SpareFoot has a public website that locates self-storage facilities. *See* https://www.sparefoot.com/. Because the class of FMS customers is well-defined and can readily be ascertained through things like internet searches, defendants' customer list is not a trade secret. *See SCM*, 399 S.W.3d at 586 (no trade secret in customers that "could readily be obtained from a Chamber of Commerce list and telephone directory"); *Kana*, 565 S.W.3d at 355-56.

Conclusory arguments are not enough. Defendants fail to explain how their customer list constitutes "potential leads" to competitors. Mot. at 7. Or how a competitor would be advantaged by knowing the "geographic regions" of their customers—information defendants do not regard as a trade secret because they offered to disclose it. *See* Defs.' May 23, 2025 Ltr. at 1; Mot. at 2. Or how knowing who defendants' customers are would allow SafeLease to steal those customers. Simply alleging a trade secret does not establish one. *See Desa*, 2006 WL 1713489, at *3 (affidavit didn't establish trade secrets: it didn't state why customers' "identity and contact information is important," why it gives "a competitive advantage," or why revealing it "would hurt its business or its relationships").

The burden to establish this list as a trade secret is on defendants. They have not met it.

**4.     Defendants' customer list has core relevance and is necessary.**

Defendants do not carry their burden to establish a trade secret, so the Court need not decide whether "the information is necessary to the proof of one or more material elements of the claim and that it is reasonable to conclude that the information sought is essential to a fair resolution of the lawsuit." *In re Valero Ref.-Tex., LP*, 2014 WL 4115917, at *3-4 (Tex. App.—Houston [1st Dist.] Aug. 21, 2014) (orig. proceeding) (cite omitted). But it undoubtedly is.

Here, the customer list is essential to SafeLease's attempted monopolization claim, which alleges that defendants are trying to leverage market dominance in the FMS market to monopolize

the tenant-insurance market. *See* 2d Am. Pet. ¶¶93, 100, 109 (Jan. 28, 2025). The customer list is necessary for establishing both defendants' FMS market share (and hence market dominance) and the relevant antitrust market.

Defendants do not dispute this. Instead, they argue that SafeLease doesn't need the list because defendants' MSJ might be granted and they offer alternative, less detailed information that they say would suffice. Mot. at 8-9. These arguments lack merit.

First, defendants' invoking the possibility that a claim might in the future be dismissed is irrelevant. It has no bearing on whether information is needed to prove a live claim.

Second, defendants are trying to use their MSJ as a sword and a shield. They say SafeLease should not get discovery related to its antitrust claim because of the pending motion while arguing in the motion that SafeLease has "no evidence" and "zero evidence" to support its claim. Defs.' Mot. for Part. Summ. J. at 3, 13, 15, 23-24 (June 2, 2025). That's simply gamesmanship.

Third, defendants' alternatives are insufficient because their representations have been unreliable and changing. Before this litigation began, defendants' website showed that they served 36,000 facilities. Ex. 4, PX-185. After SafeLease filed its antitrust suit alleging a monopoly in the FMS market, defendants' corporate representative claimed in his deposition that they serve only 33,000 facilities. Ex.5, Jan. 14, 2025 Corp. Rep. Dep. 15:20-22. Then, they changed the number on their website and, at the injunction hearing, claimed that the number was 30,000. Ex. 6, Feb. 13, 2025 Tr. 119:16-20. SafeLease should not have to rely on defendants' representation of a number they keep changing.

Defendants' customer list—including names, cities, states, and zip codes—is needed to ensure SafeLease has accurate and reliable evidence supporting its antitrust claim. Their confusion about what "verification of the list would entail" and why SafeLease's expert used defendants'

pre-litigation number (rather than the two other numbers they provided) for his preliminary market analysis are irrelevant distractions that do not change the list's relevance. *See* Mot. at 8.

Even if defendants had established that their customer list is a trade secret, SafeLease needs the information to prove its antitrust claim, and any concerns about protecting the information are adequately addressed by the agreed Protective Order.

## CONCLUSION

The Court should deny the motion for reconsideration of its May 28, 2025 discovery order.

Date: June 19, 2025

Respectfully submitted,

/s/ R. Paul Yetter

| | |
|---|---|
| Judd E. Stone II | R. Paul Yetter |
| State Bar No. 24076720 | State Bar No. 22154200 |
| judd@stonehilton.com | pyetter@yettercoleman.com |
| Christopher D. Hilton | Susanna R. Allen |
| State Bar No. 24087727 | State Bar No. 24126616 |
| chris@stonehilton.com | sallen@yettercoleman.com |
| Alexander M. Dvorscak | Luke A. Schamel |
| State Bar No. 24120461 | State Bar No. 24106403 |
| alex@stonehilton.com | lschamel@yettercoleman.com |
| STONE HILTON PLLC | Shannon N. Smith |
| 600 Congress Ave. | State Bar No. 24110378 |
| Austin, Texas 78748 | ssmith@yettercoleman.com |
| (737) 465-3897 | Julia C. Risley |
| | State Bar No. 24132932 |
| Adam T. Locke | jrisley@yettercoleman.com |
| State Bar No. 24083184 | YETTER COLEMAN LLP |
| adam@lockelaw.com | 811 Main Street, Suite 4100 |
| LOCKELAW PLLC | Houston, Texas 77002 |
| 2617 Bissonnet Street, Suite 503 | (713) 632-8000 |
| Houston, Texas 77005 | |
| (713) 832-0243 | |
| | ATTORNEYS FOR PLAINTIFF |

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on all counsel of record via the Court e-filing service and/or by email, on June 19, 2025.

*/s/ Luke Schamel*
Luke Schamel

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with Local Rule 5(a) and contains 2,934 words, not including the case caption, any index, table of contents or table of authorities, signature blocks, attached evidence, or any required certificates.

*/s/ Luke Schamel*
Luke Schamel

# Exhibit 1

ACCEPTED
15-25-00020-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
4/17/2025 7:29 PM
CHRISTOPHER A. PRINE
CLERK

**No. 15-25-00020-CV**

---

IN THE FIFTEENTH COURT OF APPEALS

---

Storable, Inc.; RedNova Labs, Inc. (d/b/a storEDGE); Sitelink
Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and
Property First Group, LP,

*Appellants,*

v.

SafeLease Insurance Services, LLC,

*Appellee.*

---

On Appeal from the Third Division of the Texas Business Court
Cause No. 25-BC03A-0001

---

## APPELLANTS' BRIEF

---

GREENBERG TRAURIG, LLP

Dale Wainwright
State Bar No. 00000049
dale.wainwright@gtlaw.com
Justin Bernstein
State Bar No. 24105462
justin.bernstein@gtlaw.com
300 West 6th Street, Suite 2050
Austin, Texas 78701
T: (512) 320-7200
F: (512) 320-7210

COUNSEL FOR APPELLANTS

## ORAL ARGUMENT REQUESTED

irreparable harm. The harms for which SafeLease provided mere speculation are both supported by no evidence and contradicted by unrebutted evidence.

Second, the undisputed facts show that SafeLease cannot establish a probable right to recover. SafeLease cannot recover because Storable is justified in blocking access to its FMS based on Storable's rights as owner of the FMS and party to the Terms of Use. At minimum, Storable conclusively demonstrated a good-faith belief in a *colorable* right, which is a complete defense to the only claim for which the business court found a probable right to recover—tortious interference with an existing contract.

Third, SafeLease's unclean hands prevent it from receiving the equitable remedy of a temporary injunction. SafeLease dirtied its hands by deliberately creating the emergency it alleges, deceiving customers about its relationship with Storable, circumventing security measures, and forum shopping.

## ARGUMENT

I. **SafeLease Untimely Removed To Forum Shop After An Adverse Ruling.**

   A. *SafeLease was required to request removal within 30 days of when it discovered, or should have discovered, facts establishing the business court's jurisdiction.*

The right to remove to the business courts is created and circumscribed by statute. TEX. GOV'T CODE § 25A.006(d), (f). While an *agreed* notice of

removal may be filed at any time, opposed notices like the one at issue "must" be filed:

> not later than the 30th day after the date the party requesting removal of the action **discovered, or reasonably should have discovered, facts establishing the business court's jurisdiction** over the action.

TEX. GOV'T CODE § 25A.006(f)(1) (emphasis added).

"If the business court does not have jurisdiction of the action, the business court **shall** remand the action to the court in which the action was originally filed." TEX. GOV'T CODE § 25A.006(d) (emphasis added).

**B.** *SafeLease requested removal to the business court more than 30 days after discovering facts establishing the business court's jurisdiction.*

**1. SafeLease does not deny that it knew sufficient jurisdictional facts more than 30 days before filing its Notice of Removal.**

SafeLease filed its Notice of Removal on January 29, 2025. CR5. Thirty days before that filing is December 30, 2024.

SafeLease did not deny that before December 30, 2024, SafeLease knew of facts that SafeLease asserts establish several independently sufficient grounds for the business court's jurisdiction. Nor did SafeLease deny that it knew it could have initially filed its Original Petition in the business court. Instead, SafeLease argued that post-petition events *also*

support jurisdiction and make SafeLease "even more certain" of jurisdiction. CR550, Opposition to Remand at 15.

There is no basis in statutory text, or the purpose of the deadline, for resetting the 30-day clock every time a party learns additional facts beyond facts sufficient for initially "establishing the business court's jurisdiction." TEX. GOV'T CODE § 25A.006(f)(1).

### 2. SafeLease's own petition, testimony, and emails proved that SafeLease knew of sufficient jurisdictional facts more than 30 days before requesting removal.

SafeLease's petition, testimony, and contemporaneous emails show that it knew of sufficient jurisdictional facts weeks before December 30, 2024.

SafeLease's Verified Original Petition described several independent grounds for jurisdiction that occurred before December 30. In addition, because SafeLease filed that petition *on* December 30, if SafeLease could reasonably have learned the grounds for its Original Petition even one day before filing it, SafeLease's Notice of Removal was untimely. Since the allegations in a *verified* petition are made under penalty of perjury and must

# Exhibit 2

**Allen, Susanna**

---

| | |
|---|---|
| **From:** | Eoff, Elizabeth F. <LEoff@porterhedges.com> |
| **Sent:** | Thursday, January 16, 2025 8:10 AM |
| **To:** | Allen, Susanna |
| **Cc:** | Smith, Shannon; Torgerson, Ray T.; Yetter, Paul; Schamel, Luke; Smith, Alyssa; Alexander, Ken; Summers, Jonna N.; Kumar, Lex N.; Brunelle, Dolores; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com; Smith, Shannon; Torgerson, Ray T.; Yetter, Paul; Schamel, Luke; Smith, Alyssa; Alexander, Ken; Summers, Jonna N.; Kumar, Lex N.; Brunelle, Dolores |
| **Subject:** | Re: Letter Ruling D-1-GN-24-010233 |
| **Attachments:** | image001.png; Agreed Protective Order(1189825.1).docx |

**External Sender** - From: ("Eoff, Elizabeth F." <LEoff@porterhedges.com>)
This message came from outside your organization.

Learn More

Yes, confirmed.

On Jan 16, 2025, at 7:59 AM, Allen, Susanna <sallen@yettercoleman.com> wrote:

Hi Liza, can you please confirm that you are signed off on the Protective Order? If so, we can upload for the Court this morning as a proposed order.

Thanks,
Susanna

**- Susanna
Yetter Coleman LLP
713.632.8009 (office)
662.801.9185 (mobile)**

**From:** Smith, Shannon <ssmith@yettercoleman.com>
**Sent:** Sunday, January 12, 2025 9:06 AM
**To:** Eoff, Elizabeth F. <LEoff@porterhedges.com>; Allen, Susanna <sallen@yettercoleman.com>; Torgerson, Ray T. <RTorgerson@porterhedges.com>; Yetter, Paul <pyetter@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>
**Cc:** Alexander, Ken <KAlexander@porterhedges.com>; Summers, Jonna N. <JSummers@porterhedges.com>; Kumar, Lex N. <LKumar@porterhedges.com>; Brunelle, Dolores <DBrunelle@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com
**Subject:** RE: Letter Ruling D-1-GN-24-010233

Liza,

See attached.

Thanks,

Shannon

**Shannon Smith | Associate | Yetter Coleman LLP**
811 Main Street, Suite 4100, Houston, Texas 77002
(D) 713.632.8066 | (M) 281.770.2697 | (O) 713.632.8000 | www.yettercoleman.com

---

**From:** Eoff, Elizabeth F. <LEoff@porterhedges.com>
**Sent:** Saturday, January 11, 2025 8:52 PM
**To:** Smith, Shannon <ssmith@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>;
Torgerson, Ray T. <RTorgerson@porterhedges.com>; Yetter, Paul <pyetter@yettercoleman.com>;
Schamel, Luke <lschamel@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>
**Cc:** Alexander, Ken <KAlexander@porterhedges.com>; Summers, Jonna N.
<JSummers@porterhedges.com>; Kumar, Lex N. <LKumar@porterhedges.com>; Brunelle, Dolores
<DBrunelle@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com
**Subject:** RE: Letter Ruling D-1-GN-24-010233

Shannon,

Y'all have suggested the last few rounds of edits. Please send us a clean and we can sign off.

Thanks.

**Elizabeth F Eoff** | Associate
**Porter Hedges LLP**

_____
1000 Main St, 36th Floor | Houston, TX 77002
**t** 713.226.6732    **c** 281.630.6388
**e** LEoff@porterhedges.com
Bio • Web • V-Card

---

**From:** Smith, Shannon <ssmith@yettercoleman.com>
**Sent:** Saturday, January 11, 2025 8:46 PM
**To:** Eoff, Elizabeth F. <LEoff@porterhedges.com>; Allen, Susanna <sallen@yettercoleman.com>;
Torgerson, Ray T. <RTorgerson@porterhedges.com>; Yetter, Paul <pyetter@yettercoleman.com>;
Schamel, Luke <lschamel@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>
**Cc:** Alexander, Ken <KAlexander@porterhedges.com>; Summers, Jonna N.
<JSummers@porterhedges.com>; Kumar, Lex N. <LKumar@porterhedges.com>; Brunelle, Dolores
<DBrunelle@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com
**Subject:** RE: Letter Ruling D-1-GN-24-010233

==Thank you, Liza. We agree.== Please send us a clean copy of the PO, and we will review and
affix a signature on our end.

Thanks!

Shannon

**Shannon Smith | Associate | Yetter Coleman LLP**

811 Main Street, Suite 4100, Houston, Texas 77002
(D) 713.632.8066 | (M) 281.770.2697 | (O) 713.632.8000 | www.yettercoleman.com

---

**From:** Eoff, Elizabeth F. <LEoff@porterhedges.com>
**Sent:** Saturday, January 11, 2025 8:38 PM
**To:** Smith, Shannon <ssmith@yettercoleman.com>; Allen, Susanna <sallen@yettercoleman.com>; Torgerson, Ray T. <RTorgerson@porterhedges.com>; Yetter, Paul <pyetter@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>
**Cc:** Alexander, Ken <KAlexander@porterhedges.com>; Summers, Jonna N. <JSummers@porterhedges.com>; Kumar, Lex N. <LKumar@porterhedges.com>; Brunelle, Dolores <DBrunelle@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com
**Subject:** RE: Letter Ruling D-1-GN-24-010233

Shannon,

These changes are acceptable to us.

We agree to abide by the protections of the PO for documents designated Confidential or Outside Counsel's Eyes Only. Please confirm you agree.

Best,

Liza

**Elizabeth F Eoff** | Associate
**Porter Hedges LLP**

_____

1000 Main St, 36th Floor | Houston, TX 77002
**t** 713.226.6732   **c** 281.630.6388
**e** LEoff@porterhedges.com
Bio • Web • V-Card

---

**From:** Smith, Shannon <ssmith@yettercoleman.com>
**Sent:** Saturday, January 11, 2025 6:39 PM
**To:** Eoff, Elizabeth F. <LEoff@porterhedges.com>; Allen, Susanna <sallen@yettercoleman.com>; Torgerson, Ray T. <RTorgerson@porterhedges.com>; Yetter, Paul <pyetter@yettercoleman.com>; Schamel, Luke <lschamel@yettercoleman.com>; Smith, Alyssa <asmith@yettercoleman.com>
**Cc:** Alexander, Ken <KAlexander@porterhedges.com>; Summers, Jonna N. <JSummers@porterhedges.com>; Kumar, Lex N. <LKumar@porterhedges.com>; Brunelle, Dolores <DBrunelle@porterhedges.com>; Dale.Wainwright@gtlaw.com; bernsteinju@gtlaw.com
**Subject:** RE: Letter Ruling D-1-GN-24-010233

Thanks for the quick response, Liza. The attached redline adds our requested changes to paragraph 24. The rest of the redlines are the same as the last version I circulated. Please confirm that these additional changes are acceptable.

Thanks!

Shannon

CAUSE NO. D-1-GN-24-010233

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES, LLC, | § § § | IN THE DISTRICT COURT |
| *Plaintiff,* | § § § | |
| v. | § § § | |
| STORABLE, INC., REDNOVA LABS, INC. (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP, | § § § § § § § | 345TH JUDICIAL DISTRICT |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |

[PROPOSED] AGREED PROTECTIVE ORDER

In order to expedite the flow of discovery material, facilitate the prompt resolution of disputes over confidentiality, adequately protect material entitled to be kept confidential, and ensure that protection is afforded only to material so entitled, entry of this Agreed Protective Order pursuant to Texas Rule of Civil Procedure 192.6 is merited. This Protective Order applies to materials produced in advance of the Temporary Injunction hearing and functions as the operative Protective Order for this matter until such time as this Order is amended or replaced.

It is hereby ORDERED that:

1.     All Confidential Information and Outside Counsel's Eyes Only Information produced or exchanged by the parties in the course of this litigation, including information produced by third parties/non-parties, shall be used solely for the purpose of preparation, trial, and appeal of this litigation and for no other purpose whatsoever, and shall not be disclosed to any person except in accordance with the terms hereof.

2.     "Confidential Information" as used herein means any information of any type,

kind, or character which is designated as "Confidential" by any of the supplying or receiving parties, including third parties/non-parties supplying said information, whether it be a document, information contained in a document, discovery materials, information or testimony revealed during a deposition, or otherwise.

3.　　"Outside Counsel's Eyes Only Information" as used herein means any information that is "Confidential" as described herein and additionally may not be disclosed to anyone except the Qualified Persons described in Paragraph 6, *infra.* "Outside Counsel's Eyes Only Information" includes trade secrets or other non-public, proprietary, or sensitive business or financial information. More specifically, an "Outside Counsel's Eyes Only" designation means that the materials so denoted may not be disclosed to any party or employee, representative, or affiliate of a party, except by agreement or a subsequent Order by this Court.

4.　　In designating information as "Confidential" or "Outside Counsel's Eyes only," a party or third party/non-party supplying information will make such designation only as to that information that it in good faith believes contains "Confidential" or "Outside Counsel's Eyes Only" information. Information or material which is available to the public, including industry materials, advertising materials, and the like shall not be classified as "Confidential" or "Outside Counsel's Eyes Only."

5.　　"Qualified Persons" as used herein for "Confidential Information" means:

(a) Attorneys of record for the parties in this litigation and employees and/or agents of such attorneys to whom it is necessary that the information be shown for purposes of this litigation;

(b) Actual or potential independent experts or consultants (and their administrative or

clerical staff) engaged in connection with this litigation (which shall not include the current employees, officers, members, or agents of the parties or affiliates of the parties) who have signed a document in the form of Exhibit A attached hereto (such signed document to be maintained by the attorney retaining such person);

(c) The parties and their respective in-house counsel, paralegals, legal staff or experts;

(d) The Court and its staff, including court reporters;

(e) Vendors engaged by the parties or the parties' respective counsel, including independent copy services, printers, or illustrators, and court reporters for the purpose of this litigation who have signed a document in the form of Exhibit A attached hereto (such signed document to be maintained by the attorney retaining such person);

(f) The authors and original recipients of the documents or information unless any such person no longer has a right to access or possess any such documents or information by virtue of a change in employment, position, or other circumstance;

(g) The designated corporate representative for the party that produced the documents or information as "Confidential" or "Outside Counsel's Eyes Only"; or

(h) By agreement of the parties, or if this Court so elects, any other person designated as a Qualified Person by order of this Court, after notice to all the parties and hearing.

6. For "Outside Counsel's Eyes Only Information," "Qualified Persons" includes (a),

3

(b), and (d) - (h).

7.    Documents produced in this action may be designated by any party or parties or by any third party and/or non-party producing said documents as "Confidential" or "Outside Counsel's Eyes Only" information by marking each page of the document(s) with the word(s) "Confidential" or "Outside Counsel's Eyes Only."  However, for documents produced in electronic native form, such as Excel spreadsheets, the designation may be affixed to the drive, disk, or other medium on which the documents or materials are produced or in the file names without marking each page of the documents or materials "Confidential" or "Outside Counsel's Eyes Only."

8.    In lieu of marking the original of a document, if the original is not produced, the designating party may mark the copies that are produced or exchanged.

9.    Information disclosed at (a) the deposition of a party or one of its present or former officers, directors, employees, agents or independent experts retained by counsel for the purpose of this litigation, or (b) the deposition of a third party (which information pertains to a party) may be designated by any party, including a third party/non-party disclosing said information or being deposed, as "Confidential" or "Outside Counsel's Eyes Only" information by indicating on the record at the deposition that the testimony is "Confidential" or "Outside Counsel's Eyes Only" and is subject to the provisions of this Order.

10.    Any party or third party/non-party disclosing said information or being deposed may also designate said information disclosed at such deposition as "Confidential" or "Outside Counsel's Eyes Only" by notifying all of the parties, in writing within 30 days of receipt of the transcript, of the specific pages and lines of the transcript which should be

treated as "Confidential" or "Outside Counsel's Eyes Only" thereafter. Each party shall attach a copy of such written notice or notices to the face of the transcript and each copy thereof in his possession, custody or control. All deposition transcripts shall be treated as "Confidential" for a period of 30 days after the receipt of the transcript, apart from any portions designated on the record as "Outside Counsel's Eyes Only," which portions shall be treated as Attorneys' Eyes Only.

11. To the extent possible, the court reporter shall segregate into separate transcripts information designated as "Confidential" or "Outside Counsel's Eyes Only" with blank, consecutively-numbered pages being provided in a non-designated main transcript. The separate transcript containing "Confidential" or "Outside Counsel's Eyes Only" information shall have page numbers that correspond to the blank pages in the main transcript.

12. "Confidential" or "Outside Counsel's Eyes Only" information shall not be disclosed or made available by the receiving party to persons other than Qualified Persons as delineated above. Notwithstanding the foregoing, nothing in this Protective Order restricts the ability of a party and/or third party/non-party to review, disclose, or disseminate its own documents or information as it sees fit.

13. Documents produced prior to entry of this Protective Order may be retroactively designated "Confidential" or "Outside Counsel's Eyes Only" by notice in writing of the designated class of each document by Bates number within 30 days of the entry of this Protective Order. Documents unintentionally produced without designation as "Confidential" or "Outside Counsel's Eyes Only" may be retroactively designated in the same manner and shall be treated appropriately from the date written notice of the designation is provided to the receiving party. The

burden shall be on the party claiming confidentiality to prove the confidential nature of the documents.

14. Documents to be inspected shall be treated as "Confidential" during inspection. At the time of copying for the receiving parties, such inspected documents shall be marked or stamped prominently "Confidential" or "Outside Counsel's Eyes Only" by the producing party.

15. If a receiving party learns of any unauthorized disclosure of "Confidential" or "Outside Counsel's Eyes Only," the party shall immediately upon learning of such disclosure inform the producing party of all pertinent facts relating to such disclosure and shall make all reasonable efforts to prevent disclosure by each unauthorized person who received such information.

16. Nothing herein shall prevent disclosure beyond the terms of this Protective Order if each party or third party/non-party designating the information as "Confidential" or "Outside Counsel's Eyes Only" consents in writing to such disclosure or, if the Court orders such disclosure. Nor shall anything herein prevent any counsel of record from utilizing "Confidential" or "Outside Counsel's Eyes Only" information in the examination or cross-examination of any person who is indicated on the document as being an author, source or recipient of the "Confidential" or "Outside Counsel's Eyes Only" information, or if counsel has a reasonable belief that such person was an author, source or recipient of "Confidential" or "Outside Counsel's Eyes Only" information irrespective of which party or third party/non-party produced such information.

17. A party shall not be obligated to challenge the propriety of a designation as "Confidential" or "Outside Counsel's Eyes Only" at the time made, and a failure to do so shall not preclude a subsequent challenge thereto. In the event that any party to this litigation disagrees at

any stage of these proceedings with the designation by the designating party of any information as "Confidential" or "Outside Counsel's Eyes Only" or the designation of any person as a Qualified Person, the parties shall first try to resolve such dispute in good faith on an informal basis, such as production of redacted copies. If the dispute cannot be resolved, the objecting party may invoke this Protective Order by objecting in writing to the party or third party/non-party who has designated the document or information as "Confidential" or "Outside Counsel's Eyes Only" or designated any person as a Qualified Person. The designating party shall be required to move the Court for an order preserving the designated status of such information or person within 30 business days of receipt of the written objection. The disputed information shall remain "Confidential" or "Outside Counsel's Eyes Only" unless and until the Court orders otherwise. Failure to move for an order shall constitute a termination of the restricted status of such item unless the parties otherwise agree. The party or third party/non-party objecting to disclosure bears the burden of proof to establish the confidentiality of the document.

18.   The parties may, by stipulation, provide for exceptions to this Protective Order, and any party may seek an order of this Court modifying this Protective Order.

19.   Nothing shall be regarded as "Confidential" or "Outside Counsel's Eyes Only" information if it is information that either:

   (a) is in the public domain at the time of disclosure supported by appropriate evidence; or

   (b) becomes part of the public domain through no fault of the other party, as supported by appropriate evidence.

20.   To the extent documents containing "Confidential" Information or "Outside

Counsel's Eyes Only" Information are filed before trial, in this or any other Court, or the substance of "Confidential" or "Outside Counsel's Eyes Only" Information is revealed in papers filed in this or any other Court, or in the transcript of any proceedings, those documents, materials, or transcripts shall be filed in camera in an envelope marked "CONFIDENTIAL," and this Order serves as a temporary sealing order, sealing such "Confidential" or "Outside Counsel's Eyes Only" Information under Rule 76a without the need for a separate motion or order. The temporary sealing order provided for under this paragraph will expire thirty days following the filing of the "Confidential" or "Outside Counsel's Eyes Only" Information unless the Designating Party moves for an order permanently sealing such material in accordance with Rule 76a prior to the expiration of such thirty-day period and thereafter complies with the permanent sealing requirements of Rule 76a. The party filing such materials in camera shall include the Bates Numbers of the specific documents used in the pleading filed and served to ensure the other parties will know which "Confidential" or "Outside Counsel's Eye Only" materials are being filed in camera. Any pleading or attachment filed in camera shall be served on Counsel by email.

21.    Unless otherwise agreed to in writing by the parties or ordered by the Court, all proceedings involving or relating to "Confidential" or "Outside Counsel's Eyes Only" documents or information shall be subject to the provisions of this Protective Order.

22.    After the conclusion of this litigation and any appeal thereof, any "Confidential" or "Outside Counsel's Eyes Only" documents and all copies or reproductions of such documents produced by a party or third party/non-party in the possession of any of the "Qualified Persons" shall be returned to the producing party or third party/non-party within 60

days of receipt of a timely written request by said producing party or third party/non-party, except as this Court may otherwise order or to the extent such information was used as evidence at the trial. As far as the provisions of any protective orders entered in this action restrict the communication and use of the documents produced thereunder, such orders shall continue to be binding after the conclusion of this litigation, except (a) that there shall be no restriction on documents that are used as exhibits in open court, and (b) that a party may seek the written permission of the producing party or order of the Court with respect to dissolution or modification of such protective orders. Alternatively, at the conclusion of this litigation, in lieu of the actual physical return of "Confidential" or "Outside Counsel's Eyes Only" documents, counsel for each party may provide a certification certifying that (1) all experts and any other person(s) receiving "Confidential" or "Outside Counsel's Eyes Only" documents have been instructed to delete or destroy all documents; and (2) all "Confidential" or "Outside Counsel's Eyes Only" documents in the possession of counsel have been deleted or destroyed.

23. Any party designating any person as a "Qualified Person" shall have the duty to reasonably ensure that such person observes the terms of this Protective Order.

24. For purposes of the Temporary Injunction hearing currently scheduled to take place on January 16, 2025, or any subsequent hearing in the case, if any party intends to discuss or offer a document or information marked as "Outside Counsel's Eyes Only," the offering party must alert opposing counsel and the Court of its intent to discuss or offer the document or information, and all persons who are not authorized under this Order to view the document will be excused during any discussion of such document or information. For purposes of any trial before a jury, the parties will propose to the Court an appropriate protocol for handling of such document or information.

Signed this _____ day of _____, 2025.

_____
Judge Presiding

**APPROVED AS TO FORM AND ENTRY REQUESTED:**

*/s/ Ray T. Torgerson*
Ray T. Torgerson SBN: 24003067
N. Kenneth Alexander SBN: 00996600
Jonna N. Summers SBN: 24060649
Elizabeth "Liza" Eoff SBN: 24095062
Lakshmi N. Kumar SBN: 24144581
Porter Hedges LLP
1000 Main Street, 36Th Floor
Houston, Texas 77002
713-226-6650
713-226-6250 (fax)
rtorgerson@porterhedges.com
kalexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
lkumar@porterhedges.com

**ATTORNEYS FOR DEFENDANTS**

*/s/ R. Paul Yetter*
R. Paul Yetter SBN: 22154200
Susanna R. Allen SBN: 24126616
Luke A. Schamel SBN: 24106403
Shannon N. Smith SBN: 24110378
Yetter Coleman LLP
811 Main Street, Suite 4100
Houston, Texas 77002
713-632-8000
pyetter@yettercoleman.com
sallen@yettercoleman.com
lschamel@yettercoleman.com
ssmith@yettercoleman.com

**ATTORNEYS FOR PLAINTIFFS**

**CAUSE NO. D-1-GN-24-010233**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES, LLC, | § § § § § | IN THE DISTRICT COURT |
| *Plaintiff,* | § § | |
| v. | § § | |
| STORABLE, INC., REDNOVA LABS, INC. (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP, | § § § § § § § | 345TH JUDICIAL DISTRICT |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |

### EXHIBIT A

### AGREEMENT TO BE BOUND BY TERMS OF PROTECTIVE ORDER

My name is, _____, my date of birth is _____, and my address is, _____. I have read and am familiar with the terms of the Protective Order concerning the records and testimony produced by the respective parties in this case, and I agree to abide by all terms of said Protective Order and not to reveal or otherwise communicate any of the information disclosed to me pursuant thereto to anyone except in accordance with the terms of said Protective Order. I agree not to make any use of that information or materials other than for the purpose of this litigation.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Executed in _____ County, State of _____

Date:

# Exhibit 3

REPORTER'S RECORD

VOLUME 3 OF 13 VOLUMES

CAUSE NO. 15-25-00020-CV
TRIAL COURT CAUSE NO. 25-BC03A-0001
IN THE FIFTEENTH COURT OF APPEALS
Sitting at Austin, Texas

STORABLE, INC.; REDNOVA LABS, INC.
(D/B/A STOREDGE); SITELINK SOFTWARE, LLC;
EASY STORAGE SOLUTIONS, LLC; BADER CO.;
AND PROPERTY FIRST GROUP, LP

V.

SAFELEASE INSURANCE SERVICES, LLC

------------------------------------------------------------

REPORTER'S RECORD

FEBRUARY 11, 2025

------------------------------------------------------------

On the 11th day of February, 2025, the hearing on Discovery Motions and a Temporary Injunction came on to be heard in the above-entitled and -numbered cause; and the following proceedings were had before the Honorable Melissa Andrews, Judge Presiding, held in Austin, Travis County, Texas:

Proceedings reported by computerized stenotype machine; Reporter's Record produced by computer-assisted transcription.

KIMBERLY KIDD, DEPUTY COURT REPORTER
kkidd295th@live.com

MR. TORGERSON: Well, in particular the contract is in evidence and I would like to show it to him, just to confirm the percentage split. He signed it, and it's been produced in this case. It has been designated by them under the Rule 11 agreement, which is acting like a protective order.

And to be clear there are really sort of two issues that I hear Mr. Hilton raising. His company's internal confidential information, I'm not going there at all. This is commercial information between the plaintiff SafeLease and MyStorage.

MR. HILTON: If he's going to talk about an exhibit that's in evidence that is subject to the protective order, no issue.

THE COURT: I think maybe to get started, because that way you don't feel like you're on the spot and having to decide these control issues for the first time.

THE WITNESS: Okay.

THE COURT: Since it's already in evidence, we'll go at it that way and make everybody most comfortable.

MR. TORGERSON: Yes, Your Honor.

(Whereupon, after those people falling under the rule left the courtroom, the following

KIMBERLY KIDD, DEPUTY COURT REPORTER
kkidd295th@live.com

# Exhibit 4



## ABOUT US

Storable is the leading brand behind SiteLink, storEDGE, SpareFoot, Storsmart/Bader, and more. We proudly deliver a powerful, integrated suite of technology – The Storable Platform.

CONTACT US

PLAY VIDEO

**EXHIBIT**

**P-185**

25-BC03A-0001

exhibitsticker.com

### HELPING SELF STORAGE OWNERS DO MORE

Empowering business owners with information is why we come to work every day. It's our job to make your job easier and more effective. To give you more. More time back in your day, more revenue, more control, more access to leading technology. Whatever you need — we provide more. So, you can run your business better than you ever thought possible.

### OUR MISSION

**Empowering Business Owners**

SAFELEASE0036082

We help self-storage owners of every size solve problems and run their businesses more efficiently and effectively. Our comprehensive suite of tools provides more time back in your day to help you run your business with complete control.

## WHAT WE BELIEVE

**We Believe You Can:**

Maximize Revenue at Your Storage Facility

Run Your Storage Business More Efficiently

Create a Five Star Tenant Experience

## OUR VISION

**Driven to Innovate**

Being the first to innovate in our category is what drives us and leads us to ask, "what's next?" How can we create better tools and experiences for our customers? Being on the leading-edge only means the view is wide open to dream bigger and better.

SAFELEASE0036083

# 550+

Storable proudly employs over 550 employees, or as we like to call them, Storriors.

# 15,000

The storage industry runs on Storable. We're proud to have 15,000 customers rely on us to Do More every day.

# 41 & 3

Currently, our employees hail from a total of 41 states and 3 different countries. They make it happen, no matter where they are.

# 36,000

That's the number of self-storage facilities that are currently managed with Storable Software. That number increases every year.

# 50

Our storriors love their pets and between them all they count over 50 different dog breeds as a part of their families.



**LOCATIONS**

## AUSTIN, TX

As a virtual tech company, we're based wherever our people can connect to WiFi and make magic happen. However, we are headquartered in Austin, Texas, with an actual office, if you'd like to send us a postcard.

**Headquarters**

10900 Research Blvd Ste 160C PMB 3099
Austin, TX 78759

## ADDITIONAL LOCATIONS

**NORTH CAROLINA**
**MISSOURI**
**KANSAS**
**TEXAS**
**COLORADO**
**PENNSYLVANIA**
**INDIANA**
**UTAH**
**ILLINOIS**

SAFELEASE0036084

# DO MORE WITH POWERFUL TECHNOLOGY.

**CONTACT US** →



**ABOUT US**
Our Story
Our Culture
Leadership
Corporate Responsibility
Careers

**SOLUTIONS**
Marketing
Operations

**PRODUCTS**
Management Software
Access Control
Storage Marketplace
Insurance Solutions
Facility Websites
Payment Processing

**RESOURCES**
Help
Learn
Connect

News
Contact
Support
Request a Demo
Storage Beat

**Storable.**

© Copyright 2024 Storable. All rights reserved.
Privacy | Security

    

SAFELEASE0036085

# Exhibit 5

PORTIONS OF TRANSCRIPT MARKED CONFIDENTIAL
ATTORNEYS' EYES ONLY

CAUSE NO. D-1-GN-24-010233

| SAFELEASE INSURANCE | § | IN THE DISTRICT COURT |
| SERVICES LLC | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| STORABLE, INC., ET AL | § | 345TH JUDICIAL DISTRICT |

ORAL DEPOSITION OF CHARLES GORDON

January 14, 2025

PORTIONS OF TRANSCRIPT MARKED CONFIDENTIAL

ATTORNEYS EYES ONLY

ORAL DEPOSITION OF CHARLES GORDON, produced as a witness at the instance of the Plaintiff and duly sworn, was taken in the above-styled and numbered cause on January 14, 2025, from 9:28 a.m. to 2:56 p.m., before Annette E. Escobar, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at the offices of Greenberg Traurig, LLP, 300 W. 6th St., Suite 2050, Austin, Texas 78701, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 1



MR. SCHAMEL: Okay. Can we go off the record very briefly to let them back in?

THE COURT REPORTER: We're off the record, 9:44 a.m.

Page 14

(Brief pause.)

THE COURT REPORTER: We're on the record, 9:49 a.m.

Q. (By Mr. Schamel) Mr. Gordon, when -- just to be clear, for questions going forward, when I say you, I'm referring to you as corporate rep on behalf of defendants unless I say otherwise, okay?

A. Understood.

Q. Okay. So you offer a three facility management software products, true?

A. That's true.

Q. Is it okay if I call them FMS for short?

A. Sure.

Q. It's SiteLink?

A. Correct.

Q. Storage?

A. Correct.

Q. And Easy Storage Solutions or ESS?

A. Correct.

Q. Today how many self-storage facilities in the United States use your FMS products?

A. Roughly 33,000.

Q. I think I saw on your website that it says 36,000. Are you aware of that?

A. I'm not aware of that.

Page 15

Q. Like, the number that you just gave is more up to date than what is on the website?

A. That's the up-to-date number.

Q. Okay. How many facilities use each of your FMS products? So first for SiteLink.

A. This is a rough split, but it's 12- or 13,000 SiteLink, ten-ish thousand Easy, and the rest -- 10 or 12,000 Easy and the rest Storage.

Q. Got it. Do you know how many -- roughly, how many total actual storage units that entailed between the three of them?

A. Rough -- well, I don't know the exact number from today, but I know that we, we did cross the ten million-unit threshold in the last 12 months.

Q. How many self-storage facilities have used each of your, your FMS products in each year dating back to when you first acquired them? So If we can just walk through year by year, you will be able to give me the numbers?

MR. TORGERSON: Objection, form.

A. Yeah. No, I can't remember that.

Q. All right. Is that information you can get us?

MR. TORGERSON: We'll take that under advisement.

Q. Is that information you can get us?

Page 16

A. We'll take it under advisement.

Q. Can you get us that information?

A. How many we had in any given year?

Q. Yeah. So dating back to when you first acquired each of the FMS products, so SiteLink in 2018, ESS in 2020 and Storage in 2018, how many facilities used each product in each year since acquisition?

MR. TORGERSON: We'll see.

A. By day? By month?

Q. By year.

A. By year? So still to pinpoint in a year, I'm sure there's some way to get some data most likely, but it's going to be kind of dependent on how you look at it.

Q. Pick a time at the end of the year each year.

A. Probably can do that.

Q. Is that information you can get us then?

A. We'll need to talk to counsel.

MR. TORGERSON: We will -- we will work on that, counsel.

Q. You can answer the question.

MR. TORGERSON: I just answered the question.

MR. SCHAMEL: I'm asking him the question.

Page 17

5 (Pages 14 - 17)

# Exhibit 6

**REPORTER'S RECORD**

**VOLUME 4 OF 7 VOLUMES**

**TRIAL COURT CAUSE NO. 25-BC03A-0001**

**APPELLATE CASE NO. 15-25-00020-CV**

_____

SAFELEASE INSURANCE SERVICES, LLC   :   TEXAS BUSINESS COURT

     Plaintiff,   :

v.   :

  :   DIVISION 3A

STORABLE, INC., REDNOVA LABS, INC., :
(d/b/a STOREDGE), SITELINK SOFTWARE, :
LLC, EASY STORAGE SOLUTIONS, LLC, :
BADER CO., AND PROPERTY FIRST GROUP, :
LP   :   TRAVIS COUNTY, TEXAS

     Defendants.   :

_____

**TEMPORARY INJUNCTION HEARING**

_____

On the 13th day of February, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Melissa Andrews, Judge Presiding, held in person in Austin, Travis County, Texas.

Proceedings reported by stenographic machine shorthand.

Donna A. Goree, CSR, RPR, CRR  (979) 533-0422

market shares to have the right numerator and the right denominator. If you have a numerator that is too high, that's going to make the shares look higher than they are. If your numerator is too low, it's also going to make the share look higher.

Q. So, let's talk about Dr. Williams' numerator. What is your understanding of what he used and what he was measuring?

A. Yes, he was looking at the number of facilities that use Storable FMS, one of the Storable FMS products; and his number was 36,000.

Q. Okay. And based on your examination of the data, is that an accurate number?

A. No.

Q. Why not?

A. So, yeah. I had data available to me that showed that the number was 30,000. And I think we agreed if we could put up the exhibit, because I don't remember the numbers by heart; but it was 30,800 something. Yeah, 30,000 -- I was pretty close. Yeah, 30,806.

And one of the reasons for the discrepancy is because the numerator that Dr. Williams was including was non-U.S. customers; and that's important because his denominator and the way he defined the market was around U.S. customers. Right? So, you need to do apples to apples between



## The Business Court of Texas,
## Third Division

SAFELEASE INSURANCE     §
SERVICES LLC,     §
    §
     *Plaintiff,*     §
    §    Cause No. 25-BC03A-0001
v.     §
    §
STORABLE, INC., et al.,     §
    §
     *Defendants.*     §

### Notice of Submission

Storable's Motion for Extension of Stay has been set for written submission on **Monday, June 30, 2025, at 10:00 a.m.** Any response should be filed by **Thursday, June 26, 2025.** The reply, if any, should be filed no later than the submission deadline.

Date signed: June 20, 2025

_____
Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 102228708
Filing Code Description: No Fee Documents
Filing Description: Notice of Submission - Motion for Extension of Stay
Status as of 6/20/2025 10:00 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 6/20/2025 9:31:28 AM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 6/20/2025 9:31:28 AM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 6/20/2025 9:31:28 AM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 6/20/2025 9:31:28 AM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 6/20/2025 9:31:28 AM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 6/20/2025 9:31:28 AM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 6/20/2025 9:31:28 AM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 6/20/2025 9:31:28 AM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 6/20/2025 9:31:28 AM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 6/20/2025 9:31:28 AM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 6/20/2025 9:31:28 AM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 6/20/2025 9:31:28 AM | SENT |
| Judd Stone | | Judd@stonehilton.com | 6/20/2025 9:31:28 AM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 6/20/2025 9:31:28 AM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 6/20/2025 9:31:28 AM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 6/20/2025 9:31:28 AM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 6/20/2025 9:31:28 AM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 6/20/2025 9:31:28 AM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 6/20/2025 9:31:28 AM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 6/20/2025 9:31:28 AM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 6/20/2025 9:31:28 AM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/20/2025 9:31:28 AM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 102228708
Filing Code Description: No Fee Documents
Filing Description: Notice of Submission - Motion for Extension of Stay
Status as of 6/20/2025 10:00 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/20/2025 9:31:28 AM | SENT |
| Cathy Hodges | | catherine.hodges@aporter.com | 6/20/2025 9:31:28 AM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 6/20/2025 9:31:28 AM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 6/20/2025 9:31:28 AM | SENT |
| Adam Locke | | adam@lockelaw.com | 6/20/2025 9:31:28 AM | SENT |
| John Holler | | john.holler@arnoldporter.com | 6/20/2025 9:31:28 AM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 6/20/2025 9:31:28 AM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 6/20/2025 9:31:28 AM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 6/20/2025 9:31:28 AM | SENT |
| Julia C.Risley | | jrisley@yettercoleman.com | 6/20/2025 9:31:28 AM | SENT |

E-filed in the Office of the Clerk
for the Business Court of Texas
6/23/2025 8:28 AM
Accepted by: Alexis Jennings
Case Number: 25-BC03A-0001

**1046**

**The Business Court of Texas,
Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § | |
| *Plaintiff,* | § § | |
| *v.* | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § § | |
| *Defendants.* | § § | |

---

**Storable's Reply in Support of its Motion for
Partial Reconsideration of the May 28, 2025 Discovery Order**

---

**I.    Storable Did Not Waive Privilege**

Waiver is an "intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Paxton v. City of Dallas*, 509 S.W.3d 247, 263 (Tex. 2017). "[T]he burden of proof is on the party relying on the waiver." *Lang v. Lee*, 777 S.W.2d 158, 164 (Tex. App.—Dallas 1989, no writ). Trade secret privilege is extraordinarily difficult to waive. Even disclosure of the trade secret itself is not necessarily waiver. *HouseCanary, Inc. v. Title Source, Inc.*, 622 S.W.3d 254, 266 (Tex. 2021). SafeLease's waiver argument is that Storable did not use the exact "magic words" at the exact right moment. This is not how privilege works.

First, SafeLease offers no evidence of waiver and instead asks the Court to infer waiver based on the timing of when Storable asserted a trade secret. That's not enough to waive **privilege**. "The Texas Rules of Civil Procedure are designed to avoid waivers of privilege." *In re Fisher & Paykel Appliances, Inc.*, 420 S.W.3d 842, 849 (Tex. App.—Dallas 2014, orig. proceeding). The Supreme Court has held that even a party "**missing a statutory deadline does not mirror any of the conduct our rules and case law recognize as waiving a privilege**" and that mere "delay,"

absent actual disclosure, is not waiver. *Paxton*, 509 S.W.3d at 263 (emphasis added). These authorities foreclose SafeLease's waiver claim.

Second, Storable has adequately asserted that the FMS customer list is a trade secret. Its response to RFP 10 objected that the request sought "confidential, proprietary, and commercially sensitive information of the highest degree." R&O to Plf's RFPs (04/21/25) (excerpt at **Ex. B**). Storable also objected to production of privileged documents. *Id.* Storable's response to SafeLease's pre-motion letter argued it should not have to produce the list, "a highly confidential document… to a hostile competitor"—*i.e.*, trade secret privilege. Pre-Mot. Response (05/23/25). Because customer lists are "generally recognize[d]" as trade secrets, Storable's repeated objections are factually sufficient. *Houston Livestock Show & Rodeo, Inc. v. Delcefino Commc'ns, LLC*, 702 S.W.3d 675, 690 (Tex. App.—Houston [1st Dist.] 2024, no pet.). SafeLease's emphasis on the specific phrase "trade secret," Res. 2, is misleading and unsupported. Asserting a privilege does not require "magic words." *Univ. of Tex. Sys. v. Franklin Ctr. for Gov'l & Pub. Integrity*, 675 S.W.3d 273, 285 (Tex. 2023).

Third, SafeLease is wrong that Storable did not follow Rule 193.3. Rule 193.3 allows a privilege to be stated in a discovery response or a "separate document." Tex. R. Civ. P. 193.3(a). Beyond the multiple objections in its discovery responses and pre-motion letter noted above, Storable filed several additional "separate documents" asserting trade secret privilege. Mot. Partial Stay (06/06/25); Mot. Partial Recons. (06/06/25); Mot. Partial Stay Reply (06/12/25); Mot. Ext. Stay (06/17/25).

Fourth, "[t]he rules **do not set a time limit for asserting a privilege**." *In re Halliburton Ener. Servs., Inc.*, 2022 WL 2513478, at *5 (Tex. App.—Houston [1st Dist.] Jul. 7, 2022, orig. proceeding) (emphasis added) (citing cases). The cases SafeLease cites regarding forfeiture are

inapposite. The defendant in *In re Anderson* delayed asserting privilege for over a year. *In re Soto* involved a party who failed to assert <u>any</u> objection or privilege. *Scrivner v. Casseb* occurred ten years before Rule 193.3 became effective.

## II.     The Agreed Protective Order Does Not Bar Trade Secret Privilege

SafeLease is wrong that the agreed protective order bars Storable's trade secret privilege. *In re Continental Gen. Tire, Inc.* rejected this exact argument, holding that because "Continental was willing to produce certain information under a protective order does not mean that Continental has waived its right to assert Rule 507 about other information which it may regard as more competitively sensitive or less necessary for the plaintiffs' case." 614 S.W.2d 609, 614 (Tex. 1998).

Further, contrary to SafeLease's assertions, the entry of a "protective order with respect to trade secret information does not dispense with the requesting party's burden to establish the necessity for the discovery of the trade secret information to fairly adjudicate a claim." *In re Hewlett Packard*, 212 S.W.3d 356, 364 (Tex. App.—Austin 2006, no pet.).

## III.    The List is a Trade Secret

SafeLease does not dispute the FMS customer list is kept secret, Res. 5–8, so the first element of trade secret protection is undisputed. *See* Mot. 4–5. SafeLease contests only the second element—whether the list derives value from its secrecy. Res. 5–8. SafeLease's arguments fail. The list would provide competitors with "customer leads, insight into Storable's presence in different geographic regions," and "[w]ithout this list, the competitor may not otherwise know that a facility is a Storable customer or be able to leverage that information in its negotiations with potential customers." Mot. 7, Ex. A ¶ 9.

Even if self-storage facilities generally can be identified by internet searches, Res. 8, Storable's list of its FMS customers is still a trade secret. The list has immense economic value to

Storable's competitors, like SafeLease, as a rich source of potential customers to target. SafeLease actively targets Storable FMS customers for new tenant insurance business. *See* Mot. 7. Storable has invested resources in educating its FMS customers about tenant insurance and its other offerings. 02/14/25 Tr. 153:13–154:10 (Gordon) (excerpt at **Ex. C**). Storable FMS customers that use a Storable tenant insurance product are particularly valuable for someone like SafeLease to steal because they generate more revenue. *See id.* Further, SafeLease is actively encouraging Storable FMS customers to switch to other FMS providers. *See* Mot. 7. The argument that Storable doesn't derive value from the list remaining confidential or that the list has no economic value for Storable's competitors is absurd. Res. 7. For more detail, Storable submits a supplemental declaration from Mr. Gordon, attached as **Exhibit D.**

Storable's FMS customer list is totally different from a public marketplace like Sparefoot, which is designed to help individuals find self-storage facilities. *See* Res. 8. The list SafeLease improperly seeks cannot be found through public searches and would enable Storable's competitors to know and target facilities that Storable has invested in. **Ex. D**.

## IV. SafeLease Does Not Need the List

SafeLease must demonstrate "with specificity exactly" how not obtaining the list would impair its case. *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732–33 (Tex. 2003) (orig. proceeding). SafeLease's insistence that the list is "essential to SafeLease's attempted monopolization claim" to "establish [] defendants' FMS market share" is wrong and not specific enough. Res. 8–9.

First, SafeLease doesn't explain why Storable's proposed alternatives are insufficient. They purportedly distrust Storable's representations about its number of FMS customers, Res. 9; however, Storable offered to (i) have the number verified by a neutral, secure third party with temporary access to the list, or even to (ii) allow **SafeLease's own expert** to review the list, in-

person or remotely, while it remains in Storable's custody.  Pre-Mot. Response (05/23/25).  Given that SafeLease only needs the number of Storable's FMS customers to calculate its FMS market share, SafeLease has never explained why these other methods are inadequate.

Second, there is no "sword and shield" problem here.  SafeLease fails to identify a **single issue** in the Partial MSJ for which they need the list.  There are none.  The Partial MSJ moves on elements unrelated to FMS market share.  *See* Mot. to Ext. Stay (06/18/25).  The sword-and-shield doctrine applies only when information over which privilege is asserted is "outcome-determinative."  *Paxton*, 509 S.W.3d at 264.  The list is not outcome determinative if summary judgment is appropriate on unrelated grounds.

Respectfully submitted June 23, 2025.

*/s/ Katherine G. Treistman*
Katherine G. Treistman
State Bar No. 00796632
Andrew D. Bergman
State Bar No. 24101507
Mikaila Skaroff (admitted *pro hac vice*)
John Holler (admitted *pro hac vice*)
**ARNOLD & PORTER KAYE SCHOLER LLP**
700 Louisiana Street, Suite 4000
Houston, Texas 77002–2755
Tel.: (713) 576–2400
Fax: (713) 576–2499
Katherine.Treistman@arnoldporter.com
Andrew.Bergman@arnoldporter.com
Mikaila.Skaroff@arnoldporter.com
John.Holler@arnoldporter.com

Ray T. Torgerson
State Bar No. 24003067
Neil Kenton Alexander
State Bar No. 00996600
Jonna N. Summers
State Bar No. 24060649
Elizabeth "Liza" Eoff
State Bar No. 24095062
Lakshmi N. Kumar
State Bar No. 24144581

**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Tel.: (713) 226–6000
Fax: (713) 226–6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
ljumar@porterhedges.com

Dale Wainwright
State Bar No. 00000049
Justin Bernstein
State Bar No. 24105462
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel.: (512) 320–7240
Fax: (512) 320–7240
Dale.wainwright@gtlaw.com
bernsteinju@gtlaw.com

*Counsel for Defendants*

### Certificate of Compliance

I hereby certify that this document complies with Local Rule 5(a) and contains 1,250 words, excluding the case caption, any index, table of contents or table of authorities, signature blocks, attached evidence, or any required certificates.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

### Certificate of Service

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon counsel of record in accordance with the Texas Rules of Civil Procedure on June 23, 2025.

*/s/ Katherine G. Treistman*
Katherine G. Treistman

# Exhibit B

**The Business Court of Texas,
Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff,* | § § § | |
| *v.* | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § § | |
| *Defendants.* | § § | |

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF SAFELEASE
INSURANCE SERVICES, LLC'S FIRST MERITS REQUEST FOR PRODUCTION**

Defendants Storable, Inc.; RedNova Labs, Inc.; SiteLink Software, LLC; Easy Storage Solutions, LLC; Bader Co.; and Property First Group, LP ("Storable" or "Defendants") hereby submit the following objections and responses to the First Set of Merits Requests for Production served by Plaintiff SafeLease Insurance Services, LLC ("SafeLease" or "Plaintiff"). These responses will be amended and/or supplemented in accordance with the Texas Rules of Civil Procedure.

**OBJECTIONS TO DEFINITIONS**

1. Storable objects to each of SafeLease's Definitions as overbroad, unduly burdensome, and unreasonable to the extent that SafeLease seeks information outside the scope of discovery or otherwise purports to impose discovery obligations beyond those set forth in the Texas Rules of Civil Procedure. Storable will therefore construe these requests as seeking non-privileged information within the bounds of the Texas Rules of Civil Procedure.

2. Storable objects to the Definition of "API" as vague and ambiguous.

3. Storable objects to the Definition of "Authorized User" as inaccurate and argumentative.

4. Storable objects to the Definitions of "Defendants," "you," and "your" as overbroad, unduly burdensome, and unreasonable to the extent SafeLease seeks information in the possession, custody, or control of any third-party or all/any employees. Storable further objects to these definitions to the extent they include Storable's attorneys, agents,

consultants, representatives, and advisors, whether past or present, who have facilitated or provided legal advice to Storable. Storable will therefore construe the requests as seeking non-privileged, responsive documents in the possession, custody, or control of Storable.

5. Storable objects to the Definitions of "Document," and/or "Documents," to the extent such Definitions cause any request to seek irrelevant information, render any request overbroad, unduly burdensome, or disproportionate to the needs of this case, are duplicative, or purport to require the disclosure of information protected by the attorney-client privilege, the work-product doctrine, or other applicable immunities. Storable will construe requests employing these definitions as seeking non-privileged information, reasonably giving words their ordinary meaning consistent with the Texas Rules of Civil Procedure.

6. Storable objects to the Definition of "Facility management software" in that it improperly characterizes facility management software as covering only products offered by Defendants.

7. Storable objects to the Definition of "Facility management software market" as calling for a legal conclusion.

8. Storable objects to the Definition of "Tenant insurance" as vague and ambiguous.

9. Storable objects to the Definition of "Tenant insurance market" as vague and ambiguous and calling for a legal conclusion.

## OBJECTIONS TO INSTRUCTIONS

1. Storable objects to each of SafeLease's Instructions as overbroad, unduly burdensome, and unreasonable to the extent that SafeLease seeks information outside the scope of discovery or otherwise purports to impose discovery obligations beyond those set forth in the Texas Rules of Civil Procedure, including with respect to the production of native documents. Storable will therefore construe these requests as seeking non-privileged information within the bounds of the Texas Rules of Civil Procedure.

2. Storable objects to SafeLease's Instructions to the extent that it seeks information that is not in Storable's possession, custody, or control.

## RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION

**Request for Production No. 1:**

All documents that reflect communications with any customer, tenant, or other third-party (including consultants and the like) regarding SafeLease. This includes complaints or feedback regarding SafeLease's access to your facility management software, discussions about purported performance or security issues caused by SafeLease's access to your facility management software, discussions about any technical restrictions put in place to limit SafeLease's access to

selling of facility management software with any other product and restricting or controlling access to any other product or service offered by you.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 9:**

All documents concerning your strategy, decision making, business plans, or analyses concerning API access pricing for Third-Party Insurance Vendors or SafeLease.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the term "API access pricing" as vague and ambiguous. Storable further objects to the extent this Request calls for the disclosure of any information protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 10:**

Documents sufficient to show all self-storage facilities that use your facility management software, including addresses for those facilities.

**RESPONSE:**

Storable objects to this Request as seeking irrelevant information, overbroad, unduly burdensome, and not proportional to the needs of the case, as well as on the basis that it seeks confidential, proprietary, and commercially sensitive information of the highest degree. This Request seeks expansive information not related to the dispute at issue in this case. Storable further objects that this Request seeks confidential information of non-parties to this lawsuit. Storable further objects to the extent this Request seeks documents outside of Storable's possession, custody, or control.

Subject to and without waiving the foregoing objections, Storable will not produce documents in response to this Request.

**Request for Production No. 11:**

Documents sufficient to show all self-storage facilities that you contend constitute the relevant market for purposes of this dispute.

**RESPONSE:**

Storable objects to this Request as overbroad, unduly burdensome, and not proportional to the needs of the case. Storable further objects to the term "relevant market" as vague and ambiguous. Storable further objects to this Request as calling for a legal conclusion. Storable further objects to the extent this Request seeks documents outside of Storable's possession, custody, or control.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

**Request for Production No. 12:**

Documents sufficient to show all Authorized Users on your storEDGE and SiteLink facility management software during the relevant time period.

8

protected by the attorney-client privilege or the work-product doctrine; Storable will construe this Request as not seeking the disclosure of privileged or protected information.

Subject to and without waiving the foregoing objections, Storable will produce non-privileged, responsive documents in its possession, custody, and control based on a reasonable and good faith investigation.

Respectfully submitted April 21, 2025.

*/s/ Mikaila Skaroff*
Katherine G. Treistman
State Bar No. 00796632
Andrew D. Bergman
State Bar No. 24101507
**ARNOLD & PORTER KAYE SCHOLER LLP**
700 Louisiana Street, Suite 4000
Houston, Texas 77002–2755
Tel.: (713) 576–2400
Fax: (713) 576–2499
Katherine.Treistman@arnoldporter.com
Andrew.Bergman@arnoldporter.com

Mikaila Skaroff (*admitted pro hac vice*)
Colorado Bar No. 60688
**ARNOLD & PORTER KAYE SCHOLER LLP**
1144 Fifteenth St, Suite 3100
Denver, Colorado 80202
Tel.: (303) 863–1000
Fax: (303) 863–2301
Mikaila.Skaroff@arnoldporter.com

Ray T. Torgerson
State Bar No. 24003067
Neil Kenton Alexander
State Bar No. 00996600
Jonna N. Summers
State Bar No. 24060649
Elizabeth "Liza" Eoff
State Bar No. 24095062
Lakshmi N. Kumar
State Bar No. 24144581
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002

Tel.: (713) 226–6000
Fax: (713) 226–6000
rtorgerson@porterhedges.com
ken.alexander@porterhedges.com
jsummers@porterhedges.com
leoff@porterhedges.com
ljumar@porterhedges.com

Dale Wainwright
State Bar No. 00000049
Justin Bernstein
State Bar No. 24105462
**GREENBERG TRAURIG LLP**
300 West 6th Street, Suite 2050
Austin, Texas 78701
Tel.: (512) 320–7240
Fax: (512) 320–7240
Dale.wainwright@gtlaw.com
bernsteinju@gtlaw.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record on April 21, 2025.

*/s/ Mikaila Skaroff*
Mikaila Skaroff

# Exhibit C

**REPORTER'S RECORD**

**VOLUME 5 OF 7 VOLUMES**

**TRIAL COURT CAUSE NO. 25-BC03A-0001**

**APPELLATE CASE NO. 15-25-00020-CV**

_____

| | |
|---|---|
| SAFELEASE INSURANCE SERVICES, LLC | : TEXAS BUSINESS COURT |
| Plaintiff, | : |
| v. | : |
| | : DIVISION 3A |
| STORABLE, INC., REDNOVA LABS, INC., (d/b/a STOREDGE), SITELINK SOFTWARE, LLC, EASY STORAGE SOLUTIONS, LLC, BADER CO., AND PROPERTY FIRST GROUP, LP | : |
| Defendants. | : TRAVIS COUNTY, TEXAS |

_____

**TEMPORARY INJUNCTION HEARING**

_____

On the 14th day of February, 2025, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Melissa Andrews, Judge Presiding, held in person in Austin, Travis County, Texas.

Proceedings reported by stenographic machine shorthand.



Q. Explain to the Court the value of a Storable insurance customer with regard to this pricing model.

A. Sure. So, I think there is a few components to that, and this is important. First is that you have to put yourself in the shoes and mindset of a self-storage owner. Historically, they may not know about the existence of tenant insurance or tenant protection at all.

Our team has spent years and years going out to market, talking to our customers, educating them about what this concept is in the first place. Once we convince them that this is a good idea for them to do, then we bring them into our team. We spend time and resources training them up so that their managers can understand so that they can go amend all of

their leases to include the language that they need to have. We get that all set up in the system. We then help them get their enrollment rate up. We help them start making more money from this platform.

And so generally speaking, a customer that has been on Storable insurance has benefited from all of this investment that we have put in; and, therefore, they are producing more than the average customer and are more valuable to a different insurance company if they were to then take that customer from us.

Q. That last point that you made, Mr. Gordon, had we heard evidence from different witnesses in this proceeding about value to them of trying to take Storable's customers?

A. So --

Q. Even at the higher end?

A. Yes, Mr. Manes said that he is still willing to pay that because it's worth it.

Q. What about for Mr. Kinet?

A. So, this is -- Mr. Kinet said that -- and then actually Mr. Stein today also confirmed that 65 to 70 percent of all the new customers they sign up every month are coming from Storable platforms. To me, that's not surprising because the ones that are our customers are more valuable because they are better at selling tenant insurance and they are going to benefit more from this type of offering that they have. And

87

THE STATE OF TEXAS:

TEXAS BUSINESS COURTS:


## CERTIFICATE OF COURT REPORTER

I, DONNA A. GOREE, Official Court Reporter in and for the Texas Business Courts, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-entitled and numbered cause, all of which occurred in open court and were stenographically reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND on this the 12th day of March, 2025.


/s/ *Donna Goree*
_____
DONNA A. GOREE, CSR, RPR, CRR
Official Court Reporter
Texas Business Courts
3721 Carmen Avenue
Rancho Viejo, Texas 78575
(979) 533-0422
donna.goree.csr3909@gmail.com
Texas Certification No. 3909
Expiration Date: 07/31/2025

# Exhibit D

**The Business Court of Texas,
Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § § | |
| *Plaintiff,* | § § | |
| *v.* | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § § | |
| *Defendants.* | § § | |

**SUPPLEMENTAL DECLARATION OF CHARLES GORDON IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL RECONSIDERATION OF THE COURT'S MAY 28, 2025 DISCOVERY ORDER**

1. My name is Charles Gordon, my date of birth is February 23, 1987, and my business address is 10900 Research Blvd Ste 160C PMB 3099, Austin, Texas 78759. I submit this supplemental declaration in support of Defendants' Motion for Reconsideration of the Court's May 28, 2025 Discovery Order. I am of sound mind and competent to make the statements in this declaration.

2. I am CEO of Defendant Storable, Inc. ("Storable"), which is the parent company of the other named Defendants in this action. I co-founded Storable and have served as CEO of Storable since its founding. As part of my job responsibilities, I am familiar with the types of information that Storable keeps confidential and which, if made public, could materially harm Storable's business or ability to compete in the marketplace.

3. I understand that Storable is asking the Court to reconsider its order that Storable produce documents sufficient to show the name, city, state, and ZIP code of all self-storage facilities using Storable's FMS platforms as of December 30, 2024. This information effectively constitutes Storable's FMS customer list (the "Facility List" or "List").

4. I also understand that SafeLease has claimed in its filings that the Storable customers on its Facilities List are "readily ascertainable." Plaintiff's Resp. to Mot. for Partial Reconsideration of May 28 Order at 7. This is false.

5. The List is one of Storable's most valuable and protected assets. It is not publicly known or available and cannot be ascertained from other generally available sources. While publicly available websites and databases that are designed to be searchable as a tool to locate a self-storage facility near a prospective customer, such as Google or Sparefoot, can be used to find self-storage facilities, these sources do not indicate whether those facilities use FMS or, if they do, which company's FMS they use. The value to Storable in maintaining the secrecy of its Facility List is not that self-storage facilities cannot be identified through other sources, but rather because the list indicates which of those facilities are specifically Storable's FMS customers. If disclosed,

the List would empower Storable's competitors to pinpoint exactly which facilities use Storable's FMS platforms, which of Storable's FMS products they use, and which facilities pay the prices that Storable charges. This is a trade secret of ours and the kind of information that Storable's competitors could not obtain through any other means. The List would enable Storable's competitors to compete unfairly based on information they otherwise would never have access to, including stealing Storable's customers by undercutting Storable's prices. This kind of unfair competition using Storable's confidential trade secret would threaten Storable's business and relationships with its customers.

6. Similarly, I understand that SafeLease has further claimed in its filings that Storable's Facility List is not a trade secret because the identities of its customers do not have economic value to third parties, or to Storable in preventing third parties from obtaining that information. Plaintiff's Resp. to Mot. for Partial Reconsideration of May 28 Order at 7. This too is incorrect.

7. Storable (and its affiliated operating entities) have spent considerable time and resources over more than a decade developing and maintaining the FMS customer base reflected in its Facility List. Storable has also invested significantly in developing and maintaining API connections that enable its FMS customers to connect to a wide range of third-party service providers, including other tenant insurance companies. Storable has also invested in building its business for ancillary products with its FMS customers. As to tenant insurance, Storable has spent years investing in educating its FMS facility customers about the benefits of tenant insurance, setting up their tenant insurance platforms, training them on how to amend tenant leases to incorporate tenant insurance, and helping them improve insurance enrollment rates, among other things.

8. Storable's FMS customers have benefitted from these investments by enabling them to run their self-storage facilities more efficiently and to seamlessly connect with third-party service providers that have integrated into Storable's FMS using an API. For the Storable FMS customers that also use Storable's tenant insurance products, Storable's investments have helped facilities increase their insurance enrollment rates and earn more revenue.

9. Storable's investments in its FMS platform, its integration partners, and its tenant insurance business make Storable's FMS customers more valuable sales targets for Storable's competitors compared to self-storage facilities that are not Storable FMS customers. The List, if disclosed, would reveal to Storable's FMS competitors not only which facilities are Storable FMS customers but also indicate that these facilities are likely to be more valuable customers due to Storable's investment in these specific customers and the systems that support their businesses. Moreover, a third-party service provider that is integrated into Storable's FMS and competes with Storable could readily use the List to target new customers or steal existing Storable customers, which are customers that would have greater value to such a competitor than those it might find through public searches.

10. Should the Court require further information or have questions regarding Storable's FMS Facility List, or why the List is Storable's trade secret, I am willing to provide further testimony for the Court's assistance.

2

Docusign Envelope ID: 75AC238B-D464-49E0-8D39-6B8BC420838F

**1068**

I declare under the penalty of perjury that the foregoing is true and correct.

Executed in Austin, Texas, on the 21st day of June, 2025.

DocuSigned by:

*Charles Gordon*

B921BB50FAAA469...

Charles Gordon

3

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Grace Ojionuka on behalf of Katherine Ginzburg Treistman
Bar No. 796632
Grace.Ojionuka@arnoldporter.com
Envelope ID: 102281428
Filing Code Description: No Fee Documents
Filing Description: Storable???s Reply in Support of its Motion for Partial Reconsideration of the May 28, 2025 Discovery Order
Status as of 6/23/2025 9:09 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
| --- | --- | --- | --- | --- |
| Ray TTorgerson | | rtorgerson@porterhedges.com | 6/23/2025 8:28:38 AM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 6/23/2025 8:28:38 AM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 6/23/2025 8:28:38 AM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 6/23/2025 8:28:38 AM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 6/23/2025 8:28:38 AM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 6/23/2025 8:28:38 AM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 6/23/2025 8:28:38 AM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 6/23/2025 8:28:38 AM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 6/23/2025 8:28:38 AM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 6/23/2025 8:28:38 AM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 6/23/2025 8:28:38 AM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 6/23/2025 8:28:38 AM | SENT |
| Judd Stone | | Judd@stonehilton.com | 6/23/2025 8:28:38 AM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 6/23/2025 8:28:38 AM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 6/23/2025 8:28:38 AM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 6/23/2025 8:28:38 AM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 6/23/2025 8:28:38 AM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 6/23/2025 8:28:38 AM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 6/23/2025 8:28:38 AM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 6/23/2025 8:28:38 AM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 6/23/2025 8:28:38 AM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/23/2025 8:28:38 AM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Grace Ojionuka on behalf of Katherine Ginzburg Treistman
Bar No. 796632
Grace.Ojionuka@arnoldporter.com
Envelope ID: 102281428
Filing Code Description: No Fee Documents
Filing Description: Storable???s Reply in Support of its Motion for Partial Reconsideration of the May 28, 2025 Discovery Order
Status as of 6/23/2025 9:09 AM CST

Case Contacts

| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/23/2025 8:28:38 AM | SENT |
|---|---|---|---|---|
| Cathy Hodges | | catherine.hodges@aporter.com | 6/23/2025 8:28:38 AM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 6/23/2025 8:28:38 AM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 6/23/2025 8:28:38 AM | SENT |
| Adam Locke | | adam@lockelaw.com | 6/23/2025 8:28:38 AM | SENT |
| John Holler | | john.holler@arnoldporter.com | 6/23/2025 8:28:38 AM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 6/23/2025 8:28:38 AM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 6/23/2025 8:28:38 AM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 6/23/2025 8:28:38 AM | SENT |
| Julia C.Risley | | jrisley@yettercoleman.com | 6/23/2025 8:28:38 AM | SENT |

**The Business Court of Texas**
**Third Division**

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § § | |
| *Defendants*. | § | |

## PLAINTIFF'S RESPONSE TO MOTION FOR EXTENSION OF STAY

Defendants ask to revisit another order. In their latest motion for reconsideration, styled as a motion to extend, they challenge the order staying production of their FMS customer list. And, again, they raise nothing new. Like before, they say the information may be irrelevant if their MSJ were granted. This is a rerun argument. The Court was aware of how the briefing for pending motions will overlap when it set the deadlines and when the stay would expire. Presenting nothing new in law, facts, or even arguments, this motion should be denied.

### ARGUMENT AND AUTHORITIES

It is "not an abuse of discretion to refuse" a motion to reconsider. *In re GreatAmerica Leasing Corp.*, 294 S.W.3d 912, 915 n.2 (Tex. App.—Corpus Christi 2009, no pet.) (orig. proc.). This is especially true when the motion raises no new facts. *See Macy v. Waste Mgmt., Inc.*, 294 S.W.3d 638, 651 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). "When there exists no independent reason for reconsideration other than mere disagreement with a prior order, reconsideration is a waste of judicial time and resources and should not be granted." *Blythe v. Offshore Serv. Vessels, L.L.C.*, 423 F. Supp. 3d 299, 304 (E.D. La. 2019).

A litigant wastes judicial and party resources by relitigating issues already considered and decided. This motion fits that bill. It should be denied for many reasons. Here are four.

*First*, the Court considered the pending MSJ when it granted the stay. Defendants disagree with the stay timing, but nothing has changed since the Court decided this issue the first time. Here, defendants again want to "extend the stay . . . until after a decision" on their MSJ because "ordering production of the list, which is a trade secret, is not necessary and would be in error." Mot. at 5-6. They sought the *same* thing for the *same* reason in their motion to stay 17 days ago, asking for a stay of the June 13 production deadline because if the Court grants the MSJ "the need for production of the customer list will become moot." Emerg. Mot. to Stay at 4, 6. The Court considered this point and stayed production through June 24. Defendants' new motion offers "mere disagreement" with that decision, so "reconsideration is a waste of judicial time and resources." *Blythe*, 423 F. Supp. 3d at 304.

*Second*, no rule or law freezes discovery while an MSJ is pending. Defendants cite no authority that says otherwise. To be sure, a court may issue a protective order "in the interest of justice," as defendants note. Mot. at 4. But no one is seeking a protective order, which had to be done "within the time permitted for response to the discovery request." Tex. R. Civ. P. 192.6(b). That time is long past. And the interests of justice and common-sense case management practices cut the other way. A policy of halting discovery just because an MSJ is pending would allow litigants to use such motions to avoid discovery and inject needless delay into cases. This would not serve the interests of justice or efficiency.

*Third*, this repeat request for more delay because of defendants' claim that the list isn't "necessary" to decide its MSJ—and hence that ordering production would be error—assumes that the customer list is a trade secret, which is wrong. Defendants have not proven that their list is a trade secret, and by failing to timely assert this privilege, they waived it anyway. *See* Resp. to Mot. to Reconsider (June 19, 2025). Because the list isn't a trade secret, defendants' denial that the list

is needed to fairly decide the MSJ is inapposite. *See In re. Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 613 (Tex. 1998) (no burden to show information is "necessary for a fair adjudication" of the party's claims until resisting party "establish[es] that the information is a trade secret").

Moreover, even if the necessary-for-a-fair-decision analysis were applicable here, defendants misunderstand it. That analysis asks whether evidence is needed to decide the requesting party's "claims"—not a *motion*. *Id.* The analysis is done once, in deciding whether information is a trade secret and, if so, whether production is necessary to decide a claim. *See id.* Here, defendants hope to turn a one-time analysis about a claim as a whole into an ongoing one about each motion a party files. This would in effect allow a party to perpetually delay discovery by filing motion after motion that doesn't implicate the trade-secret information—e.g., alleging dispositive procedural defects or the lack of personal or subject-matter jurisdiction—forcing a court to decide over and over whether the information is needed to resolve each motion before it can order production. But that is not how the analysis is done. So a court's order compelling production of a trade secret because it is needed to fairly decide a *claim* isn't later transformed into error whenever a party files a *motion* that can (allegedly) be resolved without the trade secret. Defendants cite no case law to the contrary. *See* Mot. at 4-6

In any event, defendants are wrong that the customer list isn't needed to fairly decide their MSJ. As SafeLease has explained, the list is important evidence for assessing FMS market share. Resp. to Mot. to Reconsider Discovery Order at 8-9. Defendants have a dangerous probability of monopolizing the insurance market because of their FMS market dominance, which they can and did leverage to limit competition in the insurance market. Understanding the extent of defendants' FMS dominance—and having hard evidence to back this understanding—is critical to fairly assess the elements they challenge in their MSJ. *See* Mot. at 3. This and other evidence, plus expert

analysis, is needed from the discovery process to combat defendants' "no evidence" or "zero evidence" points, despite their odd denial of making such points. Mot. at 5 n.2.

*Fourth*, a longer stay will not save anyone's resources. If defendants have to produce their customer list, they plan to petition for mandamus relief. Emerg. Mot. for Stay at 3 (defendants "will have to pursue a petition for writ of mandamus"). Extending the stay won't save resources; it will only delay the inevitable. Indeed, it simply may invite another round of motions when *that* stay is about to expire.

The motion raises nothing new in law or fact. An extension of the stay is not supported by the law, is not grounded in any established privilege, would deprive SafeLease of evidence needed for its summary judgment opposition, and would not serve the interests of justice or judicial efficiency. The motion should be denied.

<div align="center">CONCLUSION</div>

The Court should deny defendants' motion for extension of stay.

Date: June 23, 2025                                    Respectfully submitted,

                                                      */s/ R. Paul Yetter*

Judd E. Stone II                                      R. Paul Yetter
State Bar No. 24076720                                State Bar No. 22154200
judd@stonehilton.com                                  pyetter@yettercoleman.com
Christopher D. Hilton                                 Susanna R. Allen
State Bar No. 24087727                                State Bar No. 24126616
chris@stonehilton.com                                 sallen@yettercoleman.com
Alexander M. Dvorscak                                 Luke A. Schamel
State Bar No. 24120461                                State Bar No. 24106403
alex@stonehilton.com                                  lschamel@yettercoleman.com
STONE HILTON PLLC                                     Shannon N. Smith
600 Congress Ave.                                     State Bar No. 24110378
Austin, Texas 78748                                   ssmith@yettercoleman.com
(737) 465-3897                                        Julia C. Risley
                                                      State Bar No. 24132932
Adam T. Locke                                         jrisley@yettercoleman.com
State Bar No. 24083184                                YETTER COLEMAN LLP
adam@lockelaw.com                                     811 Main Street, Suite 4100
LOCKELAW PLLC                                         Houston, Texas 77002
2617 Bissonnet Street, Suite 503                      (713) 632-8000
Houston, Texas 77005
(713) 832-0243

                                                      ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I certify that this brief was served on all counsel of record via the Court's e-filing service and by email on June 23, 2025.

                        */s/ Luke Schamel*
                        Luke Schamel

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with Local Rule 5(a) and contains 1,110 words, not including any case caption, index, table of contents or authorities, signature blocks, attached evidence, or required certificates.

                        */s/ Luke Schamel*
                        Luke Schamel



## The Business Court of Texas, Third Division

| | | |
|---|---|---|
| SAFELEASE INSURANCE SERVICES LLC, | § § § § | |
| *Plaintiff,* | § | |
| v. | § | Cause No. 25-BC03A-0001 |
| STORABLE, INC., et al., | § § | |
| *Defendants.* | § § | |

### Order on Motions for Reconsideration; Other Relief

Before the Court are Storable's Motion for Reconsideration of the Court's April 15, 2025 Order Denying Modification of the Protective Order and Storable's Motion for Partial Reconsideration of the Court's May 28, 2025 Discovery Order (collectively, the Motions). The Court **DENIES** both Motions but elects to provide Storable with other relief detailed below. The Court therefore **ORDERS** as follows:

1.    The customer information requested in SafeLease's Request for Production (RFP) No. 10 qualifies for OCEO protection under the Agreed Protective Order in this case.

2.     For purposes of Storable's production in response to RFP No. 10 only, Mr. Locke will be excluded from the attorneys of record permitted to view OCEO material under the Agreed Protective Order.[1]

3.     For all other OCEO material, Mr. Locke may continue to have access as an attorney of record in this case.

4.     Consistent with the offer in his March 26, 2025 letter, Mr. Locke must refrain from participating in any future business negotiations between SafeLease and Storable that are outside the context of legal disputes or potential settlements of legal disputes, unless all parties agree otherwise.

Date signed: June 23, 2025.


_____
Hon. Melissa Andrews
Judge of the Texas Business Court,
Third Division

---

[1] This precaution in no way reflects on the integrity or professionalism of Mr. Locke, which the Court does not question.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 102291622
Filing Code Description: No Fee Documents
Filing Description: Order on Motions to Reconsider
Status as of 6/23/2025 10:54 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Ray TTorgerson | | rtorgerson@porterhedges.com | 6/23/2025 10:47:25 AM | SENT |
| Delonda Dean | | ddean@yettercoleman.com | 6/23/2025 10:47:25 AM | SENT |
| Yetter Coleman | | efile@yettercoleman.com | 6/23/2025 10:47:25 AM | SENT |
| Carolyn Reed | | creed@porterhedges.com | 6/23/2025 10:47:25 AM | SENT |
| Courtney Smith | | csmith@yettercoleman.com | 6/23/2025 10:47:25 AM | SENT |
| Melissa Sanchez | | Melissa.Sanchez@arnoldporter.com | 6/23/2025 10:47:25 AM | SENT |
| Edockets Calendaring | | eDocketsCalendaring@arnoldporter.com | 6/23/2025 10:47:25 AM | SENT |
| Andrew Bergman | | andrew.bergman@arnoldporter.com | 6/23/2025 10:47:25 AM | SENT |
| Elizabeth FEoff | | leoff@porterhedges.com | 6/23/2025 10:47:25 AM | SENT |
| Katherine G.Treistman | | Katherine.Treistman@arnoldporter.com | 6/23/2025 10:47:25 AM | SENT |
| Luke A.Schamel | | lschamel@yettercoleman.com | 6/23/2025 10:47:25 AM | SENT |
| Christopher Hilton | | chris@stonehilton.com | 6/23/2025 10:47:25 AM | SENT |
| Judd Stone | | Judd@stonehilton.com | 6/23/2025 10:47:25 AM | SENT |
| Alyssa Smith | | asmith@yettercoleman.com | 6/23/2025 10:47:25 AM | SENT |
| Bonnie Chester | | bonnie@stonehilton.com | 6/23/2025 10:47:25 AM | SENT |
| Jonna NSummers | | jsummers@porterhedges.com | 6/23/2025 10:47:25 AM | SENT |
| Lakshmi NKumar | | lkumar@porterhedges.com | 6/23/2025 10:47:25 AM | SENT |
| R. PaulYetter | | pyetter@yettercoleman.com | 6/23/2025 10:47:25 AM | SENT |
| Susanna R.Allen | | sallen@yettercoleman.com | 6/23/2025 10:47:25 AM | SENT |
| Justin Bernstein | | bernsteinju@gtlaw.com | 6/23/2025 10:47:25 AM | SENT |
| Business Court Division 3A | | bcdivision3a@txcourts.gov | 6/23/2025 10:47:25 AM | SENT |
| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/23/2025 10:47:25 AM | SENT |

# **Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 102291622
Filing Code Description: No Fee Documents
Filing Description: Order on Motions to Reconsider
Status as of 6/23/2025 10:54 AM CST

Case Contacts

| Dolores Brunelle | | dbrunelle@porterhedges.com | 6/23/2025 10:47:25 AM | SENT |
| --- | --- | --- | --- | --- |
| Cathy Hodges | | catherine.hodges@aporter.com | 6/23/2025 10:47:25 AM | SENT |
| Mikaila Skaroff | | mikaila.skaroff@arnoldporter.com | 6/23/2025 10:47:25 AM | SENT |
| Rosalinda Luna | | rosie@stonehilton.com | 6/23/2025 10:47:25 AM | SENT |
| Adam Locke | | adam@lockelaw.com | 6/23/2025 10:47:25 AM | SENT |
| John Holler | | john.holler@arnoldporter.com | 6/23/2025 10:47:25 AM | SENT |
| Alexander Dvorscak | | alex@stonehilton.com | 6/23/2025 10:47:25 AM | SENT |
| Shannon Smith | | ssmith@yettercoleman.com | 6/23/2025 10:47:25 AM | SENT |
| Dale Wainwright | | dale.wainwright@gtlaw.com | 6/23/2025 10:47:25 AM | SENT |
| Julia C.Risley | | jrisley@yettercoleman.com | 6/23/2025 10:47:25 AM | SENT |